# Exhibit 3

 # DEPARTMENT OF JUSTICE

## CORNERSTONES OF AN
## EFFECTIVE LENIENCY PROGRAM

**By**

**Scott D. Hammond**
**Director of Criminal Enforcement**
**Antitrust Division**
**U.S. Department of Justice**

Presented before the

**ICN Workshop on Leniency Programs**
**Sydney, Australia**

**November 22-23, 2004**

# CORNERSTONES OF AN EFFECTIVE LENIENCY PROGRAM

## I. Introduction

It is truly an honor to be the opening speaker at this first-ever ICN Workshop on Leniency Programs. It is fitting that we devote a full two-day workshop solely to the topic of leniency, because the advent of leniency programs has completely transformed the way competition authorities around the world detect, investigate, and deter cartels. An effective leniency program will lead cartel members to confess their conduct to authorities even before an investigation is opened. In other cases, it will induce organizations already under investigation to abandon the cartel stonewall, race to the government, and provide evidence against the other cartel members. Leniency programs have led to the detection and dismantling of the largest global cartels ever prosecuted and resulted in record-breaking fines in the United States, Canada, the EU and other jurisdictions. In the United States alone, companies have been fined over $2.5 billion dollars for antitrust crimes since 1997, with over 90 percent of this total tied to investigations assisted by leniency applicants. And there is more to come. Currently, the Division is investigating over 50 suspected international cartels operating on six continents. More than half of these investigations were initiated or are being advanced by information received from a leniency applicant.

The preceding two-day ICN Cartels Workshop covered a wide array of investigative practices used for cracking cartels. While these techniques are not available in every jurisdiction, Antitrust Division prosecutors are fortunate to have a full arsenal of tools at their disposal. Our investigations are assisted by highly trained FBI agents skilled in interview and interrogation techniques. Individuals face possible jail sentences for violating U.S. antitrust laws

and are therefore often motivated to confess and cooperate in our investigations in exchange for reduced penalties. With the cooperation of "insiders," we are able to secretly record incriminating calls or meetings among cartel members. Other available investigative powers include the power to compel individuals to provide sworn oral testimony, the assistance of INTERPOL and national immigration authorities to track, question, detain, and possibly extradite cartel members, and the execution of search warrants on corporate offices as well as the homes of cartel members. While all of these tools are valuable and frequently utilized in our investigations, the fact is that the U.S. Corporate Leniency Program has directly led to the detection and successful prosecution of more international cartels than all of these other powers combined. Unquestionably, leniency programs are the greatest investigative tool ever designed to fight cartels.

While some investigative techniques, such as taping cartel meetings or searching private homes, are not available in every jurisdiction, leniency programs can *potentially* be utilized in any jurisdiction regardless of whether cartel activity is treated as a criminal, civil or administrative offense. I say potentially available, because a jurisdiction must meet a number of criteria before it can institute a leniency program that works. Creating a program on paper is the easy part. However, implementing an *effective* leniency program – one that the business community and the private bar have confidence in and will rush to take advantage of – is much harder.

Creating an effective leniency program is what I will talk about, and it is really, in essence, the theme of this entire Workshop. How do you build a leniency program that will cause a company to come forward and voluntarily report its participation in a cartel that has gone

2

previously undetected? What inducements and concessions must a competition authority be willing to make to overcome the perceived risks and costs to the company of reporting the violation? How do you create an enforcement regime that causes management to conclude after it discovers a violation that it has but one viable option – the company must self-report and cooperate or face certain and severe penalties?

Together we will try to answer these questions by sharing our experiences with not only what works but, perhaps more importantly, what has not and what will not work. For example, government speakers from the United States, Canada, and the EU – the three jurisdictions with the most experience and most success with leniency programs – have experience with earlier versions of leniency programs that were fundamentally flawed and were not successful. These programs lacked transparency, were unpredictable, and failed to provide the necessary incentives and induce self-reporting and cooperation. For example, the original version of the U.S. Corporate Leniency Program dates back to 1978. Until the current program was revised in 1993, we received only one leniency application per year, and the original program did not lead to the detection of a single international cartel – not one. We learned some lessons the hard way and revised the program in 1993.[1] We made it more transparent and increased the opportunities and

