# Exhibit 8B

Page 51

1    wants no doubts.  They want to know who did it, and

2    when can you get rid of them, and it's very hard from

3    their perspective to justify keeping someone a day

4    longer than the time that the internal investigators

5    have determined that the person was involved in price

6    fixing.

7        So you have to be prepared in those

8    circumstances to be able to explain to boards, and

9    especially boards who have been through this before

10   and know this tension full well.  You have to be

11   prepared to explain to them the remedial steps

12   you're taking to curb the risks that employees that

13   are still in the tent are going to continue to

14   violate while at the same time emphasizing to them

15   the need to keep people in the tent long enough to

16   make sure you have all of the facts.  And to be

17   able to transition them out of the company in a way

18   that will make them continue to be available to

19   fulfill your obligations to the government to

20   cooperate.

21       Because the Division, or other parts of the

22   Criminal Division don't want to hear, "well I can't

23   produce so and so, I can't produce John Doe for an

24   interview, because the company decided to fire him."

25   And it's now not uncommon for prosecutors to ask at

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime     March 3, 2005
Las Vegas, NV

Page 52

1    the beginning of an investigation, once a company

2    pledges full cooperation, ask the company lawyer

3    for advance notice of any employment decisions, so

4    that the Division official can interview the

5    person, before the person even knows that there's

6    going to be an adverse employment decision.

7      So these are all things that you need to

8    explain to the  board candidly and in most instances

9    you're going to have to resist pressure from the

10   board to get rid of the people at an earlier point

11   than you're comfortable getting rid of them.

12     GARY SPRATLING: And isn't the last

13   point you made the crux, or it seems to me that it

14   is the crux in dealing with the board.  That is

15   that you're dealing with the board, and companies

16   who have been through this, especially as you

17   mentioned, companies who have through it more than

18   once.  And have adopted the compliance policy and

19   they're saying the way we're getting this company

20   straightened back on the track, is this is going be

21   zero tolerance, and we're announcing.

22     The CEO goes out, goes on video camera to the

23   offices all over the world, and says we mean this.

24   If somebody violates this policy, you're gone.

25   You're history.  And now they say, Walden, now you're

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
Las Vegas, NV

Page 53

```
 1    telling me that we don't discharge this guy?  This is

 2    not a premature severance.  You've identified the

 3    person responsible for this.  You've identified the

 4    guy who's gotten our butt in the crack on this thing

 5    and we want this guy gone.  Now why not?  And at

 6    least in my experience -- well we need to get more

 7    of the facts and stuff like that doesn't work.  What

 8    really works is, you tell them "because if this

 9    guy's gone and you can't deliver him you get no

10    credit with Hammond."

11         You can't -- we can't bring this guy forward,

12    we're not going to get the credit for that.  He can

13    go forward independently but the company is not

14    going to get credit.  And I wonder if either of you

15    have any reaction to that.  I mean it's -- what the

16    board or the company understands.  It's a very,

17    very difficult issue.  But what generally is

18    persuasive to the board in my experience is that if

19    we don't do it this way.  If we don't find a way to

20    keep them in the tent, get them out there,

21    different responsibilities, reassign them.  Put

22    them in position that in fact the job description

23    is assisting the company in its response to the

24    government investigation.  That's his job

25    description.
```

ABA White Collar Crime 2005 Speech         ABA - White Collar Crime         March 3, 2005
                                                    Las Vegas, NV

Page 54

1         You take out everything else, out of the job

2    description, and that's where you got him, and you

3    know, you keep his salary, and you just keep him

4    happy for a while until he gives you all that you

5    want, then you deal with it later.  But it's

6    absolutely essential, because if you -- if you go

7    in to see Scott and you say you know we've got these

8    guys who have cooperated, unfortunately the guy who

9    is really involved is not cooperating, we can't

10   bring him in.  Hammond says, "well that's worth about

11   zero."  Any reaction to that?

12        SCOTT HAMMOND: I think you guys

13   have identified the tension, as you say.  As Jim

14   says, the board wants scalps, they want compliance

15   with their code of conduct that you or some other

16   lawyer told them was really important.  It's all

17   going to be fact driven.  But it's also going to be

18   -- it's going to change according to whether you're

19   in an amnesty situation or not.  And it's going to

20   change according to whether you're the company

21   counsel who wants to go slow and cautious and make

22   sure the company gets the best deal.  Or whether

23   you're the Caremark counsel for the Board of

24   Directors, and you're there to advise them about the

25   concerns that they have.

