# Exhibit 12



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Stolt-Nielsen S.A.

    and

Stolt-Nielsen Transportation
  Group Ltd.,

              *Plaintiffs,*

      v.

United States of America,

              *Defendant.*

Filed Under Seal

04cv537

## COMPLAINT

For their complaint, Stolt-Nielsen S.A. and Stolt-Nielsen Transportation Group Ltd. (collectively "Stolt-Nielsen") allege as follows:

### SUMMARY

1.      Stolt-Nielsen brings this action to enforce its rights under a January 15, 2003 Amnesty Agreement with the Antitrust Division of the United States Department of Justice (attached as Exhibit 1). Under that agreement, Stolt-Nielsen agreed to voluntarily report certain anticompetitive activity, and the Antitrust Division agreed not to bring any criminal prosecution against Stolt-Nielsen or its executives for any act or offense committed prior to the date of the agreement in connection with the anticompetitive behavior being reported. Although Stolt-Nielsen and its executives have fully complied with the terms of the Amnesty Agreement, the Antitrust Division has, without justification, already criminally prosecuted one Stolt-Nielsen executive and has announced publicly that others will be prosecuted. Stolt-Nielsen seeks a

declaration that the Antitrust Division has deprived Stolt-Nielsen and its executives of their due process rights as well as a preliminary and permanent injunction barring the Antitrust Division from acting any further in contravention of the Amnesty Agreement.

## SUBJECT MATTER JURISDICTION

2.     Stolt-Nielsen S.A. and Stolt-Nielsen Transportation Group Ltd. bring this action alleging violations of the Due Process Clause of the Fifth Amendment of the United States Constitution and the Administrative Procedure Act.   This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

3.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to the claims brought by Stolt-Nielsen occurred in the Eastern District of Pennsylvania.

## PARTIES

4. The plaintiffs in this action are Stolt-Nielsen S.A. ("SNSA") and Stolt-Nielsen Transportation Group Ltd. ("SNTG").

5. SNSA, a Luxembourg company, is the parent corporation of all Stolt-Nielsen entities worldwide. SNSA employs approximately 13,000 people world-wide and approximately 500 people in the United States, primarily in Connecticut, Texas, and Louisiana.  SNSA pays nearly $10 million per year in federal income, state income, local property, payroll, and sales taxes in the United States.   SNSA's common shares are traded on the Oslo Stock Exchange (under symbol SNI) and on the NASDAQ Exchange as an American Depositary Receipt ("ADR") (under symbol SNSA).

6. SNTG provides transportation services for bulk liquid chemicals, edible oils, acids, and other specialty liquids.  The Company provides world-wide integrated transportation through

-2-

its intercontinental parcel tanker, coastal parcel tanker, river parcel tanker, tank container, terminal and rail services. Parcel tanker shipping is the ocean transportation of bulk chemicals, edible oils and other specialty liquids. Parcel tankers are deep-sea vessels equipped with compartments designed to carry shipments of various sizes. The temperature and other specifications of the compartments can be regulated according to the specific requirements of the type of liquid being transported.

7. The defendant in this action is the United States of America, which includes the Department of Justice's Antitrust Division as well as all the officials in the Division who, in their official capacities, are empowered to administer the Amnesty Agreement.

## THE AMNESTY AGREEMENT

### I.    The Antitrust Division's Corporate Leniency Program

8. Pursuant to the Antitrust Division's Corporate Leniency Program, promulgated in August 1993, the Antitrust Division offers amnesty to the first company in an industry that reports anticompetitive behavior to the Division and provides full, continuing, and complete cooperation throughout the Division's investigation. The Program, which was in force at all times relevant to this Complaint, uses the terms "corporate leniency," "corporate amnesty" or "corporate immunity" interchangeably. *See* Antitrust Division, Corporate Leniency Policy, August 1993 at 1 ("The policy is also known as the corporate amnesty or corporate immunity policy") (attached as Exhibit 2). The Division's Amnesty Program and numerous authoritative speeches from senior Antitrust Division criminal enforcement officials describing the Amnesty Program are posted to the Antitrust Division's web site in order to provide public guidance to the bar and potential applicants.

