# Exhibit 15A

CORRECTED        1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - -

| | | |
|---|---|---|
| STOLT-NIELSEN, S.A. and<br>STOLT-NIELSEN TRANSPORTATION<br>GROUP, LTD. | : | CIVIL ACTION |
| Plaintiffs | : | |
| vs. | : | NO. 04-537 |
| UNITED STATES OF AMERICA | : | |
| Defendant. | : | |

Philadelphia, PA
April 13, 2004

BEFORE:   HON. TIMOTHY J. SAVAGE, J

First DAY


P R E S E N T:


For the Plaintiff:

WHITE & CASE
BY:  CHRISTOPHER M. CURRAN, ESQ.
GEORGE J. TERWILLIGER, ESQ.
J. MARK GIDLEY, ESQ.
GEORGE PAUL, ESQ.
601 Thirteenth Street, N.W.
Suite 600.
Washington, D.C. 20005-3807

DISK ENCLOSED

## Page 2

```
BLANK ROME LLP.
BY: IAN COMISKY, ESQ.
    MATTHEW LEE, ESQ.
One Logan Square.
Philadelphia, PA 19103-6998
For Stolt-Nielsen


FINE, KAPLAN & BLACK.
BY: ROBERTA D. LIEBENBERG, ESQ.
    ALLEN D. BLACK, ESQ.
    GERARD A. DEVER, ESQ.
23rd Floor
1845 Walnut Street.
Philadelphia, PA 19103-4723

JAMES A. BACKSTROM, ESQ.
Suite 200
Two Penn Center
Philadelphia, PA 19102-1706.

For RICHARD WINGFIELD


For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Antitrust Division
BY: ROBERT E. CONNOLLY, ESQ.
    ANOTONIA R. HILL, ESQ.
    WENDY NORMAN, ESQ.
The Curtis Center
Suite 650 West
7th and Walnut Streets
Philadelphia, PA., 19106.

FOR THE UNITED STATES


(Proceedings recorded by mechanical stenography,
transcript produced by computer)
```

## Page 3

(Appearances as noted, the following transpired in open court:)

THE COURT: Good morning, everyone. Please be seated.

MR. CONNOLLY: Good morning.

MR. TERWILLIGER: Good morning.

THE COURT: Mr. Comisky, how long did you work on that thing that you submitted to me to read 45 minutes ago?

MR. COMISKY: Quite a lot of time.

THE COURT: I have not read it.

MR. COMISKY: I am sorry, your Honor. We did obviously all work on it.

THE COURT: It does not mean I won't read it, but I won't read it before today.

MR. COMISKY: Yes.

MR. CONNOLLY: We didn't get a copy of what was submitted.

THE COURT: It's still very warm here.

MR. COMISKY: It was supposed to be hand delivered last night.

MR. CONNOLLY: Do you have another copy?

MR. COMISKY: I will give the Government my copy.

THE COURT: Don't worry about it, Ms. Hill. I didn't read it.

MS. HILL: All right.

## Page 4

THE COURT: This is the matter of Stolt-Nielsen versus United States of America, Civil Action Number 2004-537 and Wingfield versus United States of America. 2004-684.

This matter comes before us on the Plaintiffs' separate motions for preliminary injunctions, seeking relief from the Government's intention to seek indictments of the Plaintiffs. This matter is under seal. The courtroom is locked and that the notes of testimony will be under seal, as well and any filing will be under seal and everyone in this room, is under an order not to disclose what happens here, except to their clients, understood?

MR. CONNOLLY: Yes, your Honor.

MR. TERWILLIGER: Yes, your Honor.

THE COURT: That means the Wall Street Journal, Bloomberg news.

Is that understood?

MR. CONNOLLY: Yes.

MR. COMISKY: Yes.

THE COURT: It's a civil matter, ladies and gentlemen; am I correct?

MR. CONNOLLY: Yes.

MR. TERWILLIGER: Yes, your Honor.

THE COURT: And the Government intends to call Mr. Wingfield or anybody from Stolt-Nielsen.

Can they do that?

## Page 5

MR. TERWILLIGER: I suppose.

THE COURT: They certainly have a Fifth Amendment privilege; do they not?

MR. CONNOLLY: Yes.

THE COURT: We all know what their invocation of the privilege is at a civil proceeding; do we not?

Do you all want to proceed?

MR. TERWILLIGER: Yes.

THE COURT: All right. We discussed prior to this hearing how we are going to proceed. It's my understanding, and you can correct me if I am wrong, and if you want to modify my understanding, you can make the suggestion and I will consider it, but we were talking about doing this in two phases. Phase I as to the contract, itself. I refer to the amnesty agreement as a contract.

Would we all agree it is a contract?

MR. TERWILLIGER: Yes.

MR. CONNOLLY: Yes, your Honor.

THE COURT: I will determine whether or not there is a binding agreement whether the terms are ambiguous or unambiguous and what various terms meant and whether or not the Government is purporting to proceed in good faith. I will not get into the second phase today which is to determine whether or not indeed the information the Government has and which has already been filed with me in camera ex-parte,

Page 6

1  constitutes enough information to declare the agreement void.
2      Is that your understanding, Mr. Connolly?
3      MR. CONNOLLY: Yes, your Honor.
4      MR. TERWILLIGER: Yes.
5      MS. LIEBENBERG: Yes.
6      MR. TERWILLIGER: The only thing we would note is
7  we raised in the discussion earlier, is whether or not the
8  Court may want to hear testimony from counsel who represented
9  Stolt-Nielsen in the formation of the agreement and perhaps --
10     THE COURT: Mr. Nannes?
11     MR. TERWILLIGER: Yes.
12     THE COURT: You have him here?
13     MR. TERWILLIGER: We do have him here.
14     THE COURT: It's your burden.
15     MR. TERWILLIGER: Thank you, Judge.
16     THE COURT: Do we agree it's your burden? You are
17 moving for an injunction.
18     MR. TERWILLIGER: It's our burden to go forward on
19 the merits, your Honor and what I think is --
20     THE COURT: Okay, let me make something clear.
21 Maybe this will answer where you are going. There is going to
22 be an argument as to what is admissible and what is not
23 admissible. Remember, this is not a jury trial. I am going
24 to let everything in. I will then determine whether or not it
25 should be considered by me, agreeable?

