# Exhibit 15B

Page 50

1   THE COURT: Is it or is it not?
2   MR. BLACK: I will say it is.
3   THE COURT: You want to say you have to say it is.
4   MR. BLACK: If you want a definite answer, I will
5   say it is.
6   THE COURT: Tell me why you say it is?
7   MR. BLACK: Because I think the essence of the
8   agreement, your Honor, is the bargaining of substantial
9   incriminating evidence on the one hand in exchange for a
10  promise of non prosecution and whether the person saw the
11  literal paper or not, if the person came forward and provided
12  a parcel -- a huge bunch of incriminating information in
13  reliance on that, then the Government should not be allowed to
14  rely on, oh, well, he never saw it or there is some other
15  technicality, that we ought to be allowed out of it. There
16  are cases that say the Government must be strictly held to
17  these agreements.
18  THE COURT: Sure, between the signatories.
19  MR. BLACK: Well, I think that this entire program
20  would collapse, your Honor, if the antitrust bar thought that
21  it did not protect the executives in the way that Mr. Nannes
22  and everyone else believes the program is supposed to work.
23  THE COURT: And perhaps the executives should all
24  have separate counsel at the time.
25  MR. BLACK: Well, it certainly would be best from

Page 51

1   the constitutional point of view if everybody had separate
2   counsel, but --
3   THE COURT: Could not an executive be manipulated
4   by corporate counsel?
5   MR. BLACK: It could certainly be. I think your
6   Honor will find if you look into the way the Amnesty Program
7   works --
8   THE COURT: We're going to hear about that.
9   MR. BLACK: -- that you don't generally find every
10  or many, if it all, executives having separate counsel,
11  because it would clog up the system. If every single
12  executive had their own lawyer, that's one of the problems --
13  THE COURT: You have been around and you know when
14  we have multi defendant cases or potentially multi defendants,
15  that we have separate counsel and it does not clog up the
16  system.
17  MR. BLACK: Well, I think that -- you know, you
18  will find that as a practical matter in the way this program
19  works, it's not encouraged and it's a big problem with the
20  program and it depends, I would say too much on company
21  counsel, but that's the way it works and that's the way it
22  worked here and that's one of the reasons from Mr. Wingfield
23  finds himself --
24  THE COURT: Are you suggesting he's victimized by
25  Stolt-Nielsen?

Page 52

1   MR. BLACK: No.
2   THE COURT: Are you suggesting he's victimized by
3   the Government?
4   MR. BLACK: Yes.
5   THE COURT: In what respect?
6   MR. BLACK: In the respect that Mr. Wingfield
7   provided enormous amounts of incriminating information that
8   was provided to the Government that the Government has used to
9   obtain indictments and guilty pleas from other companies, that
10  the Government proposes now to use against him in exchange
11  for --
12  THE COURT: Does the Government contend that during
13  the course of his cooperation he gave them information that
14  actually enabled them to raise the issue of a failure to abide
15  by the agreement by Stolt-Nielsen?
16  MR. BLACK: They of course don't admit that but
17  that's where the facts would show.
18  THE COURT: Where would that put Mr. Wingfield?
19  MR. BLACK: I think it would put Mr. Wingfield in a
20  position where his constitutional rights have been trampled
21  on.
22  THE COURT: By whom?
23  MR. BLACK: By the Government, by failing to abide
24  by its promises after having received substantial performance
25  on the part of Mr. Wingfield.

Page 53

1   THE COURT: My question is, what difference does it
2   make if Mr. Wingfield's cooperation, that you say he is giving
3   in reliance on this agreement, leads to the very information
4   that enables the Government to escape its obligations under
5   the agreement?
6   MR. BLACK: Well, I don't know that that happened
7   and I don't know that the Government is relying on information
8   that Mr. Wingfield produced to turn around and attempt to
9   avoid the agreement, but I believe the testimony of Mr. Nannes
10  will show, it was Mr. Wingfield who when asked to produce
11  whatever he could find with respect to this activity found,
12  found and produced to Mr. Nannes what Mr. Terwilliger referred
13  to as the "smoking guns" being the customer allocation list
14  that had been prepared by Mr. Wingfield's predecessor back in
15  1998.
16  THE COURT: Is that the information that the
17  Government could have received through a subpoena?
18  MR. BLACK: If somebody would have found it, I
19  suppose, but they didn't subpoena it, because, you know, it
20  was produced voluntarily under the amnesty agreement.
21  THE COURT: What if there was not an agreement and
22  the Government during the course of its investigation issued
23  subpoenas, could they not have obtained the same information?
24  MR. BLACK: Sure, but I think that's true of almost
25  any information that's produced in exchange for an amnesty

54

1  agreement. If there had not been an agreement and if they
2  knew what to subpoena and if they had gotten people to look in
3  the right places for where things are, they could have gotten
4  it by subpoena, but that's the whole point of an amnesty
5  agreement. They get out of having to do that. They get
6  people to voluntarily go and look and produce this stuff and
7  as the Court's have repeatedly held, it's not only
8  fundamentally unfair, but it's a violation of due process to
9  accept the benefits of all that and then turn around and based
10 on some relatively minor failure of performance, if there was
11 one, to then yank the rug out from under the operating witness
12 and then turn around and prosecute him.
13         THE COURT: Can we all agree that this proceeding
14 will constitute the hearing on the preliminary and final
15 injunction? I am suggesting about Phase I and Phase II.
16         MR. TERWILLIGER: We certainly could.
17         MR. BLACK: I think so.
18         MR. CONNOLLY: Yes, your Honor.
19         MR. BLACK: Now, I want to discuss for just a
20 minute, your Honor, something that's strikes me as really
21 quite odd about the timing of the revocation of the amnesty
22 agreement by the Government.
23         THE COURT: The timing of what?
24         MR. BLACK: The revocation of the amnesty agreement
25 by the Government.

55

1       The agreement as your Honor knows, was signed
2  January 15, 2003. Incriminating documents and information
3  were supplied to the Government pursuant to that agreement,
4  beginning February 4, 2003, as the evidence will show. The
5  Government says in its papers that by mid-to-late February of
6  2003, more than a year ago, they suspected that Stolt-Nielsen
7  had made misrepresentations to them concerning the ending date
8  of the conspiracy or the illegal activity. Oddly, the
9  Government did not contact Mr. Nannes at that point, a year
10 ago, to say, you know, look, we have gotten some information
11 that indicates to us that this thing may have gone on a few
12 months longer than you indicated, what is the story here?
13        They didn't do that. Neither did the Government
14 revoke the amnesty agreement at that time. Instead the
15 Government laid quietly by and did nothing. In April, April
16 8, 2003, the Government sent a letter to the company
17 suspending its cooperation obligations under the amnesty
18 agreement, but again, the Government did not revoke the
19 amnesty agreement.
20        On June 24, 2003, the Government arrested Mr.
21 Wingfield, but did not revoke the amnesty agreement.
22        THE COURT: Didn't the Government prior to that
23 advise Stolt-Nielsen that it was looking into allegations that
24 the conduct did not cease when represented as having been done
25 and they were permitted to suspend their obligations under the

