# Exhibit 15C

98

99

1    1:30 p.m.
2    AFTERNOON SESSION
3    (Appearances as noted, the following transpired in
4    open court:)
5        THE COURT: Good afternoon. Please be seated.
6    Mr. Curran?
7        MR. CURRAN: Before calling my witness, may I
8    address a couple of housekeeping matters?
9        THE COURT: Yes.
10       MR. CURRAN: We have agreed with counsel for the
11   Government, they may call Mr. Griffin somewhat out of order
12   and put him on as a direct witness of their's and after that
13   we will resume our case-in-chief.
14       Secondly, and I feel I have counsel's consent on
15   that as well --
16       THE COURT: What will they do?
17       MR. CURRAN: They consented to that order of
18   witnesses.
19       THE COURT: All right.
20       MR. CURRAN: Your Honor, you may recall in chambers
21   last week there was some discussion about the possibility that
22   Mr. Nannes may provide some of his testimony ex-parte to the
23   Court and specifically that was discussed in connection with
24   what he was told and what he said during his initial retention
25   by Stolt-Nielsen.

100

1        THE COURT: Did I say that?
2        MR. CURRAN: This was discussed and your Honor
3    didn't rule out the possibility of taking evidence ex-parte.
4        In fact, if I recall correctly, and I am sure I do,
5    the Government in fact suggested that the Court may want to
6    take evidence ex-parte, in camera, in connection with that
7    privileged information.
8        As your Honor may recall, the amnesty letter,
9    itself, states that Stolt-Nielsen is not waving it's
10   attorney-client privilege in connection with the amnesty
11   matter.
12       We request that a certain portion, a relatively
13   small segment of Mr. Nannes' direct, be taken ex-parte and we
14   would ask, in connection with that, that counsel for the
15   Government and counsel for Mr. Wingfield step into the
16   adjacent room for about a ten minute segment.
17       THE COURT: Any problem with that?
18       MR. CONNOLLY: We have a problem with the
19   relevance, but since your Honor will take everything in
20   connection with this and decide it later, we'll agree.
21       MR. BLACK: Mr. Wingfield would object to the
22   extent the evidence has anything to do with Mr. Wingfield, but
23   we are told it does not.
24       So to that extent, we don't object.
25       THE COURT: So you wouldn't be there.

101

1        MR. BLACK: We wouldn't be there.
2        THE COURT: However, I can assure you if I think it
3    implicates your clients, I will summon you to be there.
4        MR. BLACK: Thank you, your Honor.
5        MR. CURRAN: Thank you. One final housekeeping
6    item. I believe I have secured the consent of the other
7    parties as to the admission into evidence of the 17 tabs in
8    the Nannes direct folder that your Honor has already received.
9    So to facilitate --
10       THE COURT: How about 18?
11       MR. CURRAN: 18, is there any objection?
12       MR. CONNOLLY: No.
13       THE COURT: Is that correct, Mr. Black?
14       MR. BLACK: No objection.
15       THE COURT: You all agreed to the admission of
16   Stolt-Nielsen Exhibits 1 through 18?
17       MR. BLACK: Yes.
18       MR. CURRAN: On that basis, we move for the
19   admission of those exhibits into evidence.
20       THE COURT: They are admitted.
21       (So marked in evidence.)
22       MR. CURRAN: I would like at this time on behalf of
23   Stolt-Nielsen to call Mr. Nannes.
24       THE COURT: What's the question here?
25       MR. GRIFFIN: The question is whether I remain in

### Page 102

1  the courtroom.
2        THE COURT: Did anyone request sequestration?
3        MR. CURRAN: I believe we secured consent of
4  counsel for that and if there is any dispute about that, I
5  will make a motion at this time for the ruling on witnesses.
6        THE COURT: Well, the rules require me to grant
7  your motion, if you insist. What's the problem?
8        MR. CURRAN: Mr. Griffin is the next witness
9  testifying on many of the same subjects that Mr. Nannes is
10 testifying on.
11       THE COURT: That's correct.
12       MR. CURRAN: We would want to avoid any possibility
13 his testimony could be influenced by anything he hears Mr.
14 Nannes testify to first.
15       THE COURT: Go ahead. I am sorry, Mr. Griffin.
16 How long is his testimony going to be?
17       MR. CURRAN: I expect Mr. Nannes' direct to be 90
18 minutes.
19       THE COURT: Do you want to do something else
20 instead of hanging out here?
21       MR. GRIFFIN: I am fine, if I can make some calls
22 and have a table.
23       THE COURT: You can go into the jury room.
24       (Whereupon, Mr. Griffin left the courtroom.
25       (JOHN M. NANNES, sworn)

### Page 103

1        DIRECT EXAMINATION
2  BY MR. CURRAN:
3     Q. Mr. Nannes, you are the Stolt attorney who reported
4  the anticompetitive conduct to the Antitrust Division?
5     A. Yes.
6     Q. Can you please give us an overview for Judge Savage
7  as to your educational and employment background?
8     A. Yes. I graduated from the University of Michigan
9  Law School in 1973. I moved to Washington and following a
10 couple of judicial clerkships, I went to work in the Antitrust
11 Division as a Special Assistant to the Assistant Attorney
12 General in the Antitrust Division.
13       That gentleman had been my law professor at one
14 time and shortly after he left the Antitrust Division to
15 return to Michigan, I left the Antitrust Division and joined
16 the Washington office of Skadden, Arps, Slate, Meagher & Flom
17 and that was in 1977. I remained at Skadden, Arps until 1998
18 when I was invited to return to the Antitrust Division as a
19 Deputy Assistant Attorney General in the Antitrust Division.
20    Q. First, what was the nature of your practice at
21 Skadden, Arps?
22    A. I did almost exclusively antitrust work.
23    Q. Then you went back to the Antitrust Division you
24 said in 1998 and what were your responsibilities as a Deputy
25 Assistant Attorney General?

### Page 104

1     A. In the Antitrust Division, there is a fairly clear
2  dichotomy of civil and criminal antitrust work and the deputy
3  position I held was a supervisory position over the Civil
4  Section. One was transportation, energy and agriculture. The
5  second was computers and finance and the third was called,
6  "Civil Task Force."
7     Q. While you were Deputy Assistant, did you have any
8  responsibility for criminal matters?
9     A. At that time, I did not.
10    Q. Why is that?
11    A. There usually is a deputy for criminal matters, Mr.
12 Griffin, who was usually a career attorney and he supervises
13 the section of the Antitrust Division that primarily pursued
14 criminal enforcement of the antitrust laws.
15    Q. Very briefly, you already mentioned the areas you
16 were responsible for as a Deputy Assistant.
17       What was the nature of your work and your
18 responsibilities in those areas?
19    A. I would review case recommendations, status of
20 investigations, some testifying responsibilities, case review,
21 meeting of parties and making recommendations ultimately to
22 the Assistant Attorney General with respect to enforcement
23 action.
24    Q. While you were at the Antitrust Division, did you
25 have a change in your title or status?

### Page 105

1     A. After the election when President Bush was
2  inaugurated, the political appointees from the prior
3  administration left and I was not a political appointee and I
4  was designated by President Bush as the Acting Attorney
5  General for that period of time until President Bush's
6  appointee was nominated.
7     Q. Did that change your responsibilities?
8     A. As the acting Assistant Attorney General, I had
9  supervisory responsibilities not only for the Civil Section,
10 but for the first time, for the Criminal Section, as well.
11    Q. And more specifically, what were your
12 responsibilities in connection with criminal matters when you
13 were Acting Assistant Attorney General?
14    A. There were occasions with respect to criminal
15 enforcement matters where approval of the Assistant Attorney
16 General was required, signing certain pleadings, approving
17 certain forms of agreements and meeting with certain parties
18 attacking recommendations with regard to proposed enforcement
19 actions.
20    Q. Did you in fact work on any matters connected to
21 the Division's amnesty policy?
22    A. Well, I was certainly generally familiar and aware
23 of the Amnesty Program, but I don't recall that in the five or
24 so months that I was Acting Assistant Attorney General that I
25 was called upon to make any decision with respect to leniency

106

1  matters.
2  Q. When did you leave the Antitrust Division?
3  A. In September of 2001.
4     THE COURT: How long were you the Acting Assistant
5  Attorney General.
6     THE WITNESS: I stayed around longer. However, I
7  was there working about five months.
8     THE COURT: So your exposure was about five months?
9     THE WITNESS: Yes, that's correct.
10 Q. Then, in the second half of 2001, you left the
11 Division and returned to Skadden, Arps?
12 A. Yes, that is correct.
13 Q. Did you resume your practice there?
14 A. Yes.
15 Q. Again specializing in antitrust law?
16 A. Yes.
17 Q. Sir, until this matter, had you done any work for
18 Stolt-Nielsen?
19 A. No.
20 Q. Sir, how did it come about that you were retained
21 by Stolt-Nielsen?
22 A. On or about November 18th -- I think it was
23 actually November 18th -- I received a telephone call from a
24 lawyer named Gary Sesser.
25 Q. What year are we talking about?

107

1  A. That would have been November 18, 2002.
2  Q. So it's about a year after you left the Antitrust
3  Division?
4  A. Yes, that's correct.
5  Q. Please continue.
6  A. Mr. Sesser and I had been classmates at Michigan
7  and he told me that he had a client who had an amnesty matter
8  and asked if I could provide some recommendations of antitrust
9  counsel that the company might consider to retain in that
10 matter.
11 Q. Did you give them some recommendations.
12 A. Yes I think I gave three or four recommendations.
13 Q. Did you have any further discussions with Mr.
14 Sesser?
15 A. Yes, a day or two later, I think it was probably
16 November 20th, he called me and asked me if I would be willing
17 to meet with the company.
18    At that point, I think I did not even know the
19 company's name and I told him that I would and that by
20 coincidence, I was going to be coming up to New York on the
21 following day, Thursday, and would be available to meet that
22 following Friday, which I think was November 22nd.
23 Q. Did such a meeting in fact occur?
24 A. Yes, it did.
25 Q. Where did it occur?

