# Exhibit 15D

Case 1:05-cv-02217-RJL    Document 26-10    Filed 08/18/2006    Page 1 of 15

166

1 result of that overture to Stolt, the list that we referred to
2 as "the 1998 list", was the 1998 list.
3    I indicated to Mr. Connolly that we had been told
4 by Stolt employees that in addition to discussions with
5 Odfjell that they had discussions from time-to-time with the
6 third major trading company whose name was Jo Tankers. That
7 we had not documented any list exchanges or broad agreements,
8 but that there had been conversations from time-to-time about
9 individual contracts and we related that information to Mr.
10 Connolly at the proffer.
11    Q.   Did you tell Mr. Connolly whether you succeeded in
12 identifying the negotiators and succeeded in obtaining the
13 documents to demonstrate the anti competitive conduct you were
14 referring to?
15    A.   I believe I did. I was prepared to identify the
16 individuals by name, but I don't think I did at that meeting
17 because of Mr. Connolly's suggestion we didn't need to go into
18 that level of detail, but I did tell them that we knew when
19 the lists had been negotiated and that we had been able to
20 locate some of those lists.
21    Q.   Did you indicate whether or not you would be
22 providing those documents and witness testimony?
23    A.   I don't recall that I said we would, but the clear
24 import of what I was saying was that as part of the
25 cooperation, we would do so.

167

1    Q.   Was there anything else about the anticompetitive
2 conduct that you recall stating to the Antitrust Division
3 lawyers in Philadelphia?
4    A.   Well, I did fairly quickly try to get the
5 Government from 1998 closer in time to the present. I
6 indicated that in the aftermath of the 1998 list exchanges
7 that there came a time in 1999 where there was a further
8 meeting at which the carriers discussed broadening their
9 agreement that they had not done so at that time, but then
10 there was a period of time when Stolt and Odfjell were talking
11 about merging and that in early 2000, Odfjell merged with a
12 different carrier, a carrier called Sea Chem, which indicated
13 to Stolt that with new capacity, Odfjell was going to have to
14 compete for contracts to fill those vessels and Stolt took it
15 upon itself to strike the first blow and so there was a period
16 of time during 2000 when there was substantial competition
17 between the carriers, that in early 2001, when Mr. Wingfield
18 took Mr. Pickering's position that Odfjell reached out to
19 Stolt and Mr. Wingfield about renewing the arrangement and
20 that was the explanation for the 2001 lists that were
21 exchanged.
22    Q.   Did you state when the anticompetitive activity you
23 were describing ended?
24    A.   I don't think I did with any specificity.
25    I might have said it ended in 2002, but I don't

168

1 recall specifically saying that.
2    I think I might have summarized in very short hand
3 fashion the same information I gave at the December 4th
4 meeting the steps that Stolt took in 2002, but I don't recall
5 a specific date where the conduct terminated.
6    Q.   Now, did Mr. Connolly and his colleagues react to
7 your proffer?
8    A.   We had a number of questions during the proffer and
9 after the proffer there was a caucus. Mr. Connolly came back
10 and indicated that he thought the presentation had gone well,
11 I think was his term. They had a number of questions. They
12 had some questions about other carriers who from their
13 research they had ascertained were in the business, but whom I
14 had not mentioned in my proffer. At the risk of injecting
15 some humor here, one of the carriers was named Tokyo Marine
16 and Mr. Connolly asked if we had information if Tokyo Marine
17 was involved and I said we had not developed that and he made
18 a comment, that if this was a cartel that the Japanese missed,
19 it would be the first one in a long time, so we discussed the
20 number of carriers, some other aspects of the business.
21    He asked me, I believe, specifically, what lists we
22 had and at that point I think I gave him the dates of the
23 lists and the pages, because one of the lists was incomplete
24 and told him that we might even have located the combined list
25 from 1998, because although I had been advised by telephone

169

1 that they found it, that Mr. Wingfield and Mr. Pickering had
2 located even though it was hidden for a long time I did not
3 actually see it, but I did not represent to Mr. Connolly we
4 had it until I was able to do the review.
5    Q.   Was anything stated during the proffer meeting
6 about Mr. O'Brien?
7    A.   Yes, I believe after the caucus, but after we
8 talked about other carriers and after we talked about the
9 lists, Mr. Connolly posed a question to me about Mr. O'Brien
10 and the gist of the question was, you know Mr. O'Brien filed
11 this lawsuit saying the company's activities were continuing.
12 The wrongful activities were continuing and might have gone
13 underground. Is it your position that Mr. O'Brien was just a
14 disgruntled employee with a grudge against the company? I
15 don't think Mr. Connolly used the words, "grudge against the
16 company," but I understood that from a disgruntled employee.
17 I told Mr. Connolly I had never met Mr. O'Brien, that I wasn't
18 in a position to characterize him one way or the other and I
19 said I knew there was some concern at the company about his
20 motivations that he was known to be unhappy with his
21 compensation, that he was known to be unhappy reporting to Mr.
22 Wingfield, that he was known to be unhappy because there had
23 been a reduction in force early in the year that impacted his
24 department and that he had retained an employment lawyer even
25 before he left the employ of the company, but that in any

170

1  event, knowing that Mr. O'Brien had left the company in March,
2  I believe I said to Mr. Connolly, that I didn't know how he
3  was in any position to know that there was continuing
4  misconduct of any kind at the company after his departure and
5  that so far as I was able to determine from speaking with
6  employees, they were advising me that they were making
7  business decisions unencumbered by any agreement with Odfjell
8  and making decisions on the merits on whether it made sense
9  for Stolt to bid.
10     Q.  During this proffer meeting, did you represent or
11 state that the anticompetitive activity you were reporting had
12 terminated in March, 2002?
13     A.  I did not.
14     Q.  Did you represent or state that the anti
15 competitive activity had terminated at any particular prior
16 date?
17     A.  No, I did not.
18     Q.  Did Mr. Connolly ask you at the proffer meeting
19 whether particular people would be cooperating going forward?
20     A.  I believe he did.  Mr. Connolly indicated, either
21 the day we spoke to accelerate the proffer or at the proffer,
22 itself, that the staff had done some investigating on its own
23 and I guess as part of that, he listed a number of employees
24 by name in the course of the meeting and asked me whether I
25 thought they would be cooperating pursuant to Stolt's leniency

171

1  where Stolt could be admitted to the program and I told him
2  that I had no reason to believe they would not.
3          Indeed, virtually all of them he mentioned to me by
4  name had been people we had interviewed and who had provided
5  information that went into the proffer that I had made.
6      Q.  Do you remember what names were stated by Mr.
7  Connolly in his question?
8      A.  I remember certainly some of them.  He mentioned
9  Mr. Cooperman, Mr. Lee, Mr. Wingfield, Mr. Jansen and I think
10 two or three other gentlemen at the business manager level.
11 So that was a listing from the top down.
12     Q.  What happened after the proffer meeting?
13     A.  In the days that followed, we had a couple of
14 communications with Mr. Connolly, I think one by email and a
15 few by phone where he asked follow-up questions.  One or two
16 of them I think went to other carriers and whether we had any
17 information that they were involved in misbehavior.  Some
18 additional aspects about the nature of the parcel tanker
19 trading business and we endeavored to respond to him as
20 quickly as we could about those.
21     Q.  Did there come a time when an amnesty agreement or
22 conditional leniency agreement was executed?
23     A.  Yes.
24     Q.  How did that come about?
25     A.  In one of our conversations, I think on January

