# Exhibit 15E

1

```
 1
 2
 3          IN THE UNITED STATES DISTRICT COURT
 4       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 5                  - - - -
 6
 7  STOLT-NIELSEN S.A.        :
    and                      :     CIVIL ACTION
 8  STOLT-NIELSEN TRANSPORTATION :
    GROUP, LTD.               :
 9
                Plaintiffs    :
10        vs.                 :     NO. 04-537
11  UNITED STATES OF AMERICA  :
12          Defendant.        :
13
14                  Philadelphia, PA
15                  April 14, 2004
16
17    BEFORE:   HON. TIMOTHY J. SAVAGE, J
18
19
20               TRIAL - SECOND DAY
21
22
23
24
25
```

2

```
 1
 2                 P R E S E N T:
 3        For the Plaintiff:
 4
 5     WHITE & CASE
       BY:  CHRISTOPHER M. CURRAN, ESQ.
 6     GEORGE J. TERMILLIGER, ESQ.
       J. MARK GIDLEY, ESQ.
 7     GEORGE PAUL, ESQ.
       LUCIOS LAU, ESQ.
 8     601 Thirteenth Street, N.W.
       Suite 600
 9     Washington, D.C. 20005-3807
10
11     BLANK ROME LLP
       BY:  IAN COMISKY, ESQ.
12     MATTHEW LEE, ESQ.
       One Logan Square
13     Philadelphia, PA 19103-6998
14        For Stolt-Nielsen
15
16     FINE, KAPLAN & BLACK
       BY:  ROBERTA D. LIEBENBERG, ESQ.
17     ALLEN D. BLACK, ESQ.
       GERARD A. DEVER, ESQ.
18     1845 Walnut Street-23rd Fl.
       Philadelphia, PA 19103-4723
19
20     JAMES A. BACKSTROM, ESQ.
       Two Penn Center - Suite 200
21     Philadelphia, PA 19102-1706
22        For RICHARD WINGFIELD
23
24
25
```

3

```
 1
 2        For the Defendant:
 3     UNITED STATES ANTITRUST DIVISION
 4     BY:  ROBERT E. CONNOLLY, ESQ.
       ANOTONIA R. HILL, ESQ.
 5     WENDY NORMAN, ESQ.
 6        FOR THE UNITED STATES
 7
 8
 9
10
11
12
13
14
15
16
17              Philip Feldman
                Sidney S. Rothschild
18              Official Court Reporters
                U.S. Court - Room 1234
19              601 Market Street
                Philadelphia, PA 19106
20              (267) 738-8713
21
22
23
24  Proceedings recorded by mechanical stenography,
25  transcript produced by computer.
```

NANNES - DIRECT

4

```
 1          (Proceedings commenced at 9:35 a.m.)
 2          THE COURT:  Good morning.
 3          Mr. Nannes, come on back.  We will try to
 4  get you out of here today.
 5          JOHN M. NANNES, RESUMED
 6          MR. CURRAN: May I proceed?
 7          THE COURT:  Have you worked out anything?
 8          MR. CURRAN:  We attempted to.  We conferred
 9  in good faith.
10          THE COURT:  The answer is yes or no?
11          MR. CURRAN:  We were not able to work
12  anything out.
13          THE COURT:  Proceed.
14          MR. CURRAN:  Thank you.
15          CONTINUED DIRECT EXAMINATION
16  BY MR. CURRAN:
17     Q.  Mr. Nannes, let me bring you to where we were in
18  the chronology when your examination was stopped
19  yesterday.
20          We already discussed the proffer, the
21  execution of the January 15th agreement and we were
22  discussing the post agreement phase, correct?
23     A.  Yes, sir.
24     Q.  Sir, we were discussing in particular a document
25  under tab 11 in the witness book, which I believe is
```

NANNES - DIRECT

5

1   still before you?
2   A.  I have it.
3   Q.  Now, sir, in this--there is a letter from Mr.
4   Connolly to you, dated January 31, 2003?
5   A.  Yes.
6   Q.  This is a letter you already referred to as a
7   reference to Bjorn Jansen or reference to Ray
8   Jansen, which you understood to be a reference to
9   Bjorn?
10  A.  Yes.
11  Q.  In this letter, Mr. Connolly was asking to
12  interview Mr. Jansen?
13  A.  Yes.
14  Q.  Did you provide Mr. Jansen for an interview?
15  A.  Yes.
16  Q.  How long after the January 31st written request
17  did you provide Mr. Jansen?
18  A.  I think that we went for the interviews on
19  February 5th, both with Mr. Jansen and with Mr.
20  Pickering.
21  Q.  Mr. Nannes, did Mr. Connolly also request
22  certain documents in connection with this January
23  31st letter?
24  A.  Yes, he did. This is an attachment to the
25  letters that specifies certain documents that the

NANNES - DIRECT

6

1   government wanted to have.
2   Q.  What's the relationship between the documents
3   that they wanted to have and the proffer that you
4   had made to the government?
5   A.  The references in the attachment are to various
6   documents, which I had referred in the proffer.
7   Particularly the customer list references.  And, in
8   item three, the request for expense reports is keyed
9   to the individuals, most of whom I had told Mr.
10  Connolly  had been participants in some of the
11  meetings, giving rise to the list.
12  Q.  Let's break that down a little bit.  In the very
13  first document request, the very first thing
14  requested are all customer lists, correct?
15  A.  Yes. And, any other document which lists,
16  reflects or refers to customers of parcel tanker
17  shipping which either were sent by SNTG to any other
18  company engaged in parcel tanker shipping or
19  received by SNTG from any other company engaged in
20  parcel tanker shipping.
21  Q.  Mr. Nannes, what did you understand that request
22  to be asking you for?
23  A.  The kinds of lists that I had described to Mr.
24  Connolly, that had been exchanged between Stolt and
25  Odfjell.

NANNES - DIRECT

7

1   Q.  Did you provide those requested materials to Mr.
2   Connolly?
3   A.  Yes, we endeavored to provide them and did
4   provide them to Mr. Connolly, before he conducted
5   the interviews of Mr. Jansen and Mr. Pickering, so
6   he would have the documents to assist him in the
7   interview process.
8   Q.  You referred to certain individuals in this
9   document request, which individuals are those?
10  A.  In item three, there is a reference to a number
11  of individuals.  If you would like me to read them.
12  Q.  I would.
13  A.  Samuel Cooperman, Andrew Pickering, Albert
14  Schaeldrup, Reginald Lee, Richard Wingfield, Ray
15  Long, Bjorn Jansen and William Humphreys.
16  Q.  Now, again, Mr. Nannes, among those various
17  names that Mr. Connolly listed, which ones did he
18  ask specifically to interview at this point and
19  time?
20  A.  He had asked specifically only for Mr. Jansen.
21  I had told him that Mr. Pickering, who was based in
22  Stolt's Singapore office was in the United States
23  that week. He had arrived and would be available for
24  an interview.
25      At that point, I believe Mr. Connolly knew

NANNES - DIRECT

8

1   that Mr. Pickering had been the person that met with
2   Odfjell in 1998, in conjunction with the preparation
3   of the key list.
4   Q.  You volunteered Mr. Pickering?
5   A.  Yes.
6   Q.  He ordinarily resides outside of the United
7   States, is that correct?
8   A.  Yes.  Outside of the subpoena power of the
9   Antitrust Division, in Singapore.
10  Q.  I would like to direct your attention to tab
11  12.
12  A.  Yes.
13  Q.  What is that document?
14  A.  That document is a transmittal letter dated
15  February 4th, pursuant to which we submitted to Mr.
16  Connolly about 6,000 pages of documents in response
17  to the letter request we had received, dated January
18  31.
19  Q.  So this is your response for documents in
20  connection with the request made less than a week
21  earlier?
22  A.  Yes.
23  Q.  Sir, what's the date on this letter?
24  A.  The receipt stamp says February 4 and the date
25  of the letter is February 4.

NANNES - DIRECT

9

1    Q.  How does that happen, a letter leaves Washington
2    on the fourth and arrives in Philadelphia at 11
3    o'clock the same day in the morning?
4    A.  I'm not sure.  The signature shows that it was
5    signed by someone in my absence, either the letter
6    was misdated, it was sent out the 3rd or the letter
7    and the documents were delivered by a courier
8    service.  But, our intention was to get the
9    documents to Mr. Connolly, before the interviews.
10   This was the way that we did it.
11   Q.  Why was it your intention?
12   A.  We were looking to assist Mr. Connolly and make
13   the interviews as useful to him as possible.
14   Q.  What documents were you providing, accompanying
15   this letter?
16   A.  I think the documents fell into three or four
17   categories, I know they included the lists.  I know
18   they included expense reports of employees that were
19   keyed to the dates that we were able to identify
20   were dates upon which Stolt's and Odfjell employees
21   had met.  There were a number of employee journals.
22   In this industry, employees tend to keep daily
23   journals, kind of running accounts of conversations
24   or accounts.  We were able to secure journals for a
25   number of employees, sent those, along, with other

NANNES - DIRECT

10

1    submissions to Mr. Connolly.
2    Q.  Whose expense reports and whose journals did you
3    provide at this time?
4    A.  I can't recall exactly.  I think they would have
5    been for Mr. Cooperman, Mr. Pickering, Mr. Wingfield
6    and Mr. Jansen, for sure.  I just don't know about
7    the others.
8    Q.  The lists you were referring to, you provided at
9    this time was the same list that Mr. Wingfield
10   provided to you?
11   A.  Yes, sir.
12   Q.  Sir, I would like to direct your attention to
13   the document under tab 13.
14       What is this document?
15   A.  This is a letter addressed to me, signed by Mr.
16   Connolly, referring to an interview of Mr. Jansen.
17       In advance of the interview, Mr. Connolly
18   had sent me a draft of a letter that would be
19   provided to the witness.  I think the one he sent me,
20   really first to Mr. Pickering and he said this was
21   the letter that would be provided to the employees
22   at the time of their interviews.
23       When we arrived in Philadelphia, at the
24   beginning of Mr. Pickering's interview, he was
25   provided with a letter.  And, at the beginning of

NANNES - DIRECT

11

1    Mr. Jansen's interview, he was provided with a
2    letter.
3    Q.  The document under tab 13 is the letter to Mr.
4    Jansen, correct?
5    A.  Yes, it is.
6    Q.  The document under tab 14 is the letter to Mr.
7    Pickering, correct?
8    A.  Yes.
9    Q.  Jansen is the individual that was specifically
10   requested, Pickering is the individual you
11   volunteered?
12   A.  Yes.
13   Q.  Sir, if you can look at either letter, I'm
14   looking under tab 13, the first sentence refers to a
15   cooperation agreement with the Antitrust Division,
16   under its corporate leniency policy.
17       What was your understanding as to what
18   agreement was referred to there?
19   A.  The agreement, dated January 15th, 2003.
20   Q.  Sir, in the next sentence or actually the next
21   paragraph, there's a reference.  I'll read the
22   sentence, then I'll ask you what you understood it
23   to mean.
24       "Pursuant to the corporate leniency policy
25   current/former employees who admit their knowledge

NANNES - DIRECT

12

1    of or participation in anticompetitive activity in
2    the parcel tanker shipping market and fully and
3    truthfully cooperate with the investigation will not
4    be prosecuted criminally by the antitrust Division
5    for any act or offense committed prior to January
6    15, 2003, the date of the conditional amnesty letter
7    in connection with the anticompetitive activity
8    being reported."
9        Mr. Nannes, when you received and
10   countersigned this letter, what did you understand
11   that sentence to be referring to?
12   A.  I interpreted the sentence as being a reflection
13   of the understanding in the conditional leniency
14   letter that we had with the government.  And, being
15   basically an implementation of one of the features
16   of that letter that provided for the cooperation by
17   current employees and participation by those
18   employees under the umbrella program.
19   Q.  Mr. Nannes, is there any reference to March 2002
20   in either the letter under tab 13 or the letter
21   under tab 14?
22   A.  No, sir.
23   Q.  Mr. Nannes, is that in fact your signature
24   countersigning these two letters?
25   A.  Yes, it is.

NANNES - DIRECT

13

1  Q.  Mr. Nannes, were you in attendance at the
2  interviews of Mr. Jansen and Mr. Pickering?
3  A.  Yes, I was.
4  Q.  Tell us about those?
5  A.  The interviews lasted as much as I can recall
6  about two hours each, interrupted by lunch.
7       Mr. Pickering was interviewed first and
8  basically he provided background about the parcel
9  tanker industry and events leading up to the lists
10 in 1998 and taking the chronology through early 2001
11 when Mr. Pickering was transferred from Greenwich to
12 Singapore, assumed a different position.
13      Mr. Jansen, who was interviewed after
14 lunch, provided some background information about
15 the industry as well but basically focused on events
16 occurring in 2001, including the meeting with
17 Odfjell, where Odfjell asked Stolt to update and
18 reinvigorate use of the list.
19 Q.  Mr. Nannes, after the interviews, did Mr.
20 Connolly or anybody on his staff complain about a
21 lack of cooperation?
22 A.  No, sir.
23      After the interviews, kind of on the way
24 out of the office, I was with Mr. Connolly and asked
25 him if I could speak to him privately.  We stepped

NANNES - DIRECT

14

1  into a conference room.  I asked him how he thought
2  things had gone.  I'm sure Mr. Pickering and Jansen
3  would ask me.
4       He said he found their information very
5  helpful, thought it had been very candid.  He said
6  that the interviews had gone more quickly than he
7  had expected because he didn't have to pull
8  information out of them.  They were very forthcoming
9  with their information, characterizing the express
10 agreement and the other anticompetitive activities
11 between Stolt and Odfjell.
12      I asked him what we could expect next? He
13 said the Division would need sometime to digest
14 everything that they had been provided and that they
15 would get back to us.
16 Q.  Did Mr. Connolly at that time ask to interview
17 any other employees of Stolt?
18 A.  No, he did not.
19 Q.  Did he ask specifically to interview Mr.
20 Wingfield?
21 A.  No, he did not.
22 Q.  Did he ever ask you to arrange an interview with
23 Mr. Wingfield?
24 A.  No, he did not.
25 Q.  Did you ever do anything to try to conceal Mr.

NANNES - DIRECT

15

1  Wingfield's identity or existence or relevance in
2  your discussions with the Department of Justice?
3  A.  No, I did not.
4  Q.  Do you have an understanding as to whether Mr.
5  Connolly was aware of the existence of Mr. Wingfield
6  at this point and time?
7  A.  I'm certain that he was because in one of our
8  conversations, after the proffer, he had asked for
9  the persons who had attended the various meetings. I
10 provided those names.  I think on two occasions he
11 mentioned a number of employees whom he might
12 eventually want to talk to, if I had any reason to
13 think they would not cooperate.  I had no reason to
14 think they would not cooperate.  One of the
15 individuals was Mr. Wingfield.
16 Q.  Did Mr. Connolly ever state or even suggest he
17 expected Stolt employees to show up on their own
18 initiative at his offices or otherwise volunteer
19 their cooperation individually?
20 A.  No.
21 Q.  Mr. Nannes, I would like to refer your attention
22 to tab 15.
23      Sir, what is this document?
24 A.  This is a letter dated February 19, to me, from
25 Mr. Connolly, attaching a list of documents that the

NANNES - DIRECT

16

1  Division wanted Stolt to produce.
2  Q.  These are documents in addition to the documents
3  that were produced on February 4?
4  A.  Yes.  It is very substantial and quite broad and
5  much more encompassing than the letter I received
6  back in January.
7  Q.  What did you and your colleagues at your law
8  firm do upon the receipt of this letter, and the
9  accompanying requests for more documents?
10 A.  We started to move expeditiously for the
11 production of more documents.  We sent people up to
12 the company to do an inventory of documents,
13 identifying locations, custodians, matters of that
14 kind.
15      We then had a dialogue with attorneys on
16 Mr. Connolly's staff regarding what particular files
17 they wanted us to search and produce, if they had
18 any priorities for our search and review of person's
19 files.  I believe we provided them with organization
20 charts to assist in that regard and we provided what
21 I would call sample documents to show them the kinds
22 of documents that were available in the company's
23 files,
24      Mr. Connolly's staff asked specifically for
25 us to produce Mr. Jansen's documents, which we did.

