# Exhibit 15G

Case 1:05-cv-02217-RJL   Document 26-13   Filed 08/18/2006   Page 1 of 16

50

1 despite SNTG's best efforts, SNTG has not breached its duty of
2 cooperation?
3    A.   Yes.
4    Q.   If an employee fails to cooperate with the
5 antitrust efforts, SNTG has not breached its duty of
6 cooperation, has it?
7    A.   Generally, that would be the case.
8    Q.   Would you concede, sir, that an outside lawyer does
9 not have the full arsenal of tools to use to persuade an
10 individual that the Government has, does not have a grand
11 jury, prison system, does not have the ability to take away
12 leniency?
13    A.   That is correct. It's my understanding that the
14 carrot is continued employment.
15    Q.   Now, in construing this agreement, we talked about
16 the word, "discovery", are there any words in the amnesty
17 agreement that are ambiguous?
18    A.   Well, I understand what they mean or I think I
19 understand what they mean.  I don't know --
20    Q.   Does the Antitrust Division contend that any words
21 in the January 15, 2003 agreement are ambiguous, that's my
22 question?
23    A.   We certainly -- we don't contend that any of the
24 words are ambiguous. We contend that there are
25 representations or matters in the agreement that specifically

51

1 called for reference to matters outside the agreement.
2    Q.   Which words are those?
3    A.   Effective action to terminate. Specifically, one
4 must look at -- to determine whether discovery occurred and
5 assess the action that takes place outside the scope -- that
6 takes place upon discovery, providing or using best efforts to
7 obtain cooperation of officers, directors, employees, et
8 cetera, would require reference to what the company has done
9 in order to obtain --
10    Q.   I want to make sure that I am communicating with
11 you. Do you contend that the phrase, "prompt and effective
12 action" is itself ambiguous?
13    A.   No.
14    Q.   And on discovery, if I understood your answer, your
15 point was that discovery refers to outside events, outside
16 facts; is that correct?
17    A.   As does "action" or "prompt and effective action",
18 yes.
19    Q.   Is the word, "discovery", itself, ambiguous?
20    A.   Well, it has a specific understood meaning in the
21 context of the leniency agreement as was explained in 1998.
22    Q.   Other than the Spratling Speech, is there any other
23 ambiguity or gloss to the word "discovery" in your view?
24         THE COURT: What do you mean other. He didn't
25 concede there was.

52

1         MR. GIDLEY: I can lay that foundation.
2    Q.   You will agree with me the Spratling Speech puts a
3 gloss on the word, "discovery", so that a CEO's knowledge is
4 not automatically imputed to the company back to the date when
5 he's running a price fixing conspiracy, correct?
6    A.   Yes.
7    Q.   Even though one might say that the corporation
8 discoved when the CEO picks up the phone and has his first
9 collusive call.
10    A.   That was the point of the 1998 speech to make that
11 clear as to what our view is.
12    Q.   Other than the 1998 speech is there any other
13 outside speech that bears on discovery that is important to
14 our purposes today?
15    A.   Not that I am aware of.
16    Q.   Let me direct your attention to page 8, this letter
17 is signed by Reginald J. R. Lee, who is the CEO of SNTG.
18    A.   You are going to have to give me the tab and book.
19    Q.   Government's Exhibit 2, the last page, the page
20 with all the signatures?
21    A.   The agreement was signed by Mr. Lee.
22    Q.   So Mr. Lee, the CEO of SNTG signed the letter?
23    A.   Yes.
24    Q.   He indicates and warrants he has the capacity and
25 authority to enter into this letter?

53

1    A.   Yes.
2    Q.   He was not at the December 4th meeting?
3    A.   Yes.
4    Q.   So if in some intrinsic understanding he has to get
5 that from who, Mr. Nannes?
6    A.   If he has questions about the agreements I am sure
7 Mr. Nannes would explain it to him.
8    Q.   If there is an important oral statement made at the
9 December 4th meeting, Mr. Lee can't get it by reading this
10 document, can he?
11    A.   No.
12    Q.   Similarly, the board of directors would not be
13 able, because no one from the board was at the December 4th
14 meeting; isn't that correct?
15    A.   That's right.
16    Q.   Wouldn't you agree with me the better practice is,
17 that if there are any additional representations, that they be
18 reduced to writing?
19         Isn't that the better practice?
20    A.   You would have the entire meeting with counsel
21 transcribed and then handed over to the board, we could bring
22 the board in for all meetings, no, I don't agree with that.
23    Q.   That's an interesting hypothetical. My question is
24 more simple.
25         If there is an important representation on which

54

1 the company's fate hinges, that it be reflected in the
2 agreement, Government's Exhibit 2.
3    A.    It's absolutely reflected in Government's Exhibit
4 12.
5    Q.    So head fake is reflected in "prompt and effective
6 action"; is that your testimony?
7    A.    No, prompt and effective action upon discovery is
8 reflected in the agreement.
9    Q.    I see the words. Is it your view that everything
10 that was said on December 4th that's important to you on the
11 misrepresentation is reflected in this phrase, prompt and
12 effective action to terminate?
13    A.    The whole discussion on December 4th, the majority
14 of it, was whether or not there was prompt and effective
15 action upon discovery.
16    Q.    Here is my question. My question is, does SNTG's
17 fate for staying in the program language on the four corners
18 of representation 1(a)?
19    A.    Yes -- that's one of the points, yes.
20    Q.    The other thread that it's hanging by is
21 cooperation, paragraph 2(a)?
22    A.    Yes.
23    Q.    2(a) is still the same time period of March through
24 November, 2002, correct?
25    A.    Or February, yes.

55

1    Q.    Your current Antitrust Amnesty Program dates back
2 to August, 1993, correct?
3    A.    Yes.
4    Q.    The prior program was the 1978 program, right?
5    A.    '78, '77.
6    Q.    Late '70's.
7    A.    All right, late '70s.
8    Q.    Under that old program, the old program failed to
9 break open a single international cartel case?
10    A.    Yes.
11    Q.    If we go back 10 or 11 years ago, the largest and
12 the Antitrust Division had obtained was in the range of two or
13 three million dollars?
14    A.    I am sure that's right.
15    Q.    Since the 1993 program, you have seen much larger
16 fines?
17    A.    Much larger conspiracies an fines.
18    Q.    So you are detecting the conspiracy, the lawyer
19 believes in the clients and they inculpate themselves --
20    MS. HILL: I object. I don't understand the
21 relevance.
22    THE COURT: What is the relevance?
23    MR. GIDLEY: I want to setup the Government got
24 entirely the benefit of its bargain.
25    THE COURT: Hasn't this been covered?

56

1    MR. GIDLEY: I don't think so.
2    THE COURT: Go ahead.
3    MR. GIDLEY: I'll keep it brief.
4    Q.    The purpose of the program is to detect cartels?
5    A.    Correct.
6    Q.    To break them up?
7    A.    Yes.
8    Q.    And to incarcerate and get fines against the
9 wrongdoers, correct?
10    A.    To obtain the evidence that will allow us to do
11 that.
12    Q.    In order to entice people to do the difficulty
13 thing of incriminating themselves, Division officials,
14 including yourself an Mr. Hammond give speeches, correct?
15    A.    We give speeches to let people know the status of
16 the enforcement program and to publicize, among other things,
17 this policy, yes.
18    Q.    One of the things you say in these speeches is that
19 there is a fork in the road and that companies have to make a
20 decision whether to stone wall or fess up under the program;
21 isn't that correct?
22    A.    That's right.
23    Q.    An example of that is found in your exhibit book,
24 tab 3, if you go to -- book 3, tab 5, it's a speech by Mr.
25 Hammond.

