# Exhibit 17

STOLT–NIELSEN S.A. v. U.S.    **553**
Cite as 352 F.Supp.2d 553 (E.D.Pa. 2005)

courts should consider several factors in setting a fee award. These include the size of the fund created and the number of persons benefited; the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; the skill and efficiency of attorneys involved; the complexity and duration of the litigation; the risk of nonpayment; the amount of time devoted to the case by plaintiffs' counsel; and the awards in similar cases. *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195, n. 1 (3d Cir.2000); *see In re Prudential,* 148 F.3d at 336–40; *In re General Motors,* 55 F.3d at 819–22.

[7, 8] The FCRA provides that in the case of any successful action to enforce liability under the statute, costs and attorneys' fees shall be awarded. 15 U.S.C. § 1681n(a)(3). The settlement agreement also provides that Plaintiff may apply for an award of attorneys' fees and reimbursement of expenses payable from the Settlement Fund. Plaintiff is applying for fees and expenses in the amount of 33% of the $772,500.00 Settlement Fund, equal to $254,925.00.

There are no objections to Plaintiff's fee request. Claiming class members will receive a substantial benefit. A 33% fee is reasonable and well within the norm. Plaintiff's counsel articulated a complex recovery theory and reached resolution efficiently and relatively rapidly. Plaintiff's counsel spent many hours of preparation on the case, including extensive settlement negotiations.[3]

[9] In considering awards in similar cases, we look to cases of similar size and not necessarily similar subject matter. *See In re Cendant PRIDES,* 243 F.3d at 737. Most fees awarded by this court

*tig.,* 243 F.3d 722, 734, 737 n. 20 (3d Cir. 2001).

under the percentage-of-recovery method in settlements under $100 million have ranged from 15% to 40%. *See* Plaintiff's Memorandum in Support of Attorneys' Fees and Reimbursement of Expenses, 11. In light of the foregoing, Plaintiff's Motion for Award of Attorneys' Fees and Reimbursement of Expenses is granted.



**STOLT–NIELSEN S.A., Stolt–Nielsen Transportation Group Ltd. and Richard B. Wingfield**

v.

**UNITED STATES of America.**

**No. Civ.A.04–CV–537.**

United States District Court,
E.D. Pennsylvania.

Jan. 14, 2005.

**Background:** Company filed civil action seeking to enforcement of its rights under immunity agreement under United States Department of Justice's (DOJ) corporate leniency program (amnesty program).

**Holdings:** The District Court, Savage, J., held that:

(1) due process prohibited DOJ from rescinding immunity agreement prior to a judicial ruling that company was in breach of the agreement, and

(2) company was not in breach of the agreement.

Judgment in favor of plaintiff.

---

**3.** According to declarations of Plaintiff's counsel, 560 hours of work were devoted to the case.

**1. Criminal Law ☞42**

Cooperation agreements with United States Department of Justice (DOJ) are binding contracts; both parties must abide by the terms of the agreement and are obligated to fulfill their respective obligations under it.

**2. Criminal Law ☞42**

If other party does not perform under cooperation agreement, it loses the benefit of the bargain and the government is relieved of its obligations under the contract; on the other hand, if the other party does perform, government must keep its promise.

**3. Constitutional Law ☞257**

Immunity agreements, like plea agreements, affect the due process rights of the party giving up valuable constitutional rights in return for the government's promise not to prosecute. U.S.C.A. Const.Amend. 5.

**4. Constitutional Law ☞257.5**

Due process requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves. U.S.C.A. Const.Amend. 5.

**5. Constitutional Law ☞257.5**

Because due process is implicated, the government cannot unilaterally declare an immunity agreement void; instead, due process demands that the government first obtain a judicial determination that the defendant breached the agreement. U.S.C.A. Const.Amend. 5.

**6. Constitutional Law ☞257.5**
  **Criminal Law ☞42**

Due process prohibited United States Department of Justice (DOJ) from rescinding immunity agreement with company under DOJ's corporate leniency program (amnesty program) prior to a judicial ruling that company was in material breach of the agreement; in reliance on the agreement, company gave up significant constitutional rights, supplied DOJ the information essential to DOJ's successful prosecution of company's co-conspirators, and incriminated itself in the same illegal activities, and government's interest would not be significantly compromised by a judicial proceeding and decision prior to indictment. U.S.C.A. Const.Amend. 5.

**7. Criminal Law ☞42**

Because a party surrenders valuable constitutional rights when entering into an immunity agreement, a court must carefully scrutinize the agreement to determine whether the government has performed; in doing so, court must strictly construe the agreement against the government.

**8. Criminal Law ☞42**

Company, which entered into agreement with United States Department of Justice (DOJ) which immunized it from prosecution for activity prior to January, 2003, was not in breach of the agreement as result of government's belief that its participation in the illegal activity had not ceased at an earlier unspecified date that was not set forth in the agreement; had government wanted to fix the date sometime before January, 2003, it could have replaced the words "to the date of this letter" with the earlier date it claimed that the parties contemplated.

**9. Criminal Law ☞42**

When an immunity agreement contains an integration clause expressly excluding any terms other than those set forth in the agreement, a party cannot rely on a purported implicit understanding in order to demonstrate that the government has breached the agreement.

George J. Terwilliger, III, J. Mark Gidley, Christopher M. Curran, George L. Paul, Peter J. Carney, Lucius B. Lau, White & Case, LLP, Washington, DC, Ian M. Comisky, Blank Rome LLP, Philadelphia, PA, for Stolt-Nielsen Transportation Group, Ltd.

Allen D. Black, Roberta D. Liebenberg, Gerard A. Dever, Fine, Kaplan and Black, RPC, Philadelphia, PA, for Richard Wingfield.

Antonia R. Hill, United States Dept. of Justice, Patrick L. Meehan, U.S. Attorney Office, Robert E. Connolly, U.S. Department of Justice, Antitrust Division, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

SAVAGE, District Judge.

In this civil action where we are asked to enjoin the government from prosecuting the plaintiffs for criminal antitrust violations, we must first answer two threshold questions. First, can the government unilaterally rescind an immunity agreement without a judicial determination that the other party breached the agreement? Second, if it can not, should the determination be made before or after indictment? Balancing the government's prosecutorial discretion and a party's due process rights under an immunity agreement, we conclude that due process dictates that a court must decide whether there has been a breach of the agreement before it can be voided, and the decision should be made before indictment.

