# Exhibit 36

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - -

| | | |
|---|---|---|
| STOLT-NIELSEN, S.A. and<br>STOLT-NIELSEN TRANSPORTATION<br>GROUP, LTD. | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | NO. 04-537 |
| vs. | : | |
| UNITED STATES OF AMERICA | : | |
| Defendant. | : | |

Philadelphia, PA
April 14, 2004

BEFORE:   HON. TIMOTHY J. SAVAGE, J

SECOND DAY
(AFTERNOON SESSION)

P R E S E N T:

For the Plaintiff:

WHITE & CASE
BY: CHRISTOPHER M. CURRAN, ESQ.
GEORGE J. TERWILLIGER, ESQ.
J. MARK GIDLEY, ESQ.
GEORGE PAUL, ESQ.
601 Thirteenth Street, N.W.
Suite 600.
Washington, D.C. 20005-3807

DISK ENCLOSED

```
                                    2
 1
 2
            BLANK ROME LLP.
 3      BY: IAN COMISKY, ESQ.
            MATTHEW LEE, ESQ.
 4          One Logan Square.
          Philadelphia, PA 19103-6998
 5          For Stolt-Nielsen
 6
 7       FINE, KAPLAN & BLACK.
       BY: ROBERTA D. LIEBENBERG, ESQ.
 8         ALLEN D. BLACK, ESQ.
           GERARD A. DEVER, ESQ.
 9             23rd Floor
            1845 Walnut Street.
10        Philadelphia, PA 19103-4723
11
         JAMES A. BACKSTROM, ESQ.
12              Suite 200
            Two Penn Center.
13        Philadelphia, PA 19102-1706.
14        For RICHARD WINGFIELD
15
16        For the Defendant:
17    UNITED STATES DEPARTMENT OF JUSTICE
              Antitrust Division
18      BY: ROBERT E. CONNOLLY, ESQ.
            ANOTONIA R. HILL, ESQ.
19          WENDY NORMAN, ESQ.
             The Curtis Center
20            Suite 650 West
          7th and Walnut Streets
21        Philadelphia, PA., 19106.
22        FOR THE UNITED STATES
23
24   (Proceedings recorded by mechanical stenography,
      transcript produced by computer)
25              1:15 P.M.
                1:15 p.m.
```

```
                                    3
 1          AFTERNOON SESSION
 2      Appearances as noted, the following transpired in
 3  open court:)
 4      (JAMES M. GRIFFIN, resumed)
 5          CROSS-EXAMINATION
 6  BY MR. GIDLEY:
 7      Q.  Mr. Griffin, I want to go back to some of your
 8  testimony on direct, sir.
 9          Sir, you testified that you attended a meeting with
10  John Nannes on December 4, 2002, correct?
11      A.  Yes.
12      Q.  Could you keep your voice up?
13      A.  Yes, 2002.
14      Q.  Thank you very much.
15          Sir, you testified at that meeting you used the
16  term head fake; is that correct?
17      A.  Yes.
18      Q.  And sir, would you tell the Court to the best of
19  your recollection, what exactly you said about head fake at
20  that meeting?
21      A.  It was in reference to the emails that had been
22  shown to us and the representation that that is when
23  Stolt-Nielsen withdrew from or ceased its activity, illegal
24  activity.
25      Q.  What were your exact words?
```

```
                                    4
 1      A.  I can't recall my exact words, but it was something
 2  to the effect that if it was a head fake and you would not
 3  qualify for leniency and if it were a conditional amnesty
 4  agreement in effect, it would be revoked.
 5      Q.  Did you say this at the beginning or at the end of
 6  the meeting, sir?
 7      A.  Near the end.
 8      Q.  What did Mr. Nannes say in response, if anything?
 9      A.  I don't recall. I don't recall what, if anything,
10  he said.
11      Q.  At the December 4th meeting, did Mr. Nannes say
12  that not a single antitrust violation had occurred at
13  Stolt-Nielsen after March 31, 2002?
14      A.  No, he did not say that.
15      Q.  Did Mr. Nannes tell you that his law firm had
16  audited the SNTG antitrust compliance from March to November,
17  2002?
18      A.  I do not believe he said that.
19      Q.  Did Mr. Nannes say that Skadden, Arps investigated
20  all contacts with competitors after March 2002 at the December
21  4th meeting?
22      A.  No, he specifically said that he had more
23  investigation to do.
24      Q.  And Mr. Nannes was very early in his assignment
25  from Stolt-Nielsen; isn't that correct, on December 4th, 2002?
```

```
                                    5
 1      A.  Well, I don't know that. I know that his first
 2  contact with me was November 22nd and this was what is that,
 3  12 days later or so?
 4      Q.  Between November 22nd and December 4th, you had a
 5  series of phone calls with Mr. Nannes; is that correct?
 6      A.  That's correct.
 7      Q.  Sir, in the course of those phone calls, did you
 8  tell Mr. Nannes there was a "shoot the messenger" issue that
 9  the Division had?
10      A.  I do not recall using that term, "shoot the
11  messenger."
12      Q.  That's to the best of your recollection, you did
13  not use that term, sir, to Mr. Nannes?
14      A.  I don't recall using it, no.
15      Q.  Did you mention to Mr. Nannes that you were also
16  looking into Treasury allegations and that would also be an
17  issue with the application that SNTG was proffering to the
18  Division?
19      A.  Yes, we talked about that. They weren't proffering
20  that to the Division, though.
21      Q.  But, sir, did you mention to Mr. Nannes that there
22  was an issue about the Treasury Department investigation and
23  you needed to check that out in the course of approving the
24  amnesty application?
25      A.  Yes.
```

