# Exhibit 43

# ANTITRUST ENFORCEMENT,
## SOME INITIAL THOUGHTS AND ACTIONS

Address by

ANNE K. BINGAMAN
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

Before the
Antitrust Section of the
American Bar Association

Loews Hotel
New York, New York

August 10, 1993

I am pleased to appear before you today in my new capacity. My appointment as Assistant Attorney General for Antitrust by President Clinton and Attorney General Reno is the greatest honor of my life. I will bend every effort to discharge the responsibility they have conferred on me -- to re-energize antitrust enforcement for the benefit of both U.S. consumers and producers.

As a long-standing member of the ABA and of the Antitrust Section, I am especially pleased to offer my first formal speech before this group, which has done so much to foster the intelligent and vigorous enforcement of the antitrust laws. The Report prepared this March for the new Administration by this Section's Task Force on Competition Policy was but the latest in a series of thoughtful and constructive studies by this Section on antitrust enforcement issues.

Let me say at the outset, I am an unabashed and enthusiastic supporter of vigorous antitrust enforcement. Antitrust enforcement confers great benefits on American consumers in terms of price, output, quality, and diversity. Producers also receive benefits, if not always comfort, from a climate of economic rivalry that spurs innovation and efficiency. Antitrust policy has served to preserve economic opportunity, an important element of American freedom that continues to attract people daily to this country.

The value of competition and antitrust enforcement has not diminished with the passage of time. I do not subscribe to the view that the increased complexity and internationalization of our economy makes antitrust policy less important. Indeed, I believe the converse is true. It is precisely <u>because</u> the United States is faced with strong foreign rivals that we need vigorous antitrust enforcement. Firms that seek the relatively "quiet life" of monopoly power or collusion are likely to find their pleasure short-lived, to the detriment of their shareholders, employees and customers. With rivals emerging from every direction, it is more critical than ever that U.S. firms secure the increased efficiency that only vigorous, hard competition on the merits can bring.

That some of the firms which now compete with U.S. firms originate in nations with economic systems that differ from ours is not cause to relax the enforcement of our antitrust laws. To be sure, from time to time, there have been, and will to continue to be, situations where a foreign firm or firms surpass their U.S. rivals. But, I am not aware of any such situation which resulted from our antitrust laws. In fact, part of the genius of our antitrust laws is that they are written in language sufficiently broad to allow flexible application that is suitable to enhance competition under a wide variety of circumstances.

For this reason, I disfavor the creation of new antitrust exemptions. I am not aware of any situation where existing law is not sufficiently flexible to allow desirable economic cooperation. To be sure, I have heard the argument that even if the antitrust laws are flexible, efficient collaboration nevertheless is deterred by legal uncertainty or unwarranted fear of antitrust liability or litigation. To the extent that is true, the preferable approach is to provide the public with accurate information rather than to create antitrust exemptions. While educational efforts are not without cost, they are likely to be far less costly in the long run than the creation of more antitrust exemptions. The economic performance of those areas of our economy that have, from time to time, been exempted from the antitrust laws generally has not been stellar. On the contrary, consumer welfare has been materially enhanced when Congress repealed or narrowed antitrust exemptions.

As many of you know, most of my time in private practice has been devoted to antitrust litigation. During that time, I became aware of the academic work on antitrust emanating from our law schools and economic departments. That work has produced a sophisticated understanding of the competitive purposes and effects of various types of economic activity. As a result of this work, neither antitrust policy scholars nor enforcement officials view large firm size as a source of concern, in and of itself. There is a greater appreciation of economies of scale and scope and the potential economic efficiencies of various forms of integration. By the same token, recent scholarship has provided new insights into the potential anti-competitive effects of various practices in certain circumstances. We are indeed fortunate to have the benefit of these insights at this stage in our history. Given the increasing pressure from international rivals, we can afford neither

to penalize efficiency, nor to countenance restrictive practices that on balance retard rivalry, opportunity, or innovation.

