# Exhibit 44



# DEPARTMENT OF JUSTICE

**CHANGE AND CONTINUITY IN
ANTITRUST ENFORCEMENT**


Address by

ANNE K. BINGAMAN
Assistant Attorney General
Antitrust Division
U.S. Department of Justice


Before the
Fordham Corporate Law Institute


Fordham Law School
New York, New York

October 21, 1993

It is a great pleasure for me to be here at Fordham today at what is one of the premier forums for new thinking about international antitrust. Without question, I am the luckiest lawyer in America, privileged to be charged by President Clinton and Attorney General Janet Reno with the responsibility for antitrust enforcement in the Clinton Administration.

During the past few months, I have thought a great deal about priorities for the Antitrust Division. We, like many others in Washington, will not have unlimited resources. On the contrary, we will be subject to resource constraints that will force us to reorganize, to set priorities, and to increase the efficiency of our efforts. That hurdle, however, can be met and overcome. I am grateful for a 300-person staff of lawyers and economists who are among the most talented and dedicated professionals that I have ever encountered, either in the private or public sector. I am also grateful to be working for Attorney General Janet Reno, whose only admonition to me has been to "enforce the law vigorously" and "do the right thing." I recognize, in view of the inherently controversial nature of many antitrust issues, that it will not always be easy to determine what is "the right thing." Nevertheless, the opportunity to serve the American public and American business under that charge is an enormous responsibility and the greatest privilege of my life.

My priorities for the Antitrust Division over the next few years reflect both the recent economic changes affecting the U.S. economy and my own experience and attitudes. As many of you know, I have spent most of my professional life as an in-the-trenches antitrust litigator. I hope that perspective can be used to strengthen the litigation capability of the Division, a task to which I ascribe the highest importance.

I have four key priorities. The first is enhancing international antitrust enforcement; the second is bringing significant civil cases; the third is strengthening our litigation record in the merger area; and the fourth is health care. Let me describe each in turn.

First, we need to enhance international antitrust enforcement. That would have been a new, and perhaps surprising, concept just twenty years ago, when we could afford to be more parochial in our thinking. However, the world is now more open to international trade. Indeed, approximately 22 percent of the United States' GDP now is accounted for by international trade (as measured by both exports and imports). This is roughly double what it was after World War II. In this increasingly global economy, U.S. firms today compete abroad and foreign firms devote considerable efforts to United States markets. To prosper, many U.S. firms need access to foreign markets, and U.S. consumers now often look to foreign producers as important sources of price and quality options. International competition disciplines domestic and foreign competitors both in this country and abroad, and must be encouraged.

Increased openness in trade, however, has not always meant increased competition. In other countries, various markets are sheltered by some form of import protection, or in the case of services, may reflect no effective competition at all. Foreign cartels exist with respect to some commodities. These instances of anticompetitive conduct must be countered by increased cooperation and collaboration among antitrust enforcers throughout the world.

In the international arena, I seek additional mechanisms to exchange data among international enforcers. Enforcement agencies determine the antitrust legality of commercial practices or mergers -- not on the basis of theory alone, but

more importantly, on facts.  The relevant facts, of course, are recorded in documents or in the testimony of individuals.  When such materials are located in the U.S., they are readily obtainable.  When they are located abroad, however, enforcement agencies often confront significant obstacles to obtaining information critical to the legal judgments that must be made.  In many cases with multi-national implications, the fact-gathering tools available to the Division, and our counterparts abroad, are woefully inadequate.  Other nations are prevented by statutes or confidentiality laws from cooperating with U.S. authorities in obtaining information needed for responsible antitrust enforcement.  Similarly, we in this country often can offer no aid when foreign enforcement authorities request it.  This situation more closely reflects the attitudes and the economies of the late 19th Century more closely than the needs of the 21st Century into which we are moving.

