## ABA SECTION OF ANTITRUST LAW FALL FORUM

## CARTEL ENFORCEMENT ROUNDTABLE

**Moderator:** Gary R. Spratling

**Panelists:**

- Scott D. Hammond, Deputy Assistant Attorney General, Antitrust Division, US Department of Justice
- Kirtikumar Mehta, Director, Cartels, Directorate General Competition, European Commission, Brussels, Belgium
- John M. Majoras, Jones, Day, Washington, DC

**START: 2:00 PM**

I.  **INTRODUCTION  (Gary) (5 minutes)**

- Welcome
- Developments in cartel enforcement
- Introduction of panelists

II. **DEVELOPMENTS IN AMNESTY PROGRAMS AND POLICIES**

A. Seque (2 minutes)

**Gary:** Let's start where the last panel left off.  Most enforcers and private practitioners in this field believe that the implementation, fine-tuning, and proliferation of amnesty/immunity programs has been the primary factor in the explosion of international cartel prosecutions.  We should not forget that, just a dozen years ago, when the US DOJ announced its revised amnesty program, there were only two countries in the world with leniency programs:  Canada and the US.  As Don said, [. . .repeat a statement or statements by Don Klawiter from previous panel. . .].  Mr. Uesugi told us about the JFTC accomplishing "mission impossible" with the enactment of a leniency program in Japan, which will go into effect on January 4.  Scott told us [. . .repeat a statement or statements by Scott Hammond re the US leniency policy . . ] and about the new leniency policy and criminalization developments "down under."  But nowhere has the introduction of an Immunity Program had greater success -- in terms of number of applications and resulting investigative proceedings -- than in the European Union.

GOVERNMENT EXHIBIT D

ATR-3995

Kirti, would you (1) tell us a little about the European Commission's Immunity Policy, (2) give us a sense of the success of the EC's Immunity Program, (3) tell us if that success poses any problems for the Commission, and (4) make a prediction about whether any revisions are imminent.

**B. Kirti (10 minutes)**

**Gary:** John, assume one of your clients informs you that it believes it may have engaged in cartel conduct with respect to a product that is sold in many jurisdictions. Your client's detection of problematic conduct may have been through an internal audit or, at the other end of the spectrum, as a result of various of its facilities being the subject of simultaneous dawn raids by EC officials and national police in Europe, searches by the Royal Canadian Mounted Police in Canada, execution of search warrants by the FBI and local police in the US, and inspections by the JFTC in Japan. Recognizing that the strategy, manner and timing of your response will be greatly affected by the way in which your client became aware of the potential anticompetitive conduct, how does the existence of amnesty programs in multiple jurisdictions affect your development of an integrated international response? That is, how does this network of amnesty programs – in some cases with overlapping geographic applications, and in many cases with differing requirements to qualify – affect your client's decision (1) whether to apply for amnesty, (2) if so, in how many jurisdictions to apply and which ones, and (3) if your client applies in multiple jurisdictions, in what order does it proceed? How in the world do you take account of all the considerations?

**C. John (8 minutes)**

III.  **STOLT-NIELSEN – ANOTHER DIMENSION OF AMNESTY (8 minutes)**

**Gary:** Two of the specific requirements for amnesty in every program of which I am aware are (1) the applicant has terminated its involvement in the anticompetitive activity and (2) the applicant cooperates fully and completely with the enforcer. Scott, the US DOJ, in a move that attracted the attention of other enforcers and defense counsel around the world, revoked the conditional leniency of a Luxembourg shipping company, Stolt-Nielsen, because it failed to meet those requirements. Can you give us an update on the Stolt-Nielsen case?

A.  **Scott (6 minutes)**

**Gary:** John, (1) how does the Stolt-Nielsen development affect your expectations, concerns, and risk assessment in evaluating the leniency decision; and (2) how, if at all, will Stolt-Nielsen affect the manner in which you deal with the DOJ in making an application?

