

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stolt-Nielsen Transportation Group Ltd.,   )
   )
        Plaintiff,   )
   )
     v.   ) Civil Action No. 05-2217 (RJL)
   )
United States of America,   )
   )
        Defendant.   )
_____)
   )
Stolt-Nielsen Transportation Group Ltd.,   )
   )
        Plaintiff,   )
   )
     v.   ) Civil Action No. 06-0474 (RJL)
   )
United States Department of Justice,   )
   )
        Defendant.   )
_____)

### DECLARATION OF SCOTT D. HAMMOND

CITY OF WASHINGTON   )
   ) ss:
DISTRICT OF COLUMBIA  )

I, SCOTT D. HAMMOND, do hereby declare:

1.     I am the Deputy Assistant Attorney General for Criminal Enforcement (Criminal

DAAG) of the Antitrust Division of the United States Department of Justice (Division), having

assumed that position in January 2005.[1]  As Criminal DAAG, I report directly to the Division's

---

[1] Prior to assuming the Criminal DAAG position, I served as the Division's Director of Criminal Enforcement from January 2000 to January 2005, the Senior Counsel for Criminal Enforcement from May 1995 to January 2000, and as a trial attorney in the Division from

Assistant Attorney General and am responsible, among other things, for the supervision of all Division criminal investigations and prosecutions. My duties and responsibilities also include the supervision of the operation of the Division's Corporate Leniency Policy. I am fully familiar with the requirements of the Division's Corporate Leniency Policy and am responsible for recommending to the Assistant Attorney General whether the Division enter into a particular conditional leniency agreement. The Assistant Attorney General has final authority to approve a conditional leniency agreement. The statements made herein are based upon my personal knowledge and information obtained during the course of my official duties.

I.    The Division's Criminal Enforcement Program

2.    Attorneys in the Division's criminal enforcement program investigate and prosecute hard core cartel offenses, such as agreements among competitors to fix prices, rig bids, or allocate customers, territories, or sales volumes. Such agreements are violations of 15 U.S.C. § 1. Cartels inflate prices, limit supply, lessen innovation, and inhibit efficiency, undermining our free enterprise system. Due to the pernicious effect of cartels on competition and their lack of redeeming economic value, anti-cartel enforcement is the Division's highest enforcement priority[2] and has been described as the "core antitrust mission."[3] The Division has seven field

---

November 1988 until May 1995.

[2] Thomas O. Barnett, Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, Seven Steps to Better Cartel Enforcement, Presentation to the 11th Annual Competition Law & Policy Workshop of the European Union Institute (June 2, 2006), *available at* http://www.usdoj.gov/atr/public/speeches/216453.htm.

[3] R. Hewitt Pate, Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, Anti-Cartel Enforcement: The Core Antitrust Mission, Speech Before the Third Annual Conference on International and Comparative Competition Law of the British Institute of International and Comparative Law (May 16, 2003), *available at*

offices and one section in Washington, D.C. that conduct criminal antitrust investigations and prosecutions.

3.    Beginning in the 1990's, the Division began to place a particular emphasis on the investigation and prosecution of international cartels, such as the parcel tanker shipping conspiracy at issue in the grand jury investigation underlying plaintiff's twelve FOIA requests that are the subject of this action. This new emphasis was due to the increasing globalization of the U.S. economy and the resulting increased opportunities for the formation and success of international cartels targeting U.S. businesses and consumers. The Division soon found that the international cartels it uncovered dwarfed the domestic conspiracies it had traditionally prosecuted up until the mid-1990's. These international cartels encompassed much broader geographic scopes, adversely affected much greater amounts of commerce, and injured much larger numbers of businesses and consumers. The substantial fines the Division has obtained since the mid-1990's reflect the massive volumes of commerce affected by international cartels and the associated harm caused by the cartels. Since 1996, the Division has obtained over $3 billion in criminal fines, and over 90% of those fines have been obtained in prosecutions of international cartels. The Division has uncovered international cartels which have held cartel meetings in more than 100 cities and 35 countries around the world. The Division has prosecuted corporations based in multiple foreign countries, including Belgium, Germany, Japan, Korea, Liechtenstein, Luxembourg, Netherlands, Norway, Switzerland, and the United Kingdom,

---

http://www.usdoj.gov/atr/public/speeches/201199.htm. Likewise, the Organization for Economic Co-operation and Development, an international competition organization of 30 market democracies, has recognized that cartels are "the most egregious violations of competition law." OECD Council, Recommendation of the Council Concerning Effective Action against Hard Core Cartels (1998).

and foreign individuals from Austria, Belgium, Canada, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, Norway, Sweden, Switzerland, and the United Kingdom. Today, the Division's enforcement efforts against international cartels continue to be the highest priority of its criminal enforcement program, with over 60 sitting grand juries investigating international cartel behavior.

