

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 06-466 |
| v. | ) | |
| | ) | Violation: 15 U.S.C. § 1 |
| STOLT-NIELSEN S.A., | ) | |
| STOLT-NIELSEN TRANSPORTATION | ) | Filed: |
| GROUP LTD. (LIBERIA), | ) | |
| STOLT-NIELSEN TRANSPORTATION | ) | |
| GROUP LTD. (BERMUDA), | ) | **FILED** |
| SAMUEL A. COOPERMAN, and | ) | |
| RICHARD B. WINGFIELD, | ) | SEP – 6 2008 |
| | ) | MICHAEL E. KUNZ, Clerk |
| Defendants. | ) | By_____Dep. Clerk |

INDICTMENT

The Grand Jury charges:

I

OFFENSE CHARGED

1.      STOLT-NIELSEN S.A. ("SNSA"), STOLT-NIELSEN TRANSPORTATION

GROUP LTD. (LIBERIA) ("SNTG (Liberia)"), STOLT-NIELSEN TRANSPORTATION

GROUP LTD. (BERMUDA) ("SNTG (Bermuda)," and together with SNTG (Liberia),

"SNTG"), SAMUEL A. COOPERMAN and RICHARD B. WINGFIELD are hereby indicted

and made defendants on the charge stated below.

2.      Beginning at least as early as August 1998 and continuing until as late as

November 2002, the exact dates being unknown to the Grand Jury, defendants and their co-

conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate

competition by allocating customers, rigging bids and fixing prices for contracts of affreightment

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED: 9/6/06
ATTEST:
DEPUTY CLERK, UNITED STATES DISTRICT COURT

for parcel tanker shipping of products to and from the United States and elsewhere. The

combination and conspiracy engaged in by defendants and co-conspirators was in unreasonable

restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman

Antitrust Act (15 U.S.C. § 1).

II

BACKGROUND

3.      Parcel tanker shipping is the ocean transport of bulk liquid chemicals, edible oils,

acids and other specialty liquids. Parcel tankers are vessels equipped with compartments designed

to carry shipments of various sizes. The temperature and other specifications of the compartments

can be regulated according to the specific requirements of the type of liquid being transported.

4.      A contract of affreightment is a contract between a customer and a parcel tanker

shipping company for the transportation of bulk liquids from one port to another. A contract of

affreightment typically covers multiple shipments during a certain time period and specifies the

price, cargo, destinations and other terms and conditions.

III

THE CONSPIRACY

5.      The charged combination and conspiracy consisted of a continuing agreement,

understanding, and concert of action among the defendants and their co-conspirators, the

substantial terms of which were to allocate customers, rig bids, and fix prices for contracts of

affreightment for parcel tanker shipping of products to and from the United States and elsewhere.

6.      For purposes of forming and carrying out the charged combination and

conspiracy, the defendants and co-conspirators did the following, among other things:

(a)    In or about August 1998, defendant COOPERMAN and two subordinates met in London, England with senior executives of Company B and agreed not to compete for one another's customers for contracts of affreightment on certain trade lanes around the world, including to and from the United States.  They further agreed that executives of the two companies would both prepare and exchange customer lists so that they could monitor one another's compliance with the scheme.

(b)    In or about January 1999, defendant COOPERMAN and a subordinate had a meeting in Amsterdam with representatives of Company B and Company C to discuss ways in which the three companies could maintain their respective market shares, control market capacity, prevent and eliminate new entrants, and otherwise suppress and eliminate competition in the parcel tanker shipping market.

(c)    During the charged period, representatives of defendant SNTG and representatives of Company B each had discussions with representatives of Company C in which they agreed not to compete for certain of one another's customers for contracts of affreightment.

(d)    Defendant SNTG and the co-conspirator companies carried out their fraudulent scheme in several ways.  Principally, each company refrained from seeking business from the others' customers.  On occasion, if asked to submit a bid by another company's customer, the co-conspirator companies either declined to bid or submitted bids with intentionally high prices to create the appearance of competition.  As a result, these customers were defrauded into believing there was competition among the co-conspirator companies.  Senior executives and other employees who worked at the co-

3

conspirator companies also discussed customers and prices for contracts of affreightment with their counterparts at the other co-conspirator companies to avoid competition. The co-conspirators sometimes referred to their illegal agreement as "the coop" or "the status quo."