---

[1] Under the 1978 program, violators who came forward and reported their illegal activity before an investigation was underway were *eligible* to receive a complete pass from criminal prosecution. The grant of amnesty, however, was not automatic and the Division retained substantial prosecutorial discretion in the decision-making process. In 1993, the Division dramatically expanded its Amnesty Program to increase the opportunities and raise the incentives for companies to report criminal activity and cooperate with the Division. The Amnesty Program was revised in three major respects. First, the policy was changed to ensure that amnesty is *automatic* if there is no pre-existing investigation. That is, if a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is certain and is not subject to the exercise of prosecutorial discretion. Second, the Division created an alternative amnesty, whereby amnesty is available even if cooperation begins *after* an investigation is underway. Third, if a corporation qualifies for automatic amnesty, then all directors, officers, and employees who come forward with the corporation and agree to cooperate also receive

raised the incentives for companies to report criminal activity and cooperate with the Division. Since then, there has been a nearly twenty-fold increase in the application rate, and it has resulted in the cracking of dozens of large international cartels.

Equally important is the experience that the Non-Governmental Advisors (NGAs) bring to this Workshop. They will provide valuable insight on what matters most in the board rooms where the decisions on whether to report are weighed. They know first-hand what it takes to induce a company to turn itself in. They also appreciate what disincentives in a program will cause a company not to report a violation and choose instead to gamble that enforcers will never be able to build a case against it. Our NGA speakers have observed both outcomes, so they know what is required to convince a company to put its trust (and potentially the future of the company and its employees) in the hands of the authorities who are administering a leniency program.

My presentation this morning will focus on three prerequisites for adopting and implementing an effective leniency program. These prerequisites are essential cornerstones that must be in place before a jurisdiction can successfully implement a leniency program. First, the

---

automatic amnesty. For a fuller discussion of these changes and the application of the Division's Corporate Leniency Policy see Antitrust Division, U.S. Department of Justice Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/atr/public/guidelines/0091.htm; "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998), *available at* http://www.usdoj.gov/atr/public/speeches/1626.htm; "Making Companies An Offer They Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999), *available at* http://www.usdoj.gov/atr/public/speeches/2247.htm; "Detecting And Deterring Cartel Activity Through An Effective Leniency Program," speech by Scott D. Hammond, before International Workshop on Cartels (November 21-22, 2000), *available at* http://www.usdoj.gov/atr/public/speeches/9928.htm; "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," speech by Scott D. Hammond, Fifteenth Annual National Institute On White Collar Crime (March 8, 2001), *available at* http://www.usdoj.gov/atr/public/speeches/7647.htm.

4

jurisdiction's antitrust laws must provide the threat of severe sanctions for those who participate in hardcore cartel activity and fail to self-report. Second, organizations must perceive a high risk of detection by antitrust authorities if they do not self-report. Third, there must be transparency and predictability to the greatest extent possible throughout a jurisdiction's cartel enforcement program, so that companies can predict with a high degree of certainty how they will be treated if they seek leniency and what the consequences will be if they do not. These three major cornerstones – severe sanctions, heightened fear of detection, and transparency in enforcement policies – are the indispensable components of every effective leniency program.

However, before addressing these prerequisites, it is important that I be clear on some terminology. In the United States, the terms corporate immunity, corporate leniency, and corporate amnesty are all synonymous. Under the U.S. Corporate Leniency Program, these terms all refer to a complete pass from criminal prosecution or total immunity for a company and its cooperating employees. The company pays no fine. Their culpable executives do not go to jail. The key is that only one company can qualify for leniency. A company that is second in the door – even if by only a matter of days or hours, as has been the case on a number of occasions – will not be eligible for leniency. Companies that come forward after the leniency applicant and offer to cooperate may enter into plea agreements and have their fines reduced, but this process falls outside of our leniency program. When I use the term "leniency" or "amnesty," I am referring to a company that is the first to report anticompetitive activity and that is seeking a pass from prosecution and a 100% reduction in fines.

A number of other leniency programs, including, notably, the EU's, operate a little differently.[2] So it is possible to confuse the terminology. Like the U.S. policy, the EU's program offers the promise of a 100 percent reduction or full immunity from fines for a company that self-reports. However, the EU's Notice also applies to companies that do not win the race for full immunity, but still cooperate with an investigation and earn merely a reduction in fines. It is my understanding that, informally, when the EU uses the term "immunity" it refers to full immunity (or 100 percent reduction in fines), and a reference to "leniency" includes cases where a company is not awarded full immunity, but earns a reduction in fine (50 percent or less reduction in fines). When I use the terms "amnesty" or "leniency" in my presentation, however , I will be referring to full immunity.