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime                    March 3, 2005
                                                    Las Vegas, NV

Page 55

1          GARY SPRATLING: Joe, what do you mean by

2     Caremark counsel, what's Caremark counsel?

3          JOE LINKLATER: I'm sure most

4     people know, Caremark counsel is the lawyer that's

5     hired by the Board of Directors to advise them to

6     make sure they're complying with their either two,

7     or three depending on how you read the Delaware

8     decisions, duties -- loyalty, care and good faith.

9          And to avoid what they're all worried about

10    now, directors are ever more sophisticated, they

11    read the Wall Street Journal, they don't want a

12    denial order from the SEC, they don't want a personal

13    judgment against them in civil litigation.  They

14    don't want somebody coming after their assets.

15    They don't even want to be named in those civil

16    lawsuits.  So they hire their own lawyer to advise

17    them on those duties and if it's not the right

18    lawyer, or if -- well whether it is or isn't,

19    tensions can develop.

20         GARY SPRATLING: With respect to the

21    right lawyer, if you know, if you or Jim or I are

22    faced with this, do -- what do you think about us

23    advising the board on who the Caremark counsel

24    ought to be and the considerations that go into

25    that?

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 56

1          JOE LINKLATER: I think it's hugely

2     important.  I think it's as much your duty to give

3     the board information about that, and try to

4     influence that decision as you would in trying to

5     help the CEO decide who his individual lawyer

6     should be if he needs one.

7          The last thing you want in there, is somebody

8     who is fighting with you as the company's lawyer

9     every day about should we fire people, should we get

10     independent counsel for people, should we discipline

11     people.  And if that lawyer is not experienced in the

12     aspects of a criminal antitrust investigation, you're

13     going to have those problems all the time every day

14     and it's going to be another layer in the three

15     dimensional chess that Jim mentioned earlier, and a

16     bad one, because the board's going to be listening to

17     that lawyer, and he's going to be saying "I'm making

18     sure that you're not going to get named in a lawsuit,"

19     "I'm making sure they're not going to take away that

20     third country home you've got somewhere or that

21     vacation home you've got in Hawaii, so you better

22     listen to me."  You don't want those fights.

23          GARY SPRATLING: And you mentioned about

24     bringing in a separate counsel in the conduct of the

25     investigation, what are some of the considerations

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
Las Vegas, NV

Page 57

1    that you go through as to the appropriate time to

2    do that, and the ethical tensions that develop in

3    that situation?

4        JOE LINKLATER: Well if you're talking about an

5    antitrust investigation, in the amnesty situation

6    as we are here, as opposed to what Jim mentioned

7    earlier, the straight criminal investigation.  I

8    think you can construct a very good argument that

9    you can go as slowly as we've described here, in

10   getting individual counsel for people, and you

11   don't have to kick them out of the tent so long as

12   two  things -- one you're meeting your ethical

13   obligations under 4.1 and 4.3, and so long as the

14   cooperation is continuing and finally of course, so

15   long as the conduct is shut down.  If you have those

16   three things, then I think you can wait a while.

17       Sometimes admittedly, it helps if you get a

18   really  rigid employee who's not cooperating,

19   sometimes it  helps to get individual counsel for

20   him, and he can  sit down and persuade him to be

21   more forthcoming  with you, but that's a rare

22   situation.

23       GARY SPRATLING: Jim do you have any comments on

24   that?

25       JIM WALDEN: And part of it certainly depends on

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime                    March 3, 2005
                                              Las Vegas, NV

Page 58

1    how transparent the staff attorney that you're

2    dealing with is, and thankfully at least my

3    experience has been that there's nearly complete

4    transparency because if the Division official says

5    we're thinking about carving out these six people,

6    then the decision's made for you.  You get lawyers

7    for those six people, bringthem up to speed and try

8    and work with them.  Whereas in other parts of the

9    Division there is less transparency, and so the

10   decisions are harder to make.

11        GARY SPRATLING: What do you think about

12   talking to Division staff about when they

13   identify the carve outs for you, and by that I

14   mean, you know, once a party is identified as a

15   carve out, the Division might tell you it could be

16   for one or two purposes.  They might tell you that

17   the carve out is for purposes of obtaining the -

18   the obvious purpose would be because the party is

19   targeted for prosecution, is a target in the

20   investigation.  Another might be because the

21   Division wants to deal with that person

22   independently, and by dealing with them

23   independently, retain some leverage with respect to

24   the cooperation so that the individual is not part

25   of the protected employees portion of a plea

Page 59

 1    agreement.  And therefore doesn't have quite the

 2    incentive to cooperate that he otherwise might

 3    against the individuals that the Division is going

 4    against.  In each of those situations it seems

 5    clear to me, no matter what the reason is, that you

 6    need to have separate counsel for that individual.