9. The striking feature of the Antitrust Division's Amnesty Program is that it promises a "complete pass" to the first corporation to report anticompetitive behavior to the Division and a

"complete pass" to all of that company's employees. Scott Hammond, the Antitrust Division's Director of Criminal Enforcement, described the Division's Corporate Leniency Program as "provid[ing] a complete pass from prosecution for companies and their executives who are the first to come forward, cooperate, and meet the program's other requirements." Scott Hammond, "A Review of Recent Cases and Developments in the Antitrust Division's Criminal Enforcement Program," March 7, 2002, at 11. Similarly, Mr. Hammond has stated: "[w]e developed a Corporate Leniency Program ('Amnesty Program') that provides the ultimate prize for companies that choose to self-report—no criminal conviction, no criminal fine, and non-prosecution protection for all officers, directors, and employees—and we made the requirements for entering the program as transparent and attainable as possible. No other governmental voluntary disclosure program creates as great an opportunity or incentive for corporations to come forward and cooperate." Scott Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," March 8, 2001, at 1.

10.   The Antitrust Division touts the extraordinary predictability that its broad Amnesty Program offers the first-reporting corporation and its executives: "The Amnesty Program works because it offers a very predictable and favorable alternative to the potentially devastating corporate and individual consequences if we discover the conduct the hard way. The catch is that it is only available to the first one in the door." Scott Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," March 8, 2001, at 2. "The Division's Amnesty Program by its nature is transparent because we have eliminated, to a great extent, the exercise of prosecutorial discretion

-4-

in its application." Scott Hammond, "Lessons Common to Detecting and Deterring Cartel Activity," Sept. 12, 2000, at 12.

11.    The Division also stresses the need for being the first to report. "If you are second, even if only by a matter of a few hours, which has happened on a number of occasions, the second firm and all of its culpable executives will be subject to full prosecution. This 'winner-take-all' approach sets up a race . . . ." *Id.* at 9.

12.    Because the Division's Amnesty Program puts its premium on speed of reporting, rather than awaiting a final completed internal investigation, the Division's policy is that companies will not be penalized for coming forward prior to the completion of a full internal investigation. As Mr. Hammond has described it: "To ensure that companies are not penalized for coming forward before they have completed their internal investigation, the Division's policy is to protect amnesty applicants if, as a result of the company's good faith efforts, their executives disclose additional antitrust offenses that were not reported in the original amnesty application. For example, if an ensuing investigation uncovers anticompetitive activity that is more extensive than the conduct originally reported or falls outside of the non-prosecution protection of the conditional amnesty letter, then the amnesty coverage will be expanded to include the newly discovered conduct so long as the company has met its cooperation obligations and the company can meet the criteria for amnesty on the newly discovered conduct." Scott Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on An Individual's Freedom?," March 8, 2001, at 4.

## II.    Stolt-Nielsen And The Antitrust Division Entered Into The Amnesty Agreement After An Investigation By Outside Counsel Revealed Possible Anticompetitive Conduct

13.    On or about November 22, 2002, Stolt-Nielsen retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to assist the Company in connection with

-5-

antitrust matters along with the Company's separately-retained counsel, Carter, Ledyard & Milburn LLP ("Carter, Ledyard").    The Skadden team was led by John M. Nannes, a distinguished and experienced antitrust lawyer, who had recently served as Deputy Assistant Attorney General for the Antitrust Division and as Acting Assistant Attorney General for the Division.

14.    Relying upon the Division's public statements regarding the Corporate Leniency Program, Stolt Nielsen decided to pursue entry into that program.

15.    On or about November 22, 2002, Skadden attorney Nannes contacted James M. Griffin, Deputy Assistant Attorney General for the Antitrust Division, to establish a "marker" to reserve Stolt-Nielsen's place in line for a potential grant of amnesty.    The marker holds the volunteer's place in line pending a preliminary investigation and proffer to the Antitrust Division.