Page 7

1      MR. TERWILLIGER: Certainly.
2      THE COURT: Because if on review, somebody said you
3  should have let this information in, so that we have a clear
4  picture of what is going on, I would not have precluded it,
5  even though I may not have considered it.
6      MR. TERWILLIGER: Understood.
7      THE COURT: Agreed?
8      MS. LIEBENBERG: Yes.
9      THE COURT: All right, Mr. Terwilliger, why don't
10 you give me an idea of what it is you intend to argue today?
11     MR. TERWILLIGER: I intend to address our argument
12 initially to what is in the agreement, what is not in the
13 agreement and the relevant principles of law that govern the
14 dispute that has arisen now over the terms of the agreement
15 and the Government abrogating its effect in terms of my
16 client's immunity.
17     THE COURT: Ms. Liebenberg, are you going to be
18 leading the charge for Mr. Wingfield?
19     MS. LIEBENBERG: Mr. Black.
20     THE COURT: Mr. Black?
21     MR. BLACK: I imagine I will simply add whatever
22 pertains to Mr. Wingfield.
23     THE COURT: Do you think his position may be
24 somewhat different than Stolt-Nielsen?
25     MR. BLACK: The contract has different provisions

Page 8

1  that apply to the individuals and there may be some additional
2  things that I would need to say respecting Mr. Wingfield's
3  individual position.
4      THE COURT: Do you want to tell me how you consider
5  his position different?
6      MR. BLACK: Sure, your Honor. If you look at the
7  agreement, the agreement spells out what is necessary to
8  comply with it in two separate places, one for the company and
9  one for the individuals and there are different requirements
10 there.
11     I guess this is maybe getting into Phase II, but
12 essentially, the Government has conceded that Mr. Wingfield
13 complied with four out of the five requirements for
14 cooperation listed in the individual section of the contract
15 and so the issue really with respect to Mr. Wingfield boils
16 down to the meaning of that fifth requirement, which is to
17 voluntarily provide other information. So that's a different
18 issue from --
19     THE COURT: That's Phase II. How about Phase I?
20     MR. BLACK: I imagine on Phase I, in terms of the
21 binding nature of the agreement, our positions are the same.
22     THE COURT: You think that? You are looking at Ms.
23 Liebenberg.
24     MS. LIEBENBERG: Yes, your Honor.
25     THE COURT: What do you say?

Page 9

1      MR. CONNOLLY: Your Honor, Mr. Wingfield's -- there
2  are two issues. One when the agreement is void, it is no
3  more. Mr. Wingfield has no basis to claim he has leniency.
4  He's a third-party beneficiary of an agreement that does not
5  exist.
6      Secondly, on an independent basis, Mr. Wingfield
7  failed his own cooperation requirements under that agreement.
8  He had relevant information that the company was trying to get
9  leniency on false pretenses. He had relevant information that
10 the Government had been given materially false information --
11     THE COURT: We're getting into Phase II, aren't we?
12     MR. CONNOLLY: Excuse me.
13     THE COURT: That's Phase II.
14     MR. CONNOLLY: Our interpretation is that somebody
15 who fails to cooperate independently on their own, they could
16 be removed from the Leniency Program, but you are right,
17 that's actually Phase II.
18     THE COURT: Let me tell you what I think is a
19 potential difference, my analysis.
20     This is not based on any evidence. This is
21 hypothetical. The company enters into an agreement with the
22 Government and purports to fulfill all the conditions required
23 under the agreement and part of the agreement, the officer of
24 the corporation becomes a third-party beneficiary in a sense
25 and relies on that agreement, comes forward, gives information

10

1  to the Government.
2         Again, we are assuming it's all truthful and total,
3  okay?
4         MR. CONNOLLY: Yes.
5         THE COURT: It is then determined that the company
6  has not been forthright and the company in some way has given
7  the Government a reason to void the agreement. The officer
8  who has been cooperating with the Government is unaware, and
9  in the meantime, has been cooperating with the Government in
10 good faith.
11        Is that person now, that officer, automatically out
12 of the program because the company breached?
13        MR. CONNOLLY: Not automatically, your Honor. That
14 person could make a good argument of detrimental reliance.
15        THE COURT: Now, is there a difference, Mr. Black?
16        MR. BLACK: In terms of the --
17        THE COURT: You weren't paying attention.
18        MR. CONNOLLY: Could I add, when a party does that,
19 the Government executes a separate agreement with that
20 individual, making it clear that their rights --
21        THE COURT: Yes, but an officer could be on
22 reliance on that agreement providing all that information and
23 the company is not -- the officer is not going to be punished,
24 because the company was not forthright, correct?
25        MR. CONNOLLY: We agree with that, sir.

11

1         THE COURT: So we will then get into Phase II. I
2  want to make sure we are agreed on the principles under the
3  contract, okay?
4         MR. BLACK: That's correct, that's where we see Mr.
5  Wingfield as being.
6         THE COURT: Now, the agreement, itself, is dated
7  January 15, 2003, correct?
8         MR. CONNOLLY: Yes, your Honor.
9         THE COURT: Do you intend to mark that as an
10 exhibit?
11        MR. TERWILLIGER: Yes, your Honor.
12        THE COURT: Do you have exhibits?
13        MR. TERWILLIGER: Yes.
14        THE COURT: Do you have copies for the Court?
15        MR. TERWILLIGER: We do.
16        THE COURT: Are they pre marked?
17        MR. TERWILLIGER: Would you like them now or later?
18        THE COURT: Now.
19        MR. TERWILLIGER: Okay. With the Court's
20 indulgence?
21        (Pause)
22        MR. TERWILLIGER: Your Honor, while they are
23 pulling the agreement, I actually have three documents I would
24 like to have marked and perhaps Mr. Connolly will stipulate to
25 their admission once I show it to him.

12

1         The original draft of the agreement sent to Mr.
2  Nannes, the agreement that was signed and then we prepared a
3  red line version that shows such differences as there are
4  between the two, but while that is being prepared, just on the
5  colloquy that the Court had with counsel before, I just want
6  to flag an issue.
7         If in fact the company, through its counsel made
8  truthful representations throughout its dealings with the
9  department in the formation of the contract, then it turns out
10 later that one of the officers of the company who also may be
11 a future defendant was not truthful with the company during
12 that process, it seems to me that the same equitable analysis,
13 fairness analysis would apply in those circumstances.
14        THE COURT: It depends on the relationship and it
15 depends on all other factors.
16        MR. TERWILLIGER: Yes, I agree. I am not saying
17 this is an across-the-board, but that may be part of the
18 analysis in this case.
19        MR. CONNOLLY: We would disagree strongly with
20 that. The company is responsible for the representations of
21 its senior officers when trying to get them leniency and they
22 can't benefit from having a senior officer tell a false
23 statement.
24        THE COURT: Either one, telling the truth or lie,
25 they are bound by either one, right?