56

1  agreement?
2          MR. BLACK: That was in the April 8th letter, your
3  Honor, but the agreement as of Mr. Wingfield's arrest still
4  had not been revoked. It was still in place.
5          On February 18th of this year --
6          THE COURT: What does it matter?
7          MR. BLACK: It raises questions to me about the
8  good faith revocation of the agreement, frankly.
9          THE COURT: You would argue to me if in April,
10 2003, the Government said we have information that we believe
11 makes suspect representations that activity stopped when you
12 said it had and we're going to arrest your guy and you are
13 saying they acted precipitously because they did not go out
14 and do further investigation that indeed that information was
15 correct. Isn't that the argue being raised?
16         MR. BLACK: I imagine somebody would raise that
17 argument.
18         In February, 2004, a year later, Mr. Wingfield
19 filed this action to seek protection under the agreement, to
20 enforce the agreement. February 24th, he files the
21 preliminary injunction motion. The briefs, the arguments, are
22 all based on the agreement. Here's what the agreement says
23 and provides and the agreement should protect Mr. Wingfield.
24 On March 5th, the Government filed its brief opposing the
25 motion for preliminary injunction. The Government said

57

1  nothing about revoking the agreement in its paper and its
2  brief and argument went to the interpretation of the
3  agreement. Here's what it means. It does not mean what Mr.
4  Black said, it means what we said and under the agreement,
5  Wingfield gets no protection.
6          On March 12th of this year, we filed our reply
7  brief, again, arguing from the agreement which was still in
8  place.
9          On March 19th, a week after the a briefing was
10 closed, the Government revoked the agreement and said in its
11 surreply brief, there is no agreement so Mr. Wingfield has
12 nothing to rely on. There is just something strange to me,
13 your Honor, about the timing of all this and it seems to me
14 that it can't be just a matter of pure coincidence.
15         I would like to turn to the two or three parts of
16 the agreement that are specific to Mr. Wingfield. I have
17 already touched on one, which is that I would like to make
18 sure that the Court understands that there are separate
19 provisions governing the cooperation requirements of the
20 company and the cooperation requirements of the individuals.
21         The company's requirements are spelled out in
22 paragraphs 2 and 3 and they include full and continuing and
23 complete cooperation and verification of the company's
24 representations, including the representation of prompt and
25 effective action.

58

1  Paragraph four which applies to the individuals,
2  does not depend on the verification of the company's
3  representations and that makes sense because it wasn't the
4  individuals who made the representations, it was the company
5  who made the representations.
6      THE COURT: Why is that?
7      MR. BLACK: Why is it?
8      THE COURT: Yes.
9      MR. BLACK: Because the whole program deals through
10 company counsel. That's sort of as I said, the lynch pin of
11 the whole thing. The individuals are in discussion with --
12     THE COURT: What happens to the corporate officer
13 who relies on the agreement and is unaware of the company's
14 violation of the agreement?
15     MR. BLACK: That's the position Mr. Wingfield finds
16 himself in. He gets arrested and gets charged and he has to
17 bring a lawsuit to try to enforce the agreement.
18     THE COURT: Is that the difference between the two
19 in this case that I asked at the outset?
20     MR. BLACK: It certainly is a difference. I don't
21 remember the difference at the outset.
22     Paragraph 4 lays out five specific instances that
23 must be provided:
24     One, is producing documents and records.
25     Two, making himself for interviews.

59

1  Three, responding fully and truthfully to all
2  requirements by the Government.
3  Four, is testifying at trial or before a grand jury
4  whenever the Government requests.
5  Five, voluntarily producing other materials not
6  specifically mentioned in the other four sections.
7  The Government concedes in its March 5th brief at
8  page 25 and it's the brief opposing the preliminary
9  injunction, but the Government concedes Richard has met four
10 out of the five of those cooperation requirements. The only
11 one that the Government claims that Richard has not met is
12 item 4(d).
13     THE COURT: That's correct. Mr. Connolly?
14     MR. CONNOLLY: Yes.
15     MR. BLACK: Item 4(d) says:
16 "Otherwise voluntarily providing the United States
17 with any materials or information into requested in (a)
18 through (c) that he may have relative to the anti competitive
19 activity being reported."
20     So, with respect to Wingfield, that's the specific
21 language --
22     THE COURT: What was Mr. Wingfield's understanding
23 of what the anticompetitive activity being reported was?
24     MR. BLACK: Well, I am sure it wasn't a technical
25 one.

60

1      THE COURT: What was it?
2      MR. BLACK: All --
3      THE COURT: All encompassing anticompetitive --
4      MR. BLACK: Since he had not received a copy of the
5  written agreement, my guess is his understanding was very
6  general. He had to tell everything he knew, as you have said,
7  everything he knew regarding the collusive activity that had
8  been going on.
9      THE COURT: What was his understanding of what that
10 was?
11     MR. BLACK: I think his understanding was reflected
12 in what he produced and what he told Mr. Nannes about, who in
13 turn told the Government.
14     THE COURT: Tell me what it was?
15     MR. BLACK: That there had been understandings to
16 allocate customers in the parcel tanker industry that had gone
17 back to 1998, three years before he had arrived in the United
18 States, at least back that far and, you know the details of
19 what had, you know happened and as I mentioned, when asked to
20 produce all of that information, Mr. Wingfield gave to Mr.
21 Nannes not only his own business diaries for the period up
22 through December of 2002 that recorded all these meetings and
23 conversations and so forth, but he also went and found the
24 documents of his predecessor that Mr. Terwilliger, I think
25 properly characterized as the smoking gun, the lists of

61

1  customers and how they were allocated that had been prepared
2  by Mr. Wingfield's predecessor.
3      So, it's clear that Mr. Wingfield produced just an
4  awful lot of incriminating information that was later turned
5  over to the Government.
6      Now, on the specifics of the language of 4(d) which
7  says that the individuals must voluntarily -- let me get it
8  " -- otherwise voluntarily provide the United States with any
9  materials or information not requested in the preceding
10 paragraphs."
11     The Government takes the position that this
12 language required Richard to take the initiative and without
13 being asked to come forward and to seek an interview with the
14 Government. This, I submit is far beyond the ordinary meaning
15 of voluntarily provide, which can best be understood as
16 meaning, you know, without coercion, without enforcement and
17 without a subpoena and in short, upon request and there are a
18 number of reasons why I would urge the Court that -- that the
19 Government's interpretation is too much of a stretch to be the
20 meaning of the term, "Otherwise voluntarily provide."
21     First off, there is no language in 4(d) at all to
22 support the notion this requires an individual to take the
23 initiative and come forward, as Mr. Terwilliger pointed out,
24 the Government put an integration clause in here is that the
25 only thing is what the agreement says and if the Government

62

1 wanted to put that in, they could have, but they didn't.
2     Second, the Government has pointed to no published
3 regulations or directives from the Antitrust Division, no
4 speeches or any other official interpretation that adopts this
5 interpretation of an individual's cooperation and
6 responsibilities.
7     THE COURT: Is there anything about that outside
8 this agreement?
9     MR. BLACK: I don't think so. Not that I know of.
10     THE COURT: You said they didn't put it in. That
11 would mean to me there is something out there.
12     MR. BLACK: If there was some publication on the
13 government's website or some interpretation of the regulation
14 that said, in these letters, when we say, "Otherwise
15 voluntarily provide", we mean you have to take the initiative
16 and come forward and even if we don't ask you for an
17 interview, even if we don't approach you, you have to come
18 forward to us, the Government would have cited that and they
19 haven't.
20     It would really pretty much defy common sense, I
21 think, to say that these agreements which the Government
22 points out are the standard form agreements that are used in
23 every case, require individual executives and employees to
24 come forward and ask the Government for interviews, even when
25 the Government has not asked them.