108

1  A. At Mr. Sesser's office.
2  Q. Who was in attendance?
3  A. In attendance was Mr. Sesser; Samuel Cooperman, who
4  was the Chairman of Stolt-Nielsen Transportation Group, Alan
5  Winsor, who was general counsel to the company at the time;
6  one of my colleagues, Ben Crisman and myself.
7     MR. CURRAN: I intend to ask Mr. Nannes what
8  transpired and this would be the only instance to be cleared.
9     THE COURT: Let's do it the easy way, we'll go into
10 the jury room.
11    (Whereupon, the following transpired in chambers
12 with Mr. Terwilliger and Mr. Curran and the witness, Mr.
13 Nannes being present:)
14    CONTINUED DIRECT EXAMINATION
15 BY MR. CURRAN:
16 Q. Mr. Nannes in reference to this November 22nd
17 meeting you were discussing in open court, what transpired at
18 that meeting?
19 A. We had a lengthy meeting, your Honor, that took the
20 better part of the day. We jumped around from topic-to-topic.
21    We started out with a general introduction. I had
22 not met the client before and they had not met me and they
23 reviewed some of their employment history as I reviewed mine.
24 They made the judgment at that point to go forward with the
25 understanding that if for some reason that he decided not to

109

1  retain me, that all the information that I provided to them
2  would remain confidential and Mr. Cooperman provided me with
3  an overview of the parcel tanker industry.
4     I had done some work in private practice in the
5  ocean shipping industry separately, but in a different segment
6  of the industry and Mr. Cooperman gave me an overview of the
7  business.
8  Q. Can you elaborate upon the overview he gave you?
9  A. Mr. Cooperman explained to me that the parcel
10 tankers are large vessels that travel in international waters
11 in geographically defined trade lines internationally and that
12 the vessels have up to 50 separate compartments within the
13 vessel, so that it can transport parcels for multiple
14 customers at the same time and the commodities that the
15 carrier transports for the customer can be different
16 commodities.
17    They tended to be in the chemical and vegetable oil
18 categories and some of the commodities were very sensitive to
19 temperature and very sensitive to cleanliness conditions, so
20 the ability of a carrier to provide specialized equipment in
21 the form of heated compartments or cool compartments or
22 extraordinarily clean compartments was essential for the
23 attractiveness of a vessel to a particular customer. He
24 explained to me that most cargoes were transported pursuant to
25 contracts that ran between one and three years, that generally

110

1 there was a high degree of renewal of contracts, that a
2 customer who used a particular parcel tanker company would
3 tend to renew the contract, because the carrier had developed
4 a port rotation schedule and a sailing schedule in terms of
5 arrivals and departures compatible with the shipper's needs
6 and that because of the specialized equipment, that the
7 carrier would commit to make available to the customer, there
8 tended to be a comfort level that the customer had with the
9 carrier and thus, there were many times when the customer
10 would put in contractual provisions in the contract that would
11 favor the incumbent carrier such as the right of first refusal
12 or even a right to extend the contract without a brand knew
13 price negotiation each time it expired and as a result, what
14 happened over time, was there was a high degree of repeat
15 business, such that a customer would very often extend the
16 contract without even taking the contract to market and giving
17 other carriers a chance to bid.
18      Mr. Cooperman explained to me that because of the
19 importance of a customer to a carrier in its overall rotation,
20 because the ship was on a perpetual voyage and stopping along
21 the way was very important to the carrier to have his vessel
22 as full as possible at each stop so as to minimize excess
23 capacity and maximize profitability, an incumbent carrier
24 would usually fight very hard to retain the customer's
25 business at the time of the expiration, so that over time, it

111

1 became the case that the combination of the customer's
2 propensity to renew the contact with the carrier and the
3 carrier's desire to have that renewed, meant that somebody who
4 wanted to come in and compete for that business would have to
5 usually offer a substantial discount and that the carriers
6 also knew that if one of them was successful in obtaining
7 business from somebody else's customer in a trade, that that
8 displaced carrier would now have excess capacity of its own
9 and was likely to try to take away some business from the
10 other carrier.
11      So that as a practical matter over time, there
12 tended to be a high level of repeat business and not a
13 substantial amount of turnover in customer business.
14      He also told me that there were a number of kinds
15 of agreements in the industry that were in the form of joint
16 ventures, collaborative activities by carriers that the
17 antitrust laws tend to recognize as being procompetitive.
18      If a carrier, for example, did not have enough
19 space on its vessel to carry a customer's cargo, that carrier
20 might try to arrange for another carrier to transport that
21 cargo as an accommodation. That would be called a "sublet" or
22 "relet" and that was intended to make sure that the customer's
23 cargo was transported on time or there would be times when
24 carriers would co-bid, they would bid together.
25      If a customer had needs that not one carrier could

112

1 accommodate on its own, two carriers might get together to try
2 to carry that cargo and there were other categories of
3 collaborative agreements where carriers might rent space on
4 one of those vessels in order to allow them to serve ports
5 that they may not otherwise serve or serve them economically
6 so this was an industry where there were communications
7 between competitors.
8    Q. Did Mr. Cooperman inform you as to what the impetus
9 was for you to be consulted and for this meeting to occur?
10   A. Yes. I think the particular impetus for the
11 meeting at that time was some information that Mr. Cooperman
12 had received from an employee of Stolt who had recently been
13 at a meeting in Europe with customers, where a customer
14 approached the Stolt employee and said that the customer,
15 itself, had been approached by a person purporting to be a
16 class action lawyer, looking to enlist the customer in a
17 possible legal action against Stolt and purportedly showing to
18 the Stolt representative who was there -- I am sorry, I'm not
19 sure if he showed him or described to him that the customer
20 had been shown a document that looked to be a diary of a Stolt
21 employee, detailing communications between Stolt and
22 competitors regarding potentially anticompetative activities.
23      THE COURT: Did he say when that contact had been
24 made?
25      THE WITNESS: He said it had been made within a

113

1 matter of weeks before the meeting.
2      THE COURT: Okay.
3   A. (Continuing) Mr. Cooperman then put that in the
4 context of a chronology. He told me that in February of 2002,
5 Stolt's counsel, Paul O'Brien had sent Mr. Cooperman a
6 memorandum raising some antitrust concerns to Mr. Cooperman,
7 that Mr. Cooperman had met with Mr. O'Brien and as a result of
8 their discussions, had instituted a number of steps to
9 strengthen, reinvigorate Stolt's antitrust program. He said
10 that Mr. O'Brien, nonetheless, had tendered his resignation
11 and Mr. Cooperman asked him to reconsider and Mr. Cooperman
12 decided to leave --
13     THE COURT: Mr. O'Brien, you mean?
14     THE WITNESS: Yes, Mr. O'Brien indicated that he
15 was going the leave.
16     THE COURT: Did he say why?
17     THE WITNESS: Because he was not fully satisfied
18 with the response.
19   A. (Continuing) Mr. O'Brien worked about three weeks
20 on an antitrust compliance program which included multiple
21 facets. The company had a prior version of an antitrust
22 policy, but the new version that was prepared was
23 significantly expanded and focused. It made particularized
24 kinds of conduct that was problematic very clearly defined, so
25 employees could have no doubt about the nature of proper,

114

1  versus improper communications they could have with
2  competitors. That was in March. In April, they had conducted
3  antitrust compliance seminars not only in Connecticut, but in
4  Rotterdam and Singapore where other people were engaged in
5  tanker trading decisions.
6      Following that, they had a process of
7  certifications where all the employees were given
8  certifications that required them to attest that they had
9  reviewed the policy, attended the seminar, understood the
10 policy, would comply with the policy, would report violations
11 of the policy and understood that violations of the policy
12 would be taken very seriously and could result in their
13 dismissal.
14     Mr. Cooperman also told me that Stolt had gone so
15 far as to provide copies of its new antitrust compliance
16 policy to its principal competitors and to its principal
17 trading partners, other carriers with whom they had pooling
18 arrangements and other kinds of joint ventures.
19     With that information set forth, we turned to a
20 discussion of whether the company should contact the Antitrust
21 Division to seek to participate in the Division's Leniency
22 Policy. We reviewed the criteria of the Leniency Policy which
23 I believe that Mr. Cooperman was already aware of, perhaps
24 from Mr. Sesser. We discussed whether if we went into the
25 Antitrust Division, we would be able to confess a violation of

115

1  the antitrust laws, that's one of the requirements of
2  participation in the leniency program. You have to have a
3  violation to report in order to participate in the program and
4  we talked about whether the information that he had provided
5  about the company's activities, the nature of the industry was
6  such that we could reasonably go into the Antitrust Division
7  an indicate to them that we had a potential violation to
8  report.
9      We discussed in detail that point, I think this
10 communication that the Stolt employee had with a customer in
11 Europe, and at some point, I asked Mr. Cooperman what he
12 thought would happen if I conducted an investigation,
13 specifically, would I find something and he said he thought
14 that I would. He indicated at that point that the Stolt Board
15 had authorized the company to contact the Antitrust Division
16 to explore participation in the leniency program.
17     So that was not something that he had to reconsult
18 the board on. We talked then about the implications, the
19 process of investigation, the process of laying down a marker
20 and the process of applying. I know you have heard about the
21 Leniency Program. The program has really been around for a
22 long time, but in the 1970's and '80s --
23     THE COURT: Hold on. Why is this in camera?
24     Q. Is this still information related to your
25 discussion with Mr. Cooperman at this meeting?