172

1  13th, I raised the question with Mr. Connolly about the
2  letter.  He had advised me, I think in one of his email
3  communications that Mr. Griffin had been consulted and we were
4  on an conditional leniency track and having responded to the
5  questions Mr. Connolly raised in the aftermath of the meeting
6  the time, it was appropriate to raise the issue of the letter.
7  Mr. Connolly said that he would work on the letter and would
8  have the letter to me on January 14th, the following day.
9      Q.  And did he?
10     A.  Yes, on January 14th, I received a draft of the
11 letter.  There is only really a few places in the letter where
12 there is anything unique to the parties.  They basically have
13 their model letter and they plug in the identifying
14 information with respect to the company and the industry
15 involved and he wanted to resolve those issues with me before
16 he sent the letter onto Mr. Griffin for signature, so we had
17 some conversations that actually ran over from the 14th to the
18 15th about some of those factors because we wanted to make
19 sure that all of the enterprises -- all the business units
20 within the Stolt family of companies were covered and
21 encompassed by the leniency and that took a little bit of time
22 what the proper definition should be.
23     Q.  Can you look under tab 10 of your witness book?
24     A.  Yes.
25     Q.  Was that the letter that was eventually executed by

173

1  the parties on behalf of Stolt and the Government?
2      A.  Yes, it is.
3      Q.  What was the date on this letter?
4      A.  January 15, 2003.
5      Q.  That's the date on which all three of the executing
6  parties signed?
7      A.  Yes.
8      Q.  Was there any connection stated between you and Mr.
9  Connolly incoming to this agreement on January 15th that the
10 timing related in any way to long term contracts that Stolt
11 had obtained during the period of the anticompetitive
12 activity?
13     A.  No.
14     Q.  What was the impetus for the timing of this letter?
15     A.  I am not sure I understand the question.
16     Q.  How did it come about on January 15th, as opposed
17 to some other date?
18     A.  January 15th was a few days after the proffer and I
19 asked Mr. Connolly about it and he said that he spoke with Mr.
20 Griffin and they could start drafting the letter and as soon
21 as they got the letter to us we tried to resolve a few
22 outstanding items and then dated it the 15th.
23         The only reason for that particular day was that we
24 spoke the afternoon of the 15th, I mentioned to them that I
25 was going out of town that night on business and that if it

174

1  were possible to execute the letter on the 15th, then carry it
2  over for a day or two, I would appreciate it so we can get it
3  resolved, and thus, I think the letter was actually executed
4  after 6:00 p.m. on the 15th.
5       THE COURT:  So on the 14th, he sent a draft for
6  your comments?
7       THE WITNESS:  Yes.
8       THE COURT:  And for any suggestions you might have?
9       THE WITNESS:  Yes, but in the context of the
10 variables in the letter.  I did not understand him to be
11 sending me the letter and asking me whether I wanted to change
12 anything in the letter.
13      THE COURT:  Did you suggest any?
14      THE WITNESS:  We actually worked on one or two.
15      THE COURT:  Former employees?
16      THE WITNESS:  Yes.  In the model letter, there is
17 kind of a place holder for former employees.  So the former
18 employees may or may not be included depending on the
19 circumstances.
20      THE COURT:  You suggested that it go in?
21      THE WITNESS:  I don't remember whether I suggested
22 I wanted them to go in or whether he asked me if I wanted them
23 in, but I believed at the time that there might be former
24 employees that might have information relative to the
25 anticompetitive activity I was reporting and to obtain

175

1  information from them would be helpful and it would be helpful
2  if the former employee was included.
3       I understood that to be a discretionary judgment by
4  the Department but they would often take the recommendation of
5  counsel if counsel believes former employees could be helpful.
6       THE COURT:  What else did you suggest?
7       THE WITNESS:  I don't think I suggested anything
8  else.  There are a couple of variations in the letter from the
9  boiler plate, but they just flowed from the definition of the
10 company.
11      So, for example I wanted to make sure that Stolt
12 and all of its parents, subsidiaries and affiliates were
13 included and Mr. Connolly was concerned if they did that, he
14 would inadvertently be granting leniency to a Stolt competitor
15 that he might want the eventually prosecute.
16      THE COURT:  That is the joint venture?
17      THE WITNESS:  Yes with respect to former employees,
18 my recollection is that his concern was that there might be an
19 employee who used to work for Stolt and now works for a
20 competitor of Stolt who he might want to prosecute.  He didn't
21 want to inadvertently grant leniency to that employee.
22      THE COURT:  So you all talked about that?
23      THE WITNESS:  We talked about that, but I did not
24 get the impression that he was inviting my comments,
25 generally, on the structure of the letter or the elements of

176

1  the Leniency Policy or anything approaching this.  This was a
2  model leniency letter that they use regularly.
3       THE COURT:  So as a result of that assumption, you
4  did not offer any other suggestions?
5       THE WITNESS:  Your Honor, it did not occur to me to
6  offer any.
7       THE COURT:  So you didn't?
8       THE WITNESS:  And I did not.
9       THE COURT:  You could not?
10      THE WITNESS:  I have a pretty good idea that I
11 could not.
12      THE COURT:  It's been tried.
13      THE WITNESS:  Yes, but I would be prepared to tell
14 you my belief that it would have been unsuccessful to try if
15 you would like me to.
16      THE COURT:  Go ahead.
17      THE WITNESS:  I knew from my work with the
18 Antitrust Division and my general knowledge of the Leniency
19 Policy that the Government very much wants to have a model
20 letter so they don't have to negotiate individualized terms,
21 de novo, with every one who comes in to make a leniency
22 application so every time they make a change to the letter,
23 they run the risk that the applicant whom they are negotiating
24 with, would want that change and more.
25      So this is a well considered letter and nothing --

177

1  it did not occur to me to think that it was likely changes
2  would be accepted and there were no changes that I frankly
3  thought were needed, so I did not propose it.
4       THE COURT:  Okay, that answers the question.
5  Q.  Do you remember Mr. Connolly saying anything to you
6  or writing anything to you with regard to the scope of the
7  variables in the form and model corporate conditions of the
8  leniency letter?
9  A.  I think when he sent me the draft, there was a
10 covering email that said that here's a draft, leaving Mr.
11 Connolly to try to fill in the blanks.  There really isn't
12 much to do but I want to get it done before we send it onto
13 Mr. Griffin so we can send the final version for him to sign.
14      THE COURT:  In other words, do you want to know if
15 he said take it or leave it, is that what you want to know?
16      MR. CURRAN:  Not exactly, but I am comfortable with
17 him answering the question.
18      THE WITNESS:  Your Honor, he did not use those
19 words.  I said what I think I just described it didn't go
20 beyond that.  We didn't have a discussion with respect to
21 that feature.
22 Q.  Do you remember precisely the words that Mr.
23 Connolly used in the email in which he forwarded to you a
24 draft of the amnesty letter?
25 A.  Not more so than I ever just related.

178

1  Q. Have I exhausted your recollection with regard to
2  the contents of that email?
3  A. Yes, you have.
4     MR. CURRAN: Your Honor, may I approach the witness
5  in an attempt to refresh his recollection?
6     THE COURT: Yes.
7     MR. CURRAN: Thank you, your Honor.
8     THE WITNESS: I read it.
9  Q. Reading that letter, does that refresh your
10 recollection as to the contents of Mr. Connolly's
11 communication to you?
12 A. It's consistent with my recollection.
13    The first sentence said:
14    "Would you please review this draft and let me know
15 if it is what you are looking for?"
16    I took that to mean that he had endeavored to
17 include the language in identifying the company that I
18 provided to him over the phone, because we had some back and
19 forth about how to identify the parent company of Stolt
20 transportation group. Then he says:
21    "As you noted, there are very few variables and I
22 have highlighted the proposed language in bold. I have
23 approached Jim Griffin. We are going to be sending him a
24 conditional letter for approval, but I don't want to send it
25 down until we are in agreement on the letter."