And also to produce documents from one of the round voyage managers, is a level of staff, one step below Jansen, business manager level, so that the department could determine if they wanted us to search round voyage manager's files.

Then we sent a team of lawyers up to the company within a matter of weeks after we got the letters to begin the actual process of pulling, reviewing, compiling documents for production.

Q. Did your firm on behalf of Stolt-Nielsen produce additional documents to the Division in response to this request?

A. Yes.

Q. Sir, I wanted to get an idea for the volume of documents produced, I want to limit the time frame. We are talking about the time frame from January 15th amnesty agreement to the April 8th date, when cooperation was unilaterally suspended by the government; what's the volume of documents that you and your firm produced out of Stolt's files?

A. I think the volume of documents was somewhere in the neighborhood of 25,000 pages.

Q. Sir, did there come a time when Mr. Connolly asked to interview additional employees?

A. Yes. Sometime subsequent to the letter, Mr.

Connolly made inquiry about two former employees of Stolt, whom the government wanted to talk to. He raised the question with me about issuing subpoenas to them. I asked him why he wanted to go the subpoena route, we might be able to contact them, persuade them to participate as part of the leniency program.

Mr. Connolly told me he had no objection to that, as long as I made it clear to the former employees they were not required to come through Stolt.

We did contact those two former employees, they agreed to cooperate and participate.

THE COURT: Hold on a second.

MS. NORMAN: Can Mr. Griffin come in?

THE COURT: Anywhere he wants.

Please continue.

MR. CURRAN: Thank you.

BY MR. CURRAN:

Q. Mr. Nannes, who were the two former employees you were talking about?

A. Phil Fecher. And, excuse, me Steve White.

Q. Sir, did those interviews take place prior to April 8th, 2003?

A. No, they did not.

Q. Sir, I would like to direct your attention to the document under tab 16 in your witness book.

A. Yes, I have it.

Q. What is that?

A. That's a letter dated April 8th, 2003, to me from Mr. Connolly, announcing that the government was suspending Stolt's cooperation obligations under the agreement and was considering whether to withdraw the conditional leniency that had been granted to Stolt.

Q. Sir, I would like to direct your attention to the first sentence in the second paragraph. I'll read it, ask you what you understood it to mean, .

"The Antitrust Division has received specific credible evidence that SNTG did not terminate its part in the illegal activity in or about March 2002 and that in fact it continued its illegal activities until at least as late as the second half of 2002."

Mr. Nannes, what did you understand that statement to mean?

A. I didn't--I don't recall having any understanding other than the words themselves. I mean it was pretty direct.

Q. Mr. Nannes, had you ever represented prior to

this time, prior to April 8th of 2003, to the Antitrust Division that the anticompetitive activity that you reported had terminated in or about March 2002?

A. No, I had not.

Q. Did you make any such representation to the best of your knowledge in the January 15th, 2003, amnesty agreement to that effect?

A. No.

Q. Mr. Nannes, were there documents accompanying this letter?

A. My recollection is there were two attachments to the letter. One was a subpoena for Mr. Fecher. Mr. Connolly told me he thought under the circumstances that Mr. Fecher should be separately represented and appear by subpoena. And I recall that there was a document subpoena issued to Stolt-Nielsen, essentially the attachment of the documents that had been requested previously by the letter on February 18, but now incorporated as part of the grand jury subpoena.

Q. Please look in your witness book under the same tab 16, tell me if you see the attachments you were referring to?

A. Yes, sir. These were the attachments I was

NANNES - DIRECT

21

1    referring to.

2    Q.  Mr. Nannes, I would like to refer to the final

3    document in your witness book, that's under tab 17.

4         What is that document, sir?

5    A.  That document is a criminal information filed by

6    the United States against Odfjell, Seachem, dated

7    September 29, 2003.

8    Q.  Sir, is it your understanding that Odfjell was

9    indicted on the basis of this information?

10   A.  It was-- it was charged criminally. It might

11   have been a criminal complaint rather than

12   indictment, but they were charged criminally.

13   Q.  To the best of your knowledge is Odfjell the

14   only criminal defendant charged in connection with

15   an antitrust violation, in the parcel tanker

16   shipping business?

17   A.  No.

18   Q.  What other defendants have been charged?

19   A.  On the same date that Odfjell was charged, two

20   executives of Odfjell were also charged.  And some

21   months thereafter an employee of Jo Tankers was also

22   charged criminally.

23   Q.  Mr. Nannes, I want to refer your attention to

24   paragraph four, on the second page of this

25   information.

NANNES - DIRECT

22

1         Do you see in paragraph four, there's a

2    description of the combination and conspiracy, isn't

3    that being alleged here?

4    A.  Yes.

5    Q.  Mr. Nannes, putting aside for a moment, the

6    dispute about the end date of the conspiracy, how

7    does the conspiracy charged here in paragraph four

8    relate to the anticompetitive activity that you

9    reported to the Antitrust Division?

10        THE COURT:  In his mind?

11   BY MR. CURRAN:

12   Q.  In your mind, your judgment?

13   A.  In my mind this is exactly what I proffered to

14   the Antitrust Division on January 8, 2003.

15   Q.  In what respect?

16   A.  I had described for the Antitrust Division that

17   there was an express agreement between Odfjell and

18   Stolt to divide customers.  That representatives of

19   the companies had attended meetings and I had

20   identified locations of those meetings both in the

21   United States and Europe.

22        I had told the government that

23   representatives of Stolt and Odfjell had agreed

24   during those meetings to allocate customers and to

25   create and exchange customer lists to implement and

NANNES - DIRECT

23

1    monitor the agreement.

2         And, I had said at the proffer that the

3    carriers had agreed either not to submit bids to the

4    other's customers or to submit intentionally high

5    bids, so that the second carrier with the high bid

6    would not threaten the ability of the incumbent

7    carrier to retain the business.

8         And, they had discussed prices on contracts

9    from time to time to make sure that they didn't

10   undercut one another.  Those are all elements

11   enumerated in paragraph four.

12   Q.  Mr. Nannes, you referred to the fact that

13   Odfjell had subsequently entered a plea agreement?

14   A.  Yes.

15   Q.  Are you aware of the fine that Odfjell paid in

16   connection with the plea?

17   A.  I think it was 42 million dollars.

18   Q.  You also referred to criminal charges against

19   three executives in the industry?

20   A.  Yes.

21   Q.  Two from Odfjell, one from Jo?

22   A.  Yes.

23   Q.  Are you aware of whether those individuals

24   served time in prison or been sentenced to serve

25   time in prison?

NANNES - DIRECT

24

1    A.  I think that they have.

2         MR. CURRAN:  I have no further questions,

3    your Honor.

4         THE COURT:  Hold on.

5         Mr. Backstrom.

6         MS. LIEBENBERG: I have a few questions on

7    direct.

8         CROSS EXAMINATION

9    BY MS. LIEBENBERG:

10   Q.  Good morning, Mr. Nannes.

11   A.  Good morning.

12   Q.  You testified yesterday concerning some 1999

13   customer lists that Mr. Wingfield produced to you.

14   Did Mr. Wingfield prepare those lists?

15   A.  I think he did not.

16   Q.  With respect to the 2001 customer list, did Mr.

17   Wingfield prepare that customer list?

18   A.  I do not think that he did.

19   Q.  What were the circumstances that led to the

20   discovery of the more complete 1998 customer list,

21   which is identified as Stolt exhibit 8, which you

22   described as being very critical to your

23   negotiations with the government?

24   A.  In the course of our investigation, we spoke

25   with a number of Stolt employees.  And one of the

NANNES - CROSS

25

1  employees recalled having seen a list in Mr.
2  Pickering's office sometime in the late 1990s, that
3  Mr. Pickering had stored behind some piece of office
4  furniture.  I can't recall whether it was a credenza
5  or computer console.
6        We had spoken with Mr. Pickering about the
7  list, once I had confirmed there were lists.  We
8  asked him if he had copies of the list.  He said he
9  did not, he thought he had thrown them out.
10       When we communicated with Mr. Wingfield on
11  January 3, and he provided certain lists, I asked
12  him to see if there was any way to find other
13  versions of the lists, including more complete
14  versions.
15       And I was advised by telephone, the morning
16  of January 8th, actually when I arrived in
17  Philadelphia, that Mr. Wingfield had been speaking
18  to Mr. Pickering.  Mr. Pickering had described to
19  Mr. Wingfield where Mr. Pickering had kept the
20  lists.  Since Mr. Pickering now resided in Mr. - -
21  I'm sorry, since Mr. Wingfield now occupied Mr.
22  Pickering's former office, had the same furniture, I
23  was told that he went and looked at the place where
24  Mr. Pickering recalled having hidden the list.  The
25  list was in fact there.

NANNES - CROSS

26

1  Q.  As soon as Mr. Wingfield discovered the list,
2  that list was produced to you?
3  A.  Yes.
4  Q.  In addition to the--excuse me.  You testified
5  that Mr. Wingfield produced certain journals to you,
6  is that correct?
7  A.  Yes.
8  Q.  And, do you recall the time period that these
9  journals covered?
10  A.  I don't recall the time period at the earliest.
11       I believe at the latest, they ran through
12  the end of 2002.  But, there was a gap.  There was a
13  gap for a substantial period in 2001 for which Mr.
14  Wingfield reported that he once had a journal but
15  the journal had been stolen or taken from his
16  office.
17       MS. LIEBENBERG:  May I approach the
18  witness.
19       I have a document that may refresh his
20  recollection.
21       (Handing.)
22  Q.  Mr. Nannes, does this document refresh your
23  recollection that the Wingfield journals that were
24  produced were from November 2001 through December
25  2002?

NANNES - CROSS

27

1  A.  Yes.  I still don't have an independent
2  recollection of the dates but if this was an
3  attachment to the transmittal letter, I would have
4  no reason to doubt those were the dates we provided
5  the journals - -
6       THE COURT:  When we talk about a journal,
7  are we talking about a diary?
8       THE WITNESS:  Yes, in the nature of an 8 and
9  a half by 11 book, that was usually bound, not
10  spiral bound.  And people would make notes in them
11  by day or by other occasions.
12       THE COURT:  It was more than a calendar?
13       THE WITNESS:  Absolutely, sir, yes, it was
14  quite a narrative in nature.
15       THE COURT:  Of what took place that day?
16       THE WITNESS:  Yes, sir.
17  BY MS. LIEBENBERG:
18  Q.  These journals that were produced to the
19  government covered the period March 2002 then
20  through December 2002?
21  A.  Yes, they did.
22  Q.  At the time that Mr. Wingfield produced those
23  journals to you, was he separately represented by
24  counsel?
25  A.  Not to my knowledge.

NANNES - CROSS

28

1  Q.  Did Mr. Wingfield ever tell you that if the
2  government asked to interview him, he would refuse
3  to be interviewed?
4  A.  No, he did not.
5  Q.  Did he ever tell you that if the government
6  asked him to testify before the grand jury, that he
7  would refuse to testify before the grand jury?
8  A.  No, he did not.
9  Q.  You testified just previously that the
10  government never told you that the amnesty letter,
11  the corporate leniency program required employees to
12  show up at the Division for an interview without
13  being asked, is that correct?
14  A.  Yes.
15  Q.  You never told Mr. Wingfield there was any
16  policy that required an employee to show up at the
17  Division for an interview without being asked?
18  A.  I did not.
19       MS. LIEBENBERG:  Thank you.
20       THE COURT:  In your dealings with the
21  government, were you representing anyone other than
22  Stolt-Nielsen?
23       THE WITNESS:  No.
24       THE COURT:  Did it ever occur to you that
25  you were representing the officers, the executives

NANNES - CROSS

29

1  and employees of Stolt-Nielsen?

2      THE WITNESS: No, sir.

3      THE COURT: Did it ever occur to you that

4  their interests might be antagonistic to

5  Stolt-Nielsen or vice versa?

6      THE WITNESS: I think we considered it, your

7  Honor, in the sense that when we spoke with

8  employees the first time, we undertook to advise

9  them that they should understand that we represented

10  the company and not them.

11      THE COURT: And, you told them they had a

12  right to counsel?

13      THE WITNESS: If they wished to seek

14  counsel on their own behalf, that they could. But,

15  that the company was urging them to cooperate in the

16  matter.

17      THE COURT: So they had the right to

18  counsel.

19      How did you convey it?

20      THE WITNESS: The way I told you.

21      THE COURT: Did you tell them it was in

22  their best interest to have counsel?

23      THE WITNESS: No.

24      THE COURT: Did you tell them they might

25  have criminal liability?

---

NANNES - CROSS

30

1      THE WITNESS: At that point we were working

2  on the amnesty.

3      THE COURT: That protects Stolt-Nielsen?

4      THE WITNESS: And, its employees.

5      THE COURT: You were not representing the

6  employees, were you?

7      THE WITNESS: No, sir. We told them we were

8  working on a strategy, if successful, would protect

9  both the company and the employees.

10      THE COURT: Did you tell them if the deal

11  fell through, they could be exposed to criminal

12  liability?

13      THE WITNESS: No, sir.

14      THE COURT: If in fact the employees did

15  not cooperate in the investigation, it would hamper

16  Stolt-Nielsen's effort to secure successful

17  completion of the program, would it not?

18      THE WITNESS: It could, that was not

19  necessarily so. Because under the leniency

20  agreement, I believe the government recognizes that

21  the company cannot compel employees to cooperate.

22  So that the expectation is that the company will use

23  its reasonable efforts to encourage and secure the

24  cooperation of employees but the refusal of an

25  employee to cooperate would not be a disqualifying

---

NANNES - CROSS

31

1  element attributable to the company.

2      THE COURT: But, it wouldn't help the

3  company, would it?

4      THE WITNESS: It couldn't help but not hurt.

5      THE COURT: Anything else?

6      MS. LIEBENBERG: No further questions.

7  Thank you, your Honor.

8      THE COURT: Mr. Connolly.

9      CROSS EXAMINATION

10  BY MR. CONNOLLY:

11  Q.  Good morning, Mr. Nannes.

12      You testified and let me ask you, did

13  Richard Wingfield ever tell you that he continued to

14  conspire with Odfjell and Jo Tankers up to November

15  2002?

16  A.  No, sir.

17  Q.  If he had told you that, sir, you would have

18  considered that important information to give to the

19  government?

20  A.  Yes, sir.

21  Q.  Did he ever tell you that he attended a price

22  fixing meeting in London, in June of 2002 with

23  Odfjell?

24      MR. CURRAN: Objection.

25      THE COURT: Overruled.

---

NANNES - CROSS

32

1      It is a question, not evidence.

2      MR. CONNOLLY: Thank you.

3  Q.  Had Mr. Wingfield told you he attended a price

4  fixing meeting in London in 2002?

5  A.  No.

6  Q.  Did he tell you he was in a price fixing meeting

7  in London, in October 2002?

8  A.  No. He didn't tell me in October of 2002.

9  Q.  If he told you those things, you would consider

10  them material, to tell the government?

11  A.  I would have told the government, yes, sir.

12  Q.  You testified—let me strike that. What did

13  your understanding of whether the employees, had any

14  idea of what the amnesty policy meant, that

15  Stolt-Nielsen was trying to qualify under?

16  A.  I thought the employees had an understanding

17  that the company was participating in efforts that

18  if successful would protect the company and the

19  employees from antitrust prosecution.