57

1    A.    Yes.
2    Q.    At page 1 in the middle of the first paragraph it
3 says:
4        "A leniency program will need cartel members in
5 some cases to confess their conduct even before an
6 investigation is opened. In other cases, it will induce other
7 organizations already under investigation to abandon the
8 cartel stone wall ways to the Government and provide evidence
9 against other cartel members."
10        Is that correct?
11    A.    That's correct.
12    Q.    I wanted to make sure I understand the scope of
13 your criminal enforcement program. Not all anticompetitive
14 activity is prosecuted criminally by the antitrust Division,
15 correct?
16    A.    That is correct.
17    Q.    You reserve criminal prosecution for hard-core, per
18 se crimes, correct?
19    A.    Yes.
20    Q.    Those are typically price fixing situations?
21    A.    Or market allocation, whether it's by customer.
22    Q.    You don't prosecute conduct that's examined under
23 the rule of reason criminally?
24    A.    That's correct.
25    Q.    The anticompetitive effects of the joint venture

58

1  would be investigated civilly, not criminally.
2     A.   Of a legitimate joint venture, yes.
3     Q.   Typically, that's done under the rule of reason,
4  correct?
5     A.   Yes.
6     Q.   Conscious parallelism by itself --
7        MS. HILL: Objection, relevance.
8        MR. GIDLEY: It goes to the scope of their criminal
9  enforcement program. I am not asking him what the law is, I
10 am asking what is in and out of bounds for the amnesty
11 program.
12       THE COURT: Go ahead.
13    Q.   Conscious parallelism by itself is not unlawful
14 under the Sherman Act, correct?
15    A.   It would not be a criminal violation.
16    Q.   I want to direct your attention to a board we had
17 up yesterday. I think you know this quote because it was
18 covered on the direct and with the indulgence of counsel, I am
19 going to put it up here on the easel.
20       On March 8, 2001, Scott Hammond gave a speech,
21 correct?
22    A.   Yes.
23    Q.   And there is no reservation in his speech, Mr.
24 Griffin, that his speech does not reflect Division policy, is
25 there?

59

1     A.   Oh, no.
2     Q.   He is your deputy, correct?
3     A.   Yes.
4     Q.   All right, sir, the first sentence reads:
5        " To insure that companies are not penalized for
6  coming forward before they have completed their internal
7  investigation, the Division's policy is to protect amnesty
8  applicants if as a result of the company's good fate efforts,
9  their executives disclose additional antitrust offenses that
10 were not reported in the original amnesty application."
11       Do you see that, sir?
12    A.   I do.
13    Q.   You were asked a series of questions about that
14 yesterday.
15       Do you recall that?
16    A.   Yes.
17    Q.   And is it, sir, the Division's policy to protect
18 amnesty applicants if as a result of good fate efforts their
19 executives disclose additional antitrust offenses?
20    A.   Yes, and bring them to us and qualify and meet all
21 the other standards for the expanded conduct, yes.
22    Q.   So let's say hypothetically a SNTG executive is
23 interviewed by the Division and on the evening of his grand
24 jury testimony, changes his story.
25       Why wouldn't SNTG get a chance to get expanded

60

1  amnesty for what his new disclosure is?
2     A.   Well, if you are talking about this case, number 1,
3  it was disclosure of information that had been falsely
4  provided to us in the first place.
5        Number 2, the information initially wasn't brought
6  to us by the good fate efforts of the company. They came --
7  it came to us from other sources.
8        Number 3, the outcome of such a disclosure would be
9  the expansion of the amnesty to cover newly discovered
10 conduct.
11       Well, other than the newly discovered conduct had
12 Stolt-Nielsen not made the false representations to us, would
13 have been covered by the existing agreement. There would be
14 no need to expand the coverage of the letter, because it goes
15 through January 15, 2003.
16    Q.   Is it the Division's policy that a company lawyer
17 must make a perfect proffer, that is, that when he or she
18 comes in, the description of the conspiracy has to describe
19 with metes and bounds the time period of the conspiracy?
20    A.   There must be no misrepresentation of events and
21 facts.
22    Q.   My question is --
23    A.   When a company comes in and presents evidence on
24 the issue that they took prompt and effective action and they
25 point to the prompt and effective action that they took with

61

1  six documents referring to two meetings, describing those
2  meetings as meetings that -- at which the company communicated
3  to its coconspirators that it would no longer engage in the
4  activity and we learned from other sources that that
5  representation was false and that at those meetings, the
6  company's senior executive expressed not that they would no
7  longer continue, but despite problems they were having, they
8  in fact would continue.
9     Q.   My question is a little bit different.
10       My question is:
11       When the attorney makes the proffer, does the
12 proffer have to define the conspiracy, say in terms of start
13 date and end date, absolutely precisely?
14    A.   No.
15       THE COURT: It doesn't have to, but once it does,
16 you're stuck with it. That's what he said.
17    Q.   Now, if I understood your testimony earlier, you
18 are aware that there was a statement in August, 2002 by an FBI
19 agent, correct?
20    A.   (No response).
21    Q.   A statement made to the press by Agent Sharp and I
22 have a general series of questions here.
23    A.   August of 2000 --
24    Q.   2003?
25    A.   Yes.

Page 62

1   Q.  Were you made aware of that incident at the time
2   that it happened?
3   A.  Shortly thereafter.
4   Q.  Did you implement remedial steps promptly?
5   A.  I believe they were, yes.
6   Q.  Was that just with the individual agent or
7   across-the-board for all agents working with the Antitrust
8   Division?
9   A.  I think just with the individual agent.
10  Q.  Have you implemented any new training for FBI
11  agents?
12  A.  Have I?
13  Q.  Yes, on the basis of this incident?
14  A.  No.
15  Q.  Has the Division sought to get certifications that
16  agents will adhere to the policy of the DOJ, CFR that they not
17  speak to the press about a person being charged?
18  A.  Specifically in response to this event, no.
19  Q.  Sir, in a big organization, it's possible even with
20  well defined policy for some individual to cross the line,
21  sir?
22  A.  Yes.
23  Q.  The fact that you have a policy is not a guarantee
24  that everyone will follow it, correct?
25  A.  Correct.

Page 63

1   Q.  Sir, in the SNTG application, the Division got
2   evidence of a cartel, correct?
3   A.  I am sorry, say that again?
4   Q.  In the course of the SNTG proffer and the short
5   cooperation period, January 15th through April 8th, the
6   Government got evidence of a conspiracy, correct?
7   A.  Yes.
8   Q.  You got documentary evidence in the form of lists,
9   correct?
10  A.  Yes.
11  Q.  You got witnesses, correct?
12  A.  Yes.
13  Q.  An Odfjell pled guilty to $42 million?
14  A.  Odfjell pled guilty and paid a $42.5 million fine.
15  Q.  John Nannes through his investigation turned over
16  evidence about the 1998 and 2001 conspiracy to the staff,
17  correct?
18  A.  That's my understanding, yes.
19  Q.  So from August, 1998 through March, 2002, you will
20  give Mr. Nannes credit for providing evidence of cartel
21  activity during that time period, correct?
22  A.  I am sorry, say that again? I didn't follow the
23  time period.
24  Q.  I want to direct your attention, I think it's
25  easier to work with a paper copy.

Page 64

1   MR. GIDLEY:  May I approach, your Honor?
2   THE COURT:  Yes.
3   Q.  Mr. Nannes gave the Division through the
4   interviews he had conducted of SNTG employees, evidence of the
5   1998 and 2001 conspiracy to exchange customer lists, correct?
6   A.  I believe that's correct.
7   Q.  The Odfjell charging papers charge a period and I
8   am referring to a demonstrative exhibit, Exhibit 7 of a
9   conspiracy starting in August of 1998 through March, 2002 --
10  excuse me through November, 2002, correct?
11  A.  Correct.
12  Q.  The existence of their conspiracy was first brought
13  to the Division's attention by Stolt-Nielsen, correct?
14  A.  It was first brought to our attention by the Wall
15  Street Journal.
16  Q.  All right, and you had your two hour investigation
17  and then you got the phone call from Mr. Nannes and Mr. Nannes
18  gave you evidence, didn't he?
19  A.  Eventually, yes.
20  Q.  We don't have to go through that about the
21  evidence, we know what we're talking about?
22  A.  Yes.
23  Q.  You were able to charge Odfjell from August, 1998
24  through November, 2002?
25  A.  Odfjell came in very shortly after the service of