Having concluded that we can and should decide now whether the government is entitled to void the immunity agreement in this case, we must then consider the dispositive question—did the plaintiff Stolt–Nielsen Transportation Group ("SNTG") breach its agreement with the United States Department of Justice? SNTG contends that the Department of Justice ("DOJ") improperly attempted to void the immunity agreement and to prosecute it after it had fulfilled its promise to cooperate in DOJ's investigation of its co-conspirators. DOJ counters that it was entitled to rescind the agreement because SNTG breached it by misrepresenting that it had terminated its part in the targeted antitrust conspiracy earlier than it actually had and that the failure to correct this misrepresentation after the agreement was executed constituted non-cooperation.

We find that SNTG performed its obligation under the agreement when it supplied DOJ with self-incriminating evidence that led to the successful prosecution of SNTG's co-conspirators. Because DOJ got the benefit of its bargain, it cannot avoid fulfilling its promise based upon an understanding it contends the parties intended during negotiations but is not clearly defined in the integrated agreement. Thus, because SNTG did not breach the agreement, we shall enjoin DOJ from prosecuting and indicting SNTG [1] for its part in the antitrust conspiracy to the date of the agreement.

## I.

DOJ, charged with criminal enforcement of the United States antitrust laws, entices

---

1. The action was instituted by the plaintiffs Stolt–Nielsen, S.A. and Stolt–Nielsen Transportation Group Ltd. Stolt–Nielsen S.A. is the parent company of Stolt–Nielsen Transportation Group Ltd., and was not a signatory to the agreement. For simplicity, we shall refer throughout to both plaintiffs collectively as SNTG.

The agreement also covers SNTG employees. Wingfield, an SNTG executive, was charged with having violated the Sherman Act for his involvement in the conspiracy. He then filed his own action. Both SNTG and Wingfield's actions were consolidated on May 26, 2004.

companies to report their involvement in ongoing antitrust conspiracies and to cooperate in the investigation and prosecution of co-conspirators by offering the reporting companies and their officers, directors and employees immunity from criminal prosecution under its Corporate Leniency Program ("Amnesty Program"). Only the first company to come forward gets the protection. Later applicants and co-conspirators are subject to prosecution and the cost of defending against criminal charges. Therefore, time is of the essence to secure immunity under the Amnesty Program.

SNTG, a division of Stolt–Nielsen, S.A., is an international carrier of bulk liquids, using parcel tankers which are deep-sea vessels with climate controlled compartments. SNTG competes primarily with two other carriers for international parcel tanker business.

Because a carrier loses money when its ships are idle or empty, it wants to keep the tankers at full capacity in a regular geographic rotation, unloading and loading at each port along an endless route. If a company loses a customer along a shipping route, it must find a new one or run that leg of the route while incurring operating costs without income.

One way owners can ensure that their ships stay at maximum capacity and maintain a continuous route is by dividing and allocating customers and routes through agreements to fix bids and prices. This practice is illegal.

Through conscious parallelism, owners tend to keep their respective routes and customers without actually agreeing among themselves to do so. It occurs when, in considering whether to bid on a competitor's contract, an owner self-consciously takes into account not only the price it would take to win the contract but also whether the newly-created space aboard the competitor's ship frees the competitor to compete for one of its existing contracts. This unilateral net effect analysis is not illegal.

SNTG and its competitors in the international parcel tanker business divided routes and customers for several years. These arrangements raised the apprehension of illegal collusion that exposed the companies to criminal liability and invited participation in DOJ's Amnesty Program. SNTG's efforts to seek immunity from prosecution for its participation in the unlawful conspiracy precipitated the events giving rise to this dispute.

In late 2002, John Nannes ("Nannes"), a former deputy in the Department of Justice's Antitrust Division, was asked by SNTG's outside counsel, Gary Sesser ("Sesser"), to meet with an unidentified client on a potential antitrust matter. Nannes agreed. On November 22, 2002, he met with SNTG Chairman Samuel Cooperman ("Cooperman"), Sesser and other SNTG attorneys. Cooperman explained to Nannes that he recently learned that an attorney, who claimed to have documentary evidence of potential antitrust activity by SNTG, had been contacting SNTG customers to solicit them to institute antitrust litigation.

During the meeting, Nannes learned that SNTG's former in-house counsel, Paul O'Brien ("O'Brien"), had raised antitrust concerns in a memorandum to Cooperman in February 2002. Cooperman explained that as a result of O'Brien's warning, SNTG strengthened its internal antitrust compliance program. Soon after, O'Brien resigned from SNTG.

Nannes outlined DOJ's Amnesty Program. He informed Cooperman that because DOJ encourages early reporting of potential antitrust conspiracies, it is beneficial for companies to come forward without having first conducted an internal investigation into the nature of the anti-

competitive activity. The reporting company is given a marker to reserve its place in line for eligibility while it conducts an investigation to determine whether its activity was indeed illegal. If the investigation ultimately confirms the existence of a conspiracy violating antitrust laws, the company is accepted into the program and given immunity. The protection is conditioned upon the company's continuing cooperation with DOJ.

Cooperman authorized Nannes to contact DOJ about participating in the Amnesty Program. He conceded that Nannes' investigation of SNTG would probably reveal some activity giving the company reason to apply for amnesty. At that point, however, Nannes did not have sufficient information from which he could conclude that SNTG had engaged in an unlawful antitrust conspiracy.[2]

Later that day, after he was retained to represent SNTG, Nannes contacted his former colleague at the Department of Justice, James A. Griffin ("Griffin"), the Deputy Assistant Attorney General for the Antitrust Division, to inquire whether DOJ had opened an investigation into the parcel tanker industry and, if it had, whether DOJ had given a marker. Nannes and Griffin exchanged a series of exploratory telephone calls during which they shared vague pieces of information about the possible collusive activity. During one of the conversations, Griffin told Nannes that he knew of a company that fired a lawyer who had brought to its attention an antitrust violation. Griffin advised Nannes that if his client was that company, it could be an impediment to admission into the Amnesty Program. Although SNTG was never mentioned by name during these conversations, Nannes suspected that Griffin had been referring to SNTG.

Nannes concluded that DOJ had not yet granted a marker to anyone in the parcel tanker industry, thus presenting SNTG with an opportunity to be first in line if it could resolve the "fire the messenger" concern Griffin had raised. Because time was of the essence, Nannes arranged a meeting with DOJ to address O'Brien's termination.