Page 6

1  Q. Sir, that Treasury Department investigation is not
2  listed as something in your corporate Leniency Policy that you
3  look into; isn't that correct?
4  A. That's correct.
5  Q. But nonetheless, you told Mr. Nannes that was a
6  threshold issue for admission into the program; isn't that
7  correct?
8  A. I told him we needed to do some due diligence on
9  that. We weren't going to inadvertently give amnesty on that
10 issue.
11 Q. But, sir, didn't you say to Mr. Nannes that you
12 would not be in a position to approve the amnesty application
13 until you cleared the O'Brien issue, employment issue, lawsuit
14 issue as well as the Treasury Department issue; isn't that
15 correct?
16 A. Well, the way you have asked the question, no, but
17 I -- they were on two separate tracks. There was due
18 diligence I needed to do within the Department -- within the
19 government on the treasury issue and then, there was the issue
20 of whether or not the company had taken prompt and effective
21 action. So both of those issues were at work, yes.
22 Q. Let's go to the December 4th meeting and I want to
23 show you a demonstrative exhibit. I have given you several
24 books of exhibits, sir. If I can direct you to the second
25 book, tab one and it will be on the screen, as well.

Page 7

1  A. I see it.
2  Q. Can you see the exhibit?
3  A. Yes.
4  Q. It's been marked is as SND-1.
5     At the December 4th meeting, Mr. Nannes outlined a
6  series of steps that SNTG had taken?
7  A. Yes.
8  Q. One of the steps he outlined at the December 4th
9  meeting is that SNTG revised its antitrust handbook?
10 A. That's correct.
11 Q. Mr. Nannes also mentioned that the company had
12 implemented mandatory antitrust compliance training; isn't
13 that correct?
14 A. Yes, he did.
15 Q. Isn't it the case that Mr. Nannes also mentioned
16 that all agreements with competitors were to be in writing and
17 approved by counsel as part of the measures that were
18 implemented; isn't that correct?
19 A. I believe that's correct.
20 Q. Sir, directing your attention to item 4, isn't it
21 the case Mr. Nannes mentioned that written certifications had
22 been obtained by SNTG employees?
23 A. Yes.
24 Q. Didn't Mr. Nannes mention he gave the SNTG
25 antitrust policy to competitors that that had been given by

Page 8

1  SNTG in the spring?
2  A. Yes.
3  Q. Mr. Nannes also mentioned SNTG delivered its new
4  antitrust policy to some of its business partners?
5  A. That's correct.
6  Q. Mr. Nannes at the December 4th meeting gave you
7  those emails; isn't that correct?
8  A. Yes.
9  Q. Sir, at that meeting, did you ask Mr. Nannes what
10 dates the certifications had been obtained from the various
11 employees?
12 A. I don't believe I did.
13 Q. Did anyone from the government ask Mr. Nannes
14 during what time period the certifications had been obtained,
15 to the best of your recollection?
16 A. There was some discussion of that, yes.
17 Q. Did anyone from the government specifically ask
18 what the last date was of the last certification that was
19 turned in in 2002?
20 A. I believe we were told. I don't remember a
21 specific question, but I believe Mr. Nannes told us.
22 Q. Well, sir, as you sit here today, what is your
23 understanding as to the last certification that was turned in
24 in 2002 by the SNTG employees?
25 A. I believe it was not until sometime in the summer.

Page 9

1  Q. July, the end of July; is that correct?
2  A. I was going to say June or July.
3  Q. Now, Mr. Lee of SNTG sought those certifications in
4  a May, 2002 memo; isn't that correct?
5  A. I am not sure I have seen a May, 2002 memo.
6  Q. Let me direct your attention to tab 10 of book II,
7  sir.
8  A. Yes?
9  Q. It's a form memo with a date of May 14th and it's
10 under the signature or over the signature of Reginald J. R.
11 Lee, CEO of SNTG; do you see that?
12 A. Yes.
13 Q. Is this the first time you have examined this
14 document?
15 A. I believe that it is, yes.
16 Q. Turning the page under tab 10, there is a form,
17 SNTG antitrust compliance policy, do you see that?
18 A. Yes.
19 Q. Have you seen this before?
20 A. No.
21 Q. Have you seen this in a signed executed form?
22 A. No, I don't think I have seen this before?
23 Q. Let me direct your attention to tab 11, sir, if I
24 could.
25    Mr. Griffin, have you seen this document before.