Unfortunately, neither economics in general nor antitrust analysis in particular is an exact science. As important as the theoretical advances of the past 25 years have been, it is just as important to remember that antitrust enforcement is, and indeed should be, fact intensive. My experience as a litigator has given me great appreciation for the significance of facts. As Assistant Attorney General, I intend to utilize both doctrinal and factual analysis in reaching enforcement decisions. Without the former, the business community is denied the guidance and reasonable certainty required for economic growth and efficiency, and an inordinate amount of resources must be devoted to litigating non-meritorious or marginal cases. Without the latter, however, there is a danger that theoretical constructs will be used to deny the existence of real world phenomena, to the detriment of rivalry and innovation. As Assistant Attorney General, I expect to employ a balanced approach; one that applies sound theoretical analysis together with an appreciation that the facts on occasion will not square with theory. There is nothing terribly new in such an approach, of course. Justice Holmes noted many years ago that "the life of the law is not logic but experience." With all due respect to the Justice, I would suggest that the heart of late 20th Century antitrust law is logic, tempered by experience. At least that is the lesson that I have taken from the recent Brooke Group,[1] Kodak[2] and Aspen Highlands[3] decisions.

Although the federal antitrust laws have been viewed as an essential part of our free market system for over one hundred years, their enforcement seldom has been without controversy. That is not surprising, given that the laws' foundation rests both on populist and efficiency concepts, concerns that conflict, on occasion. Given this history and the increasing complexity of current economic life, it would be naive to believe that antitrust

---

[1] Brooke Group Ltd. v. Brown & Williamson Tobacco Corp. ___ U.S. ___ (June 21, 1993).

[2] Eastman Kodak Co. v. Image Technical Services, Inc. 504 U.S. ___ (1992).

[3] Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985).

enforcement under the Clinton Administration will be free of controversy. But we will strive to enforce the antitrust laws in a thoughtful manner that accords with the best traditions of lawyering in America. That is to say, our legal positions will be based on the intent of Congress as expressed in statutory language and legislative history, as illumined by the decisions of the Supreme Court. To be sure, the Department will attempt to persuade the courts to exercise this statutory discretion in a manner that advances sound economics and competition policy, as we perceive it. However, where the law is clear as a result of decisions of the Supreme Court, we will accept our subordinate role in the creation of law and enforce it as interpreted by the Supreme Court.

My general feelings both about the relative weight to be accorded theory and facts in competition analysis and the role of the Department and the courts no doubt will be tested on a number of occasions over the next few years, as I seek to apply them to the large number of complex issues that come before the Assistant Attorney General in charge of the Antitrust Division. I already have made a number of such decisions, and I would like to announce here today two of them. First, we are rescinding the Department of Justice's Vertical Restraints Guidelines; second, we are expanding our antitrust Corporate Amnesty Policy.

As many of you know, the Vertical Restraints Guidelines were issued by the Department in 1985 with the announced purpose of reducing uncertainty associated with antitrust enforcement in this area. They were controversial from the outset; even beyond the norm for antitrust. Within the year, Congress expressed its "sense" that the Vertical Restraints Guidelines: (1) were not an accurate expression of federal antitrust law or of Congressional intent; (2) should not be accorded any force of law or be treated by the courts as binding or persuasive, and (3) should be recalled by the Attorney General.[4] That same year, the National Association of Attorneys General expressed their dissatisfaction with the Vertical Restraints Guidelines by adopting alternative Guidelines. In the ensuing years, neither Congress nor the State Attorneys General have retreated from their position.

---

[4]    P.L. 99-180, 99 Stat. 1170.

Our decision, however, to revoke the Department's Vertical Restraints Guidelines is not attributable to the opposition of Congress and the State Attorneys General. We, the Department, have a constitutional and statutory obligation to enforce the laws of the land as interpreted by the courts no matter how unpopular such action may be in other governmental bodies. I have taken an oath to that effect and Attorney General Reno would have it no other way. In fact, the core of my decision is based on the belief that the Guidelines unduly elevate theory at the expense of factual analysis and reflect a continued resistance to case law that, at this point in our history, is inappropriate.