Recently, intergovernmental cooperation for various types of law enforcement has increased.  My predecessor, Jim Rill, deserves enormous credit for this progress, and for his efforts to persuade others of the value of applying antitrust to international trade.  But with the sole exception of Canada, cooperation in the antitrust area today extends principally to providing copies of documents that are already publicly available.  While such cooperation is important -- since much valuable public information is not widely known -- effective antitrust enforcement cannot be implemented solely, or even principally, on public information.  More cooperation is needed to protect consumers and help U.S. firms gain access to foreign markets.  Under my direction, the Antitrust Division will foster greater international cooperation to acquire the information-gathering tools that we and our counterparts abroad need to enforce the antitrust laws.

In view of my publicly announced decisions to use the 1992 Horizontal Merger Guidelines and to rescind the Department's Vertical Restraints Guidelines, I assume that at least some of you are wondering about our intentions with respect to the Antitrust Enforcement Guidelines for International Operations. To put the matter succinctly, we have not yet completed the type of careful analysis that should be, and most assuredly will be, a prerequisite for any decisions to change the International Guidelines.

There is, however, one aspect of the International Guidelines that I am willing to address today. I am in complete agreement with Jim Rill's decision last year to depart from footnote 159 of the 1988 revision of the International Guideline. Thus, I want to reaffirm the Department's willingness to enforce the antitrust laws against restrictions imposed abroad that have a "direct, substantial and reasonably foreseeable effect" on U.S. exports, even where such restraints have no direct impact on U.S. consumers. The fact that the antitrust laws ascribe primacy to U.S. consumer welfare over that of U.S. producers where the interests of the two groups conflict does not call for a different result. Where there is no conflict between the interests of those two groups, antitrust injury inflicted on U.S. exporters should be recognized, subject only to considerations of jurisdiction, comity and effective remedy.

There is nothing particularly novel about my view on this issue. It mirrors the views of the drafters of the original (1977) International Guidelines, my immediate predecessor, judicial precedent, and a sense of Congress, as expressed in the 1982 Foreign Trade Antitrust Improvements Act. Nor is this view overly aggressive or extraterritorial in a pejorative sense; we will act in a manner consistent with the jurisdictional principles that determine when foreign firms and individuals are within the reach of U.S. courts. Thus,

there may be situations where matters of jurisdiction, comity or effective relief dictate that we exercise our discretion not to sue. Such considerations, however, should not, and will not, result in a general abdication of my responsibility to enforce U.S. antitrust laws against clearly anticompetitive conduct that substantially injures U.S. exporters. As we promote greater international free trade, the U.S. will be increasingly dependent on its ability to export. The antitrust laws represent a legitimate and potentially useful means of protecting our national interest where private cartels seek to close foreign markets. In appropriate circumstances, I will not hesitate to act.

Because of the increased importance of international antitrust, I am emphasizing this area in the Division's organization and operations. I have asked one of my Deputies, Diane Wood, formerly Associate Dean of the University of Chicago Law School and an internationally recognized expert in this area, to be the point person in this effort. Diane has already assumed major responsibility for promoting our international antitrust enforcement agenda.

My second priority is to bring significant civil cases. We need to put the highly developed expertise of our 300 lawyers and economists to the best use. In the short time I have been at the Division, I have been tremendously impressed by the analytical rigor of the internal work of the Division's attorneys and economists. I have also been convinced of the need to use these resources more efficiently. These factors are an indicator to me that the Division should concentrate somewhat more on matters requiring sophisticated analytical and litigation capabilities. We will now focus our attention on filing significant civil cases which involve large volumes of commerce. By "significant," I mean that the Division should focus on cases that are highly visible, enhance the competitiveness of markets, establish broad legal precedents,

and that will have a significant impact on a large number of consumers. The airline price-fixing and coordination case brought by the previous Administration serves as a good example of what I consider to be a "significant" case.