2

ATR-3996

  **B.**  **John (2 minutes)**

**IV.** **PRIVATE CIVIL DAMAGE ACTIONS (9 minutes)**

**Gary:** A Commission study has characterized private enforcement in Europe as "totally underdeveloped". Commissioner Kroes has said that comprehensive enforcement of competition rules in the EU is not complete without private enforcement, and that the EC is preparing a Green Paper setting out options for improving the current system of private enforcement.

Kirti, what is the current anticipated timing of the Green Paper? Can you give us any preview on the current state of the EC's thinking regarding private enforcement? If not, can you share with us your personal views?

  **A.**  **Kirti (5 minutes)**

**Gary:** As we all know, private treble damage exposure in the US is enormous, indeed, so potentially crippling that it is nearly always a critical factor in a company's decision to self-report. Nowadays, there are regularly 70, 80, 90 civil lawsuits filed in the wake of major DOJ investigations or prosecutions. In recent years, defendants have frequently paid more to settle civil damage actions in the US than they paid in fines in government enforcement actions brought by the US, *and* EU, *and* Canada *and* all other jurisdictions *combined*. There are also growing numbers of civil actions (although no treble damages) in Canada. Last year, a new consideration was added to the risk assessment for civil litigation in the US with the passage of legislation limiting recovery against an amnesty applicant that cooperates with private plaintiffs to single damages (with no joint and several liability). Now, the complicating prospect of civil actions in Europe appears on the horizon.

John, how will these developments likely impact a company's assessment of whether to self-report and seek amnesty? Are there some tensions developing? **(1 minute)**

  **B.**  **John (3 minutes)**

**V.** **THE DETENTION, EXTRADITION AND PROSECUTION OF FOREIGN NATIONALS (10 minutes)**

**Gary:** The US DOJ has imprisoned a large number of foreign nationals for violating U.S. antitrust laws. Scott, what is your enforcement strategy for obtaining jurisdiction over and prosecuting foreign nationals?

  **A.**  **Scott (7 minutes)**

3

ATR-3997

**Gary:** John, from the defense perspective, what does the DOJ's move to extradite criminal defendants mean for a client's risk assessment and strategy in responding to international cartel exposure?

**B.**   **John (3 minutes)**

## VI.   PLEA BARGAINING (12 minutes)

**Gary:** As I mentioned in my introductory remarks, and as many of you know, the European Commission is beginning to consider the possibility of plea bargaining, a process that is long established in the United States and Canada but still conceptual to the European Union.

**Gary:** Kirti, what is the Commission's current thinking on the pluses and minuses of plea bargaining? What challenges would the Commission face if it were to pursue such reform?

**A.**   **Kirti (5 minutes)**

**Gary:** John, if in the EU there were the greater predictability of penalties typically associated with agreed-upon dispositions in plea agreements, how would that affect your ability to counsel clients?

**B.**   **John (3 minutes)**

**Gary:** Scott, do you have any thoughts on the direct or collateral consequences of the EU going to a plea agreement system of disposition?

**C.**   **Scott (4 minutes)**

## VII.   COOPERATION AMONG JURISDICTIONS (20 minutes)

**Gary:** It is very interesting for non-enforcers to hear about the cooperation among enforcement agencies through the International Competition Network and the OECD.

Scott, I know you recently attended an OECD meeting of prosecutors and, just a few days ago, returned from an ICN Conference in Seoul. Can you tell us about some of the developments at those or other meetings of enforcers?

ATR–3998

A. **Scott (8 minutes)**

**Gary:** Kirti, the ECN is a very different coordinating organization than the ICN. Can you compare and contrast the two groups and discuss the practical aspects of the ECN as a coordinating entity?

B. **Kirti (8 minutes)**

**Gary:** John, on top of MLATS and antitrust cooperation agreements, enforcers now have the ICN, ECN, OECD-Public Prosecutor Network as well as, by all reports, unprecedented reciprocal eagerness to cooperate. What does all this mean as you develop strategy for a client to deal with international cartel exposure?

C. **John (4 minutes)**

ws27.tmp