4.      When the Division began investigating international cartels, it faced enormous obstacles in obtaining the necessary evidence to prosecute the cartels. As detailed in Section III below, key evidence of such cartels was often beyond the Division's jurisdictional reach and foreign governments were reluctant to assist the Division in obtaining evidence in cartel investigations.

5.      As the Division began to devote more resources to the investigation and prosecution of international cartels, two key factors contributed to the Division's increasing ability to obtain evidence of international cartels and to prosecute the cartels successfully. First, the cooperation of cartel insiders pursuant to the Division's Corporate Leniency Policy, described in Section II below, cracked many international cartels. Second, as described in Section III below, the Division developed strong cooperative relationships with foreign authorities that resulted in critical coordination and assistance from foreign authorities.

II.     The Division's Corporate Leniency Policy

        A.     Value of Leniency Program

6.      The Division's Corporate Leniency Policy, the current form of which was adopted in August 1993, provides amnesty for the first company in a cartel that comes forward, admits its

4

participation in a cartel, provides full cooperation with the Division's investigation of other corporate and individual conspirators, and meets the other stated requirements of the policy. If the applicant and its cooperating executives qualify for amnesty, they will avoid criminal convictions, fines, and jail terms for the cartel offense. After the current leniency policy was introduced in 1993, the number of companies seeking amnesty substantially increased, and cooperation of applicants under the current amnesty program has advanced the majority of the Division's international cartel investigations.

7.     The Division's amnesty policy is considered the cornerstone of its international anti-cartel enforcement program and has led to the detection and prosecution of more international cartels than all of the Division's search warrants, consensual monitoring, and FBI interrogations combined. Because cartels operate in secret, obtaining the cooperation of insiders is the best and frequently the only way to break open a cartel. Obtaining such cooperation can lead to the termination of cartels, conviction of coconspirators, and recovery of damages by victims; can shorten an investigation by months or years; and can conserve scarce government resources. The amnesty program is clearly the Division's most effective generator of international cartel cases, and has become the Justice Department's most successful voluntary disclosure program. The success of the Division's Corporate Leniency Policy has led to the development of leniency programs by foreign governments around the world. The Division has advised a number of foreign governments in the drafting and implementation of effective leniency policies. The emergence of amnesty policies of different governments with similar requirements has led amnesty applicants to report their conduct to multiple jurisdictions

5

simultaneously, which has provided opportunities for coordinated investigative activities such as

searches, interviews, and the service of subpoenas. This cooperation has strengthened anti-cartel

enforcement in the United States and abroad. Prior to this convergence in leniency programs,

many amnesty applicants were deterred from applying for amnesty in one jurisdiction if they had

greater exposure in another jurisdiction which had an ineffective amnesty program.[4] Thus, the

efficient functioning of an amnesty program in one jurisdiction affects the efficient functioning

of amnesty programs in other major jurisdictions.

    8.    To promote understanding of the leniency program, the Division has given

speeches and participated in numerous panel discussions explaining the program and answering

questions generated by the program.[5] The antitrust defense bar's recognition of the value of the

---

[4] *See* Gary R. Spratling and D. Jarrett Arp, Gibson, Dunn & Crutcher LLP, International
Cartel Enforcement and Leniency Programs - A Global Perspective, Speech Before the ICN
Workshop on Leniency Programs and the ACCC Cracking Cartels Conference (Nov. 22-24,
2004) at 12, *available at* http://www.accc.gov.au/content/index.phtml/itemId/566510 ("[T]here is
a broad recognition that [leniency] policies need to be similar in material respects because
decisions made by international cartel participants about whether to self-report and cooperate
with enforcement authorities are global decisions. If the provisions of the leniency policy in one
jurisdiction are sufficiently unattractive to dissuade a potential applicant from applying there, that
potential applicant may not self-report or cooperate in any jurisdiction.").