(e)    In or about March 2000, senior executives at defendant SNTG and Company B agreed to include certain additional customers in the Gulf of Mexico and Latin America in their scheme not to compete and directed their subordinates to discuss and carry out this aspect of the agreement.

(f)    In or about early 2001, defendant WINGFIELD became Managing Director, Tanker Trading for defendant SNTG. At that time, defendant WINGFIELD became a principal SNTG participant in the charged conspiracy, with the knowledge and approval of defendant COOPERMAN and other senior executives at defendants SNSA and SNTG.

(g)    In March 2001, defendant WINGFIELD and two subordinates met with senior executives of Company B in League City, Texas, to discuss issues that had arisen as a result of market consolidation among parcel tanker shipping customers and other conspiratorial matters. At this meeting, defendant WINGFIELD and his co-conspirators reaffirmed their commitment to their illegal agreement and agreed to prepare and exchange updated customer lists to facilitate implementation of the agreement.

(h)    Following the March 2001 meeting, defendant WINGFIELD directed that his subordinates conduct an analysis of the financial benefit defendant SNTG gained from the conspiratorial scheme. In or about April 2001, the subordinates prepared reports in which each analyzed whether it would be more profitable for defendant SNTG to continue

to participate in the illegal scheme or to actually compete for upcoming contracts of affreightment. Defendant WINGFIELD's key subordinate prepared a memorandum summarizing the reports and concluding that defendant SNTG could continue to charge higher prices and earn greater profits by remaining in the conspiracy. This memorandum was telefaxed to defendant WINGFIELD in Europe on April 11, 2001. Thereafter, revised customer lists were exchanged between defendant SNTG and Company B and defendant SNTG continued to participate in the illegal scheme. Later, defendant WINGFIELD's key subordinate learned that a top SNSA official had directed that the analysis of the company's profits from participating in the conspiracy be prepared.

(i)    In or about February 2002, defendant SNTG's general counsel discovered the April 2001 fax regarding the conspiracy's profitability to the company and brought his concerns about it to the attention of defendant SNTG's Chairman, defendant COOPERMAN. Thereafter, defendant COOPERMAN chastised defendant WINGFIELD's subordinate for having carelessly sent the April 2001 fax, leading to its discovery.

(j)    After defendant SNTG's general counsel notified defendant COOPERMAN of his discovery of the April 2001 fax, defendant COOPERMAN conducted a sham investigation designed to prevent his participation in the conspiracy and that of others from being disclosed to the independent members of defendant SNSA's board of directors and its public shareholders. To conceal his own participation, defendant COOPERMAN ensured that no culpable executives were disciplined, reassigned to different positions, or terminated, thus enabling the conspiracy to continue.

5

(k)    Defendant SNTG's general counsel resigned in March 2002. In or about late March 2002, defendant WINGFIELD met separately with co-conspirator representatives of Company B and Company C. He advised them that, as a result of a problem defendant SNTG was having with a former employee, defendant SNTG would need to be more careful, and only defendant WINGFIELD and his key subordinate would handle future communications concerning the conspiratorial agreement. Defendant WINGFIELD also told his co-conspirators that defendant SNTG would continue to honor the agreement, that it would be business as usual, and the status quo agreement would remain in effect.

(l)    Following counsel's discovery of the April 2001 fax and subsequent resignation, defendant WINGFIELD and his key subordinate continued to carry out the agreement on behalf of defendant SNTG through face-to-face meetings and telephone calls with co-conspirator representatives of Company B and Company C during which bids for upcoming contracts of affreightment were discussed and agreed upon.

(m)    At a meeting with co-conspirator representatives of Company B in June 2002, defendant WINGFIELD identified defendant SNTG's former general counsel as the individual who was causing the company's problem. Defendant WINGFIELD assured his co-conspirators, however, that it was business as usual and the status quo agreement continued, and that the attorney-client privilege prohibited the former general counsel from publicly disclosing what he knew about the illegal agreement.

(n)    In or about October 2002, defendant WINGFIELD had a discussion with a co-conspirator representative of Company C, in which they agreed that defendant SNTG

would not compete for a contract of affreightment of an important customer of Company

C and, in exchange, Company C would not compete for a contract of affreightment of an

important customer of defendant SNTG.

(o)    Defendant WINGFIELD and his top subordinate met with representatives

of Company B at Heathrow Airport in October 2002.  At this meeting, one of the

Company B representatives complained that SNTG had cheated on their agreement in the

U.S. Gulf to Mexico/Caribbean trade.  Defendant WINGFIELD promised to look into the

matter and, thereafter, called the representative of Company B and confirmed that his

subordinates had cheated on the agreement and said that he would personally handle future

contacts with Company B concerning this aspect of their agreement.