## II. The Threat Of Severe Sanctions

The first prerequisite to creating an effective amnesty program is the threat of severe sanctions for those who lose the race for amnesty. Since cartel activity is treated as a criminal, civil, and/or administrative offense depending on the jurisdiction, authorities around the world rely on a range of sanctions and then apply these sanctions with varying degrees of severity. So how does one determine what constitutes a severe sanction?

I think most people would agree that the threat of criminal sanctions and individual jail sentences passes the test and provides the foundation for an effective leniency program.[3] Most

---

[2] See Commission Notice on Immunity from Fines and Reduction of Fines in Cartel Cases, 2002 O.J. (C 45) 3.

[3] For example, the United States treats hardcore cartel offenses -- such as price-fixing, bid-rigging, and customer- and market-allocation agreements -- as felony crimes. Individuals and corporations are subject to prosecution. On June 22, 2004, the U.S. criminal antitrust statute was amended to raise the statutory maximum jail sentence for individuals from three years to ten years.

jurisdictions, however, do not treat hardcore cartel activity as a crime, and they do not prosecute individual participants as criminals. That raises the issue whether a jurisdiction can have a successful amnesty program if it does not treat cartel offenses as a crime and does not put offending executives in jail? My answer is yes; it is possible to have an effective amnesty program outside of a criminal antitrust regime. However, there are, in my opinion, two significant caveats. One, if a jurisdiction relies primarily on financial penalties alone to sanction cartel conduct, then the fines must be severely punitive if they are going to attract amnesty applicants. Two, all else being equal, a jurisdiction without individual liability and criminal sanctions will never be *as effective* at inducing amnesty applications as a program that does.

The Perceived Risks Must Outweigh The Potential Rewards. Regardless of whether a cartel is subject to criminal or administrative sanctions, it is axiomatic that cartel activity will not be adequately deterred nor reported if the potential penalties are perceived by firms and their executives as outweighed by the potential rewards. How punitive do the fines need to be to induce amnesty applications? I don't know of any formula, but the fine levels currently being imposed by the EU provide a good model.

The administrative fines currently being imposed by the EU are significantly greater than the criminal fines being imposed for conduct of similar scope in the United States. That is true not just in terms of the total fines imposed but, more importantly, also in terms of the relative level of the fines in proportion to the amount of commerce affected by the company's participation in each jurisdiction. In the United States, companies that fail to provide timely

---

Individuals also face fines of up to $1 million or higher. Corporate criminal fines can and often can exceed $100 million. For example, F. Hoffmann-La Roche ("HLR") was fined $500 million for its role in the vitamin cartel. In addition to being the highest antitrust fine, the HLR fine is also the highest criminal fine ever obtained in the United States against any defendant under any criminal statute.

cooperation often pay fines that amount to 30 percent or more of the revenue generated by the sale of the price-fixed product or service during the entire duration of the conspiracy. Fines in Canada are similar in magnitude. In Europe, latecomers can expect to pay much more. In terms of deterrence, that makes absolute sense. The EU does not have criminal powers. It can not put individual offenders in jail. So, it relies on the threat of heavy fines to deter cartels and induce amnesty applications. For jurisdictions that do not have criminal sanctions and rely solely on civil or administrative fines, the EU is a model of success. However, be advised, that if a jurisdiction relies on fines alone to deter cartel activity, and it is not able to obtain fines of the same *relative magnitude* as the EU, then it may not be able to attract amnesty applicants. Fines must be sufficiently punitive that they will not be viewed simply as a tax or a cost of doing business.

Criminal Sanctions Provide The Greatest Inducement To Cooperation. A few moments ago, I said that, all else being equal, a jurisdiction without individual liability and criminal sanctions will never be *as effective* at inducing amnesty applications as a program that does. Individuals stand the most to lose and so avoiding jail sentences is the greatest incentive for seeking amnesty. Common sense suggests that the threat of individual exposure will tilt the balance at the margins such that some companies will report violations that they would not otherwise have reported if they were only facing financial penalties. However, this view is informed by more than common sense.