 7    And I take it you both agree with that.

 8         But I at times, as we've discussed and I won't

 9    comment on what the result of the discussion was, but

10    at least discussed with Division folks.  If they have

11    those thoughts, to not advise me to use your word

12    Jim, prematurely about that, for fear that it would

13    affect the ability to conduct the internal

14    investigation by getting them separate counsel and

15    it just affects the dynamic of fact gathering.  And

16    it's what one of the other speakers said in the

17    first panel this morning, that when you're trying

18    to move quickly in an investigation and develop the

19    facts.

20         You oftentimes are better situated as

21    in-house counsel to work with the individuals to

22    identify the individuals with knowledge.  To

23    identify the contacts, to make sure they're going to

24    be available, to ensure they're going to talk to you

25    and to get the facts, than if you suddenly advise

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 60

1    the people that they are a target of an

2    investigation, or they're being carved out in order

3    to cooperate and they need to have a separate

4    counsel.  And they can affect the ability to

5    cooperate, the company to cooperate and support

6    that individual.  Has that ever happened to you

7    folks, or do you have any thoughts on that?

8        JIM WALDEN: I haven't had a situation yet,

9    where the decision was announced to me prematurely

10   in a sense that it was before I was able to

11   thoroughly interview the people without counsel in

12   any event.

13       So in my experience it's been a decision that

14   -- that at the point when they make it, they have

15   been transparent with me about who's involved and

16   that's a good thing.  But they haven't done it at

17   such an early stage in the process that it's impeded

18   me from getting the results of the investigation.

19   There was one case I had where it was someone that

20   we interviewed late.  It was someone that was a

21   relatively high level of the investigation.

22       GARY SPRATLING: And that's what I'm thinking

23   about.

24       JIM WALDEN: And in that particular

25   circumstance, it was difficult because he felt as

Page 61

1    though he was being thrown out of the tent when we

2    really were at that stage getting him a lawyer in

3    a way to help keep him in the tent.  And we weren't

4    able to get all of the information from that

5    individual that we might have otherwise would have

6    like to get.  It didn't impede the investigation, but

7    it certainly wasn't as complete a fact finding as I

8    would have liked.

9        So in those rare situations where it happens,

10   it can present real difficulties.

11       GARY SPRATLING: Scott, I'm going to ask you too,

12   if you have any thoughts on anything that we've said,

13   because I've seen you taking a couple of notes there.

14   They may be for private discussions with us later.

15   Or notes of what you're going to do to our clients.

16   But I'm also going to put a limit on this, because

17   something I didn't announce at the outset and I

18   apologize for doing this.  But I'm sure you've all

19   been thinking of questions anyway.  Is that we are

20   committed to leave a full 10 minutes and more if

21   possible at the end of this program for questions

22   to any of us.  Because we've found in the last few

23   years that that is sometimes the best part of this.

24   And so Scott with a five minute limitation, do you

25   have any thoughts on any of this.

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime                    March 3, 2005
                                              Las Vegas, NV

Page 62

1        SCOTT HAMMOND: I will comment if someone in the

2    audience wants to hear what I have to say.  Why don't

3    we give them the full time and if you have questions

4    about that, I will.  Is that all right?

5        GARY SPRATLING: Sure.  Sure.  Sure.  Why don't

6    we throw it open to audience questions then. We have

7    15 minutes.  And if there aren't audience questions,

8    then we can go to comments by Scott, or there's

9    plenty of questions that we've skipped along the

10   way in order to preserve this time for you folks.

11       Question from audience: [Question

12   inaudible].

13       SCOTT HAMMOND: I agree with you and that's not

14   what this case was about, so for the reasons I tried

15   to explain before, we were talking about the people

16   that continued to be involved with the same high

17   level people that were involved beforehand.  They

18   were the same people that we had identified, if

19   these people continued to be involved after you

20   discovered it, you're out.

21       And as I said, we're not talking about my

22   opinion, a good faith gold medal compliance effort.