16.    On or about November 22, 2002, as of the time Mr. Nannes contacted Mr. Griffin to establish a marker, no Division investigation into the parcel tanker industry had been opened. Stolt-Nielsen was the "first in the door" under Antitrust Division terminology.

17.    On or about December 4, 2002, after performing a preliminary investigation, Mr. Nannes met with Antitrust Division personnel and discussed issues relating to a potential amnesty agreement.

18.    On or about December 17, 2002, Mr. Griffin advised Mr. Nannes that the Antitrust Division had done a sufficient investigation and that Stolt-Nielsen's "marker" as the first company to seek amnesty had been accepted.    Mr. Griffin then directed Mr. Nannes to make a more detailed proffer to the Antitrust Division in January.

119104.00601/21240860v1

19.     After the December 17 conference, Mr. Nannes, Gary D. Sesser (of Carter, Ledyard), and other attorneys from their respective firms began a more detailed investigation of Stolt-Nielsen's potential anticompetitive activity.

20.     In the latter half of December 2002, attorneys from Carter, Ledyard first discovered the potential existence of customer lists that had been exchanged among competitors, documenting possible anticompetitive behavior in the parcel tanker industry.

21.     On or about January 3 and January 8, 2003, Mr. Nannes learned of customer lists that had been exchanged among competitors, documenting the existence of possible anticompetitive behavior in the parcel tanker industry.

22.     On January 8, 2003, Messrs. Nannes and Sesser reported to the Philadelphia Field Office of the Antitrust Division the possible anticompetitive activity discovered by outside counsel during the course of their investigation. The Division advised Stolt-Nielsen that it accepted the proffer.

23.     On or about January 15, 2003, Stolt-Nielsen and the Antitrust Division signed and entered into the Amnesty Agreement. The Agreement incorporates by reference the Antitrust Division's Corporate Leniency Program, as explained in an Antitrust Division policy statement dated August 10, 1993.

24.     The Amnesty Agreement expressly covers SNTG, its parent, its ultimate parent, as well as its affiliates and subsidiaries. The Amnesty Agreement also covers SNTG's current and former directors, officers, and employees.

25.     In the Amnesty Agreement, the Antitrust Division agreed "not to bring any criminal prosecution against SNTG for any act or offense it may have committed ***prior to the***

-7-

*date of this letter* in connection with the anticompetitive behavior being reported." (Ex. 2 at 2) (emphasis added). The Amnesty Agreement is dated January 15, 2003.

26.     In the Amnesty Agreement, the Antitrust Division further agreed "that current and former directors, officers and employees of SNTG who admit their knowledge of, or participation in, and fully and truthfully cooperate with the Antitrust Division in its investigation of the anticompetitive behavior being reported, shall not be prosecuted criminally by the Antitrust Division for any act or offense committed *prior to the date of this letter* in connection with the anticompetitive activity being reported." (Ex. 1 at 3) (emphasis added).

27.     The Amnesty Agreement contains a merger clause, which provides that "[t]his letter constitutes the entire agreement between the Antitrust Division and SNTG, and supercedes all prior understandings, if any, whether oral or written, relating to the subject matter herein." (Ex. 2 at 4).

### III.    Stolt-Nielsen Provided Extensive Assistance To The Antitrust Division

28.     Relying upon the Antitrust Division's public statements of its policy and the January 15, 2003 Agreement, Stolt-Nielsen subsequently provided substantial information to the Antitrust Division that was incriminating to the Company and its executives.

29.     On January 31, 2003, the Antitrust Division submitted a request for information to Stolt-Nielsen.

30.     Stolt-Nielsen utilized its best efforts to promptly provide documents and other items in its possession, custody or control that were requested by the Division. On February 4, 2003, counsel for Stolt-Nielsen produced key documentation to the Antitrust Division, including the customer lists identified in paragraph 21 of this Complaint and copies of certain business diaries prepared by one of its executives, Richard B. Wingfield. Mr. Wingfield had provided his diaries to Stolt-Nielsen's counsel.