13

1         MR. CONNOLLY: Yes, your Honor.
2         MR. TERWILLIGER: Judge, we have a book of
3  exhibits, most of which pertain to the potential testimony of
4  Mr. Nannes. The first or second document in there is in fact
5  the agreement.
6         THE COURT: Fine. I want to know what you have.
7  Bring it up.
8         Do you want to give Mr. Connolly one?
9         MR. TERWILLIGER: Your Honor, I have a second
10 exhibit that I would like to have marked, if I may. Would
11 your Honor like to mark the book?
12        THE COURT: I assumed -- these are all individual
13 exhibits, are they not in this book?
14        MR. TERWILLIGER: Yes.
15        THE COURT: So this will be Stolt-Nielsen 1 through
16 17.
17        MR. TERWILLIGER: So why don't we mark this as 18
18 for identification at this point. This is the red line
19 version that compares the document originally sent --
20        THE COURT: Which one?
21        MR. TERWILLIGER: This one right here. So maybe we
22 can mark that as 18.
23        THE COURT: Mr. Griffin, were you out there waiting
24 for me to say, "Where is Mr. Griffin" and then you knocked?
25        MR. GRIFFIN: I was told you asked about me and

14

1  then I knocked.
2       THE COURT: I thought your timing was really well
3  done.
4       MR. GRIFFIN: Good to see you.
5       MR. CURRAN: Your Honor, you will see there are 17
6  tabs in this exhibit book. However, under tab 4, there are a
7  number of exhibits, so you will see that there is a total of
8  22 exhibits in this binder.
9       THE COURT: Well, why don't we make this 4A, 4B,
10 4C?
11      MR. CURRAN: We can do that, your Honor.
12      THE COURT: And "D", right?
13      MR. TERWILLIGER: We also have the agreement blown
14 up, because I was going to refer to it at various points and I
15 thought it might be easier to look at the blowup.
16      THE COURT: All right. Mr. Terwilliger, it's your
17 floor.
18      MR. TERWILLIGER: Thank you very much, your Honor.
19 For the record, your Honor, George Terwilliger,
20 White & Case, Washington, D. C., for SNTG and Stolt-Nielsen
21 and I thank you, your Honor, for allowing myself and my out of
22 town colleagues to appear pro hac vice in your courtroom.
23      Your Honor, we are here, as we all now know and
24 recognize over a dispute on an immunity agreement in a program
25 that is truly unique in federal law enforcement. And that, in

15

1  itself, makes this case and the procedural circumstances in
2  which we come here rather unique. It's especially unique,
3  since it's unprecedented to our knowledge, at least, that the
4  United States and the Antitrust Division would terminate the
5  participation of a participant brought into the conditional
6  leniency program.
7       So that makes the case unique and really what the
8  dispute is about is the Government seeking ratification upon
9  our challenge by the Court of that termination. It seems
10 especially so, given that SNTG provided the Government with a
11 smoking gun of evidence of antitrust violations which has been
12 used, as is now in the record in this Court to convict several
13 other individuals and entities in the underlying antitrust
14 conspiracy.
15      However, be that as it may the fact of the matter
16 is, that we are not totally at sea or in a legal void in
17 addressing this dispute, because the performance of the
18 parties in agreements between the Government which disposes of
19 criminal charges and disputes about performance and
20 entitlement to performance and to the benefit of promises, is
21 not unknown to the courts and to our jurisprudence.
22      The Government's position here is probably most
23 clearly demonstrated, I believe, your Honor, in Mr. Griffin's
24 letter of March 2nd to Mr. Gidley, terminating our involvement
25 in the program and I believe it's already in the record in

16

1  this case and if it's not, we will make sure it gets into
2  evidence before all is done, but on Page 2 of that letter Mr.
3  Griffin writes: "Contrary to the representations made at the
4  time that SNTG made its application and in the leniency
5  agreement, itself, the Division has determined that SNTG did
6  not terminate its participation in the conspiracy when it
7  discovered the illegal activity, but instead, continued its
8  participation in the conspiracy until at least as late as
9  November 2002."
10      There are four reasons, I would suggest, your
11 Honor, why the Government's position terminating
12 Stolt-Nielsen's participation in this program cannot be
13 sustained by this Court and I respectfully submit that this
14 can, as we indicated in the papers we filed last week with the
15 Court -- this can be decided as a matter of law.
16      First, there is clearly no term in this contract,
17 in the amnesty agreement, requiring Stolt-Nielsen to have
18 terminated the anticompetitive activity as of March, 2002.
19      Second, if termination in March was a condition
20 precedent to this company's participation in this agreement
21 and the program, then under principles of contract law, the
22 contract should have said that. Instead, it said --
23      THE COURT: Does it not say it's conditionally
24 accepted?
25      MR. TERWILLIGER: It does say it's conditionally

17

1  accepted, your Honor, and we can get into a discussion of the
2  difference between representations and conditions precedent.
3       THE COURT: We will.
4       MR. TERWILLIGER: The express terms of this
5  agreement are inconsistent with reading this March 2002 term
6  in there because the contract gives Stolt-Nielsen immunity
7  through January 15, 2003. When the Government claims now that
8  it was predicated upon a representation, a condition, really
9  that the company ceased all activity the previous March 2003.
10      THE COURT: Is there any prohibition in the
11 agreement against the Government using derivative use?
12      MR. TERWILLIGER: This is not a use immunity
13 agreement, it's a transactional immunity agreement and I am
14 not sure derivative as to who? The company can't be
15 prosecuted.
16      THE COURT: What if in fact it were to be
17 determined that the revocation was proper, can the Government
18 use the information that it got up to that point?
19      MR. TERWILLIGER: Well, that is in and of itself a
20 whole separate subject matter and I will address it briefly.
21      THE COURT: My point is, is it covered in the
22 agreement.
23      MR. TERWILLIGER: It's expressed in the agreement,
24 but as Mr. Connolly said a moment ago, your Honor, if the
25 agreement is void, it is no more. The Government cannot have

```
                                      18
1    it both ways. Void the agreement and then say they are
2    entitled to use that information against Stolt-Nielsen, but
3    most importantly that illustrates under equity principles what
4    a serious issue this is and what the Government tries to do.
5    Stolt-Nielsen -- usually, if a contract is rescinded, it goes
6    through a rescission or is voided or is declared void ab
7    initio, then the standard equitable remedy is to put both
8    parties back where they were when the contract began. I
9    bought a Ming Dynasty vase from the store and it turned out to
10   be something Woolworth put together. We go back to where we
11   were. We relied on the promise made under that agreement.
12         THE COURT: The Government entered into an
13   agreement with the company and the company was found to be
14   misleading and there was a justifiable revocation and they can
15   never been prosecuted and all the information you got in the
16   meantime cannot be used against them. That would be a great
17   deal for a company. Let's go in and sign the agreement, give
18   them false information and we are protected.
19         MR. TERWILLIGER: Your Honor, I don't think we have
20   to get there, because this agreement should not be rescinded
21   for the reasons that I am outlining to the Court and I would
22   like to discuss with the Court in detail.
23         If in fact there is not an express term in this
24   agreement that all anticompetitive activity had to have ceased
25   as of the end of March or whatever the date is in the spring
```

```
                                      19
1    of 2002. If it's not expressed, then, the next thing one has
2    to do is look at the existing terms of the contract and see if
3    that can be gleaned from it and under principles of contract
4    law that I would really like to go through with the Court here
5    and that are addressed in our brief and I apologize, your
6    Honor, we would have had that to you midday yesterday, but for
7    some computer problems, but the contract law principles will
8    not abide reading that term into this agreement and lastly,
9    your Honor, the fourth reason -- what does, "upon discovery"
10   mean?
11         "Upon discovery" is a very complicated term in this
12   agreement.
13         THE COURT: Mr. Connolly says it's   what we're
14   talking about.
15         MR. TERWILLIGER: I would respectfully submit
16   that's wrong. The Government says that discovery occurred in
17   March of 2002. That is the lynch pin of their position here.
18   What does discovery pertain to, your Honor? It pertains to
19   the anticompetitive activity being reported. That is a term
20   of art, anticompetitive activity being reported is a term of
21   art in this agreement. The anticompetitive activity being
22   reported is not by the terms of their agreement the same as
23   the full scope of the underlying conspiracy in the case. The
24   anticompetitive activity being reported is such part of the
25   conspiracy as is being reported. Now, how do we know that,
```

```
                                      20
1    because that's what you get immunity for? You don't get
2    immunity for what you don't report. You get immunity for the
3    anticompetitive activity being reported. A defined in quotes
4    term of art in the agreement and what is it that you get
5    immunity for, then? It's that which counsel knows and
6    therefore discloses to the Government. The anticompetitive
7    term --
8          THE COURT: Let me interrupt you there.
9          MR. TERWILLIGER: Yes.
10         THE COURT: What counsel knows and what counsel
11   reports to the Government --
12         MR. TERWILLIGER: Is the anticompetitive activity
13   being reported?
14         THE COURT: Okay.
15         MR. TERWILLIGER: The reason we know that, your
16   Honor, is -- can you put up the excerpt from Mr. Hammond's
17   speech.
18         Scott Hammond is an official at the Justice
19   Department who has addressed this point in a speech that is
20   part of the --
21         THE COURT: Are you suggesting that's part of the
22   agreement?
23         MR. TERWILLIGER: Which, your Honor?
24         THE COURT: Hammond's speech?
25         MR. TERWILLIGER: No.
```

```
                                      21
1          THE COURT: I am going to look to Hammond's
2    comments to construe the agreement?
3          MR. TERWILLIGER: Yes.
4          THE COURT: I am, so is it referenced in the
5    agreement anywhere?
6          MR. TERWILLIGER: No.
7          THE COURT: So construing the agreement, I should
8    look at his comments.
9          MR. TERWILLIGER: The agreement embodies the
10   leniency policy --
11         THE COURT: Is it your position your client relied
12   on that policy?
13         MR. TERWILLIGER: Mr. Nannes is prepared to testify
14   as to his knowledge of the policy agreement, such as speeches
15   such as this were all parts of his reliance.
16         THE COURT: Then, if you would want me to strictly
17   construe the agreement, I would say I can't look at it.
18         MR. TERWILLIGER: Your Honor, I think we should go
19   by the rule the Court announced before, you should --
20         THE COURT: Throw it all in, right?
21         MR. TERWILLIGER: Throw it all in and then you can
22   decide it.
23         THE COURT: I am going to let it all come in
24   because I played the rules. But, go ahead.
25         MR. TERWILLIGER: I think if we want to get --
```