63

1     THE COURT: This is a don't ask, don't tell policy,
2 you are saying?
3     MR. BLACK: As your Honor quite properly pointed
4 out, how are these folks supposed to know that they are
5 supposed to voluntarily come forward and ask for an interview
6 and take the initiative and sua sponte come forward.
7     THE COURT: If they don't know about the agreement,
8 they wouldn't do that, would they?
9     MR. BLACK: They certainly wouldn't.
10     THE COURT: If they don't know about the agreement,
11 they can't invoke its protection?
12     MR. BLACK: I don't know that that's correct. I
13 don't think that you have to have read the physical paper, the
14 agreement, to claim its protection. I think that would be
15 wrong, your Honor, but, you know, if you just think about the
16 chaos that would ensue if every executive and employee in
17 order the protect himself makes sure the Government knew
18 everything that he or she new would come running down to the
19 Justice Department's offices, that can't be what this language
20 means. It's contrary to the way --
21     THE COURT: Let me interrupt you for a moment.
22     Mr. Connolly, is it the Government's position that
23 with respect to paragraph 4(d) that the information that was
24 not voluntarily provided was the duration of the collusive
25 activity?

64

1     MR. CONNOLLY: I didn't get what your Honor asked.
2     THE COURT: Is the government's position that Mr.
3 Wingfield did not give truthful information about the duration
4 of Stolt-Nielsen's participation and his own -- and/or his own
5 in the conspiracy.
6     MR. CONNOLLY: That, your Honor and that he knew
7 that we had be given false information to improperly obtain
8 leniency and yes, it does mean --
9     THE COURT: That's what I want to know. We are
10 confined to a very narrow area to what the Government contends
11 that he did not voluntarily provide. I just wanted to make
12 sure that we are on the same page.
13     MR. BLACK: The next reason that I advance --
14     THE COURT: So that does not mean that he has to go
15 knocking on the door of the Department of Justice. The
16 Government's position is they were very specific about what
17 they wanted.
18     MR. BLACK: That's not what the agreement says and
19 they are asking the Court to adopt an interpretation of the
20 agreement that two require everybody to come forward and knock
21 on the door of the Department of Justice.
22     THE COURT: I am just worried about Mr. Wingfield.
23     MR. BLACK: What your Honor has to worry about is
24 what the language means.
25     THE COURT: To Mr. Wingfield?

65

1     MR. BLACK: No, this is the Government's model
2 agreement. It can't be one thing to Mr. Wingfield and
3 somebody else to everybody else.
4     THE COURT: Are you arguing on behalf of everybody
5 else out there?
6     MR. BLACK: I am not, but just pointing out the
7 language of the agreement is what it is and the Court has to
8 -- the Court's obligation is to look hat the agreement itself
9 and if the Court determines it needs to, look at other
10 circumstances and decide what this means, what the language
11 means and I think the case is overwhelming that the language
12 does not mean what the Government contends, which is that
13 people have to, you know, rundown and knock on the door.
14     THE COURT: I don't think that's what they mean,
15 but I have not heard from Mr. Connolly yet, so I don't know.
16     MR. BLACK: Given the fact that the Government had
17 all of Mr. Wingfield's business diaries and other documents
18 for the entire period, I might add, up through December of
19 2002 and you know the very period that the Government is
20 complaining about, they had his business diaries, it's
21 certainly reasonable, I suggest, that the Government would get
22 in touch with him and say we want to sit down and talk to you
23 about what it means.
24     THE COURT: I don't think that's what Mr. Connolly
25 just said.

```
                                    66
 1          MR. BLACK:  I know, but I am saying --
 2          THE COURT:  He is saying he was there already.  He
 3  had already come through the door and while he was there he
 4  did not provide what he was supposed to provide.
 5          MR. CONNOLLY:  No, your Honor.  We have never
 6  spoken to Mr. Wingfield.
 7          THE COURT:  Never?
 8          MR. CONNOLLY:  No.
 9          MR. BLACK:  They never asked to speak to Mr.
10  Wingfield.
11          THE COURT:  So he did not come forward at all.
12          MR. CONNOLLY:  He did not come forward.
13          THE COURT:  That's what you say he would have told
14  you.
15          MR. CONNOLLY:  Yes.
16          THE COURT:  How do you know what it's being looking
17  for --
18          MR. CONNOLLY:  Mr. Wingfield knows that false
19  information --
20          THE COURT:  You are going to address that?
21          MR. CONNOLLY:  Yes.
22          THE COURT:  I want to focus in on where you are
23  going.
24          MR. BLACK:  Mr. Wingfield having given the
25  Government all these documents, it's a reasonable thing to

                                    67
 1  say, you know, if they want to know about what these mean,
 2  they came come and ask me.
 3          THE COURT:  Let me get something clear.  How does
 4  the Government get the documents if they have no contact with
 5  Mr. Wingfield?
 6          MR. BLACK:  Mr. Wingfield gave them to Mr. Nannes
 7  who gave them to the Government.
 8          THE COURT:  So we have Nannes in between them, more
 9  or less?
10          MR. TERWILLIGER:  Yes, and that's through with the
11  smoking gun theory and the oral information that Mr. Wingfield
12  provided.  All of that information went from Mr. Wingfield
13  through the company to the Government, but Mr. Connolly is
14  quite right, the Government has never, ever asked for Mr.
15  Wingfield to sit down with them and explain these things.  Mr.
16  Wingfield has always been ready, willing and able to do that.
17          It's interesting, your Honor, and it brings me to
18  another odd tea of this matter that in fact, the Government
19  has said in its sur reply brief here at page 5 that it decided
20  shortly after the February 5th interviews with the Stolt
21  employees that they spoke with, that they could not interview
22  any further Stolt employees, because at that point, they had
23  gotten information from other places that there might be a
24  discrepancy as to the end period of the unlawful activity.
25          So that even if Mr. Wingfield had taken the

                                    68
 1  initiative to seek an interview with the Government, the
 2  Government would not have interviewed.  The Government in my
 3  view is trying to have it both ways, "a", you are obligated
 4  the come forward and seek an interview with us, and "b", we
 5  have already decided we wouldn't want to talk to you.
 6          Our interpretation of 4(d) is far more reasonable
 7  than the Government's.  We think that 4(d) requires
 8  individuals to produce all relevance information and documents
 9  when the Government requests them to do it and not to take
10  some sort of narrow, squinted view of the questions or
11  document requests.  We think that's what that is there to do.
12  It really makes sense, you know, if we say --
13          THE COURT:  I understand.
14          MR. BLACK:  Produce everything, you know what
15  lawyers sometimes do.
16          THE COURT:  Yes.
17          MR. BLACK:  If we ask you everything about their
18  meeting, give us everything, don't hold anything back if the
19  meeting went over to a second day and you only gave us the
20  first day because you thought that we were only asking about
21  the first day and they will produce that kind of stuff without
22  producing any subpoena.  The Court's are clear, including the
23  Third Circuit very recently this year, that that language must
24  be construed against the Government and, you know, as I have
25  mentioned before, if the Government thought that this required

                                    69
 1  people to take the initiative and come forward, they could
 2  have put it into the agreement.
 3          I would like to turn to the issue of substantial
 4  performance which I think is information here --
 5          THE COURT:  Is that not Phase II?
 6          MR. BLACK:  It may be and I will -- let me just
 7  say, your Honor, that this is not a situation -- this is why I
 8  want to say something about -- I want your Honor to understand
 9  that this is not a situation in where either the company or
10  Mr. Wingfield is trying to take advantage of some technicality
11  of the law to enforce this agreement where they had not
12  provided what they said they would provide.
13          THE COURT:  That is Phase II.
14          MR. BLACK:  Okay.  I just want you to understand
15  that it's not a situation where the company or Mr. Wingfield
16  is relying on some sort of technical loop hole where they have
17  not given what they said they had given.  I think the evidence
18  would be overwhelming that they gave virtually complete
19  performance and if there was some failure in that, it was not
20  material.
21          I don't know whether the arguments on irreparable
22  harm, I think they are pretty well spelled out in the briefs.
23  It's pretty clear that if your Honor finds that the agreement
24  is enforceable, then it's violation would be a violation of
25  due process and many courts have held that a violation of
```