116

1    A. I can summarize it. We had a discussion about the
2  elements of the Leniency Policy and in particular the marker
3  process where somebody contacts the Antitrust Division and
4  asks for a marker to reserve their place in line until an
5  investigation can be conducted at which time the company would
6  make a proffer to the Antitrust Division and seek admission
7  into the Conditional Leniency Program.
8      As a result of that discussion, I was authorized to
9  place a call to Mr. Griffin to ascertain whether we could
10 obtain a marker and begin the process of conducting an
11 investigation to make a proffer to the Division.
12   Q. Okay, a couple of things. There has been reference
13 in court earlier to a Wall Street Journal article.
14     What relevance does that have, if any, to this
15 November 22nd meeting?
16   A. I know the Government last said --
17     THE COURT: Hold on. What does this have to with
18 the in camera -- MR. CURRAN: This is a very important pointed
19 question.
20   Q. Was a Wall Street Journal article discussed between
21 you and Mr. Cooperman at this initial consultation that you
22 had with your potential client?
23   A. Yes.
24   Q. What was said at that meeting about the Wall Street
25 Journal article?

117

1    A. Mr. Cooperman said he was contacted by a Wall
2  Street Journal reporter on the prior evening, November 21st
3  and it was by coincidence the article appeared on the day of
4  our meeting, but our meeting had been setup before the Wall
5  Street Journal article appeared or he had any reasonable
6  expectation there would be such an article.
7      MR. CURRAN: A couple of more questions dealing
8  with their client's meeting.
9    Q. Did you conclude on the basis of information Mr.
10 Cooperman gave you at this meeting that you had a criminal
11 violation of the Sherman Act to report to the Department?
12   A. No, I had not.
13   Q. Then, why were you authorized to make a call to the
14 Department?
15   A. Well, the nature of the Leniency Policy is such
16 that only the first company to report anticompetitive behavior
17 is admitted to the leniency program. When a company has
18 sufficient evidence to think that there may be an antitrust
19 violation to report, it's in the company's interest and the
20 Division encourages the company to contact the Division at
21 that point in time.
22   Q. Was this discussed between you and Mr. Cooperman at
23 this time?
24   A. Yes, it was.
25     MR. CURRAN: I think unless your Honor has any

118

1 questions about the communications between the client --
2 THE COURT: Yes, but I don't know why this was in
3 camera.
4 MR. CURRAN: This whole discussion?
5 THE COURT: Yes.
6 MR. CURRAN: These are clearly attorney-client
7 communications. The Department has clearly taken a position
8 that we have not waived our attorney-client privilege with
9 respect to our amnesty application and these are facts
10 relating to Mr. Nannes' initial retention, rather than the
11 investigation he conducted and reported to the department. So
12 that was the basis for our request to have this heard in
13 camera, ex parte.
14 THE COURT: I think that it should be revealed.
15 Persuade me otherwise.
16 MR. CURRAN: A couple of things --
17 THE COURT: What is confidential about it? It goes
18 to the heart of your argument in this case.
19 MR. TERWILLIGER: Your Honor, may I?
20 THE COURT: Yes.
21 MR. TERWILLIGER: It also goes to the heart of the
22 privilege and what we are talking about are communications
23 from the client to the lawyer, which as Mr. Curran indicated
24 were preserved.
25 THE COURT: It's your case.

119

1 MR. TERWILLIGER: I know, your Honor and we're not
2 trying to hide anything. What I am concerned about is, that
3 we will get into a morass of privileged questions if we waived
4 this matter right now. Everything else that Mr. Nannes can
5 testify to will be concerning his external communications with
6 the Department.
7 What this does, it's a very small piece of the
8 evidence, but admittedly, a very significant piece --
9 THE COURT: Do you want me to consider it?
10 MR. TERWILLIGER: Yes.
11 THE COURT: Then it has to be on the table. This
12 is a civil matter, not a criminal matter. You can't have a
13 little bit of what you want and a little bit that you don't
14 want.
15 MR. TERWILLIGER: I hear you, Judge.
16 THE COURT: You make a choice.
17 MR. TERWILLIGER: If we're going to do that, our
18 client is here, represented here, we have to confer with the
19 client.
20 THE COURT: Absolutely.
21 MR. TERWILLIGER: It's not our privilege to waive.
22 THE COURT: I don't think this really goes there.
23 MR. CURRAN: Okay.
24 THE COURT: Haven't you already admitted to the
25 facts that the witness has just testified to?

120

1 MR. CURRAN: We certainly admit as to
2 communications that Mr. Nannes subsequently had with the
3 Department.
4 THE COURT: The facts that are revealed by Mr.
5 Cooperman are facts that you have already revealed to the
6 Department of Justice.
7 MR. CURRAN: No, certainly not all of them. I
8 don't think the Department of Justice knows anything about
9 this customer who came to the Stolt employee and said, "Hey,
10 there is a plaintiff's lawyer out there who is circulating bad
11 stuff and Stolt, you are likely to get sued." I don't think
12 the Department of Justice knows anything about that. That was
13 clearly a secret communicated --
14 THE COURT: How about the communications from Mr.
15 O'Brien to Mr. Cooperman?
16 MR. CURRAN: Those are plainly covered by the
17 attorney-client privilege.
18 THE COURT: I think they are.
19 MR. CURRAN: I think they are, as well.
20 THE COURT: How do you enter into the agreement to
21 provide them full information and then say you still have the
22 attorney-client privilege. It seems to me somebody is not
23 getting all the information?
24 MR. CURRAN: It's interesting. It's the Department
25 that says discovery includes discovery by counsel. Yet, it's

121

1 the same Department in their model letter that recognizes the
2 preservation of the attorney-client privilege.
3 THE COURT: Oh, there is a real problem.
4 MR. CURRAN: If we consult with our client and our
5 client accedes to the suggestion that we present this
6 information in court with other parties present, would you
7 like Mr. Nannes to go through the information or would you
8 simply make the transcript available?
9 THE COURT: I don't know yet.
10 MR. TERWILLIGER: Can I ask a question about this?
11 THE COURT: Yes.
12 MR. TERWILLIGER: We believe that --
13 THE COURT: Let me ask you this, what if the
14 Government lawyer would ask the witness, Mr. Nannes, did
15 Cooperman tell you that Mr. O'Brien had brought to his
16 attention in February that there were antitrust violations?
17 What would you do, assert the privilege?
18 MR. TERWILLIGER: I think so. In terms of what --
19 THE COURT: What is the effect of that assertion of
20 the privilege?
21 MR. TERWILLIGER: I don't think that's what he
22 testified to, but -- just now, but regardless, I don't think
23 it has any adverse affect. I don't want to get into --
24 THE COURT: There is no inference to be drawn.
25 MR. TERWILLIGER: I don't think so.

**Page 122**

1  THE COURT: Not like the invocation of the Fifth
2  Amendment.
3  MR. TERWILLIGER: Exactly.
4  MR. CURRAN: I would add one slight modification to
5  that. Mr. Nannes told the Department that Mr. O'Brien had
6  earlier raised concerns, but Mr. Nannes was very careful not
7  to provide the substance of those concerns, recognizing
8  privilege issues.
9  THE COURT: Why don't you talk to your client?
10  MR. TERWILLIGER: Your Honor, can I just raise one
11  issue before we do that?
12  I would like to be able to tell the client that if
13  we were to waive, as to this communication, that the waiver is
14  limited to the matter in which Mr. Nannes is representing the
15  company and that is, the matter of receiving information for
16  purposes of going to the Justice Department to make a
17  disclosure. It's not a waiver of every privilege that might
18  apply to antitrust matters.
19  THE COURT: I think you can get that agreement from
20  Mr. Connolly, too.
21  MR. TERWILLIGER: I don't think so, Judge.
22  THE COURT: Did he agree to have this procedure
23  done in camera?
24  MR. TERWILLIGER: Yes.
25  THE COURT: Okay.

**Page 123**

1  MR. TERWILLIGER: It's worth a shot. Can we have
2  about 15 minutes?
3  THE COURT: 15? 10.
4  MR. TERWILLIGER: I'll take what you give me.
5  THE COURT: Okay.
6  (Whereupon, a short recess was taken, after which,
7  the following transpired in the courtroom:)
8  MR. CURRAN: Your Honor, the parties have reached
9  an agreement that the disclosure --
10  THE COURT: Do I have to construe it?
11  MR. CURRAN: I don't think so.
12  THE COURT: Is it ambiguous?
13  MR. CURRAN: We promptly and effectively reached an
14  agreement that it wasn't immediate, but prompt, that the
15  disclosure of Mr. Nannes' testimony about the November 22nd
16  meeting will be -- the waiver that flows from that will be
17  limited to what Mr. Nannes was told and what he said at that
18  meeting.
19  So we have a limited waiver and the Government is
20  free to cross-examine Mr. Nannes as to what occurred at that
21  meeting.
22  THE COURT: Is that agreed to?
23  MR. CONNOLLY: Yes.
24  THE COURT: There is no further waiver, it's
25  preserved?