179

1  Q. I would like to refer your attention to tab one of
2  your witness book. We have already established; have we not,
3  that that's the model letter Mr. Griffin sent to you on the
4  first day you spoke to him?
5  A. Yes.
6  Q. Does their model letter indicate to you the
7  variables that the Department of Justice considers available
8  in connection with this leniency letter?
9  A. Yes.
10 Q. How does it do that?
11 A. The variables are in brackets with obvious place
12 holders, such as ABC, Inc., as a place holder for insertion of
13 the company name.
14 Q. So that's the variable, identification of the
15 company that's reporting the anticompetitive activity.
16 A. Yes.
17 Q. That's what you discussed with Mr. Connolly in
18 conjunction with hammering out the ultimate agreement?
19 A. Yes.
20 Q. I would like to refer your attention to page number
21 2 under tab 1.
22    What is that footnote, sir?
23 A. The footnote addresses former employees and
24 basically says that those may be discretionary and that the
25 Division may include former employees, depending on various

180

1  factors.
2  Q. That's another place holder, correct?
3  A. Yes, sir.
4  Q. Did you and Mr. Connolly discuss and agree upon any
5  variations to the amnesty letter, other than those points that
6  are in brackets and addressed in place holder footnote 1?
7  A. I think either Mr. Connolly and I or Mr. Griffin
8  and I did agree on one other change.
9  Q. What was that?
10 A. (No response.)
11 Q. Sir, didn't that relate to the former employee
12 issue?
13 A. It related to an employee issue and an employee who
14 was changing jobs and whether that employee would be covered
15 and I thought it was in the nature of a clarification.
16 Q. I would like to ask you to flip back to tab 10.
17 That's the agreement as executed, correct?
18 A. Yes.
19 Q. Sir, I would like to refer your attention to
20 paragraph 1A?
21 A. Yes.
22 Q. Do you see the clause relating to prompt and
23 effective action to terminate?
24 A. Yes.
25 Q. Was that clause the subject of discussion or

181

1  varying agreement between you and Mr. Connolly?
2  A. No.
3  Q. I would like to refer your attention to paragraph
4  3, the second sentence, do you see where that states:
5     "Pursuant to that policy, the Antitrust Division
6  agrees not to bring any criminal prosecution against SNTG for
7  any act or offense it may have committed prior to the date of
8  this letter in connection with the anticompetitive activity
9  being reported."
10    Mr. Nannes, was that sentence the subject of
11 discussion or varying agreement between you and Mr. Connolly?
12 A. No.
13 Q. One last question in that regard. I would like to
14 refer you to the final page, page 4 of this agreement.
15    Do you see paragraph 5, entitled, "Entire
16 Agreement?"
17 A. Yes.
18 Q. Do you see the sentence after that stating that the
19 letter constitutes the entire agreement?
20 A. Yes.
21 Q. Was that paragraph, that sentence the subject of
22 discussion or agreement varying from the model letter between
23 you and Mr. Connolly?
24 A. No.
25 Q. Sir, we have already established this letter was

182

1  executed by Mr. Griffin and yourself and another
2  representative at Stolt on January 15, 2003, correct?
3      A.  Yes.
4      Q.  What happened after that?
5      A.  In the days that followed, we received a number of
6  telephone inquiries from Mr. Connolly. He was interested in
7  information that we could provide about location of Odfjell or
8  Jo Tanker offices in the United States where documents might
9  be residing, such that the Government would find it useful to
10 execute search warrants.
11         He asked me for additional information regarding
12 names and dates of meetings between Stolt and Odfjell and
13 indicated that he might want to eventually speak with people
14 who had attended those meetings and he asked me to try to find
15 information concerning business activities by shippers in the
16 Philadelphia area for purposes of venue determination.
17     Q.  And did you provide the requested information?
18     A.  Yes, we did, on each occasion as quickly as we
19 could. Later on, Mr. Connolly raised the issue with me of
20 interviews of Stolt employees and said that they would want
21 some documents, particularly the lists that I had referred to
22 in the proffer and thereafter. With respect to the employees,
23 he mentioned three by name as among the employees with whom he
24 would like to speak and interview in the first phase of the
25 investigation.

183

1      Q.  Which employees were those?
2      A.  Bjorn Jansen, William Humphreys and Ray Long and
3  they were all business manager level employees at Stolt.
4      Q.  Did Mr. Connolly ask to speak to Mr. Wingfield as
5  of that time?
6      A.  He did not.
7      Q.  Sir, did Mr. Connolly subsequently follow-up by
8  letter requesting a specific interviews?
9      A.  Yes, he did.
10     Q.  I would like to direct your attention to tab 11 in
11 your witness binder?
12     A.  All right. I have it.
13     Q.  Sir, what is that letter?
14     A.  It's a letter to me signed by Mr. Connolly
15 requesting documents as specified in an attachment. And
16 indicating that he wanted production very quickly. I think
17 the word is "immediately."
18         Then, with respect to interviews, he proposed
19 interviewing somebody on February 3rd in his offices and there
20 is a reference to the employee there by name. There are a
21 couple of errors with respect to the name. The person
22 mentioned the Ray Jansen. I assume that's a combination of
23 Ray Long and Bjorn Jansen.
24         In the next paragraph, there is reference to Mr.
25 Jansen, which I took to be Bjorn Jansen and then at the end,

184

1  he would be interested in my view as to who best could provide
2  background as to information on the industry.
3      Q.  What did you understand from that request?
4      A.  I understood from that request that they wanted to
5  talk to Bjorn Jansen. The reason I thought that's what they
6  meant is that we had identified Mr. Jansen as having been at
7  some of the key meetings with Odfjell in 2001 and I didn't
8  believe that we had mentioned Ray Long at all in the proffer
9  and in subsequent conversations, it became evident that Bjorn
10 Jansen was the person to whom they were referring and it also
11 led me to have a further conversation with Mr. Connolly about
12 providing a second person for an interview at the same time.
13 Mr. Jansen, I knew from having interviewed him --
14         THE COURT: Where are we going with this right now?
15         MR. CURRAN: Your Honor, I intend through this
16 questioning to establish that following through on the
17 proffer, Mr. Nannes and Stolt delivered to the Government
18 interviews and --
19         THE COURT: He does not dispute that.
20         MR. CURRAN: And the hard documentation that
21 allowed the Government to prosecute successfully Odfjell and
22 three executives.
23         THE COURT: Is that at issue?
24         MR. CURRAN: I don't know.
25         THE COURT: Is it, Mr. Connolly?

185

1          MR. CONNOLLY: That they provided some information
2  is not in issue. What they provided, that it didn't go past
3  March is an issue.
4          THE COURT: They gave up people who were prosecuted
5  successfully and but for the information, they may not have
6  been.
7          MR. CURRAN: Right.
8          THE COURT: It's not what Mr. Connolly says is the
9  basis for his problem with your client.
10         MR. CURRAN: That's true, but as your Honor knows,
11 one of our points is the Government got the benefit of the
12 bargain in this process and the benefit to the Government was
13 a nice neatly tied up bow of a conspiracy presented on their
14 desks, allowing them to indict other conspirators and I intend
15 to establish that the indictment or information against
16 Odfjell spells out the conspiracy almost in the precise
17 terms --
18         THE COURT: See, what Mr. Connolly's position
19 inside that box with that bow around it is some more stuff
20 that was left out of it.
21         MR. CURRAN: An end date I think the all he's
22 saying was left out.
23         THE COURT: Then why are we doing that?
24         MR. CURRAN: To show the material performance was
25 delivered.