20  Q.  Mr. Nannes, I want to hand you a copy of one of

21  the Wingfield diaries. You said he produced it and

22  you gave it to the government and I direct your

23  attention to the page marked SNTG 005790.

24  A.  Yes, sir.

25  Q.  Six pages in.

NANNES - CROSS

33

1    Right below where it says material withheld
2 on grounds of attorney-client privilege, does it say
3 conditions?
4    A.  I think it might.
5    Q.  Is number one, first found out and ended
6 promptly?
7    A.  It is difficult to read, Mr. Connolly.  I think
8 it looks like first found out, maybe ended promptly,
9 yes, sir.
10    Q.  Two, gave a policy to competitors/partners?
11    A.  Yes, sir.
12    Q.  RBW best estimates of dates at policy given?
13    A.  Yes.
14    Q.  Below that, NPRA dates, contract?
15    A.  Yes.
16    Q.  You testified that Mr. Wingfield gave the anti-
17 trust policy to competitors after the trade meeting
18 to the competitors Odfjell, Jo, after the NPRA, a
19 meeting in March of 2002, is that correct?
20    A.  I don't think I testified to that but I think
21 that's the case.  That is the case.
22    Q.  Thank you.  Mr. Nannes, you said when you first
23 talked with Mr. Griffin about the leniency, possible
24 leniency for Stolt, you thought the issue was a fire
25 the messenger issue?

NANNES - CROSS

34

1    A.  Yes.
2    Q.  You had to convince the Division in order to
3 qualify for leniency that Stolt did not fire Mr.
4 O'Brien?
5    A.  Mr. Griffin had said to me, that if Stolt had
6 fired the messenger, that would be an issue for the
7 Division.  I didn't think whether Mr. O'Brien was
8 fired or left voluntarily ought to be the issue for
9 the Division but because Mr. Griffin told me to address
10 thought it was, that's what I endeavored to address.
11    Q.  Mr. Nannes, in the Wall Street Journal article
12 of November 22nd, is that what Mr. Griffin told you
13 he had seen, correct?
14    A.  I don't recall Mr. Griffin telling me he had
15 seen the article, no, sir, not until December 4.
16    Q.  You saw the article, correct?
17    A.  Yes.
18    Q.  It says in the article that Mr. O'Brien
19 resigned, is that correct?
20    A.  I believe that it did.
21    Q.  And, Mr. O'Brien had filed a lawsuit against
22 Stolt-Nielsen, is that correct?
23    A.  Yes.
24    Q.  In his own lawsuit he said he resigned, correct?
25    A.  Yes.

NANNES - CROSS

35

1    Q.  So the issue wasn't whether Mr. O'Brien resigned
2 because it would have been not needed for a plea of
3 guilty, you could have had Mr. Griffin reread the
4 article or go check Mr. O'Brien's lawsuit, if the
5 issue was whether Mr. O'Brien was fired or whether
6 Mr. O'Brien resigned; that was not the issue, was
7 it, Mr. Nannes?
8    A.  At the time that I remember Mr. Griffin had
9 raised with me whether or not Stolt having learned
10 of an antitrust issue from counsel had fired
11 counsel.  It did not occur to me to tell him just
12 read the newspaper.
13    Q.  Didn't Mr. Griffin tell you the issue was what
14 the company did after Mr. O'Brien learned about the
15 antitrust conduct?
16    A.  Mr. Connolly, I don't believe that Mr. Griffin
17 told me that but that's what I told him at the
18 meeting, I thought was the proper inquiry.
19    THE COURT:  I don't understand that.
20    THE WITNESS:  When I went to the meeting, on
21 December 4.
22    THE COURT:  His question was pretty
23 specific.
24    THE WITNESS:  If you repeat it.
25    THE COURT:  Did Griffin give you the idea

NANNES - CROSS

36

1 the issue is what Stolt-Nielsen did after O'Brien
2 brought it to Cooperman's attention?
3    THE WITNESS:  Mr. Griffin didn't phrase the
4 issue to him.
5    THE COURT:  How did he do it?
6    THE WITNESS:  The way that it happened at
7 the meeting on December 4 was, I told him that Mr.
8 Griffin had raised the fire the messenger issue.  I
9 took him through the facts and then I told him that
10 I --
11    THE COURT:  You didn't know too many facts
12 at that point, did you?
13    THE WITNESS:  The facts with respect to
14 chronology of the events ranging from Mr. O'Brien's
15 communication to Mr. Cooperman followed by the
16 implementation of the antitrust steps, followed by
17 Mr. O'Brien's departure.
18    I told him, Mr. Griffin, I didn't think the
19 proper inquiry was whether or not Mr. O'Brien had
20 been fired or resigned, although it was clear from
21 his own lawsuit that he had resigned.  I thought the
22 issue would have been what the company did in
23 response to the issues raised by Mr. O'Brien, so he
24 didn't propose it to me.  I proposed it to him,
25 that's why I answered the question.

37

1    THE COURT: What did you propose?

2    THE WITNESS: I told him.

3    THE COURT: That was the issue?

4    THE WITNESS: Yes.

5    THE COURT: You had a clear understanding

6  that was the issue?

7    THE WITNESS: That's what I thought was the

8  proper issue under the leniency policy.

9    THE COURT: Okay.

10  BY MR. CONNOLLY:

11  Q.  I want to refer to the leniency model, you have

12  the model leniency policy?

13  A.  Yes.

14  Q.  Is there anything in the leniency policy

15  Division speech or anything you read, is there a

16  disqualification in the leniency policy if the

17  company fires its general counsel?

18  A.  No, sir.

19  Q.  It couldn't possibly be the issue in that

20  meeting, is that right, Mr. Nannes?

21  A.  I interpreted Mr. Griffin's comments about fire

22  the messenger in the context of a company having

23  been presented with an antitrust issue, had fired

24  the messenger in order to bury the message, to

25  ignore the message that had been conveyed.

38

1    Q.  What was the message?

2    A.  The message would be whatever message the

3  employee brought to the attention of the company.

4    Q.  The message in this case was that Mr. O'Brien

5  discovered antitrust price fixing, isn't that right?

6    A.  That's not a representation that I made to Mr.

7  Griffin at the meeting.

8    Q.  What did Mr. Griffin say to you?  Didn't Mr.

9  Griffin represent to you, that the issue was what

10  did the company do after O'Brien had discovered the

11  price fixing that was in his lawsuit?

12    THE COURT:  I think that's what he said,

13  didn't he?

14    MR. CONNOLLY:  He said what he said, I am

15  asking if Mr. Griffin ever said that to him?

16    THE COURT:  Not those words, but he said

17  that was his understanding?

18    MR. CONNOLLY:  I'm sorry?

19    THE COURT:  Maybe I'm wrong.

20    THE WITNESS:  If that is your understanding

21  of my understanding, I would like to qualify it.

22    THE COURT:  I would like to hear?

23    THE WITNESS:  There was no specific mention

24  at the meeting on December 4 of any particular kind

25  of antitrust misconduct.  There was no mention of

39

1  price fixing.  There was no mention of customer

2  allocation, no mention of a per se violation of the

3  antitrust laws at all.

4    Q.  Excuse me.  Are you saying by you or anybody at

5  the meeting, I want to clarify that?

6    A.  By anybody at the meeting.  I told Mr. Griffin

7  chronologically that in February of 2002, that Mr.

8  O'Brien had raised certain antitrust issues with Mr.

9  Cooperman, that was the full extent of what I said

10  at that time about antitrust issues of any kind.

11    Q.  Mr. O'Brien's lawsuit says those antitrust

12  issues were price fixing, is that right?

13    A.  I don't recall.

14    Q.  Do you recall the Wall Street Journal article

15  said the issue that O'Brien discovered was price

16  fixing?

17    A.  I think that it did, but I don't recall.

18    Q.  Price fixing is a per se offense, isn't it?

19    A.  Yes.

20    Q.  In the context of this meeting, there was

21  information that O'Brien had discovered illegal

22  activity by Stolt in the United States of price

23  fixing, do you at least concede that?

24    A.  I concede that was his allegation, yes.

25    Q.  His allegation happened to be true, isn't it?

40

1    A.  As things have proven out, pursuant to the

2  investigation that we conducted, that turned out to

3  be true.

4    Q.  I want to ask you in the model leniency

5  agreement you referred to previously, there was

6  nothing in the model leniency agreement that would

7  even have an issue whether the company did or did

8  not fire its general counsel, is that right?

9    A.  That's correct.

10    Q.  What is in the model leniency agreement is that

11  the issue here today, that a company must represent that

12  it took prompt and effective action to terminate its

13  part in the anticompetitive activity being reported

14  upon discovery of the activity, is that correct?

15    A.  Yes.

16    Q.  Didn't Mr. Griffin say at the meeting the issue

17  is whether Stolt could meet that condition?

18    A.  Either he said it or I said it, yes.

19    Q.  At the time--how could you, discussing that,

20  that condition was discussed, did you tell Mr.

21  Griffin it is irrelevant because nobody has actually

22  discovered the activity yet?

23    A.  I did not tell him that.

24    Q.  They had -- hadn't they, Mr. O'Brien had --

25  there would be no point in having the discussion

NANNES - CROSS

41

1  about this condition, if Mr. O'Brien hadn't
2  discovered the activity?
3  A.  It was not Mr. O'Brien's memorandum to Mr.
4  Cooperman that caused me to call the Antitrust
5  Division, to seek a marker to perfect a leniency
6  application.
7  Q.  But, my question was when the
8  paragraph -- the representation about taking prompt
9  action?
10        THE COURT:  Did you hear what he said?
11        MR. CONNOLLY:  I heard, your Honor.  I
12  heard it.
13        THE COURT:  Okay.
14  BY MR. CONNOLLY:
15  Q.  Mr. Nannes, at the December 4th meeting in
16  Washington - - Mr. O'Brien's lawsuit had two
17  allegations, one was that -- two that are relevant
18  here, one that he had discovered price fixing
19  violative of the U.S. antitrust laws.
20        Secondly, that when he brought it to the
21  attention of management, it continued, correct?
22  A.  I believe that to be true, Mr. Connolly.  I
23  haven't read his complaint for quite some time.
24  Q.  At the meeting, you contested the second point
25  saying that it did not continue, is that right?

NANNES - CROSS

42

1  A.  I don't recall saying that it did or didn't
2  continue.  What I recall saying that the company had
3  taken steps to address the anticompetitive concerns
4  expressed by Mr. O'Brien.
5  Q.  As to the allegation in his lawsuit that there
6  had been price fixing at Stolt-Nielsen, you never
7  denied that, did you?
8  A.  I don't recall there was any mention of the
9  complaint other than the point I made that in the
10  complaint itself, Mr. O'Brien said he resigned
11  rather than had been fired, that's the only
12  recollection that I have of any reference to the
13  O'Brien complaint at that meeting.
14  Q.  My question was at the meeting, did you deny
15  that there had been price fixing at Stolt-Nielsen,
16  at least up to the time that Mr. O'Brien raised
17  these issues?
18  A.  I didn't deny it.  I didn't confirm it.  I
19  didn't know it.
20  Q.  That's why you were there to see if you can get
21  leniency?
22  A.  To get a marker to conduct an investigation to
23  determine if we can report anticompetitive behavior
24  to get leniency, yes, sir.
25  Q.  Mr. Nannes, I want to ask you at the December

NANNES - CROSS

43

1  4th meeting, weren't you told that the Division was
2  concerned about Stolt-Nielsen's eligibility because
3  of O'Brien's allegation of price fixing continued
4  after he brought it to the attention of senior
5  management?
6  A.  I don't recall it - - I don't recall being told
7  that or asked that at the meeting.
8  Q.  Is it the particular words that I read or you
9  deny you were told something along those lines?
10  A.  I don't recall being told something along those
11  lines.
12        THE COURT:  In other words, you are not
13  denying that it was said, you just don't recall?
14        THE WITNESS:  I don't think it was said, to
15  the best of my recollection.
16        THE COURT:  Are you in a position to say it
17  was not said or you simply do not recall?
18        THE WITNESS:  In that context, may I ask,
19  Mr. Connolly to repeat the question?
20        MR. CONNOLLY:  Sure.
21  BY MR. CONNOLLY:
22  Q.  At that meeting, weren't you told that the
23  Division was concerned about Stolt-Nielsen's
24  eligibility because of O'Brien's allegation that the
25  price fixing continued after he brought it to the

NANNES - CROSS

44

1  attention of senior management?
2  A.  I have no recollection of that at all.
3        THE COURT:  Now my question again, are you
4  saying it did or did not happen or you cannot recall
5  whether or not it happened and don't mince words?
6        THE WITNESS:  I understand.  I want to be
7  precise.
8        THE COURT:  So do I want you to be
9  precise.  There's nothing wrong if you don't recall
10  but I want to know whether or not you deny that it
11  was said, or you simply cannot recall?
12        THE WITNESS:  I can't recall, your Honor.  I
13  don't think it was said.
14        THE COURT:  All right.
15  BY MR. CONNOLLY:
16  Q.  Mr. Nannes, do you recall at the meeting that
17  you were told that under the Division's leniency
18  policy it considered discovery to include when
19  counsel learned of the activity?
20  A.  No.
21  Q.  At that meeting, Mr. Nannes, December 4th,
22  didn't you say that in February '02, O'Brien brought
23  to the attention of senior management, conduct, that
24  if true, would have violated the U.S. antitrust
25  laws?

NANNES - CROSS

45

1   A.  No, I did not.

2   Q.  Did you say, Mr. Nannes, that within days the

3   parent company was notified and they said pursue and

4   address the problem?

5   A.  I think I did.

6   Q.  What was the parent company notified about then?

7   A.  Mr. O'Brien had raised certain legal issues that

8   he contended would be problematic under the

9   antitrust laws.

10          The company upon receipt of that

11  information took a number of steps beginning shortly

12  thereafter to enhance, invigorate, make stronger its

13  antitrust compliance program.

14          A company could do that prudently whether

15  or not counsel had found a violation or information

16  suggestive of a violation or merely as a

17  prophylactic matter if a company thought it should

18  take greater steps to assure that antitrust

19  violations would not occur, so the company was

20  acting prudently in response to a cautionary note

21  raised by Mr. O'Brien to enhance its program, as I

22  understood it.

23  Q.  You said, Mr. O'Brien brought to the attention

24  of senior management conduct that was problematic?

25  A.  I think I did, yes.

NANNES - CROSS

46

1   Q.  Is price fixing problematic?

2   A.  Yes, sir.

3   Q.  That's what Mr. O'Brien alleged in his suit,

4   isn't it?

5   A.  I think that it is.

6   Q.  Mr. Nannes, at the meeting in - - on December

7   4th, you said that the chairman - - did you say,

8   excuse me, that the chairman of SNTG interviewed

9   employees with knowledge about what O'Brien reported

10  and they stated they would comply with the new

11  policy?

12  A.  Yes, I did.

13  Q.  Who is the chairman, sir?

14  A.  Mr. Cooperman.

15  Q.  Mr. Cooperman was involved in the price fixing,

16  wasn't he?

17  A.  It appears now that he was.

18  Q.  You didn't know it at the time?

19  A.  I did not.

20  Q.  Mr. Cooperman was the one that did the

21  investigation?

22  A.  He was the one that spoke with the employees.

23  Q.  He investigated himself?

24  A.  He is the person that spoke with the employees.

25          MR. CONNOLLY:  Your Honor, may I approach

NANNES - CROSS

47

1   the witness?

2   Q.  And, Mr. Nannes, I want to show you the e-mails

3   that are in the Stolt exhibit book, three of them,

4   for easier reference, I'll put them on the same

5   page.  I'll ask you a couple of questions about the

6   exhibits.

7          Mr. Nannes, the first e-mail is dated 3-14,

8   is that correct?