Page 65

1   the grand jury subpoenas in February of 2003.
2   Q.  One other thing that may have motivated Odfjell was
3   publicity about the fact that Stolt-Nielsen had been admitted
4   to the amnesty program, correct?
5   A.  I am not certain that that was known before the
6   call. I just don't know.
7   Q.  Well, on what date, I don't know the specifics, but
8   on what date did Odfjell give you incriminating evidence that
9   enabled you to get into plea negotiations?
10  A.  I can't answer that today.
11  Q.  But you will concede for me the time period of the
12  conspiracy was given to you by Stolt-Nielsen?
13  A.  Yes.
14  Q.  The dispute is over eight months, not the time
15  period going back in 1999, 2000, 2001, correct?
16  A.  The dispute is not about the time. The dispute is
17  about a lie to get into the program.
18  Q.  I understand that, but let's hold that point a
19  side.
20      My question to you is this:
21      You will concede we gave you evidence of a 43 month
22  period of conspiracy and we have a dispute about not giving
23  you evidence from the March through November 2002 time period,
24  correct?
25  A.  We have a dispute about lying about prompt and

66

1 effective action and what occurred after that.
2  Q. Well, Odfjell, according to the plea papers, gave
3 you information on an eight month period of time from March
4 through November, correct?
5  A. No, that's not correct. They cooperated fully.
6  Q. But in terms of evidence on the period March 2002
7 through November 2002, Odfjell said the conspiracy continued,
8 correct?
9  A. Yes.
10  Q. But the Division got the original conspiracy from
11 Stolt-Nielsen, correct?
12  A. We had evidence from Stolt-Nielsen, yes.
13  Q. And in terms of the time period, it covered, you
14 know some 80 percent of the time period from August, 1998
15 through November, 2002, correct?
16  A. That's right.
17  Q. Sir, are you familiar with the term, "buyers
18 remorse?"
19  A. Yes.
20   MR. GIDLEY: I pass the witness.
21   THE COURT: Am I supposed to conclude something by
22 that question and answer?
23   MR. GIDLEY: Yes, your Honor.
24   MS. HILL: No redirect, your Honor.
25   THE COURT: Anything else?

67

1   MR. BLACK: The only other thing --
2   THE COURT: Do you have anything else of the
3 witness?
4   MR. BLACK: Not for this witness, no.
5   THE COURT: You are permitted to leave.
6    (Witness leaves stand.)
7   MR. BLACK: Your Honor, if the Court is going to
8 move to the Agent Sharp matter, I would like to make
9 available to the Court some other material that is of
10 relevance and I just want to do it at the beginning, rather
11 than --
12   THE COURT: Relevance to what?
13   MR. BLACK: To the Agent Sharp issue.
14   THE COURT: I didn't invite you to participate.
15   MR. BLACK: I know.
16   THE COURT: But I do want the article.
17   MR. BLACK: There is just some correspondence that
18 occurred --
19   THE COURT: I just want the article.
20   MR. BLACK: You have the article of Bob Shark.
21   THE COURT: Would you get him? What did you tell
22 him?
23   MS. NORMAN: I was unable to speak with him. I
24 asked somebody to tell him to be here by 3:00.
25   THE COURT: We will take a short recess.

68

1    (Whereupon, a recess was taken.)
2   MR. TERWILLIGER: Your Honor, we have also filed a
3 declaration and a few exhibits to go with it from the CFO of
4 the company on their irreparable injury issue.
5   THE COURT: Do you have Mr. Shark here?
6   MR. CONNOLLY: Yes, your Honor.
7   THE COURT: Bring him in.
8    Just so everybody knows, this is not for your
9 participation.
10    (Whereupon an in camera hearing was held, after which
11 the following transpired:)
12   THE COURT: All right, we're back on the record in
13 the case.
14    What is it that you want to tell me about
15 irreparable harm?
16   MR. TERWILLIGER: Thank you, your Honor.
17    We are prepared to put on testimony concerning
18 irreparable injury if the Court deems it necessary. Our
19 position is, although I will acknowledge that this hadn't been
20 made entirely clear by the Court and it's the Court's position
21 that matters, not our position, if this is a combined hearing
22 on the injunction and hearing on the merits, pursuant to Rule
23 65, then there is no need to make an irreparable injury
24 showing at this point because we have actually moved to the
25 point of a trial on the merits for a permanent injunction. If

69

1 that's not what we are doing, if in fact the preliminary --
2   THE COURT: We wrapped it up in one.
3   MR. TERWILLIGER: Then our position is, your Honor,
4 that there is no element of what the Court has to decide here
5 of irreparable injury.
6   THE COURT: Do you agree?
7   MR. CONNOLLY: Yes, your Honor.
8   THE COURT: Okay. Is there anything else you want
9 to present?
10   MR. TERWILLIGER: May I confer for a moment, your
11 Honor?
12   THE COURT: All right.
13    (Pause)
14   MR. TERWILLIGER: Your Honor, if there is no
15 objection from the Government, we would like to offer in
16 evidence the exhibits, other than the demonstrative exhibits
17 that were used in the direct and cross-examinations, so that
18 all of the exhibits and things that were referred to by
19 witnesses will be in the record.
20   MR. CONNOLLY: No objection, your Honor.
21   MR. TERWILLIGER: Okay. We have no other witnesses
22 to present. I think we would like to --
23   THE COURT: The Government has moved its admission.
24   MR. CONNOLLY: Yes, your Honor.
25   MR. TERWILLIGER: I have no objection to what they

70

1  put in.
2      THE COURT: Do you have an objection.
3      MR. BLACK: No, we have no objection. We have not
4  yet moved our exhibits.
5      THE COURT: Does anybody else have any objection to
6  anybody else's exhibits?
7      MR. TERWILLIGER: We do not.
8      MR. CONNOLLY: We were going to offer as exhibits
9  four affidavits by Stolt employees and I don't think there is
10 any objection by Stolt.
11     MR. BLACK: We do object on the grounds of hearsay.
12     MR. CONNOLLY: We would offer them as to Stolt,
13 then.
14     THE COURT: What are they, Mr. Connolly -- I
15 understand your objection. I understand your objection. You
16 know what my rules are.
17     MR. BLACK: I just wanted to say it.
18     THE COURT: If I don't think they should come in, I
19 won't consider it.
20     MR. TERWILLIGER: Your Honor, most of these are not
21 exhibits that arise from the occurrences leading up -- they
22 were not created in connection with the signing of the
23 agreement.
24     THE COURT: What are you talking about, what is he
25 giving me now?

71

1      MR. TERWILLIGER: Yes. Unfortunately, I do have to
2  object to those on the grounds that they are hearsay, number 1
3  and number 2, they really go to some substantive merits
4  aspects of this for which there is no opportunity to
5  cross-examine the witnesses -- they are witness declarations
6  and they appear to have been created, you know during the
7  litigation or at least during the period of the dispute,
8  rather than when the agreement was put together.
9      MR. CONNOLLY: Your Honor, three of them are
10 affidavits created by Stolt, so the idea they didn't have a
11 chance to cross-examine I don't think is a legitimate
12 objection and I think they are admissions by the company and
13 the reason we offer them -- the fourth is an employee of Stolt
14 that was a statement given to the Antitrust Division and we
15 provided them with a copy of it, because it was not in the
16 grand jury and they relate to the testimony that Mr. Nannes
17 gave about the compliance efforts on certifications being
18 signed and things like that.
19     So I think without having to get into the grand
20 jury testimony, which we obviously would like to keep
21 ex-parte, I think this is evidence that we could share with
22 them and I think it's relevant to this proceeding and we would
23 like the Court to have it, as well.
24     MR. TERWILLIGER: Just one point of clarification,
25 we did not obtain these from the witnesses, to the extent that

72

1  Mr. Connolly referred to them as ours.
2      In fact, they were obtained by their individual
3  counsel and made available to us. We requested them, but the
4  drafting of them and the work with the individuals was done by
5  their attorneys, not by us, so they are not our's.
6      THE COURT: Their individual counsel?
7      MR. TERWILLIGER: Yes.
8      THE COURT: Is that what I heard you say, Mr.
9  Black?
10     MR. BLACK: I have nothing more to say on that. I
11 would like to move our exhibits when we get around to it.
12     MR. CONNOLLY: The last thing I have are the
13 filings from the Odfjell cases and the individuals.
14     THE COURT: I was going to ask about that. No
15 objection to them.
16     MR. TERWILLIGER: Of course not.
17     THE COURT: Mr. Black?
18     MR. BLACK: No objection.
19     Your Honor, I would like to move the admission of
20 Wingfield exhibits 1 and 2 which are the declarations of
21 Roberta Liebenberg from Fine, Kaplan and Black with documents
22 appended that were attached to our motion for a preliminary
23 injunction.
24     There is one wrinkle on I believe its attachment
25 "C" to Ms. Liebenberg's declaration and the question has