At a meeting on December 4, 2002, after Nannes disclosed the identity of his client,[3] he was warned that if O'Brien had been fired for exposing actual antitrust violations, SNTG would be ineligible for the Amnesty Program. In response, Nannes assured Griffin and the DOJ attorneys that whether O'Brien had resigned or been fired was irrelevant because management had heeded O'Brien's admonitions by implementing remedial steps to enhance its antitrust compliance program, which O'Brien himself had crafted.[4] At the conclusion of the meeting, Griffin advised Nannes that SNTG would not be accepted into the Amnesty Program if the company had only pretended to take effective action to withdraw from the conspiracy.

On December 17, 2002, SNTG received confirmation that it had been given a "marker" establishing its first place in line for the Amnesty Program. As was customary upon receipt of a marker, Nannes commenced his internal investigation.

---

**2.** Complicating Nannes' ability to determine whether SNTG had engaged in criminal activity was that conscious parallelism resulted in a high stability of contract renewal in the parcel tanker industry.

**3.** The disclosure of the company's name at the meeting was unique to the amnesty application process because the identity of the reporting company is usually kept anonymous until after the official proffer. However, in an effort to diffuse DOJ's concerns over the "fire the messenger" problem, Nannes elected to reveal SNTG's identity.

**4.** O'Brien has since instituted a wrongful termination suit against SNTG in Connecticut state court.

Nannes met with Richard Wingfield, the Managing Director of Tanker Trading for SNTG, who gave Nannes three customer lists which had been shared by SNTG and its coconspirators. He later supplied Nannes with a fourth list that specifically allocated customer contracts among SNTG and its competitors. Nannes concluded that, by exchanging customer lists, SNTG and its co-conspirators had agreed to divide customers by trade lanes, an arrangement that constituted a *per se* unlawful agreement.[5] Knowing then that SNTG had criminal exposure for violating the antitrust laws, Nannes hastened to expedite the official proffer so he could secure immunity for SNTG.

On January 8, 2003, Nannes made the proffer to DOJ. He revealed that for several years SNTG had express agreements with its competitors to divide customers using allocation lists negotiated and agreed upon by the companies. No one asked and no one said when, if at all, SNTG's part in the arrangement had ceased.

After DOJ conducted additional investigation, it notified SNTG that it would be accepted into the Amnesty Program. On January 14, 2003, Griffin sent Nannes DOJ's model corporate leniency letter. At Nannes' suggestion, the model letter was revised to cover all SNTG subsidiaries and affiliates. The agreement was executed the following day.

## II.

To induce DOJ to accept it into the Amnesty Program, SNTG made certain representations required by DOJ. It asserted that it "took prompt and effective action to terminate its part in the anticom-

petitive activity being reported upon discovery of the activity," did not coerce any other party to participate in the activity, and was not the leader or the originator of the activity. These standard representations are recited in the agreement.

The entire agreement between the parties is set forth in the letter of January 15, 2003. It defines the respective obligations of the parties.

DOJ agreed "not to bring any criminal prosecutions against SNTG for any act or offense it may have committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported," that is, the anticompetitive collusion in the parcel tanker industry involving transportation to and from the United States. In consideration for the promise of immunity, SNTG agreed to provide "full, continuing and complete cooperation" with respect to the facts relating to the activity; to provide all documents requested by DOJ; to secure the cooperation of its directors, officers and employees, including facilitating their appearing for interviews or testimony; to verify the completeness and truthfulness of the information provided by them; to take steps to insure that no one attempts to falsely protect or implicate any person or entity; and to make restitution to any person or entity injured as a result of the activity in which SNTG participated.

Because SNTG's discharge of its obligation required the cooperation of its directors, officers and employees in the investigation, DOJ agreed not to prosecute them "for any act or offense committed

---

5. Nannes explained that because competition in the parcel tanker industry is normally low, evidence of the exchange of customers lists was essential to the government because collusion would be difficult to prove without clear evidence of an agreement between the conspirators. He learned that there are legal joint ventures in the industry which require competitors to frequently communicate with one another. The documents produced by SNTG eliminated any plausible claim that the bidding was the product of a joint venture or conscious parallelism.

prior to the date of this letter in connection with the anticompetitive activity reported." Conversely, any director, officer or employee who failed to comply with his or her obligations would not receive immunity and any statement or information provided by such a person could be used against him or her in a prosecution.

DOJ reserved the right to declare the agreement void and to revoke the "conditional acceptance of SNTG into the Corporate Leniency Program." In the event of revocation, DOJ could prosecute SNTG and use any statements or information provided by it in the prosecution.

### III.

After the agreement was executed on January 15, 2003, SNTG turned over incriminating documents to DOJ and produced two employees, Andrew Pickering and Bjorn Jansen, who explained how the customer lists were exchanged among the conspirators. Using this critical information, DOJ successfully prosecuted Odfjell Seachem AS ("Odfjell") and Jo Tankers BV ("Jo Tankers"), obtaining guilty pleas resulting in fines totaling $62 million. DOJ also secured guilty pleas and prison sentences in prosecutions of individual executives of both companies.

On April 8, 2003, DOJ suspended SNTG's participation in the Amnesty Program because it claimed that SNTG did not cease its part in the illegal activity in March 2002, but continued the illegal activity into the second half of 2002. Two and a half months later, on June 24, 2003, plaintiff Richard Wingfield was arrested and charged with participating in the conspiracy to allocate customers, fixing prices and rigging bids between March 2001 and October 2002.

Under threat of indictment, SNTG filed a complaint on February 6, 2004, seeking enforcement of its rights under the agreement. On February 12, 2004, DOJ agreed to provide the court *in camera* notice prior to seeking an indictment of SNTG. Wingfield filed a complaint on February 18, 2004, seeking to enforce his own rights under the amnesty agreement. On February 24, 2004, Wingfield's attorneys sought a preliminary injunction preventing DOJ from seeking his indictment. On February 27, 2004, SNTG filed a motion requesting a pre-indictment hearing.

On March 2, 2004, DOJ formally revoked SNTG's conditional leniency and notified SNTG that it intended to seek SNTG's indictment on March 24, 2004. In response, SNTG filed a motion for preliminary injunction to enjoin DOJ from seeking an indictment. DOJ agreed to delay indicting SNTG until the conclusion of these proceedings.