10

1  It's labeled for the record is Exhibit 51 and it's entitled:
2  "SNTG Antitrust Compliance Policy Confirmation."
3      Do you see that?
4  A.  Yes.
5  Q.  Have you seen that before?
6  A.  No.
7  Q.  It's July 31, 2002; is it not?
8  A.  Yes.
9  Q.  Weren't these compliance policies delivered to you
10 on July 9, 2003 at a meeting in the Justice Department?
11 A.  They well could have been.
12 Q.  But, you didn't look at the signed certifications;
13 is that correct?
14 A.  I don't recall seeing this.
15 Q.  Let me take you back to November 22, 2002 for a
16 minute.
17     Sir, when Stolt-Nielsen came in and phoned you, did
18 Stolt-Nielsen know whether there was a Government
19 investigation into the parcel tanker industry?
20 A.  No, that was the first question.
21 Q.  You had had this investigation open only for a
22 matter of hours when Mr. Nannes called, correct?
23 A.  That's correct.
24 Q.  Mr. Nannes's call was on Friday November 22, 2002,
25 correct?

11

1  A.  It was November 22nd. I don't recall whether it
2  was a Friday or not, but yes.
3  Q.  You weren't in the office, so he left a voicemail;
4  is that correct?
5  A.  That's right.
6  Q.  You picked up the mail and you had a conversation
7  over the weekend, correct?
8  A.  That's right.
9  Q.  Now, sir, Friday Morning, the Wall Street Journal
10 article had come out, correct?
11 A.  Yes.
12 Q.  Can you describe for me the process of opening an
13 antitrust investigation that involves criminal charges?
14    Can you briefly outline that for me?
15 A.  Well, it can be done in any number of ways, but if
16 we're opening a preliminary inquiry, it can be done by a phone
17 call, because that does not authorize any kind of compulsory
18 process and the staff or office calls me or calls the Director
19 and lays out what they want to do and they want to begin an
20 investigation, preliminary investigation, that authority can
21 be given orally. It will then be papered up by a short memo.
22 Q.  When you say "papered up", when is the
23 investigation formally opened as a matter of Division policy?
24 Does not the paperwork have to be completed?
25 A.  Formally opened in terms of -- yes, in terms of

12

1  opening a file within the Department, the paperwork has to go
2  through.
3  Q.  When was the file opened in this matter, sir?
4     THE COURT: Excuse me, are we arguing --
5     MR. GIDLEY: This is relevant to the questions
6  about SNTG employees and what John Nannes was applying for at
7  the time he made the phone call.
8     THE COURT: So it bears on the "A" and "B" sides.
9     MR. GIDLEY: Yes.
10    THE COURT: We're proceeding under "B", it's a
11 given.
12    MR. GIDLEY: The inquiry was opened hours earlier
13 by a phone call.
14    THE COURT: So what, they are under "B" the line of
15 your questions appear to me that you are suggesting that it
16 should have been subject to part 1, rather than "B" because
17 there really was an investigation going and what I am saying
18 to you it does not matter because they went in for "B."
19    MR. GIDLEY: I agree, it's limited to Part "B."
20    THE COURT: Tell me what this is relevant to?
21    MR. GIDLEY: I think it's relevant to whether or
22 not at the time that Mr. Nannes called, he knew he was going
23 for "A" or "B" side amnesty.
24    THE COURT: That Mr. Nannes knew?
25    MR. GIDLEY: Yes.

13

1     THE COURT: Did he say he wasn't going for "B"?
2     MR. GIDLEY: And what was said by Mr. Nannes to Mr.
3  Griffin in the initial calls.
4     THE COURT: I don't understand the relevance of it
5  as to the issue that is before me.
6     MR. GIDLEY: I can move on, your Honor.
7     THE COURT: Okay.
8  Q.  Let's go back to the December 4th meeting, Mr.
9  Griffin. If I understood your direct testimony, Mr. Nannes'
10 statement at the December 4th meeting was important to your
11 decision to admit Stolt-Nielsen; is that correct?
12 A.  Yes.
13 Q.  After the December 4th meeting the Division did not
14 send a letter memorializing any representation to Mr. Nannes?
15 A.  That's correct.
16 Q.  There is no reference to March 2002 in the January
17 15, 2003 agreement, correct?
18 A.  That's correct.
19 Q.  Nor, is there a reference to February 2002
20 discovery in the January 15th agreement, correct?
21 A.  That's correct.
22 Q.  Yesterday, you testified on direct that since
23 discovery might have been earlier than February 2002, you
24 couldn't put it into the agreement.
25    Do you recall that testimony?