A fundamental premise of the Department's Vertical Restraints Guidelines is that antitrust enforcement should focus on interbrand restraints because [and here I quote] "vertical restraints that only affect intrabrand competition generally represent little anti-competitive threat and involve some form of economic integration between different levels of production or distribution that tend to create efficiencies."[5] From the premise that vertical restraints on distribution are usually designed to expand a manufacturer's output, the Guidelines create a complicated two-screen process designed to legitimize all but the most harmful intrabrand restrictions. I do not suggest that the analytical methodology utilized in the Department's current vertical guidelines is totally bereft of merit. It provides a perspective that on some occasions may produce an accurate determination of the competitive effects of a particular vertical restraint. But the Guidelines' theoretical premises are, in my opinion, expanded too far.

It is possible to share the view that interbrand restraints are generally more pernicious than intrabrand restraints without trivializing the latter. Similarly, one may believe that some, or even many, intrabrand vertical restraints are either pro-competitive or competitively neutral without believing that to be true in almost every case. The difficulty here, as in many controversial areas, is striking the best and most workable balance. I am not yet certain where that optimal balance is for vertical restraints at this early stage of my term, but I am convinced that it is not reflected in the current Vertical Guidelines. These Guidelines seem

---

[5]   ¶ 2.1.

so thoroughly to discount the anti-competitive potential of vertical intrabrand restraints and so easily to assume their efficiency-enhancing potential as to predetermine the conclusion against enforcement action in almost every case. I am simply not willing to sign on to that balance.

There are other features of the current Guidelines that I cannot accept. They seem to treat all agreements between distributors of a single manufacturer as vertical agreements rather than under the harsher strictures applied to horizontal agreements.[6] And they are pre-disposed to treat vertical price fixing under the rule of reason if they find such restraints to be ancillary to non-price agreements.[7] I find it difficult to square such views with existing case law. These pieces, of course, are but part of a larger cloth.

Most of you are well aware of the efforts of the Department during the 1980's to persuade the Supreme Court to reverse its repeated decisions holding vertical price fixing *per se* illegal. Those efforts culminated with the filing in Monsanto[8] of an amicus brief that invited the Court to *sua sponte* reconsider its prior rulings on the issue. That invitation was rejected by the Court. Thus, both Congress and the Supreme Court have had recent opportunities to change the law. They have not. As a result, my obligation could not be more clear. Henceforth, the Antitrust Division will treat vertical price fixing as *per se* illegal under the Supreme Court's decisions in Monsanto and Sharp[9], and non-price fixing restraints as subject to a meaningful rule of reason analysis.

Let me quickly note a caveat. I am not "declaring war" on all vertical restraints. I and others at the Division are cognizant of the potential pro-competitive effects of some vertical non-price restraints in a variety of circumstances. Nor do I wish to ignore the

---

[6]   ¶¶ 2.1, 2.2.

[7]   ¶ 2.3.

[8]   Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984).

[9]   Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988).

insights provided by scholars over the past 25 years.  If we are to continue as one of the foremost economic nations, we must observe the Supreme Court's admonition that our focus be on promoting competition, not just the prerogatives of competitors.  We will, however, look at vertical restrictions in a more balanced manner than reflected in the current Guidelines.

The other change in Antitrust Division policy that I want to discuss entails an expansion of our Corporate Amnesty Policy.  That policy was initiated in October, 1978.  Under it, the Division will consider not seeking indictment of corporations that confess to violation of the antitrust laws prior to the initiation of an investigation by the Division.  Confessing officers and employees receive the same consideration for amnesty.  The grant of amnesty, however, is not automatic.  The Division exercises its prosecutorial discretion on the issue in accord with a seven-factor test.  Under the test, amnesty is available <u>only</u> to those who come forward <u>before</u> our investigation began.