This refocusing, to be sure, is a matter of degree, not kind. I do not mean to suggest that antitrust violations that have a limited geographic impact are unworthy of antitrust prosecution. What I am suggesting is that in this era of limited resources, I will try to persuade the State Attorneys General or the U.S. Attorneys to prosecute antitrust violations of local import that do not have a national character. This policy will permit the Antitrust Division to pursue the type of cases where our greater enforcement resources and in-house staff of 50 expert micro-economists give us a comparative advantage among enforcement agencies. In no event, however, will we knowingly fail to prosecute criminal conduct that comes to our attention.

As part of this initiative, the Division will exchange with State Assistant Attorneys General our economic and fact-finding methodologies. Attorney General Janet Reno places the highest priority on close cooperation with state law enforcement officials to maximize scarce prosecutorial resources. We are going to do all we can to work closely with other antitrust enforcement officials.

The fact that a case may have a large potential impact on consumers and producers should not engender paralysis of enforcement will. Rather, it increases the need to clearly identify the risks to competition through sound legal and economic analysis, and to make sure that those risks are susceptible to cost-effective judicial resolution. Where we can satisfy both of these criteria, the Antitrust Division will not flinch from instituting a case merely because it will

- 6 -

require a large commitment of our resources.  Congress did not so limit the antitrust laws, nor should I.

Indeed, I have hired a group of individuals whose role, together with others already in the Division, will be to develop significant civil non-merger cases.  I hope that you will assist us in these efforts.  In that vein, let me encourage you to bring to the Division's attention situations or practices that you believe are fraught with significant antitrust risk.  Obviously, we will reserve judgment pending our own careful analysis of the facts and the law.  But I assure you that you will find a willing listener.

My third priority entails improving our litigation record in the merger area.  I have taken several steps to do so.

The first step I have taken is to become personally involved in the decision process much earlier.  In the past, the staff used to bring the decision to the Assistant Attorney General at the very end -- after preparing lengthy written memoranda that were reviewed layer by layer up the chain of command. We have stopped this.  Instead, we are now using a team approach, in which the staff meets almost from the inception of an investigation with the Front Office, which consists of my immediate staff.  I have hired experienced merger attorneys for the Front Office who work closely with the staff attorneys and economists from the very beginning of the investigation to the end.  In addition, both my merger specialists and the staff attorneys and economists give me regular briefings on merger investigations as they progress. By utilizing this approach, we have already ended some investigations that were going nowhere, and this has allowed us to focus our resources more effectively on viable merger investigations.

The second step that I have taken is to make it clear to Division personnel that I want them to spend less time on preparing the elaborate written internal merger analyses that have traditionally been used, and _more time_ preparing for trial at an earlier stage than in the past.  It is not enough to be right.  We must be able to convince the trier of fact that we are right.  At first blush, this greater emphasis on trial preparation might appear to sacrifice the quality of merger analysis.  Let me assure you that will not be the case. From my discussions with prior Division officials and my own observations, I have concluded that the need is to preserve the analysis but to reduce the large amount of staff resources utilized in distilling that analysis into lengthy written memos as currently required.  I believe that those resources can better be used preparing for trial.  Earlier involvement of the Front Office in the process will preserve the analysis while reducing the resources expended on internal memo writing and review.

Simply stated, the purpose of this effort is to invigorate our merger enforcement program.  Congress repeatedly has indicated that potentially anticompetitive mergers should be enjoined.  The legislative history of the Clayton Act and subsequent decisions under Section 7 of that Act make it clear that the statute is designed to deal with potentially anticompetitive mergers in their incipiency. There is no need to wait until proof of an actual adverse effect is at hand. Under any prophylactic statute, of course, there is always the possibility that a judgment to oppose a merger will prove to be wrong, at least in light of future developments.  But that risk must be undertaken to carry out the will of Congress.  As Assistant Attorney General, I will not shrink from that responsibility.

Rest assured that I am not talking about a "shoot anything that moves" policy.  In today's fluid markets, many

mergers either are pro-competitive or benign.  In an era of heightened international economic competition, we simply cannot afford the costs of a merger policy that needlessly interferes with private reallocations of asset control.  By the same token, however, we can ill-afford to allow anticompetitive mergers.  Therefore, where sound economic analysis indicates that a merger may pose a significant risk to competition, I will act to enforce Congress' merger directives without apology.