[5] *See, e.g.,* Scott D. Hammond, Director of Criminal Enforcement, Antitrust Div., U.S.
Dep't of Justice, Cornerstones of an Effective Leniency Program, Speech Before the ICN
Workshop on Leniency Programs (Nov. 22-23, 2004), *available at*
http://www.usdoj.gov/atr/public/speeches/206611.htm; Gary R. Spratling, Deputy Ass't Att'y
Gen., Antitrust Div., U.S. Dep't of Justice, Making Companies An Offer They Shouldn't Refuse,
The Antitrust Division's Corporate Leniency Policy - An Update, Speech Before the Bar
Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust
(Feb. 16, 1999), *available at* http://www.usdoj.gov/atr/public/speeches/2247.htm; Spratling, The
Corporate Leniency Policy: Answers to Recurring Questions, Speech Before ABA Antitrust
Section's 1998 Spring Meeting (Apr. 1, 1998), *available at*
http://www.usdoj.gov/atr/public/speeches/1626.htm.

program has been critical to the success of the program and the willingness of companies to

apply for leniency.

B.    Confidentiality of Leniency Program

9.    In spite of the benefits of amnesty to corporations and their employees, companies

are reluctant to come forward and admit their involvement in a cartel, whether domestic or

international.  Among the reasons for the reluctance are fear of retribution by former

coconspirators and concern over damaged relations with customers.  Accordingly, the Division

concluded long ago that confidential treatment of amnesty applications is crucial.  In its speeches

regarding the application of the amnesty program, the Division has emphasized the

confidentiality of the amnesty program.  The Division "holds the identity of amnesty applicants

in strict confidence, much like the treatment afforded to confidential informants [and] [t]herefore,

. . . will not publicly disclose the identity of an amnesty applicant, absent prior disclosure by the

applicant, unless required to do so by court order in connection with litigation."[6]  Moreover,

amnesty negotiations are conducted with the express understanding that those negotiations and

the information provided by the applicant will remain confidential, even after the investigation at

issue is closed.  Even after an investigation is closed, confidential informants pursuant to the

leniency program maintain an interest in keeping their identities and the information they

disclose confidential due to fear of retribution by former coconspirators they implicated and

damaged relations with customers.  Moreover, with respect to amnesty applications for

international conspiracies, given that some foreign governments do not have statutes of

---

[6] Spratling, The Corporate Leniency Policy: Answers to Recurring Questions, *supra* note 5, at 11.

limitations for cartel offenses and thus the applicant's foreign exposure remains, this continued confidentiality is particularly important. Many leading members of the private antitrust bar who represent amnesty applicants have advised me that the Division's promise of confidentiality is a critical, and in some cases determinative, factor that companies rely upon in making a decision whether to self report pursuant to the Division's amnesty program.

10.    Despite the Division's close cooperative relationships with numerous foreign antitrust authorities and the critical need for assistance from foreign antitrust enforcers discussed in Section III below, the Division will not share a specific amnesty letter with foreign enforcers when the Division is requesting assistance in an investigation or is coordinating investigative activities with a foreign government, nor will the Division reveal the applicant's identity or information provided by the applicant, unless the applicant first agrees to the disclosure.[7] The Division made a policy decision not to share amnesty information with foreign authorities pursuant to bilateral antitrust cooperation agreements without an amnesty applicant's concurrence, notwithstanding the Division's promotion of increased cooperation among international antitrust enforcers, due to the Division's interest in maximizing incentives for companies to report cartel offenses and the Division's "overriding interest in protecting the viability of the [a]mnesty [p]rogram."[8] Hence, the Division will not share the amnesty letters requested by Stolt-Nielsen Transportation Group Ltd. ("Stolt-Nielsen") in FOIA Request

---

[7] Spratling, Making Companies An Offer They Shouldn't Refuse, The Antitrust Division's Corporate Leniency Policy – An Update, *supra* note 5, at 4-5.