(p)    During the period October and November 2002, defendant WINGFIELD

and a representative of Company B had additional conspiratorial discussions in which

they, among other things, agreed that defendant SNTG would compensate Company B for

the cheating that had been discussed at the October meeting.  During this period of time, a

subordinate complained to defendant COOPERMAN that defendant WINGFIELD had

been called by a representative of Company B to discuss an upcoming bid on which the

subordinate was then working.  Thereafter, defendant WINGFIELD had discussions about

prices for the bid with Company B and Company B was able to maintain the allocated

account.

7.    In or about November 2002, defendants became concerned that their illegal

activities had become public and ended their participation in the charged conspiracy.

7

IV

<u>DEFENDANTS AND CO-CONSPIRATORS</u>

8.      During the period covered by this Indictment, defendant SNSA was a Luxembourg corporation with offices in London, England, and is the parent corporation of all Stolt-Nielsen entities worldwide, including defendant SNTG (Liberia), a Liberian corporation, and defendant SNTG (Bermuda), a Bermuda corporation, each with offices in Greenwich, Connecticut. During the period covered by this Indictment, defendants SNSA and SNTG engaged in parcel tanker shipping of products around the world, including to and from the United States.

9.      During the period covered by this Indictment, defendant SAMUEL A. COOPERMAN held high-level executive positions in companies owned by defendant SNSA. During at least parts of the charged period, defendant COOPERMAN was Chairman, President and Chief Executive Officer of defendant SNTG, and a member of defendant SNTG's Board of Directors.

10.     During the period covered by this Indictment, defendant RICHARD B. WINGFIELD was a senior executive of defendant SNTG. During part of the charged conspiracy, defendant WINGFIELD was Executive Vice President and Managing Director, Tanker Trading, for defendant SNTG.

11.     Various corporations and individuals not made defendants in this Indictment participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

12.     Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, it means that the corporation engaged in the act, deed or transaction by or

through its officers, directors, agents, employees or other representatives while they were actively

engaged in the management, direction, control or transaction of its business or affairs.

V

INTERSTATE AND FOREIGN TRADE AND COMMERCE

13.     During the period covered by this Indictment, the conspirator parcel tanker

shipping companies shipped substantial quantities of products by parcel tanker shipping vessels in

a continuous and uninterrupted flow of interstate and foreign commerce to customers located in

states and countries outside the place of origin of the shipments.  In addition, substantial quantities

of equipment and supplies necessary to providing such parcel tanker shipping, as well as

payments for such parcel tanker shipping, traveled in interstate and foreign commerce.

14.     During the period covered by this Indictment, the activities of defendants and their

co-conspirators in connection with the parcel tanker shipping services affected by this conspiracy

were within the flow of, and substantially affected, interstate and foreign trade and commerce.

VI

JURISDICTION AND VENUE

15.     The combination and conspiracy charged in this Indictment was carried out, in

part, within the Eastern District of Pennsylvania within the five years preceding the return of this

Indictment.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

## SENTENCING ALLEGATION

16.    With respect to the charge in this Indictment, defendants SNSA, SNTG and their

co-conspirators derived gross gains, and persons other than the defendants or their co-conspirators

suffered gross losses, of at least $100,000,000.

Dated:

A True Bill:    9/6/06

_Beverly Robinson_
FOREPERSON

_Thomas O. Barnett_

THOMAS O. BARNETT
Assistant Attorney General

_Scott D. Hammond_

SCOTT D. HAMMOND
Deputy Assistant Attorney General

_Marc Siegel_

MARC SIEGEL
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

First Assistant U.S. Attorney

_Patrick L. Meehan_

For PATRICK L. MEEHAN
United States Attorney for the
Eastern District of Pennsylvania

_Robert E. Connolly_

ROBERT E. CONNOLLY
Chief, Philadelphia Office

_Antonia Hill_

ANTONIA R. HILL
WENDY BOSTWICK NORMAN
KIMBERLY A. JUSTICE
RICHARD S. ROSENBERG
LAURA HEISER
JEFFREY PARKER
Antitrust Division
U.S. Department of Justice
Philadelphia Office
The Curtis Center, Suite 650W
170 South Independence Mall West
Philadelphia, PA 19106
Tel.:  (215) 597-7401