We are observing firsthand in some of our investigations how the threat of criminal prosecution in the United States has deterred a significant number of global cartels from extending their conspiracy into the United States. We have uncovered cartels that operated

8

profitably and illegally in Europe, Asia, and elsewhere around the world, but did not expand

their cartel activity to the United States solely because it was not worth the risk of U.S.

sanctions. I am referring to cartels that had every opportunity to target U.S. consumers, because

they sold in the U.S. market. Indeed, in some cases, the U.S. market was the largest and

potentially most profitable but the collusive conduct still ceased at the border. Why? The

answer, from the mouths of the cartel members and verified by our investigators, is that the

executives did not want to risk getting caught and going to jail in the United States.

This specific gerrymandering of collusive activities should come as no surprise, because

hardcore cartel activity is pure premeditated conduct. We routinely find evidence that cartel

members know full well they are breaking the law. They discuss the need to be careful and to

conceal their activity. They adopt code names, use prepaid calling cards, stash incriminating

documents in attics, falsify documents, and take other steps to avoid detection. However, in the

cases that I am referring to, the cartel members weighed the risks of breaking laws around the

world and decided that the United States was one country where they were unwilling to cross

over the line. They were simply not willing to risk going to jail!

### III.  Fear Of Detection

The second prerequisite to building an effective amnesty program is instilling a genuine

fear of detection. If firms perceive the risk of being caught by antitrust authorities as very small,

then stiff maximum penalties will not be sufficient to deter cartel activity. Likewise, if cartel

members do not fear detection, they will not be inclined to report their wrongdoing to authorities

in exchange for amnesty. Therefore, antitrust authorities must cultivate an environment in which

business executives perceive a significant risk of detection by antitrust authorities if they either enter into, or continue to engage in, cartel activity.

The Race To The Courthouse. To achieve this objective, it is critical that cartel investigators have access to every available law enforcement power to ensure that "crime in the suites" is treated the same as crime in the streets. The more anxious a company is about the fact that its cartel participation may be discovered by the government, the more likely it is to report its wrongdoing in exchange for amnesty. If cartel members perceive a genuine risk of detection, then an amnesty program can build on that fear and create distrust and panic among the cartel members. The cartel members can no longer afford to trust one another. The rewards for self-reporting are too great, the consequences of getting caught too severe. The dynamic literally creates a race to be the first to the enforcer's office.

For example, consider a scenario where five members of a cartel are scheduled to hold an emergency meeting. When the meeting starts, there is an empty seat at the table. One of the conspirators has not returned calls and has unexpectedly not arrived at the meeting. One of the cartel members at the meeting starts to get nervous. Has the missing cartel member had a change of heart and abandoned the cartel? Has he already reported the others to the government? Or did he just miss his plane? In this environment, with the risk of detection and the stakes so high, who can you trust? Each member of a cartel knows that any one of its co-conspirators can report the others in exchange for total amnesty – a decision that will seal their fate. Imagine the vulnerability of being in that position and asking yourself, "Can I really trust my competitors to look out for my best interests?"

The U.S. Individual Leniency Policy. If a company detects a violation and its' employees are subject to individual jail sentences (in *at least one* of the jurisdictions where the offense was committed), then the company is not only in a race with its competitors but also with its culpable employees, since they have the most to lose. The Individual Leniency Program is available to individuals who approach the Division on their own behalf, not part of a company proffer or confession, and report anticompetitive activity.[4] Individuals who cooperate through this Program receive amnesty and a promise of non-prosecution for the anticompetitive activity they report. While we do not receive individual amnesty applications at the same rate as company applications, the individual amnesty program helps prevent companies from covering up their misconduct. *The real value and measure of the Individual Leniency Program is not in the number of individual applications we receive, but in the number of corporate applications it generates.* It works because it acts as a watchdog to ensure that companies report the conduct themselves.

It is easy to imagine how the threat of jail sentences for culpable executives can alter a corporation's decision whether to self-report. This would obviously occur when the individuals who influence or make the decision whether to report are the same ones who face jail time if they do not win the race for amnesty. Additionally, it will take place any time the individuals with exposure are valued by the company. However, self-preservation or humanitarian concerns are *not* the only factors at play here. The threat of individual exposure can tilt the balance and

---

[4] See, U.S. Department of Justice Individual Leniency Policy (1994), *available at* http://www.usdoj.gov/atr/public/guidelines/0092.htm.

cause a company to seek amnesty even in the absence of personal exposure by the company's decision makers. Let me give you an example.