23   It wasn't prompt and it certainly wasn't effective.

24   This was allowing the top level people who were still

25   involved in the conspiracy to continue to meet with

Page 63

1     competitors, and in fact the company sent high level

2     executives to go meet with the competitors

3     afterwards.  Ostensibly, to deliver the news that

4     we're out.  But --

5          Audience: [Question inaudible].

6          SCOTT HAMMOND: No.  I am here to say

7     effective -- a prompt and effective doesn't mean

8     perfect.  We're not now laying in wait -- waiting

9     for your client for payback time.  This is not

10    about gotcha, it's never been about gotcha.  You

11    know we have -- if you will look at our leniency

12    speeches that are out there -- you will see that

13    every single -- the clarification to our Leniency

14    Program, the answers to recurring questions, you

15    will see that every single clarification out there

16    is we have found ways to make the program more

17    generous and easier to come in.  We took the

18    language that says, there's a condition, you can't

19    be the ring leader organizer.  We've never kicked

20    anybody out for that.  It's not because there

21    wasn't a few sets of -- it wasn't that we haven't

22    swallowed hard on a few amnesty applications, I can

23    assure you.

24          It's because we're not -- if we play

25    gotcha with this -- if you're sitting there

Page 64

1    paralyzed saying, I represent this multi-national

2    company, and I don't -- how can I -- we have

3    20,000 employees, how do I know that someone out

4    there didn't just send a fax the day after we came

5    in.  You're paralyzed, you won't be able to convince

6    the client to come in.  But again that's not the

7    set of facts here.

8         And then the last message that I delivered

9    earlier is, if you represent a company and you

10   discover it, and you don't report it and you decide

11   that, well we're going to withdraw but not report,

12   then I do think you're at risk.  Then please don't

13   come to -- then I would be concerned.  So you

14   discover it, you don't report it.  Six months later,

15   guess what, we've opened an investigation, you want

16   to come in and report the conduct.  You could still

17   be eligible, but if we found out that the conduct

18   continued, and we found out that the company really

19   soft pedaled -- this is an impossible situation the

20   company is in.  If you make a noisy withdrawal, if

21   you tell everybody unequivocally "we're out," guess

22   what, they're going to beat you in.  If they find out

23   that you're withdrawing, they know about the race,

24   you're going to lose.

25        But I'm also saying if you soft pedal the

Page 65

1    withdrawal, you try to be cute about it.  You try

2    to tell everybody, "well we're withdrawing, but

3    we're not really withdrawing, you know take it

4    easy."  And it turns out that the message that your

5    employees got was, it's go time still.

6         I haven't been fired, I haven't been reassigned,

7    I'm allowed to keep meeting with my competitors, you

8    find yourself in that situation then, I think you

9    won't find a very receptive Antitrust Division,

10   because as I said before, they deserve to be kicked

11   out.  I'm trying to explain why and be transparent

12   about it because we're going to do it.  With these

13   same set of facts, we'd do it again.

14        GARY SPRATLING: Let me say something in

15   response to the question because Scott gave a -- you

16   know -- obviously a very emotional response to the

17   one part of the question.  And the message that I

18   understand, I understand why Scott is anxious to

19   reinforce the message that the Antitrust Division

20   still tilts in favor of the amnesty applicant

21   wherever possible, that's always been the message,

22   it's been the  message since the revision of the

23   program in 1993.  It is still the message.  I believe

24   it's still the way the Division approaches things.

25   Unless, unless you violate one of the hearts of --

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime                    March 3, 2005
                                                   Las Vegas, NV

Page 66

1     one of the -- the heart conditions of the program.

2     And I think Scott's answer addressed one part of your

3     question, but not another.

4          It addressed the person at the periphery who

5     did it, but it didn't address what if somebody that

6     was fairly high level but not the highest level did

7     it.  In my opinion, you're out of the program.  I

8     will let Scott respond in a moment.  Because you're

9     at a high level, but not the highest level.  You're

10    still at a level with people who should have known,

11    the company ought to have been able to take care of

12    those people.  There's no excuse for not doing it.

13         And my advice to the company, I say to them, if

14    anybody in this zone continues this conduct, just

15    assume that you're doing all this for nothing.

16    That the information, not only you're going to get

17    the benefits of it, but the information is going to

18    end up being used against you.  You're in deep

19    trouble.  And it was verified at least in one of my

20    experiences, I think we've all had experiences like

21    this, where as Joe said earlier, you can't stop an

22    international corporation on a dime.  You can't

23    turn it around.  You can't take care of every

24    office in Hong Kong, Kuala Lumpur, Korea, et cetera,

25    and other areas where you might have trouble.