-8-

31.     Stolt-Nielsen used its best efforts to secure the ongoing, full, and truthful cooperation of is directors, officers, and employees and to ensure that they responded completely, candidly, and truthfully to all questions asked in interviews.  On or about February 5, 2003, Stolt-Nielsen presented two of its employees for interviews by the Antitrust Division. These employees gave statements that were incriminating to the Company and to the Company's employees.

32.     On or about February 24, 2003, the Antitrust Division requested interviews with two former Stolt-Nielsen employees.  Both employees agreed to cooperate after speaking with Stolt-Nielsen's counsel. Stolt-Nielsen subsequently agreed to present the first former employee for an interview.

33.     Stolt-Nielsen produced numerous additional documents to the Antitrust Division on March 13 and March 25, 2003.  Stolt-Nielsen identified and explained the significance of otherwise seemingly innocuous or ambiguous documents.

34.     During this period, Stolt-Nielsen's counsel also met with Antitrust Division Staff and provided a full exposition of the facts known to Stolt-Nielsen's counsel at that stage of its internal investigation relating to the anticompetitive activity being reported.

35.     By providing its proffer of anticompetitive behavior and its documents to the Antitrust Division and by making its employees available for interview, Stolt-Nielsen performed the duties required of it by the Amnesty Agreement.  Stolt-Nielsen was prepared to continue performing all the duties and obligations it undertook in the Agreement.

## IV.     The Antitrust Division's Unilateral Suspension Of Stolt-Nielsen's Cooperation Is Not Authorized By The Amnesty Agreement And Deprived Stolt-Nielsen Of Due Process

36.     Although Stolt-Nielsen was providing substantial assistance to the Antitrust Division, the Division itself effectively abrogated the Agreement by depriving Stolt-Nielsen of

-9-

the benefit of its bargain.  First, the Antitrust Division purported to unilaterally "suspend" Stolt-Nielsen's obligation to cooperate under the Amnesty Agreement.  Then, in contravention of the express terms of the Amnesty Agreement, the Antitrust Division criminally prosecuted a Stolt-Nielsen executive, Richard B. Wingfield.  These actions deprived Stolt-Nielsen of due process.

**A.    The Antitrust Division Unilaterally Suspends Stolt-Nielsen**

37.    On April 8, 2003, Robert Connolly, the Chief of the Antitrust Division's Philadelphia Field Office made a phone call and sent a letter to Mr. Nannes, informing Mr. Nannes that the Division had "suspended" Stolt-Nielsen's obligations to cooperate under the Amnesty Agreement.

38.    The sole articulated basis for this unilateral suspension was the Division's contention in its April 8 letter that "[t]he grant of conditional leniency was based, *inter alia,* on SNTG's representation that in or about March 2002 it 'took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity'" (attached as Exhibit 3).

39.    The Division contended that it was in receipt of "specific, credible evidence" that Stolt-Nielsen "did not terminate its part in the illegal activity in or about March 2002, and that in fact it continued its illegal activities until at least as late as the second half of 2002."

40.    The "March 2002" date referred to in Mr. Connolly's letter does not appear anywhere within the Section 1(a) representation of the January 15, 2003 Agreement.  Indeed, the "March 2002" date does not appear anywhere in the January 15, 2003 Agreement.

41.    The April 8, 2003 letter also cancelled the pending interview of a former Stolt-Nielsen employee that had been arranged with the cooperation of Stolt-Nielsen's counsel.  The letter enclosed a subpoena for the former employee whose interview had been scheduled and

-10-

advised that it was the Division's position that the former employee should obtain counsel separate from the company's counsel. The letter also enclosed a subpoena for the production of documents directed to Stolt-Nielsen.

42.     On numerous occasions since April 8, 2003, Stolt-Nielsen has attempted to ascertain the basis for the "March 2002" assertion in the April 8, 2003 letter. Stolt-Nielsen has not been provided with information as to the contracts, trade lanes or customers that the Antitrust Division contends are at issue in its alleged March 2002 misrepresentation.