### Page 22

1  THE COURT: Do you want to hold me to the four
2  corners of the agreement or --
3  MR. TERWILLIGER: I think the agreement is held to
4  the four corners of the agreement. What the terms of the
5  agreement mean to the parties participating is in part
6  determined by their knowledge of the program this is part of
7  the agreement itself and by any stretch requires some
8  expertise in analysis, if not interpretation and we don't have
9  to get -- under the rules of contract construction, you don't
10 have to get to parol evidence if the terms agreement can be
11 given their common meanings and understandings and the
12 agreement was memorialized this way. I see that as an aid to
13 that. If you don't want to hear it, I'm happy to --
14 THE COURT: No, no; don't get me wrong. Everybody
15 will get the same treatment. I will ask you questions because
16 I want to focus an opinion point on what's going on and I want
17 to be clear on what your positions are. I told you at the
18 outset I will let everything in and then determine what should
19 be considered. You argue everything you want to argue today.
20 Don't say I don't want to hear it.
21 MR. TERWILLIGER: Thank you.
22 Does he have a book that has a copy of it?
23 THE COURT: There is another book.
24 MR. TERWILLIGER: Yes, there is a book like this.
25 THE COURT: Do you want me to follow along?

### Page 23

1  MR. TERWILLIGER: I don't think secret notes are in
2  there.
3  THE COURT: Okay.
4  MR. TERWILLIGER: This is not really that
5  complicated. This is a really common sense application of the
6  policy Mr. Hammond is referring to.
7  What it says is that because this program puts an
8  emphasis on speed, come in first, it recognizes that it's
9  likely counsel will not know everything when they come through
10 the door and as a result of that, what Mr. Hammond is saying,
11 that if an ensuing investigation uncovers anticompetitive
12 activity that is more extensive than the conduct originally
13 reported, then the amnesty coverage will be expanded to
14 include the newly discovered evidence.
15 THE COURT: Does that not assume a good faith
16 basis?
17 MR. TERWILLIGER: Of course. I am sure it does.
18 THE COURT: They may know at the outset what's
19 going on and claim later --
20 MR. TERWILLIGER: That raises another equitable
21 principal that I will get back to in a minute, your Honor, but
22 focusing on this --
23 THE COURT: Since we're talking about equitable
24 principles, does the doctrine of unclean hands come into this?
25 MR. TERWILLIGER: Yes, indeed, your Honor. In

### Page 24

1  fact, I am a little concerned, to be honest with you, your
2  Honor and I take the Court's earlier admonition to us when we
3  were discussing procedure in this matter informally in your
4  chambers that we should not assume things by your questions as
5  to the Court's position.
6  THE COURT: That's correct.
7  MR. TERWILLIGER: But, I am a little concerned by
8  the Court's questions that the Court has drawn a conclusion
9  that the company came into this discussion with unclean hands.
10 THE COURT: No, I did not.
11 MR. TERWILLIGER: I think --
12 THE COURT: Come on, don't even go there.
13 MR. TERWILLIGER: Okay, Judge.
14 THE COURT: The whole point of this is for me to
15 understand what your arguments are and what is going on and
16 throughout this proceeding I will interject so I can clarify
17 for my benefit what everybody is doing here.
18 MR. TERWILLIGER: Very well, Judge.
19 THE COURT: I have not made up my mind in this case
20 or I wouldn't be here. I could have done it on the papers.
21 MR. TERWILLIGER: I assumed that.
22 THE COURT: All right.
23 MR. TERWILLIGER: The important aspect of this,
24 your Honor, is that it recognizes the distinction between the
25 concept and the term of art in the agreement of

### Page 25

1  anticompetitive activity being reported and the underlying
2  conspiracy, the Sherman act violations which could be quite a
3  bit more extensive then the anticompetitive activity being
4  reported. Thus, he says if you come in and you tell us
5  everything you know presuming the good faith of the court,
6  that is, everything that the reporter, counsel knows, acting
7  as the company's authorized agent to make the report and then
8  as the investigation proceeds, newly discovered
9  anticompetitive activity arises, well, we will work with you
10 to try to sweep that into the immunity that you have been
11 granted. The immunity you have been granted to begin with is
12 for the anticompetitive activity being reported and not more.
13 That pertains to discovery. We started this discussion off by
14 the Court asking me a question about discovery. What the
15 anticompetitive activity being reported is, what is the "it",
16 is critical to understanding the express terms of this
17 agreement, because the prompt and effective action requirement
18 which is what the Government contends Stolt-Nielsen violated
19 here or misrepresented is triggered by discovery. Discovery
20 of what, though? The anticompetitive activity being reported,
21 which is a term of art. Here, what is the anticompetitive
22 activity being reported? The anticompetitive activity being
23 reported in this case is what John Nannes discovered in
24 December and reported to the Division in December and January.
25 Discovery is an important word in this case, your Honor. When