70

1 one's constitutional rights is per se is irreparable harm and
2 add Todd that is harm to reputation, et cetera, et cetera.
3           Then, finally, there is the question of whether the
4 Court should act now or whether the Court should wait until
5 after indictments are returned. We have provided the Court
6 with those two 7th circuit cases, the Meyer case and Ferruzzio
7 (sic) case, I believe it is, that state that a preindictment
8 determination of the enforceability of an immunity agreement
9 is far preferable than forcing the parties to the agreement to
10 await an indictment. It's not required. The courts don't say
11 it's required and that's the Government's big point in
12 response and we don't say it's required, but it's preferable
13 and it's preferable for good reason. The primary one is it
14 gives the parties to the contract the full benefit of their
15 bargain.
16           THE COURT: We are here. That's what we are doing.
17           MR. BLACK: Yes.
18           THE COURT: Okay. Black so -- and I decided to
19 wrap it all up into one and that is, if I determine that you
20 are not entitled to the hearing, you still had it, anyway.
21           MR. BLACK: The Government here has made no real
22 showing of harm to it by having this determination --
23           THE COURT: I haven't heard anything from the
24 Government.
25           MR. BLACK: In their papers, they say the world

71

1 will come to an end if your Honor precludes us from indicting
2 these folks, but there is no factual support for that and in
3 fact, the world will not come to an end. We are not seeking
4 an injunction to stop a grand jury or anything else.
5           THE COURT: I think you are. You are suggesting
6 that I stop them from indicting your client. What does that
7 mean?
8           MR. BLACK: Two people, who, if your Honor were to
9 do it, you would only do it upon a finding that they have a
10 contractual agreement and a right to have it stopped, that
11 they were promised they would not be indicted.
12           So really, there is no substantial or real or
13 factual harm that's been shown the Government would suffer if
14 you go ahead and enforce this agreement.
15           I would like to just close by coming back to where
16 your Honor started, where should we go here? My thinking is
17 that the first step is for your Honor --
18           THE COURT: I know where you want to go.
19           MR. BLACK: -- for your Honor to decide whether the
20 rove vocation of the agreement was proper. If the Court
21 decides that the agreement remains in force, that the
22 revocation was improper, then, the only issue for Wingfield
23 is, did he comply with 4(d)?
24           THE COURT: Couldn't I find the agreement is
25 enforceable and the revocation is proper? Finding the

72

1 agreement enforceable, does not mean you win.
2           MR. BLACK: Enforceable and not breached.
3           THE COURT: Two separate issues.
4           MR. BLACK: Okay. If your Honor finds that, then,
5 the issue -- if the agreement is in force, the main agreement
6 is in force, the only issue as to Wingfield is 4(d)
7 compliance.
8           If your Honor finds the revocation as to Stolt was
9 proper and therefore, the agreement is out the window, then
10 the issues are 4(d) compliance issues and whether Richard
11 Wingfield detrimentally relied on the agreement. So we would
12 suggest that the best procedure is to decide whether the
13 revocation was proper and if it was, then we move forward to
14 4(d). If it was not, then we would suggest that we have a
15 Phase III of some sort, a brief hearing on detrimental
16 reliance.
17           Thank you, your Honor.
18           THE COURT: Mr. Connolly?
19           MR. CONNOLLY: Thank you, your Honor.
20           Your Honor, the Government submits that neither
21 Stolt, nor Wingfield can make a showing of likely success on
22 the merits. There are two bases for the revocation of the
23 amnesty agreement and I submit one is very simple. It is a
24 non prosecution cooperation agreement. It is not an immunity
25 agreement. It is not a unique instrument in the world of

73

1 criminal law. It's a straightforward, non prosecution
2 agreement. You have tell the truth you don't get prosecuted.
3 Materially not tell the truth or make omissions, the agreement
4 is void and the second basis is that agreement, Stolt-Nielsen
5 did represent that it took prompt an effective action to
6 terminate its part in the anticompetitive activity being
7 reported upon discovery of the activity. And we think the
8 evidence even in the record at this point, your Honor, would
9 show that they did not do that.
10           If I could just say a brief word on irreparable
11 harm, we are in a situation where Mr. Wingfield has already
12 been charged, the company has publically announced that it has
13 been removed from the leniency program, the type of harm that
14 it will suffer is the type of harm that any criminal defendant
15 suffers. Is it harm, it just isn't irreparable harm in the
16 legal sense and we submit that thing have not shown
17 irreparable harm, but getting to the factual basis, your
18 Honor, why Stolt-Nielsen was removed from the program, just a
19 little history, because Stolt-Nielsen has said, this is the
20 first time it ever happened that somebody has been kicked out
21 of the program, that's true. These circumstances were quite
22 unique. At the time that Stolt Nielsen came into try and get
23 leniency, there was already a lawsuit filed against Stolt
24 publically, alleging that it engaged violations of the
25 antitrust laws in the United States --