**Page 124**

1  MR. CONNOLLY: Yes.
2  MR. BLACK: No problem here, your Honor.
3  MR. CURRAN: How would your Honor like to proceed?
4  Shall we cover that meeting again in open court?
5  THE COURT: Yes.
6  MR. CURRAN: Thank you, your Honor.
7  THE COURT: My concern is, I thought it should be
8  revealed, just so you all know.
9  CONTINUED DIRECT EXAMINATION
10  BY MR. CURRAN:
11  Q. Mr. Nannes, with regard to the November 22, 2002
12  meeting, what transpired?
13  A. The November 22nd meeting was scheduled by Mr.
14  Sesser after he contacted me earlier in the week to see if I
15  could meet with an unnamed client, and subsequently,
16  Stolt-Nielsen was identified as the client and asked me to
17  meet with Mr. Sesser, with Mr. Cooperman, who was the Chairman
18  of Stolt-Nielsen Transportation Group, Mr. Alan Winsor and Mr.
19  Sesser in Mr. Sesser's office on Friday November 22nd, which I
20  did with my colleague Ben Crisman.
21  Q. What was said at the outset of that meeting?
22  A. At the beginning of the meeting, there were
23  introductions. We didn't know one another and so we reviewed
24  a little bit of our employment histories.
25      We agreed that we would be retained for at least

**Page 125**

1  the purposes of the meeting and if for any reason the company
2  chose not to go forward with me, the confidences they had
3  provided would be retained. Then we had a discussion of
4  various items that we covered not all at one time, there were
5  three or four major components of what we discussed and we
6  went back and forth with respect to the better part of the
7  day.
8  Q. Did Mr. Cooperman give a description of the
9  industry?
10  A. Yes.
11  Q. What did he say?
12  A. Mr. Cooperman provided a description of the parcel
13  tanker trading business. He explained that the parcel tanker
14  trading vessels are large vessels that have many separate
15  compartments, so that the vessel can carry different bulk
16  liquids at the same time and is likely to be carrying
17  commodities for multiple customers at any given time when it's
18  on the high seas, unlike for example, crude oil tankers which
19  would carry one product for one customer for the entire
20  voyage.
21      He explained the customers are predominantly very
22  large chemical and petroleum companies and that they tend to
23  enter into contracts with parcel tanker companies with the
24  contracts running from a year or two to two or three years.
25  He explained that there was a very significant renewal rate of

126

1 contracts, that a customer, once having a contract with a
2 carrier was very likely to renew that contract overtime and
3 maintain a long-term relationship with the carrier, because
4 the carrier would have developed a port rotation schedule, a
5 sailing schedule and may well have arranged for specialized
6 equipment to suit the needs of the customer.
7    Some of the chemicals that are carried by parcel
8 transportation companies are sensitive to temperature. The
9 compartments have to be cooled or heated depending on the
10 product and some very high cleanliness and they have to be
11 cleaned and so once a customer has found a carrier that could
12 meet its needs, they often built into their contracts with
13 that carrier provisions that favored the incumbent carrier,
14 like a right of first refusal or a right to extend the
15 contract provided that the change in price was within a
16 defined band, plus or minus five percent, for example, of the
17 preexisting contract price. And he also indicated that by
18 virtue of this experience, many times when a contract came up
19 for renewal, the customer would not even take the contract to
20 market and give other firms a chance to bid on the contracts.
21    So as a result, there was a high stability of
22 contract renewals which was known throughout the business and
23 thus, if a carrier wanted to compete for a piece of business
24 that was held by another carrier, the carrier who wanted to
25 bid would often have to offer a very substantial price

127

1 discount to convince the customer to make a change which would
2 make the price less remunerative to the company contemplating
3 bidding for the business and because these carriers operated
4 in geographic trades that were similar and overlapping, a
5 carrier knew if it were successful in attracting a significant
6 volume of business from its competitor, that competitor would
7 now have empty space in its vessel that it would seek to
8 replace with new business and likely come after the business
9 of the carrier that had just taken some business away from it.
10    So, with the companies recognizing these
11 competitive features and the customers having a strong
12 preference for contract renewal, there tended to be the high
13 incidence of contract renewal in the parcel tanker trade
14 business.
15    Q.  Did Mr. Cooperman say anything about cooperative
16 transactions among competitors in this industry?
17    A.  Yes, I can't recall whether I asked him or he
18 volunteered, but we were interested in circumstances in which
19 competitors might be in communication with one another. That
20 would sort of be relevant to an antitrust analysis, for
21 example. He described there were various kinds of cooperative
22 agreements between carriers. Relets or sublets which arise
23 when a carrier does not have enough extra space on its vessel
24 to carry the cargo of the shipper it wants transported, so a
25 carrier might ask another carrier to carry that cargo for the

128

1 shipper. There would be co-bid situation. There might be a
2 situation where a customer had a volume of cargo to transport
3 that no one carrier could accommodate and so two carriers
4 might get together and make a joint bid or co-bid to the
5 customer for that business and there were agreements called,
6 "co-service agreements" where carriers essentially could rent
7 space on one of those vessels. They would still be separate
8 in the marketplace, but they would be consolidating on a
9 single vessel which would reduce potential operating costs.
10 Which would be bringing one vessel into port rather than two
11 vessels into port, so there were communications among
12 competitors as part of the ordinary course of business.
13    Q.  Did Mr. Cooperman tell you why he had asked to
14 consult with you?
15    A.  Yes.  Mr. Cooperman indicated that he had received
16 a report recently from a Stolt employee who had been at a
17 conference in Europe that was attended by shippers and that
18 one customer of Stolt had approached this employee and told
19 the employee that a customer had been approached by an
20 attorney claiming to have a journal of the Stolt employee that
21 contained descriptions of problematic competitive behavior and
22 Mr. Cooperman said that he had called that customer and
23 received confirmation of that report. And it seemed to me
24 that that was the precipitating cause for the meeting.
25    Q.  Now, sir, was there a Wall Street Journal article

129

1 relevant to this meeting?
2    A.  On the way to the meeting in a cab, I was reading
3 the Wall Street Journal and saw an article that appeared that
4 day about Stolt-Nielsen and recounting the allegations.
5    Q.  Was the meeting held on November 22nd reaction to
6 the Wall Street Journal article?
7    A.  Not to the best of my knowledge. Mr. Cooperman
8 indicated to us that morning that he had received a telephone
9 call from the Wall Street Journal reporter the night before.
10 Our meeting had been scheduled a day or two before that, so it
11 was a coincidence, but I don't think it was the cause or
12 explanation for the meeting.
13    Q.  Sir, at this meeting on November 22nd, was there
14 any discussion of Paul O'Brien?
15    A.  Yes. In addition to providing the industry
16 overview, Mr. Cooperman provided a chronology of events going
17 back to early 2002.
18    He explained that in February, I think, of 2002,
19 that Mr. O'Brien had sent him a memorandum, raising certain
20 antitrust concerns to Mr. Cooperman and that Mr. Cooperman had
21 had meetings with Mr. O'Brien thereafter regarding the issues
22 that Mr. O'Brien made known and that Stolt had initiated a
23 series of anticompetative steps in response to issues that Mr.
24 O'Brien raised. He identified those steps for me and he told
25 me, also, that Mr. O'Brien had nonetheless tendered his

130

1 resignation in early March. Mr. Cooperman had asked him to
2 reconsider, but Mr. O'Brien declined and Mr. O'Brien
3 subsequently left the company three weeks later after a
4 transitional period of about three weeks.
5  Q. Did Mr. Cooperman describe the antitrust compliance
6 steps that he referred to?
7  A. Yes, he did. He said the company had substantially
8 revised and expanded it's antitrust compliance handbook,
9 making certain prohibited conduct far more explicit in the
10 memorandum. He said that the company had initiated a series
11 of antitrust compliance seminars in offices all around the
12 world, including Greenwich, Connecticut, Rotterdam and
13 Singapore where the compliance policy was provided to
14 employees engaged in dealing with employees and customers. He
15 indicated the company had instituted new provisions, such as
16 the co-serves and the co-bids that I mentioned previously. He
17 said that thereafter, the company had required each of the
18 employees, and I think he mentioned about 134, 135 employees
19 who attended the seminars, to execute certifications, stating
20 that they had read the policy, understood the policy, would
21 follow the policy, were aware of no violations of the policy,
22 would report violations of the policy to counsel and
23 understood that violation of the policy could subject them to
24 various sanctions, including dismissal.
25   Mr. Cooperman also said that Stolt had gone so far

131

1 as to distribute its antitrust compliance policy to a number
2 of principal competitors, as well as to its business partners.
3  Q. Sir, at this meeting, was there any discussion of
4 the Department of Justice Antitrust Division's Amnesty Policy.
5  A. Yes, we discussed the Antitrust Division's
6 Antitrust Amnesty Policy and I think Mr. Cooperman was
7 familiar with the elements of the policy, but we reviewed it
8 nonetheless and we discussed the procedure associated with the
9 policy, the encouragement by the Antitrust Division that
10 companies come in early and quickly because only the first
11 company that comes into report a potential violation would be
12 admitted to the program and the so-called, "Marker Process"
13 where a company could contact the Antitrust Division before it
14 conducted an investigation and asked to reserve its first
15 place in line for a reasonable time so it could conduct an
16 investigation and then make a proffer to the Division of the
17 evidence it had found for admission to the program as a form
18 of leniency.
19  Q. Was any discussion reached at the meeting with
20 respect to the Amnesty Program?
21  A. Yes, Mr. Cooperman indicated the board gave its
22 authorization for the company to contact the Antitrust
23 Division and seek a marker to conduct the investigation.
24  Q. Sir, did Mr. Cooperman say anything with regard to
25 whether the company in fact or in his judgment had an

132

1 anticompetitive problem?
2  A. Yes, I was trying to make a judgment about whether
3 there was sufficient cause to contact the Antitrust Division
4 to ask for the marker.
5   Mr. Cooperman had described as best he could the
6 employee journal that had been related to him from the
7 customer to whom it had apparently been shown, but ultimately,
8 I turned to Mr. Cooperman and asked him whether if we
9 conducted an investigation, we were likely to find something
10 and he said he thought that we would and I took that to mean
11 that there was sufficient cause for us to contact the
12 Antitrust Division and seek a marker as a preliminary step for
13 the client for leniency.
14  Q. At the November 22nd meeting, did you reach a
15 conclusion that Stolt had in fact committed a criminal
16 violation of the Sherman Act?
17  A. No, I had not. I certainly wasn't given enough
18 facts on that occasion to make that judgment. There were
19 characteristics of the industry that would make assessment
20 more difficult. It might be another circumstance, namely the
21 customer renewal pattern and the frequent legitimate
22 communications between competitors, so sorting that out might
23 be difficult.
24   So I had not reached a judgment at that meeting as
25 to whether or not there was an antitrust violation to report.