186

1  THE COURT: I don't think that Mr. Connolly says
2  otherwise. Do you believe there was material performance?
3  MR. CONNOLLY: No, there was not.
4  THE COURT: You mean they did not help you at all?
5  MR. CONNOLLY: No.
6  THE COURT: Did you get successful prosecutions?
7  MR. CONNOLLY: Yes, your Honor, we did.
8  THE COURT: I have thought that we agreed in the
9  beginning that the problem is the material misrepresentation
10 about the period of time that they were participating in the
11 conspiracy and the roles of their executives.
12 MR. CONNOLLY: All the witnesses got immunity who
13 told us information what Stolt did not tell us. So yes, our
14 position is, they provided information and it was materially
15 misleading and it was not completely truthful of what they
16 were to provide under the cooperation agreement.
17 THE COURT: Ask him about that.
18 Off the record
19 (Whereupon a discussion was held off the record)
20 (JAMES M. GRIFFIN, sworn)
21 DIRECT EXAMINATION
22 BY MS. HILL:
23 Q. Mr. Griffin, you are currently Deputy Assistant
24 Attorney General for the Antitrust Division For Criminal
25 Enforcement; is that correct?

187

1  A. Yes.
2  Q. How long have you had that position?
3  A. Since January of 2000.
4  Q. I am going to ask you to look at Government's
5  Exhibit 1, please.
6  Is this a letter from R. Hewitt Pate, who is the
7  Assistant Attorney General For Antitrust, authorizing you to
8  testify here on behalf of the Government today?
9  A. Yes.
10 Q. Are there any limitations that Mr. Pate placed on
11 your ability to testify here today?
12 A. It states I am authorized to testify about my
13 involvement in negotiations for Stolt-Nielsen Transportation
14 Group in the Amnesty Program and it lists the limitations on
15 Government official testimony that exist in the Code of
16 Federal Regulations.
17 Q. It also provides that you are not authorized to
18 reveal information protected by privilege; is that correct?
19 A. That's correct.
20 Q. Mr. Griffin, would you please state the positions
21 that you have held since joining the Antitrust Division?
22 A. I began as a trial lawyer in the Atlanta Field
23 Office. I eventually became Assistant Chief of that Office.
24 I moved to Chicago as Chief of the Chicago Office in 1994 and
25 then to Washington as Director Of Criminal Enforcement in late

188

1  1998 and my current job January of 2000.
2  Q. Would you please tell the Court briefly your
3  responsibilities as Deputy Assistant Attorney General?
4  A. Basically, oversight supervision of the Division's
5  criminal investigations and prosecutions.
6  Q. Are you also responsible for the Division's
7  Corporate Leniency Policy?
8  A. Yes, I am responsible for its application and
9  administration.
10 Q. Who has final authority to make recommendations to
11 the Assistant Attorney General about leniency agreements?
12 A. I make the final recommendation -- I make the
13 determination whether to recommend leniency or not to
14 recommend leniency to the Assistant Attorney General.
15 Q. In your capacity as deputy assistant Attorney
16 General you were involved in Stolt-Nielsen application for
17 leniency in late 2002, early 2003?
18 A. Yes.
19 Q. I want to ask you to look at Government's Exhibit
20 2, which is January 15th letter signed by you and Mr. Nannes
21 concerning Stolt-Nielsen's conditional admission into the
22 Leniency Policy; is that correct?
23 A. That's correct. This is the conditional amnesty
24 agreement between the Division and Stolt-Nielsen.
25 Q. I am going to ask you about the terms of the

189

1  agreement, Mr. Griffin, but first, I would ask you to look at
2  Government's Exhibit 3 which is the Corporate Leniency Policy
3  and ask you if you could briefly describe the policy and the
4  purpose of it?
5  A. Sure. This is the Corporate Leniency Policy that
6  was adopted in August of 1993. It provides an expanded
7  opportunity and incentives for companies to come forward and
8  cooperate with Division criminal investigations into illegal
9  conduct. It's designed to obtain assistance in obtaining
10 evidence that would be used to prosecute other members of a
11 cartel or antitrust conspiracy. It has the effect of
12 destabilizing cartels as they operate, simply because people
13 know that one of the corporate conspirators could, for
14 whatever reason decide to self report, cooperate with the
15 Government and expose the other cartel members to criminal
16 prosecution.
17 Q. What has the Division done since 1993 to publicize
18 its Corporate Leniency Policy?
19 A. We get the word out. We speak to Bar Associations,
20 to business groups, to investigators, to the FBI, to just make
21 sure that everyone is aware that this program exists and that
22 we encourage corporations to take advantage of them.
23 Q. Does the Division limit the number of corporations
24 that can qualify in a particular investigation?
25 A. Yes.

190

Q. Why is that?

A. To destabilize the cartels that exist and the whole purpose is to break them up and obtain for us the evidence necessary to prosecute others. It's an investigative tool. It's not a solution.

Q. How effective has that policy been?

A. Extraordinary. It is the Department's most successful self reporting program. It's responsible for in the past seven years of breaking up numerous cartels, particularly international cartels and the imposition of over one and a half $1 billion in criminal fines.

Q. There are two types of situations in which a company can apply for leniency under the 1993 policy, what's been referred to already as part "A" Leniency and Part "B" Leniency?

A. That's right.

Q. Could you briefly describe the differences?

A. Part "A" applies in situations where the self reporting company comes in prior to the Division having any information about the conduct being reported from any other source. Shorthand, we say that's preinvestigation.

Part "B" provides that a corporation that meets all of the other standards in the policy and is the first in and comes in prior to our having evidence sufficient to prosecute the company already, is eligible for amnesty, as well. So

191

that's post investigation.

Q. Stolt-Nielsen in this case was given and considered for leniency under Part "B" of the policy?

A. That's correct.

Q. The policy sets forth a number of conditions that a company has to meet to qualify for Part "B" Leniency and I would like to talk to you about condition 3 which requires that a company upon its discovery of the illegal activity being discovered, why is that condition important to the Division?

A. Yes.

Q. Why is that important?

A. It's A(2), as well as B(3). It's important for a couple of reasons. One, as a matter of good public policy, we did not believe that it would be appropriate to provide leniency to a company that upon discovery of the illegal conduct chooses to continue engaging in that conduct. So we impose the obligation that upon discovery to take prompt and effective action to terminate.

Another practical reason that Mr. Connolly alluded to earlier is that this is an investigative tool. We want quality and valuable evidence to come to us through the program that we will use to prosecute other cartel members and it effects the credibility of the evidence provided. It's for the company that makes the decision not to continue the

192

conduct.

Q. I am going so ask you to look back at the whole January 15th agreement which is Exhibit 2 and first, point out that the introduction to the agreement says that it is conditional, that if all the conditions are met, that the Division will notify Stolt-Nielsen in writing that it has been admitted into the program.

Why is the agreement conditional?

A. It's conditional because these agreements are entered early on in an investigation. They are entered and they are forward looking. They are entered at a time when you are bargaining for cooperation that is throughout the investigation and prosecution -- or prosecutions that result from it. So while we want to be able -- we want to set out the expectations, the representations and all the requirements of the policy, but in an agreement early on with a company to insure its full cooperation.

So it is conditioned upon the company meeting its obligations and our determination that the two important representations that are required early in the investigation are verified by the investigation.

Q. Is that why paragraph 3 expressly provides that they are subject to verification, the representations?

A. Exactly, at this point in an investigation, we don't have the information.

193

Q. Now, could you please take a look at Government's Exhibit 4, Mr. Griffin, which is entitled: "The Corporate Leniency Policy, Answers To Recurring Questions, April 1, 1998."

Why did the Antitrust Division determine it was appropriate to issue these answers to reoccurring questions in 1998?

A. Well, this was one of -- I guess two major policy statements about the operation of the Leniency Policy. There is the first and after five years of experience, we realized that there were some issues that kept coming up, some questions that we get kept getting that we felt like we needed to answer.

One of the most important aspects of this program is that the bar and the business community understand its provisions and that our application of it be transparent and understandable, so we wanted to answer publicly some of the questions that had been asked in -- either privately or in connection with amnesty applications.