9   A.  Yes, sir.

10  Q.  It was sent to a series of companies, are these

11  business partners of Stolt-Nielsen?

12  A.  Yes, they are.

13  Q.  The last sentence in the e-mail.  You may wish

14  to update your own policy in this regard but please

15  be aware that SNTG will comply without deviation, is

16  that correct?

17  A.  Yes.

18  Q.  The next two e-mails--the first one is to Rick

19  Van Westenbrugge at Jo Tankers?

20  A.  Yes.

21  Q.  The one following that is to Bjorn Sjaastad at

22  Odfjell?

23  A.  Yes.

24  Q.  These are the people that you -- the same people

25  you just described as having pled guilty to a

NANNES - CROSS

48

1   conspiracy going to November, correct?

2   A.  Yes, sir.

3   Q.  Mr. Wingfield, at that meeting, did you tell the

4   government about all of these e-mails sent by Mr.

5   Wingfield, is that correct?

6   A.  Yes, sir.

7   Q.  At the meeting what did you tell the government

8   about why the e-mails to the business partners was

9   sent on March 14th but the ones to Jo Tankers and

10  Odfjell were sent in April?

11  A.  I don't recall that I said anything about why

12  the dates were different.

13  Q.  Is that a, you don't recall or you didn't say

14  anything?

15  A.  This I don't recall.

16  Q.  Because there were six lawyers from the

17  Antitrust Division at that meeting, correct, Mr.

18  Nannes?

19  A.  I think there were.

20  Q.  Several of whom came down to Philadelphia for

21  this meeting, correct?

22  A.  Mr. Connolly, I'm sorry, are we speaking about

23  the December meeting?

24  Q.  The December 4th meeting?

25  A.  Mr. Connolly, I don't recall what I told them

NANNES - CROSS

49

1  about the difference in the dates but I know the
2  explanation for the difference in the dates.
3  Q.  But, you did say something, didn't you?
4  A.  I know I told the Division on December 4, that
5  Stolt had described its policy to a number of
6  competitors and business partners, that I gave a
7  copy of the compliance policy and these e-mails to
8  the Division at that meeting.
9       I don't recall if I said why they sent them
10  at one time or another.
11  Q.  You were asked about that, weren't you?
12  A.  I don't recall, Mr. Connolly, I'm sorry.
13  Q.  Mr. Nannes, there was a three to four week
14  difference in sending of these e-mails, is that
15  correct?
16  A.  Yes.
17  Q.  An issue at the meeting at best was what Stolt
18  did upon learning about O'Brien's suspicions,
19  correct?
20  A.  Yes.
21  Q.  Are you saying that the antitrust Division
22  didn't ask you to explain what the discrepancy in
23  the dates was?
24  A.  Mr. Connolly, as I sit here today, I don't
25  recall, those documents were tendered to the

NANNES - CROSS

50

1  Division in the course of a meeting, if they had
2  asked me, I would have told them.  If your notes
3  indicate that I explained to you the difference in
4  the dates, I won't deny that because you couldn't
5  have gotten it from anyone other than me at the
6  time.  I had no reason not to tell you.  If you did,
7  I just, I do not recall.
8  Q.  Didn't you explain the difference in dates by
9  saying that Mr. Wingfield would meet personally with
10  Dan Odfjell, it wouldn't be prudent to put in an
11  e-mail you are withdrawing from a conspiracy?
12  A.  No, I would not have said that.
13  Q.  Let me ask you, Mr. Nannes, in the e-mail to Jo
14  Tankers and the e-mail to Odfjell, there's no
15  statement as the first one ends, you may wish to
16  update your own policy in this regard but please be
17  aware that SNTG personnel will comply without
18  deviation, that doesn't appear in either the e-mail
19  to Odfjell or the e-mail to Jo Tankers, does it?
20  A.  That is correct.
21  Q.  What did you say at the meeting about that?
22  A.  I don't recall being asked about the
23  distinction.  I don't recall commenting on the
24  differences.
25  Q.  You don't recall saying that Mr. Wingfield said

NANNES - CROSS

51

1  that personally to Odfjell and Jo when he met with
2  them?
3  A.  I don't recall saying that.  I believe that to
4  be the case.  I could have said because I knew of it
5  at the time, I just don't recall having said it to
6  the Division at the meeting.
7  Q.  You could have said what?
8  A.  I could have said that Mr. Wingfield personally
9  delivered the message to Odfjell and Jo.
10  Q.  What message?
11  A.  That Stolt adopted a new antitrust compliance
12  policy.
13  Q.  The message above here, please be aware that
14  Stolt personnel will comply without deviation?
15  A.  Yes, I had not finished.
16  Q.  I'm sorry.  Please finish.
17  A.  That Mr. Wingfield had met with Odfjell and Jo
18  separately.
19  Q.  Yes.
20  A.  That he told them that Stolt had a new antitrust
21  compliance policy.  And that Stolt was going to
22  adhere to that policy.
23  Q.  And, Stolt had a new antitrust policy that
24  prohibited price fixing, it did, didn't it?
25  A.  Yes.

NANNES - CROSS

52

1  Q.  And, Mr. Wingfield told Mr. Van Westenbrugge and
2  Sjaastad, that would be his conveyance of their
3  withdrawal from the conspiracy, correct?
4  A.  If there had been an unlawful conspiracy, he
5  told them that henceforth, Stolt would conduct
6  itself according to policy.  I would think it would
7  be withdrawal.
8  Q.  There had been an unlawful conspiracy?
9  A.  Yes, as it turned out.
10  Q.  Mr. Wingfield was involved in the unlawful
11  conspiracy?
12  A.  I believe that to be true.
13  Q.  Does that refresh your recollection whether you
14  told the Division at this meeting, that Mr.
15  Wingfield conveyed the withdrawal of Stolt-Nielsen
16  from the conspiracy to Jo Tankers and Odfjell at
17  this meeting?
18  A.  I don't know if I told them that it was at the
19  meeting they announced to the competitors they had a
20  new antitrust policy and they intended to comply
21  with it.
22  Q.  And, Mr. Nannes, to just jump ahead.
23       After the Division was told that, at no
24  time to this present day has Stolt told the
25  Antitrust Division that representation was not true

NANNES - CROSS

53

1 and in fact you know that the conspiracy did
2 continue to November?
3 A. That's correct.
4 Q. So, Stolt's full exposition of the facts known
5 to the company was that it communicated withdrawal
6 from the conspiracy to Jo Tankers and Odfjell in
7 March of 2002, no information about any conspiracy
8 after that, correct?
9 A. I think that's correct.
10 Q. Because nobody in the company told you about
11 that, the conspiracy continued, right?
12 A. That's correct.
13 Q. Mr. Nannes, you said at the January 8th meeting
14 in Philadelphia, that was the first time that you
15 outlined the history of the illegal contacts that
16 had happened, is that correct?
17 A. Yes.
18 Q. At that time, at that meeting, Mr. Nannes, did
19 you tell the Division that Mr. O'Brien had found a
20 memo and that was what prompted whatever action
21 Stolt took, correct?
22 A. Yes.
23 Q. Was that memo, the document that you referred to
24 yesterday in the Stolt exhibit book about, let me,
25 if I could give you a copy of the fax from Mr.

NANNES - CROSS

54

1 Jansen to Mr. Wingfield?
2 A. Yes.
3 Q. Could you please turn to that?
4 A. Yes, I have it.
5 Q. Mr. Nannes, on the second page of that fax, on
6 the top it says: Here are the figs worked out by
7 each service. There's a fairly strong sense among
8 the people here that continued co-op is preferable.
9 Yesterday, you testified that to you, co-op
10 would mean unilateral action by one company not to
11 attack another, so that they would hope for the
12 same?
13 A. I don't believe I said that.
14 Q. Please, I'm sorry. Put it in your own words. I
15 don't want to mischaracterize.
16 A. I would certainly not have - - do not believe
17 that the term co-op is a term.
18 THE COURT: I think you already raised
19 that, didn't you?
20 THE WITNESS: I don't think.
21 THE COURT: You weren't asked to define
22 it?
23 THE WITNESS: That's what I said.
24 THE COURT: He was not asked to define it.
25 BY MR. CONNOLLY:

NANNES - CROSS

55

1 Q. Mr. Nannes, someone in the business with
2 Stolt-Nielsen worked with Stolt Neilson, saw the
3 words continue co-op was preferable, might think
4 co-op is short for co-operation?
5 A. I assume they could. I could too.
6 Q. Later on in the document, paragraph five, where
7 it says the market is fragile, excuse me, paragraph
8 five. "I think the timing is particularly poor. The
9 market is fragile but not bad, therefore OST is not
10 desperate to co-op, to survive."
11 Again co-op could mean cooperation?
12 A. Yes.
13 Q. One might know that OST is not desperate to
14 survive, is one talking to OST?
15 A. You might know it. If you were talking to them,
16 you might know it. If you were not talking to them,
17 and if you were in the business --
18 Q. At least to you - - first of all, OST is the
19 same company you were referring to earlier that pled
20 guilty, right?
21 A. Yes.
22 Q. You said this document doesn't show that
23 competitors were communicating, right?
24 A. I believe I said that yesterday.
25 Q. And there is the document that Mr. O'Brien

NANNES - CROSS

56

1 found, is that correct?
2 A. Yes.
3 Q. Now, you said that copies of Mr. Wingfield's
4 diaries were taken, stolen, correct?
5 A. That's what I was told, yes.
6 Q. The company believed that Mr. O'Brien had copies
7 of those diaries, didn't they?
8 A. I don't know what the company believes in that
9 regard.
10 Q. Excuse me. What did you believe, what did you
11 tell us?
12 A. I think I told you that certain diaries were
13 missing, that indeed the diaries might have found
14 their way to the Wall Street Journal. I don't know
15 whether I said the company suspected that Mr.
16 O'Brien might have taken the diaries and provided
17 them to the Wall Street Journal.
18 Q. My question is if Mr. O'Brien had a copy of the
19 April 10th fax, and Mr. O'Brien had it, but that
20 didn't show communication among competitors, if Mr.
21 O'Brien had seen Mr. Wingfield's diaries, they
22 showed communications among competitors, correct?
23 A. If he had them at the time he wrote the memo,
24 then he might have had information concerning
25 communications.

NANNES - CROSS

57

1           MR. CONNOLLY:  A few more questions.
2    BY MR. CONNOLLY:
3    Q.  I want to ask, you said after O'Brien reported
4    its concerns to management, there was a new
5    antitrust policy, correct?
6    A.  Yes.
7    Q.  Did you ever refer to it as a zero tolerance
8    policy?
9    A.  I think I did.
10   Q.  Is it true, that before and after the new
11   policy, Samuel Cooperman retained his position with
12   Stolt-Nielsen?
13   A.  For some period of time, yes.
14   Q.  It wasn't discipline for his involvement in this
15   conspiracy?
16   A.  I was not privy to the decision to remove him
17   from his position but he has been removed.
18   Q.  Do you know if Mr. Cooperman was disciplined,
19   was he moved for other reasons or because of his
20   role in this conspiracy?
21   A.  I don't know.
22   Q.  Do you know that Mr. Wingfield had the same
23   title before and after the new and old policy?
24   A.  I believe that he did but I think the reference
25   to zero tolerance in the new policy was a

NANNES - CROSS

58

1    prospective policy.  So that the import of the
2    policy changes was that on an ongoing, forward
3    bases, anyone that violated the new policy would be
4    subject to dismissal.  It was not backward looking.
5    Q.  But, the people that violated the old policy
6    were left in their positions but told, going
7    forward, it would result in - - could result in
8    dismissal?
9    A.  Yes.
10   Q.  Mr. Nannes, in the January 15th agreement that
11   was signed, you understood that agreement was
12   conditional, didn't you?
13   A.  Yes.
14   Q.  Conditional upon the Division verifying the
15   representations made in the agreement?
16   A.  I don't know that the agreement imposes an
17   independent verification obligation on the
18   Division.  But, the representations by Stolt are
19   stated in the letter and are conditions of the
20   leniency agreement.
21   Q.  If the conditions aren't met, the Antitrust
22   Division has the right to revoke the agreement, it
23   would become void, is that correct?
24   A.  I believe that there's language to that effect
25   in the agreement.

NANNES - CROSS

59

1    Q.  If the agreement is revoked, it is void, Stolt
2    is subject to prosecution without limitation,
3    correct?
4    A.  I think that is correct.
5    Q.  What did you understand without limitation to
6    mean?
7    A.  I don't believe that I gave it any particular
8    thought at the time.
9    Q.  Mr. Nannes, you entered into an agreement on
10   behalf - -
11          THE COURT:  Why don't you ask him pointedly
12   the question, do you believe they could indict
13   Stolt-Nielsen?
14          THE WITNESS:  If there was no leniency, they
15   concluded that Stolt had violated the antitrust
16   laws, they could indict Stolt.
17   Q.  For what period of time, what conduct?
18          THE COURT:  He is asking about the
19   contested language, without limitation?
20          THE WITNESS:  I don't know there's any
21   constraint on the time period.
22   BY MR. CONNOLLY:
23   Q.  You never understood that the agreement was
24   void, Stolt could only be prosecuted for conduct
25   that happened after the date of the agreement,

NANNES - CROSS

60

1    correct?
2    A.  I didn't consider the distinction at the time,
3    Mr. Connolly, because I wasn't contemplating there
4    had been circumstances to lead to termination of the
5    leniency agreement.
6          THE COURT:  Did you ever explain to your
7    client what the consequences were?
8          THE WITNESS:  Not with precision, your
9    Honor.  Going to four months or three and a half
10   years versus four years but the clear contemplation
11   of the leniency agreement was if you went into the
12   Antitrust Division, you bared your soul, provided
13   them with incriminating evidence, that could be
14   compromising to your position in the event the
15   government didn't accord you leniency.
16          THE COURT:  Did you tell them what it
17   meant?
18          THE WITNESS:  I don't recall telling them
19   but I think it was understood.
20          THE COURT:  You believe that?
21          THE WITNESS:  Yes.
22   BY MR. CONNOLLY:
23   Q.  The term, upon discovery, is in the agreement,
24   it's what triggers the prompt and effective -- the
25   company has to take prompt and effective action to

NANNES - CROSS

61

1  terminate their role in the activity upon

2  discovery.

3      What did you understand upon discovery to

4  mean?

5      Can I start over?

6      Did you mean, understand it to mean

7  anything different than what was in the Division's

8  policy statements on this point?

9  A.  No, I did not.

10  Q.  You just mentioned Mr. Sesser was at the

11  November 22nd meeting with you when you met with Mr.

12  Cooperman, correct?

13  A.  Yes, sir.

14  Q.  And Mr. Sesser had done work for Stolt-Nielsen

15  before that, right, he was their outside counsel,

16  one of them?

17  A.  Yes.

18  Q.  Mr. Sesser was called in to help with the

19  problems O'Brien raised in February '02, is that

20  correct?

21  A.  He was consulted at the time, yes.

22  Q.  Mr. Sesser gave antitrust compliance programs,

23  is that correct?

24  A.  I believe he was involved in that process, yes,

25  sir.

NANNES - CROSS

62

1  Q.  So did Mr. Sesser know that Stolt had been

2  involved in anticompetitive activity at that time?

3  A.  I don't know that he knew anything beyond the

4  Jansen fact memorandum.

5  Q.  So you don't know if Mr. O'Brien had concerns or

6  raised issues about price fixing, if Mr. Sesser

7  didn't ask any questions, just gave an antitrust

8  compliance program?

9  A.  I'm sorry, I didn't understand the question.

10  Q.  Do you know if Mr. Sesser found out if there was

11  anything to Mr. O'Brien's complaints?

12      MR. TERWILLIGER:  May we have a moment

13  before he answers the question?

14      We may be going beyond the privilege waiver

15  that we discussed earlier.