73

1  arisen whether one page of that exhibit was or was not with
2  the letter that was delivered to the Government.
3      We have agreed with the Government that we'll work
4  that out by stipulation over the next couple of days. We'll
5  figure out what that was.
6      With that, I offer those two exhibits.
7      THE COURT: Any objection?
8      MR. CONNOLLY: No.
9      MR. TERWILLIGER: No, your Honor.
10         (So marked)
11     THE COURT: Anything else?
12     MR. BLACK: We move the admission of Wingfield 3
13 which we gave you earlier.
14     THE COURT: Any objection to 3?
15     MR. TERWILLIGER: No.
16     MR. CONNOLLY: No.
17     THE COURT: All right.
18         (So marked)
19     THE COURT: Anything else?
20     MR. TERWILLIGER: No other evidence. We would like
21 to have an opportunity to make some closing points with the
22 court as indicated at the outset of the proceedings, if that's
23 all right.
24     There is one other housekeeping thing. Your Honor,
25 I want you to know that when I stood after you had ruled on

74

1  our privilege objection, it was not to argue with your ruling,
2  it was to try to find some prophylactic way that if he was
3  going to testify to something privileged, we could contain it,
4  but I certainly was not questioning your Honor's ruling.
5       THE COURT: Okay. I don't need these, then?
6       MR. TERWILLIGER: That's correct.
7       THE COURT: All right. (Handing).
8       You are the plaintiff.
9       MR. TERWILLIGER: Thank you, your Honor and your
10  Honor, I don't intend to plow a lot of the old ground that we
11  talked about before.
12       If the Court thinks it would be useful now that we
13  have heard some evidence and so forth to file something
14  post-trial, of course, we would be pleased for the opportunity
15  to do that.
16       Mr. Griffin in the conclusion of his testimony on
17  cross-examination said and I believe I am quoting him
18  correctly, but I'll do the best I can from my notes: "This
19  dispute is about a lie to get into the program."
20       I think that characterization of this dispute puts
21  the objectivity of the Government's position on this somewhat
22  into question. I don't think, despite the differences between
23  his and Mr. Nannes's testimony, one necessarily has to decide
24  that either is lacking in credibility as is typical in
25  situations like this. Mr. Nannes may have heard less than the

75

1  Government thinks it said and the Government may have heard
2  more than Mr. Nannes believes he said, without necessarily
3  concluding that there is a lack of credibility, although there
4  are stark differences on a couple of key points about what was
5  said and what was not said. Although I think if you sort
6  through it carefully, you can perhaps even reconcile that,
7  because clearly, the characterization of what Mr. Nannes said
8  as a lie -- I think we all agree, it isn't meant to say Mr.
9  Nannes was lying. There is certainly something more here as a
10  legal matter then some metaphysical question of what the
11  company is on the other hand, when Mr. Griffin and the
12  Government, indeed, take the position that the company lied,
13  made a fraudulent misrepresentation, an intentional falsehood,
14  it does require resort to legal principles to decide where
15  that representation is from and who or what entity is
16  responsible for it, if we reach that point. But I don't think
17  we do, Judge. I don't think we reach that point at all,
18  because I think as I said at the outset of this case, we think
19  this dispute, this issue that's been raised can be decided as
20  a matter of law within the four corners of the agreement. I
21  think having heard the evidence and appreciating your Honor's
22  approach and the efficient approach to hearing the evidence
23  and being all inclusive about it, that you still can resolve
24  this question as a matter of law, within the four corners of
25  the agreement and in fact, Mr. Griffin's testimony has made it

76

1  easier for the Court to do that, because Mr. Griffin
2  maintained, as the Government's chief representative here that
3  there is no ambiguity in this agreement.
4       THE COURT: That's for the Court to decide.
5       MR. TERWILLIGER: Of course, it's for the Court to
6  decide. Absolutely, but if that is correct, if the
7  Government's position is and the Court decides that there is
8  no ambiguity in this agreement and one gives effect to the
9  merger clause as one must under the jurisprudence of
10  contracts, then, it's full stop and dispute over, because
11  there is nothing in that agreement about a representation that
12  all anticompetitive activity by Stolt-Nielsen ceased as of
13  March of 2002. It's just not there.
14       If you go beyond that --
15       THE COURT: Is it the position here that one who
16  seeks the immunity under the Amnesty Program is free to
17  continue doing what he has been doing once he applies for it?
18       MR. TERWILLIGER: No, and that did not happen here.
19       THE COURT: Well, what is your point?
20       MR. TERWILLIGER: My point is, your Honor that if
21  there was a representation within the four corners of that
22  agreement about prompt and effective action to terminate
23  having been taken, that representation was as of the time that
24  the anticompetitive activity was reported, because the
25  anticompetitive activity being reported is a term of art and

77

1  there is no dispute, but that the anticompetitive activity
2  ceased as of the time immunity was granted on January 15th and
3  it harmonizes the date in the agreement being January 15th.
4       As Mr. Griffin testified, if the agreement was
5  meant to restrict itself to the condition of all
6  anticompetitive activity having ceased by March, they have in
7  another case, according to him, changed that date of immunity
8  from the date upon which it is rendered to some other date and
9  as your Honor asked him, it could be an earlier date and they
10  didn't do that here and they could have and if they --
11       THE COURT: Couldn't your client have required
12  that?
13       MR. TERWILLIGER: They could, but there would be no
14  reason for them to do that.
15       THE COURT: Didn't Mr. Griffin say the reason they
16  don't do it is because they are not sure at the time the
17  person comes forward and they have to later determine and it's
18  sort of left open and they have to pin point when the time of
19  discovery was?
20       MR. TERWILLIGER: He offered that explanation, Mr.
21  Connolly offered another explanation --
22       THE COURT: Mr. Connolly is not the witness.
23       MR. TERWILLIGER: Okay, but I mean he made the
24  argument that the reason for the January 15th date is because
25  there are long term contracts, those contracts continued after

## Page 78

1  January 15th, so that just does not make any sense.
2  THE COURT: I agree it does not mean here and now.
3  I agree with that.
4  MR. TERWILLIGER: That raises a very difficult
5  issue in this case, because we can win within the four corners
6  of the agreement, even given the construct that the Government
7  wants to give to the terms of the agreement, the
8  interpretation that they urge upon the Court, because there is
9  ambiguity about "prompt" and there is ambiguity about
10 "effective." And if you don't go to Parole Evidence to
11 resolve that ambiguity, certainly not if Mr. Griffin said
12 there is no ambiguity, that is really an admission on his
13 part, then, you give the terms their reasonable meanings under
14 common usage of the words as they are "prompt and effective",
15 does not mean, here, now and complete. That does not make any
16 sense. If you meant here, now and complete, you can say here,
17 now and complete.
18 THE COURT: There has to be reasonableness.
19 MR. TERWILLIGER: Without that reasonableness being
20 expressed in any chronological period, it may not mean years
21 but it may mean years and it's easy to harmonize the facts in
22 this case as you heard them to a prompt and effective action
23 being a process that was begun in March and it ended in
24 December.
25 If you give it that meaning, then we meet the

## Page 79

1  conditions of that agreement, even as under the construct that
2  the Government gives to them -- the difference is that the
3  Government wants to give a meaning to the term, "prompt and
4  effective" that with all due respect to Mr. Griffin, who is
5  obviously a fine man and who comes here in good fate and the
6  Government is in good fate taking a legal position and you
7  cannot completely change the meaning of words in an agreement
8  from prompt and effective to immediately and completely
9  terminated.
10 He is taking that position if he says there was a
11 March cut-off and anything after the March cut-off, made us
12 ineligible -- ineligible -- for the program.
13 I would also like to talk about the discovery issue
14 for just a moment, if the Court please.
15 Discovery is also a term that is not defined in the
16 agreement and in fact, if you even go into the policy
17 statements and even beyond the policy statement to the
18 speeches, which from the testimony we heard I think the Court
19 could reason that they are given the force and effect of
20 policy.
21 Now, there is no reason under rules of contract
22 construction to read those into the agreement, because the
23 first step is to give the terms their reasonable and ordinary
24 meaning and common usage, but even if you go and look at those
25 policy statements for guidance, there is nothing that