An evidentiary hearing was held on April 13 and 14, 2004, at which Nannes and Griffin testified. At the conclusion of the hearing, the parties agreed that because this matter had advanced to a trial on the merits,[6] the plaintiffs were not required to show irreparable injury. The parties then filed post-hearing briefs and proposed findings of fact.

### IV.

[1, 2] Cooperation agreements are binding contracts. *See United States v. Baird,* 218 F.3d 221, 229 (3d Cir.2000); *United States v. Nolan–Cooper,* 155 F.3d 221, 236 (3d Cir.1998); *United States v. Isaac,* 141 F.3d 477, 481 (3d Cir.1998). Both parties must abide by the terms of the agreement and are obligated to fulfill their respective obligations under it. *See Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *see*

---

6. Tr. 4/14/04 (P.M.) at 68–69. A hearing on an application for preliminary injunction may

be consolidated with the trial of the action on the merits. FED. R. CIV. P. 65.

also *United States v. Aleman,* 286 F.3d 86, 89–90 (2d Cir.2002). Consequently, if the other party does not perform, it loses the benefit of the bargain and the government is relieved of its obligations under the contract. On the other hand, if the other party does perform, the government must keep its promise. *See United States v. Moscahlaidis,* 868 F.2d 1357, 1361 (3d Cir. 1989); *see also Aleman,* 286 F.3d at 91.

[3, 4] Immunity agreements, like plea agreements,[7] affect the due process rights of the party giving up valuable constitutional rights in return for the government's promise not to prosecute. *Baird,* 218 F.3d at 229; *see also Aleman,* 286 F.3d at 90. As the Second Circuit has stated, these agreements are "unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *In re Altro,* 180 F.3d 372, 374–75 (2d Cir.1999) (citation omitted). Due process requires prosecutors to "scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves." *United States v. Meyer,* 157 F.3d 1067, 1076 (7th Cir.1998) (quoting *United States v. Eliason,* 3 F.3d 1149, 1153 (7th Cir.1993)).

[5, 6] Because due process is implicated, the government cannot unilaterally declare an immunity agreement void. *Meyer,* 157 F.3d at 1076 (quoting *United States v. Verrusio,* 803 F.2d 885, 888 (7th Cir.

1986)); *United States v. Castaneda,* 162 F.3d 832, 836 (5th Cir.1998). Instead, due process demands that the government first obtain a judicial determination that the defendant breached the agreement. *Meyer,* 157 F.3d at 1076. Accordingly, the other party is entitled to a judicial ruling before the government can rescind the agreement.

DOJ and SNTG made mutual promises. SNTG waived its constitutional rights and exposed itself to criminal liability by divulging incriminating information in exchange for DOJ's promise not to prosecute. Therefore, due process requires that before its amnesty can be revoked, SNTG is entitled to a judicial determination whether it breached the agreement.

When should the judicial resolution be made—before or after indictment? The government argues that the plaintiff may raise the issue in a motion to dismiss after indictment. SNTG counters that the time is now—before it is forced to challenge an indictment and suffer the consequences of one. We agree that SNTG is entitled to a decision before the government pursues a prosecution because if an indictment were later determined to have been wrongfully secured, it would be too late to prevent the irreparable consequences.[8]

Our decision is guided by the Seventh Circuit which observed that "[t]he preferred procedure, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement prior to indictment." *Meyer,* 157 F.3d at 1077.[9] The court rea-

---

7. The rights created by an immunity agreement are no different than those implicated in plea agreements. *See United States v. Castaneda,* 162 F.3d 832, 835–36 (5th Cir.1998). Thus, the same principles apply to both.

8. "[A] wrongful indictment ... works a grievous, irreparable injury to the person indicted" resulting in damage to the person's reputation which, because the public remembers the ac-

cusation and suspects guilt, can not be simply cured by a subsequent finding of not guilty. *In re Fried,* 161 F.2d 453, 458–59 (2d Cir. 1947).

9. In *Meyer,* defendants Hoff and Meyer, who were charged in a drug trafficking conspiracy, entered into immunity agreements with the government and implicated their co-con-

soned that the burden on the government to obtain a pre-indictment judicial determination is minimal because the government must eventually obtain one. *Id.* Resolving the issue of whether SNTG was in material breach of the agreement and whether DOJ is bound by the agreement now at the pre-indictment stage ensures that SNTG is afforded the requisite due process without imposing an undue burden on the government.

In reliance on the agreement, SNTG supplied DOJ the information essential to DOJ's successful prosecution of SNTG's co-conspirators. By cooperating with DOJ, SNTG gave up significant constitutional rights. *See Nolan–Cooper,* 155 F.3d at 236. At the same time it provided evidence against its co-conspirators, SNTG incriminated itself in the same illegal activities. Now the government wants to use SNTG's self-incriminating evidence against it and Wingfield in a prosecution against them.

Weighing the government's interest in maintaining prosecutorial discretion against a party's due process rights, we conclude that the government's interest will not be significantly compromised by a judicial proceeding and decision prior to indictment rather than later after the other party's interest will have been adversely affected. If the court determines that DOJ is correct that SNTG breached the agreement, DOJ can indict. If not, SNTG

will have been saved from being wrongfully indicted and harmed as a result.

## VI.

[7] Because a party surrenders valuable constitutional rights when entering into an immunity agreement, a court must carefully scrutinize the agreement to determine whether the government has performed. *Nolan–Cooper,* 155 F.3d at 236. In doing so, the court must strictly construe the agreement against the government. *Baird,* 218 F.3d at 229. The government cannot rely on a "rigid and literal" construction of the terms of the agreement. *Id.* Applying these principles and recognizing that immunity agreements are interpreted in light of "special due process concerns," we turn to the agreement here. *Id.* (citation omitted).

[8] SNTG and DOJ entered into DOJ's standard corporate amnesty agreement. In exchange for SNTG's revelations and cooperation, DOJ agreed not to bring any criminal prosecutions against SNTG for any act or offense it may have committed prior to January 15, 2003, the date of the agreement.