On reflection, it seems to me that some form of Corporate Amnesty Policy makes good sense.  Under various criteria, prosecutors traditionally have been willing to accord lenient treatment to those who provide valuable cooperation.  They have done so because such cooperation can increase significantly the likelihood of discovering and punishing illegal conduct.  It also allows a more efficient use of the government's limited resources.  The benefit of an amnesty policy, moreover, extends beyond the cases in which it is employed.  To the extent that the existence of the policy is viewed by potential conspirators as raising the risk of detection and punishment, it also may deter other anti-competitive agreements.

The Corporate Amnesty Policy has been somewhat successful.  A number of corporations have come forward.  But, I think there is a potential to improve its efficacy.  It has seemed to me that our policy of refusing to offer amnesty to <u>anyone</u> once an investigation has begun is too rigid; it may be depriving the Division of additional cooperation that would on balance serve the public interest.  We also have concluded that counsels' current inability to <u>guarantee</u> amnesty to their clients if certain criteria are satisfied

may be reducing the efficacy of the program. Therefore, we have decided to change the Policy in several respects. If parties come forward before our investigation begins and satisfy six criteria, they <u>will</u> receive amnesty. That much greater certainty is provided. The six criteria are:

(1)    at the time the corporation comes forward, the Division has not received information about the activity from any other source;

(2)    the corporation, on discovery of the illegal conduct, must take prompt and effective action to terminate its participation in the illegal activity;

(3)    the corporation must report the wrongdoing with candor and completeness and provide full, continuing and complete cooperation throughout the subsequent investigation;

(4)    the confession must truly represent a corporate act, as opposed to isolated confessions of individual employees acting on their own;

(5)    where possible, the corporation must make restitution to injured parties; and

(6)    the corporation must not have coerced another party to participate in the illegal activity and must not have been the leader in, or originator of, the misconduct.

If a corporation comes forward <u>after</u> our investigation begins, for the first time, under the policy announced today, it still may qualify for amnesty, in the Department's discretion. To be sure, the fact that a corporation does not come forward until after an investigation has been initiated may raise some questions as to its eligibility under some of the other factors. If, however, a potential defendant is in a position to offer the government important and valuable cooperation, it is not apparent to me why the Division should refuse even to consider amnesty simply because an investigation has been instituted. We, of course, do not

- 8 -

want to dilute the incentives to come forward before the initiation of our investigation. However, at a time when all government agencies are being asked to increase their productivity, I think that it is reasonable to expand the Division's Corporate Amnesty Policy in the manner indicated.

If a corporation qualifies for the guaranteed amnesty, individuals who come forward with it also will receive amnesty. Where the corporation does not qualify for guaranteed amnesty, the individuals will be considered for immunity as if they had approached the Division individually.

Let me make it clear that I view conduct that is sufficiently anti-competitive to merit criminal prosecution to be very serious business. More importantly, Congress has made it clear that it believes that criminal antitrust conduct is very harmful to consumers. It has sought to deter such conduct by repeatedly increasing the permissible financial and prison sanctions for antitrust violators. We hope that the expansion of our Corporate Amnesty Policy both will produce greater cooperation with our investigations and deter anti-competitive activity in general. Whatever the result, we shall continue to look for ways to enhance the effectiveness of the Division's law enforcement efforts.

\* \* \* \*

In closing, I want to reiterate my enthusiasm at the opportunity to lead the Antitrust Division. This is one of the most exciting and challenging jobs in this country, and I am privileged to hold it. The Antitrust Section of the American Bar Association has for many years played an important role in the public-private dialogue that has accompanied the development of contemporary antitrust policy. I hope that you continue that tradition. Many of you already have been most generous to me in the time you have taken to advise me about the opportunities and potential pitfalls of my new job, and for that I am most grateful. I am open to your suggestions and thoughts, and I earnestly seek your help, as we together embark upon the task of reinvigorating and reshaping antitrust policy to foster competition and innovation at the brink of the Twenty-first Century.