Indeed, upgrading our merger enforcement capability could not be more timely.  The business page headlines of the last few months make it clear that we will be extremely busy on the merger front.  Proposed mergers in telecommunications, health care, banking, and other industries reflect the dynamic conditions brought about by technological and economic change.  I cannot predict -- nor would it be appropriate for me to do so--what course of action the Division will take toward these high-profile mergers.  I can, however, discuss how we will analyze them.

Parties to mergers sometimes view growth by consolidation as the best means of meeting the challenges of today, or, in some cases, tomorrow.  And, we recognize that in some cases mergers may be procompetitive to the extent that they create economies of scale or scope that will reduce costs or accelerate the development of new products or services.  At the same time, we are acutely aware that some mergers may pose significant competitive risks by increasing the likelihood that market power will be exercised or that rivals of the merged entity will find it more difficult to secure efficient access to critical markets.  The current DOJ/FTC Merger Guidelines analyze the potential procompetitive benefits as well as the potential competitive risks of a merger.  It is my intention to apply that type of careful analysis to all mergers that we review.  Our analytical methodology will be

consistent; it will constitute a broad inquiry into potential competitive harms and benefits. We will not oppose transactions that do not pose any significant risk of competitive harm. We will, however, vigorously oppose any transaction that does pose such risks. Moreover, our analysis will not be affected by matters extrinsic to the competitive merits, no matter how large or publicized the merger or joint venture. We have an important role to play under the law -- to prevent those, and only those, mergers that are likely to have a net anticompetitive effect. We will do everything in our power to discharge fairly that statutory responsibility.

I would like now to turn from these generic priorities to an industry-specific goal. My fourth priority involves health care. I have concluded that the imminence of significant change and the prevalence of misperceptions as to the application of antitrust laws in the health care industry justify industry-specific guidelines to clarify the issues. This is the first time, to my knowledge, that the Division has issued industry-specific guidelines.

I am well aware that some argue that health care is sufficiently different from the provision of other goods and services that competition and the antitrust laws should not apply to health care markets. I disagree with that view.

Marketplace competition, subject to the protection of the antitrust laws, is the norm for our society. Those who would substitute antitrust exemptions for market forces bear a heavy burden. Health care markets, however, are quite capable of performing competitively. They are not inherently characterized by the special economic circumstances that would justify dispensing with our normal reliance on competition and antitrust policy. They are not natural monopolies in a general sense. In most geographic areas, health care provider markets are competitively structured; numerous providers can

compete efficiently. And, in those few areas where providers are few, current antitrust law is sufficiently flexible to recognize and accept that reality. In some cases, certain health care markets have performed inefficiently due to lack of consumer information and/or the fact that some patients do not pay directly for the services they consume, due to insurance or other reimbursement. But these deficiencies are not immutable; they are remediable. Consequently, the better solution is to rectify or change those deficiencies to allow competition to flourish rather than to accept them as grounds for permanently precluding competition through antitrust exemptions.

Moreover, existing legal precedents make it clear that many types of efficiency enhancing collaborative activities by health care providers do not raise antitrust concerns. Nevertheless, there persists a view among many health care providers that uncertainty as to the scope of antitrust law has had the effect of overly deterring collaborative activities that save costs and promote efficiencies. In response to these concerns, on September 15, 1993, the Department of Justice, along with the FTC, issued antitrust enforcement policy statements covering several areas: hospital mergers, hospital joint ventures involving expensive medical equipment and services, collaborative provision of information to insurers by physicians, joint purchasing arrangements among health care providers, physician provision of medical services via joint ventures, and the sharing of price and cost information among hospitals.

Through these efforts, we have given health care providers a clear picture of those types of joint activities that do not raise antitrust concerns, as well as those that do. Additionally, we have guaranteed providers an expedited 90-day to 120-day business review procedure to obtain the

Antitrust Division's or FTC's view where questions about antitrust liability remain in health care markets.