[8] *Id.* at 5 ("There is no doubt that amnesty applications would dry up if the Division took a different position").

ATFY06-002 even with its sister enforcement authorities. Moreover, to protect the viability of the amnesty program, it is the Division's policy to forgo assistance from a foreign authority if it means disclosing the contents of an amnesty letter in cases where the applicant does not agree to the disclosure.

11.    In this FOIA action, Stolt-Nielsen has requested a copy of every amnesty agreement entered by the Antitrust Division over the last thirteen years since the revision of the amnesty program in August 1993,[9] a request which involves roughly one hundred grand jury investigations and roughly one hundred amnesty letters. If amnesty letters were publicly available pursuant to the FOIA, such a disclosure obligation could reasonably be expected to have a negative effect on the perception of the amnesty program. Amnesty applicants could perceive that the amnesty application process is no longer confidential, and hence the disclosure obligation would have a chilling effect on amnesty applications in both domestic and international investigations. Due to the importance of the Division's amnesty program, such a disclosure obligation could interfere with the Division's anti-cartel enforcement program, including both ongoing and prospective enforcement proceedings. Further, disclosure to Stolt-Nielsen in this case could lead to an onslaught of FOIA requests from various individuals and groups, including coconspirators under investigation, in every cartel grand jury investigation in an attempt to obtain confidential information, such as whether an amnesty application was made, who made it, and what can be gleaned from the letter regarding the information the applicant

---

[9] ATFY06-002, Oct. 14, 2005 FOIA Request from Stolt-Nielsen, Exhibit N to Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment.

provided about the cartel. Without an effective amnesty program, numerous cartels would go undetected and large numbers of consumers would continue to be harmed by this egregious activity.

C.    Integrity of Leniency Program and Revocation of Plaintiffs' Leniency

12.    Because the amnesty program is such a critical element of the Division's anti-cartel enforcement program, maintaining the integrity of the program, including the application and granting process, is also critical. Amnesty is granted to an applicant in a two-step process. First, the applicant is granted a conditional amnesty letter.[10] As noted in the conditional amnesty letter granted to SNTG, the conditions in the initial letter include the verification of certain specified representations made by the applicant and the full, continuing, and complete cooperation of the applicant, as defined in the letter.[11] The required representations include the applicant's representation that it "took prompt and effective action to terminate its part in the

---

[10] *See* Amnesty Agreement between the Antitrust Division and Stolt-Nielsen and its affiliates (Jan. 15, 2003) (hereinafter "SNTG Amnesty Agreement"), attached as Exhibit C to Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment ("This agreement is conditional and depends upon SNTG satisfying the conditions set forth below. After all of these conditions are met, the Division will notify SNTG in writing that the application has been granted."). The SNTG Amnesty Agreement defined SNTG as Stolt-Nielsen Transportation Group Ltd. (Bermuda), as well as its parent (including its ultimate parent), affiliates, and subsidiaries, but not including joint venture partners. Thus, I use SNTG in this Declaration in reference to the Amnesty Agreement and to refer to the same entities.

[11] *See* SNTG Amnesty Agreement ¶ 3 ("Subject to verification of SNTG's representations in paragraph 1 above, and subject to its full, continuing and complete cooperation, as described in paragraph 2 above, the Antitrust Division agrees conditionally to accept SNTG into Part B of the Corporate Leniency Program . . . .").

anticompetitive activity being reported upon discovery of the activity."[12] The conditional letter also provides that, if the Antitrust Division determines that the applicant has violated the agreement, the amnesty agreement "shall be void, and the Antitrust Division may revoke the conditional acceptance of [the applicant] into the Corporate Leniency Program."[13] If and when the Division confirms that all of the conditions in the conditional leniency letter are satisfied, the Division notifies the applicant in writing that its application has been granted. The integrity of the amnesty program depends upon applicants providing truthful representations and full and truthful cooperation. The Division cannot allow the amnesty program to be misused by applicants who are not eligible for amnesty and who would escape conviction based on false pretenses. The Division must ensure that the defense bar and business community have confidence in the amnesty program such that they are not dissuaded from making amnesty applications.