Creating A Race Between The Company And Its Employee. Imagine the not uncommon scenario in which upper management first becomes aware of price fixing by one of its employees when a lower-level employee, say a secretary, reports the wrongdoing to the general counsel as part of a compliance audit. The secretary confesses to the general counsel that, at the direction of her superior, she has forwarded and placed calls to and from competitors, faxed draft price sheets to a competitor, and observed other suspicious conduct by her boss. Assume further that, after conducting a discrete internal investigation, management concludes that the executive has been fixing prices with competitors and would like nothing more than to immediately fire the errant executive who disregarded stated company policy and engaged in cartel activity. Finally, assume that no one in a position to influence the decision whether to self-report was involved in the conduct in any way, and therefore that none of the decision makers are at personal risk. Thus, self-preservation and humanitarian concerns are not at issue in this set of facts. So is the decision whether or not to seek *corporate* amnesty influenced by the fact that the disfavored executive faces potential individual criminal exposure? Absolutely. So long as one of its employees has individual exposure, the company remains at great risk. If the company self-reports the conduct under the Corporate Leniency Policy, then the company and all of its cooperating executives will avoid criminal prosecution. However, if the company delays or decides not to report, then the company puts itself in a race for leniency with its own employees.[5]

---

[5] As noted above in the "empty chair" example, once the company terminates the executive's participation in the cartel and it withdraws from the cartel, it will send a signal to competitors that the race for leniency is on for them as well, and the company will be at even greater risk if it does not promptly report the activity.

In this example, if the company does not report the conduct first, then the executive may come forward on his own and report the conduct for his own protection, thereby potentially leaving the company out in the cold. Obviously, if the executive is fired and becomes disgruntled, the likelihood that he will report the conduct increases. If the secretary gets nervous, say, after talking to a relative who convinces her that she has real criminal exposure for her own conduct, she may decide to report the conduct. Alternatively, if the secretary simply becomes disillusioned with her career track and decides that she is being retaliated against as a whistle blower, she may decide to report. In every one of these scenarios, we will be there waiting for the executive or the secretary with open arms and a copy of the Division's Individual Leniency Program.

### IV.  <u>Amnesty Plus, Cartel Profiling, And Other Proactive Strategies</u>

Of course, cultivating a fear of detection requires that an authority has a demonstrated track record of detecting cartels.   Next, I want to share with you some of the practices that we have used to solidify the Division's reputation.  As I mentioned earlier, we are currently investigating over 50 suspected international cartels.  Amazingly, over half of these investigations were initiated as a result of leads generated during an investigation of a completely separate market.  What that means is that every time the Antitrust Division opens an international cartel investigation, the chances are better than even that it will also uncover a second, separate conspiracy.  Our success in detecting cartels by "rolling" one investigation into another is a result of a number of proactive strategies that we use for uncovering antitrust offenses.  Before discussing these strategies, however, let me offer two prime examples of the "rollover" pattern.

It has been widely acknowledged that one of the keys to the Division's success in cracking the worldwide vitamin cartel was the cooperation provided by Rhône-Poulenc SA pursuant to its amnesty application.  However, what may not be fully appreciated is that the Division had been investigating the vitamin industry for more than two years before Rhône-Poulenc came forward.  By the time Rhône-Poulenc sought amnesty, the investigation had already uncovered conspiracies to fix prices and allocate smaller vitamin markets, such as naicin, naicinamide, and choline chloride.  These investigations were generating leads that indicated the existence of cartel activity in the massive vitamin A, C, and E markets.  It was the development of these leads that precipitated Rhône-Poulenc's decision to seek amnesty.  With one investigation rolling over into the next, the Division eventually uncovered cartel activity in 12 different vitamin markets.  Our investigation led to the prosecution of 12 companies (three U.S., three German, three Japanese, two Swiss, and one Canadian) and 14 individuals, nearly $1 billion in fines, and the incarceration of 11 executives, including 6 foreign nationals.