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime                    March 3, 2005
                                                    Las Vegas, NV

Page 67

1        But if one of those situations come up and you

2    come to the Division and you say, "God, this is what

3    happened.  We had this problem in this one area."

4    And in my experience, exactly as Scott just said,

5    the Division said, if you corrected it now, we

6    understand that.  You've told us about the measures

7    you took to try to make sure that didn't happen.  It

8    didn't work.  You had a rogue employee who went out

9    there and kept doing it on this small basis in

10   wherever it was, but if we find out that somebody

11   above this level in the corporation knew about it,

12   different story.  And I --

13       SCOTT HAMMOND: Let me, underscore that but

14   then also direct -- you know, you can assume that I

15   mean, one day I assume we'll kick out a second

16   company.  I will be back here if I'm still in this

17   position, or whoever is in my position will be back

18   here and we'll be as transparent again as I have been

19   here today.

20       We have to be.  Okay.  So we'll make the

21   decision in terms of whether or not we'll be able

22   to convince a room full of people that it was the

23   right thing to do.  Now what I would factor in, is

24   this a type A leniency, is this a company that

25   discovered it, and tried to do the right thing and

Page 68

1    came forward immediately, or is this a company that

2    didn't report it and only reported it after it

3    appeared in the Wall Street Journal?  Is this

4    conduct that continued and then was discovered and

5    immediately brought to our attention, or is this

6    conduct that continued in the Stolt case, for nine

7    more months, was not brought to our attention by the

8    company, but instead we had to discover it on our

9    own?

10        I mean this is a decision that would involve a

11    number of different factors, you know I can't make

12    a blank statement in terms of yes, you would always

13    be okay, or no, you would never be okay.  But we

14    would be making a decision in which we would have

15    to feel comfortable that the equities involved that

16    the company had not taken effective action.  Not

17    just prompt and effective, but effective action.  Why

18    is it that this person still felt like he still had

19    the green light to conspire?

20        GARY SPRATLING: And did you have a comment, Joe?

21        JOE LINKLATER: No, you addressed my point.

22        GARY SPRATLING: Okay.  Yes.

23        Audience: [Question inaudible].

24        SCOTT HAMMOND: They're absolutely screwed.

25        [Laughter].

Page 69

1    SCOTT HAMMOND: And you know that's the way it

2    has to be on a leniency program.  I mean -- and it

3    happens all the time.  I mean sometimes it's days

4    and sometimes it's hours.  You know when a

5    conspiracy starts to unravel, it unravels fast,

6    and the race to our office is fast, and there's a

7    winner and there's a loser.

8        But we have -- in order to maintain that race,

9    in order to maintain the sort of instability and

10   panic that this causes, we have to make sure there's

11   a big difference between the first and the second

12   coming in.  Now just because you're not the first,

13   you're not going to get the big prize, but you know

14   we give out pretty substantial consolation prizes to

15   the second company in too, and that company in all

16   likelihood would receive substantial assistance,

17   departure from its fine range.  We would very much

18   like the cooperation of their executives.  And I'm

19   sure we would find ourselves and have repeatedly,

20   making favorable deals with those executives.

21       Obviously yes, we would recognize the fact

22   that they tried to do the right thing, but they

23   lost the race.  But we will never give out two

24   first prizes.  There will never be a tie for first

25   place.  There will be a winner and there will be

Page 70

1    losers.

2        Audience: [Question inaudible].

3        GARY SPRATLING: You might repeat the question

4    for those at the back.

5        SCOTT HAMMOND: I think I can.  The question

6    is what happens if you're the second company in,

7    but the first company is disqualified from the

8    Leniency Program, does the second company move

9    into the first spot?

10        The answer is -- I mean, that's possible.

11    That's not what happened in this case, and it's --

12    you know if you're the second company in, our

13    investigation is going to be farther along, and if

14    -- in this case the second company in, and there

15    were two other companies that came in, had to plead

16    guilty, and as I said they both received downward

17    departures and still may have received downward

18    departures even if the amnesty applicant hadn't been

19    removed because they provided immediate substantial

20    assistance, not long after subpoenas were issued,

21    and well before any indictments.

22        So I can't say it's not possible that a second

23    company in, but it's not an automatic thing either.

24    And we only have one experience to draw on.

25        GARY SPRATLING: And there's -- both the

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
Las Vegas, NV

Page 71

1    policy of one jurisdiction and in speeches of

2    another jurisdiction allow for that possibility

3    in other jurisdictions, where number two, might

4    accede to the immunity position if the number one

5    doesn't qualify, so it's something that you should

6    look into in the each jurisdiction where you're in

7    that situation.