43.     The April 8 letter amounted to a unilateral nullification of the Amnesty Agreement by the Antitrust Division. The April 8 letter terminated the cooperative working relationship between SNTG outside counsel and Antitrust Division prosecutors as envisioned in the Agreement and the Program. The April 8 letter also prevented and frustrated any further cooperation by Stolt-Nielsen by subjecting Stolt-Nielsen's current and former directors, officers and employees to jeopardy not foreseen or envisioned in the January 15, 2003 Agreement and requiring separate counsel, not company counsel, for Stolt-Nielsen employees. The April 8 letter had the effect of isolating the company's outside counsel from any future investigation and prevented any possibility of further disclosures under amnesty.

44.     The April 8 letter was contrary to ten years of Antitrust Division practice under its Amnesty Program. No Antitrust Division speech, policy statement, or regulation sets forth a procedure as was followed by the Division on April 8, 2003. Antitrust Division officials have admitted that the April  8 letter sent to SNTG is the first such letter sent to a company such as Stolt-Nielsen.

45.     The Amnesty Agreement makes no provision for the Government to "suspend" the cooperation of Stolt-Nielsen in the manner set forth in the April 8 letter.

**B.    The Antitrust Division's Unilateral Termination Of The Amnesty Of A Stolt-Nielsen Employee**

46.     Equally abruptly, on June 23, 2003 the Antitrust Division faxed to counsel for Stolt-Nielsen a letter informing the company that the Division "has determined that Richard B. Wingfield is no longer covered by any of the provisions of the Conditional Corporate Leniency Agreement entered between Stolt-Nielsen Transportation Group Ltd. (Bermuda) and the Division on January 15, 2003" (attached as Exhibit 4).  No basis for this lack of coverage under the January 15, 2003 Agreement was provided in the letter.  At the time of the June 23, 2003 letter, Mr. Wingfield was an employee of Stolt-Nielsen.  The letter ominously added:  "Mr. Wingfield is a target of the parcel tanker investigation."

47.     Neither Stolt-Nielsen nor Mr. Wingfield was given any prior notice of the Division's unilateral determination that Mr. Wingfield was "no longer covered" by the January 15, 2003 Agreement.  The Antitrust Division did not provide the legal or factual basis for the Division's contention that Mr. Wingfield was "no longer covered" by Section 4 of the Stolt-Nielsen Amnesty Agreement.  The Antitrust Division did not seek prior judicial relief from the terms of its Agreement.

48.     Notably, under Section 4 of the Amnesty Agreement, the sole basis for revocation of the amnesty for a Stolt-Nielsen employee is the employee's failure to comply with his or her obligations to cooperate with the Division.  Mr. Wingfield had never failed to cooperate with the Division.  The Division's purported revocation of Mr. Wingfield's amnesty had no foundation under the terms of the Amnesty Agreement.

49.     On June 24, 2003, the Division caused a warrant to be issued for the arrest of Mr. Wingfield.  The Division filed a criminal complaint alleging that, beginning "at least as early as March 2001 and continuing until at least October 2002," Mr. Wingfield "and co-conspirators

-12-

engaged in a conspiracy to suppress and eliminate competition by allocating customers, fixing prices and rigging bids for parcel tanker shipping of products to and from the United States and elsewhere, in unreasonable restraint of interstate and foreign trade and commerce, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)" (attached as Exhibit 5).

50.     The complaint filed by the Antitrust Division was supported by the affidavit of a Special Agent for the Federal Bureau of Investigation who is currently on detail to the Antitrust Division. The agent's affidavit makes clear that the Division relied in part on Mr. Wingfield's business diaries:

> I have examined documents of the co-conspirator companies, including documents prepared by the defendant, and they corroborate the existence of the conspiracy and the defendant's participation in it. Specifically, among other things, I have reviewed copies of the defendant's business diaries for portions of the charged period. The diaries show frequent contact with co-conspirators.

(attached as Exhibit 5, affidavit at 10).

51.     Pursuant to the terms of the Amnesty Agreement, Stolt-Nielsen had provided Mr. Wingfield's business diaries to the Division in February 2003. Thus, the Antitrust Division actually used the incriminatory information provided by Stolt-Nielsen (and by Stolt-Nielsen executives, including Mr. Wingfield) under the Amnesty Agreement when it criminally charged Mr. Wingfield in violation of the Amnesty Agreement.