26

1   Columbus --
2   THE COURT: You said what Mr. Nannes discovered?
3   MR. TERWILLIGER: Yes.
4   THE COURT: What about what the company had
5   discovered?
6   MR. TERWILLIGER: Mr. Nannes is the company's
7   agent, your Honor.
8   THE COURT: I understand that.
9   MR. TERWILLIGER: Discovery --
10  THE COURT: Can he select what he tells them about
11  the anticompetitive --
12  MR. TERWILLIGER: No, there is no reason for him to
13  do so. He should tell them everything because the immunity
14  will be co-extensive with what he reports.
15  THE COURT: Is what Mr. Nannes discovered the same
16  as what Mr. O'Brien discovered?
17  MR. TERWILLIGER: No. And what O'Brien discovered
18  is irrelevant for several reasons.
19  THE COURT: It was Mr. O'Brien's stuff that started
20  this whole thing running?
21  MR. TERWILLIGER: On the contrary, your Honor.
22  THE COURT: You should enlighten me on that issue.
23  MR. TERWILLIGER: I will try to. When Columbus got
24  his charter from Queen Isabella and set out from Spain, he had
25  a belief --

27

1   THE COURT: He did not have parcel tanker.
2   MR. TERWILLIGER: He had a belief, maybe
3   reasonable, maybe some people would have said it was
4   unreasonable, but it was something more than a mere suspicion.
5   He had a logical conclusion, deduction, that somewhere over
6   that horizon there was a plan in place, but that was not
7   discovered until he set foot on it. It was tangible and
8   something he could report on and saying what he thought was a
9   different part of the world. He had proved the theory.
10  What Mr. Nannes had, as the Court will hear in the
11  evidence, was essentially different, because anticompetitive
12  activity being reported, your Honor, has to be a judgment.
13  It has to be a judgment. If you look at what --
14  anticompetitive activity being reported, has several elements.
15  I am sorry, I thought I had it on the charts, but evidently, I
16  don't. It has several parts. The first part, obviously,
17  is -- the elements of the anticompetitive activity being
18  reported under the terms of this agreement by the definitions
19  in the agreement -- put the big agreement up in the section
20  that defines anticompetitive activity being reported, I
21  believe it's three -- is number one, collusive activity,
22  number two, violative of the Sherman Act. Number three in the
23  parcel tanker industry and number four, involving
24  transportation to and from the United States which is
25  obviously jurisdictional. That term has to be -- it's in

28

1   section one not three. Possible collusive activity or other
2   conduct, violative of the Sherman Act.
3   In the parcel tanker industry, involving
4   transportation to and from the United States, there has to be
5   a judgment made by a person with experience and expertise in
6   antitrust law. That is a legal judgment that is made at that
7   point.
8   Now, what did Mr. Nannes have in December? What
9   did he set foot on that allowed him to make that judgment,
10  your Honor? The qualitative difference is he had conclusions
11  that were exchanged between Stolt-Nielsen and its competitors,
12  the smoking gun, the evidence of the underlying antitrust
13  conspiracy that was charged and in fact, your Honor, it is
14  that very evidence that the Government has used to convict
15  other participants in this conspiracy of violating the Sherman
16  Act.
17  What that tells us is that the anticompetitive
18  activity information that Mr. Nannes had in January, reached
19  that threshold. Maybe it's not a clear line. Maybe it's a
20  zone, but reached that threshold where it could be reported
21  and would be accepted by the Government. When your Honor
22  hears the evidence of what took place between Mr. Nannes and
23  the Government, I submit, your Honor, you will be fully
24  satisfied that in fact there was a process thereby which there
25  was a discovery, there was a qualitative point that had to be

29

1   reached before the Government would accept Stolt-Nielsen into
2   the program and it is Mr. Nannes' information that gets us
3   there and what --
4   THE COURT: Where is Mr. Nannes' understanding of
5   what the collusive activity spelled out in here?
6   MR. TERWILLIGER: It's not spelled out in there.
7   THE COURT: Okay. How does that make it definitive
8   of what is in Mr. Nannes' head.
9   MR. TERWILLIGER: It's not what is in his head.
10  It's what the anticompetitive activity is for purposes of this
11  agreement.
12  THE COURT: It says, "Possible collusive activity";
13  is that correct?
14  MR. TERWILLIGER: Yes, it does, "-- or other
15  conduct violative of the Sherman Act in the parcel tanker
16  industry --"
17  THE COURT: Where does that leave that --
18  MR. TERWILLIGER: It's this term right here, "being
19  reported." It's not everything that is out there. That's
20  what Mr. Hammond's speech. That's what you get immunity for
21  in the agreement, the anticompetitive activity you report.
22  THE COURT: What is the other conduct, then?
23  MR. TERWILLIGER: The other conduct can well be
24  part of the underlying conspiracy that is not being reported.
25  THE COURT: That is not collusive activity.

Page 30

1    MR. TERWILLIGER: It may well be collusive
2 activity, but it's not being reported and if it's not being
3 reported, you don't get immunity for it.
4    THE COURT: No, no; I am looking at the sentence
5 you talked about in your representations. It talks about
6 possible collusive activity or other conduct, and then,
7 parenthetically, it's referring to the anticompetitive
8 behavior being reported.
9    MR. TERWILLIGER: Yes.
10    THE COURT: Are you saying the parenthetical
11 information is defining the collusive activity or is just a
12 limitation?
13    MR. TERWILLIGER: It's a limitation. For purposes
14 of this agreement, it's putting a circle around the
15 anticompetitive activity that's covered by this agreement.
16    THE COURT: So, you are saying that possible
17 collusive activity is not the same as anticompetitive activity
18 being reported?
19    MR. TERWILLIGER: Correct. It's a limitation.
20    THE COURT: Okay.
21    MR. TERWILLIGER: The terms -- again, your Honor, I
22 am dwelling on the discovery question --
23    THE COURT: Usually, when we put something in
24 parenthesis and within quotes, we're using that as further
25 reference as the thing that's preceding it.