74

1    THE COURT: The O'Brien suit?
2    MR. CONNOLLY: The O'Brien suit, your Honor. There
3  was an article in the Wall Street Journal coincidentally the
4  very day that Stolt Nielsen first called the Government,
5  although they did not identify themselves as Stolt-Nielsen at
6  the time and there were lengthy negotiations, your Honor, from
7  late November, the first time they called, until January 15th
8  the culmination of this agreement though make sure that Stolt
9  Nielsen understood the leniency policy and had time to do
10  their investigation so that their representations would be
11  true and the attorneys were comfortable in moving forward.
12  They assumed the risk if they said if people lied to us what
13  can we do. They assumed the risk. Where they stood at that
14  point there is a public knowledge and public understanding of
15  the wrong doing and they had a chance to come in and get
16  leniency under false pretenses and I don't mean the lawyers
17  knew anything they were telling us was untrue. The Stolt
18  employees new. Better to get leniency and fight later when
19  the Government tries to kick us out rather than saying we're
20  just not eligible, so I think they really assumed the risk
21  here and that's why we are here today, because the
22  representations were not true and your Honor, in their papers,
23  Stolt repeatedly says that they came in for leniency before
24  there was an investigation and I just want to point out, there
25  are two types of leniency, one is type "A" before an

75

1  investigation and the other is type "B", and it says right in
2  the agreement, this is type "b."
3    THE COURT: That was within a day or so?
4    MR. CONNOLLY: It was very quick. The first
5  breach, the non cooperation, Stolt-Nielsen represented in the
6  agreement that they would make a fall exposition of all the
7  facts known to Stolt-Nielsen. The representation was that
8  they would tell the truth. They could come in and tell the
9  truth about the price fixing that had been going on for years
10  and when Stolt Nielsen came in and said, we were involved in
11  price fixes, but it ended in March, when O'Brien, whatever,
12  through osmosis, or he speculated at the time, the word was,
13  he found out about it.
14    THE COURT: How is the March date, as opposed to
15  the November date material?
16    MR. CONNOLLY: The March date is material --
17    THE COURT: Before you answer, does it not make
18  more sense that you would cut it off the day that you run to
19  the Government and say, look I want to blow the whistle here.
20  It comes to be common sense if you come in that day, that you
21  come in and that's when you are stopping, because before then,
22  you had no incentive to stop.
23    MR. CONNOLLY: I am sorry, I didn't hear you.
24    THE COURT: You didn't have any incentive to stop
25  until somebody blew the whistle when O'Brien filed the lawsuit

76

1  in November.
2    MR. CONNOLLY: O'Brien first filed the lawsuit in
3  June and they still didn't stop the price fixing.
4    THE COURT: So they contact the Department of
5  Justice in November. The Wall Street article is in November.
6    MR. CONNOLLY: Yes.
7    THE COURT: Does it not make sense, then, that a
8  company is not going to stop it's activity until it knows that
9  it may be caught?
10    MR. CONNOLLY: That seems to be what happened here
11  but they are not eligible for the leniency --
12    THE COURT: You say they told you in March?
13    MR. CONNOLLY: Yes.
14    THE COURT: What does it matter to the Government?
15    MR. CONNOLLY: Under the leniency program, this is
16  a great benefit to a company that's eligible and the idea of
17  the program, your Honor, is to use these witnesses to testify
18  against other people, other conspirators and as a matter of
19  fairness, the Government does not want the extend leniency to
20  a company that's on notice, to counsel, the board of directors
21  or otherwise the entity is aware of the illegal activity and
22  chooses to continue it, because as your Honor said, he might
23  not get caught. So that's a matter of executive prerogative
24  somebody is not eligible for the leniency if corporate or
25  outside counsel finds out about activity and they decide to

77

1  continue it any way and that's clearly stated in the policy
2  and that's why Stolt represented that it ended in March.
3    THE COURT: So you are telling me it's material
4  from the Government's perspective they don't want somebody now
5  who now knows they are going to get caught to try and get out
6  in.
7    MR. CONNOLLY: Yes and we want to encourage people
8  when corporate counsel find out about it to come into the
9  Government instead of the company continuing the conspiracy.
10  If you don't come into the Government, you do so at your own
11  risk, that the Government will really stop activity and if
12  they don't, I think you are eligible for leniency an Mr.
13  Nannes was with the Division, he understood that and that's
14  why the representation was made, that it ended in March; you
15  know nobody ever said to the Government, it continued to
16  November, but we don't think your policy is a good one and we
17  want an exception.
18    I think we are going to show the Court without need
19  for a second hearing, just from the guilty pleas and other
20  admissions that are being made, you know in this hearing
21  today, that the conspiracy really continued until November.
22    In this Circuit, your Honor, the Skalsky case I
23  think is right on point and if I may just read briefly in
24  short, Skalsky provided information that was incomplete,
25  inaccurate in context and affirmatively misleading and a far

78

1  cry from the complete, truthful and accurate information and
2  testimony contemplated by his agreement with the Government.
3  That's the kind of testimony or the kind of
4  information that we have gotten from Stolt here and it was
5  found to be a material brief in Skalsky and both Stolt and Mr.
6  Wingfield said the Government has gotten the benefit of its
7  bargain. The Government has not. In a legal sense or factual
8  sense. The Government bargained for a full and complete
9  exposition of the facts and we have not gotten it to get a
10  full exposition of the facts additional immunities to
11  non-Stolt people have been granted and companies who pled
12  guilty pled guilty under better terms if and the guidelines
13  recognizes the companies are eligible for substantial
14  assistance for giving information that Stolt admitted and the
15  sentencing calculations are affected, because you are not
16  allowed to use certain information against them if they are
17  the ones that provide it, as opposed to the amnesty company,
18  so the omissions, the representations were material.
19  I think, your Honor, on this basis alone, the Court
20  can find this is a non prosecution cooperation agreement,
21  there was a material breach and Stolt-Nielsen's leniency was
22  properly revoked.
23  To get into the second basis and I think the
24  Government need only show one but we do believe both are shown
25  in this case, that Stolt Nielsen took prompt and effective

79

1  action to terminate activity reported upon discovery. There
2  are a couple of sub issues that the Court explored with
3  counsel that I would like to address and what is the
4  definition of "upon discovery."
5  THE COURT: Let's go earlier in the sentence, what
6  is "prompt?"
7  MR. CONNOLLY: Okay, your Honor. Your Honor, I
8  don't think -- "prompt" would be in this case, in March or
9  April when Stolt said that they withdrew from the conspiracy.
10  THE COURT: Who defines the term, "prompt?"
11  MR. CONNOLLY: Your Honor, I think the
12  definition --
13  THE COURT: If the Court must determine whether or
14  not it was a prompt and the second word I would ask you to
15  define is "effective." Who gets to do that?
16  MR. CONNOLLY: I think the Court can make that
17  determination.
18  THE COURT: What was the understanding of the
19  parties?
20  MR. CONNOLLY: Our understanding was that prompt
21  meant in March, that O'Brien found out about --
22  THE COURT: Where is it defined?
23  MR. CONNOLLY: Your Honor, I think that has a plain
24  meaning, "prompt." It certainly can't mean that the company
25  discovered it in February and did not terminate until November