133

1  Q. But nonetheless, a decision was reached to call the
2 Department of Justice?
3  A. Yes.
4  Q. Sir, did you in fact call the Department of
5 Justice?
6  A. Yes, I did.
7  Q. When did you do that?
8  A. I think it was in the middle of the afternoon. I
9 placed a call to Mr. Griffin in Washington. He wasn't there.
10 I asked for Mr. Hammond, who reports to Mr. Griffin and he
11 wasn't there and so I left voicemail messages for them telling
12 them I was calling about a potential amnesty matter.
13  Q. This was on the same day, November 22nd that you
14 met with Stolt-Nielsen for the first time?
15  A. Yes, it was.
16  Q. Sir, did there come a time when you eventually
17 spoke to somebody live at the Department of Justice?
18  A. Mr. Griffin and I exchanged telephone messages over
19 the weekend and finally spoke that Sunday and I told him that
20 we had a potential amnesty applicant and discussed from how to
21 ascertain whether or not my client would be first in line.
22 That could be a very delicate process.
23   Mr. Griffin does not want to tell me all of the
24 investigations that the Division is conducting and I don't
25 want to tell him the name of the client or sufficient factual

134

1  information so he could deduce that until I know that we would
2  be first.
3       So there is a bit of a chicken and egg process that
4  goes on, so for the next couple of days we exchanged calls
5  where I would give him some description of the industry in
6  broad terms and he would come back with some information
7  without identifying, particularly what the Division had
8  ongoing, but we tried to narrow the range to see whether Stolt
9  might be first in line with respect to the parcel tanker
10 industry.
11      Q.   Do you have in front of you the exhibit book that I
12 handed out to counsel and the Court earlier?
13      A.   Yes.
14      Q.   Can you please flip to tab 1 in that booklet?
15      A.   Yes.
16      Q.   What is that document under tab 1?
17      A.   Tab one is an email and email attachment which is
18 the conditional corporate leniency letter that Mr. Griffin
19 faxed me -- I am sorry, emailed to me on November 24th. It
20 indicated in our conversation that he would do so. He said
21 that the Division, if it proceeded, would proceed according to
22 its customary leniency letter. He mentioned to me there had
23 been some changes to the letter perhaps in the intervening
24 years since I left the Antitrust Division and he would send me
25 a copy of the model, which he did.

135

1       Q.   Mr. Nannes, you mentioned you had a series of
2  telephone calls with Mr. Griffin after the initial live phone
3  call on the 24th?
4       A.   Yes.
5       Q.   Can you walk the Court through those telephone
6  discussions, please?
7       A.   Sure. We had some conversations about the Amnesty
8  Policy, in general. There are two forms of leniency, it's
9  called Part "A" and Part "B" and Part "A" is more automatic
10 and Part "B" is more discretionary and I was interested in
11 pursuing with Mr. Griffin, whether the client I was calling
12 about would be a Part "A" or Part "B" leniency applicant. We
13 reviewed the differences between being a Part "A" or Part "B"
14 applicant and determined for our situation it did not seem
15 that the distinctions were critical. We were trading
16 information about transportation services and in particular,
17 modes of transportation.
18      Again, Mr. Griffin was trying to convey it looked
19 like we would be first unless we fell into certain categories
20 and we were making some progress along those lines when we had
21 a separate conversation on, I think it was, November 26th.
22      Q.   Can you look at tab 2 in your booklet?
23      A.   Yes.
24      Q.   What is that document?
25      A.   Tab 2 is the Corporate Leniency Policy of the

136

1  Division.
2       Q.   Does that have any relation to the part "A" and
3  Part "B" you were referring to?
4       A.   Yes, prior to 1993, leniency would be considered
5  only by the Division before it began an investigation. The
6  Division decided in 1993 to make leniency before an
7  investigation had begun automatic if the company met the
8  criteria specified in the Leniency Policy, so that a company
9  going in and bearing its competitive soul to the Government
10 would know that there was an automatic feature to the leniency
11 and it would not be subject to prosecutorial discretion.
12      Part "B" provided an alternative so that even if an
13 investigation had begun, there still could be circumstances in
14 which the Government would grant leniency to an applicant
15 provided the applicant was the first one come in the door.
16      Q.   Mr. Nannes, back to our telephone discussions with
17 Mr. Griffin.
18      You mentioned that at some point the discussions
19 progressed past the "A" versus "B" issue?
20      A.   Yes.
21      Q.   In what regard did they progress?
22      A.   I think when Mr. Griffin called me on November 26th
23 and said he wanted to clarify something. He said the Division
24 was aware of a particular situation. He didn't know whether
25 it was our situation -- my situation, but he wanted to

137

1  disclose it, anyway. The situation that he described was that
2  the Division was aware of a circumstance in which a lawyer had
3  brought to the attention of a company an antitrust violation
4  and that the company had responded by firing the lawyer. Mr.
5  Griffin simply wanted to say that if that was the situation
6  about which he was called, that that could be a hurdle to the
7  admission of that very company into the Leniency Program.
8       I didn't have the authorization from my client at
9  that point to disclose the identity of Stolt-Nielsen to Mr.
10 Griffin, so I did not respond directly to his information and
11 we discussed a few other things about leniency in general, but
12 I subsequently called Stolt-Nielsen and said it may be that
13 the situation to which Mr. Griffin was referring was the Stolt
14 situation although the facts as I understood them were
15 different from the facts that Mr. Griffin related to.
16      So, with the authorization of the company, I called
17 Mr. Griffin a few days later, because I think Thanksgiving
18 intervened, but the first business day I could, and told him
19 that I thought the situation to which he was referring might
20 be the Stolt situation and he asked me a few probing
21 questions, such as, did this involve specialty transportation
22 by water and did the employee sue your client and when I said
23 yes, we knew we had a match and so, I asked him whether we
24 could have an opportunity to come in and meet with him to
25 confront head on what he called fire the messenger problem.

138

1  THE COURT: The hurdle?
2  THE WITNESS: "The hurdle", as he was referring to
3  it thereafter, it was the fire the messenger problem.
4  Q. Did Mr. Griffin indicate whether your client would
5  in fact be the first one in line for amnesty?
6  A. I think at that point or the earlier call, it had
7  become clear that they had not granted leniency previously
8  with respect to anybody in the tanker trade industry and the
9  agreement we had going in, if we could address the fire the
10 messenger problem, we would be first in line and eligible for
11 a marker to then conduct the investigation.
12 THE COURT: When you are talking about the
13 messenger, you are referring to Mr. O'Brien in your mind at
14 that time?
15 THE WITNESS: Yes, sir. It was actually Mr.
16 Griffin who coined the phrase, "Fire the messenger."
17 THE COURT: Who were you thinking about?
18 THE WITNESS: I was thinking about Paul O'Brien.
19 Q. Were steps taken to address the fire of the
20 messenger situation?
21 A. Yes, we asked for an opportunity to meet with Mr.
22 Griffin and he scheduled the meeting for December 4th and we
23 did meet on that day.
24 Q. What transpired at that meeting?
25 A. Well, the meeting was somewhat unusual, because

139

1  usually, even when you are making a proffer to the Division,
2  before you know whether you have been admitted as a
3  conditional leniency applicant, the Government does not know
4  who you are. You don't disclose the client's name, you don't
5  disclose the industry, but you disclose the problem.
6  The Government knew who we were because we told
7  them in response to the fire the messenger call from Mr.
8  Griffin, so I began the meeting by reviewing the steps that
9  led to the meeting because certain people who were there were
10 not privy to the call when I spoke to Mr. Griffin. Then I
11 gave him some information about Stolt and a little bit and not
12 much about the parcel tanker trading industry and then I
13 turned directly to confronting the issue he raised, which was
14 the concern having been advised of antitrust problems and
15 fired the messenger who brought those problems to the
16 company's attention.
17 I told him in early 2002, I don't recall February
18 or March, that an in-house counsel and I think I did name Paul
19 O'Brien, had sent a memorandum to Mr. Cooperman expressing
20 some concern about antitrust issues and that the company
21 having been alerted to those issues by Mr. O'Brien took a
22 number of steps to treat and reinvigorate its antitrust
23 compliance programs including the steps I mentioned today
24 their issuance of a handbook, the seminars, the new procedures
25 for counsel to view the certification, the sanction of

140

1  employees for violations of the antitrust laws and the
2  dissemination of the policies to certain competitors and
3  companies. I showed them a copy of the compliance handbook
4  and some of the emails and transmittal letters communicating
5  those policy to Stolt competitors and having described to Mr.
6  Griffin and his colleagues what the company had done, I think
7  addressed the fire the messenger issue specifically. I told
8  Mr. Griffin and his colleagues that in fact Stolt had not
9  fired Mr. O'Brien and tried to convince Mr. O'Brien to stay
10 with the company and Mr. O'Brien indicated an intention to
11 resign. I told him that Mr. O'Brien had stayed on-site at
12 Stolt for another three weeks. Working with the company and
13 had been a consultant in the development of the antitrust
14 compliance guidelines which the company began in March, but
15 that Mr. O'Brien had subsequently left and sued the company.
16 So, basically, I told Mr. Griffin that I did not
17 think that Stolt had fired the messenger and in any event,
18 whether he had been fired or left on his own, the company had
19 not ignored the cautionary message because it had undertaken a
20 number of actions to tighten and invigorate and expand its
21 antitrust compliance programing go forward.
22 Q. On this meeting on December 4th, do you tell the
23 Department of Justice attorneys what it was that Mr. O'Brien
24 had raised?
25 A. No, I did not. I don't think I was any more