Q. Would you take a look at page 35, which is entitled, clarifying the Division's application of its corporate leniency policy.

What does this 1998 policy statement say about the requirement that a company take prompt and effective action to terminate its part in the antitrust activity that its

194

1 reporting?
2 A. The focus is termination of the activity. The
3 question that had arisen is what does a company have to do?
4 Do they have to legally withdraw, go through whatever all of
5 the legal requirements are for withdrawal from a conspiracy?
6 We wanted to get the word out that no, that is not necessarily
7 the case. There could be conduct short of legal withdrawal
8 that would satisfy that standard and in addition, we wanted to
9 make sure that people understood that we -- you did not have
10 to notify all the other coconspirators that you had withdrawn
11 and in order to qualify for termination and there were two
12 reasons for that. One was that there was an express concern
13 on some occasions that a company considering applying for
14 leniency, if they felt they had to notify all their other
15 conspirators, might in fact setup notice to the prosecutor
16 that they in fact lost, even though somebody would get to us
17 before them, so they were concerned about that as a
18 qualification and we, quite frankly, didn't want companies
19 believing that they necessarily had to notify all of their
20 other coconspirators if there was an ongoing conspiracy before
21 coming in, because if they come into us while it's going on,
22 we may well have the opportunity to initiate a covert
23 investigation.
24 Q. Whether the company notified its competitors or
25 came in and confessed to the Division, notified the Division,

195

1 is there any question that the company was required to refrain
2 and stop its participation in the anticompetitive activity?
3 A. However, they terminate it, they have to refrain
4 from continuing to participate.
5 THE COURT: You are not suggesting that if they
6 have long term contract, that they have to cancel the
7 contract?
8 THE WITNESS: No, your Honor.
9 Q. In this same policy statement, the Division also
10 clarified when the Division deems a company to have discovered
11 its illegal conduct for purposes of the amnesty program.
12 Why did the Division find it necessary to make this
13 clarification?
14 A. This one, when you think about it, it was pretty
15 clear, we needed to clarify it. Many cartels operate through
16 fairly senior or if not have senior executives of the company.
17 When we looked at the policy and began getting questions, we
18 realized that some people were reading that to mean that if a
19 senior executive of the company was involved in the cartel,
20 then the company knew about the conduct at the time that the
21 executive of the company entered the cartel.
22 If that were the case, if that were the
23 interpretation, in many of our larger cases, particularly in
24 international cartels, no one would qualify. There wouldn't
25 be a company that would qualify, because company knew from the

196

1 very beginning. So we clarified that by placing the discovery
2 or defining discovery as a company by placing that with the
3 responsible authoritative representatives of the company
4 responsible for legal matters, either counsel inside or
5 outside counsel or the board.
6 Q. Now, this policy statement also had attached to it
7 a model leniency letter; is that right?
8 A. That's correct.
9 Q. Since 1998, I guess in 1998, the Division was
10 making public the model leniency letter so people would know
11 what its terms were; is that right?
12 A. That's correct.
13 Q. And since 1998, the letter has been modified
14 somewhat and I guess it was in 2002.
15 A. There have been some minor modifications to it,
16 yes.
17 Q. Were the modified model letters also publicized?
18 A. Oh, yes.
19 Q. Was the most recent version of the model letter the
20 basis for the Stolt leniency letter?
21 A. It is or was.
22 Q. Since the Division issued this 1998 speech and
23 other speeches, has the Division gone about trying to
24 publicize the speech and the policy statements and
25 clarifications that were made?

197

1 A. Yes, and a number of -- there are two major
2 interpretative speeches, interpretative of the amnesty policy.
3 This is one. There was one in 1999 and then there was also a
4 third, not as major, but clarified some things in I believe it
5 was 2001 and quite often in other speeches and in other pages,
6 those speeches are either referenced or attached to them.
7 Q. Now, I want to direct your attention to November
8 22nd, 2002, Mr. Griffin. That day, did you receive a request
9 from the Philadelphia Field Office to begin an investigation
10 of possible collusion in the parcel tanker shipping industry?
11 A. I did?
12 Q. Was that based on information that staff had
13 gleaned from an article that had appeared that morning in the
14 Wall Street Journal?
15 A. Yes, it was.
16 Q. Would you take a look at Government's Exhibit 6.
17 Is that the article that the staff --
18 A. That's the article.
19 Q. -- had read?
20 A. Yes.
21 Q. What did the article say that caused the
22 Philadelphia Field Office to seek authority to look into the
23 industry?
24 A. The article is reporting on a lawsuit brought by a
25 Mr. O'Brien, former General Counsel of Stolt-Nielsen and in

198

1 the article it says that Mr. O'Brien has alleged that the
2 company was involved in -- I don't recall the exact
3 terminology, but antitrust conduct that would be violative of
4 U.S. laws and other laws.
5    Q.   Against price fixing and other illegal conduct?
6    A.   Yes, price fixing and antitrust conduct.
7    Q.   Was there anything else in the article that was of
8 particular interest to the Division about Mr. O'Brien's
9 allegations?
10   A.   Yes, and it became even more so later, but the
11 allegation and the report is or was that Mr. O'Brien alleged
12 that when he brought the matter to the attention of senior
13 management, they declined to withdraw or take appropriate
14 action to withdraw from -- cease the illegal conduct.
15   Q.   Did you authorize the Philadelphia office to begin
16 investigating the parcel tanker shipping industry?
17   A.   Yes.
18   Q.   Later that day, did your Office receive a call from
19 Mr. Nannes concerning a potential amnesty application?
20   A.   Yes.
21   Q.   Did you ultimately speak with Mr. Nannes about that
22 matter?
23   A.   Yes.
24   Q.   Would you please tell us what you discussed with
25 Mr. Nannes during that phone call?

199

1    A.   It was a fairly short call. He told me that he had
2 a client that might be interested in applying for leniency and
3 wanted to talk a little bit about what information he would
4 need to give to me for me to be able to tell him whether
5 amnesty was available and if so, whether it was -- whether it
6 would be an "A" or "B" amnesty. He wanted to give me as
7 little information as possible, but sufficient to allow me to
8 answer the question. At that point, he asked if I could at
9 least answer the question, was amnesty available in connection
10 with transportation and I told him that that wasn't enough.
11 If I had to answer on that basis, then, at least in terms
12 of "A" amnesty, depending on where it went, we did have
13 investigations open in the transportation industry and that
14 wasn't enough.
15   Q.   Did you have further conversations with Mr. Nannes
16 in which he ultimately identified his client?
17   A.   We had several conversations. I don't recall how
18 many over the next eight or ten days, yes.
19   Q.   When you learned that Stolt-Nielsen was Mr. Nannes'
20 client, what was your reaction? What did you tell him?
21   A.   I told him a couple of things. I told him, one,
22 that we did have an investigation ongoing in that matter, but
23 that it was early. In fact, I think it was very early I said
24 in the investigation and therefore, a company that otherwise
25 qualified was available. Amnesty was available, but I also

200

1 pointed out that we had read the article and that we were
2 concerned and would be concerned about the allegation that the
3 general counsel was aware of the conduct and the company did
4 not take prompt and effective action to terminate its role in
5 the cartel.
6    Q.   Did you tell Mr. Nannes what would happen if Mr.
7 O'Brien's allegations turned out to be true?
8    A.   In that conversation, I don't recall what I did. I
9 probably did, but Mr. Nannes was familiar with the Amnesty
10 Program and was probably aware of that, but I can't say
11 whether in that conversation I said and if that is the case,
12 we will remove it.
13   Q.   How did Mr. Nannes respond to Mr. O'Brien's
14 allegations?
15   A.   He said he did not think Mr. O'Brien's allegations
16 were credible and he was confident that he would be able to
17 satisfy us of that and he wanted a little more time to get --
18 I think to get additional information.
19   Q.   How did you respond?
20   A.   We agreed that he could have that time. I am not
21 sure whether in that phone call we set up the December 4th
22 meeting or not, but certainly a meeting shortly thereafter was
23 contemplated and if I remember correctly, I gave him a marker
24 at that time, which is that you are in as far as being first
25 in for some period of time until we resolved this with you, so