16      All right.

17      (Pause.)

18      MR. CURRAN:  May we have the question read

19  back, Mr. Reporter?

20      (Read)

21      (Discussion off the record between

22  counsel.)

23      MR. CURRAN:  Your Honor, we object to the

24  question as framed, on the grounds of

25  attorney-client privilege.

NANNES - CROSS

63

1      If the question were limited in scope to

2  what Mr. Nannes was told at the November 22 meeting

3  then we withdraw the objection, because that is the

4  agreement of counsel before your Honor, confirmed by

5  your Honor as to the scope of our waiver.

6      THE COURT:  What do you have to say?

7      MR. CONNOLLY:  Your Honor, I think that the

8  question as framed is proper.  Mr. Nannes has

9  testified about these activities, these remedial

10  activities to deal with the O'Brien problems and I

11  think it is a fair question and then was part of the

12  remedial activities, to find out if the allegations

13  were true.

14      MR. TERWILLIGER:  May I, your Honor?

15      May I respond to that?

16      THE COURT:  How many people are we going to

17  do this - -

18      MR. TERWILLIGER:  If you don't want me - -

19      THE COURT:  Go ahead.

20      MR. TERWILLIGER:  The waiver we agreed to

21  was purposefully crafted as to what Mr. Nannes knows

22  and has done, what he was told from November 22nd

23  forward.  What the question is about, is what Mr.

24  Sesser did or didn't do with Mr. O'Brien.  We have

25  said it can be answered to the extent that the

NANNES - CROSS

64

1  answer is based on what he was told at that November

2  22nd meeting, but he is not here to give a general

3  exposition of matters that occurred before he was

4  engaged in the case unless he was told about it at

5  that meeting.

6      THE COURT:  Is that your objection?

7      MR. TERWILLIGER:  Yes, your Honor.

8      THE COURT:  Overruled.

9      Ask the question again.  Let me hear it.

10      I said overruled.

11      MR. TERWILLIGER:  Yes, your Honor.

12      THE COURT:  Mr. Terwilliger, I said

13  overruled.  Sit down, please.

14  BY MR. CONNOLLY:

15  Q.  Mr. Nannes, do you remember whether when Mr.

16  Sesser was called in to help implement this new

17  antitrust policy, whether he found out whether there

18  was anything to O'Brien's allegations that there had

19  been price fixing?

20      THE COURT:  How would he know that?

21      MR. CONNOLLY:  He could have asked people,

22  your Honor.

23      THE COURT:  What are you asking now,

24  hearsay?

25      MR. CONNOLLY:  Why would it be hearsay if

NANNES - CROSS

65

1   someone admitted to Mr. Sesser that he -- that they
2   were involved in price fixing at the time, that
3   would be another attorney representing Stolt-Nielsen
4   that discovered the activity.
5           THE COURT:  Sustained.
6   BY MR. CONNOLLY:
7   Q.  Mr. Nannes, let me show you a document that is
8   marked SNTG 436640.
9           (Handing.)
10  BY MR. CONNOLLY:
11  Q.  Now, you said that Mr. Sesser gave antitrust
12  compliance programs at Stolt-Nielsen in April 2002,
13  is that correct?
14  A.  I don't recall saying that Mr. Sesser did.
15  There were programs and he did it, I just didn't say
16  it before.
17  Q.  Let me ask you if you had ever seen this
18  document before?
19  A.  I believe I had.
20  Q.  Can you tell me what it is?
21  A.  I think it is in the nature of a power point
22  presentation that may have been used by Mr. Sesser
23  in conducting one of the antitrust compliance
24  seminars in April of 2002 as one of the implementing
25  steps of the Stolt program.

NANNES - CROSS

66

1   Q.  Turn to page 21 of the presentation.
2   A.  Yes, sir.
3   Q.  Is the second bullet point thereunder, DOJ
4   amnesty program, stop illegal activity immediately
5   upon discovery?
6   A.  I see it.
7   Q.  So in April of 2002, the employees of
8   Stolt-Nielsen were informed of what the - - at least
9   of what's on this document about what the conditions
10  of the leniency program were, is that correct?
11  A.  This was Mr. Sesser's characterization.
12  Q.  Now as part of the antitrust compliance program,
13  employees were asked to sign certifications that
14  they were in compliance with the company's antitrust
15  policy, is that right, sir?
16  A.  Yes, it is.
17  Q.  Didn't--are you aware that a number of employees
18  raised objections to signing the certification?
19  A.  I know that a number of employees raised
20  questions before they would agree to sign.  But - -
21  Q.  Wasn't one of the concerns that they were aware
22  of antitrust violations at Stolt-Nielsen because
23  they knew the company was involved in an agreement
24  with Odfjell?
25  A.  You mean as of the time they were signing?

NANNES - CROSS

67

1   Q.  That was the concern that they had at the time
2   they were signing, is that right?
3   A.  My understanding is they wanted to make clear
4   what they were certifying to differentiate between
5   current conduct and past conduct.
6   Q.  That was because there had been past conduct?
7   A.  There had been past conduct.
8   Q.  A certification was reached for that purpose,
9   right?  I'm sorry, an amendment to the certification
10  was drafted for that purpose?
11  A.  I think there were some efforts to clarify the
12  certification, yes, sir.
13  Q.  I want to show you one of these antitrust
14  compliance confirmations.
15          This is Mr. Cleary's confirmation signed,
16  dated July 9, 2002, is that correct?
17  A.  Yes, sir.
18  Q.  Attached to it is a confirmation item number
19  four?
20  A.  Yes, sir.
21  Q.  The top right-hand corner, it says ABW draft?
22  A.  Yes.
23  Q.  Is that Alan B. Winsor?
24  A.  I believe it is.
25  Q.  Dated May 23, '02?

NANNES - CROSS

68

1   A.  Yes.
2   Q.  With regard to past trading decisions and
3   arrangements resulting therefrom unless an alleged
4   agreement or understanding formal or informal with
5   competitors is memorialized/documented in a written
6   document that has been subject to legal review such
7   as a charter party, such agreement has been
8   determined to be in full compliance with the
9   antitrust policy as from time to time in effect then
10  SNTG does not consider such alleged agreement or
11  understanding to have any continuing operative
12  effect or to be binding on SNTG in any way, correct?
13  A.  Yes, sir.
14  Q.  The concern the employees had was to make sure
15  that they weren't falsely certifying based on the
16  illegal conduct that had gone on before?
17  A.  I think that's correct.
18  Q.  So, Mr. Winsor knew that there was illegal
19  conduct at Stolt prior to this too, hadn't he?
20  A.  I have no basis.
21          MR. CURRAN:  Objection, hearsay.
22          THE COURT:  Sustained.
23  BY MR. CONNOLLY:
24  Q.  You know its employees raised this issue?
25  A.  I believe that was the genesis of the

NANNES - CROSS

69

1  confirmation.
2  Q.  Mr. Winsor issued an interpretation guideline as
3  a result?
4  A.  I believe that he did.
5  Q.  Mr. Nannes, I want to direct your attention now
6  to the interviews in Philadelphia - -
7        THE COURT:  How much more do you have?
8        MR. CONNOLLY:  Maybe 20 minutes.
9        THE COURT:  Let's take a break.
10       (Recess.)
11       JOHN M. NANNES resumed
12       THE COURT:  You may resume, Mr. Connolly.
13       MR. CONNOLLY:  Thank you.
14  BY MR. CONNOLLY:
15  Q.  I would like to direct your attention to the
16  February 5th interviews that were conducted in our
17  offices in Philadelphia?
18  A.  Yes, sir.
19  Q.  And, you previously testified that both Mr.
20  Jansen and Mr. Pickering testified pursuant to a
21  separate letter with each of them that you
22  countersigned, is that correct?
23  A.  Yes.
24  Q.  There was a separate letter executed so that Mr.
25  Jansen and Mr. Pickering would have protection

NANNES - CROSS

70

1  should the company not fulfill its requirements
2  under the amnesty agreement so they would not be
3  left hanging out?
4  A.  Hanging out, I think that's what you explained
5  to me.
6  Q.  That's what you signed?
7  A.  I signed the letters, yes.
8  Q.  When Mr. Jansen was interviewed, didn't he tell
9  the government that Paul O'Brien found the April
10  10th fax that we referred to previously, April 10,
11  2001 fax?
12  A.  I don't recall but I do believe that Mr. O'Brien
13  said that he found the fax on his desk one day.
14  Q.  But, in the interview did Mr. Jansen say that
15  Mr. O'Brien found the fax and that has triggered the
16  new antitrust policy?
17  A.  I don't recall.
18  Q.  Did Mr. Jansen tell you that something happened
19  in February '02, that triggered a new antitrust
20  compliance program?
21  A.  I don't recall.  He may well have.  It was
22  consistent with the facts as I knew them.
23  Q.  And, Mr. Jansen said that after that new policy
24  came into effect, he had no further conspiratorial
25  contacts with Jo or Odfjell?

NANNES - CROSS

71

1  A.  I believe he did.
2  Q.  Mr. Jansen, neither his boss, Richard Wingfield
3  nor anyone else at Stolt had continued
4  conspiratorial contacts with Jo and Odfjell, is that
5  correct?
6  A.  That's consistent with my recollection.
7  Q.  During that meeting, you said that we talked out
8  in the hall, but at any point did you express
9  concern to the government about what Jansen was
10  telling us?
11  A.  No, I did not.
12  Q.  Because in fact what Jansen was telling us is
13  consistent with what you had told the Division all
14  along, is that correct?
15  A.  Yes.
16  Q.  And, isn't it a fact, Mr. Nannes, when we
17  stepped outside of the room, out of Mr. Jansen's
18  presence and you asked how he did, and I said, he
19  was consistent with what you told us, so as long as
20  that was true, he did fine?
21  A.  I don't recall that.
22  Q.  At any time up to when the company's requirement
23  to cooperate under the leniency agreement was
24  suspended to, April 8th, did you ever contact the
25  Antitrust Division and say we believe that Mr.

NANNES - CROSS

72

1  Jansen gave false information?
2  A.  No, I did not.
3  Q.  Because it was consistent with what the company
4  had told the government, correct?
5  A.  Because I had no reason to believe that it was
6  false testimony.
7  Q.  I want to ask you a question.  Now, after the
8  company received the April 8th suspension letter,
9  that letter just meant that the company was not
10  obligated to continue to provide cooperation with
11  the government, is that right?
12  A.  I believe that was the phrase used.
13  Q.  The government wasn't going to consider that
14  lack of cooperation past April 8th to be a breach of
15  the amnesty agreement?
16  A.  I assume that was what was meant, but I didn't
17  know beyond the face of the letter, there was no
18  precedent for that kind of a letter, I know of.
19  Q.  Weren't you told that the government was issuing
20  a letter because it had serious doubts about the
21  veracity of representations made by Stolt and the
22  government, didn't think it fair to ask Stolt to
23  continue to cooperate while the government had those
24  doubts?
25  A.  Yes, I think you said that to me.

NANNES - CROSS

73

1  Q. And, you asked for an opportunity to come in to
2  talk to the staff, didn't you?
3  A. Yes.
4  Q. You wanted to convince the staff that whatever
5  information we had about the conspiracy continued
6  past March was wrong, correct?
7  A. The purpose of the meeting was to see if we
8  could ascertain from staff what the basis was for
9  sending the letter because the letter didn't specify
10 the nature of the specific and credible evidence to
11 which it referred.
12        THE COURT: What's the answer to his
13 question?
14 A. That's when I asked to meet with him to see if I
15 could find out what underlaid the letter.
16 Q. My question was, didn't you tell the staff that
17 you wanted to meet because you believed that the
18 information, whatever information we had, you wanted
19 to find out about Stolt continuing to conspire past
20 March was wrong?
21 A. It was like shooting in the dark. We didn't
22 know what was the basis for the staff's concerns.
23 We thought it was possible that the staff was
24 misinterpreting certain kinds of activities with
25 which we were familiar. We thought we had some

NANNES - CROSS

74

1  information that would be inconsistent with the
2  proposition that any conspiratorial activities
3  continued and we wanted an opportunity to meet with
4  the staff to discuss those kinds of things.
5  Q. Did you ever tell the staff that you thought the
6  information that we had was wrong, there were people
7  out there with a motivation to make things up about
8  Stolt?
9  A. I think I did ask in a conversation on that day
10 to consider the possibility that there were people
11 out there who would have a motivation to do that.
12 Q. Was it still, at that time, was it still Stolt's
13 position, the conspiracy didn't continue past March
14 8th, correct?
15 A. It was still Stolt's position that it had taken
16 prompt and effective action to terminate the
17 anticompetitive activity reported.
18 Q. Is that the way you talked to me at the time, is
19 that the way you expressed it at the time?
20 A. I am sure I did not speak in the language of the
21 policy at the time.
22 Q. Wasn't the language you used at the time that
23 the activity didn't continue past March and the
24 information that we had you thought was wrong?
25 A. I didn't have any basis to believe that either

NANNES - CROSS

75

1  of the conduct had continued -- I don't know
2  whether I said March, because you had said in your
3  letter March-November. The notion was we didn't
4  believe that the anticompetitive activity had
5  continued with -- continuing and we wanted an
6  opportunity to address it.
7        THE COURT: You say "we," you as the
8  attorney.
9        THE WITNESS: Yes.
10       THE COURT: What you were told, right?
11       THE WITNESS: Yes, sir.
12       MR. CONNOLLY: I'm sorry. I don't think
13 you answered the question.
14 BY MR. CONNOLLY:
15 Q. At the meeting you told the government, that you
16 had no reason to believe that the activity continued
17 past March-April and you wanted an opportunity to
18 show us some information you had to try to convince
19 us that our belief that it did was wrong?
20       THE COURT: Or that you wanted to get
21 information that would say that?
22       THE WITNESS: I was looking to get
23 information. I didn't believe that we had ever
24 represented to the government that all illegal
25 activity, if any, had stopped in March. So that

NANNES - CROSS

76

1  wasn't the proper standard but given the letter that
2  had been sent saying illegal activity had continued,
3  we wanted an opportunity to address that because
4  that was inconsistent with information that we had.
5  I wanted to know what information Mr. Connolly was
6  basing the letters on, so we could endeavor to
7  address that.
8        THE COURT: Again, I'm struggling with the
9  term "we".
10       THE WITNESS: I'm sorry, your Honor. I and
11 the other lawyers.
12       THE COURT: All right, the law firms?
13       THE WITNESS: Also, Mr. Sesser, that's why I
14 tend to say we.
15       THE COURT: I don't want the we to include
16 the company if that is not what you intend to say.
17       THE WITNESS: The we, meant what I
18 understood including people from the company.
19       THE COURT: What you were told?
20       THE WITNESS: Yes, sir.
21 BY MR. CONNOLLY:
22 Q. Mr. Nannes, can I show you a document marked
23 SNTG 0005732.
24       THE COURT: What date did you report to the
25 Department of Justice in 1998.

NANNES - CROSS

77

1      THE WITNESS: February, sir.

2      THE COURT: February?

3      THE WITNESS: Yes, sir.

4  BY MR. CONNOLLY:

5  Q.  Could you turn to the page tabbed and that

6  particular page is SNTG 0005747?

7  A.  Yes, sir.

8  Q.  Did you bring that copy--is this a page out of

9  Mr. Wingfield's diary?

10  A.  Yes, it is.

11  Q.  The right-hand corner, it has 13.  I read the

12  Bates number.

13      Did you bring that document with you to

14  Philadelphia on April 21st?

15  A.  Yes, I did.

16  Q.  And, what did you tell the staff what that

17  document meant?

18  A.  I told the staff that I thought that document

19  was an indication that Stolt was not engaging in on-

20  going improper activities with Odfjell.