## Page 80

1  illuminates discovery. Certainly, there is nothing in that
2  agreement, your Honor, that says discovery is by counsel or
3  the board of directors. That is not even in the policy.
4  That's in a speech. If in fact that is --
5  THE COURT: A speech given by whom?
6  MR. TERWILLIGER: By Mr. Spratling.
7  THE COURT: Who was Mr. Spratling?
8  MR. TERWILLIGER: He was the lead of enforcement
9  for the Antitrust Division up until when --
10 MR. CONNOLLY: He was Mr. Griffin's predecessor.
11 THE COURT: I know the answer, all right. I know
12 the answer.
13 MR. TERWILLIGER: Okay.
14 THE COURT: When did he give it?
15 MR. TERWILLIGER: When did he give the speech?
16 THE COURT: April 1, 1998 and when did Mr. Nannes
17 begin again in the Antitrust Division, in February, 1998. He
18 had a sophisticated lawyer when dealing someone that he knows.
19 MR. TERWILLIGER: Sure.
20 THE COURT: And with whom he had worked.
21 MR. TERWILLIGER: I don't know dealing when with
22 somebody who he knows.
23 THE COURT: He comes forward to try and get the
24 amnesty.
25 MR. TERWILLIGER: Mr. Spratling wasn't there.

## Page 81

1  THE COURT: I am talking about Mr. Griffin and I am
2  talking about Mr. Nannes
3  MR. TERWILLIGER: My point, your Honor, is not to
4  debate the applicability of counsel's business. My point is
5  that discovery is hardly defined. It is of little aid to
6  those of us, like the Court, in a position trying to figure
7  out what this agreement means, if you just don't give the
8  terms their plain meaning.
9  THE COURT: You are arguing that discovery pops up
10 in some speech. It's not that Mr. Nannes didn't know what was
11 going on.
12 MR. TERWILLIGER: I am not arguing it just popped
13 up in some speech. My point is the limitation on discovery,
14 the further definition of discovery is not in the agreement,
15 but more importantly than that, if we go to the next level
16 with discovery, discover what? That's the wheel nub of this.
17 If a detective walks into a house and he finds blood all over
18 the floor and a knife there and he says it's a homicide, it's
19 not a homicide yet, if eight months later they find a dead
20 body on the premises or on the premises of the guy whose
21 fingerprints are on the knife, then it's a homicide, but just
22 because you have some indication, some reason to believe or
23 suspect, does not mean that you have in fact discovered an
24 anticompetitive activity and I would say that under the terms
25 of this agreement, if you look in the four corners of it, you

82

1  have to discover anticompetitive activity that is in fact a
2  crime, that it's a Sherman Act violation, just like the knife
3  and blood is not a homicide. By the way, I admire Mr.
4  Connolly's valiant attempt to distinguish Columbus, but with
5  all due respect, Columbus, didn't know from California.
6  Columbus New West Indies and he was even confused about where
7  he was. So he didn't discover California at that point and it
8  really illustrates the point. Discovery can't be just a
9  whiff, an indication or something of that nature. It is a
10 legal conclusion drawn by an expert that there is sufficient
11 evidence there of a Sherman Act violation to conclude that
12 this anticompetitive activity has now been discovered and
13 maybe that's a process, too. Maybe discovery does not occur
14 on one particular day. Maybe it's a process. In Mr. Nannes'
15 case it's a process of the information he got from the
16 beginning, his investigation and colloquy with employees and
17 then the discovery was made when he finally got the evidence.
18 Here, now, we have a Sherman Act violation. It's no longer a
19 memorandum about conscious parallelism. A violation, a
20 Sherman Act violation because it is a customer list exchange
21 between competitors.
22          I want to talk just a minute about what happens
23 here if this contract is voided. There has been a number of
24 different terms thrown around about it. We have talked about
25 the contract and I think the Government has taken the position

83

1  that the contract was void ab initio because we were
2  ineligible for the program. What they are really talking
3  about is rescinding the whole contract. They are saying
4  because a misrepresentation was made, we have the right under
5  the agreement to rescind the agreement and they are saying
6  that because the agreement gives us the right to use
7  everything that you gave us against you, not only do you lose
8  your immunity, but we can use the information that you gave us
9  against you to prosecute you. That seems harsh to me, Judge,
10 under equitable principles here, when you consider and this
11 goes to all of the evidence that we developed about the
12 benefit of the bargain. The Government got the full benefit
13 of the bargain here. We have heard argument that they didn't
14 get the benefit of the bargain because the integrity of the
15 process of the agreement was affected.
16          THE COURT: That's not the argument, as I
17 understand it.
18          MR. TERWILLIGER: I understand them to be saying
19 that they didn't get the benefit of the bargain, because the
20 integrity of the program is affected and they had to make
21 deals with some other people that if we had told them
22 everything, they would not have had to make. The bottom line
23 is, they achieved the objectives of the entire program and the
24 agreement here which was to be able to break up the cartel as
25 we heard so eloquently from Mr. Griffin and indict and charge

84

1  other individuals and entities and that has been accomplished.
2          There is a case in our brief, your Honor, that I
3  would urge the Court to consider in this regard.
4  Unfortunately, it's not from the Third Circuit, but the
5  principles upon which it's based are very well-established.
6  It's United States versus Castaneda and the very question in
7  that case is whether the defendant's admitted failure to
8  cooperate by not providing 100 percent exposition of the facts
9  in his possession entitled the Government to rescind an
10 agreement by which he would not be prosecuted and instead
11 prosecute them and there are a couple of important principles
12 that come out of that decision. One is that it is something,
13 despite the language of the plea agreement for a court to
14 decide, because due process rights are implicated not for the
15 Government to decide unilaterally and number 2, that perfect
16 performance is not necessary in order to avoid a breach of an
17 agreement of that nature to provide cooperation and I would
18 submit to you, your Honor, that the metaphysical question of
19 whether the company is responsible for misleading the
20 Government here, going in, can be avoided by looking at
21 Castaneda and saying, okay, let me assume that Stolt-Nielsen
22 did not provide 100 percent cooperation here and that it's
23 representations at the beginning were not 100 percent
24 accurate, but nonetheless, there was substantial performance
25 of its obligations under their agreement by Stolt-Nielsen and

85

1  the Government got the benefit of its bargain and therefore,
2  rescinding the contract, doing away with it, particularly
3  whereas I mentioned when we first had an opportunity to speak
4  to you in this proceeding, particularly where you cannot put
5  Stolt-Nielsen back where it was before, should control the
6  outcome of that question.
7          But, the bottom line, your Honor, is, that in this
8  particular instance, if you frame the legal issue as the case
9  of statutory construction that was presented to the Court
10 initially, I think after hearing this evidence, considering
11 the exhibits, it is clear that the Court can conclude that
12 whatever those terms prompt and effective mean, what discovery
13 means, whatever they may mean, whatever may be the parameters
14 of the definition of those terms, one thing they don't mean is
15 immediate, now, absolute cessation. You cannot go so far as
16 to read those into the contract and if that's the case, then
17 there was no -- there is no basis to find an affirmative
18 misrepresentation by the company that was intentional and
19 therefore, fraudulent, which would be sufficient to void this
20 contract.
21          Unless the Court has any other questions, we thank
22 you very much, your Honor, for the time and attention you have
23 given to this matter and the approach the Court has taken to a
24 novel procedural issue.
25          THE COURT: If I were to find that Stolt-Nielsen

86

1  substantially performed and gave the Government everything it
2  wanted in terms of prosecuting coconspirators and I also found
3  that they intentionally misled the Government as to their good
4  fate efforts to cessation, does that absolve, that is the
5  substantial performance, absolve them from the initial
6  misrepresentation that was an inducement for the Government to
7  enter into the agreement?
8      MR. TERWILLIGER: I would say it does, unless that
9  representation --
10     THE COURT: The end justifies the means?
11     MR. TERWILLIGER: No -- well, it has an effect on
12 the evaluation of what would be an appropriate remedy, if you
13 found a misrepresentation and whether voiding the contract,
14 which is about the only remedy that is available here and it's
15 what the Government has already done, really. That's what we
16 are here contesting, what the Government has done and in fact,
17 your Honor, there is an important point if I may digress for a
18 second on that issue. We certainly had the burden of going
19 forward here as the plaintiff, but I would be remiss if I did
20 not point out to the Court that the burden of proof here, the
21 burden of persuasion at the end of the day is on the
22 Government to show by clear and convincing evidence that we
23 breached this amnesty agreement. The jurisprudence on plea
24 and immunity agreements is clear on that point. It's in our
25 brief, I won't belabor the discussion with the cases at this