After SNTG had provided the information that led to the government's securing several convictions and the break-up of the conspiracy, DOJ unilaterally rescinded the agreement. It did not and does not claim that SNTG failed to cooperate in the investigation or withheld evidence necessary to DOJ's successful prosecution of SNTG's

spirators while incriminating themselves. *Meyer,* 157 F.3d at 1071. Under the agreements, the government promised not to use any statements made by the defendants regarding their involvement in the conspiracy's criminal activities in any criminal proceeding. *Id.* After interviewing additional witnesses, the government concluded that Hoff and Meyer's answers to the government's questions were incomplete and untruthful. Hoff and Meyer were subsequently indicted. *Id.* at 1072. Hoff filed a motion to dismiss. *Id.* The

magistrate judge and district judge each held an evidentiary hearing and determined that the government had met its burden of demonstrating that Hoff had breached the agreement. *Id.* On review, the Seventh Circuit agreed with the district court's ultimate conclusion, but also emphasized the importance of requiring the government to seek a judicial determination of whether a party is in breach of an immunity agreement prior to indicting him. *Id.* at 1077.

co-conspirators. Rather, its justification for revoking SNTG's amnesty is that SNTG misrepresented when its participation in the anticompetitive activity had ended. DOJ argues that March 2002 was understood to be the date SNTG said it had discovered the anticompetitive activity and implemented prompt and effective steps to end its participation in it.

Did DOJ and SNTG agree that the illegal conduct was discovered in March 2002, thus triggering SNTG's obligation to withdraw from its participation in the anticompetitive activity? The only date referenced in the agreement is January 15, 2003, the date it was signed. DOJ agreed not to prosecute SNTG for criminal activity which may have occurred prior to that date. Nowhere in the agreement is there a reference to March 2002 as the date SNTG discovered the illegal activity.

Griffin had, in an unrelated case, specified the discovery date in the agreement. He could have done so here. He did not.

DOJ, as author of the immunity agreement, bears the burden of precisely drafting it to reduce the chance of ambiguity and confusion. *Baird*, 218 F.3d at 229; *see also Aleman*, 286 F.3d at 90. Its inartful drafting cannot inure to its own benefit and to SNTG's detriment. We conclude that DOJ rescinded the agreement based on its own belief that SNTG had to have ceased its participation in the illegal activity in March 2002, a date that is not specified in the agreement.[10]

DOJ argues that when it sought protection under the amnesty program, SNTG represented that its participation in the anticompetitive activity had ceased as of March 2002, the date when O'Brien first reported that he suspected SNTG's in-

volvement in the activity. Griffin conceded that Nannes had never represented that SNTG's participation in the anticompetitive activity ceased as of March 2002.

[9] When an immunity agreement contains an integration clause expressly excluding any terms other than those set forth in the agreement, a party cannot rely on a purported implicit understanding in order to demonstrate that the government has breached the agreement. *In re Altro*, 180 F.3d at 375–76. Likewise, DOJ, especially because it drafted the agreement, cannot depend upon a tacit understanding of what it contends was meant during negotiations but was not memorialized in the integrated agreement.

The agreement immunizes SNTG from prosecution for activity prior to January 15, 2003. Now DOJ contends the activity had to have stopped at an earlier unspecified date that is not set forth in the agreement. Had it wanted to fix the date sometime before January 15, 2003, it could have replaced the words "to the date of this letter" with the earlier date it now contends the parties contemplated.

## VII.

When it entered into the agreement, DOJ never intended to prosecute SNTG. Its goals were to pursue SNTG's co-conspirators and to break up the conspiracy. It got what it had bargained for in the agreement. SNTG's partners in the conspiracy were prosecuted and convicted, and the conspiracy has been terminated. Now that it has received the benefit of the bargain, DOJ cannot prosecute the party that incriminated itself when it delivered the evidence DOJ used to accomplish its goals. Therefore, we shall enjoin DOJ from prosecuting SNTG and Wingfield[11]

---

10. A review of what transpired in the negotiations reveals that the date when SNTG ended its participation was never clearly established.

11. Although the reporting company's executives are protected by the immunity agreement, they have obligations separate and distinct from the company's obligations. In-

for the anticompetitive activity through January 15, 2003.

## ORDER

AND NOW, this 14th day of January, 2005, after an evidentiary hearing and upon consideration of the Findings of Fact (Document No. 57), as supplemented by the Memorandum, it is ORDERED that JUDGMENT IS ENTERED in favor of Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd. and Richard B. Wingfield and against the United States of America.

IT IS FURTHER ORDERED that the United States of America is ENJOINED from indicting or prosecuting Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd. and Richard B. Wingfield for any violations of the Sherman Act, 15 U.S.C. § 1, up to and including January 15, 2003, in the parcel tanker industry involving transportation to and from the United States.

## FINDINGS OF FACT

AND NOW, this 14th day of January, 2005, after an evidentiary hearing held on April 13 and 14, 2004, at which it had the opportunity to observe the demeanor of the witnesses and to evaluate their credibility, the Court makes the following findings of fact:

1. Stolt–Nielsen Transportation Group Ltd. ("SNTG") is a division of Stolt–Nielsen S.A., a Luxembourg company. *SNTG Compl.* ¶ 5.

2. The United States Department of Justice ("DOJ") is charged with criminal enforcement of the United States antitrust laws.

3. Richard B. Wingfield ("Wingfield") is the former Managing Director of Tanker Trading for SNTG. *Wingfield Compl.* ¶ 8.

4. DOJ has the Corporate Leniency Program ("Amnesty Program") which encourages companies involved in ongoing antitrust conspiracies to report the activity and to cooperate in the investigation and prosecution of co-conspirators by offering them and their officers, directors and employees immunity from criminal prosecution. *Scott D. Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," Fifteenth Annual National Institute on White Collar Crime (Mar. 8, 2001)* (SNTG's Pre–Hearing Brief, Ex. A).

5. The Amnesty Program was designed as an investigative tool to assist the Division in obtaining evidence to expose and prosecute members of a cartel or antitrust conspiracy. *Scott D. Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," Fifteenth Annual National Institute on White Collar Crime (Mar. 8, 2001), at 2 (Exhibits Presented by Stolt–Nielsen During April 13–14 Hearing,* Ex. 36 (Tab 29)).

6. Leniency under the Amnesty Program is only available to the first company to come forward. *Scott D. Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," Fifteenth Annual National Institute on White Collar Crime (Mar. 8, 2001), at 2 (Exhibits Presented by Stolt–*

---

dividuals protected by the agreement must produce any documentary evidence requested by DOJ and make themselves available for interview at the request of DOJ. During Nannes' investigation, Wingfield turned over his personal journal entries and the four

customer lists which evidenced a *per se* unlawful agreement between SNTG and its co-conspirators. Although Wingfield was available, DOJ did not request an interview with him. Thus, he is entitled to immunity.

*Nielsen During April 13–14 Hearing*, Ex. 36 (Tab 29)).