These DOJ-FTC health care policy statements are historic because they are joint. I cannot say enough about my appreciation of the FTC, particularly FTC Chairman Janet Steiger, for their close cooperation in working on and publishing these policy statements expeditiously. I will do everything I can to continue and expand our joint efforts to shape antitrust policy.

Now that I have discussed our priorities, let me bring you up to date on what we have done. At the ABA meeting in August in New York City, I announced two other initiatives -- the rescission of the Department's Vertical Restraints Guidelines and the expansion of the Antitrust Division's Corporate Leniency Policy.

The rescinded Vertical Restraints Guidelines, promulgated in 1985, were controversial from the outset. They were criticized by Congress and the National Association of Attorneys General. Those Guidelines were based on a premise that "vertical restraints that only affect intrabrand competition generally represent little anticompetitive threat and involve some form of economic integration between different levels of production or distribution that tend to create efficiencies." Consequently, the Guidelines sought to legitimize all but the most harmful intrabrand restraints. While the analytical methodology utilized in those Guidelines may provide insight into the competitive efforts of particular vertical restraints, in my opinion they unduly evaluated theory over factual analysis, and in certain respects were at variance with existing case law.

The rescinded Guidelines seemed particularly to be at variance with existing case law to the extent that they

treated all agreements between distributors of a single manufacturer as vertical rather than horizontal agreements,[1] and treated vertical price fixing agreements under a rule of reason analysis if they were ancillary to non-price agreements.[2] To the extent that these conclusions were part of a broader effort by the Department of Justice during the 1980's to persuade the Supreme Court to reverse its decisions holding vertical price fixing per se illegal,[3] we will not pursue that effort. Henceforth, the Antitrust Division will treat vertical price fixing as per se illegal, and non-price fixing restraints as subject to a meaningful rule of reason analysis.

Let me quickly note a caveat. I am not "declaring war" on all vertical restraints. I and others at the Division are cognizant of the potential procompetitive effects of some vertical non-price restraints in a variety of circumstances. Nor do I wish to ignore the insights provided by scholars over the past 25 years. If we are to continue as one of the foremost national economies, we must observe the Supreme Court's admonition that our focus be on promoting competition, not just the prerogatives of individual competitors. We will, however, look at vertical restraints in a more balanced manner than was reflected in the rescinded Vertical Guidelines.

The second initiative involves the expansion of the Division's Corporate Leniency Policy. Under the Division's previous Corporate Leniency Policy, the Division would consider not seeking indictment of corporations that confessed to violations of the antitrust laws prior to the Division's initiation of an investigation. The grant of amnesty was not

---

[1] ¶¶2.1, 22.

[2] ¶2.3.

[3] See amicus brief of U.S. Department of Justice filed in Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984).

automatic.  The Division exercised its prosecutorial discretion in accord with a seven factor test.  Under that test, amnesty was available <u>only</u> to those who came forward <u>before</u> our investigation began.

The Corporate Leniency Policy had been somewhat successful.  A number of corporations came forward.  But, I thought that there was a potential to improve its efficacy.  It seemed to me that our policy of refusing to offer amnesty to <u>anyone</u> once an investigation had begun was too rigid; it may have deprived the Division of additional cooperation that, on balance, would have served the public interest.  We also concluded that counsel's inability to <u>guarantee</u> amnesty to its clients if certain criteria were satisfied may have limited the efficacy of the program.  Therefore, we have decided to change the Policy in several respects.  Now, if parties come forward before our investigation begins and satisfy six criteria, they <u>will</u> receive amnesty.  That much greater certainty is provided.  The six criteria are:

(1) at the time the corporation comes forward, the Division has not received information about the activity from any other source;

(2) the corporation, on discovery of the illegal conduct, must take prompt and effective action to terminate its participation in the illegal activity;

(3) the corporation must report the wrongdoing with candor and completeness and provide full, continuing and complete cooperation throughout the subsequent investigation;

(4) the confession must truly represent a corporate act, as opposed to isolated confessions of individual employees acting on their own;

(5) where possible, the corporation must make restitution to injured parties; and

(6) the corporation must not have coerced another party to participate in the illegal activity and must not

>> have been the leader in, or originator of, the misconduct.