13.    Less than three months after entering a conditional leniency letter with SNTG, the Division received credible evidence that SNTG had not taken prompt and effective action to terminate its participation in the international parcel tanker shipping cartel upon its discovery as required by the Division's Corporate Leniency Policy, that it had provided false information to the Division, and that it had withheld information about the cartel from the Division. The Division promptly notified SNTG in April 2003 that it was considering whether to withdraw its conditional leniency, and the Division suspended SNTG's obligations to cooperate with the

---

[12] *See* SNTG Amnesty Agreement ¶ 1(a).

[13] *See* SNTG Amnesty Agreement ¶ 3.

Division pending resolution of SNTG's eligibility for amnesty. In February 2004, Stolt-Nielsen, its parent, and Stolt-Nielsen executive Richard Wingfield filed civil actions in the Eastern District of Pennsylvania to enjoin the Division from seeking their indictment. The Division formally revoked SNTG's conditional leniency on March 2, 2004, the first time that the Division had ever revoked an applicant's conditional leniency.

14.    Because the revocation of an applicant's conditional leniency was unprecedented and because of the importance of the Division's amnesty program, the revocation generated intense interest in the antitrust defense bar and generated many questions as to the Division's future application of the program. Thus, after the district court decision granting Stolt-Nielsen's request for injunction was issued and the accompanying hearing record was unsealed, the Division responded to many inquiries in public fora, such as ABA panel discussions, in order to provide guidance to the antitrust bar in the continued use of the amnesty program.

## III.    Cooperation with Foreign Authorities

### A.    Jurisdictional Challenges in International Anti-Cartel Enforcement

15.    As noted above, when the Division began investigating international cartels in the early to mid 1990's, it faced significant obstacles in obtaining the evidence necessary to prosecute such cartels. Cartel meetings were frequently held overseas to evade detection by U.S. authorities. Key documents and witnesses were also often located overseas, beyond the Division's subpoena power and search and seizure authority. In addition, at that time, the Division did not have strong cooperative relations with foreign authorities, and many foreign governments did not promote strong anti-cartel enforcement within their own jurisdictions. As a

12

result, such governments were reluctant to provide investigative assistance to another jurisdiction in an antitrust investigation. As a result, the Division would usually have to wait many months to receive a response to a request to a foreign authority for investigative assistance, and the answer, once finally received, was often a refusal of assistance.

B.     Development of Cooperative Relations with Foreign Authorities

16.     Recognizing that foreign assistance was critical in the investigation of international cartels, the Division worked diligently to improve relations with foreign authorities and to promote strong anti-cartel enforcement by other governments. The Division instituted an annual international anti-cartel enforcement workshop, which brings together antitrust enforcers from numerous jurisdictions around the world to discuss challenges in international anti-cartel enforcement and to identify mechanisms to meet such challenges. In addition, antitrust cooperation agreements were entered with multiple foreign governments. The Division also participated in various multilateral organizations, such as the Organization for Economic Co-operation and Development (OECD), to advance the development of sound antitrust policy and practice. The recognition of the need to combat international cartels resulted in the landmark 1998 OECD Recommendation Concerning Effective Action Against Hard Core Cartels, which recommended that member countries provide for effective sanctions against cartels in their competition laws and adequate enforcement procedures and institutions to detect and prosecute cartels.

17.     In recognition of the enormous harm caused by cartels and their lack of redeeming value, over the last several years, governments around the world have stepped up their own

enforcement efforts against cartels. Foreign governments have enacted new antitrust laws, created new cartel investigative units, and obtained significant antitrust penalties. As foreign governments have become aware of the need to prosecute and deter cartel activity, they have become more receptive to providing other governments with investigative assistance against specific cartels. In a dramatic change from the early days of the Division's enforcement against international cartels, today many antitrust enforcers in multiple jurisdictions now know each other and are searching for better ways to cooperate. It is now no longer uncommon for foreign authorities to provide investigative assistance to the Division and for the Division and foreign authorities to discuss investigative strategies and to coordinate the timing of searches, service of subpoenas, and drop-in interviews to avoid the premature disclosure of an investigation and the destruction of evidence.