The second example involves the fruits of the Division's investigation of the worldwide lysine cartel.  This example is particularly instructive because, while the targeted markets here are not nearly as closely related as they were in the vitamin cases, each investigation led directly to the next.  The connection between the Division's lysine and citric acid investigations is generally known because of the publicity surrounding the prosecution of Archer Daniels Midland and its former high-ranking executives.  However, what is not as evident is that the investigation and prosecution of the international *citric acid* cartel led to the investigation and prosecution of the international *sodium gluconate* cartel, which resulted in the investigation and prosecution of the international *sodium erythorbate* cartel, which, in turn, led to the investigation

14

and prosecution of the *maltol* cartel. In all, 12 companies (three U.S., two Korean; two Japanese; two Swiss; two Dutch; and one French) and 14 individuals from 9 different countries (United States, Korea, Japan, Germany, Switzerland, Austria, Italy, Netherlands, and France) were convicted and paid over $250 million in criminal fines as a result of the these five interconnected investigations.

The Amnesty Plus Program. In response to the recurring patterns described above, the Division has developed a number of proactive strategies for uncovering antitrust offenses. First, the Division has developed a policy called "Amnesty Plus." The policy takes a proactive approach to attracting amnesty applications by encouraging subjects and targets of ongoing investigations to consider whether they may qualify for amnesty in other markets where they compete. So even though a company may not qualify for amnesty for the initial matter under investigation, the value of its assistance in disclosing a second cartel will lead to amnesty for the second offense and a substantial additional reduction (the "plus") in the calculation of the fine for its participation in the first offense. The Division's Amnesty Plus program creates an attractive inducement for encouraging companies who are already under investigation to report the full extent of their antitrust crimes and begin to put the matters behind them.

Cartel Profiling. As indicated from the vitamin and lysine examples discussed above, the Division will not relax and wait for companies to come forward and report new violations. Instead, the Division has had success engaging in "cartel profiling" techniques aimed at ferreting out these violations. The Division will target its proactive efforts in industries where we suspect cartel activity in adjacent markets or which involve one or more common players from other cartels. When we are able to identify culpable executives, we begin digging deeper to determine

15

whether they had pricing authority on other products over time and then for indicia of collusion in those products as well. We might investigate who mentored the culpable executives and what other products they were responsible for overseeing, and we keep digging. We will ask executives, who are subpoenaed and compelled to provide sworn testimony under penalty of perjury, not just about their knowledge of price fixing in the market under investigation, but whether they have any information of any cartel activity in any other markets as well. This last practice is commonly referred to as the "omnibus question."

Companies are aware of our success in uncovering related offenses through the "cartel profiling" technique, and so they often turn the company upside down to try to discover any additional wrongdoing before we do. While this is happening, cartel members in unrelated markets that are not currently under investigation frequently become nervous as well. For example, assume we are investigating Corporations A, B, and C for price fixing on product one. Unknown yet to the government, A and B may have also fixed prices with companies X and Y on a totally unrelated product. With the overlap of two companies under investigation in a second product market, you can bet that we will take a look at the second product market as well for possible collusion. Even if there was no overlap in companies between the two markets, if one of the past or present leaders of the cartel in product one at one time had pricing responsibility in this second market, it may cause us to eventually expand our investigation to the second product. Companies recognize this risk and so, in the scenario I just described, A or B will report the conduct on the second product in return for Amnesty Plus. However, if they do not hurry, they may both be beaten by company X or Y after it learns that members of its cartel are under investigation for fixing prices on another product. A company that is fortunate enough

16

to uncover its participation in a second conspiracy before we do is advised to take advantage of the Leniency Program while it is still available.

Penalty Plus -- The "Stick" Side To The Amnesty Plus Carrot. Companies that elect not to take advantage of the Amnesty Plus opportunity risk potentially harsh consequences. If a company is knowledgeable about a second offense and decides not to report it, and the conduct is later discovered and successfully prosecuted, where appropriate, we will urge the sentencing court to consider the company's and any culpable executive's failure to report the conduct voluntarily as an aggravating sentencing factor. We will request that the court impose a term and conditions of probation for the company, and we will pursue a fine or jail sentence at or above the upper end of the Sentencing Guidelines range.[6] Moreover, where multiple convictions occur, a company's or individual's Guidelines calculations may be increased based on the prior criminal history. For a company, the failure to self-report under the Amnesty Plus program could mean the difference between a potential fine as high as 80 percent or more of the volume of affected commerce versus no fine at all on the Amnesty Plus product. For the individual, it could mean the difference between a lengthy jail sentence and avoiding jail altogether.