8         Incidentally, you mentioned the Stolt-Nielsen

9    situation where a person loses his amnesty status

10   because of failure to meet a condition.  In there

11   the condition involves, I won't repeat it, but the

12   condition may be something else, such as they were

13   the leader or instigator.  And see, that's something

14   you find out after a lot of fact gathering, where

15   somebody else might have come in immediately

16   afterwards, and with the benefit of that, somebody

17   might move into number two.  So for example in the

18   EU, they consider that possibility of the number two

19   moving into number one, in the event that number one

20   is the instigator.  So -- yes.

21        Audience: [Question inaudible].

22        SCOTT HAMMOND: All right, this would be

23   difficult to do justice to in even five minutes.

24   But what John has referred to is, the Antitrust

25   Division has something called a marker system.

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 72

1    Okay.  And this goes back to something that we

2    talked about earlier where I said, the Division

3    is telling people that you must race in, and you

4    should come in even before you have completed

5    your investigation.  You're sitting back dotting

6    all your I's and crossing your T's, and having

7    board meetings and let's talk about it again next

8    week.  You're going to lose the race, we know that.

9         And remember we're trying to fuel this race, so

10   we're saying get in, get in quick even before you

11   have completed your internal investigation and

12   get a marker.  Okay.  Now you will then have -- you

13   will meet with staff who will agree on some finite

14   period of time in which you will have to complete

15   your investigation in order to perfect that marker.

16   What I can't define for you and be formulaic

17   about is exactly what it takes to get a marker, in

18   terms of how much evidence do you have to give us

19   to get the marker, well I can't tell you exactly

20   how much time you have because every fact, every

21   case is going to be different.

22        And I'll give you an example.  We have type A

23   amnesty, and type B amnesty.  Type A amnesty is

24   available to companies who come in before an

25   investigation is begun.  When we revised the

Page 73

1    program in 1993, we even made amnesty available

2    after the investigation has begun.  The company can

3    still receive a pass from prosecution, as can its

4    executives just so long as we haven't developed

5    sufficient evidence that we can use to bring cases

6    against the company and those executives.

7        Now, your ability to get a marker though could

8    be much different in a type A, versus a type B

9    situation. I think you will find if you come in to

10   the Antitrust Division in a type A situation for

11   example, if you say I was just over in Europe

12   conducting some corporate compliance programs and

13   afterwards I was told X, Y, and Z, and we're very

14   concerned.  I need to get back.  I just flew back

15   yesterday, I just heard this yesterday, I'm going

16   to go back in two weeks.  I'm going to conduct more

17   investigations, I will then come back and meet with

18   you.  Can I have -- I think this process is going to

19   take 2 weeks, 3 weeks, 4 weeks.  I think you'll

20   find a very receptive Antitrust Division, we'll say

21   "I'll give you that marker."  Okay.  We're taking

22   about someone who's just come and voluntarily

23   disclosed an antitrust conspiracy to us and wants

24   time to continue that investigation, come on in.

25       The next day, a company notifies us and says

Page 74

1    we're ready to bring this package in front of you,

2    it's the results of our internal investigation,

3    it's got a great big bow on it, and we want to

4    report the same conduct that you heard about

5    yesterday, or maybe they don't say that, but we

6    know they do.  And we're ready to go.  Will we let

7    that second company with its juicy prepared ready

8    to go proffer leap frog over the first company?

9    Absolutely not.  Go ahead, first company, take your

10   month, and let's bust that second company.  That

11   second company that had everything ready to go, and

12   decided not to bring it in.  That company made the

13   wrong decision.  And that's what we're trying to

14   say.

15       So the first company that came in, they get

16   their marker, they'll have the opportunity to

17   perfect that marker and no one will have an

18   opportunity to leap frog over that company.  That's

19   how we create the race.

20       GARY SPRATLING: We've reached the end of the

21   time, and I want to thank the panels, and I

22   especially want to thank Scott, for something that

23   Jim made reference to in his answer, and that is the

24   extraordinarily rare circumstance when you hear a

25   government official being so transparent in his

Page 75

1    answers.  So please join me in thanking the panel

2    and Scott.

3        Narrator: Thank you.  This concludes this

4    presentation from the 19th Annual National Institute

5    on White Collar Crime 2005, presented by the American

6    Bar Association Criminal Justice Section and the

7    Center for Continuing Legal Education, held March 3rd

8    and 4th, 2005.  Thank you for listening.

9        [End of audio]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25