### C.     Impact Of The Division's Actions Upon Stolt-Nielsen

52.     Mr. Wingfield's arrest resulted in widespread press coverage about Stolt-Nielsen's status in the Amnesty Program, including a prominent article in the June 25, 2003 Wall Street Journal, which referenced the criminal complaint and the Special Agent's affidavit

-13-

(attached as Exhibit 6). The charging of Mr. Wingfield also attracted the attention of the Norwegian press, where important Stolt-Nielsen investors and lenders are located.

53.     The financial press and financial community immediately appreciated the significance of the charging of a current Stolt-Nielsen employee as boding ill for the company's position in the Amnesty Agreement. Because a company within the Amnesty Program would not ordinarily have one of its executives charged, questions were immediately raised as to Stolt-Nielsen's status within the Division's Amnesty Program. Due to the April 8, 2003 letter and the actions taken against Mr. Wingfield, the company could not respond that its position was anything other than "uncertain."

54.     Examples of press coverage of Stolt-Nielsen's uncertain status include articles in the Wall Street Journal. *See* James Bandler, "Odfjell Subsidiary Pleads Guilty To U.S. Charges," Wall Street Journal, Sept. 30, 2003, p.A2 ("Stolt has received conditional amnesty from government prosecution in the case, but that immunity is now under review at the Justice Department because of new information prosecutors have developed in recent months"); James Bandler, "Ex-Counsel At Stolt Called To Testify," Wall Street Journal, Sept. 22, 2003, p.A3 ("The government granted [Stolt-Nielsen's amnesty] request in January, but according to people familiar with the case, new evidence has made it question whether Stolt violated conditions of the agreement").

55.     Concerns about Stolt-Nielsen's status under the Amnesty Agreement were heightened even more by press statements made by the same FBI agent whose affidavit supported Mr. Wingfield's arrest. In comments reported in a major worldwide shipping industry publication, the FBI agent said that he expected "several more arrests" in the coming months. "FBI's 'Strong Case' May Lead To More Stolt-Nielsen Arrests; Bureau's Stance Over Price-

-14-

Fixing Probe Is Made Public In the Run Up To Wingfield's Indictment," Lloyd's List, August 13, 2003 (attached as Exhibit 7). According to the same press report: "[The FBI agent] said he was not at liberty to divulge names of people other than Mr. Wingfield who would be arrested, but added: 'I know who they are.'" *Id.*

56.     The actions taken by the Division against Mr. Wingfield had almost an immediate effect upon Stolt-Nielsen's lenders. Stolt-Nielsen, which was highly leveraged and which had forecast losses in another business unit, found itself impaired in its ability to refinance a $180 million revolving credit facility with Den Norske Bank ASA. The chief financial officer of the Stolt-Nielsen parent company, SNSA, traveled throughout Europe to replace the Den Norske Bank credit facility but faced repeated questions about the status of SNTG's antitrust amnesty. Stolt-Nielsen's lenders were put off by the business and legal uncertainties, including that occasioned by the Division's actions against Mr. Wingfield. Ultimately, in December 2003 Stolt-Nielsen had to pay down $20 million of the $180 million credit facility, due to its failure to find a financial institution willing to replace the $180 million credit facility. During the August 2003 through January 2004 timeframe, Stolt-Nielsen's status within the Antitrust Division Amnesty Program has been a prominent discussion topic, with lenders voicing concern over the antitrust issues and potential criminal fine exposure of Stolt-Nielsen. Lenders were put off by the uncertainty. Banks that had previously indicated an interest in extending credit now withdrew, damaging Stolt-Nielsen's financial condition.

57.     The ultimate parent entity of SNTG, Stolt-Nielsen S.A., is publicly traded. The company's ADR's are traded in the United States in the NASDAQ market and on the Oslo Stock Exchange. Since the charging of Richard Wingfield, the company's investors have raised questions concerning the status of the company within the Antitrust Division Amnesty Program.