Page 31

1 So if I use that argument as it typically appears,
2 parenthesis within a quote is what we're going to call what
3 goes before it throughout and therefore, if I use that
4 analysis, then the anticompetitive activity being reported is
5 synonymous with possible collusive activity or other conduct,
6 under that analysis?
7    MR. TERWILLIGER: That's correct, but if you look
8 at what we get immunity for, your Honor, in the agreement, we
9 don't get immunity and according to Mr. Hammond's speech, we
10 don't get immunity for everything. We get immunity for the
11 anticompetitive activity that is being reported. It is a term
12 of art in this agreement and it is indeed the axle upon which
13 discovery and many other terms in this agreement turn.
14    Let me imagine a hypothetical, if I might with you,
15 your Honor. If someone in a company, a lawyer, board member,
16 because under the policy the Government says those are the
17 only people to whom the discovery trigger applies, has
18 suspicions of possible collusive activity, but they don't rise
19 to the level of being a violation, they don't reach
20 judgmentally the level that you can go into the Division and
21 get yourself into the leniency program, then there is no
22 discovery. Discovery by its common understanding and as I
23 will show in a moment under some analogous legal
24 circumstances, discovery means something that is more than
25 mere suspicion, indication and those sorts of things. It

Page 32

1 means setting your foot in the West Indies and we are there.
2    In fact, even Webster's says that, "'Discovery' is
3 gaining knowledge through observation, study or search."
4    In the Third Circuit, the Court of Appeals has in
5 the case of Fidelity And Deposit Company Of Maryland, versus
6 Hudson United Bank, I think is a very helpful analogous
7 circumstance that construed what "discovery" means in
8 circumstances of where a notice of loss obligation, notice of
9 loss to an insurer's obligation is triggered and the Court
10 there said, "A bank is not under a duty to notify its
11 insurance carrier until it has knowledge of some specific
12 fraudulent act that would in fact constitute discovery,
13 triggering the notice of loss provision."
14    Here, the defining fact, as I mentioned a moment
15 ago, is that the Government got pleas based on what Mr. Nannes
16 discovered. It was when he got the customer lists that this
17 went over the threshold to the point of setting foot on land,
18 making the discovery.
19    In that way, your Honor, to sort of come back full
20 circle to where I started here, the express terms of this
21 agreement do not support -- do not support -- the position
22 that the Government is taking, that you should read into this
23 agreement, which is what they are asking the Court to do, read
24 into this agreement, a requirement that Stolt-Nielsen ceased
25 all anticompetitive activity as of March of 2002.

Page 33

1    Now, it may be, your Honor, I don't doubt the good
2 faith of these fine people. It may be that that's what they
3 intended. It may even be that they think that's what they
4 told Mr. Nannes in their dialogue with you. That is not what
5 their agreement says and under contract law --
6    THE COURT: Maybe we can find out in addition to
7 what it is they thought they told Mr. Nannes.
8    MR. TERWILLIGER: Not even if they told him, that's
9 not what the agreement says. To the extent there is any
10 ambiguity in this agreement, that ambiguity has to be
11 construed against the Government.
12    If you look at, I believe, Exhibits 1, 10 and 18,
13 your Honor will see that there is very little difference
14 between the agreement that was originally sent to Mr. Nannes
15 and the agreement Stolt Nielsen signed. The Government is the
16 drafter of the agreement. It dictates the terms. The parties
17 don't come to the table from a start from scratch negotiation
18 in equal bargaining positions, and as the Third Circuit made
19 it clear in the Baird decision, under those circumstances, any
20 ambiguities cannot be construed in favor of the drafter of the
21 agreement, here, the Government.
22    In addition to that, your Honor --
23    THE COURT: Is this a contract of adhesion?
24    MR. TERWILLIGER: In many respects, it's at least
25 like that, your Honor, but in addition to that, your Honor, if

**Page 34**

in fact -- again, going back to --

THE COURT: Your client came in the door. Your client approached the Government.

MR. TERWILLIGER: Yes, with the leniency policy in mind. I am not taking the position that this is a contract of adhesion. I said it's like that and some similar principles apply and if in fact it was a condition of precedent, as they are now saying that all anticompetitive activities ceased as of March, 2002, they could very easily put that in the agreement. There is no clause in this agreement that says whereas Stolt Nielsen has represented that as of March, 2002 it ceased all anti competitive activities. It does not say this is conditioned upon the representation --

THE COURT: It says, "Subject to representation, conditionally accepted."

MR. TERWILLIGER: Yes, but it does not say --

THE COURT: That's kind of conditional --

MR. TERWILLIGER: There is no reference in this agreement to March of 2002.

THE COURT: We will agree on that, but you can't take the position there is not a subject of verification in here.

MR. TERWILLIGER: Yes, of course, as a general matter, that is true.

THE COURT: Not as a general matter, as a specific

**Page 35**

matter.

MR. TERWILLIGER: My point is, the Government is the drafter of the agreement and if that's what they intended to be, there to be a condition precedent to Stolt-Nielsen's participation they could very easily have written that into the agreement.

THE COURT: Your client could have demanded a restricted definition of the anticompetitive behavior --

MR. TERWILLIGER: They saw no reason to do that, your Honor. Here, the anti competitive activity being reported got them immunity through January 15, 2003. Now, the Government comes in and says, "As a result of our investigation, we think there was anticompetitive activity prior to January, 2003, but after March of 2002." We're shocked, this is gambling in a back room. Why did they give us immunity to January, 2003? It does not make sense that all anticompetitive activity had to cease as of March of 2002.

THE COURT: Do you think the Government would say, you have come forward with this particular part of the anticompetitive behavior and we're going to immunize you for that, but we don't care if you continue doing some other anticompetitive activity.

MR. TERWILLIGER: Of course they can.

THE COURT: They're not going to give you an agreement that you guys can do anticompetitive acts in some

**Page 36**

other area.

MR. TERWILLIGER: No, but that comes back to discovery and once you have discovery, you have an obligation to take prompt and effective action to terminate it.

THE COURT: If the Government withholds information from its counsel, can it hide behind counsel's representations?

MR. TERWILLIGER: It's not hiding behind counsel's representations. Counsel can only know what he knows.

THE COURT: Can the company manipulate its counsel and use that as a safety valve?

MR. TERWILLIGER: If there was evidence of affirmative manipulation of counsel in order to fraudulently enter the program, I would say no, but I don't think there is any evidence of that here. The fact of the matter is, your Honor, if you look at the express terms of this contract, January 15th, it's inconsistent with the expressed -- the inclusion of January 15th is inconsistent with reading into the existing terms of this contract a March, 2002 obligation, condition precedent to participation. It does not make any sense.

I would like to talk about prompt and effective action for a moment, if I might, Judge.

I am certainly not conceding that Stolt-Nielsen either represented that it did discover in March and take

**Page 37**

prompt and effective action or that it represented that what it took in March was the prompt and effective action demanded by this agreement, but if you look at what the terms, "prompt and effective action" mean I think that's also instructive, because even if the Court were to draw the conclusion that there was an obligation to take prompt and effective action in March, for two reasons, the terms and applicability of other people's conduct to the company's position, I think we still win this case.

Effective under Third Circuit precedent, a case of Nader vs. Burry, "effective", means reasonably calculated to prevent further misconduct. I liken the analogy to a case I would think your Honor is probably familiar with, Delaware Chancery Court, condition precedent, Care Mart decision which redefines the duties of boards of directors.