80

1  when it appeared in the Wall Street Journal. That's not
2  prompt.
3  THE COURT: Who gets to define the word,
4  "effective?"
5  MR. CONNOLLY: There is a lot more legal
6  definition. "Effective", Stolt says sending those emails to
7  Jo Tank and Odfjell was effective. Your Honor, under the
8  Sentencing Guidelines, if I may, 8(a)1.2(K), there are
9  definitions about this effective program to prevent and detect
10  violations of law means a program that has been reasonably
11  designed implemented and enforced so it generally would be
12  effective in preventing and detecting criminal conduct.
13  Subsection 3, "The organization must have used due care not to
14  delegate substantial discretionary authority to individuals
15  whom the organization knew or should have known through the
16  exercise of due diligence had a propensity to engage in
17  illegal activities."
18  In this case, by their own admission, Stolt
19  designated Mr. Wingfield who was one of the most active
20  participants in the conspiracy at the time to be the messenger
21  of withdrawal, left him in the very same position that he was
22  in at the time that the conspiracy was before -- when the
23  conspiracy was taking place and after when he allegedly
24  withdrew.
25  Under any legal definition, this is not effective

81

1  and the Guidelines also say at the same time it's presumed
2  ineffective if a high level management official is involved in
3  the activity and Mr. Wingfield was an Executive Vice President
4  and also Mr. Bjorn Jansen was also involved, the Senior Vice
5  President.
6  THE COURT: So what you are telling me with respect
7  to the word "prompt", the Court will determine it, but what
8  the parties meant has to be under a reasonable standard,
9  right?
10  MR. CONNOLLY: Yes, your Honor. I think "prompt"
11  has to be under a reasonable standard, as well.
12  THE COURT: Prompt does not mean immediate, but it
13  means something less than a while.
14  MR. CONNOLLY: It means -- if it was Mr. O'Brien
15  who brought it to the attention of management in February and
16  they didn't have the antitrust compliance programs until March
17  which we knew about, we do not dispute that was prompt, it
18  took time to get it together. That the conspiracy continued
19  until November, that's not prompt and we don't think that's a
20  tough question.
21  THE COURT: I just want to know where the standard
22  is.
23  Now, upon discovery.
24  MR. CONNOLLY: I do think that "upon discovery"
25  can have one of two meetings. The corporation discovered this

82

1  when senior management got involved. These were very high
2  executives, including the chairman of the board. So under any
3  definition of the word --
4      THE COURT: Is that the Government's position?
5      MR. CONNOLLY: Excuse me.
6      THE COURT: Your position is not that it was
7  discovered in 19 --
8      MR. CONNOLLY: We admit in this case, under the
9  policy, you look to the definition that the Government has
10 given this. If that were true, nobody would qualify, where
11 senior management was involved. So to encourage companies to
12 come forward we would modify that to say inside counsel,
13 outside counsel or the board of directors.
14     So, in this case, your Honor, I think inside
15 counsel and it does not say that in the document, because it
16 can be any of those. It did not have to be Mr. O'Brien. We
17 think there is evidence that other counsel knew about it after
18 Mr. O'Brien brought it to the attention of the senior
19 management and that's the definition I think that's operative
20 in this document about "upon discovery."
21     Why isn't March 2002 --
22     THE COURT: Let me ask you something. If inside
23 counsel discovers, but does not reveal it -- where are you?
24     MR. CONNOLLY: I think they can be still be
25 terminated.

83

1      THE COURT: They are on the hook under the wording
2  as I see it.
3      MR. CONNOLLY: Yes, your Honor.
4      THE COURT: Okay.
5      MR. CONNOLLY: That's not our contention --
6      THE COURT: I understand.
7      MR. CONNOLLY: Stolt says that it's a fatal defect
8  that we did not put the date "March", into the upon the
9  discovery clause rendering it meaningless. We take the
10 opposite view. Upon discovery -- the reason March is not in
11 there, your Honor, their representation was that it was
12 discovered in February by Mr. O'Brien. We are entitled to do
13 an investigation. We could have found Mr. O'Brien discovered
14 the this in 2000 in which case they definitely would have been
15 out. So the representation is, upon discovery they terminated
16 it. Their view of the cooperation agreement is it's basically
17 a bill of particulars. If you don't have the specific fact in
18 there that we need to represent, we don't have to tell you.
19     Your Honor, if you look at the agreement, under
20 their theory they didn't have to tell us anything about
21 Odfjell. And Mr. Wingfield is not in the agreement, so they
22 don't have to admit that because we didn't write it down.
23 This is not a bill of particulars. This sets forth the
24 representations that they viewed true for the company to
25 qualify, there is a verification process, i.e., an

84

1  investigation and if those representations are true, then they
2  get the leniency letter which they never got because those
3  representations, in our opinion, were not true.
4      Your Honor, the third thing I want to address on
5  discovery, is I think there is evidence in the record already
6  that discovery under this definition took place by March 2002.
7  Mr. O'Brien filed the lawsuit in June, alleging that
8  Stolt-Nielsen had been engaged in the illegal antitrust
9  activities that violate U.S. and international law against
10 price fixing and other illegal collusive conduct and that also
11 appealed in the Wall Street Journal. Their position is, Mr.
12 O'Brien did not find the hot documents, though. It's using
13 the Columbus analogy, Columbus never went to California, but
14 he still discovered America. He did not know the parameters
15 of it, but he discovered it.
16     THE COURT: Mr. Terwilliger really liked that,
17 because that was good.
18     MR. CONNOLLY: Your Honor --
19     THE COURT: He turned it on you.
20     MR. CONNOLLY: Stolt-Nielsen comes in and the
21 article appears that Mr. O'Brien has this lawsuit alleging
22 antitrust violations of the United States. Stolt-Nielsen
23 comes in seeking leniency. They did not come in and say Mr.
24 O'Brien is nuts. We did not participate in any illegal
25 conduct. They came in and said we want to try and get

85

1  leniency and show you O'Brien is wrong when he said it
2  continued after March.
3      THE COURT: Don't they later claim O'Brien was
4  lying?
5      MR. CONNOLLY: That he was lying? I am not sure
6  what they claim on Mr. O'Brien other than that he did not
7  discover enough facts to constitute a discovery. I don't
8  think they ever said -- I don't know what their position on
9  that; because they haven't said, just that he did not discover
10 enough facts to constitute discovery.
11     Your Honor, I think if Mr. Nannes testifies, he
12 will say that Mr. O'Brien reported the illegal activity to
13 people within Stolt-Nielsen, to management within
14 Stolt-Nielsen and Stolt-Nielsen produced the emails, allegedly
15 withdrawing from the conspiracy, which now Mr. O'Brien did not
16 discover.
17     I think there is enough evidence in the record,
18 your Honor, to show that the discovery did take place by March
19 of 2002.
20     Conversely, your Honor, in response to the evidence
21 that the Government has put forth and will, Stolt has shown
22 absolutely no evidence that Mr. O'Brien did not discover and
23 this is their lawsuit, any memo Mr. O'Brien knew they were
24 held under attorney-client privilege or redacted, so the only
25 evidence in the record, your Honor, is Mr. O'Brien's lawsuit