141

1  specific than how I phrased it here, that he brought certain
2  antitrust issues to the attention of Mr. Cooperman. I did not
3  identify the conduct and I was not asked to identify the
4  conduct by anyone.
5  Q. Sir, you referred to having provided certain
6  documents to the Department at this meeting in connection with
7  your presentation. I would like you to look at the documents
8  under tabs 3 and 4 of your notebook and ask if those are the
9  documents you gave to the Department that day?
10 A. I believe that they are. I know because I can
11 envision giving the email messages that are in tab 4. I think
12 I also gave Mr. Griffin copies of the two letters that are
13 also in tab 4, but at this particular moment I can't be 100
14 percent certain.
15 Q. How about the policy under tab 3?
16 A. I did give them a policy that's set forth at tab 3.
17 Q. How did you conclude your presentation on this fire
18 the messenger point?
19 A. I told Mr. Griffin that I thought Stolt was a good
20 candidate for leniency and if the Government gave us a marker,
21 we would endeavor to conduct a prompt investigation and get
22 back to the Government with the results of that investigation
23 as soon as we could reasonably do so.
24 Q. Had you conducted any investigation prior to this
25 meeting?

Page 142

1  A. No, I had not.
2  Q. How did the attorneys from the Department of
3  Justice respond to your presentation?
4  A. I don't recall particular questions during the
5  presentation itself. We did refer to the Wall Street Journal
6  article which the Government had. Either during my
7  presentation or after caucus, the Government, I think in the
8  form of Mr. Griffin, said that they needed some source whom to
9  consider the situation. They said that with respect to the
10 antitrust points that I had raised and the steps the company
11 had taken they had a source to whom they wanted to contact and
12 they had a number of questions for me about a portion of the
13 Wall Street Journal article that spoke to an investigation of
14 Stolt being conducted by the Department of the Treasury
15 regarding trading with Iraq -- trading with Iran and that they
16 wanted the information we could provide it as to the nature of
17 that investigation and who at the if Treasury Department we
18 could call regarding information about that investigation.
19 Pending that process, they said we had a marker, that we were
20 first in and until they resolved whether they were going to
21 let us in with a real marker to conduct an investigation, that
22 they would protect our place.
23 Q. You referred to Mr. Griffin having referred to a
24 source. Was that in the context of describing the O'Brien
25 situation or the Treasury investigation?

Page 143

1  A. It was clear to me that it was the O'Brien
2  situation.
3  Q. Did Mr. Griffin identify who his source was?
4  A. No, he did not.
5  Q. Was there any discussion at this meeting with
6  regard to contacting other jurisdictions outside the United
7  States?
8  A. Yes, it's not uncommon for a leniency applicant
9  dealing in an international marketplace to contact other
10 authorities that over the years have developed their own
11 leniency policy, the European Union has a comparable leniency
12 policy and in fact one of my earlier calls with Mr. Griffin
13 when I mentioned Europe, he noted to me that Europe had
14 recently substantially revised its leniency policy to be more
15 similar to converge more with the Antitrust Division's policy
16 because the agencies thought if there were similar terms and
17 similar amnesty policies it would make it more likely the
18 companies would come in and avail themselves of these matters
19 and I believe we did have a short discussion at the meeting or
20 one of the calls about us going out and contacting other
21 antitrust authorities.
22 Q. Did Stolt in fact subsequently contact the European
23 Union?
24 A. Yes, we did.
25 Q. Is Stolt currently in the European Amnesty Program?

Page 144

1  A. Yes.
2  Q. Did the Department of Justice lawyers say anything
3  whether they thought Stolt was on track in being accepted into
4  the U.S. Amnesty Program?
5  A. Yes, at the end of the meeting as we were getting
6  ready to leave, they made a comment, the gist of which was
7  that if Stolt had done the things that I had said they had
8  done and it had not been business as usual, that it looked
9  like we would be given a real marker and a time to do the
10 investigation.
11       THE COURT: Let me get something straight. If they
12 had done the things that you said you did, you are talking
13 about the compliance program?
14       THE WITNESS: Yes, sir.
15       THE COURT: And not business as usual, meaning they
16 didn't continue any antitrust conduct, right?
17       THE WITNESS: Your Honor, I don't think that's
18 exactly how I interpreted it.
19       THE COURT: What did the words mean to you, "not
20 business as usual?"
21       THE WITNESS: I interpreted the words to mean if
22 Stolt had taken the steps that we said it had taken and they
23 were genuine and real steps and their behavior had changed,
24 they would be admitted into the program.
25       THE COURT: So you were not doing business as

Page 145

1  usual?
2        THE WITNESS: That's true, but what I didn't
3  understand by the question is they were asking for a guarantee
4  that there had been --
5        THE COURT: Your understanding was that they were
6  not asking for a guarantee, so when they used the word "if",
7  that did not mean conditional to you?
8        THE WITNESS: It was not a question posed to me.
9        THE COURT: Who said the words?
10       THE WITNESS: It would have been Mr. Griffin or Mr.
11 Connolly.
12       THE COURT: What did they say?
13       THE WITNESS: That's the best I can do.
14 Q. You said that that comment you related was not a
15 question.
16 A. That's correct.
17 Q. What was it?
18 A. It was a comment made by one of the participants at
19 the meeting.
20       THE COURT: From the DOJ?
21       THE WITNESS: Yes.
22 Q. At this meeting on December 4th, did you represent
23 or state that the anticompetitive conduct that you would be
24 reporting had ended in March, 2002?
25 A. I did not.

146

1  Q. Did you state at that time that it had ended at any
2  other prior time?
3  A. I did not.
4  Q. How can you be sure?
5  A. At the time that I met with the Government on
6  December 4th, I had not yet conducted an investigation. I
7  didn't even know at that point whether there had been an
8  antitrust violation that we would ultimately report, so I was
9  not in a position, if asked that the conduct had terminated at
10 any particular time. I think if I had been asked the question
11 I know I would have been unable to answer it and I know it
12 wasn't asked, and therefore, I know I didn't say that any and
13 all anticompetitive conduct that might have been occurring
14 terminated at any particular point in time.
15 Q. Did you understand from what the Department of
16 Justice attorneys said that there would be any changes or
17 additional requirements added to the standard amnesty letter?
18 A. No, there was no indication there would be.
19 Q. At there point in time, the December 4th meeting,
20 did you know what the anticompetitive conduct was that you
21 would be reporting later?
22 A. No, I did not.
23 Q. Why is that?
24 A. I had not yet had an opportunity to conduct an
25 investigation.

147

1  Q. Did you know at the time whether that was in fact
2  any anti competitive conduct?
3  A. No, I did not.
4  Q. What happened after the December 4th meeting?
5  A. In the ensuing weeks, I had a number of telephone
6  conversations with Mr. Griffin. I provided him with the
7  information that he had requested, with respect to the
8  Treasury Department investigation of Stolt.
9        During one of those conversations, I think he said
10 to me that they might want to speak with some other people
11 regarding the investigation at Stolt and he called it the
12 "good faith issue" and he said he would try to accelerate the
13 process so he could get a prompt decision to us with respect
14 to whether we had a marker and could go forward.
15 Q. What did you understand Mr. Griffin to meet when he
16 referred to the good faith issue?
17 A. I thought he was referring to whether or not Stolt
18 had taken genuine steps in enhancing the antitrust compliance
19 program in an attempt to cause cessation of any
20 anticompetitive activity in which the company might be engaged
21 to take care of this.
22 Q. Did you understand Mr. Griffin to be referring to
23 any determination as to absolute termination.
24 A. I didn't understand him to say whether he was
25 asking for a determination or whether there was magic to any

148

1  particular day or time.
2  Q. These were phone conversations?
3  A. Yes.
4  Q. Did he refer to any conversations about your
5  meeting on the 4th?
6  A. In an effort to take a temperature check, I asked
7  him whether the presentation was okay and how it went and he
8  said it was okay and I got the impression I was able to dispel
9  the fire the messenger situation.
10 Q. Did Mr. Griffin in any of these phone calls after
11 the meeting refer to his source?
12 A. No, he did not. He didn't identify his source. I
13 think at some point he said he wasn't hearing anything
14 different from what I had told him at the meeting and since he
15 told me he was going to be checking with his source, that
16 might have meant that he had done so, but I don't recall him
17 referring to that specifically again.
18 Q. Sir, so you were having a series of phone
19 conversations with Mr. Griffin after the meeting on the 4th?
20 A. Yes.
21 Q. Did those calls lead anywhere?
22 A. Yes, on December 17th, I received a telephone call
23 from Mr. Griffin telling me that the Division had done a
24 sufficient investigation to be comfortable going forward and
25 therefore, Stolt had a marker and that it was time for us to