201

1 if anybody else comes in, they are too late.
2    Q.   Now, you mentioned a meeting, did you meet with Mr.
3 Nannes on December 4th in Washington?
4    A.   Yes.
5    Q.   Who did Mr. Nannes have with him?
6    A.   Mr. Crisman who is a partner of his.
7    Q.   Who from your staff was present.
8    A.   Scott Hammond, our Director Of Criminal Enforcement
9 was there, Belinda Barnett (sic), who is Senior Counsel For
10 Criminal Matters and Anne Olick (sic), who is a Special
11 Assistant in our Office Of Operations.
12   Q.   Was there anyone from the Philadelphia Office
13 present?
14   A.   And Mr. Connolly was there and Ms. Norman.
15   Q.   Can you please tell the Court what happened during
16 that meeting?
17   A.   Yes. Mr. Nannes gave us some background
18 information on the industry and the company, his client and
19 then, we spent most of the time talking about what happened in
20 February, March and early April of 2002.
21       Mr. Nannes said that in February of 2002, Mr.
22 O'Brien discovered evidence or conduct that if true would be
23 violative of U.S. Antitrust Laws and that that information was
24 reported up the line. He even said to the parent company that
25 there was a decision made to undertake an antitrust compliance

**Page 202**

1 program or adopt a new antitrust compliance program and take
2 other action to implement that program and also to notify the
3 coconspirators that the company no longer would participate in
4 the conduct.
5   Q.  In connection with that notification to
6 competitors, did Mr. Nannes bring with him any documents?
7   A.  Yes, he did. In fact, he said, "You know that Mr.
8 O'Brien's allegations were not credible." He went through
9 some of the things I just mentioned about what the company
10 actually did when they were -- when they became aware of the
11 conduct and then, said that he would like to submit six
12 documents that provided unequivocal evidence or proof that the
13 company had in fact terminated its conduct in March and April.
14   Q.  Please turn to Government's Exhibit 7, Mr. Griffin.
15   A.  I have it.
16   Q.  There are six documents here?
17   A.  Yes.
18   Q.  Two emails from Mr. Wingfield to various business
19 partners dated March 14, 2002, two letters from Mr.
20 Wattenbergh to European companies and two emails dated April
21 28, 2002, one to an individual at Odfjell and one to an
22 individual and JO Tankers?
23   A.  Yes.
24   Q.  Did you raise any questions or your staff raise any
25 questions about why there were emails issued earlier in March,

**Page 203**

1 mid March and then these emails to the competitors were not
2 sent until April 8th?
3   A.  Yes, we did. We questioned both the timing and the
4 difference in content and what that might mean, particularly
5 in light of Mr. O'Brien's allegations that the company refused
6 to take effective action to withdraw.
7   Q.  What did Mr. Nannes say about the timing of the
8 emails?
9   A   The timing of the emails, the last two, the one to
10 Odfjell and one to JO Tankers, he said that there was an
11 intentional decision not to send letters or emails to these
12 two companies because it was decided that there would be a
13 meeting with each of those companies that was coming up, I
14 believe, in connection with a trade association, but in any
15 event, the communication would be delivered to those two
16 orally.
17   Q.  Did you also discuss with Mr. Nannes the difference
18 in the content of the earlier emails from Mr. Wingfield and
19 the later emails to Mr. Wingfield which merely say: "I refer
20 to our recent discussion?"
21   A.  Yes, we did. We raised that. It's obvious that
22 there were -- it's suggested there were earlier discussions
23 and as I say, he had said that that was the case that the
24 withdrawal was going to be done orally, because -- and that
25 these emails were worded the way they are, because the concern

**Page 204**

1 that they not create any incriminating documents, because of
2 these differences and because of the allegations that had been
3 reported in the newspaper -- throughout this meeting, the
4 whole discussion was about Mr. O'Brien's discovery and whether
5 the company qualified even to apply for immunity based upon
6 its actions upon Mr. O'Brien's discovery of the conduct.
7       We talked specifically about the program, about the
8 model letter, about the speech that we talked about earlier.
9 I think it was towards the end of the meeting or as it was
10 ending, I said that if it turned out that all of this, that
11 is, this evidence of withdrawal turned out to be -- I used the
12 term, "a head fake", so that -- and Mr. O'Brien's allegations
13 were in fact true, the company would not qualify for leniency
14 and even if we did enter into a conditional leniency
15 agreement, that that would be revoked.
16   Q.  Did Mr. Nannes say anything about why Mr. O'Brien
17 would be making these allegations, if they were not true?
18   A.  That there had been a history of animosity I guess
19 between Mr. O'Brien and some other people in management and
20 that he was in fact extorting or using this, the lawsuit to
21 try to extort a settlement, a substantial amount of money.
22   Q.  At this time, did you ask Mr. Nannes whether
23 Stolt-Nellsen would allow the Division to talk to Mr. O'Brien?
24   A.  Yes, in light of these differences in what was
25 being reported in the newspaper and what had been reported to

**Page 205**

1 us, I asked Mr. Nannes if he would consider -- if
2 Stolt-Nielsen would consider waiving the attorney-client
3 privilege for the purpose of allowing us to interview Mr.
4 O'Brien on this issue. I don't recall whether that request
5 was rejected at that meeting or not or whether it was taken
6 under advisement, but in any event, it ultimately was
7 declined.
8   Q.  At any time during this meeting or the various
9 telephone conversations that you had with Mr. Nannes, did he
10 ever tell you that O'Brien did not discover the activity that
11 the company was seeking to report to the Division?
12   A.  No. None of our conversations between November
13 22nd and then through December 4th made any sense other than
14 as a response to the concern that general counsel had
15 discovered conduct that was being reported and what was the
16 company's reaction.
17   Q.  That was the very purpose for the December 4th
18 meeting
19 to air this out a little bit more?
20   A.  That was the purpose of the December 4th meeting.
21   Q.  Did Mr. Nannes ever suggest to you at any time that
22 the conspiracy was discovered at some other time, other than
23 February or in early 2002 by Mr. O'Brien?
24   A.  No. In fact, it was at the December 4th meeting
25 that we were first informed that it was February.

206

1  Q. Did Mr. Nannes ever suggest to you that he, not Mr.
2  O'Brien, that Mr. Nannes was the person who discovered the
3  anticompetitive activity that the company was seeking amnesty
4  for?
5  A. No, the entire discussion was about what transpired
6  after Mr. O'Brien --
7  Q. Did he ever suggest that anybody else ever
8  discovered the conspiracy that the company was seeking amnesty
9  for?
10 A. No.
11 Q. Did he ever tell you, Mr. Griffin, that the
12 conspiracy ended in November?
13 A. No.
14 Q. Now, after the December 4th meeting, did the
15 Philadelphia staff have further meetings, another meeting and
16 some discussion with Mr. Nannes concerning the issues that you
17 raised and the further amnesty discussions?
18 A. Yes, I believe that there were -- I know that there
19 was at least one meeting and several phone calls with Mr.
20 Nannes.
21 Q. Did the Philadelphia staff report to you that they
22 had in fact repeated your concerns concerning O'Brien's
23 discovery and the prompt and effective termination of the
24 conspiracy to Mr. Nannes?
25 A. Yes, there were members of the staff who were not