21  Q.  Because it says, "he", which you thought was

22  Erik Nilsen?

23  A.  Yes, sir.

24  Q.  Erik Nilsen is one of the Odfjell people that

25  pled guilty?

NANNES - CROSS

78

1  A.  Yes, sir.

2  Q.  Mr. Wingfield wrote down not accepting?

3  A.  Yes.

4  Q.  Do you know how many phone calls Mr. Wingfield

5  had with Mr. Nilsen on that particular day?

6  A.  I do not.

7  Q.  At the time you made this representation to the

8  government, did you believe that Mr. Wingfield was

9  no longer conspiring with Odfjell or Jo Tankers?

10  A.  That's what I believe.

11  Q.  By that time, Mr. Nannes, had you had

12  conversations with Mr. Wingfield about the

13  conspiracy, the activity being reported?

14  A.  Yes.

15  Q.  Now a couple of quick questions and I'll be

16  through.

17      You referred to an earlier document, it is

18  in the Stolt exhibit book, exhibit 11, where the

19  government requested that Stolt produce certain

20  documents to the government.

21      My question is just, isn't it a fact that

22  the government was going to issue Stolt-Nielsen a

23  subpoena and Stolt asked instead to produce it

24  voluntarily while acknowledging that they were being

25  provided pursuant to, as if compelled by grand jury

NANNES - CROSS

79

1  subpoena because you thought actually having the

2  subpoena might indicate that the company wasn't

3  cooperating?

4  A.  I do recall having a conversation with you along

5  those lines.

6      I don't recall whether the conversation

7  preceded the January 31 letter or preceded the

8  February 18 letter for documents.

9  Q.  But, you understood the documents being produced

10  were being produced as if compelled under subpoena?

11  A.  It was certainly my assumption that the

12  government could have compelled them by subpoena had

13  it chose.  I thought in the context of a cooperation

14  agreement, the informal means would be more

15  consistent.

16  Q.  Mr. Nannes, when the government sent the April

17  8th suspension letter and you met with the staff in

18  Philadelphia, did you also meet with Mr. Griffin in

19  Washington about the suspension letter?

20  A.  Yes, I did.

21  Q.  At either of those meetings, did you ever say

22  that even if the activity continued, you didn't

23  consider it a breach because in fact you were the

24  one that discovered the activity being reported

25  in--you didn't discover it until January of 2003?

NANNES - CROSS

80

1  A.  I don't think I made that statement.

2  Q.  That hadn't occurred to you yet, had it?

3      THE COURT:  What?  It is a convoluted

4  question?

5      MR. CONNOLLY:  I withdraw it.

6      THE COURT:  You can ask, it is hard to

7  understand.

8  BY MR. CONNOLLY:

9  Q.  If you thought the company hadn't breached the

10  agreement because in fact discovery was made by you,

11  not Mr. O'Brien but by you, in January of 2003, why

12  didn't you say that to the Division in the meetings,

13  you had an opportunity to address the issues?

14  A.  I was endeavoring to address the issues that the

15  government had raised with us.  That was their

16  position, that anything after March was an antitrust

17  violation that would subject the company to

18  withdrawal of the leniency agreement and the issue

19  on the table.  I thought what was most immediate,

20  was what basis do you have for that?  We don't

21  believe that the conduct continued later.

22  Q.  You referred to certain guilty pleas,

23  information that had been filed in the parcel tanker

24  matter, the Odfjell information, there were

25  two--informations against two Odfjell employees as

NANNES - CROSS

81

1  well, is that correct?

2  A.  Yes, sir.

3  Q.  You don't know how many - - there were more

4  Odfjell people than that involved in the conspiracy,

5  correct?

6  A.  I heard other names, I don't know the extent of

7  their involvement.

8  Q.  You have no knowledge, if some of the people

9  were given immunity instead of prosecuted because

10  Odfjell had information that Stolt had not provided

11  about the conspiracy between March and November of

12  2002?

13  A.  I have no way of knowing one way or the other.

14  Q.  Mr. Van Westenbrugge so far is the only Jo

15  Tankers employee who has pled guilty in this action,

16  is that right?

17  A.  That's the only person whom I'm aware.

18  Q.  Again you have no idea if others, Jo Tankers

19  - - you do know. Do you, I'm sorry - - strike that.

20      Do you remember whether there were other Jo

21  Tanker employees involved in the conspiracy?

22  A.  I heard other names.

23  Q.  You don't know whether any of those employees

24  were immunized because they gave information about

25  the conspiracy from March to November 2002?

NANNES - CROSS

82

1  A.  I have heard rumors but I don't have any way of

2  knowing.

3  Q.  Mr. Nannes, I want to ask you one last question

4  about the December 4th meeting in Washington.

5      Do you remember Mr. Griffin using the term

6  head fake?

7  A.  Yes, sir.

8  Q.  Could you tell us in what context Mr. Griffin

9  used the term head fake?

10  A.  I think he was referring to the O'Brien related

11  issue rather than the trading with Iran issue.  The

12  context as I understood it, that I had told them

13  that Stolt had taken all of these actions in

14  response to the issues raised by Mr. O'Brien and in

15  that context, I think he used the phrase, head fake

16  to refer.

17      THE COURT:  Stolt-Nielsen reported in

18  response to O'Brien?

19      THE WITNESS:  Whether the response to

20  O'Brien's concern was genuine and in good faith or

21  was simply a deceptive endeavor, maneuver.

22      THE COURT:  A cover?

23      THE WITNESS:  I wasn't thinking of cover,

24  given the head fake reference.

25      THE COURT:  I'm trying to get an idea?

NANNES - CROSS

83

1      THE WITNESS:  I understood it to mean, was

2  the antitrust compliance policy including all of the

3  steps real, genuine, adopted in good faith, intended

4  to cause a cessation of any illegal conduct

5  occurring or was it somehow a head fake, a deceptive

6  effort.

7      THE COURT:  So then I infer from your

8  comments from that head fake reference you raised,

9  it should have been a cessation of the competitive

10  behavior at that time?

11      THE WITNESS:  I would not agree with that,

12  your Honor.

13      I think a company can be expected to take

14  reasonably prudent steps that are designed in good

15  faith to cause a change in employee behavior, that's

16  what I take the phrase, the leniency policy to mean.

17      I don't know that a company can guarantee

18  that in all instances everyone of its employees gets

19  the message, understands it and conforms their

20  conduct to the company's directions.

21      I think Stolt's obligation under the

22  leniency policy was to take reasonably prudent steps

23  available to it to cause a cessation of any unlawful

24  conduct.

25      THE COURT:  At that time?

NANNES - CROSS

84

1      THE WITNESS:  The way that things turned

2  out, it may be that the legal obligation under the

3  leniency wouldn't trigger until there would been

4  formal discovery within the meaning of the policy.

5      THE COURT:  That is your understanding?

6      THE WITNESS:  Whether or not there had been

7  discovery, I had represented to the government at

8  the meeting that the company had taken these steps

9  at the time in response to issues raised by Mr.

10  O'Brien.

11      THE COURT:  I take it from your answers to

12  previous questions that you believed that the

13  anticompetitive conduct had ceased in March? That

14  was your understanding.

15      THE WITNESS:  Your Honor, there was no

16  understanding that it had ceased automatically in

17  March, okay.  There are a lot of people in the

18  company.  There are a lot of activities.  I assumed

19  that the antitrust compliance program was the

20  totality of all the steps.  The certifications for

21  example were very important to the employees in

22  terms of clarifying what it was that was required of

23  them.  The antitrust compliance was to educate them

24  on the basis of the policy.

25      Those activities continued over a few

NANNES - CROSS

85

1  months.  I did not represent to the Department
2  because I could not know everything had in fact
3  terminated in March or any other specific day but
4  when I met with Mr. Griffin on December 4, I had no
5  reason to lead me to think otherwise.  I didn't
6  represent it because it was not asked.  If I had been
7  asked, I would have said I couldn't represent it.
8         THE COURT:  But, you understood from that
9  conversation that was a concern of Griffin?
10        THE WITNESS:  I understood Mr. Griffin to be
11  concerned about the steps we had taken, the steps I
12  had identified as Stolt having taken genuine steps
13  or were head fakes.
14        THE COURT:  You knew that with the December
15  4 meeting?
16        THE WITNESS:  With the steps we had taken,
17  yes, sir.
18  BY MR. CONNOLLY:
19  Q.  A head fake or a deception in the sense that the
20  agreement would continue, correct?
21  A.  I understood it, Mr. Connolly as I have related
22  it.
23  Q.  Wasn't the term head fake used in the sense that
24  if it turns out that this withdrawal was a head
25  fake, Stolt would lose its leniency and be

NANNES - CROSS

86

1  prosecuted?
2  A.  I don't recall the word withdrawal ever being
3  used on the December -- on the meeting of December
4  4.
5  Q.  If it turns out this is a head fake, Stolt did
6  not stop the illegal activity with Odfjell and Jo,
7  the defendant would be prosecuted?
8  A.  I don't recall it being phrased in terms of
9  withdrawal or automatic stop.
10  Q.  Automatic stop?
11  A.  A full stop at any particular date or time.
12  Q.  You mentioned round voyage managers, correct?
13  A.  Yes.
14  Q.  Lower level people in the company that have some
15  responsibility for shipping?
16  A.  Yes.
17  Q.  This conspiracy at Stolt and Odfjell involved
18  many people in the company, didn't it?
19        let me strike that about Odfjell and ask
20  you about Stolt.
21        You knew about the agreement with Odfjell?
22  A.  It was unclear how many employees knew about the
23  express agreement.
24  Q.  At the meeting, you said, I had not yet had a
25  chance to talk to all the round voyage managers, is

NANNES - CROSS

87

1  that correct?
2  A.  I don't recall referring to round voyage
3  managers.  It was stated, I had not had an
4  opportunity to interview Stolt employees generally.
5         MR. CONNOLLY:  Can I have a second to
6  confex?
7         Your Honor, no further questions.
8         THE COURT:  Is it your understanding on the
9  December 4 meeting that Stolt had discontinued its
10  participation in the conspiracy?
11        THE WITNESS:  Your Honor, I had no
12  information that they hadn't.
13        I reasoned from the steps that they had
14  taken, that they had but I hadn't had an opportunity
15  to investigate it.
16        There were a number of reasons that to me,
17  made it likely, that they implemented the policy
18  very conscientiously and with the intention of
19  causing any improper communications to stop.
20        They knew about the O'Brien lawsuit.  They
21  had given copies of the policy to competitors.  They
22  had gone to quite substantial steps in the seminars,
23  the certifications seem to be real and valid.
24        I thought on the basis of what I knew, that
25  it had stopped but I hadn't corroborated that and I

NANNES - CROSS

88

1  hadn't had a chance to test that but the steps that
2  they took were consistent with an intention to cause
3  cessation.
4         THE COURT:  They were consistent with?
5         THE WITNESS:  They were consistent, logical
6  steps that someone would take if they were trying to
7  cease conduct that is problematic.
8         THE COURT:  Whether or not they were
9  effective steps, you didn't conclude that on the
10  meeting of December 4, is that correct?
11        THE WITNESS:  That is correct.
12  BY MR. CORRAN:
13  Q.  Continuing on that line, Mr. Nannes, being here
14  today, do you have any reason to believe that
15  certifications were not executed by the Stolt
16  employees?
17  A.  No.  In fact, I think they were.
18  Q.  How many employees?
19  A.  Over 130.
20  Q.  Do you have any reason to believe sitting here
21  today, that the antitrust compliance seminars, in
22  April 2002, did not occur?
23  A.  No.  In fact I do believe that they did occur.
24  Q.  Sitting here today, do you have any reason to
25  believe that the company did not revise its

NANNES - REDIRECT

89

1   antitrust compliance handbook in the March-April
2   2002 time frame?
3   A.  I believe that they did.  I read it.
4   Q.  Sitting here today, do you have any reason to
5   believe that revised handbook was not provided to
6   Stolt's competitors and business partners?
7   A.  I have no reason to believe that it was not.
8   Q.  Sitting here today, do you have any reason to
9   believe that those activities were intended by
10  Stolt's management to be a head fake or window
11  dressing, or anything along those lines?
12  A.  No, I do not.
13  Q.  Mr. Nannes, do you remember at the beginning of
14  Mr. Connolly's cross-examination, he suggested that
15  Mr. Griffin would have no reason whatsoever to be
16  concerned about a fire the messenger issue?
17  A.  Yes, I do recall him saying that.
18  Q.  First of all, who coined the term, "fire the
19  messenger issue" in this context?
20  A.  Mr. Griffin.  It was not my term at all.
21  Q.  Are you sure about that?
22  A.  Absolutely.
23  Q.  Are you sure?  You referred earlier in the
24  cross-examination and in your original direct
25  examination that Mr. Griffin had raised at least two

NANNES - REDIRECT

90

1   preliminary issues after you first called, after it
2   first became clear in your discussions you were
3   talking about the Stolt situation, the O'Brien, fire
4   the messenger issue was one issue.  There was
5   another issue as well, correct?
6   A.  The trading issue.
7   Q.  Trading issue, trading with Iran, correct?
8   A.  Yes.
9   Q.  Whether it was a violation of the foreign assets
10  control in the Department of Treasury?
11  A.  I don't recall that specifically.  It was the
12  trading issue to me.
13  Q.  Here is the point I am getting to, Mr. Connolly
14  suggested that Mr. Griffin would have no reason
15  whatsoever to raise the fire the messenger issue, it
16  didn't appear in any speeches or the like; given
17  your familiarity with the amnesty program and the
18  speeches thereunder and other policy statements
19  along those lines, have you ever seen the Department
20  of Justice antitrust comments about OFAC issues in
21  those?
22  A.  No, in fact just as I told Mr. Griffin at the
23  meeting on December 4th, fire the messenger, with
24  the inquiry under the leniency policy.  I think I
25  also told him there or one of the subsequent

NANNES - REDIRECT

91

1   telephone calls, I didn't think Iran was a
2   cognizable issue under the leniency.
3   Q.  As a practical matter, whose decision was it as
4   to whether Stolt would be admitted into the
5   Antitrust Division's corporate leniency policy
6   program?  Whose decision was it as a practical
7   matter?
8   A.  It was the Division's decision.
9   Q.  What individual did you believe at that time had
10  the, as a practical matter, had the ultimate
11  decision on whether Stolt would be admitted or not?
12  A.  I thought it was Mr. Griffin.
13  Q.  Why did you think that?
14  A.  Two reasons.  As a practical matter I thought
15  administratively within the Antitrust Division those
16  decisions were made on a day-to-day basis by the
17  Deputy rather than Assistant Attorney General.  In
18  the leniency policy itself there's a reference to
19  potential meetings by leniency applicants with Mr.
20  Griffin, if they are dissatisfied with the
21  recommendations made by the staff regarding their
22  conditional admission to the program.
23  Q.  Given that it was Mr. Griffin's decision to be
24  made, weren't you going to address whatever issue he
25  wanted to raise?

NANNES - REDIRECT

92

1   A.  Yes.
2   Q.  Whether or not it was in policies or speeches or
3   anything else?
4   A.  Yes, sir.  I had to satisfy him.
5   Q.  In fact, did you attempt to satisfy him on both
6   the OFAC issue and on the fire the messenger issue?
7   A.  Yes.
8   Q.  Mr. Nannes, do you have a pretty good
9   recollection of the December 4th meeting?
10  A.  I believe that I do.
11  Q.  Do you have any recollection of Mr. Griffin
12  saying that he believed or he had concluded that
13  discovery had already occurred because of the
14  O'Brien situation?
15  A.  No, I do not.
16  Q.  Do you think you would remember if he had said
17  that?
18  A.  Yes.  I don't think there was any discussion of
19  what Mr. O'Brien found or didn't find.  The closest
20  I want to that, he had raised some issues, brought
21  them to the attention of Mr. Cooperman.  There was
22  no reference beyond that to what he had found or how
23  he had characterized the issues he found.
24  Q.  Did you make any statement or representation
25  when discovery -- for purposes of the amnesty

NANNES - REDIRECT

93

1 program had occurred or would occur at this December

2 4th meeting?