87

1  point, but it's clear that that is their burden.
2      If the Court were to find -- if I may, your Honor,
3  let me just approach that just a slightly different way.
4      The Government's position is that Mr. Nannes came
5  in and said, everything stopped in March, all anticompetitive
6  activity ceased as of March of 2002. That's the Government's
7  position as to the representation that he made. The
8  Government says we now find out that there was anticompetitive
9  activity that took place after that and therefore, what Mr.
10 Nannes did was a misrepresentation. There are several
11 intervening steps that you have to get to, to make that
12 representation material, even assuming that it was in error.
13 I will address the fraudulent in a second, but assuming it was
14 in error, it's incorrect, because there was anticompetitive
15 activity after March. In order to get there, you have to pull
16 the trigger on the prompt and effective action requirement,
17 number 1, and that's discovery and to pull the trigger on
18 discovery, the Government, which has the burden of proof on
19 this, has got to show your Honor, by clear and convincing
20 evidence that there was discovery in March. I frankly still
21 from all of this testimony and all this, don't know what
22 discovery means with any certainty, but there is no proof,
23 whatsoever, that there was a discovery in March of
24 anticompetitive activity that is a crime under the Sherman
25 Act, number 1.

88

1      Number 2, if you find that there is discovery, then
2  you have to construe prompt and effective action to mean
3  immediate and terminate. That's not in the agreement. It's
4  not even in the policy statements.
5      Number 3, I would submit, your Honor, you have to
6  find that whoever undertook this anticompetitive activity post
7  March, that despite the withdrawal of Stolt-Nielsen from the
8  conspiracy, its overt acts about which there is no dispute
9  that they sent these notices, that that was authorized, that
10 there was something that over came the withdrawal of agency
11 authority to bind the company to non-competition agreements at
12 that point, for all the reasons that I outlined in the
13 beginning.
14     The long and the short of all that is, your Honor,
15 to find a misrepresentation, have you to go through, I would
16 respectfully submit, all those steps and they are just not
17 there.
18     So I think the way to harmonize in the simplest
19 way, the resolution of their dispute is, that even if you give
20 the terms of the agreement their ordinary meaning with a
21 little bit of gloss from the policy statements that we have
22 here, there is still a question that exists as to a clear and
23 convincing showing that Stolt-Nielsen did not take prompt and
24 effective action as that term is given its reasonable meaning.
25     So, for that reason, your Honor, it seems to me

89

1  that however regretful it is that the Government seems to feel
2  that this company deserves this treatment, they did write an
3  agreement that the law can allow them to take the unilateral
4  action of suspending this agreement and the court should not,
5  for the reasons I have outlined, ratify it and again, I thank
6  you, Judge.
7      THE COURT: Mr. Black?
8      MR. BLACK: Your Honor, Allen Black for Richard
9  Wingfield.
10     I would like to start with two sort of housekeeping
11 matters. One is that I would like to simply put on the record
12 Mr. Wingfield's objection to the consideration of any ex-parte
13 or hearsay evidence on the merits of this matter. I am sure
14 the Court will not do that. I understand there is a pending
15 motion by the Government for leave to submit ex-parte evidence
16 to which we responded in an erroneously captioned brief that
17 thought it was a motion for reconsideration, rather than
18 opposition papers, but we will straighten that out.
19     THE COURT: I already granted the motion.
20     MR. BLACK: We haven't seen that.
21     The second sort of housekeeping thing, it's really
22 substantive, but my brain trust here informed me yesterday
23 that on the question of whether Mr. Wingfield needs to have
24 seen the agreement to be able to be a beneficiary of it, the
25 law is, that he need not have seen or even have been aware of

90

1  the agreement to be a third-party beneficiary and the case is
2  Whitfield against Providence Hospital (sic) and it's cited in
3  our briefs. So they saved me from that one. I hope they can
4  save me from the others.
5          I would like to say that from Mr. Wingfield, as
6  well as from the company, the Government got the substantial
7  benefit of their bargain. As Mr. Terwilliger pointed out,
8  they got the evidence, that Mr. Wingfield in large part
9  provided to Mr. Nannes about the activities that went back to
10 1998, years before he was even in the United States.
11         THE COURT: Did he have any contact with Mr.
12 Nannes?
13         MR. BLACK: Yes, your Honor, I believe he did.
14         Mr. Nannes testified that Mr. Wingfield went and
15 found the lists at his request and had turned over to him Mr.
16 Wingfield's journals and in that regard, I think it's
17 interesting that Mr. Wingfield had turned over to the
18 Government all of his diaries and daily journals, all the way
19 up through December of 2002, which covers the whole period
20 they are complaining about. He had given them the evidence
21 concerning that period. The evidence was strong enough to let
22 them get these indictments. So, I keep getting the feeling
23 that the tail is wagging the dog here, your Honor, in terms of
24 what Mr. Wingfield and the company gave to the Government,
25 versus what they didn't give.

91

1          So, to follow the language of the Castaneda case
2  which is a very important case, the Government has not been
3  deprived of the benefit of the bargain, even under the
4  Government's version of the facts and that leads me to ask the
5  Court to please bear in mind as you decide this matter, that
6  the Government -- the Court has heard only the Government's
7  side of this story about Mr. Wingfield's actions and behavior
8  and not Mr. Wingfield's. I am sure the Court understands the
9  rock and the hard place that Mr. Wingfield finds himself in.
10 Either he has to let the Government's versions of the facts go
11 unchallenged or he has to come in and waive his Fifth
12 Amendment rights to tell his side of the story and take the
13 risk that if the Court voids the agreement, he is toast
14 because he has waived his Fifth Amendment rights. We
15 understand that. That's life. I just hope the Court will
16 understand that he has not had the opportunity -- that you
17 have heard really only one side of the story.
18         I would like to talk very briefly about just two or
19 three -- two cases, really. One of them very recent Third
20 Circuit case, United States against Rivera, that was decided
21 February 4th of this year. Your Honor nods his head. I don't
22 need to read you the quotes from that case. It's a darn good
23 case. It sets forth the law very strongly and it's not an
24 aberration, it's a culmination of all the cases that you read.
25 These rules are all the same, ambiguities have to be construed

92

1  against the Government, there is a constitutional overlay, et
2  cetera, et cetera. I would like to stress again, as Mr.
3  Terwilliger did, the importance of the Castaneda case which is
4  a case very much like this one I think. Castaneda, like Mr.
5  Wingfield, was an imperfect cooperating witness. He did a
6  lot, but he didn't do everything that he had promised to do.
7  He promised to tell everything he knew and he told most
8  everything that he knew, but not everything and the a circuit
9  in that case reversed the conviction and held that the
10 District Court should have dismissed the indictment in that
11 case because the quantity and quality of what Mr. Castaneda
12 had provided was so much more substantial than the areas in
13 which he had failed to live up to his promise, to tell
14 everything that he knew and there is a great quote from that
15 case that I just can't resist reading to your Honor, it's only
16 10 or 12 lines long, but this is a great quote:
17         "It ill behooves the Government agents and
18 prosecutors to enter into agreement of transactional immunity
19 with mid level coconspirators. Milk them of substantial leads
20 and information that literally make the Government's case
21 against the big fish. While coincidentally giving the
22 Government a lay down winning hand against the cooperating
23 coconspirator and then at the last moment, rely on some
24 technical or relatively minor deficiency in performance to
25 pull the rug out from under the cooperating informant by