7. In order to apply for the Amnesty Program, a reporting company must first obtain a "marker" to hold its place in line until the company completes its internal investigation into the potential anticompetitive activity. Tr. 4/13/04 at 115–16.

8. SNTG provides worldwide transportation of bulk liquid chemicals, edible oils, acids and other speciality liquids through a network involving intercontinental parcel tankers, coastal parcel tankers, river parcel tankers, tank containers, and terminal and rail services. *SNTG Compl.* ¶ 6.

9. Parcel tanker ships are deep-sea vessels with climate controlled compartments designed to transport multiple liquids for multiple customers at a time. *SNTG Compl.* ¶ 6.

10. Parcel tanker ship owners seek to ensure that the tankers are kept at full capacity and maintain a regular geographic rotation because an owner loses money when its ships are idle or empty. Tr. 4/13/04 at 109–10.

11. In the parcel tanker industry, one of the factors taken into consideration by a carrier in deciding to bid on a competitor's shipping lane is whether the carrier's successful bid on a competitor's route will result in the competitor's ability to use the newly-created space on its vessels to compete for the carrier's own shipping lanes. Tr. 4/13/04 at 110–12, 126–28.

12. Taking into account the likely reactions of its competitors to a carrier's bidding on particular routes is a legal practice called conscious parallelism. Tr. 4/13/04 at 109–10, 154–55.

13. Competitors in the industry sometimes have legal joint ventures. Tr. 4/13/04 at 111, 128–29.

14. Odfjell Seachem AS ("Odfjell") and Jo Tankers B.V. ("Jo Tankers") are competitors of SNTG in the parcel tanker shipping industry. Tr. 4/13/04 at 155–58.

15. Beginning in August 1998 and continuing into 2002, SNTG had express agreements with Odfjell and Jo Tankers to allocate customers by not bidding on each other's selected shipping routes. Tr. 4/14/04 (a.m.) at 22–23.[12]

16. On November 22, 2002, John M. Nannes ("Nannes"), a former Deputy Assistant Attorney General in DOJ's Antitrust Division, then in private antitrust law practice, met with Samuel Cooperman ("Cooperman"), Chairman and CEO of SNTG, and other SNTG officials. Tr. 4/13/04 at 105–06, 124–25.

17. During the meeting, Nannes learned that SNTG's former in-house counsel, Paul O'Brien, had raised antitrust concerns in a memorandum to Cooperman in early 2002. Tr. 4/13/04 at 113, 129–30.

18. Nannes learned that the basis for O'Brien's concerns was an internal fax dated April 10, 2001, discussing SNTG's alternative strategies in competing with Odfjell. Tr. 4/14/04 (a.m.) at 106–07.

19. Nannes believed that the fax was evidence of conscious parallelism, not of a Sherman Act violation. Tr. 4/13/04 at 163–64.

20. Cooperman told Nannes that as a result of O'Brien's warning, SNTG had revised and expanded its internal antitrust compliance program. Tr. 4/13/04 at 130–31.

21. Nannes reviewed DOJ's Amnesty Program with Cooperman and the others. Tr. 4/13/04 at 131.

---

**12.** The transcript of the April 14, 2004, hearing, is divided into an "a.m." and "p.m." session.

22. Cooperman admitted to Nannes that an internal investigation would yield information providing a sufficient basis to seek leniency. Tr. 4/13/04 at 131–32.

23. At the conclusion of the November 22, 2002, meeting, Nannes did not have enough information to determine whether SNTG had engaged in criminal conduct. Tr. 4/13/04 at 133–34.

24. Cooperman authorized Nannes to contact DOJ about participating in the Amnesty Program. Tr. 4/13/04 at 131.

25. On November 24, 2002, Nannes contacted Deputy Assistant Attorney General James A. Griffin ("Griffin") to inquire whether DOJ had opened an investigation into the parcel tanker industry and whether DOJ had given a marker. Tr. 4/13/04 at 133–34, 199–200.

26. Griffin informed Nannes that DOJ's Philadelphia office had opened an investigation of possible illegal activity within the parcel tanker industry that same day. Tr. 4/13/04 at 199–200.

27. Former colleagues Nannes and Griffin exchanged a series of exploratory telephone calls during which they shared vague pieces of information about possible collusive activity in the industry. Tr. 4/13/04 at 133–35.

28. SNTG was not mentioned by name during these exploratory conversations. Tr. 4/13/04 at 133–34.

29. Nannes concluded from his conversations with Griffin that DOJ had not yet granted leniency to anyone in the parcel tanker industry. Tr. 4/13/04 at 138.

30. During one of the conversations, Griffin told Nannes that he knew of a company that fired a lawyer who had brought to its attention an antitrust violation. Tr. 4/13/04 at 136–37, 201–203.

31. Griffin advised Nannes that if his client was that company, it could be an impediment to the company's admission into the Amnesty Program. Tr. 4/13/04 at 137–38, 203–04.

32. O'Brien's employment with SNTG ended in March 2002. Tr. 4/13/04 at 129–30.

33. O'Brien later instituted a wrongful termination lawsuit against SNTG in Connecticut state court. *O'Brien v. Stolt–Nielsen Transp. Group Ltd., et al.,* No. 02–0190051–S (Conn.Super. Ct., filed June 18, 2002) (*Exhibits Presented by Stolt–Nielsen During April 13–14 Hearing,* Ex. 54 (Tab 47)).

34. Nannes arranged a meeting with DOJ to address and resolve Griffin's concern with O'Brien's termination. Tr. 4/13/04 at 138–39.

35. At the meeting with Griffin and other DOJ attorneys held on December 4, 2002, Nannes was warned that if O'Brien had been fired for exposing actual antitrust violations, SNTG would not be eligible for the Amnesty Program. Tr. 4/13/04 at 203–05.

36. DOJ's investigation into the parcel tanker industry was precipitated by a *Wall Street Journal* article. Tr. 4/13/04 at 197–98.

37. Nannes explained to Griffin that because SNTG had heeded O'Brien's warnings by implementing remedial steps to enhance its internal antitrust compliance program, the circumstances of his departure from SNTG were irrelevant. Tr. 4/13/04 at 140–41; Tr. 4/14/04 (a.m.) at 36–37.

38. At the conclusion of the December 4 meeting, Griffin advised Nannes that SNTG would not be eligible for the Amnesty Program if the "evidence of withdrawal turned out to be . . . 'a head fake.'" Tr. 4/13/04 at 204.