If a corporation comes forward <u>after</u> our investigation begins, it still may qualify for amnesty, in the Department's discretion. The fact that a corporation does not come forward until after an investigation has been initiated may raise some questions as to its eligibility under some of the other factors. If, however, a potential defendant is in a position to offer the government important and valuable cooperation, it is not apparent to me why the Division should refuse even to consider amnesty simply because an investigation has been instituted. Of course, we do not want to dilute the incentives to come forward before the initiation of our investigation. However, at a time when all government agencies are being asked to increase their productivity, I think that it is reasonable to expand the Division's Corporate Leniency Policy in the manner indicated.

Today's discussion of new priorities and our new initiatives should not obscure the fact that certain aspects of the Division's activities have been very successful over the years and continue to enjoy broad bi-partisan support.

For example, the Antitrust Division's efforts to detect, punish and thereby deter horizontal price fixing and bid rigging have been constant for many years. The significant harm that such practices inflict on consumers is widely recognized. I share the view of my predecessors in this area. I want to make it very clear from the outset that collusive conduct of the type traditionally made subject to criminal prosecution will not be condoned. In recent years, Congress has indicated that criminal antitrust violations are very harmful to consumers. It has sought to deter such conduct by increasing the permissible financial and prison sanctions for antitrust violators. Having urged Congress to take these

- 15 -

steps, the Division will continue to root out and punish those who fix prices, rig bids or otherwise engage in criminal antitrust violations. Such violators will feel no respite during this Administration.

The last 25 years also have witnessed a consistent and successful effort by the Antitrust Division to reduce governmentally-imposed impediments to competition in a number of regulated industries. Initiated in the Johnson Administration and continued under every subsequent President, this Competition Advocacy Program has played a significant role in enhancing consumer welfare and increasing industry efficiency.

You may recall that at one time commission rates on stocks traded on the New York Stock Exchange were fixed by the member-brokers, subject to the approval of the SEC. Long distance telephone service and the manufacture of telephone equipment were dominated by a single regulated firm. Domestic air, rail, and trucking rates were regulated, and potential entrants into these markets had to overcome very high entry barriers in the form of public convenience and needs licensing proceedings.

Today, of course, all of these markets have changed dramatically. The millions of people that purchase securities, either directly or indirectly, have numerous pricing and service options. Long distance telephone service and telephone equipment are provided by numerous firms who offer the public a variety of price and quality options. Price and entry competition is now allowed and, at times is vigorous in our domestic air and land transportation industries.

As a result of these changes, consumer savings in these markets measure in the hundreds of millions of dollars

annually, and billions on an aggregate basis. In each of these regulated areas, the Antitrust Division, through filings with the regulatory agency and/or reports to Congress, played an important role in bringing about very beneficial changes. Competition advocacy has a proud tradition in the Antitrust Division, and it is one that I plan to continue. Important competitive issues remain in these regulated industries and others as well.

\* \* \*

I hope that these comments have given you some idea of what we plan to do at the Antitrust Division over the next several years. We believe profoundly in our mission. Vigorous and effective antitrust enforcement has provided significant benefits to both U.S. consumers and producers in the past. There is every reason to believe that this salutary relationship will continue. Indeed, as our economy continues to grow and become ever more integrated with international markets, we will increase our efforts to preserve and enhance the beneficial role of competition throughout the world.

I am deeply honored and privileged that President Clinton and Attorney General Janet Reno have given me the responsibilities of Assistant Attorney General in charge of the Antitrust Division in these challenging and historic times. I will do everything in my power to discharge those responsibilities fairly, fully, and with the utmost vigor.