C.    Confidentiality of Communications with Foreign Authorities

18.    It is vital that the cooperative relations that the Division and foreign governments have worked diligently to develop and maintain continue in order for governments to be able to effectively investigate and prosecute international cartels. The Division and foreign governments communicate with, and provide advice to, one another regarding investigative and prosecutorial issues in specific investigations with an understanding of confidentiality. In these communications, the Division and foreign enforcers are pursuing the common goal of investigating, prosecuting, punishing, and deterring cartel activity. Public disclosure of such communications could have an adverse effect on the specific investigation at issue, as well as on enforcement efforts in general and the willingness of foreign governments to engage in such

communications in other investigations, whether current or future. To effectively investigate and prosecute international cartels, governments need to be able to communicate freely on investigative and prosecutorial issues regarding the cartels, whether in writing or verbally, without a concern that such communications could be publicly disclosed. Due to time differences or the need for precision in communications, it is sometimes necessary for governments to communicate regarding cartel investigations in writing, including by e-mail, but the public disclosure of such communications could make governments reluctant to continue to communicate in writing, to reduce verbal communications to writing, or to engage in communications with other enforcers who might be reducing the communications to writing. Hence public disclosure could seriously hinder the effectiveness of these vital communications and the Division's enforcement efforts against international cartels.

19.    Stolt-Nielsen has submitted two FOIA requests[14] relating to the Division's communications with members of the International Competition Network (ICN).[15] The requests ask not only for public speeches and presentations at ICN conferences, but also ask for all communications, including e-mails, facsimiles, and other documents, between Division officials and ICN members relating to any investigation of Stolt-Nielsen or the parcel tanker industry. The Division has released at least one ICN speech, planning e-mails among panelists at an ICN

---

[14] ATFY05-088 and ATFY06-026, June 24, 2005 and Dec. 7, 2005 FOIA requests from Stolt-Nielsen, Exhibits J and P to Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment.

[15] The ICN is a multilateral organization of antitrust authorities from approximately 85 jurisdictions that addresses antitrust enforcement policy and practice issues and promotes convergence and cooperation among antitrust authorities.

conference, and press releases or links to press releases provided to foreign enforcers.[16]  The Division has withheld documents relating to private communications with specific foreign authorities regarding the investigation of Stolt-Nielsen or the parcel tanker shipping industry due to the need to maintain the confidentiality of those communications.  Some of those communications are official notifications regarding the parcel tanker grand jury investigation made to specific governments, which hold common interests in prosecuting cartel activity.  Disclosure of these communications could interfere with the investigation and could invade individuals' privacy rights, and the majority of these communications are protected from public disclosure under Federal Rule of Criminal Procedure 6(e).  In addition, the Division has withheld other documents relating to confidential informal investigative consultations with specific foreign enforcers.  Multiple foreign antitrust agencies who are ICN members are also investigating Stolt-Nielsen and the parcel tanker industry.  The consultations the Division had with such foreign enforcers about the investigation of Stolt-Nielsen and the parcel tanker industry were conducted in confidence, to assist one another in such investigation, and for the common goal of investigating, prosecuting, punishing, and deterring cartel activity.  As outlined above, disclosure of such consultations could have a chilling effect on the investigations at issue, the willingness of foreign governments to communicate with the Division regarding other specific investigations, and hence the Division's international anti-cartel enforcement efforts in general.

---

[16]  ATR-84-91, 2384-90, 2392-96, and 2482-84.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 11, 2006 at Washington, D.C.