---

[6] For example, in one recent "penalty plus case" involving Hoechst AG, the Division asked the court to depart upward from the top of the U.S. Sentencing Guidelines ("U.S.S.G.") range, due to the company's recidivism as an antitrust offender, and to impose a sentence on the corporation that was roughly 30% above the maximum Guideline fine and 130% above the minimum Guideline fine. In that case, Hoechst's sales (not illegal profits) affected by the conspiracy amounted to $17 million, and it ended up paying a fine of $12 million -- roughly 70% of the volume of affected commerce. Furthermore, three Hoechst executives were "carved out" of the plea agreement. If the company had reported the conduct when it had the chance in connection with the earlier prosecution, it would have paid zero fine and its executives would have been given full nonprosecution protection.

17

## V. <u>Transparency In Enforcement Policies</u>

The third and final hallmark of an effective Amnesty Program is the need for transparency to the greatest degree possible throughout the enforcement program. Self-reporting and cooperation from offenders have been essential to our ability to detect and prosecute cartel activity. Cooperation from violators, in turn, has been dependent upon our readiness to provide transparency throughout our anti-cartel enforcement program so that a company can predict with a high degree of certainty how it will be treated if it reports the conduct and what the consequences will be if it does not.

Our experience has been that transparency must include not only explicitly stated standards and policies, but also clear explanations of prosecutorial discretion in applying those standards and policies. The Division has sought to provide transparency in the following enforcement areas: (1) transparent standards for opening investigations; (2) transparent standards for deciding whether to file criminal charges; (3) transparent prosecutorial priorities; (4) transparent policies on the negotiation of plea agreements; (5) transparent policies on sentencing and calculating fines; and (6) transparent application of our Leniency Program.[7] With the time I have remaining, I want to focus on how transparency is critical to an effective Leniency Program.

The Antitrust Division has a written Leniency Policy and has published a number of papers in order to clarify the Division's application of its Corporate Leniency Program. We have

---

[7] For a more detailed discussion on transparency in enforcement, with references to Antitrust Division public statements in each of the areas outlined above, see, "Transparency In Enforcement Maximizes Cooperation From Antitrust Offenders," by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before Fordham Corporate Law Institute (October 15, 1999).

18

also created a model conditional amnesty letter that is publicly available for prospective

applicants to review.  In addition, representatives from the Division regularly speak about the

Leniency Program before national and international bar associations, trade groups, other law

enforcement agencies, and the media.  However, in order for a Leniency Program to work, an

antitrust authority must do more than just publicize its policies and educate the public.  It has to

be willing to make the ultimate sacrifice for transparency - the abdication of prosecutorial

discretion.

Our Leniency Program is inherently transparent because we have eliminated, to a great

extent, the exercise of prosecutorial discretion in its application.  Obviously, this is a very

difficult thing to do, and we have had to swallow hard on a number of amnesty applicants that

we would have preferred to prosecute.  However, recall that we had roughly 15 years of

experience with a Leniency Program that was designed to maintain a greater degree of

prosecutorial discretion, and it simply did not work.  Prospective amnesty applicants come

forward in direct proportion to the predictability and certainty of whether they will be accepted

into the program.  If a company cannot accurately predict how it will be treated as a result of its

corporate confession, our experience suggests that it is far less likely to report its wrongdoing,

especially where there is no ongoing government investigation.  Uncertainty in the qualification

process will kill an amnesty program.

## VI.  Conclusion

The Division's philosophy has always been that, wherever possible, we will tilt our

program in favor of finding ways to make companies eligible for our program rather than

looking for ways to keep them out.  We maximize the opportunities for companies to report

conduct, and we are extremely adverse to practices that may create disincentives. As a result, the U.S. private antitrust bar has confidence that they can accurately advise clients as to whether they are likely to qualify for amnesty under our program. If companies cannot confidently predict how an enforcement authority will apply its leniency program, it may ultimately decide against self reporting and cooperation, and existing cartels may go unreported and unpunished. Our experience has been if you abide by this philosophy and your leniency program rests on a foundation of severe sanctions, high detection rates, and transparent enforcement policies, then cartel members will come knocking on your door.