-15-

Stolt-Nielsen is unable to give any assurance to investors in light of the April 8 letter and the unilateral determination by the Division that Mr. Wingfield is not covered by the Amnesty Agreement.

58.    The uncertainties caused by the Division's actions have exacted a toll on executive morale and performance. Stolt-Nielsen's executives live under a cloud of potential indictment. The Division's actions have sapped the company's resources. None of the repose promised in the Amnesty Agreement or the Antitrust Division policy speeches describing its Amnesty Program has been enjoyed by Stolt-Nielsen and its executives.

59.    There does not exist a legal remedy to correct the harm that Stolt-Nielsen has suffered or will suffer in the future.

## V.    The Antitrust Division Has Acted In Bad Faith

60.    The Antitrust Division acted in bad faith by suspending Stolt-Nielsen's cooperation on April 8.

61.    The Antitrust Division also acted in bad faith by prosecuting Richard Wingfield, notwithstanding the fact that Mr. Wingfield possesses immunity as conferred by the Amnesty Agreement. This bad faith was aggravated by the Division's use of information provided under the Amnesty Agreement as the foundation of the charges against Mr. Wingfield.

62.    The Antitrust Division also acted in bad faith in publicly announcing that more arrests of Stolt-Nielsen employees would be forthcoming.

### COUNT I

(Violation Of The Due Process Clause
Of The Fifth Amendment To The United States Constitution)

63.    Stolt-Nielsen refers to and incorporates by reference the allegations contained in Paragraphs 1 through 62 of this complaint the same as if they were repeated here in full.

-16-

64.     The Amnesty Agreement conferred upon Stolt-Nielsen (and its current and former officers, directors, and employees) property and liberty interests that are protected by the Fifth Amendment of the United States Constitution.

65.     In return for the Antitrust Division's promises, Stolt-Nielsen agreed to cooperate with the Division by, for example, providing a full exposition of all facts known to the Company relating to the anticompetitive behavior being reported.

66.     Stolt-Nielsen fully complied with its duties until the Antitrust Division abrogated the agency's obligations under the Agreement by suspending Stolt-Nielsen's duty to cooperate.

67.     The Antitrust Division has deprived Stolt-Nielsen of due process of law by, for example, unilaterally suspending the Company's duty to cooperate and criminally prosecuting its employee, Richard Wingfield.

68.     Stolt-Nielsen is prepared to continue to fully and completely perform its ongoing obligations under the Agreement.

69.     There is an actual controversy between Stolt-Nielsen and the Antitrust Division, and there are continuing adverse effects to Stolt-Nielsen resulting from the Division's actions.

70.     Accordingly, Stolt-Nielsen is entitled to a declaratory judgment that (1) Stolt-Nielsen (and its current and former officers, directors, and employees) have property and liberty interests in the Amnesty Agreement that are protected by the due process clause of the Fifth Amendment of the United States Constitution; (2) it is for the Court to determine whether Stolt-Nielsen has breached any of its obligations under the Amnesty Agreement; (3) prior to commencing criminal prosecution against Stolt-Nielsen or any of its employees, the Antitrust Division must first obtain a judicial determination that Stolt-Nielsen has committed a material

breach of the Amnesty Agreement; and (4) the Antitrust Division, its officials, agents, and/or employees are obligated to restore Stolt-Nielsen's conditional leniency.

## COUNT II

### (Specific Performance Of The Agreement)

71.     Stolt-Nielsen refers to and incorporates by reference the allegations contained in Paragraphs 1 through 70 of this complaint the same as if they were repeated here in full.

72.     The Antitrust Division and Stolt-Nielsen entered into a binding and legally enforceable Amnesty Agreement on or about January 15, 2003.

73.     The Antitrust Division's April 8, 2003 letter unilaterally "suspending" Stolt-Nielsen's duty of cooperation constitutes an effective abrogation of the agreement by the Division.

74.     The Antitrust Division's June 24, 2003 criminal complaint against Richard Wingfield constitutes an effective termination of the agreement by the Division.