In that case the Delaware Chancery Court stated the board has the responsibility to maintain such systems and controls over the companies finances and operations that the board can rely on those to satisfy its obligation to oversee the company and it's finances, but the strict terminology that the Court used was "reasonably designed."

"Prompt and effective action", your Honor, has to include an element of reasonableness. If it meant terminate, drop the curtain, it could say that and it does not say that.

The second reason goes back to what happened in

38

March. When the company notified its competitors that it was no longer going to engage in such conduct as had given rise to the need to ratchet up its compliance program -- Mr. Curran will elicit testimony from Mr. Nannes about that. When the company did this, that had several legal effects.

First of all that the company was involved in a conspiracy, it was a withdrawal as a matter of law from the conspiracy because it went to their competitors and to the extent they were involved in antitrust violations at that point of U.S. law, they said no more, we're done, we're out of this. That has an effect on the authorization of officials in the company, as well.

As your Honor knows, agents who can bind a principal to a contract have to have authorization to bind. One of the fundamental precepts of agency law is that I go out and say I represent White & Case, I would like to buy a pack of pencils and put it on their credit card. I have apparent authority to bind White & Case to make that payment on that account, but know that bearded guy Terwilliger if he comes into buy pencils, he does not have authority to do that. If they sell me the pencils, anyway, they are out of luck. If the company went to its competitors and said, no authority for these guys to enter into collusive arrangements on contracts or anything else of this nature and then somebody goes and tries to do

39

that, they are acting, number one without express authority, because to the extent it was ever there, it was revoked and number 2, they can't bind the company to that as a matter of law, because that authority has been withdrawn in the eyes of the reciprocating party in that contract.

Your Honor, I would respectfully submit that this is a case that is about more than a question of fairness. This is about a question of justice and I know it sounds odd sometimes for a company, a corporation to come in and request justice. This is not a situation where somebody is trying to pull a fast one on the Government. We fully performed here. The Government got the full benefit of Stolt-Nielsen's obligations under this agreement. Even if your Honor, you were to conclude that Stolt Nielsen discovered a term of art in March and didn't go fast enough to satisfy the Government in terms of whatever "prompt and effective action" means, the Government has not been injured by that, but if this agreement is revoked, Stolt-Nielsen will be injured.

THE COURT: Have you all worked out how you're going to handle that issue?

MR. TERWILLIGER: If the Court wants --

THE COURT: We discussed that --

MR. TERWILLIGER: If the Court wants to hear testimony on injury, we can put it on.

THE COURT: Unless you can do it by stipulation.

40

MR. TERWILLIGER: We need to take that up further with the Government.

THE COURT: You will have time.

MR. TERWILLIGER: Thank you.

Under contract principles, plea agreement and immunity agreement and we now there is a legion of jurisprudence on this to hold the Government's feet to the fire on an agreement. That's what the courts say over-and-over. If the Government makes an agreement and a defendant in a me agreement situation acts in reliance on that, the Court is going to hold the Government to its bargain and construe any ambiguities about what that agreement was against it. So here, the Government has not been harmed by the agreement. It drafted it. If what they meant to say we have ceased all anticompetitive activity in March they could have said that. They could have said at the very least, you only get immunity to the end of March not to January 15th. If something happened as we suspect between March and now, you are on your own on that. You will have to come in under Mr. Hammond's secondary immunity.

So the question is, should Stolt-Nielsen suffer harm when it relied on what the Government offered to us in this program, when we, performed, gave it information which has been used to convict other people and it now suffers not only having the repose from prosecution that it got in that

41

agreement, but in addition everything he gave the company has been available for use against it and its officers.

Unless the Court has other questions, your Honor, I thank you for your time and for the colloquy and perhaps at the conclusion of the evidence in this case, I might have an opportunity to address other points that are not raised here.

THE COURT: All right.

MR. TERWILLIGER: Thank you.

THE COURT: We're going to take five minutes.

(Whereupon a recess was taken.)

MR. BLACK: My name is Alan Black and I represent Richard Wingfield in these proceedings. I am sorry I wasn't able to be here for the procedural conference last week, but I was called for jury duty in the Court of Common Pleas and the judge wouldn't let me out to come down to that, although, Judge Greenspan did excuse me from a double homicide death penalty jury in order to be here today.

THE COURT: That's the case where the defendant decided to slug his counsel.

MR. BLACK: Same judge, different case. This is a case involving the murder of some West Philadelphia High School basketball star, I believe, so I am happy to be here than sitting on a double death penalty jury, I must say.

I would like to --

THE COURT: Wait and see.

42

1    MR. BLACK: I would like to start by just clearing
2 up an item that I was a little bit confused about in the
3 colloquy with Mr. Terwilliger and that is to make sure that we
4 all understand that this is not a situation where the
5 Government claims that some sort of unlawful activity or funny
6 business was going on after Mr. Nannes came in and started
7 negotiating with them about amnesty, to get an amnesty
8 agreement, nor does the Government contend that there was some
9 sort of funny business or anything illegal going on after the
10 amnesty agreement was signed in January of 2003.
11    The dispute, the question is whether there was any
12 funny business going on as a matter of historical fact,
13 whether the unlawful activity stopped in March of 2002, eight
14 months before the agreement or whether the unlawful activity
15 stopped in November of 2002, a couple of months before the
16 agreement. That's the parameter of the dispute. There is
17 nobody here insinuating or claiming that anything unlawful
18 continued into the time period where there were negotiations
19 going on with the Government or after the agreement was signed
20 and I just wanted to make sure that everybody is clear on
21 that.
22    Based on the rules of the game, as we agreed to
23 them this morning, even though Mr. Wingfield joins the company
24 in urging that the Court may, and in fact, should interpret
25 the agreement without the need for extrinsic evidence, I will

43

1 go ahead and address the other things the Court is likely to
2 hear later today --
3    THE COURT: So, from Mr. Wingfield's perspective,
4 you want to confine this inquiry to the four corners of the
5 amnesty agreement?
6    MR. BLACK: We think your Honor can and should do
7 that. On the other hand, we think if you consider extrinsic
8 evidence, you will come to the same conclusion that the
9 Government should be held to the promises it made in the
10 agreement.
11    THE COURT: So, in your view, it does not matter.
12    MR. BLACK: In my view, the outcome should be the
13 same.
14    THE COURT: All right. I accept that as an
15 affirmative answer to the question. Go ahead.
16    MR. BLACK: I bring into the courtroom the
17 representation of an individual, rather than a company. This
18 is someone who is at risk for going to jail, not just somebody
19 who is at risk of paying a fine.
20    Mr. Wingfield, as you may know from the papers, is
21 a New Zealander. He's a citizen of New Zealand. He's legally
22 a resident in the United States, he's a gentleman who is 57
23 years old and has worked for Stolt-Nielsen for 33 years,
24 virtually all of his life and except for a few months in
25 the '70s, Mr. Wingfield lived all of his life outside the