**86**

1 and other evidence, there is no evidence to the contrary that
2 he did not discover.
3     Your Honor, prompt and effective, I think, your
4 Honor already asked questions about that, but having Mr.
5 Wingfield tell the competitors that they were withdrawing from
6 the conspiracy, no further action, nobody was disciplined in
7 this company, your Honor, not Mr. Wingfield, not Mr. Jansen,
8 not anybody higher than Mr. Wingfield, nothing happened. It
9 was another antitrust compliance program in April but the same
10 actors were left in place to meet with the same competitors
11 that they were comparing with the job responsibilities, same
12 salary. Your Honor, any definition of defective, this was not
13 effective. The same folks doing the same thing, is not
14 effective.
15     I want to address the argument that the Government
16 inadvertently or inartfully just made a bad mistake and by
17 putting the January 15th date in the letter, we immunized
18 Stolt-Nielsen for any conduct that happened before that and
19 Mr. Wingfield and unless they conspired after January 15th, we
20 are just out of luck, because it was our mistake. That's
21 absolutely not true, your Honor. There is a reason for the
22 January 15th date in the letter. Even taking the
23 circumstances that Stolt-Nielsen presented at the time, that
24 in March, they stopped talking to their competitors, stopped
25 conspiring with their competitors, but did not report activity

**87**

1 to the Government until the date of January 15th, they have a
2 potential liability for that period of time, because these are
3 long term contracts that were fixed and payments were
4 continued to be received, the customers were never told about
5 the fraud that was going on --
6     THE COURT: If they are long term contracts, you
7 are implicating the prompt and effective term.
8     MR. CONNOLLY: When the agreement is signed on
9 January 15th, the reason they got protection up to that date
10 instead of just March, if we said it ended in March, how far
11 come to agreement does not say that. If the agreement said
12 you only have protection until March ---
13     THE COURT: Punitive purposes.
14     MR. CONNOLLY: Yes, the company wants piece. They
15 don't want to have this exposure. It's in the model letter.
16 They weren't going to take anything less than the model
17 letter, so they got that. Your Honor, it's at no risk to the
18 Government. If you peace at the agreement, your Honor and
19 your Honor has obviously looked at the agreement, but if I
20 could direct your attention, it's first off, as your Honor
21 noted, it's obviously conditional and if the conditions aren't
22 met, it case the agreement is void and Stolt-Nielsen can be
23 prosecuted without limitation. It does not say from March to
24 November. Without limitation. The idea that we inadvertently
25 immunized them because they gave us information and even if

**88**

1 the agreement is void, you know we can't use the information
2 against them, that's dealt with specifically within the
3 letter.
4     THE COURT: They argue that because you were very
5 specific about that aspect, why weren't you about the others?
6     MR. CONNOLLY: I think we weren't. Discovery
7 prompt and effective and even here, it says any information --
8 if they provide information, and the agreement is breached, we
9 can use that information against them. It does not say you
10 can use the customer list or this or that, because that's the
11 bill of particulars idea they are trying to get you to buy and
12 the agreement is more general than that.
13     Your Honor, as you will hear evidence today, there
14 was a lot of effort and time that went into negotiating this
15 contract. Contracts have to be given reasonable
16 interpretations and the interpretation that they are trying to
17 advance is by putting there January 15th date in there, we
18 inadvertently or whatever, as I said, made every
19 representation in that agreement meaningless unless they
20 continued to conspire after January 15th and I think that's
21 both not consistent at all with the language of the agreement
22 and the specific language. It says can be prosecuted without
23 limitation.
24     Just a couple of minutes on Mr. Wingfield.
25     Your Honor, it is our position that if the

**89**

1 agreement with Stolt is void, as we think it properly is, he
2 last no coverage under the agreement. The agreement is
3 explicit. Paragraph 4 that they claim protection under starts
4 with "subject to his full and complete cooperation --" that
5 simply cannot be read to mean -- if they don't, I still have
6 the prosection.
7     THE COURT: Let me ask you this. And this is
8 hypothetical, if in fact Mr. Wingfield acts on the basis of
9 this agreement and provides you full and accurate information,
10 unbeknownst to him, the company is playing a game with the
11 Government, and you knock the Government out, where is he?
12     MR. CONNOLLY: Mr. Pickering, got a letter that
13 gave him protection.
14     THE COURT: Stay focused.
15     MR. CONNOLLY: All right.
16     THE COURT: Mr. Wingfield cooperates in reliance on
17 this agreement, gives you everything that he knows and does it
18 truthfully, unbeknownst to him, the company is playing some
19 games and the company's agreement is voided. Where does it
20 leave Mr. Wingfield?
21     MR. CONNOLLY: In that situation Mr. Wingfield
22 would have a good detrimental reliance point.
23     THE COURT: Where is that agreement that gives him
24 that safety valves?
25     MR. CONNOLLY: I don't think it's an agreement.

90

1 When a witness comes forward, a separate letter is executed
2 with that witness, so when they are cooperating, they are not
3 relying on subject to his cooperation.
4     THE COURT: That did not happen with Mr. Wingfield,
5 did it?
6     MR. CONNOLLY: No, your Honor, we never spoke to
7 Mr. Wingfield to this day.
8     THE COURT: So, before he could detrimentally rely
9 upon it, he would have to know about it?
10     MR. CONNOLLY: Yes, on the detrimental reliance
11 which is for another day, if I can just say one word because
12 they addressed that.
13     We don't think Mr. Wingfield can show detrimental
14 reliance. He's one principal reasons the company is in
15 jeopardy of losing its leniency. The company was not truthful
16 about his participation.
17     THE COURT: The company wasn't truthful about his
18 participation?
19     MR. CONNOLLY: Yes.
20     THE COURT: What did he do that misled the
21 Government?
22     MR. CONNOLLY: That misled us?
23     THE COURT: Anything?
24     MR. CONNOLLY: No, we have never spoken to him,
25 your Honor. So no.