149

1  begin the investigation. He said that the Antitrust Division
2  had not conclusively determined what happened with respect to
3  the O'Brien matter and that there might come a time when they
4  would want to talk to Mr. O'Brien, although he was not asking
5  for a waiver of the attorney-client privilege and that the
6  Division was comfortable in giving us the marker and allowing
7  us the go forward.
8        He observed the representations were there going
9  forward and that I should call Mr. Connolly because the
10 Philadelphia Office would be handling the investigation.
11 Q. To the best of your recollection, did Mr. Griffin
12 refer back to this fire the messenger problem?
13 A. I don't recall him doing so at that time, other
14 than him saying that the Division had done an investigation
15 and were satisfied.
16 Q. On that phone call with Mr. Griffin did you
17 represent that the anticompetitive activity you were reporting
18 had terminated on any specified date?
19 A. I did not.
20 Q. Did you call Mr. Connolly as Mr. Griffin suggested?
21 A. As quickly as I could get him on the phone, yes.
22 Q. Did you have a telephone discussion with Mr.
23 Connolly?
24 A. I spoke with Mr. Connolly. He heard from Mr.
25 Griffin that we were getting the marker. We set a tentative

150

1  date for the proffer of January 13th. I think Mr. Griffin had
2  indicated to Mr. Connolly that we might need some extra time
3  to do the investigation because of the intervening Christmas
4  and New Years week. I asked Mr. Connolly what he wanted to
5  know with respect to their investigation. He said the
6  Government wanted to definitely know the nature of the conduct
7  that we reported and then I asked him if there was anything he
8  would like to know before we came into the office for the
9  proffer and he said yes, sometimes in these investigations,
10 companies get a marker and then conclude in the investigation
11 that there is no hard-core criminal violation to report and
12 that if that was our situation, he would prefer to learn of it
13 sooner, rather than later. If we reached that judgment
14 sometime before January 13th, then he asked to be advised of
15 it promptly. He asked me whether I knew whether along a
16 continuum, ranging from a joint venture to hard-core criminal
17 behavior that could be prosecuted where activity at Stolt fell
18 and I told him that I knew it wasn't simply a joint venture,
19 but how far it ran, I just didn't know, because I needed to
20 interview employees and most importantly, I needed candor from
21 employees. I didn't tell him, but we had already started to
22 do some interviews of employees while we were waiting to hear
23 back from Mr. Griffin, but I was unable to tell the employees
24 that we were interviewing at that time where we stood with
25 respect to any leniency application, but my hope was that with

151

1  a marker, I could go to the employees and tell them that the
2  company was working on a strategy that would protect the
3  company and individual employees, but it was dependent on
4  their candor and cooperation, so now was the time to tell me
5  what was going on and that's the way I left it with Mr.
6  Griffin I would call him and we had a discussion on January
7  13th.
8      Q.   You had a dialogue about a continuum relating to
9  antitrust conduct?
10     A.   Yes.
11     Q.   Can you explain in just a little bit more detail
12 from a laymen's perspective, what you meant and what you
13 understood Mr. Connolly to mean by "continuum?"
14     A.   Yes. There can be various conduct between and
15 among competitors that don't violate the antitrust laws at
16 all, but even where there are violations, the violations tend
17 to be analyzed by the courts and by the agencies in one of two
18 ways.
19          With respect to conduct that is deemed hard-core
20 violations of the antitrust laws, like price fixing or
21 dividing markets, that's regarded as a per se offense, it's
22 per se unlawful and the Government reserves its criminal
23 prosecution sanction for per se violations.
24          As you move away from the continuum from per se
25 violations you get into an area that's analyzed under the

152

1  antitrust law where a court balances the collaboration, for
2  example a joint venture. You may have two competitors joining
3  in a joint venture and the joint venture might mean they
4  wouldn't compete with one another. So I thought what Mr.
5  Connolly was asking me was, are we going to be at the end of
6  the continuum where the Division may have a crime to prosecute
7  or would it be in the rule of reason where the Division does
8  not proceed criminally and proceeds civilly, if at all.
9      Q.   The process, you have referred to the marker and
10 the proffer, can you explain in just a little bit more detail
11 exactly what the marker is?
12          THE COURT: I understand what that is and I
13 understand what the proffer is.
14          MR. CURRAN: Thank you, your Honor.
15     Q.   You referred to having the marker help you in your
16 investigation?
17     A.   Yes.
18     Q.   How is that?
19     A.   Beginning almost immediately after we got the
20 marker, we set up interviews with Stolt employees. We
21 interviewed probably 18 to 20 Stolt employees over the last
22 two weeks of December and the first couple of days of January.
23 We were able to tell the employees with whom we met that the
24 company was working on a legal strategy to protect the company
25 and its employees, but that the success of the effort would be

153

1  dependent upon the candor of the employees and therefore, they
2  had an incentive, we hoped, to be forthright and candid with
3  us about prior conduct, so we could assess whether the conduct
4  violated antitrust laws.
5      Q.   Did you refer specifically to the Department of
6  Justice Antitrust Division Amnesty Program in these
7  discussions with employees?
8      A.   I think generally, we did not. One of the concerns
9  that we had at the time was the admonition with Mr. Connolly
10 in my discussion with him on December 17th that leaks could be
11 problematic and would we understood from our discussions with
12 European Commission they would regard a leak as unfavorable
13 and unhelpful to their investigation. I think the Antitrust
14 Division and The European Commission wanted to have an
15 opportunity to either execute search warrants in the United
16 States or conduct what is called in Europe a "dawn raid" where
17 the regulators appear unannounced at the company offices and
18 the success of both of those might be compromised if word that
19 Stolt was seeking leniency was leaked to Stolt competitors.
20         So we wanted to give the employees an incentive to
21 cooperate with us during the investigation and without arming
22 them with information if it was inadvertently disclosed might
23 compromise the investigation.
24     Q.   Where did you interview people?
25     A.   We interviewed people in person both in Greenwich

154

1  and Rotterdam and by telephone in Singapore and Brazil.
2  Q. Eventually, did you learn of the anticompetitive
3  activity you later reported?
4  A. Yes.
5  Q. Please describe that process?
6  A. The process was a difficult one. Early on in our
7  interviews, especially those that occurred before we had the
8  marker, employees were describing for us the competitive
9  dynamics of the parcel tanker trading and were saying that
10 they generally were successful in renewing their own contracts
11 but when considering whether the bid for another carrier's
12 contracts would take into account not only the price that they
13 thought they might be able to achieve by the contract, but
14 also whether if they were successful in getting the contract
15 that the displaced carrier would now have extra space on its
16 vessels and whether they would come after Stolt and
17 successfully attract away a piece of Stolt's business and thus
18 people would analyze the net situation before deciding to bid
19 and take away somebody else's customer, so the described
20 behavior was under the antitrust laws, which is sometimes
21 called, "consciously parallel behavior" where you took into
22 account your competitors likely reaction in deciding what you
23 will do unilaterally and under the antitrust laws, that kind
24 of action is perfectly lawful.
25     As we got past the marker stage, I interviewed not

155

1  only additional people, but went back and interviewed some of
2  the people we spoke to previously. We started to be able to
3  draw out of them that there had been some communications
4  between Stolt and its competitors, providing some form of
5  assurances that one would not go after the other's customers
6  and that, of course, we would be able to substantiate that in
7  an anticompetitive agreement.
8  Q. Did you eventually learn information that caused
9  you to conclude that there was a per se or criminal violation
10 of the Sherman Act?
11 A. Yes, by taking bits of information that we were
12 able to take from employees, we were able to confront one
13 employee that we were aware of a list of customers that
14 purportedly he had maintained while he was at Stolt in
15 Greenwich and that the list of customers had Stolt customers
16 listed and Odfjell customers listed on the same list and
17 basically was the implementing reference points for an
18 agreement to divide customers that with the list, each carrier
19 knew whose customers were whose. But at that point in time,
20 although we now had a person with whom we had spoken who
21 indicated that there had been an exchange of lists, we did not
22 have the list, themselves.
23 Q. At some point, did you obtain actual lists?
24 A. Yes.
25 Q. Please describe how that came about?

156

1  A. The first information we got that there had been an
2  exchange of these kinds of lists, I think was toward the very
3  end of the year. I think it was around December 30th, but we
4  didn't have a full interview of the employee until the evening
5  of January 2nd. We had indicated to a number of Stolt
6  employees in the buildup to that time that we needed and
7  wanted documentation of any illegal agreement and in
8  particular, that we were on a search for lists.
9      On January 3rd, Mr. Wingfield gave me a plastic
10 folder that contained lists and those were the first time --
11 that was the first time that I had seen the lists.
12 Q. Sir, why were these lists so important to you?
13 A. The lists to me were very important, because absent
14 the lists, it would be possible for people to characterize the
15 behavior involved. Their respecting of one another's
16 customers of consciously parallel unilateral decisions were
17 made by competitors separately which would be lawful. The
18 lists, especially lists that had been exchanged between
19 competitors were evidence that there was an agreement with
20 respect to dividing customers.
21     So, for example, to be able to find in Stolt's
22 files a list of Odfjell contracts that had originated with
23 Odfjell, would be strongly indicative of a hard-core violation
24 and if we could find an agreed upon list that had both Stolt
25 and Odfjell customers on it, that would be very, very strong

157

1  evidence of a hard-core violation.
2  Q. You referred to Mr. Wingfield having given you
3  certain lists on the 3rd of January?
4  A. Yes.
5  Q. What were those lists?
6  A. My recollection is that Mr. Wingfield brought three
7  lists. He actually said he brought them from home. The lists
8  that he had were two lists dated 1998. One was a list of
9  Stolt contracts arranged by geographic trading lanes and the
10 other one was a partial list of Odfjell contracts by trade
11 lane that had the Odfjell fax number at the top of the page.
12 Q. Can you look under tabs 5, 6 and 7 in your witness
13 book?
14 A. Yes.
15 Q. Are those the lists you are referring to?
16 A. The first two lists are the two lists that I have
17 described to you thus far. The third list that he gave us was
18 dated in 2001 and we had been told that in 2001, Odfjell had
19 approached Stolt about reupping the list. We had some
20 information that led me to believe that sometime between 1998
21 when the earlier lists were essentially negotiated and agreed
22 upon, that the companies had begun to compete and deviate from
23 the lists and that in March of 2001, Odfjell had proposed to
24 Stolt that the companies basically re-up the lists and make
25 them current.