207

1  at the December 4th meeting and I am told it was gone over
2  thoroughly once again -- at least once again.
3  Q. Did the Philadelphia staff tell you that Mr. Nannes
4  at any time questioned or disputed the Division's position
5  that it deemed discovery to have taken place in February, 2002
6  as Mr. Nannes reported by Paul O'Brien?
7  A. No.
8  Q. Now, to your knowledge, Mr. Griffin, did Mr. Nannes
9  ever dispute or question that the Division intended to verify
10 the accuracy and truth of that representation that the company
11 did in fact take prompt and effective steps to terminate its
12 part in the anticompetitive activity being reported upon its
13 discovery?
14 A. No, it's clear -- the policy is clear in the letter
15 and it's certainly clear in the several discussions that we
16 had that that would be the case. It was specifically said on
17 more than one occasion.
18 Q. You ultimately did recommend that Stolt-Nielsen be
19 conditionally admitted into the Leniency Program?
20 A. Yes.
21 Q. Can you tell the Court what you relied on in making
22 that decision?
23 A. I relied on several things. One, the
24 representation that Mr. O'Brien's allegations were not true.
25 I relied on the documents that were presented in support of

208

1  the -- the company's perception or Mr. Nannes' presentation
2  that they had in fact in March notified the coconspirators
3  that they would no longer participate.
4  Q. The emails?
5  A. The emails. The only documents, by the way, at
6  that time, that had been presented to us and the realization
7  in the policy itself and in the letter itself the company was
8  comfortable making that representation and us relying on it
9  and there had been a full airing of the consequences of the
10 extent that there was any uncertainty of the consequences of
11 not taking prompt and effective action.
12 Q. What were they?
13 A. The removal from the Amnesty Program.
14 Q. At any time if Mr. Nannes suggested to you that the
15 conspiracy continued until November, 2002 through Mr.
16 Wingfield or whoever at the company, would you have
17 recommended that the company be admitted into the conditional
18 amnesty program?
19 A. No.
20 Q. Why not?
21 A. Because the company under the clear interpretation
22 of the policy discovered the conduct in February of 2002
23 and -- that did not enter my mind because what we were being
24 told, we stopped it at that time.
25 Q. They simply would not have qualified?

209

1  A. They would not have qualified.
2  Q. Mr. Griffin, if this time February-March 2002 was
3  so important, why is it not referenced specifically in the
4  whole 15th agreement?
5  A. The importance is not -- the importance is the
6  trigger and the conduct that follows it. It's when the
7  company discovers it, they took this action. If we had put
8  all of this -- think about it, if you put the March 2002 date
9  in there and based the agreement on that, it would -- well, it
10 changes the terms of the policy which is upon discovery.
11 Whenever that happens, you take prompt and effective action.
12 So it may well be that we could have took all of that in the
13 policy -- I am sorry, in this particular agreement. It could
14 all have turned out to be absolutely true and at the end of
15 the investigation, under our policy, they wouldn't have
16 qualified, anyway, because we discovered, let's say, that
17 O'Brien didn't find out in February, 2002, he really found out
18 about it in February, 2001.
19 Q. So the point is not whether O'Brien discovered it
20 on a particular day or time, but in relation to that date of
21 discovery, what the company did as a result to terminate?
22 A. That's exactly right.
23 Q. Why does the model agreement and this agreement
24 provide non prosecution protection up until the date of the
25 letter, as opposed to, for example, March 2002?

210

1  A. We put the model letter out with the idea of
2  extending the coverage through the date of the letter on the
3  basis that that would be the point in time that a company
4  would, by reporting to us, legally withdraw from the
5  conspiracy, so that that would give clear coverage.
6      Quite frankly, even if some of it was not needed,
7  it would give the company comfort in clear coverage through
8  the point in time where there was clearly legal withdrawal
9  from the conspiracy by notifying law enforcement authorities.
10 Q. Because Division does not require that; is that
11 correct?
12 A. Exactly, because we don't require that and if there
13 is some period of time to give the company comfort, we wanted
14 to cover it and quite frankly, it's something that was of no
15 cost, if you will, to the Government, because if the company
16 fails in either of the representations or its undertaking to
17 fully cooperate with the Government, then it loses its entire
18 coverage, so it would be liable for the entire course of the
19 conspiracy regardless.
20 Q. If the company violates the agreement, anyway, the
21 Division is free to prosecute for the entire period of the
22 conspiracy?
23 A. Exactly.
24 Q. Can you please now turn to Government's Exhibit 89?
25 A. All right.

211

1  Q. That is a letter from Mr. Connolly to Mr. Nannes,
2  dated April 8, 2003.
3      Did you authorize Mr. Connolly to notify
4  Stolt-Nielsen that the Division was considering withdrawing
5  the leniency?
6  A. Yes, I did.
7  Q. On what grounds did you authorize Mr. Connolly to
8  do that?
9  A. We obtained evidence on, I believe it was April
10 4th, but I was advised sometime between April 4th and April
11 8th, that there was clear credible evidence that the
12 representations that the company took action to withdraw from
13 the conspiracy or notify its co-conspirators that that's what
14 we were doing.
15     MR. BACKSTROM: I have an objection on the basis of
16 hearsay.
17     THE COURT: Overruled: It's not whether the
18 information was true or not. It's why he did it.
19     MR. BACKSTROM: I understand.
20     THE WITNESS: (Continuing) We had evidence that
21 the company's representation that in fact it had taken action
22 to notify its conspirators that it was withdrawing from the
23 conspiracy in March of 2002 was false.
24 Q. Now, in this letter, the Division also notifies
25 Stolt-Nielsen through Mr. Nannes that its application to

212

1  cooperate under the whole 15th letter was suspended.
2  Q. Why did you authorize Mr. Connolly to do that?
3  A. The terms of the agreement provide that if a
4  company loses its amnesty, we revoke the agreement.
5      All of the evidence provided pursuant to the
6  agreement can then be used to prosecute the company and any of
7  its executives. We felt that it was fair to cease taking
8  evidence or to at least cease the company's obligation to
9  provide us evidence under that agreement when we had
10 discovered evidence that called into serious question its
11 continuation of that agreement.
12 Q. By virtue of this letter, Mr. Griffin, was
13 Stolt-Nielsen prohibited from providing evidence to the
14 Government concerning its eligibility for amnesty?
15 A. No.
16 Q. In fact, was Stolt-Nielsen given opportunities to
17 present evidence and argument to the Division about its
18 eligibility for amnesty?
19 A. Yes, in the year since then, we met several times.
20 I don't recall the number, but a number of times and had a
21 number of conversations and in fact this was -- because as has
22 been said earlier, this is the first time that we have revoked
23 an amnesty application and I recommended that an unusual
24 procedure for criminal matters in the Antitrust Division, the
25 Assistant Attorney General rarely meets with counsel for

213

1  companies or individuals that are subject to being targets of
2  our criminal investigations. He relies on recommendations
3  from the criminal deputy, in this case, because of the
4  seriousness and the importance of the program, I recommended
5  that the assistant Attorney General meet with counsel for
6  Stolt-Nielsen and he did so.
7  Q. And in fact, Mr. Pate had a lengthy meeting with
8  Stolt and it's various counsel; is that right?
9  A. I am sorry, would you repeat that?
10 Q. I said Mr. Pate had a lengthy meeting with Stolt
11 and its counsel; is that right?
12 A. Yes, That's right.
13 Q. Mr. Griffin, could you please look at Government's
14 Exhibit 10 which is behind this last document and look behind
15 9?
16     Now, this morning, Mr. Terwilliger argued that this
17 speech by Scott Hammond on March 8, 2001 provided some basis
18 for Stolt-Nielsen to continue to obtain or obtain expanded
19 amnesty by virtue of telling about the continuation of the
20 conspiracy past March into November, 2002 and he relies, I
21 think, on page 6 of this speech, the second full paragraph in
22 which Mr. Hammond said:
23     "To insure that companies are not penalized for
24 coming in early to the Division, the policy is to protect the
25 result of a company's good faith efforts and the efforts of