3 A. No, I had not.

4 Q. Are you sure?

5 A. Yes.

6 Q. How can you be sure of that?

7 A. It just wasn't the way that the issue had been

8 set on the table for the meeting with Mr. Griffin.

9 It was, did you fire the messenger, bury the

10 message? The answer was we didn't fire the

11 messenger. We didn't bury the message.

12 Q. Forgive me, I think I asked in the direct exam,

13 I'll do it again. At this meeting, December 4th,

14 did you represent or state to Mr. Griffin that the

15 company had terminated anticompetitive conduct as of

16 March 2002?

17 A. I did not.

18 Q. Did Mr. Griffin or anybody from the Department

19 of Justice ask you for such a representation or

20 statement?

21 A. No, they did not.

22 Q. Did Mr. Griffin or anybody from the Department

23 state anything that led you to believe that

24 termination as of March 2002 was a prerequisite, an

25 absolute prerequisite for Stolt's entry into the

NANNES - REDIRECT

94

1 program?

2 A. I do not believe that they did.

3 Q. Mr. Nannes, do you remember testifying on direct

4 as to a telephone conversation you had with Mr.

5 Connolly on December 17th, 2002?

6 A. Yes, I do.

7 Q. Do you remember testifying about a continuum he

8 referred to?

9 A. Yes, I do.

10 Q. Can you remind us the context of Mr. Connolly's

11 comment about this continuum?

12 A. Yes. We set up a ptoffer appointment on January

13 13th. I asked Mr. Connolly whether he needed

14 anything from us before that proffer? He said he

15 didn't. But, sometimes it turns out in these

16 matters that the company's conduct, investigations

17 find out there's nothing to report. And, if that

18 would be our situation, he would want to know about

19 it sooner rather than later. I assume he wouldn't

20 do things, if an investigation that would turn out

21 to be unnecessary.

22      In that regard, he said things fall along

23 on a continuum, from joint venture on the one hand

24 to, I think he said hard-core or collusive activity

25 on the other. And. Asked if I knew where Stolt's

NANNES - REDIRECT

95

1 conduct fell along that continuum?

2 Q. Did those comments, those statements by Mr.

3 Connolly indicate to you whether or not he had

4 already concluded whether there had been a hard-core

5 violation of the Sherman Act?

6 A. He obviously didn't know.

7 Q. Mr. Nannes, without hard-core criminal

8 violations of the Sherman Act there cannot be any

9 discovery for purposes of the amnesty program,

10 correct?

11 A. I think that's correct.

12 Q. Mr. Nannes, when did you first learn or conclude

13 that there was in fact a hard-core criminal

14 violation of the Sherman Act in connection with this

15 industry?

16 A. It was in the last week of December, the first

17 few days of January as part of the investigation we

18 were conducting.

19 Q. You talked about that on your direct, that was

20 in reference to the lists that Mr. Wingfield turned

21 out, correct?

22 A. Yes.

23 Q. The accompanying recommendation that Mr.

24 Pickering and Mr. Wingfield and others provided to

25 you?

NANNES - REDIRECT

96

1 A. Yes.

2 Q. Now, Mr. Nannes. I'm sorry, Mr. Connolly on his

3 cross referred to a document which is in your direct

4 exam witness book under tab 9, that's the fax from

5 Bjorn Jansen to Mr. Wingfield?

6 A. Yes.

7 Q. Mr. Nannes, you had this document. Let me ask

8 you, when did you first see this document to the

9 best of your recollection?

10 A. I can't recall for sure whether I saw it at the

11 meeting on November 22nd. But, I'm reasonably

12 confident that I saw it within a day or two or three

13 thereafter.

14 Q. You also testified under Mr. Connolly's

15 questioning that this is the document that Mr.

16 O'Brien apparently found on his chair?

17 A. His chair or desk is what I was told.

18 Q. Mr. Nannes, how come you didn't conclude, based

19 on this document that there was a hard-core criminal

20 violation of the Sherman Act?

21 A. The document on its face, appears to be an

22 assessment by Mr. Jansen of whether it would be

23 economically beneficial for Stolt to go after more

24 of Odfjell's contracts because if he were to do so,

25 it had to consider the possibility that Odfjell

NANNES - REDIRECT

97

1 would go after some of Stolt's contracts.

2          The document doesn't refer on its face to

3 any communications between Odfjell and Stolt with

4 respect to that analysis.  The term coop is used in

5 that memorandum and the term coop could refer to

6 express cooperation in the form of an agreement

7 between the parties.

8          But, it could also refer to the separate

9 recognition by the parties that it doesn't make

10 sense for them to go after one another's customers

11 because of the implications of doing so would have

12 in the marketplace.

13          So, I thought that the document was

14 relevant to be sure to competitive questions but not

15 enough on its face to conclude that there had been

16 an express agreement between competitors that would

17 violate essentially the Sherman Act.

18 Q.  Mr. Nannes, you gave the proffer I think we

19 already established on January 8 of 2003 to Mr.

20 Connolly and his colleagues, correct?

21 A.  Yes.

22 Q.  At that meeting, at the December 4th meeting, at

23 phone calls you had with Mr. Griffin or Mr.

24 Connolly, at any time between those times, did they

25 ever suggest that Stolt was ineligible for inclusion

---

NANNES - REDIRECT

98

1 in the amnesty program because they had not fired

2 certain executives?

3 A.  No, they did not.

4 Q.  Do you have an understanding whether the folks

5 at the Department of Justice, knew that people who

6 had violated the antitrust laws were still employed

7 there, for instance after you gave your proffer on

8 January 8th?

9 A.  I don't recall whether at the proffer or shortly

10 after the proffer I connected employees by name to

11 the events that had ensued, particularly the

12 meetings and the lists, but either at the proffer or

13 thereafter I provided the names to Mr. Connolly in

14 conjunction with the dates and the lists.  And they

15 knew that the employees who I named were still

16 employed by the company because we talked about the

17 willingness of those people to proffer the

18 information that they had in conjunction with the

19 company's cooperation.

20 Q.  In connection with the discussions leading to

21 the January 15th, 2003 letter agreement, you and Mr.

22 Connolly and/or Mr. Griffin discussed coverage of

23 current as well as certain former employees,

24 correct?

25 A.  Yes.

---

NANNES - REDIRECT

99

1 Q.  Now, as of that letter agreement on January

2 15th, '03 the government certainly knew that

3 individuals who violated the Sherman Act were--had

4 continued employment at Stolt, correct?

5 A.  Yes.

6 Q.  Are you sure of that?

7 A.  Yes.

8 Q.  At any time prior to January 15 of '03, did they

9 say Stolt was ineligible because they didn't fire

10 the employees?

11 A.  No.

12 Q.  Are you aware if the amnesty program has a

13 requirement to fire employees that violated the

14 antitrust laws?

15 A.  I don't think that it does.

16 Q.  Mr. Nannes, do you still have the sample

17 certification there that Mr. Connolly gave to you?

18 A.  Yes, I do.

19 Q.  I say a sample, do you happen to know how many

20 of these certifications were executed by Stolt

21 employees?

22 A.  I think in the neighborhood of 130 plus.

23 Q.  Do you know how those 130 plus employees were

24 identified as people to sign the certifications?

25 A.  I don't recall specifically but I think it was

---

NANNES - REDIRECT

100

1 described to me that they were employees who would

2 have any responsibilities that could put them in a

3 circumstance where needing to know how to deal with

4 competitors would be relevant.

5 Q.  Mr. Nannes, you are familiar with the Stolt

6 revised antitrust policy put in place in March or

7 April of 2002 in general terms?

8 A.  Yes.

9 Q.  One characteristic of that policy is world wide

10 application of antitrust principles?

11 A.  Yes.

12 Q.  I want you to look at the certification, the

13 page attached to it and tell me whether this

14 certification and the explanation attached in any

15 way indicates that there have been prior violations

16 of the U.S. antitrust laws as opposed to

17 Stolt-Nielsen antitrust policy?

18          THE COURT:  You assume -- he doesn't think

19 I can read.

20          MR. CURRAN:  I'm sorry, your Honor but I

21 didn't raise an objection early enough when Mr.

22 Connolly was asking.  He asked a question that maybe

23 it sounded like this implied that there was illegal

24 activity that was discovered.  It deals only with

25 the policy and forgive me, your Honor.

NANNES - REDIRECT

101

1        I withdraw that question.

2   BY MR. CURRAN:

3   Q.  Mr. Nannes, are you aware of any impediment that

4   Mr. Griffin or the Department of Justice Antitrust

5   Division had in terms of modifying the model amnesty

6   letter when they were proposing to Stolt-Nielsen for

7   your signature?

8   A.  No.  I believe they could have made

9   modifications if they so chose.

10  Q.  Are you aware of anything that prevented Mr.

11  Griffin or Mr. Connolly from inserting in that

12  letter a statement that the parties acknowledged

13  that the discovery of the anticompetitive activity

14  being reported had occurred at a specified time?

15  A.  I can't recall how the question was phrased at

16  the beginning.

17  Q.  Let me restate it.

18        Did Mr. Griffin or the Department of

19  Justice, the Antitrust Division have any impediment

20  stopping them from inserting into that amnesty

21  agreement a statement that the parties acknowledged

22  discovery had occurred at a particular point and

23  time?

24  A.  No.

25  Q.  Or no later than a particular point in time?

---

NANNES - REDIRECT

102

1   A.  No.

2        THE COURT:  Or earlier?

3   Q.  Or earlier?

4   A.  No.

5   Q.  Are you aware of any impediment that Mr. Griffin

6   or the Antitrust Division had in stating that, in

7   including in this letter the amnesty letter, a

8   statement that the activity in question, the

9   anticompetitive activity reported had terminated

10  without exception as of a specified date?

11  A.  I don't think there was any such impediment, no.

12        MR. CURRAN:  Thank you, your Honor.

13        THE COURT:  Anything else?

14        MR. CONNOLLY:  One question.

15        RECROSS EXAMINATION

16  BY MR. CONNOLLY:

17  Q.  Mr. Nannes, when the phrase fire the messenger

18  was used on the December 4 meeting, was it in the

19  context of O'Brien's claim he was constructively

20  dismissed because Stolt did not stop the illegal

21  activity he had learned of?

22  A.  That was constructively?  I don't recall it being

23  captured in that context.  I simply said he had not

24  been fired, that his lawsuit acknowledged that he

25  had resigned rather than be fired.  I don't recall

---

NANNES - RECROSS

103

1   we discussed constructive termination.  I may have

2   referred to it as the claim in his complaint.

3   Q.  The Division used the phrase, fire the

4   messenger, in the sense he had to resign because the

5   conspiracy continued, that would be the equivalent

6   of firing the messenger?

7   A.  I don't recall any such statement at the

8   meeting.

9        MR. CONNOLLY:  No further questions.

10       THE COURT:  Mr. Nannes, when you met with

11  Cooperman in New York, you knew about the Wall

12  Street Journal article?

13       THE WITNESS:  Yes.

14       THE COURT:  That was discussed with Mr.

15  Cooper?

16       THE WITNESS:  Yes.

17       THE COURT:  Did Cooperman tell you what it

18  is that O'Brien described to him as being the

19  anticompetitive conduct?

20       THE WITNESS:  I don't think he did, your

21  Honor.

22       THE COURT:  Wouldn't you want to know that?

23       THE WITNESS:  Well, in the context in which

24  we --

25       THE COURT:  Answer my question.

---

NANNES - RECROSS

104

1        You are being asked to come into this

2   thing, wouldn't you want to know what it is that

3   your prospective client is asking you to do?

4        THE WITNESS:  Certainly.

5        THE COURT:  Wouldn't you want to know what

6   they supposedly did?

7        THE WITNESS:  Yes, sir.

8        THE COURT:  Did you ask them?

9        THE WITNESS:  I think I must have asked

10  them, okay, the information?

11       The O'Brien issues that had been raised

12  with Mr. Cooperman involved concerns that the

13  company as exhibited in the Jansen fax had engaged

14  in cooperation in the form of an express agreement

15  with Odfjell to allocate customers in the manner

16  found.

17       THE COURT:  O'Brien told Cooperman, he

18  thought it was a violation of the law, didn't he?

19       THE WITNESS:  Yes.

20       THE COURT:  Would you agree that with your

21  background, that you knew that could be the

22  discovery date?

23       THE WITNESS:  I didn't know the information

24  on which Mr. O'Brien expressed his concerns but it

25  certainly was possible that was the discovery date,

NANNES - RECROSS

105

1   yes.

2       THE COURT: And, do you believe you were

3   being asked for a second opinion in a sense as to

4   whether or not that behavior constituted a violation

5   as O'Brien said to Cooperman?

6       THE WITNESS: It was phrased to me, your

7   Honor, in terms of conducting an investigation. I

8   didn't hear it in terms of first opinion, reviewing

9   second opinion, reviewing the first opinion but what

10  for me was the triggering event for calling the

11  government was the combination of the other factors,

12  the purported employee journal that had notations

13  reflecting express agreements between competitors

14  and then my inquiry to Mr. Cooperman, if I conducted

15  an investigation was there likely to be something.

16  Those factors caused me -- -

17      THE COURT: For which he replied, yes?

18      THE WITNESS: Yes.

19      THE COURT: In other words, you were being

20  asked to confirm what O'Brien said, is that right?

21      THE WITNESS: I didn't interpret it as

22  confirming. I thought it was an assignment to

23  conduct an investigation to see what had in fact

24  occurred.

25      THE COURT: Okay.

---

106

1       Anything else?

2       MR. CURRAN: Can I follow-up on the same

3   point, your Honor?

4       THE COURT: Maybe.

5   BY MR. CURRAN:

6   Q.  Mr. Nannes, with respect to the document under

7   tab 9, again that's the fax from Bjorn Jansen to

8   Richard Wingfield, were you told at that November

9   22nd meeting or shortly thereafter that Mr. O'Brien

10  had based his conclusion on this document?

11  A.  My understanding was that Mr. O'Brien had based

12  the concerns that he expressed to Mr. Cooperman

13  solely on the basis of that document.

14  Q.  Solely on that document?

15  A.  That was my understanding.

16  Q.  Did you conclude that document established a

17  criminal violation of the Sherman Act that could be

18  reported to the Department of Justice for entry into

19  the amnesty program?

20  A.  I did not reach such a conclusion.

21      MR. CURRAN: Thank you.

22      THE COURT: Who gave you that

23  understanding?

24      THE WITNESS: The understanding with respect

25  to the premise of O'Brien's opinion was based on one

---

107

1   document and I have the answer, your Honor. I'm

2   concerned about privilege.

3       MR. CURRAN: If you were told at the

4   November 22nd meeting or in that context, we waive

5   the privilege as to that. You may answer.

6       THE WITNESS: I don't think I was told that

7   at the meeting. But, I think that's what I came to

8   understand.

9       THE COURT: It is an understanding not

10  something you were told?

11      THE WITNESS: It is based on something that

12  I read.

13      THE COURT: Something you read?

14      THE WITNESS: Yes.

15      THE COURT: In the nature of a privileged

16  communication?

17      THE WITNESS: Yes, sir.

18      THE COURT: Subject to the attorney-client

19  privilege?

20      THE WITNESS: Yes.

21      THE COURT: All right.

22      Anything else?

23      MR. CURRAN: Thank you, your Honor.

24      THE COURT: Mr. Nannes, you are free to go

25  finally.

---

108

1       THE WITNESS: Thank you, your Honor.

2       (The witness leaves the witness stand.)