93

1  claiming a breach and proceeding to prosecute him in a slam
2  dunk case based largely on his own revelations."
3          That's really pretty much the situation Mr.
4  Wingfield finds him in today.
5          THE COURT: Who is the big fish in Mr. Wingfield's
6  case.
7          MR. BLACK: I think the big fish are the other
8  coconspirators and the people who were above him.
9          THE COURT: Where?
10         MR. BLACK: I would say at Stolt and elsewhere.
11         THE COURT: But he did not come in and give them
12 the big fish.
13         MR. BLACK: That's not what they are complaining
14 about, I think.
15         THE COURT: That's a factual scenario to me.
16         MR. BLACK: The cases aren't exactly same, but they
17 are darn close and it's a darn good quote, you have to admit.
18         Mr. Wingfield was not a perfect cooperating
19 witness, but he was pretty darn good and the stuff he gave the
20 Government was pretty darn good. The Government's strongest
21 case against him is he failed to come forward at the time he
22 was not represented by counsel with two pieces of evidence,
23 one that the conspiracy continued until November, 2002,
24 instead of ending in March, 2002, all of which was before Mr.
25 Nannes went into see the Government. I just want the make it

94

1 crystal clear --
2    THE COURT: I understand.
3    MR. BLACK: -- there is not the smell here of a case
4 that Mr. Wingfield or the company or anybody else was
5 continuing to do bad stuff at the same time Mr. Nannes is
6 negotiating with Mr. Griffin. It was done by then. It's a
7 question of how long it went on in the past. That's a matter
8 of historical fact. That's one thing he didn't come forward
9 and tell them and the other one, some witness other than Mr.
10 Wingfield had lied to the Government about that same fact.
11    Balanced against that are the uncontested facts
12 that Mr. Wingfield supplied all of his business diaries and
13 daily journals that very highly incriminating evidence in them
14 and the smoking gun customer lists. The Government argues
15 that those lists and journals were technically the company's
16 property. They had title to them and they say Mr. Wingfield
17 didn't have title to them. I don't care whether they were the
18 company's or Mr. Wingfield's, but as Mr. Nannes testified,
19 when Mr. Nannes went in and asked for the production of the
20 documents that related to this anticompetitive activity, Mr.
21 Wingfield went and got his diaries, what were still there and
22 gave them to him, what had not been stolen and went and found
23 these lists and gave them to them.
24    So, the bottom line, really, I think in a common
25 sense way is, the penalty fit the crime? To the extent that

95

1 Mr. Wingfield failed to cooperate, does he deserve the
2 draconian penalty that for failing to come forward with
3 evidence that a four and a half year conspiracy went on for an
4 extra six or eight months, that his amnesty agreement is
5 revoked and he is subject to prosecution with a slam dunk
6 case, based on evidence that he, himself has provided?
7    Why didn't Mr. Connolly or somebody pick up the
8 phone early on when they thought something was awry, when they
9 first started getting vibes there was something wrong about
10 this March date and this November date? Why didn't the
11 Government give Richard Wingfield, the same chance they gave
12 the witness who lied to them? The witness that lied to them,
13 they gave a second chance. They said hey, this does not sound
14 right. Go get yourself your own lawyer and come in here and
15 we'll give you a separate agreement that will protect you and
16 now you can come in and tell us the truth. They don't say Mr.
17 Wingfield lied to them. They never talked to Mr. Wingfield.
18 Mr. Wingfield did not lie to them, but yet, why don't they
19 give him the same opportunities they gave to the witnesses who
20 lied to them. I think that goes to the materiality of any
21 omissions on Mr. Wingfield's part.
22    Instead, instead of picking up a phone and calling
23 Mr. Nannes and saying let's come in here and straighten this
24 out, instead of giving Mr. Wingfield an opportunity to do the
25 same thing when they think there is something wrong, they

96

1 don't tell Mr. Wingfield in April that they have suspended the
2 company from the program --
3    THE COURT: Whose obligation was it to tell him?
4    MR. BLACK: I think they certainly should have told
5 him that. Somebody should have told him that.
6    THE COURT: Hey Mr. Wingfield, do you know, this
7 agreement we don't know about it, we don't have it?
8    MR. BLACK: I am sure Mr. Wingfield knew about the
9 amnesty agreement. He didn't have it, but he knew the company
10 had an amnesty agreement. And then they arrest him and they
11 call the company saying tomorrow we're going to arrest
12 Wingfield and Agent Sharp goes out and gives all these highly
13 improper interviews to the press, saying that no matter what
14 the outcome, the arrest will remain on Mr. Wingfield's record.
15    I would closely echo a little bit about what Mr.
16 Terwilliger said at the beginning of his closing that I
17 don't -- I sat here and heard the witnesses, as did your Honor
18 and I don't think you need to go to -- I don't think the Court
19 needs to go to a point of determining that one of them was
20 credible and one of them wasn't and one of them was telling
21 the truth and one of them was lying. I think that, you know,
22 sometimes you have two people who are in a conversation or in
23 a negotiation and who have very honestly differing perceptions
24 of what happened and what was said and what went on and I
25 think that's very likely what happened here.

97

1    THE COURT: How would I determine what went on?
2    MR. BLACK: In terms of whether there were
3 statements that everything ended in March of 2002 and those
4 sorts of things.
5    Of course that's --
6    THE COURT: How do I make that determination. You
7 tell me they are not intentionally misleading me, that they
8 had different recollections of what happened. How do you
9 resolve the difference?
10    MR. BLACK: I don't think I need to resolve that.
11 No, I really don't. For one thing, that's why you have
12 integration clauses in contracts, so that later, the Court
13 don't have to deal with the he said, she said, about what went
14 on in the negotiations. There was one here that the
15 Government put in. One way you can avoid dealing with that is
16 simply saying the he or she said stuff is irrelevant, so I am
17 going to decide it without looking at that. I don't have to
18 look at that.
19    Another thing the Court can do is follow the course
20 of what the Third Circuit said should be done in cases like in
21 the Gebble case in 2002, where the Court said that what the
22 district court should do in those circumstances, is look at
23 the contract, see if that resolves the issue. If it does not,
24 look at the surrounding circumstances and the extrinsic
25 evidence, see if that resolves the issue and if there is still

98

1  uncertainty as to what it really is, then you fall back on the
2  rule of construction and say that the ambiguities must be
3  construed against the Government.
4      THE COURT: In the second step, what goes on in the
5  second step?
6      MR. BLACK: I think it's what you just did here, to
7  hear what the people had to say.
8      Thank you, your Honor, unless have you any
9  questions.
10     THE COURT: Thank you, Mr. Black.
11     MR. BLACK: Thank you, your Honor.
12     MR. CONNOLLY: Very briefly.
13     THE COURT: I have to ask you a question before you
14 get into it.
15     Do you agree that the Government's investigation in
16 this matter is completed and it's just a matter of whether or
17 not it's going to indict?
18     MR. CONNOLLY: No, your Honor. No, definitely not.
19     THE COURT: So, do you perceive this proceeding as
20 interfering with your criminal investigation.
21     MR. CONNOLLY: Absolutely, if there were an
22 indictment of Mr. Wingfield and Stolt-Nielsen tomorrow, this
23 matter would continue.
24     THE COURT: Do you perceive this as interfering
25 with the proceedings.

99

1      MR. CONNOLLY: The entire process of trying to find
2  out what happened, that we didn't get from Stolt that resulted
3  in tremendous delay in the grand jury investigation and that's
4  why yesterday and I can't put my hands on it, but we cited and
5  referred the Court to the Skalsky (sic) case, a Third Circuit
6  case and first, we have much disagreement the Government got
7  the benefit of its bargain. The benefit of the bargain was
8  truthful testimony, full exposition of the facts. You got a
9  lot of bad guys and you may have had to cut them some breaks,
10 but you still got them and I don't think that's the law in
11 this circuit.
12     I am sorry, did I answer that question.
13     THE COURT: I wanted to see how I was interfering
14 with the criminal investigation.
15     MR. CONNOLLY: I am sorry, I didn't hear that.
16     THE COURT: I am soft spoken sometimes.
17     I wanted to know how the Government perceived my
18 entertaining these civil suits was interfering with the
19 criminal investigation, if at all?
20     MR. CONNOLLY: It's delaying the investigation. We
21 said in chambers -- and I'll say on the record -- we don't
22 have an immediate statute problem. We have agreed to postpone
23 the indictment, but I think -- the process of getting the
24 facts that we did not get from Stolt and this is part of it,
25 that process has resulted in a lot of delay in the