39. Although he asserted during the meeting that SNTG had taken remedial

steps to cease the activity in question, Nannes did not represent that SNTG's participation in the illegal activity ceased as of March 2002. Tr. 4/13/04 at 145–47; Tr. 4/14/04 (a.m.) 19–20, 75–76, 85–86, 92–94; Tr. 4/14/04 (p.m.) at 4–5.

40. As of December 4, 2002, Nannes still could not confirm whether SNTG had engaged in any illegal anticompetitive conduct. Tr. 4/13/04 at 146–47; Tr. 4/14/04 (a.m.) at 42, 87–88; Tr. 4/14/04 (p.m.) at 4–5.

41. After the meeting, DOJ conducted its own investigation before deciding whether to consider accepting SNTG into the Amnesty Program. Tr. 4/13/04 at 148–49.

42. On December 17, 2002, SNTG was given a "marker," establishing first place in line for the Amnesty Program. Tr. 4/13/04 at 149–50.

43. Upon receiving the marker, Nannes commenced his internal investigation. Tr. 4/13/04 at 152–54.

44. At DOJ's request to avoid leaks which might compromise the European Union's investigation into similar activity, Nannes kept the investigation confidential. Tr. 4/13/04 at 153; Tr. 4/14/04 (p.m.) at 31–32.

45. Nannes initially had difficulty discerning the differences between legal conscious parallelism and illegal anticompetitive conduct in SNTG's practices. Tr. 4/13/04 at 154–55.

46. During his internal investigation, Nannes met with Richard Wingfield who gave Nannes his personal journal entries and three customer lists which had been shared by SNTG and its co-conspirators. Tr. 4/13/04 at 155–61; Tr. 4/14/04 at 25–27(a.m.).

a. The list dated August 27, 1998, was a listing of SNTG's contracts arranged according to geographic trading lanes. Tr. 4/13/04 at 156–58; *Exhibits Presented by* *Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 11.

b. The list dated August 31, 1998, was a partial list prepared by Odfjell of its customers. Tr. 4/13/04 at 156–58; *Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 10.

c. The list dated April 26, 2001, was a comprehensive list of both SNTG and Odfjell customers. Tr. 4/13/04 at 156–58; *Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 12.

47. Wingfield later supplied Nannes with a fourth list that proved that SNTG and its conspirators allocated customers. Tr. 4/13/04 at 159–62; *Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 13.

48. Nannes concluded that SNTG and its co-conspirators, by exchanging customer lists, had agreed to divide customers, an arrangement that constituted a *per se* unlawful agreement. Tr. 4/13/04 at 156–61.

49. Nannes wanted to expedite the official proffer so he could secure immunity for SNTG. Tr. 4/13/04 at 162, 164.

50. During the proffer on January 8, 2003, Nannes revealed that for several years SNTG had express agreements with its competitors to divide customers using allocation lists negotiated and agreed upon by the companies. Tr. 4/13/04 at 164–66.

51. At the proffer, no one represented and no one inquired when specifically the anticompetitive arrangement among SNTG and its conspirators had ceased. Tr. 4/13/04 at 170–71.

52. DOJ does not require that a proffer include the precise starting and ending dates of a reported conspiracy. Tr. 4/14/04 (p.m.) at 61.

53. In deciding whether to grant immunity, Griffin relied on Nannes' representation that O'Brien's complaint allega-

tions were not true and Nannes' assertion that SNTG had in fact taken steps to strengthen its antitrust compliance policy. Tr. 4/13/04 at 207–08.

54. On January 14, 2003, Griffin sent Nannes DOJ's model corporate leniency letter. Tr. 4/13/04 at 172.

55. At Nannes' suggestion, the model letter was clarified to cover all SNTG subsidiaries, affiliates and former employees. Tr. 4/13/04 at 174–75.

56. The letter agreement was executed on January 15, 2003. Tr. 4/13/04 at 173.

57. In the letter, SNTG represented that it "took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity," that it did not coerce any other party to participate in the activity, and was not the leader or originator of the activity. *SNTG Compl.*, Ex. 1 ¶ 1.

58. DOJ does not require that an amnesty applicant meet the formal legal requirements of withdrawal to satisfy the prompt and effective action requirement. Tr. 4/13/04 at 192–93.

59. The agreement does not define "prompt and effective."

60. The agreement does not specify a date of discovery. Tr. 4/13/04 at 209.

61. DOJ can specify and has specified in the past the date of discovery in the agreement. Tr. 4/14/04 (p.m.) at 14.

62. DOJ agreed not to prosecute SNTG for any act or offense in connection with the reported anticompetitive activity it may have committed prior to the date of the letter, January 15, 2003. *SNTG Compl.*, Ex. 1 ¶ 3.

63. The anticompetitive activity reported was the "possible collusion or other conduct violative of Section 1 of the Sherman Act" in the parcel tanker industry involving transportation to and from the United States. *SNTG Compl.*, Ex. 1 at 1, ¶ 1.

64. SNTG agreed to provide "full, continuing and complete cooperation" with respect to the facts relating to the activity; to provide all documents requested by DOJ; to secure the cooperation of its directors, officers and employees, including facilitating their appearing for interviews or testimony; to verify their completeness and truthfulness of the information provided by them; to take steps to insure that no one attempts to falsely protect or falsely implicate any person or entity; and to make restitution to any person or entity injured as a result of the activity in which SNTG participated. *SNTG Compl.*, Ex. 1 ¶ 2.

65. DOJ agreed to extend the immunity protection to any director, officer or employee who cooperated in DOJ's investigation. *SNTG Compl.*, Ex. 1 ¶ 4.

66. An employee's failure to cooperate is not imputed to SNTG because SNTG's corporate obligations are distinct from those of its individual current and former directors, officers and employees. Tr. 4/14/04 (a.m.) at 83; *SNTG Compl.*, Ex. 1 ¶ 4.

67. The agreement included a provision that DOJ reserved the right to declare the agreement void and to revoke the "conditional acceptance" of SNTG into the Amnesty Program if it determined SNTG had violated the agreement. *SNTG Compl.*, Ex. 1 ¶ 3.

68. In the event the agreement was revoked, DOJ could criminally prosecute SNTG and use any statements or information provided by SNTG against it. *SNTG Compl.*, Ex. 1 ¶ 3.

69. The agreement contains a standard integration clause, providing that the agreement supersedes any and all prior oral or written understandings which may

have existed between the parties. *SNTG Compl.*, Ex. 1 ¶ 5.