Scott D. Hammond
Deputy Assistant Attorney General
Antitrust Division

Name and Title List
for Civil Action No. 06cv474 Vaughn Index

| Name | Position/Office |
|---|---|
| Baker, Donald | Private Practice Attorney |
| Barnett, Belinda | Senior Counsel to Director of Criminal Enforcement and Deputy Assistant Attorney General for Criminal Enforcement |
| Candera, Lisa | Paralegal, Philadelphia Field Office |
| Casey, Maureen | Attorney, Foreign Commerce Section |
| Chung, Nakku | Paralegal, Philadelphia Field Office |
| Connolly, Robert | Chief, Philadelphia Field Office |
| Fonte, John | Attorney, Appellate Section |
| Fuhrhop, Beth Ann | Secretary, Philadelphia Field Office |
| Grannon, Eric | Former Counsel to Assistant Attorney General Hewitt Pate |
| Griffin, James | Deputy Assistant Attorney General for Criminal Enforcement until 12/31/04, then Private Practice Attorney |
| Hamilton, Monica | Paralegal, Philadelphia Field Office |
| Hammond, Scott D. | Deputy Assistant Attorney General for Criminal Enforcement, was Director of Criminal Enforcement until 1/11/05 |
| Hand, Edward | Chief, Foreign Commerce Section |
| Hart, Kevin | Special Assistant to the Directors of Enforcement and Deputy Assistant Attorney General for Criminal Enforcement |
| Heiser, Laura | Attorney, Philadelphia Field Office |
| Hill, Antonia | Attorney, Philadelphia Field Office |
| Justice, Kimberly | Attorney, Philadelphia Field Office |
| Kedziora, Regina | Secretary, Philadelphia Field Office |
| Lenzi, Melissa | Paralegal, Philadelphia Field Office |
| Maher, Evan | Paralegal, Foreign Commerce Section |
| McClain, Lucy | Attorney, Philadelphia Field Office |

| Name | Position/Office |
|---|---|
| McDonald, Bruce | Deputy Assistant Attorney General for Antitrust |
| Muoio, Joseph | Assistant Chief, Philadelphia Field Office |
| Norman, Wendy (Bostwick) | Attorney, Philadelphia Field Office |
| O'Brien, Ann (Olek). Her husband, Paul O'Brien, is an Antitrust Division Attorney. | Senior Counsel to Director of Criminal Enforcement and Deputy Assistant Attorney General for Criminal Enforcement |
| O'Shaughnessy, Patrick | Special Assistant to Directors of Enforcement and Deputy Assistant Attorney General for Criminal Enforcement |
| Parker, Jeffrey | Paralegal until May 16, 2003; Law Clerk from August 11, 2003-Nov. 30, 2003; and Attorney as of Nov. 30, 2003, Philadelphia Field Office |
| Patchwick - Paszyc, Natalie Merry | Paralegal, Foreign Commerce Section |
| Pate, R. Hewitt | Assistant Attorney General, Antitrust Division |
| Phelan, Lisa | Chief, National Criminal Enforcement Section |
| Powers, John | Assistant Chief, Appellate Section |
| Purcell-White, Anne | Assistant Chief, Foreign Commerce Section |
| Rakoff, Judge Jed S. | United States District Judge |
| Rosenberg, Richard | Attorney, Philadelphia Field Office |
| Shaan Chima | Paralegal, Philadelphia Field Office |
| Starling, Laura | Special Assistant to Directors of Enforcement and the Deputy Assistant Attorney General for Criminal Enforcement |
| Talamona, Gina | Press Officer, DOJ Office of Public Affairs |
| Tehrani, Daniel B. | Summer Law Intern, Philadelphia Field Office |
| Turner, Tanya | IT Specialist, Philadelphia Field Office |
| Watson, Scott | Chief, Cleveland Field Office |
| Webster, Constance | Secretary, Philadelphia Field Office |

2

| Name | Position/Office |
|------|-----------------|
| Wellford, Hill | Counsel to the Assistant Attorney General and DAAG McDonald |

3

Name and Title List
for Civil Action No. 05-2217 Vaughn Index

| Name | Position/Office |
|---|---|
| Bandler, James | Wall Street Journal Reporter |
| Barnett, Belinda | Senior Counsel to Deputy Assistant Attorney General for Antitrust, Scott Hammond |
| Blaszak, M. | Attorney in Private Practice |
| Bostwick, Wendy | Attorney, Philadelphia Field Office |
| Corallo, Mark | Director of Public Affairs, DOJ |
| Connolly, Robert | Chief, Philadelphia Field Office |
| Currie, Duncan | Chief, Dallas Field Office |
| Davis, Nezida | Chief, Atlanta Field Office |
| Delrahim, Makan | Deputy Assistant Attorney General for Antitrust |
| Erin, Blake | Paralegal, Philadelphia Field Office |
| Finch, Andrew | Counsel to the Assistant Attorney General for Antitrust |
| Fonte, John | Attorney, Appellate Section |
| Fuhrhop, Beth Ann | Secretary, Philadelphia Field Office |
| Gibbs, Elaine | Chief, Premerger Unit, Antitrust Division |
| Giordano, Ralph T. | Chief, New York Field Office |
| Goodling, Marcia | Deputy Director, DOJ Public Affairs Office |
| Griffin, James | Deputy Assistant Attorney General for Antitrust until 12/31/04 |
| Hammond, Scott D. | Deputy Assistant Attorney General for Antitrust, was Director of Criminal Enforcement until 1/11/05 |
| Hand, Edward | Chief, Foreign Commerce Section |
| Heiser, Laura | Attorney, Philadelphia Field Office |
| Hess, Richard | Contract Attorney, Manager, Antitrust Division Information System Support Group |