75.     Stolt-Nielsen has no adequate remedy at law because, *inter alia*, monetary damages are unavailable to it.

76.     Stolt-Nielsen has a right to specific performance of the Amnesty Agreement.

77.     Stolt-Nielsen will be irreparably harmed if the Antitrust Division is not ordered to restore Stolt-Nielsen's conditional leniency.

## COUNT III

### (Promissory Estoppel)

78.     Stolt-Nielsen refers to and incorporates by reference the allegations contained in Paragraphs 1 through 77 of this complaint the same as if they were repeated here in full.

119104.00601/21240860v1

79.    Through its Corporate Leniency Policy and numerous speeches made by its officials, the Antitrust Division has promised corporate leniency to the first company in an industry that comes forward and reports anticompetitive behavior to the Division.

80.    In order to obtain Stolt-Nielsen's critical cooperation against its alleged co-conspirators in the parcel tanker industry, the Antitrust Division promised Stolt-Nielsen (and its current and former directors, officers, and employees) that they would be granted conditional leniency, would not be prosecuted, and would be granted full leniency after the Company fully cooperated and its Agreement representations were verified.

81.    The Antitrust Division knew, or should have known, that the promises described in paragraphs 79 and 80 would be relied upon by Stolt-Nielsen.

82.    Stolt-Nielsen reasonably relied on the Division's promises to its detriment in that, *inter alia*, Stolt-Nielsen (1) provided evidence beyond that required by law that could be used against it; and (2) exposed itself to a multitude of civil lawsuits after the existence of the Agreement was disclosed to the public.  The Antitrust Division knew or should have known that Stolt-Nielsen's cooperation would result in a detriment to the Company if the Division failed to honor its promises.

83.    The promises made by the Antitrust Division should be enforced in order to avoid injustice.

### DEMAND FOR RELIEF

WHEREFORE, Stolt-Nielsen respectfully prays for an order of this Court:

a.    entering a declaratory judgment holding that:

i)    Stolt-Nielsen (and its current and former directors, officers, and employees) have obtained property and liberty interests in the January 15, 2003 Amnesty Agreement that are protected by the due process clause of

-19-

the Fifth Amendment of the United States Constitution by virtue of that Agreement as well as the Division's Corporate Leniency Program, as explained in an Antitrust Division policy statement dated August 10, 1993;

ii)    the Antitrust Division, through the actions described herein, has deprived Stolt-Nielsen (and its current and former officers, directors, and employees) of the due process rights referenced in paragraph a.i.;

iii)    Stolt-Nielsen (and its current and former officers, directors, and employees) are entitled to have their rights, privileges and obligations under the Amnesty Agreement judicially determined prior to the Division taking any action inconsistent with that agency's obligations under the Agreement;

iv)    Stolt-Nielsen (and its current and former officers, directors, and employees) are entitled to specific performance of the Amnesty Agreement; and

v)    the Antitrust Division, its agents, and employees are obligated to restore Stolt-Nielsen's amnesty and to adhere to the obligations imposed upon the Division by the Amnesty Agreement;

b.    issuing a preliminary injunction that prevents the Division from acting contrary to the immunities granted and obligations conferred under the Amnesty Agreement;

c.    issuing a permanent injunction effectuating the terms and conditions of the Agreement; and

d.    issuing such further relief as the Court deems just and proper.

119104.00601/21240860v1

Dated:  February 6, 2004

Respectfully submitted,

STOLT-NIELSEN S.A. AND
STOLT-NIELSEN TRANSPORTATION
GROUP LTD.

By: _____
William H. Roberts
Ian M. Comisky
Matthew D. Lee
Blank Rome LLP
One Logan Square
Philadelphia, PA  19103-6998
tel.: (215) 569-5500
fax: (215) 569-5555


*Of Counsel*

George J. Terwilliger III
J. Mark Gidley
Christopher M. Curran
Lucius B. Lau
WHITE & CASE LLP
601 Thirteenth St., N.W.
Washington, D.C.  20005
tel.: (202) 626-3600
fax: (202) 639-9355

-21-