44

1 United States until he was brought to the United States from
2 Singapore in early 2001 to head up the company's parcel tanker
3 business which is headquartered up in Connecticut.
4    Mr. Wingfield, is, as the Government recognizes, is
5 a beneficiary of the amnesty agreement signed between
6 Stolt-Nielsen and the Government.
7    THE COURT: When did he learn he was a beneficiary
8 of the agreement? Simultaneous with its execution?
9    MR. BLACK: Now, that's an interesting question,
10 your Honor. Let me answer it just by telling you what I know
11 as to the facts. I think that the facts will show that Mr.
12 Wingfield was apprised of the general contours of the leniency
13 program by Stolt-Nielsen's counsel early on.
14    THE COURT: When is early on?
15    MR. BLACK: I think certainly -- I think before the
16 agreement was signed and certainly shortly thereafter.
17    THE COURT: So he knew before January 15, 2003 that
18 an agreement was imminent.
19    MR. BLACK: I think that's fair to say.
20    THE COURT: And he knew he could take advantage of
21 it.
22    MR. BLACK: I think it's fair to say that he
23 understood like other executives in the company, if he
24 cooperated with the investigation, that he would be the
25 recipient of an immunity agreement.

45

1    THE COURT: Okay, go ahead. Continue your
2 argument.
3    MR. BLACK: Just to be candid with your Honor, he
4 did not receive an actual copy of the agreement until after he
5 was arrested. And we really kind of had to pry that out of
6 the Government.
7    THE COURT: Is he here?
8    MR. BLACK: No, he's not.
9    THE COURT: Is he back in New Zealand?
10    MR. BLACK: No, when he was arrested, his passport
11 was taken away and he had to post half million dollars bond
12 secured by his house, so he is in the United States. He is in
13 New York or Connecticut, as we speak.
14    As I mentioned before we began --
15    THE COURT: Let me ask you this: If he did not
16 get a copy of the agreement until after his arrest, how did he
17 know about the requirements?
18    MR. BLACK: He knew what he was told by cocounsel.
19    THE COURT: Who was?
20    MR. BLACK: Mr. Nannes. There were a bunch of
21 people working with him, you know so it would have been --
22    THE COURT: I really do see Mr. Wingfield's
23 situation somewhat different.
24    MR. BLACK: I think so. He is an individual who,
25 in our view, did the best he could and certainly delivered

Page 46

1  substantial performance to the Government.
2      THE COURT: How did he know what it is that he had
3  to do if he did not know about the agreement?
4      MR. BLACK: Again, he followed the general
5  parameters of what was necessary, that he had to cooperate and
6  produce what he had and I believe when you hear from Mr.
7  Nannes, you will hear that he did that.
8      THE COURT: What was he told that he would get out
9  of it?
10     MR. BLACK: He was told that he would not be
11 prosecuted. And in fact, that was an accurate representation.
12 That's what is in the agreement.
13     As I mentioned before, we began the formal
14 arguments, your Honor, the agreement, itself, treats the
15 individuals in a separate way from the company and there is a
16 separate paragraph, paragraph 4 of the agreement, which is at
17 tab 10 of the booklet that Mr. Terwilliger gave you, that
18 grants transactional immunity to Stolt-Nielsen's directors,
19 officers and employees who cooperate fully and truthfully with
20 the investigation it says that they shall not be prosecuted
21 criminally by the antitrust Division for any act or offense
22 committed prior to the date of this letter, namely, January
23 15, 2003.
24     So, on its face, the agreement provides
25 transactional immunity to Mr. Wingfield.

Page 47

1      THE COURT: How can you demonstrate that he
2  detrimentally relied upon the agreement?
3      MR. BLACK: Your Honor, I don't think we need to or
4  should get to that at this hearing, because --
5      THE COURT: When do you suggest we do it?
6      MR. BLACK: Well, I think --
7      THE COURT: After the indictment?
8      MR. BLACK: Just to give you a road map as to how I
9  think the proceedings would logically develop, I think the
10 first issue before your Honor is whether the Government
11 properly revoked the agreement -- the whole agreement, because
12 I think that --
13     THE COURT: Let's assume for the sake of this
14 argument that we find that they improperly revoked the
15 agreement.
16     MR. BLACK: In that case, Mr. Wingfield does not
17 have to demonstrate reliance --
18     THE COURT: How about conversely.
19     MR. BLACK: Let me finish that thought and I'll get
20 to the other one. If the Court finds the Government acted
21 improperly in revoking the agreement and Mr. Wingfield
22 continues to be a beneficiary of that agreement, then the only
23 thing that he needs to demonstrate and actually I think it's
24 the Government's burden to show that he didn't, is compliant
25 with --

Page 48

1      THE COURT: You filed the suit.
2      MR. BLACK: -- Section 4(d) of the agreement which
3  spells out the five specific requirements of cooperation that
4  an individual is supposed to provide.
5      Yes, we filed the suit. We have the burden of
6  carrying -- and we filed the motion for preliminary
7  injunction, so we have the burdens of showing a reasonable
8  likelihood on the merits, irreparable harm and so forth, but
9  the law is very clear that in deciding whether there has been
10 a breach of an immunity agreement or plea agreement, the
11 Government bears the burden, at least by the preponderance of
12 the evidence, if not by clear and convincing or beyond
13 reasonable doubt as some courts have held, that there has been
14 a breach. That was the point I was trying to make.
15     In any event, as I mentioned when I began, all of
16 the conduct for which the Government seeks to prosecute Mr.
17 Wingfield is well prior to that January 15th date. The
18 criminal complaint is from March 2001 to October of 2002.
19     THE COURT: Mr. Black let's get back to the second
20 part of the question.
21     MR. BLACK: All right.
22     THE COURT: What if it's found that the Government
23 properly revoked the amnesty part of the agreement, how can
24 you demonstrate that Mr. Wingfield detrimentally relied upon
25 that agreement?

Page 49

1      MR. BLACK: We can certainly demonstrate he relied
2  on the general promise of amnesty in the way this program
3  works, which puts cocounsel as the lynch pin of the whole
4  operation and, you know, we will show that Mr. Wingfield
5  provided very substantial incriminating evidence to the
6  company in exchange --
7      THE COURT: How did he detrimentally rely on the
8  amnesty agreement? He never saw it.
9      MR. BLACK: He saw it after he was arrested.
10     THE COURT: It's too late then, for I am to blame,
11 detrimental reliance on something he didn't know about.
12     MR. BLACK: He knew about it. He had not seen --
13     THE COURT: How did he invoke the provisions of the
14 agreement if he did not know what it provided and only had
15 been told in the most general terms.
16     MR. BLACK: I think he --
17     THE COURT: Tell me.
18     MR. BLACK: Because the agreement was described to
19 him and he provided incriminating information in reliance on
20 the promises that were in fact in the agreement and the fact
21 of whether -- the promises were in the agreement.
22     THE COURT: What if counsel says you go and give
23 everything to the Government that you know about in this
24 particular area, and you will be okay, is that enough?
25     MR. BLACK: I think it may be.