91

1     THE COURT: I got it from Mr. Black's argument that
2 he turned some information over.
3     MR. CONNOLLY: Your Honor, he may have given
4 information to the company and some of this we just learned
5 for the first time through this.
6     THE COURT: From Mr. Nannes.
7     MR. CONNOLLY: Yes, we do have some of his business
8 diaries. I don't know if somebody went into his office and
9 told him.
10     THE COURT: Follow the analysis. Corporate counsel
11 says Wingfield you have this information, I need to give to
12 the somebody and he gives it to corporate counsel and
13 corporate counsel gives it to you.
14     MR. CONNOLLY: In the abstract you are asking?
15     THE COURT: Does he know what's going on?
16     MR. CONNOLLY: Yes.
17     THE COURT: So he should not be entitled to
18 protection? He was only doing what the company told him to
19 do.
20     MR. CONNOLLY: Their detrimental reliance argument,
21 they admitted they were business records, so Mr. Wingfield
22 lost the opportunity to destroy evidence, because they are not
23 his property. They are Stolt-Nielsen's documents.
24     THE COURT: So in your scenario, he was acting as a
25 mere functionary, producing the documents requested by

92

1 counsel, not to take advantage of this agreement for himself.
2     MR. CONNOLLY: I don't pretend to know his state of
3 mind. What he gave us were business records that were
4 required and they were not his property and he did not
5 identify them. We have had independent witnesses identify
6 what they are. He did not. He did not -- he has never
7 interpreted them for us. So, the extent of detrimental
8 reliance is producing business records.
9     THE COURT: Okay. So in the scenario he rises or
10 falls with Stolts?
11     MR. CONNOLLY: Yes, and he violated his cooperation
12 agreement.
13     THE COURT: They want to hang on the agreement that
14 he didn't know about and you want to impose requirements on
15 the agreement he didn't know about.
16     MR. CONNOLLY: As your Honor said earlier, I'll
17 make the arguments and your Honor can consider them.
18     THE COURT: You see the dilemma there?
19     MR. CONNOLLY: Yes, but they spent a fair bit of
20 time saying our interpretation of voluntary is absurd and I
21 want to say it really isn't.
22     THE COURT: I am not cutting you off. I am giving
23 you a question. Mr. Terwilliger said he thought I was picking
24 on him.
25     MR. TERWILLIGER: No, I didn't.

93

1     MR. CONNOLLY: "Subject to their continuing
2 cooperation, the Antitrust Division agrees that the current
3 directors and officers who admit their knowledge of or
4 participation in and fully and truly cooperate with the
5 Antitrust Division in its investigation of the anti
6 competitive --"
7     THE COURT: If you had no contact with him, how did
8 he admit it?
9     MR. CONNOLLY: I never did.
10     THE COURT: So you are saying he does not even come
11 under the cloak of this paragraph 4?
12     MR. CONNOLLY: Well, your Honor, we only know from
13 them he said he never saw it. I don't know what he would say
14 if he ever testifies.
15     THE COURT: Mr. Black said you're the one who told
16 him or somebody in the Government.
17     MR. CONNOLLY: Your Honor, they asked us for a copy
18 because they said the company would not give them one. That's
19 between them and the company. We don't know anything about
20 that.
21     THE COURT: It goes back to one of my other
22 theories, whether he was victimized possibly by the company.
23     MR. CONNOLLY: But, your Honor, on the question of
24 voluntary, your Honor, they posit the scenario that it can't
25 mean what it says, otherwise our waiting room would be filled

94

1  with executives who hearing there is a leniency in the
2  offering, have to come in and voluntarily do this. In every
3  one of these provisions, there is a materiality element to it.
4  Somebody who is an executive who has the knowledge that the
5  company has already told us truthfully, it won't be material
6  to say, that person just didn't volunteer and therefore, we're
7  kicking him out. Number 1, we never did and if we did, your
8  Honor would say it's absolutely not material and you can't
9  breach it. Mr. Wingfield is in a totally different position.
10 He knows the requirements of the leniency program, that was
11 set forth by Mr. Black. He knows you have to take prompt and
12 effective action to stop it and he knows the company is going
13 in to get leniency when he actually continued to conspire
14 until November.
15         Further, this is the evidentiary part and we do
16 have evidence that he knows that we were given false
17 information.
18         Your Honor, somebody in that position voluntarily
19 means exactly what it says, you have to volunteer and step
20 forward and say Government, I know you are being scammed here
21 and here's the truth. Mr. Wingfield did not do that.
22         THE COURT: That all assumes he knew what was going
23 on.
24         MR. CONNOLLY: Some of it we can show he did know.
25         THE COURT: I am talking about what was going on

95

1  with this amnesty agreement.
2          MR. CONNOLLY: Yes.
3          THE COURT: That assume he knew and that's how you
4  started that out.
5          MR. CONNOLLY: If he did not know we had gotten
6  false information, I don't think we can say that failure to
7  come forward voluntarily would be material.
8          THE COURT: If he does not know that program is out
9  there, he can't avail himself of that opportunity.
10         MR. CONNOLLY: That's right.
11         Your Honor, I think that's it, except at one point,
12 Mr. Black raised -- questioned the good faith of the
13 Government because the Stolt-Nielsen revocation -- leniency
14 revocation didn't happen until March of 2004 and Mr. Wingfield
15 was arrested in 2003 and I really can't let that stand, your
16 Honor. There are facts in this case about discussions that
17 went on. We have given Stolt-Nielsen every opportunity to
18 come into the Government and explain their position before the
19 revocation actually happened. We have given Mr. Wingfield
20 every opportunity to come in with numerous different counsel,
21 to come in and talk to the Government about the situation here
22 and this so-called bad faith delay was nothing more than the
23 professional courtesy of letting these lawyers come in and
24 meet with miss and Mr. Griffin and others.
25         MR. BLACK: Your Honor, may I point to personal

96

1  privilege. I raised only the question that the revocation
2  came one week after briefing was completed on the assumption
3  that the agreement was in place. That is the only thing I
4  raised.
5          THE COURT: Do you accept his clarification?
6          MR. CONNOLLY: Yes, your Honor. Thank you, your
7  Honor.
8          THE COURT: I want to ask you this, Mr. Connolly.
9  Listen to the question carefully because I am framing the
10 issue.
11         Other than the Government's position that
12 Stolt-Nielsen materially misrepresented the duration of its
13 participation in the conspiracy and the roles that the
14 executives or officers made in it, does the Government contend
15 that there was any violation of anything else in paragraph 1
16 (a) through (g)?
17         MR. CONNOLLY: May I have a second, your Honor?
18         (Whereupon, counsel for the Government conferred,
19 after which the following transpired in open court:)
20         MR. CONNOLLY: Your Honor, just a point of
21 clarification. The misrepresentation was not just they said
22 that the conspiracy actually lasted longer than it was told to
23 us.
24         THE COURT: It subsumes they took prompt and
25 effective action.

97

1          MR. CONNOLLY: There was a specific action of
2  withdrawal in March of 2002 and that's important.
3          THE COURT: That's all within the idea of their
4  duration of participation.
5          MR. CONNOLLY: It wasn't simply --
6          THE COURT: They never said the conspiracy ended on
7  that date. They said their role in the conspiracy ended on
8  that date; is that correct?
9          MR. CONNOLLY: Yes, their role in the conspiracy.
10         THE COURT: Other than those failures that the
11 Government alleges, are there any other breaches of paragraphs
12 1(a) through (g)?
13         MR. CONNOLLY: No, your Honor.
14         THE COURT: I just want to make sure whether we are
15 on the same page.
16         All right, we're going to take a break. We'll call
17 your witness when you get back.
18         How long do you expect him to be?
19         MR. CURRAN: The direct examination could be as
20 long as 90 minutes or so.
21         THE COURT: Do you have a train going back?
22         MR. GRIFFIN: Yes, at 5:45.
23         THE COURT: All right, we'll come back at 1:30.
24         (Whereupon, at 12:30 p.m., a luncheon recess was
25 taken.) 1:30 P.M.