158

1    THE COURT: You mean change it or just update it,
2    given the changes that you saw that occurred?
3    THE WITNESS: Your Honor, by "re-up", I was trying
4    to convey that Stolt people were telling me in essence the
5    agreement had collapsed in the year 2000, due to some
6    extraneous developments which I would be happy to relate at
7    great length and that the companies had begun to compete
8    against one another and go after certain of each other's
9    contracts and what Odfjell was proposing in 2001 is that the
10   parties recommence, reestablished their agreement and as part
11   of that reestablishment, take the old 1998 list and update it
12   to show additional customers that the carriers had obtained in
13   the interim, so the third list in the book here reflects the
14   changes and actually, it has repeated at the beginning of the
15   trade lane of the contract for the 1998 list and then it has a
16   heading that says: "New COA's", which are contracts of
17   affreightment and the list provided to us by Mr. Wingfield
18   dated 2001 was evidence of this new agreement.
19   Q.   Were any of these they lists originally given to
20   you by Mr. Wingfield, the combined lists that you have
21   referred to?
22   A.   No, they were not.
23   Q.   Mr. Wingfield gave you these lists and said they
24   were kept at his home; is that what you said?
25   A.   Yes.

159

1    Q.   Was Mr. Wingfield represented by counsel in
2    connection with your discussions with him?
3    A.   Not to my knowledge.
4    Q.   But, he provided these lists, nonetheless?
5    A.   Yes, he did.
6    Q.   Did you at a subsequent point in time get a
7    combined list?
8    A.   Yes.
9    Q.   Who provided that?
10   A.   Mr. Wingfield provided that list, although my
11   understanding was that he obtained it from another Stolt
12   employee or information provided by another Stolt employee.
13   Q.   Who was that?
14   A.   Andrew Pickering, Mr. Wingfield's predecessor.
15   Q.   In this time frame, did you get any understanding
16   as to the role Mr. Pickering had in relation to the creation
17   and implementation of these lists?
18   A.   Oh, yes. When I referred earlier that we used one
19   employee's recollection of the list as a means of obtaining
20   information regarding the origin of the lists, I was referring
21   to Mr. Pickering.
22       There was a Stolt employee who revealed to us that
23   he had seen a list in Mr. Pickering's office that was kept
24   hidden away and when we spoke to Mr. Pickering about lists, we
25   asked him about the hidden list and that caused him to be very

160

1    forthcoming to us about the evolution of the lists and indeed
2    the fact that he had been a negotiator of the 1998 list.
3    THE COURT: When Mr. Wingfield gave you those three
4    lists, what precipitated that? I mean at this point in time,
5    you are not telling these employees there is an Amnesty
6    Program?
7    THE WITNESS: Your Honor, we didn't use the "L"
8    word, but we tried as close as we could to convey to them that
9    the company was working on a strategy. The strategy would
10   protect the company and the individuals, but that the success
11   of the strategy in protecting the company and the individuals
12   was dependent upon their candor and cooperation and the
13   forthcomingness of the employees in telling us what had
14   previously transpired.
15   THE COURT: Working on it?
16   THE WITNESS: Necessary. I don't think we could
17   have gone further because until we made the proffer and got
18   the leniency letter we weren't in a position to tell anybody.
19   THE COURT: When you had a conversation with Mr.
20   Connolly, he didn't want you to tell anybody about it?
21   THE WITNESS: He was concerned about leaks, yes.
22   THE COURT: Go ahead.
23   Q.   After you had obtained these three lists from Mr.
24   Wingfield, by that point in time, had you concluded whether or
25   not you had something to proffer to the Department of Justice?

161

1    A.   Yes, I concluded that we did.
2    Q.   Was there a specific point in time when you reached
3    that conclusion?
4    A.   It really was a combination of two factors. One
5    was the conversation with Mr. Pickering concerning the
6    evolution of the list and the nature of the agreement and the
7    second phase was getting the list, themselves, which
8    corroborated not only Mr. Pickering's account of what happened
9    in 1998, but information we had obtained about discussions
10   between Odfjell and Stolt in the first quarter of 2001
11   regarding the updating and recirculation of the lists.
12       With those two factors, I thought we had an
13   agreement and evidence of an agreement worthy to be presented
14   to the Antitrust Division as a proffer.
15   Q.   After you had the information from Pickering and
16   the three lists from Winfield, what did you do?
17   A.   I think we got the lists from Mr. Wingfield on a
18   Friday, January 3rd and January 6th, which was the next
19   business day, I called Mr. Connolly and asked him if we could
20   accelerate the proffer which had previously been scheduled for
21   January 13th and come in and see him sooner.
22   Q.   Did there come a time when you obtained a combined
23   list as you referred to it before?
24   A.   Yes. Either in the meetings with Mr. Wingfield on
25   January 3rd or during the day on January 6th, I asked him

162

1  whether there was any way to come up with either a more
2  complete version of the 1998 list, because I only had a
3  partial version or any other lists that would be more
4  corroborative of an illegal agreement and I received a
5  telephone message on the morning of January 8th that has as a
6  result of a conversation between Mr. Wingfield and Mr.
7  Pickering that they found a copy of the 1998 list that had
8  both carriers contracts listed, that it was a list that was
9  prepared by an Odfjell employee, Eric Neilson and that had
10 been communicated to Stolt and retained by Mr. Pickering.
11      Q.  Did you eventually obtain possession of that
12 combined list?
13      A.  I did, but it was not until after I made the
14 proffer to the Division on January 8th.
15      Q.  Sir, I would like you to look under tab 8 of your
16 witness book.
17      A.  Yes.
18      Q.  Is that the combined list that you referred to?
19      A.  Yes, it's the last list there and it has a Bates
20 number that begins with his in the 0005812 and the taking line
21 on the bottom left I believe dates it as October 14, 1998,
22 referring to Eric Nilsen.
23      Q.  Can you make sure you are looking at the first page
24 under tab 8?
25      A.  I am sorry, you are correct. I was in the

163

1  beginning page of that list in the 0005811. I am sorry for
2  the mistake.
3       Q.  Can you look under tab 9, as well, please?
4       A.  Yes.
5       Q.  Do you recognize that document?
6       A.  Yes, I do.
7       Q.  What is that?
8       A.  That document is a memorandum that appears to have
9  been faxed from Mr. Bjorn Jansen to Mr. Wingfield dated April
10 10, 2001.
11      Q.  Sir, did you have their document before you had the
12 lists from Mr. Wingfield?
13      A.  Yes, I did.
14      Q.  Sir, was this document sufficient evidence for you
15 to conclude that there was a criminal violation of the Sherman
16 Act for you to report?
17      A.  No, it was not in my opinion.
18      Q.  Why not?
19      A.  This is a document that appeared to me to be a
20 discussion by Mr. Jansen of the alternative strategies
21 available to Stolt which were either going to war, which I
22 took to mean competing aggressively against Odfjell for
23 Odfjell contracts or what was called "co-op", in his term,
24 which I took to mean basically protect your own contracts and
25 retain them, but don't go after contracts of Odfjell.

164

1      On the face of the document, it's not certain to me
2  that the alternatives being considered reflect an agreement
3  between Stolt and Odfjell or the consciously parallel behavior
4  that I described earlier which would have been a unilateral
5  judgment by Stolt to forebear from going after Odfjell
6  contracts, but not pursuant to an agreement.
7       Q.  So you got the three lists from Wingfield, you
8  called Connolly asking to accelerate the proffer, did he agree
9  to accelerate it?
10      A.  Yes.
11      Q.  When did you set the proffer for?
12      A.  Two days hence, January 8th.
13      Q.  Did you give the proffer on that date?
14      A.  Yes, I most certainly did.
15      Q.  Where did you give it?
16      A.  The Philadelphia Office and met Mr. Connolly in the
17 conference room.
18      Q.  What transpired at that proffer on January 8, 2003?
19      A.  At the meeting, I made a proffer. As I mentioned
20 earlier, this was an unusual proffer in the sense the
21 Government already knew who we were and therefore, I was much
22 more specific in identifying the companies involved, the
23 nature of the business that I might have been in other
24 circumstances.
25      So I told them about Stolt, revenues, nature of the

165

1  business, described some of the same features that I
2  previously had mentioned about the nature and composition of
3  the industry, the frequent renewal by customers of contracts,
4  the incentives of customers to renew, the economic incentives
5  the carriers might have from time-to-time, not to bid against
6  other competitors for new business. The procompetitive
7  aspects of some competitor exchanges, sublets, relets, co-bids
8  and co-serves and then told him that we believed that we had
9  found evidence to establish an express agreement between Stolt
10 and Odfjell to divide customers according to customer
11 allocation lists that had been negotiated and agreed to by the
12 parties over the course of some years in meetings and by
13 telephone.
14      Q.  Did you say when these improper agreements --
15 express agreements -- began?
16      A.  I believe that I did. I told Mr. Connolly and his
17 staff that at various times in the 1990's, we had been able to
18 determine, but not with precision. There were kind of on
19 again and off again discussions between Stolt and Odfjell that
20 at one point in the mid '90's, we thought there was a list
21 that related to single trade lane, but that we had not found
22 that list, but that in 1998, Odfjell had approached Stolt and
23 convened a meeting at which they proposed to expand the trade
24 lanes in which they would respect one another's customers to
25 include the major trade lanes that both companies had and as a