**214**

1 their executives to disclose additional offense that's were
2 not reported.
3     "For example, if an ensuing investigation uncovers
4 anti competitive activities that is more extensive than the
5 original conduct or falls outside the non-prosecution letter,
6 that the Division would consider grants go amnesty for that
7 particular conduct."
8     Can you explain the purpose of this particular
9 policy of the Division?
10   A.  Sure, there are times when a company comes in and
11 seeks a marker, as was given in this case, prior to the
12 company completing it's full investigation and as the company
13 completes its investigation, it reports additional conduct.
14 As you will see, the examples that are given -- this, by the
15 way, is right out of the second major policy statement or
16 policy speech, the 1999 deputy Attorney General speech. This
17 was not new in 2001, but it happens occasionally that a
18 company comes in and is reporting anticompetitive conduct
19 throughout North America and comes back later and reports it
20 actually extended throughout the world or that we were fixing
21 prices on widgets of a certain size and then comes back and
22 actually it turns out now that we were fixing prices on
23 widgets of all sizes, so the idea was that once you had
24 evidence of a violation that you wanted to report, come in,
25 get a marker, get the conditional amnesty letter and if you

**215**

1 disclose additional conduct that is not covered by the letter
2 and you meet all of the criteria for that conduct, the amnesty
3 letter can be expanded.
4   Q.  So the company essentially has to reapply for
5 amnesty and qualify for amnesty for the new geographic area or
6 new product area.
7   A.  For the new product area, for the new geographic
8 area and it has to be information that is provided to us by
9 the executives or through the good faith efforts of that
10 company. That's not the case here. Quite the contrary. We
11 were told that this company -- this company's representation
12 was that it withdrew in March of 2002 and that certain things
13 happened at the April -- I am sorry, the March meetings that
14 are referenced in the April emails and we found out from
15 others that that is not what happened.
16   Q.  Now, did Stolt-Nielsen ever come into the Division,
17 Mr. Griffin and say we have learned the conspiracy continued
18 from March to November and can we qualify for amnesty?
19   A.  No.
20   Q.  If they did come in and seek amnesty on that basis,
21 would they have qualified for amnesty?
22   A.  No.
23   Q.  Why not?
24   A.  Because of the determination that the company
25 through its general counsel discovered in February of 2002.

**216**

1   Q.  Now, at any time, Mr. Griffin, has Stolt-Nielsen
2 admitted that the conspiracy continued through or until
3 November, 2002?
4   A.  Not that I am aware of, no.
5   Q.  Now I want to direct your attention to June 2003.
6 Did you authorize the Philadelphia staff to notify Mr. Nannes
7 that Mr. Wingfield was no longer covered by any of the
8 provisions of the whole 15th conditional leniency agreement?
9   A.  Yes, I did.
10   Q.  Did you also authorize the Philadelphia staff to
11 seek a warrant for Mr. Wingfield's arrest?
12   A.  Yes.
13   Q.  Can you please explain why you made that decision?
14   A.  At that point we had evidence that -- what happened
15 at -- without getting into specifics, we had evidence that Mr.
16 Wingfield's conduct in February and March of 2002 was contrary
17 to what it had been represented to us to be. We had evidence
18 that he was aware that those representations had been made
19 about his conduct and he was aware that evidence had been
20 presented to us about his conduct at the meetings in March of
21 2002, that were contrary to what he in fact had done in 2002.
22   Q.  In other words, the Government has been given false
23 evidence?
24   A.  About what he did and he took no action to correct
25 that, to come forward and make it known to us --

**217**

1   THE COURT: How did he know?
2   THE WITNESS: Excuse me, your Honor?
3   THE COURT: How did he know that you believed that,
4 so that he would come forward and tell you?
5   THE WITNESS: He knew what another witness had told
6 us.
7   THE COURT: How do you know?
8   THE WITNESS: The witness told us.
9   THE COURT: The witness told the Government that
10 the witness told Mr. Wingfield?
11   THE WITNESS: That he had provided false
12 information about what Wingfield did.
13   Q.  You heard Mr. Black argue that the amnesty
14 agreement, the cooperation requirements under paragraph 4(d),
15 concerning what an employee's obligations are, under no
16 stretch of the imagination would it require an individual like
17 Mr. Wingfield who assuming knew the false information had been
18 given to the Government and knew that false evidence had been
19 given to the Government, had any obligation to come forward
20 and tell the Government and correct the Government's
21 misperception, is that correct in your opinion?
22   THE COURT: I didn't hear that question. When the
23 Government had this information from another witness that led
24 the Government to believe Mr. Wingfield had lied about his
25 role in the conspiracy, is that really essentially what it

218

1  was?
2     THE WITNESS: I can't say that Mr. Wingfield lied
3  about his role, because I don't know who gave the information
4  to Mr. Nannes that was presented to us.
5     What we found out was that that information
6  regarding what Mr. Wingfield did at the two meetings that are
7  referenced in this email was totally contrary to what had been
8  represented.
9     THE COURT: By whom?
10    THE WITNESS: By Mr. Nannes
11    THE COURT: But, you don't know who told Nannes?
12    THE WITNESS: I don't know.
13    THE COURT: Okay, now, once this witness tells you
14 that, did the Government go to Mr. Nannes and say, hey, we got
15 information that's different about Wingfield, give him an
16 opportunity to come on in and straighten it out?
17    THE WITNESS: No, your Honor, we didn't.
18    THE COURT: Maybe at that point, you could have
19 found out that maybe the information that Nannes gave you was
20 wrong.
21    THE WITNESS: Well, what we had was a
22 representation that at these meetings Mr. Wingfield
23 communicated withdrawal from the conspiracy and that was the
24 representation.
25    THE COURT: You see my concern?

219

1     THE WITNESS: Maybe I just have to get into some of
2  the evidence, your Honor. I was trying not to do that.
3     THE COURT: I hear what you are saying. My concern
4  is that the Government concludes that information it had been
5  supplied about Mr. Wingfield's role in the conspiracy in
6  February and March of 2002 was not correct. The Government
7  assumes that the information that's communicated from Mr.
8  Nannes was from Mr. Wingfield, but we'll concede we are not
9  sure of that.
10    THE WITNESS: Yes.
11    THE COURT: Then the Government decides that we
12 want to pull the plug on Mr. Wingfield and arrest him --
13    THE WITNESS: There was more. We had in addition
14 to that, what we had was a witness who had provided
15 information to us about what Mr. Wingfield did, untrue
16 information about what Mr. Wingfield did at those meetings,
17 later recanted that story, told us what happened --
18    THE COURT: This is the other witness.
19    THE WITNESS: The other witness and also told us
20 that he, the witness had let Mr. Wingfield know about the
21 prior testimony or prior statement, so Mr. Wingfield for some
22 period of time was aware that a story was being told by this
23 witness that was not true about what he had done and at that
24 point, we believe that that is the total and at this time
25 satisfies --

220

1     THE COURT: Do you think Mr. Nannes should have
2  told Mr. Wingfield he had a responsibility to come in and
3  clean it up?
4     THE WITNESS: At that point, I don't know how to
5  clean it up, because at that point, neither the company nor
6  Mr. Wingfield or any of the other executives in the company
7  qualified for amnesty.
8     THE COURT: We're going resume tomorrow at 9:30.
9     (Whereupon, at 6:10 p.m., court was adjourned)

221

INDEX OF WITNESSES

| Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| J. M. Nannes | 103/108/124 | # | # | # |
| J. M. Griffin | 185 | # | # | # |