3       THE COURT: Mr. Griffin.

4       How much more do you have of Mr. Griffin.

5       MS. HILL: Essentially two minutes, five

6   minutes.

7       THE COURT: Let's get him done on the

8   direct then we will see where we are.

9       Mr. Nannes, I'm sorry you had to stay

10  over.

11      MS. HILL: I would like to place the

12  exhibit book back.

13      JAMES GRIFFIN, RESUMED

14      CONTINUED DIRECT EXAMINATION

15  BY MS. HILL:

16  Q.  Good morning, Mr. Griffin.

17  A.  Good morning.

18  Q.  I'll ask you to turn to Government Exhibit 9 in

19  the book in front of you, please?

20      Mr. Griffin, is Government Exhibit 9 your

21  March 2nd, 2004 letter to Mr. Gidley in which you

22  advise him that the government will decide to revoke

23  Stolt-Nielsen's conditional leniency?

24  A.  Yes, it is.

25  Q.  Did you base that decision -- did you advise Mr.

GRIFFIN - DIRECT

109

1  Gidley, that you were basing that decision on two
2  reasons?
3  A.  That's correct.
4  Q.  One, was the company made materially false
5  representations to the Antitrust Division?
6  A.  Yes.
7  Q.  The other, that the company failed to cooperate
8  and breached its duty to cooperate?
9  A.  Yes.
10  Q.  Can you please explain the first reason why you
11  considered why the Division considered that the
12  company had made materially false representations?
13  A.  Well, as I testified yesterday, the policy
14  provides that upon discovery a company must take
15  prompt and effective action to terminate its
16  activity in the conduct being reported.
17      We were given evidence that had happened
18  particularly with respect to meetings that occurred
19  between executives of Stolt-Nielsen and executives
20  of the coconspirator firm, where it was represented
21  that the coconspirator - -
22      MR. COMISKY: We can't hear you again.
23  A.  Where the company, company representatives told
24  the coconspirators that they had adopted a new
25  antitrust policy and that they would no longer be

GRIFFIN - DIRECT

110

1  participating in the agreements.
2      We then found--developed evidence, that is
3  not what happened at the meetings but what happened
4  at those meetings was that the representatives of
5  Stolt-Nielsen told the coconspirators that they
6  would, in fact, continue the conspiracy.
7  Q.  The government had also uncovered evidence that
8  the conspiracy did in fact continue after that, up
9  until as late as November of 2002, is that correct?
10  A.  That is correct.
11  Q.  And, I would ask you to please describe why you
12  found that Stolt had failed to cooperate as it was
13  required to do under the agreement?
14  A.  Well, the agreement provides for the company to
15  provide all of the information that it has regarding
16  the conduct being reported and there was a failure
17  to provide information about the extent of the
18  executive's conduct and participation in the
19  conspiracy.
20  Q.  Did you further advise Mr. Gidley, if Stolt had
21  been truthful from the onset as to when the
22  conspiracy ended, it would not have qualified for
23  the leniency program?
24  A.  That's correct.  The company never qualified for
25  the program.

GRIFFIN - DIRECT

111

1  Q.  That the false representations, that it had in
2  fact took prompt and effective steps to understand
3  its participation in the conspiracy, upon discovery,
4  was a materially false statement, that information
5  was material, that information was material to the
6  Division?
7  A.  It was critical to our decision to enter the
8  conditional amnesty agreement, yes.
9      MS. HILL: I have no further questions.
10      One more question.  I'm sorry.
11  Q.  In either reason, Mr. Griffin, standing alone,
12  materially false representation or the failure to
13  cooperate, sufficient basis to revoke the amnesty
14  agreement?
15  A.  Yes.
16      MS. HILL: I have no further questions,
17  your Honor.
18      THE COURT: Ms. Liebenberg.
19      CROSS EXAMINATION
20      MS. LIEBENBERG: Mr. Backstrom will exam.
21  BY MR. BACKSTROM:
22  Q.  Good afternoon, Mr. Griffin.
23  A.  Hi.
24  Q.  Just to refer to the March 2nd letter that was
25  mentioned, that letter was written during the course

GRIFFIN - CROSS

112

1  of this litigation, wasn't it?
2  A.  Yes.
3  Q.  In fact it was written after a briefing in this
4  case had been done at least in one of the cases,
5  isn't that right?
6  A.  That I am not sure of.  I believe reference was
7  made to it yesterday, that is the case.
8  Q.  And, you were aware of the briefing schedule in
9  this case?
10  A.  Generally, yes.
11  Q.  And are you, with the staff filing the briefs in
12  this case, aware that letter was going to be written
13  before they filed their briefs, if you know?
14  A.  I'm not sure of that.
15  Q.  All right.  Let's go back to your testimony of
16  yesterday.  Concerning the entrance of companies
17  into cooperation with the government, let's not talk
18  about Stolt but about anyone else that came along,
19  isn't it true that before another company came in to
20  cooperate with the Division in the parcel tanker
21  investigation, the Division had received customer
22  lists and many other documents about the conspiracy
23  from Stolt and Wingfield without a subpoena?
24  A.  We had received company documents.
25  Q.  From Stolt?

GRIFFIN - CROSS

113

1    A.    From Stolt.

2    Q.    Right.  Isn't it true that in early February,

3    2003 the Division received Richard Wingfield's

4    personal diaries for dates through December of 2002?

5    A.    I am not sure of the dates, Mr. Backstrom but I

6    know that we received company documents including

7    documents that related to Mr. Wingfield.

8    Q.    You don't know the dates of those diaries?

9    A.    That they were through --

10   Q.    Through the end of 2002?

11   A.    I may have heard that we did.  I have not

12   reviewed the documents.

13   Q.    All right.  You are familiar with an affidavit

14   of FBI Agent Sharp, in support of the complaint and

15   the warrants for Mr. Wingfield's arrest, are you?

16   A.    Yes.

17   Q.    Did you authorize that affidavit, complaint and

18   warrant?

19   A.    We authorized the complaint and warrant.

20   Q.    Did you review the affidavit?

21   A.    I don't believe I specifically reviewed the

22   affidavit.

23   Q.    Have you ever seen it?

24   A.    Yes.

25   Q.    Are you aware that at paragraph 10, you may not

GRIFFIN - CROSS

114

1    be aware that it is paragraph 10, are you aware that

2    paragraph, in that affidavit, Special Agent Sharp

3    swore, quota -  Among other things I have reviewed

4    copies of the defendant's -- that's Mr. Wingfield's

5    business diaries for portions of the charged

6    period.  That's through November of 2002, the

7    defendant, had frequent contact with

8    coconspirators.  I also reviewed certain customer

9    lists obtained by coconspirators pursuant to the

10   charged conspiracy.

11        Are you familiar with that language,

12   Special Agent Sharp's affidavit in support of the

13   arrest warrant?

14   A.    I have no doubt if you read it from the

15   affidavit that it is in the affidavit.

16   Q.    Isn't it true that the documents Special Agent

17   Sharp is referring to, in support of that conspiracy

18   warrant are the same ones that Richard Wingfield and

19   Stolt provided to the Division before a single

20   subpoena was issued in this matter?

21   A.    I believe that would be correct, yes.

22   Q.    You don't contend, do you, that the conspiracy

23   that Stolt reported, that lasted beyond November of

24   2002, do you?

25   A.    No.

GRIFFIN - CROSS

115

1    Q.    For example, it is not going on today, right?

2    A.    As far as we know it is not.

3    Q.    The Division never told Richard Wingfield that

4    it had suspended Stolt's obligation of cooperation

5    at any time, did it?

6    A.    Directly to Mr. Wingfield?

7    Q.    That's right?

8    A.    I do not believe so.

9    Q.    You testified yesterday that the Division

10   learned that a witness provided false information to

11   the Division about Stolt's activity in the

12   conspiracy, is that right?

13   A.    Will you repeat it?

14   Q.    Yes.  I believe you testified yesterday that the

15   Division learned that a witness supplied false

16   information to the Division about Stolt's activity

17   in the conspiracy, is that right?

18   A.    That is right, yes.

19   Q.    You testified that this witness later recanted

20   and said that Mr. Wingfield knew that the witness

21   had lied, is that right?

22   A.    Yes.

23   Q.    Is that the information?

24   A.    Yes.

25   Q.    You acted on that information, is that right?

GRIFFIN - CROSS

116

1    A.    Yes.

2    Q.    Isn't it true that the witness to whom you are

3    referring was given an opportunity to get a personal

4    lawyer after he lied to the Division and his amnesty

5    was not revoked?

6    A.    That's correct.

7    Q.    He has immunity or amnesty today, doesn't he?

8    A.    Yes.

9    Q.    Isn't it true that the Division gave this

10   witness immunity even though he lied and testified

11   that Mr. Wingfield knew that he had lied to the

12   government, isn't that right?

13   A.    That was his testimony after he recanted, yes.

14   Q.    Isn't it true that Mr. Wingfield was never given

15   the opportunity to tell his side of events even

16   once?

17   A.    We never asked him for an interview, that is

18   correct.

19   Q.    Isn't it unusual for the Division to give - -

20   the Division to give immunity to a witness that lied

21   under an amnesty agreement?

22   A.    It is not often.

23   Q.    Now often is it done, you understand when a

24   witness lies and continued to have immunity or

25   amnesty?

GRIFFIN - CROSS

117

1      THE COURT:  After recanting?

2      MR. BACKSTROM:  After recanting or any

3  time?

4      THE WITNESS:  No.

5  BY MR. BACKSTROM:

6  Q.  Isn't it true, Bjorn Jansen and Andrew Pickering

7  have amnesty, even though the government revoked

8  Richard Wingfield's amnesty agreement, back in June

9  and Stolt's amnesty agreement more recently?

10  A.  That's true.

11  Q.  Now, I want to turn to the subject for a moment

12  to public speeches, pronouncements by the Antitrust

13  Division.

14      We talked about policy statements and

15  speeches and I understand that pursuant to

16  Government Exhibit number one, you were here because

17  you are permitted, under the Code of Federal

18  Regulations and permission by the Assistant Attorney

19  General to give testimony in this proceeding, is

20  that right?

21  A.  That's right.

22  Q.  But, the Division also issues press releases,

23  right?

24  A.  Yes.

25  Q.  In fact, the Division posts indictments and

GRIFFIN - CROSS

118

1  press releases on the World Wide Web for global

2  dissemination?

3  A.  That's right.

4  Q.  It has been doing that since about 1994?

5  A.  I couldn't give you the year.

6  Q.  But, it is doing it today?

7  A.  Doing it today, yes.

8  Q.  Isn't it true that the antitrust Division in

9  Washington, D.C. issues a press release upon the

10  return of an indictment?

11  A.  We do so in most cases.

12  Q.  What kind of cases don't you do it in?

13      MS. HILL:  Objection, your Honor.

14      THE COURT:  The basis?

15      MS. HILL:  There is no reason to go into

16  the reasons why the Division doesn't make public

17  - - it is privileged, your Honor.

18      THE COURT:  Is there any other reason you

19  want to give to me?

20      MS. HILL:  It is not relevant, your Honor.

21      THE COURT:  I'll sustain the objection on

22  that basis.

23      MR. BACKSTROM:  Thank you, your Honor.

24      I'll withdraw it.

25  BY MR. BACKSTROM:

GRIFFIN - CROSS

119

1  Q.  It is true, isn't it, the Justice Department

2  regulations forbid public comments on the guilt of a

3  defendant while charges are pending?

4  A.  That's true.

5  Q.  In fact, Justice Department regulations forbid

6  most comments about defendants while charges are

7  pending, isn't that right?

8  A.  That's true.

9  Q.  Did you authorize Special Agent Sharp, the case

10  agent in this case to tell the international press

11  after Mr. Wingfield's arrest, that "Based on the

12  strength of the incriminatory materials in the FBI's

13  possession, the most likely outcome when the

14  indictment is handed down could be a plea bargain

15  that obviates the need for a trial"?

16  A.  I did not.

17  Q.  Are you familiar with that statement in the

18  press?

19  A.  Yes.

20  Q.  Did you authorize Special Agent Sharp to say,

21  that "The FBI had documents to prove that

22  Stolt-Nielsen executives hatched a price fixing

23  conspiracy.  The existence of these documents and

24  the executives' inability to contest their existence

25  was itself tantamount to an admission of

GRIFFIN - CROSS

120

1  culpability."

2  A.  What was the first part?

3  Q.  Did you authorize that statement by the Special

4  Agent?

5  A.  No.

6      THE COURT:  Did you authorize Agent Sharp

7  to say anything to anybody?

8      THE WITNESS:  I did not.

9      THE COURT:  Where is he getting the idea he

10  can tell everybody what he thinks?

11      THE WITNESS:  Your Honor, I can't answer

12  that.

13      THE COURT:  I think it is disgraceful.

14  Okay.

15      MR. BACKSTROM:  Your Honor, I have one

16  further question along those lines.

17  BY MR. BACKSTROM:

18  Q.  I take it, Mr. Griffin, you didn't authorize any

19  government official, including Mr. Sharp to tell the

20  press, no matter what happens to this case, the

21  arrest, the arrest will remain on Mr. Wingfield's

22  record?

23  A.  Absolutely not.

24      THE COURT:  Is that all you have right

25  now?

GRIFFIN - CROSS

121

1    We will take a break.

2        MR. BACKSTROM:  I have one more but I can

3    save it.

4        THE COURT:  You promise.

5        MR. BACKSTROM:  I promise, your Honor, I'm

6    the second shortest lawyer in this courtroom.

7        THE COURT:  Go ahead.

8        MR. BACKSTROM:  I am referring to Mr.

9    Comisky, your Honor.

10   BY MR. BACKSTROM:

11   Q.  Mr. Griffin, how much warning did you give to

12   Mr. Wingfield before you arranged to have him

13   arrested?

14   A.  Well, it is incorrect to say he was arrested.

15   He voluntarily surrendered.

16   Q.  That's because?

17   A.  That's because I contacted his or company

18   counsel and arrangements were made for him to

19   surrender his passport to counsel.  And, once I got

20   word that had been done, we agreed that there would

21   be no arrest and he would voluntarily surrender the

22   next morning.  I believe it was the next morning,

23   two days later.

24   Q.  Additionally in the manner of a White House

25   press conference, a subpart?

GRIFFIN - CROSS

122

1        THE COURT:  Come on.

2    BY MR. BACKSTROM:

3    Q.  You never notified Mr. Wingfield personally, did

4    you?

5    A.  No.

6    Q.  He would be arrested?

7    A.  I notified him through company counsel.

8    Q.  Then the government after arranging his

9    voluntary appearance, he appeared, asked for half a

10   million dollars bail for him and took his passport,

11   is that right?

12   A.  That's right.

13       MR. BACKSTROM:  Your Honor, that's all I

14   have.

15       THE COURT:  You want to come back in 45

16   minutes, will that give everybody enough time?

17       (Luncheon recess.)

18

19

20

21

22

23

24

25

GRIFFIN - CROSS

123

1            I N D E X

2

3            DIRECT  CROSS REDIRECT RECROSS

4    JOHN M. NANNES        4    24

5    JAMES GRIFFIN       108   111

6

7

8

9        SIDNEY ROTHSCHILD, being a United States Court
     Reporter, United States District Court, Eastern
10   District of Pennsylvania, do hereby certify that I
     was authorized to and did transcribe the above and
11   foregoing proceedings, and that the foregoing pages
     contain a true and correct transcription to the best
12   of my ability, of the notes taken therein.
         Done and signed this 10th day of May, 2004,
13   in the City of Philadelphia, County of Philadelphia,
     State of Pennsylvania.

14       ---------------------
15            SIDNEY S. ROTHSCHILD

16
17       U.S. Court Reporters
         United States District Court
18       Eastern District of Pennsylvania

             - - -
19

20

21

22

23

24

25