100

1  investigation and I don't have a lot to say. I want to answer
2  a couple of issues that came up and answer any questions the
3  Court has, but a couple of times it was said, why didn't the
4  Government just pick up the phone and call Mr. Wingfield and
5  tell him there was a problem. Stolt would have had me up on
6  ethics charges.
7      THE COURT: You could have called Mr. Nannes.
8      MR. CONNOLLY: We did call Mr. Nannes.
9      THE COURT: And tell him to bring Wingfield?
10     MR. CONNOLLY: We didn't tell him to bring
11 Wingfield.
12     THE COURT: Did you tell him you wanted to talk to
13 him?
14     MR. CONNOLLY: No, we did not.
15     THE COURT: Why not?
16     MR. CONNOLLY: One Stolt executive told a false
17 story about his conduct and Mr. Wingfield's conduct and then
18 got an opportunity to get separate counsel. It was the little
19 fish, big fish. It was Mr. Wingfield's subordinate. That's
20 happened. Your Honor, I covered the benefit of the bargain,
21 except for one point. The Court asked, well, if you found
22 substantial performance, is it a problem that Stolt may have
23 gotten into the program by misrepresentation, is that cured by
24 the fact of the substantial performance? I would say most
25 certainly not, your Honor, because the Amnesty Program as it's

101

1  setup is an executive branch decision to allow companies that
2  meet those representations to qualify. Another representation
3  in there goes to your question, have they coerced anybody to
4  get into the agreement and substantial performance provided a
5  cure to misrepresentations to get yourself into the agreement,
6  I don't believe that's correct.
7      I will talk about prompt and effective. I don't
8  want to belabor the evidence, but what is at issue here is
9  conduct that continued from March to November by the same
10 people, Mr. Wingfield, conspiring with the same people,
11 Odfjell and others and stopping because of external events,
12 not the Stolt Leniency Policy finally kicking in -- excuse me,
13 the antitrust compliance program finally kicking in, but a
14 customer in Europe has got a hold of a diary that's
15 incriminating and The Wall Street Journal now has an article,
16 so the Government initially applies reasonableness of prompt
17 and effective and we don't believe that continuation of March
18 to November in these circumstances is prompt and effective and
19 I urge the Court to make the same findings.
20     Your Honor, I think other than that, we rely on the
21 argument we made yesterday.
22     THE COURT: Okay.
23     MR. CONNOLLY: Thank you, sir.
24     MR. TERWILLIGER: May I respond in less than two
25 minutes, briefly?

102

1   THE COURT: All right.
2   MR. TERWILLIGER: Thank you, Judge. I really don't
3   want to play this card of "I used to be there", but it is
4   germane to the point that Mr. Connolly just made, particularly
5   in response to your Honor's question about interference with
6   the investigation and the benefit of the bargain. I spent 15
7   years in the Justice Department, your Honor. Eight of those
8   as an Assistant United States Attorney. I dealt with lots of
9   non-cooperators, incomplete cooperators and there are a lot of
10  things you can do when somebody does not cooperate and that a
11  prosecutor should do, but one of them is not to immediately
12  tear up the cooperation agreement and that is especially so
13  when the cooperation agreement is with an entity that can
14  produce other cooperation from individuals and the entity,
15  itself, is not a witness. Somebody argued I think it was Mr.
16  Connolly or it came out in a question, that one of the reasons
17  that this had to be terminated, as far as the Department was
18  concerned, was because the credibility of the cooperator had
19  been adversely affected. The credibility of the company does
20  not matter in an evidentiary sense. The company's
21  contribution to this effort is bringing people and evidence
22  forward. Every piece of evidence that we are heard about in
23  this case has flowed from Stolt-Nielsen's initial cooperation.
24  THE COURT: Isn't that what happened in Skalsky?
25  MR. TERWILLIGER: Yes, your Honor and, you know

103

1   these cases -- the benefit of the bargain analysis is
2   certainly case specific. Here, the benefit of the bargain --
3   the benefit of the bargain in this case was fully enjoyed by
4   the Government. If the Court concludes, as you indicated in
5   hypothesizing initially, that there was a misrepresentation
6   here, but also concludes that the Government got the
7   substantial benefit as Castaneda expresses it, of the bargain
8   here, then that misrepresentation as a matter of law was not
9   material to the bargain between the parties here and it's
10  insufficient to void the agreement.
11  One final point, your Honor, that I think is
12  especially important, having heard from Mr. Griffin and
13  considering the burden. Mr. Griffin said that he could not
14  recall whether there was a response from Mr. Nannes to his
15  head fake comment. He couldn't recall exactly what his word
16  were, but whatever that was. The Government outside the
17  expressed terms of this agreement cannot be said as a matter
18  of law to dictate the term — some additional terms of this
19  agreement --
20  THE COURT: Okay, that conversation with head fake
21  precedes the signing of this conditional agreement by a month;
22  does it not?
23  MR. TERWILLIGER: Yes, it does.
24  THE COURT: And was not the head fake comment
25  something that was set out as a warning shot and did not

104

1   require any response? Could I construe it as that from the
2   testimony that I heard?
3   MR. TERWILLIGER: Well, I don't know about did not
4   require a response, your Honor because if the Government is in
5   here now telling you that that condition, the head fake
6   condition what was said at the December 4th meeting and that's
7   all we heard about from Mr. Griffin concerning when this new
8   condition arose, was what happened at that meeting, if there
9   is no response to it, then there is no agreement between the
10  parties that that condition is part of the agreement.
11  THE COURT: So the head fake came on December 4th?
12  MR. TERWILLIGER: That's the Government's --
13  THE COURT: We are still doing the dance here. We
14  want to find out whether or not we're going to finish the
15  dance.
16  MR. TERWILLIGER: Clearly, it's not part of the
17  proffer --
18  THE COURT: Understood.
19  MR. TERWILLIGER: I would say for that reason, it
20  can't be part of the agreement.
21  THE COURT: They're still dancing. All right, now,
22  if this is a head fake, you know you are not going to be in,
23  so what happens, five weeks later, six weeks later, they enter
24  into the agreement. The Government could argue that that head
25  fake was a warning to Mr. Nannes, make sure, otherwise they

105

1   are not going to qualify and what happens in between.
2   Obviously, Mr. Nannes says I checked and it's okay. Let's go.
3   MR. TERWILLIGER: Well, I am not sure that's the
4   evidence, your Honor, but as a matter of contract law, as a
5   matter of contract law, if that was part -- if that became
6   part of the agreement between the parties, then there has to
7   be ascent on Stolt-Nielsen's part through its counsel and
8   there is no evidence of that and it preceded, as you said, the
9   proffer session at which point the agreement is truly joined
10  by a substantial period of time.
11  Your Honor, I appreciate the Court's practical
12  approach to the evidence here and I know that your Honor will
13  consider the law in the context of the overall facts here.
14  THE COURT: I will consider the facts in the
15  overall context of the law, how is that?
16  MR. TERWILLIGER: You know, your Honor, I think
17  there is another view of what the facts show here. I think
18  what the facts show is that the Government --
19  THE COURT: Mr. Terwilliger, you take my questions
20  of being a statement of my position.
21  MR. TERWILLIGER: Not at all, your Honor. I
22  wouldn't assume that -- I have been in too many courtrooms
23  before too many judges to make the mistake of making that
24  assumption, but I am using it as a segway to a point, if I may
25  and that is this, your Honor, what appears to have happened

```
                                                      106
 1   here is the Government made a deal that at the end of the day,
 2   they decided they didn't like -- that's really what Mr.
 3   Gidley's question about buyer's remorse was. They now seized
 4   upon the argument that we have heard here to play a game of
 5   "Gotcha." I gotcha, you are out of this agreement because you
 6   know what, even though your counsel came in in good fate and
 7   told us everything he knew and went through this business
 8   about what the activities they undertook in March, we can make
 9   an argument that in fact there was discovery in March, you had
10   to take prompt and effective action in March and we mumbled
11   something about a head fake along the way here and you were on
12   notice and that's good enough to read it into the agreement.
13   I don't think the Court should validate that approach.
14           Thank you again, very much.
15           THE COURT: Anything else?
16               (No Response)
17           THE COURT: Do you all feel you had enough of an
18   opportunity to say what you wanted to say and present whatever
19   you wanted to present?
20           MR. CONNOLLY: Yes.
21           MR. TERWILLIGER: Yes.
22           MR. BLACK: Yes.
23           THE COURT: That concludes the matter.
24           Thank you.
25       (Whereupon, at 5:00 p.m., court was adjourned.)
```