70. After the execution of the agreement, SNTG turned over voluminous incriminating documents to DOJ and produced employees who revealed how the parcel tanker industry operated and how the customer lists were exchanged among the conspirators for the purpose of allocating customers and shipping lanes. Tr. 4/14/04 (a.m.) at 7–11.

71. DOJ did not request an interview with Wingfield. Tr. 4/14/04 (a.m.) at 14–15, 116.

72. In response to DOJ's requests, SNTG produced approximately 25,000 pages of documents to the Division. Tr. 4/14/03 (a.m.) at 15–18.

73. Using SNTG's information, DOJ charged Odfjell with participating in a conspiracy to allocate customers, fix prices and rig bids from August 1998 through November 2002. *United States v. Odfjell Seachem AS*, No. 03–CR–654 (E.D. Pa., Criminal Information, Sept. 29, 2003) (*Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing*, Ex. 22).

74. DOJ later charged Jo Tankers with participating in the same conspiracy to allocate customers, fix prices and rig bids from August 1998 through November 2002. *United States v. Jo Tankers, B.V.*, No. 04–CR–221 (E.D. Pa., Criminal Information, Apr. 19, 2004), *available at http://www.usdoj.gov/atr/cases/f203500/203589.htm*.

75. Odfjell pled guilty and was fined $42.5 million. *Press Release, Department of Justice, Norwegian Shipping Co. and Two Executives Agree to Plead Guilty in International Parcel Tanker Shipping Investigation (Sept. 29, 2003)*, at 1 (*Stolt–Nielsen's Proposed Findings of Fact*, Ex. 4).

76. Jo Tankers pled guilty and paid a fine of $19.5 million. *Press Release, De-*

*partment of Justice, Dutch Shipping Company Agrees to Plead Guilty in International Parcel Tanker Shipping Investigation (Apr. 19, 2004)*, at 1 (*Stolt–Nielsen's Proposed Findings of Fact*, Ex. 5).

77. DOJ prosecuted and obtained guilty pleas from several executives of Odfjell and Jo Tankers.

78. The chairman of Odfjell, Bjorn Sjaastad, was sentenced to four months imprisonment and fined $250,000. *United States v. Bjorn Sjaastad*, No. 03–CR–652 (E.D. Pa., Judgment Entered Oct. 22, 2003) (*Stolt–Nielsen's Proposed Findings of Fact*, Ex. 2). Odfjell Vice–President Eric Nilsen received three months prison sentence and was fined $25,000. *United States v. Erik Nilsen*, No. 03–CR–653 (E.D. Pa., Judgment Entered Oct. 22, 2003) (*Stolt–Nielsen's Proposed Findings of Fact*, Ex. 3). Hendrikus van Westenbrugge, a former co-managing director of Jo Tankers, was sentenced to three months imprisonment and fined $75,000.00. *United States v. Hendrikus van Westenbrugge*, No. 03–CR–806 (E.D. Pa., Judgment Entered Jan. 7, 2004) (*Stolt–Nielsen's Proposed Findings of Fact*, Ex. 1).

79. DOJ acknowledges that the prosecutions as a result of SNTG's cooperation were successful. Tr. 4/13/04 at 186.

80. On April 8, 2003, DOJ suspended SNTG's participation in the Amnesty Program because DOJ claimed that SNTG did not cease its part in the illegal activity in March 2002, but that the illegal activity continued until the second half of 2002. *Letter from Connolly to Nannes, Apr. 8, 2003 (Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing*, Ex. 21).

81. Neither Nannes nor anyone else represented that SNTG's participation in the illegal activity had ended in March

2002. Tr. 4/13/04 at 207; Tr. 4/14/04 (a.m.) at 19–20, 75–76, 85–86, 92–94.

82. The date "March 2002" does not appear in the agreement. Tr. 4/14/04 (p.m.) at 14.

83. The suspension letter suspended SNTG's voluntary document production but included a subpoena *duces tecum* for SNTG documents. *Letter from Connolly to Nannes, Apr. 8, 2003 (Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 21).

84. DOJ canceled a previously scheduled interview with an SNTG employee and recommended that SNTG employees obtain private counsel because they were now subject to criminal jeopardy. Tr. 4/14/04 (p.m.) at 36–38.

85. After April 8, 2003, DOJ conducted interviews of SNTG employees outside the presence of SNTG counsel and SNTG was not informed as to the status of DOJ's investigation. Tr. 4/14/04 (p.m.) at 36–38.

86. On June 24, 2003, Wingfield was arrested and charged with having violated the Sherman Act, 15 U.S.C. § 1, for his involvement in the conspiracy between March 2001 and October 2002. *SNTG Compl.,* Ex. 5.

87. On March 2, 2004, Griffin notified SNTG that DOJ was voiding the agreement and revoking amnesty because SNTG had falsely represented that "SNTG's in-house counsel learned of possible illegal activity by no later than February 2002 and, by March 2002, SNTG had taken prompt and effective action to terminate its part in the activity," and that in fact SNTG had continued its participation in the conspiracy until November 2002. *Letter from Griffin to Gidley, Mar. 2, 2004, at 2 (Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 43 (Tab 36)).

88. DOJ asserted that SNTG had failed to cooperate and meet its obligations under the agreement by falsely representing the true duration of its participation in the illegal activity and failing to fully disclose the involvement in the illegal activity of some of SNTG's senior executives. *Letter from Griffin to Gidley, Mar. 2, 2004, at 2 (Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 43 (Tab 36)).

89. DOJ has stated its intention to indict SNTG for its participation in the conspiracy. *Letter from Griffin to Gidley, Mar. 2, 2004, at 3 (Exhibits Presented by Stolt–Nielsen During April 13–14, 2004 Hearing,* Ex. 43 (Tab 36)).



**Ronald RINES**

v.

**UNITED STATES of America**

**No. CIV.A.04–3242.**

**Nos.CRIM.A. 00–334, CRIM.A.01–228.**

United States District Court,
E.D. Pennsylvania.

Jan. 14, 2005.

**Background:** Following conviction by guilty plea to five counts of armed robbery, defendant filed motion to vacate sentence.

**Holdings:** The District Court, Rufe, J., held that:

(1) three criminal history points for each of two bank robbery convictions were properly attributed to defendant;

(2) six criminal history points for defendant's prior six state robbery convictions were properly attributed to defendant;