| Name | Position/Office |
|------|-----------------|
| Higbee, David | Attorney, Office of the Assistant Attorney General |
| Hill, Antonia | Attorney, Philadelphia Field Office |
| Hurloch, Jim | Stolt-Nielsen official |
| Jenkins, Gloria | Secretary, Office of the Assistant Attorney General |
| Justice, Kimberly | Attorney, Philadelphia Field Office |
| Kowal, S. | Attorney in Private Practice |
| Lawson, Trisha | Attorney in Private Practice |
| Lenzie, Melisa | Paralegal, Philadelphia Field Office |
| Lynch, Niall | Assistant Chief, San Francisco Field Office |
| Maher, Evan | Paralegal, Foreign Commerce Section |
| McCaulty, Luke | Press Assistant, DOJ Office of Public Affairs |
| McKinnon, John | Reporter, Wall Street Journal |
| Meiners, Brian | Attorney in Private Practice |
| Muoio, Joseph | Assistant Chief, Philadelphia Field Office |
| Nicholson, Robert | Assistant Chief, Appellate Section |
| Norman, Wendy (Bostwick) | Attorney, Philadelphia Field Office |
| O'Brien, Ann (Olek). Her husband, Paul O'Brien, is an Antitrust Division Attorney. | Senior Counsel to Deputy Assistant Attorney General Scott Hammond |
| O'Shaughnessy, Patrick | Special Assistant to Deputy Assistant Attorney General James Griffin |
| O'Sullivan, Catherine | Chief, Appellate Section |
| Overton, Leslie | Counsel in the Assistant Attorney General's Office |
| Parker, Jeffrey | Paralegal, Philadelphia Field Office |
| Pate, R. Hewitt | Assistant Attorney General, Antitrust Division |
| Patchwick - Paszyc, Natalic Merry | Paralegal, Foreign Commerce Section |
| Phelan, Lisa | Chief, National Criminal Enforcement Section |

| Name | Position/Office |
|------|-----------------|
| Pletcher, Mark | Attorney, National Criminal Enforcement Section |
| Piper, Matthew | DOJ Public Affairs Office |
| Pittman, Nellie | Paralegal, Office of the Deputy Assistant Attorney General's Office |
| Powers, John | Assistant Chief, Appellate Section |
| Purcell-White, Anne | Assistant Chief, Foreign Commerce Section |
| Price, Marvin | Chief, Chicago Field Office |
| Quinn, Valerie | Legal Intern, Philadelphia Field Office |
| Ragsdale, James | Litigation Data Analyst, Antitrust Division |
| Rosenberg, Richard | Attorney, Philadelphia Field Office |
| Ross, Douglas | Special Counsel for Agriculture, Antitrust Division |
| Shaan Chima | Paralegal, Philadelphia Field Office |
| Sharp, John | FBI Employee detailed to the Philadelphia Field Office |
| Siegel, Marc | Director of Criminal Enforcement |
| Simms, Donna | Secretary, Office of the Deputy Assistant Attorney General for Antitrust |
| Spigel, Jeffrey | Attorney in Private Practice |
| Starling, Laura | Special Assistant to the Deputy Assistant Attorney General for Antitrust |
| Talamona, Gina | Press Officer, DOJ Office of Public Affairs |
| Walden, James | Attorney in Private Practice |
| Warren, Phillip | Chief, San Francisco Field Office |
| Watson, Scott | Chief, Cleveland Field Office |
| Webster, Constance | Secretary, Philadelphia Field Office |
| Wills-Simms, Donna | Secretary, Office of the Deputy Assistant Attorney General for Antitrust |