UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Stolt-Nielsen Transportation Group Ltd.,

*Plaintiff,*

v.

United States of America,

*Defendant.*

Consolidated Cases
Civil Action No. 05cv2217 (RJL)
Civil Action No. 06cv474 (RJL)

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE ARE GENUINE ISSUES TO BE LITIGATED

Pursuant to Local Rules 7(h) and 56.1, Plaintiff Stolt-Nielsen Transportation Group Ltd.

("Stolt-Nielsen") submits the following statement of material facts as to which there are genuine

issues to be litigated.

## GENERAL OBJECTIONS

Stolt-Nielsen objects to each and every purported fact in the Antitrust Division's

Statement of Material Facts Not In Dispute because the Antitrust Division has not satisfied the

requirements of Rule 56(e) of the Federal Rules of Civil Procedure. Specifically, the Antitrust

Division has not presented "[s]worn or certified copies of all papers or parts thereof referred to."

The Antitrust Division relies instead upon unsworn, unauthenticated copies of documents.

## SPECIFIC RESPONSES TO THE ANTITRUST DIVISION'S
## STATEMENT OF MATERIAL FACTS

1.     The Antitrust Division of the U.S. Department of Justice is responsible for

enforcing the federal antitrust laws and serving as the Federal Government's principal analyst of,

and advocate for, competition policy. (Richards decl. ¶ 3, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 1**:    Admitted for the purposes of this Motion only, subject to General Objections.

2.    Antitrust enforcement, which constitutes the principal function of the Division, involves investigating possible antitrust violations, conducting grand jury proceedings, preparing and trying antitrust cases, prosecuting appeals, and negotiating and enforcing final judgments. (Richards decl. ¶ 3, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 2**:    Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff does not admit or agree that antitrust enforcement is the principal function of the Division because the declarant has no personal knowledge on the principal function of the Division and is not competent to testify to such in her capacity as Chief of FOIA for the Antitrust Division.

3.    It is the Division's policy to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations.  If proved, such activities violate Section 1 of the Sherman Act, 15 U.S.C. § 1.  When allegations of such offenses are brought to the attention of the Division, which occurred with regard to plaintiff, a grand jury is convened.  (Richards decl. ¶ 4, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 3**:    Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff does not admit or agree that a grand jury is convened in every instance where allegations of such offenses are brought to the attention of the Division.  The declarant has no personal knowledge of the Division's policy or procedure and is not competent to testify to such in her capacity as Chief of FOIA for the Antitrust Division.

4.      Cartels inflate prices, limit supply, lessen innovation, and inhibit efficiency, undermining the free enterprise system.  Due to the pernicious effect of cartels on competition and their lack of redeeming economic value, anti-cartel enforcement is the Division's highest enforcement priority and has been described as the "core antitrust mission." (Hammond decl. ¶ 2, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 4**:      Plaintiff does not admit or agree that cartels will always result in inflated prices, limited supply, lessened innovation, and inhibited efficiency because Defendant provides no cite to the record for this assertion.  Plaintiff also does not admit or agree that anti-cartel enforcement is the Division's highest enforcement priority.  This statement is inconsistent with Fact No. 6, which identifies anti-cartel enforcement as the highest priority of the Division's criminal enforcement program, not the Division itself.  Similarly, Plaintiff does not admit or agree that anti-cartel enforcement is the "core antitrust mission" of the Antitrust Division.  Defendant has not established this fact in the record with any further substantiating, admissible evidence.

5.      Beginning in the 1990's, the Division began to place a particular emphasis on the investigation and prosecution of international cartels, such as the parcel tanker shipping conspiracy at issue in the grand jury investigation underlying plaintiff's twelve FOIA requests that are the subject of this action.  This new emphasis was due to the increasing globalization of the U.S. economy and the resulting increased opportunities for the formation and success of international cartels targeting U.S. businesses and consumers. (Hammond decl. ¶ 3, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 5**:      Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff takes issue with the assertion that the grand jury underlies its FOIA requests.  Defendant has not established this fact anywhere in the

record, has no personal knowledge on the underlying impetus for Plaintiff's FOIA Complaint, and is not competent to testify to such.

6.    The Division has uncovered international cartels which have held cartel meetings in more than 100 cities and 35 countries around the world. The Division has prosecuted corporations based in multiple foreign countries, including Belgium, Germany, Japan, Korea, Liechtenstein, Luxembourg, the Netherlands, Norway, Switzerland, and the United Kingdom, and foreign individuals from Austria, Belgium, Canada, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, Norway, Sweden, Switzerland, and the United Kingdom. Today, the Division's enforcement efforts against international cartels continue to be the highest priority of its criminal enforcement program, with over 60 sitting grand juries investigating international cartel behavior. (Hammond decl. ¶ 3, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 6**:    Admitted for the purposes of this Motion only, subject to General Objections.

7.    When the Division began investigating international cartels, it faced enormous obstacles in obtaining the evidence necessary to prosecute the cartels. Key evidence of such cartels was often beyond the Division's jurisdictional reach and foreign governments were reluctant to assist the Division in obtaining evidence in cartel investigations. (Hammond decl. ¶ 4, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 7**:    Plaintiff disagrees. Specifically, Plaintiff objects on the basis that declarant's statements are based on information (hearsay) that is not admissible in evidence (*i.e.*, the assertion that foreign governments were reluctant to assist the Division).

8.    As the Division began to devote more resources to the investigation and

prosecution of international cartels, two key factors contributed to the Division's increasing ability to obtain evidence of international cartels and to prosecute the cartels successfully. First, the cooperation of cartel insiders pursuant to the Division's Corporate Leniency Policy, cracked many international cartels. Second, the Division developed strong cooperative relationships with foreign authorities that resulted in critical coordination and assistance from foreign authorities. (Hammond decl. ¶ 5, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 8**:    Subject to General Objections and Plaintiff specifically objects on the basis that Fact No. 8 is a statement of opinion, not fact.

9.    The Division has a Corporate Leniency Program pursuant to which a cartel member admits its participation in a criminal antitrust violation and cooperates in the Division's investigation of its coconspirators in return for protection from criminal conviction, fines, and jail terms for its employees. The leniency, or amnesty, program has been a key part of the success of the Division's international anti-cartel enforcement program and is the Justice Department's most successful voluntary disclosure program. Confidentiality is a key component of the amnesty program's success. (Hammond decl. ¶¶ 6-7, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 9**:    Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff disagrees that confidentiality is a key component of the amnesty program's success. Many companies issue public statements regarding their admission into the program. *See* Lau Decl. Exs. 4-27. The Antitrust Division discloses key facts about entrants into the program when it suits it to disclose such facts. *See* Lau Decl. Exs. 28-35. Further, the Division's statement that confidentiality is a key component of the amnesty program's success is severely undermined by the recent statute, passed with the Division's support, requiring amnesty applicants to raise their agreements — including still-

conditional agreements — to secure decreased damages exposure. The statute thereby contemplates disclosure of amnesty status. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004 § 213, 15 U.S.C. § 1 (2004) (Lau Decl. Ex. 46).

10.    The Division's Corporate Leniency Policy, the current form of which was adopted in August 1993, provides amnesty for the first domestic or international company in a cartel that comes forward, admits its participation in a cartel, provides full cooperation with the Division's investigation of other corporate and individual conspirators, and meets the other stated requirements of the policy. If the applicant and its cooperating executives qualify for amnesty, they will avoid criminal convictions, fines, and jail terms for the cartel offense. After the current leniency policy was introduced in 1993, the number of companies seeking amnesty substantially increased, and cooperation of applicants under the current amnesty program has advanced the majority of the Division's international cartel investigations. (Hammond decl. ¶ 6, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 10:**    Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff does not admit or agree that if the applicant and its cooperating executives qualify for amnesty, they will avoid criminal convictions, fines, and jail terms for the cartel offense. The amnesty agreement signed by Stolt-Nielsen clearly provides that amnesty means that the Antitrust Division will not bring criminal prosecution. Stolt-Nielsen qualified for amnesty under the guidelines set by the Antitrust Division regarding its investigation into the parcel tanker industry, yet as of today, the Antitrust Division sought and received an indictment against Stolt-Nielsen for alleged acts falling squarely within the amnesty agreement. Moreover, Stolt-Nielsen now faces criminal conviction and fines, and two of its executives now face jail time.

11.    Because cartels operate in secret, obtaining the cooperation of insiders is the best

and frequently the only way to break open a cartel. Obtaining such cooperation can lead to the termination of cartels, conviction of coconspirators, and recovery of damages by victims; can shorten an investigation by months or years; and can conserve scarce government resources. (Hammond decl. ¶ 7, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 11**:    Admitted for the purposes of this Motion only, subject to General Objections.

12.    The amnesty program is the Division's most effective generator of international cartel cases. The success of the Division's Corporate Leniency Policy has led to the development of leniency programs by foreign governments around the world. The Division has advised a number of foreign governments in the drafting and implementation of effective leniency policies. The convergence in the requirements of amnesty policies of different governments has led amnesty applicants to report their conduct to multiple jurisdictions simultaneously, which has provided opportunities for coordinated investigative activities such as searches, interviews, and the service of subpoenas. This convergence has strengthened anti-cartel enforcement in the United States and abroad. Prior to this convergence in leniency programs, many amnesty applicants were deterred from applying for amnesty in one jurisdiction if they had greater exposure in another jurisdiction which had an ineffective amnesty program. Thus, the efficient functioning of an amnesty program in one jurisdiction affects the efficient functioning of amnesty programs in other major jurisdictions. (<u>Id</u>.)

**Plaintiff's Response To Proposed Fact No. 12**:    Admitted for the purposes of this Motion only, subject to General Objections.

13.    To promote understanding of the leniency program, the Division has given speeches and participated in numerous panel discussions explaining the program and answering

questions generated by the program. The antitrust defense bar's recognition of the value of the program has been critical to the success of the program and the willingness of companies to apply for leniency. (Hammond decl. ¶ 8, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 13**:    Admitted for the purposes of this Motion only, subject to General Objections.

14.    In spite of the benefits of amnesty to corporations and their employees, companies are reluctant to come forward and admit their involvement in a cartel, whether domestic or international.    Among the reasons for the reluctance are fear of retribution by former coconspirators and concern over damaged relations with customers.    Accordingly, the Division concluded long ago that confidential treatment of amnesty applications is crucial.    In its speeches regarding the application of the amnesty program, the Division has emphasized the confidentiality of the amnesty program.    The Division "holds the identity of amnesty applicants in strict confidence, much like the treatment afforded to confidential informants [and] [t]herefore, . . . will not publicly disclose the identity of an amnesty applicant, absent prior disclosure by the applicant, unless required to do so by court order in connection with litigation." Moreover, amnesty negotiations are conducted with the express understanding that those negotiations and the information provided by the applicant will remain confidential, even after the investigation at issue is closed.    Many leading members of the private antitrust bar who represent amnesty applicants have stated that the Division's promise of confidentiality is a critical, and in some cases determinative, factor that companies rely upon in making a decision whether to self report pursuant to the Division's amnesty program. (Hammond decl. ¶ 9, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 14**:    Plaintiff disagrees.  Based upon its actions,

the Division does not believe that confidential treatment of amnesty applications is crucial.  The

Antitrust Division releases information regarding ongoing investigations and amnesty applicants

when it suits its purposes.  *See* Lau Decl. Exs. 28-35.  For instance, the Antitrust Division

petitioned the court in Stolt-Nielsen's civil action against it to unseal the record in that case,

including the amnesty agreement between the Antitrust Division and Stolt-Nielsen, despite the

fact that the parcel tanker industry investigation was ongoing.  Plaintiff also does not agree or

admit that the Division "holds the identity of amnesty applicants in strict confidence, much like

the treatment afforded to confidential informants [and] [t]herefore, . . . will not publicly disclose

the identity of an amnesty applicant, absent prior disclosure by the applicant, unless required to

do so by court order in connection with litigation."  As is the case here, the Antitrust Division

refuses to release information regarding amnesty agreements even after the companies involved

have publicly announced their entrance into the Corporate Leniency Program.  *See* Lau Decl.

Exs. 4-27.  Plaintiff also disagrees that amnesty negotiations are conducted with the express

understanding that those negotiations and the information provided by the applicant will remain

confidential, even after the investigation at issue is closed or that many leading members of the

private antitrust bar who represent amnesty applicants have stated that the Division's promise of

confidentiality is a critical, and in some cases determinative, factor that companies rely upon in

making a decision whether to self report pursuant to the Division's amnesty program.  This

statement is completely contradicted by the fact that the Amnesty Agreement contains no

assertion of confidentiality.  Indeed, the Amnesty Agreement cannot contain a confidentiality

clause because an obligation of an applicant's cooperation may include publicly testifying or

providing evidence against co-conspirators.

15.    In this FOIA action, Stolt-Nielsen has requested a copy of every amnesty agreement entered by the Antitrust Division over the last thirteen years since the revision of the amnesty program in August 1993, a request which involves roughly one hundred grand jury investigations and roughly one hundred amnesty letters.  (ATFY06-002, Oct. 14, 2005 FOIA Request from Stolt-Nielsen; Hammond decl. ¶ 11, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 15**:    Admitted for the purposes of this Motion only, subject to General Objections.

16.    If amnesty letters were publicly available pursuant to FOIA, such a disclosure obligation could reasonably be expected to have a negative effect on the perception of the amnesty program.  Amnesty applicants could perceive that the amnesty application process is no longer confidential, and hence the disclosure obligation would have a chilling effect on amnesty applications in both domestic and international investigations.   Due to the importance of the Division's amnesty program, such a disclosure obligation could reasonably be expected to interfere with the Division's anti-cartel enforcement program, including both ongoing and prospective enforcement proceedings.  (Id.)

**Plaintiff's Response To Proposed Fact No. 16**:    Plaintiff disagrees.   Stolt-Nielsen has cited no fewer than twenty companies whose entry into the amnesty program is public information. *See* Lau Decl. Exs. 4-27.  The public availability of the amnesty agreements for those companies could not reasonably be expected to have a negative effect on the perception of the amnesty program since this information is already publicly available.  Moreover, the Antitrust Division admits in its own publications that "amnesty applicants may issue press releases or, in the case of publicly-traded companies submit public filings announcing their conditional acceptance into the corporate amnesty program thereby obviating the need to maintain their anonymity."  *See* Lau

Decl. Ex. 40. Plaintiff does not agree that amnesty applicants who have already announced that they are in the amnesty program could perceive that the amnesty process is no longer confidential. Plaintiff further does not agree that the disclosure obligation would have a chilling effect on amnesty applications in both domestic and international investigations, since the amnesty agreements at issue here are already publicly known. Moreover, this statement is undermined by the recent statute, passed with the Division's support, requiring amnesty applicants to raise their agreements — including still-conditional agreements — to secure decreased damage exposure. The statute thereby contemplates disclosure of amnesty status. *See Antitrust Criminal Penalty Enhancement and Reform Act of 2004 § 213 (Lau Decl. Ex. 46). Plaintiff also does not agree that such a disclosure obligation could reasonably be expected to interfere with the Division's anti-cartel enforcement program, including both ongoing and prospective enforcement proceedings, because the Antitrust Division regularly discusses amnesty applicants in its speeches. *See Lau Decl. Exs. 28-35.* Again, a statute supported by the Division would require disclosure to receive decreased damage exposure.

17.    In recognition of the enormous harm caused by cartels and their lack of redeeming value, over the last several years, governments around the world have stepped up their own enforcement efforts against cartels. Today many antitrust enforcers in multiple jurisdictions know each other and are searching for better ways to cooperate with each other. It is now no longer uncommon for foreign authorities to provide investigative assistance to the Division and for the Division and foreign authorities to discuss investigative strategies and to coordinate the timing of searches, service of subpoenas, and drop-in interviews to avoid the premature disclosure of an investigation and the destruction of evidence. (Hammond decl. ¶ 17, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 17**:   Admitted for the purposes of this Motion only, subject to General Objections.

18.   It is vital that the cooperative relations that the Division and foreign governments have worked diligently to develop and maintain continue in order for governments to be able to effectively investigate and prosecute international cartels.   The Division and foreign governments communicate with, and provide advice to, one another regarding investigative and prosecutorial issues in specific investigations with an understanding of confidentiality.   In these communications, the Division and foreign enforcers are pursuing the common goal of investigating, prosecuting, punishing, and deterring cartel activity.   Public disclosure of such communications could have an adverse effect on the specific investigation at issue, as well as on enforcement efforts in general and the willingness of foreign governments to engage in such communications in other investigations, whether current or future.   To effectively investigate and prosecute international cartels, governments need to be able to communicate freely on investigative and prosecutorial issues regarding the cartels, whether in writing or verbally, without a concern that such communications could be publicly disclosed. (Hammond decl. ¶ 18, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 18**:   Plaintiff disagrees.   The Antitrust Division has not established that foreign governments provide it information with an understanding of confidentiality.   Moreover, hypothetical statements ("Public disclosure of such communications *could* have an adverse effect on the specific investigation") are not undisputed statements of fact.

19.   Stolt-Nielsen has submitted two FOIA requests (fourth and tenth requests as detailed below) relating to the Division's communications with members of the International Competition Network (ICN).   The requests ask not only for public speeches and presentations at

ICN conferences, but also ask for all communications, including e-mails, facsimiles, and other documents, between Division officials and ICN members relating to any investigation of Stolt-Nielsen or the parcel tanker industry.  (Exhibits J and P.)

**Plaintiff's Response To Proposed Fact No. 19**:    Admitted for the purposes of this Motion only, subject to General Objections.

20.    The Division has withheld documents relating to private communications with specific foreign enforcers regarding the investigation of Stolt-Nielsen or the parcel tanker shipping industry due to the need to maintain the confidentiality of those communications.  Some of these communications are official notifications regarding the parcel tanker investigation that were made to specific governments with common interests in combating cartels, and the disclosure of such communications could interfere with the investigation, could invade individuals' privacy rights, and would reveal information protected from disclosure to others by Federal Rule of Criminal Procedure 6(c).  In addition, the Division has withheld documents relating to investigative consultations with specific foreign enforcers relating to the parcel tanker investigation.  Multiple foreign antitrust agencies who are ICN members are also investigating Stolt-Nielsen and the parcel tanker industry.  Consultations that the Division had with specific foreign enforcers about the investigation of Stolt-Nielsen and the parcel tanker industry were conducted in confidence, to assist one another in such investigation, and for the common goal of investigating, prosecuting, punishing, and deterring cartel activity.  (Hammond decl. ¶ 19, Exhibit B.)

**Plaintiff's Response To Proposed Fact No. 20**:    Plaintiff disagrees.  The Antitrust Division has not established that foreign governments provide it with information with an understanding of confidentiality.  Plaintiff does not agree or admit that some of these communications are

official notifications regarding the parcel tanker investigation that were made to specific governments with common interests in combating cartels, and the disclosure of such communications could interfere with the investigation, could invade individuals' privacy rights, and would reveal information protected from disclosure to others by Federal Rule of Criminal Procedure 6(c). The Antitrust Division's *Vaughn* Index and accompanying declarations are not specific enough to allow Stolt-Nielsen or this Court to determine whether disclosure of these communications could interfere with the investigation, could invade individuals' privacy rights, and would reveal information protected from disclosure to others by Federal Rule of Criminal Procedure 6(c). *See* Amended 2005 *Vaughn* Index; Amended 2006 *Vaughn* Index; Declaration of Scott D. Hammond; and Declaration of Ann Lea Richards.

21.    Between June 3, 2005 and January 26, 2006, while both the grand jury investigation of the parcel tanker industry and the related leniency litigation continued, plaintiff submitted the twelve FOIA requests at issue in this action to obtain documents for its leniency litigation against the government. Plaintiff's Response to Defendant's Motion to Consolidate at 2, Stolt-Nielsen Transportation Group Ltd. v. U.S., Civil Action No. 05-2217 (filed May 25, 2006). (Richards decl. ¶ 8, Exhibit A).

**Plaintiff's Response To Proposed Fact No. 21**:    Admitted for the purposes of this Motion only, subject to General Objections.

22.    Request ATFY05-071. Defendant received plaintiff's first two FOIA requests on June 3, 2005. The first, ATFY05-071 (Exhibit G), sought:

> [A]ny and all internal memoranda or notes related to a December 4, 2002 meeting between Antitrust Division officials and John Nannes relating to SNTG's application to, and participation in, the Antitrust Division's Amnesty Program.

(Richards decl. ¶ 9, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 22**:    Admitted for the purposes of this Motion

only, subject to General Objections.

23.    Request ATFY05-072.  Plaintiff's second request, also submitted on June 3, 2005,

ATFY05-072 (Exhibit H) requested:

> [C]opies of, and notes related to, the following speeches given by Scott
> Hammond, Deputy Assistant Attorney General and [formerly the] Director of
> Criminal Enforcement: (1) In Las Vegas, Nevada during the 19th Annual National
> Institute on White Collar Crime 2005, on March 3-4, 2005; (2) At the Spring 2005
> American Bar Association Antitrust Section Meeting, on March 30 - April 1,
> 2005; (3) At the Langdon Hall 2005 Competition Law and Policy Invitational
> Forum in Canada on May 6, 2005; and (4) Any other public speeches or
> presentations in which Mr. Hammond discussed the Antitrust Division's pending
> action(s) against SNTG . . . .

> [A]ny drafts of The Curious Case of Stolt-Nielsen. S.A. v. United States*/ and
> any comments, notes or other documents relating to this article that were
> prepared by any Antitrust Division employees, whether located in Washington,
> D.C. or the Antitrust Division's Philadelphia Field Office.

> */    Jim Walden and Kristopher Dawes, *The Curious Case of Stolt
> Nielsen, S.A. v. United States*, The Antitrust Source (March 2005).

(Richards decl. ¶ 10, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 23**:    Admitted for the purposes of this Motion

only, subject to General Objections.

24.    Request ATFY05-080.  On June 13, 2005 the Division received a third FOIA

request, ATFY05-080 (Exhibit I), in which plaintiff requested:

> [A]ny and all documents relating to the opening of the antitrust investigation of
> the parcel tanker industry in November 2002, including but not limited to
> documents and information specifically relating to the following: (1) The article,
> 'Stolt-Nielsen Is Probed For Traffic With Iran,' published in the *Wall Street
> Journal*\*\*/; (2) The request to open an investigation by the Philadelphia Field
> Office of the Antitrust Division, including but not limited to the Preliminary
> Inquiry Request Memorandum and any memoranda to the Federal Bureau of
> Investigation requesting assistance; and (3) Any documents memorializing actions
> taken by the Antitrust Division in opening such investigation.

> **/    James Handler & John McKinnon, *Stolt-Nielsen Is Probed For Traffic*

*With Iran*, Wall St. J., Nov. 22, 2002, at A3.

(Richards decl. ¶ 11, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 24**:     Admitted for the purposes of this Motion

only, subject to General Objections.

    25.    Request ATFY05-088. Two weeks later, on June 27, 2005, the defendant

received a fourth FOIA request, ATFY05-088 (Exhibit J), seeking:

> [A]ny and all materials relating to presentations or communications by, or involving, officials of the Antitrust Division to the International Competition Network ('ICN') regarding any investigation of SNTG or the parcel tanker industry, or to the revocation of amnesty related to SNTG, including but not limited to: 1. Presentations, speeches and discussions made to the ICN by any Antitrust Division officials or any other ICN member relating to any SNTG investigation or to the SNTG amnesty revocation; 2. Electronic mail or facsimile communications between Antitrust Division officials and ICN members relating to any SNTG investigation or to the SNTG amnesty revocation; and 3. Any documents in the possession of the Antitrust Division or its officials memorializing communications, correspondence, presentations, meeting minutes or agenda relating to any SNTG investigation or to the SNTG amnesty revocation with ICN members.

(Richards decl. ¶ 12, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 25**:     Admitted for the purposes of this Motion

only, subject to General Objections.

    26.    Request ATFY05-113. Two months later, on August 23, 2005, defendant

received a fifth FOIA request, ATFY05-113 (Exhibit K) seeking:

> [A]ny and all correspondence between Antitrust Division officials and Jim Walden and/or Kristopher Dawes of O'Melveny & Myers LLP related to the antitrust investigation into the parcel tanker industry, particularly relating to the article by Mr. Walden and Mr. Dawes.***/

> **/ Jim Walden and Kristopher Dawes, *The Curious Case of Stolt-Nielsen v. United States*, The Antitrust Source (March 2005).

(Richards decl. ¶ 13, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 26**:    Admitted for the purposes of this Motion only, subject to General Objections.

.27.    <u>Request ATFY05-131.</u>   The following month, on September 20, 2005, the defendant received a sixth FOIA request, ATFY05-131 (Exhibit L), seeking:

> [A]ny and all documents that reflect, memorialize, embody or contain communications to or from (1) the press, including trade press, (2) bar associations, or (3) any other external communications with individuals uninvolved in the litigation with SNTG or the investigation into the parcel tanker industry regarding SNTG or the investigation into the parcel tanker industry. In particular, SNTG requests (a) communications to or from James Bandler of the Wall Street Journal, (b) communications to or from reporter(s) at the Tradewinds publication, and (C) internal Department circulation of press stories regarding SNTG or the investigation into the parcel tanker industry.

(Richards decl. ¶ 14, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 27**:    Admitted for the purposes of this Motion only, subject to General Objections.

28.    <u>Request ATFY06-003.</u>  On October 14, 2005 the defendant received two more FOIA requests.  In ATFY06-003 (Exhibit M), plaintiff requested:

> [A]ny and all documents that reflect, memorialize, embody or contain communications regarding the investigation into the parcel tanker industry, to or from. (1) David S. Golub; (2) Jonathan M. Levine; (3) James M. Griffin, following his departure from the Antitrust Division in December 2004; and (4) Donald I. Baker, the author of a September 26, 2005 article in the *Legal Times* entitled True Confessions.

(Richards decl. ¶ 15, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 28**:    Admitted for the purposes of this Motion only, subject to General Objections.

29.    <u>Request ATFY06-002.</u>  ATFY06-002 (Exhibit N), received on October 14, 2005, sought "any and all amnesty agreements entered into by the Antitrust Division from August 1993 to the present."  (Richards decl. ¶ 16, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 29**:    Admitted for the purposes of this Motion only, subject to General Objections.

30.    Request ATFY06-019. On November 9, 2005 the defendant received a ninth request, ATFY06-019 (Exhibit O), seeking:

> [C]opies of speeches, speech outlines, audio or video recordings of speeches including audio tapes, video tapes, CD-ROM or DVDs, program materials announcing the speaking event, notes of any DOJ participant at a speech, emails relating to speeches, and any other documents related to any speeches (collectively "speeches and speech-related materials") by an Antitrust Division official, which discusses in any way SNTG, SNTG's status in the Division's Amnesty Program, the circumstances and rationale for the Division's attempted withdrawal of amnesty from SNTG, and/or the Antitrust Division's litigation with SNTG over SNTG's amnesty status in the Eastern District of Pennsylvania and the appeal to the Third Circuit and/or the investigation into SNTG (tile "SNTG matters"). In particular, SNTG requests material related to: (1) Any speeches and speech-related materials relating to speeches relating to the SNTG matters by Scott D. Hammond, Deputy Assistant Attorney General and Director of Criminal Enforcement, from June 2, 2005 (the date of SNTG's prior FOIA request, assigned control number ATFY05-072) to the present, including but not limited to the speeches given by Mr. Hammond (a) in New York City on September 14, 2005, and (b) in Brussels, Belgium on October 26, 2005; and (2) Any public speeches and speech-related materials relating to speeches given by any other Antitrust Division official concerning the SNTG matters, including but not limited to Lisa Phelan (currently Chief, National Crime Enforcement Division), from March 1, 2004 to the present.

(Richards decl. ¶ 17, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 30**:    Admitted for the purposes of this Motion only, subject to General Objections.

31.    Request ATFY06-026. On December 7, 2005 the plaintiff submitted its tenth FOIA request, ATFY06-026 (Exhibit P), seeking:

> [A]ny and all materials relating to communications, presentations or speeches by any Antitrust Division official, which discuss in any way SNTG, SNTG's status in the Division's Amnesty Program, the circumstances and rationale for the Division's attempted withdrawal of amnesty from SNTG, and/or the Antitrust Division's litigation with SNTG over SNTG's amnesty status in the Eastern District of Pennsylvania and the appeal to the U.S. Court of Appeals for the Third Circuit and/or the investigation into SNTG (the "SNTG matters") by officials of

the Antitrust Division to the participants in the International Competition Network ("ICN"). The request includes, but is not limited to: 1. Presentations, speeches and discussions ("speeches"), including copies of speeches, PowerPoint slides, speech outlines, audio or video recordings of speeches including audio tapes, video tapes, CD-ROM or DVDs, notes of any DOJ participant at a presentation or speech, email communications, and any other documents related to any speeches (collectively "speeches and speech-related materials") made to the ICN by any Antitrust Division officials or any other ICN member relating to the SNTG matters; 2. Electronic mail or facsimile communications between Antitrust Division officials and ICN members relating to the SNTG matters; and 3. Any documents within the possession or control of the Antitrust Division or its officials memorializing communications, correspondence, presentations, meeting minutes or agenda relating to the SNTG matters with ICN members.

(Richards decl. ¶ 18, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 31**:    Admitted for the purposes of this Motion only, subject to General Objections.

32.    Request ATFY06-038. On January 24, 2006 the defendant received plaintiff's eleventh request, ATFY06-038 (Exhibit Q), seeking:

[C]opics of speeches, speech outlines, audio or video recordings of speeches including audio tapes, video tapes, CD-ROM or DVDs, program materials announcing the speaking event, notes of any DOJ participant at a speech, emails relating to speeches, and any other documents related to any speeches (collectively "speeches and speech-related materials") by any Antitrust Division official, which discusses in any way SNTG. SNTG's status in the Division's Amnesty Program, the circumstances and rationale for the Division's attempted withdrawal of amnesty from SNTG, and/or the Antitrust Division's litigation with SNTG over SNTG's amnesty status in the Eastern District of Pennsylvania and the appeal to the Third Circuit and/or the investigation into SNTG (the "SNTG matters"). In particular, SNTG requests /Material related to: (1) Any speeches and speech-related materials related to speeches relating to the SNTG matters by Scott D. Hammond, Deputy Assistant Attorney General and Director of Criminal Enforcement, from November 9, 2005 (the date of SNTG's prior FOIA request, assigned control number ATFY06-019) to the present, including but not limited to the speech given by Mr. Hammond at the National Press Club in Washington, D.C. on November 16, 2005; and (2) Any public speeches and speech-related materials relating to speeches given by any other Antitrust Division official concerning the SNTG matters, including but not limited to Lisa Phelan (currently Chief, National Crime Enforcement Division), from March 1, 2004 to the present.

(Richards decl. ¶19 Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 32**:    Admitted for the purposes of this Motion

only, subject to General Objections.

    33.    Request <u>ATFY06-040</u>.  On January 26, 2006, plaintiff submitted its twelfth

request, ATFY06-040 (Exhibit R), seeking:

> [A]ny and all documents that reflect, memorialize, embody, or contain
> communications regarding the investigation into the parcel tanker industry, to or
> from: (1) Any attorney with St. Martin & Williams, including but not limited to
> Conrad S.P. "Duke" Williams III; and (2) Any attorney with Kasowitz,
> Benson, Torres & Friedman LLP, including but not limited to: (I) Hector
> Torres: (ii) Harold G. Levinson; or (iii) Gary W. Dunn.

(Richards decl. ¶ 20, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 33**:    Admitted for the purposes of this Motion

only, subject to General Objections.

    34.    As is done with all FOIA requests, plaintiff's requests were assigned to one of the

paralegal specialists in the Unit.  Wayne Foster is a paralegal specialist who has processed FOIA

requests in the Division's FOIA Unit for nine years.  All of the requests were assigned to him as

they were received.  He began his search for responsive documents by searching the Division's

computerized records index which contains information about each matter currently or formerly

under investigation.  The system may be searched by the name of a company, the name of an

individual, or an industry code.  The index revealed an open investigation and litigation relating

to the plaintiff that was assigned to the Philadelphia Field Office.  Mr. Foster, accordingly,

contacted that section, asking its Chief, Robert Connolly, to search for the records responsive to

plaintiff's first two requests, ATFY05-071 and ATFY05-072.  At approximately the same time,

he contacted Mr. Hammond's office to obtain any responsive material.  The Philadelphia Field

Office and Mr. Hammond's office searched for the material requested, locating a small number

of responsive documents. Each time the defendant received another request from plaintiff, Mr. Foster contacted Mr. Connolly and Mr. Hammond's offices to have their offices search for documents responsive to the most recent request. Given the time between plaintiff's requests, the Philadelphia Field Office conducted, in all, ten separate time consuming searches for responsive information. Mr. Hammond's office conducted a similar number of searches. Ultimately, the Division's AAG's and DAAG's offices, Appellate and Foreign Commerce Sections, and all Division criminal sections were contacted for responsive material and conducted searches. (Richards decl. ¶ 21, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 34**:     Subject to General Objections and Plaintiff specifically objects on the basis that the declarant asserts facts not admissible in evidence — namely, because it is hearsay — and that is not based on personal knowledge. Mr. Foster's testimony is necessary to state with personal knowledge which steps he took and Mr. Hammond's testimony is necessary to state with personal knowledge what searches were conducted at his office. Neither are provided here.

35.     Upon receipt of records located in response to the requests, Mr. Foster reviewed carefully each document to determine whether it was responsive to one or more of the FOIA requests and set aside those that were not. That accomplished, he re-reviewed each page to determine its public availability under the FOIA. Documents exempt in their entirety were so marked. Exempt information in otherwise disclosable documents was bracketed for excision and the exemption supporting the non-disclosure was noted on the page next to the redaction.[1] Once the initial review was complete, the documents were forwarded to the Chief of the FOIA Unit, Ann Lea Richards, for final review. After her review was complete, documents to be withheld

---

[1] In some instances when a number of redactions were made pursuant to the same exemption, only the first redaction was marked with the exemption.

were segregated and the information marked for redaction was excised using opaque tape. The redacted documents and documents to be released in full were copied and produced to plaintiff. (Richards decl. ¶ 22, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 35**:    Plaintiff disagrees.  The Antitrust Division has not satisfied the statutory requirements for segregating exempt from non-exempt material.  In addition, the Division attempts to admit as fact statements of a declarant with no personal knowledge.  Ms. Richards cannot state with personal knowledge that Mr. Foster reviewed the documents "carefully," or whether they were actually subjected to two reviews before being submitted to her.

36.    In response to plaintiff's first five requests, (Exhibits G through K), on September 13, 2005, defendant released 280 pages of documents, some of which were redacted.  Additional documents were withheld in full.  (Exhibit S.) (Richards decl. ¶¶ 23, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 36**:    Admitted for the purposes of this Motion only, subject to General Objections.

37.    On January 31, 2006 defendant supplemented its September 13, 2005 response, producing, in full, one page of an e-mail responsive to ATFY05-072 and ATFY05-113 that inadvertently had been redacted.   (Exhibit T.)   On March 28, 2006, defendant again supplemented its September 13, 2005 response to plaintiff's requests submitted in fiscal year 2005, producing, in response to ATFY05-072, 22 additional pages in full and withholding 36 pages in their entirety.   Defendant also produced three pages of documents responsive to ATFY05-080.  Defendant also produced, in response to plaintiff's sixth request, ATFY05-131, 109 pages, some of which were redacted, and withheld 130 pages in their entirety.  (Exhibit U.) Upon further review of the documents released in its September 13, 2005 production, defendant

determined that 191 pages of those documents, some of which were redacted, were also responsive to ATFY05-131. (Richards decl. ¶ 24, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 37**:    Admitted for the purposes of this Motion only, subject to General Objections.

38.    On April 27, 2006, defendant responded to all of plaintiff's fiscal year 2006 requests (Exhibits M-R), producing a total of 261 pages of documents, some of which are redacted, and withheld in full 1,232 pages.   Specifically, with respect to plaintiff's seventh request, ATFY06-003, defendant produced to plaintiff 158 pages of responsive documents, some of which were redacted, and withheld 151 pages in their entirety. (Exhibit V.)  With respect to plaintiff's eighth request ATFY06-002, defendant produced to plaintiff 14 pages of responsive documents, and withheld additional pages in their entirety.  (Exhibit W.)  With respect to plaintiff's ninth request ATFY06-019, defendant produced to plaintiff nine pages of responsive documents, some of which were redacted, and withheld 33 pages in their entirety.  (Exhibit X.) With respect to plaintiff's tenth request ATFY06-026, defendant produced to plaintiff 14 pages of responsive documents, some of which were redacted, and withheld 154 pages in their entirety. (Exhibit Y.)  With respect to plaintiff's eleventh request ATFY06-038, defendant produced to plaintiff 20 pages of responsive documents.  (Exhibit Z.)  With respect to plaintiff's twelfth request ATFY06-040, defendant produced to plaintiff 46 pages of responsive documents, some of which were redacted, and withheld 526 pages in their entirety.  (Exhibit AA.)  (Richards decl. ¶ 25, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 38**:    Admitted for the purposes of this Motion only, subject to General Objections.

39.    In  processing  the  documents  responsive  to  plaintiff's  FOIA  requests,  the

defendant complied in full with the reasonable segregation requirement of the Act, 5 U.S.C. §
552 (final sentence), which reads: "Any reasonably segregable portion of a record shall be
provided to any person requesting such record after deletion of the portions which are exempt
under this subsection." As noted above in ¶ 35, Mr. Foster reviewed each page line by line to
assure himself that he was withholding from disclosure only information exempt pursuant to the
Act. In the FOIA Unit's review of the responsive records, it also adhered to the requirement to
release all reasonably segregable information contained therein. (Richards decl. ¶ 26, Exhibit
A.)

**Plaintiff's Response To Proposed Fact No. 39**:    Plaintiff disagrees. The Defendant does not
agree or admit that the defendant complied in full with the reasonable segregation requirement of
the Act, 5 U.S.C. § 552 (final sentence), which reads: "Any reasonably segregable portion of a
record shall be provided to any person requesting such record after deletion of the portions which
are exempt under this subsection." As illustrated by Exhibit 38 to the Lau declaration, the
potentially exemptible information contained in the approximately 100 amnesty agreements,
which are based on the Model Amnesty Letter and are withheld in-full, is easily segregable from
the non-exemptible information. Moreover, as explained in the Plaintiff's Opposition to
Defendants' Motion for Summary Judgment, there are dozens more documents withheld in full
for which the arguably-exemptible information can be redacted. Plaintiff further does not agree
or admit that, in the FOIA Unit's review of the responsive records, it also adhered to the
requirement to release all reasonably segregable information contained therein.

40.    In preparing the *Vaughn* Indexes, defendant Bates numbered each page of
previously produced records, those released in full, those withheld in full, and those released in
redacted form. It also Bates numbered and produced with the ATFY05 and ATFY06 *Vaughn*

Indexes 94 pages responsive to the ATFY05 requests and 30 pages responsive to the ATFY06 requests that had not been produced previously. Each document on the Amended *Vaughn* Indexes is described by the following: Bates numbers, date, author(s), recipient(s), type or style of documents, exemption(s) used, and the FOIA request(s) to which the document responds and a statement of justification for the application of each exemption. The first index, styled Civil Action No. 05-2217 (RJL), covers plaintiff's first six FOIA requests: ATFY05-071; ATFY05-072; ATFY05-080; ATFY05-088; ATFY05-113; and ATFY05-131 (Exhibits G through L). The second index, styled Civil Action No. 06-0474 (RJL), covers plaintiff's FY 2006 FOIA requests: ATFY06-003; ATFY06-002; ATFY06-019; ATFY06-026; ATFY06-038; and ATFY06-040 (Exhibits M through R). The Bates numbers in the Amended FY2005 *Vaughn* Index are in numerical order, but they are not in the Amended FY2006 *Vaughn*. A number of documents are responsive to both FY 2005 and FY 2006 FOIA requests and were listed in each *Vaughn*. When listing documents responsive to both AF 2005 and 2006 requests on the 2006 *Vaughn* Index, the numbers were no longer sequential. In addition, attached to each Amended *Vaughn* is a list of all individuals whose name, employer and title of whose names appear in each Amended *Vaughn* Index. (Richards decl. ¶ 27, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 40:** Admitted for the purposes of this Motion only, subject to General Objections, except that Plaintiff does not agree or admit that each document on the Amended *Vaughn* Indexes is described by the following: Bates numbers, date, author(s), recipient(s), type or style of documents, exemption(s) used, and the FOIA request(s) to which the document responds and a statement of justification for the application of each exemption. There are many entries for documents in the *Vaughn* Indexes that fail to list the date of the document, the author, the recipients, and the type of document. By reviewing these

entries, it is impossible to tell any dates of the agreements, the authors or recipients of the agreements, or, even, how many documents there are.

41.    Exemption 2, 5 U.S.C. § 552(b)(2).  Exemption 2 provides for the non-disclosure of "matters that are related solely to the internal personnel rules and practices of an agency." The exemption consists of two parts: (1) "internal matters of a relatively trivial nature . . . and (2) more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement."  DOJ file numbers redacted from the documents listed below are clearly trivial and have no genuine public interest.  They are, accordingly, properly withheld from disclosure pursuant to Exemption 2 of the FOIA, 5 U.S.C. § 552(b)(2).  The second category under Exemption 2 exempts from mandatory disclosure documents relating to more substantive internal matters, such as documents that would reveal techniques and procedures for law enforcement investigations or prosecutions, would disclose guidelines for law enforcement investigations, or would risk circumvention of an agency statute or impede the effectiveness of an agency's law enforcement activities.  Amnesty agreements are withheld under Exemption 2 because if disclosed, they would reveal information relating to the operation of the Division's amnesty program, would interfere with ongoing or prospective enforcement proceedings, and would discourage future amnesty applicants due to loss of confidentiality.  Likewise, the defendant withheld documents relating to private investigative consultations with specific foreign enforcers about the investigation of Stolt-Nielsen or the parcel tanker industry under Exemption 2 because if disclosed, they would reveal information relating to the operation of the Division's international anti-cartel enforcement program, would interfere with ongoing or prospective enforcement proceedings, and would discourage such essential communications in the future due to loss of confidentiality.  The documents withheld in full or in part pursuant to

Exemption 2 are listed in paragraph 28 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 41**:    Plaintiff disagrees.    First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***.    Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.    Third, the defendant has failed to properly assert this exemption for dozens of documents.    Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under Exemption 2 in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

42.    FOIA Exemption 3, 5 U.S.C. § 552(b)(3), authorizes withholding information that is "specifically exempted from disclosure by statute (other than [the Freedom of Information Act]), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." Fed. R. Crim. P. 6(e) ("Rule 6(e)") qualifies as a so-called (b)(3) statute because, although it is a rule of criminal procedure, it was specially enacted by Congress, thereby attaining the status of a statute.    Rule 6(e) prohibits an attorney for the government, and others, from disclosing "matter[s] occurring before the grand jury."    Grand jury secrecy is vital to the investigative function of the grand jury.    Releasing information such as the identities of witnesses or jurors, the substance of testimony, or the strategy or direction of the investigation would breach grand jury secrecy, compromising the grand jury process because secrecy: (a) encourages witnesses to come forward and testify freely and honestly; (b) minimizes the risk that prospective defendants will flee or use corrupt means to thwart investigations; (c) safeguards the grand jurors and the proceedings from extraneous pressures and influences; and, (d) protects accused persons who are ultimately exonerated.    Because the parcel tanker grand

jury investigation is on-going, a substantial amount of information responsive to plaintiff's FOIA requests, in full or in part, is exempt pursuant to Rule 6(e)'s prohibition against disclosure of "matter[s] occurring before the grand jury." Categories of information withheld in full or in redacted form are: staff memoranda to superiors recommending the filing of indictments, informations, and/or plea agreements; the identity of witnesses before the grand jury; documents concerning grand jury testimony; pleadings concerning the grand jury filed under seal; the identity of subjects of the grand jury; documents reflecting the direction of the grand jury; documents discussing testamentary and/or document subpoenas; responses to grand jury subpoenas other than document submissions; official foreign government notifications made pursuant to limited Rule 6(e) orders; and grand jury exhibits from other investigations. The documents withheld in full or in part pursuant to Exemption 3, 5 U.S.C. § 552(b)(3), and Fed. R. Crim. P. 6(c) are listed in paragraph 29 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes. Information is also withheld in full or in part pursuant to statutes that prohibit the disclosure of confidential information other than Rule 6(e). The statute applicable here cannot be identified because to do so would disclose the very information sought to be protected by the statute. Documents from which such statutorily protected information is withheld are listed in paragraph 29 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 42**: Plaintiff disagrees. First, it is improper to include legal conclusions and authority in a statement of *undisputed facts*. Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it. Third, the defendant has failed to properly assert this exemption for dozens of documents. Fourth, Plaintiff explains that the defendant

wrongfully withheld dozens of documents under Exemption 3 in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

43.    Exemption 5 authorizes the non-disclosure of "inter-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).  The exemption encompasses privileges commonly recognized at common law, including the attorney work-product doctrine and the deliberative process privilege. Exemption 5 also includes the efficient operations of government privilege.  Each is discussed separately below. (Richards decl. ¶ 30, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 43**:    Plaintiff disagrees.  It is improper to include legal conclusions and authority in a statement of *undisputed facts*.  Further, Ms. Richards is not competent to offer legal analysis on statutory authority, even if it were appropriate to offer it in a statement of undisputed facts.

44.    The attorney work-product doctrine applies to memoranda and other documents created by an attorney or his or her designee in anticipation of litigation and applies to grand jury proceedings.  It covers the following: trial and grand jury preparation material, including attorneys' selection of important facts and evidence; memoranda to superiors; memoranda intended for circulation among the staff; attorneys' notes related to actual or possible witnesses; memoranda to files reflecting the author's thought processes; lists of grand jury witnesses, potential witnesses, deponents, individuals interviewed, subpoena recipients and notes concerning the foregoing; litigation related analysis, including summaries, evaluations, opinions and mental impressions concerning legal theories; drafts of the foregoing documents as well as grand jury subpoenas, document schedules, drafts of pleadings (including motions and proposed orders), internal memoranda not listed above, drafts of speeches and press releases; and staff

notes about, among other matters, meetings and telephone conversations. Documents properly withheld in full or in part pursuant to the attorney work product doctrine prong of Exemption 5 are listed in paragraph 31 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 44**:    Plaintiff disagrees.  First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***.  Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.  Third, the defendant has failed to properly assert this exemption for dozens of documents.  Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under the attorney-work product doctrine in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

45.    The deliberative process prong of Exemption 5 exempts from disclosure information that is inter or intra-agency, predecisional and makes recommendations or expresses opinions on legal or policy matters.  Information subject to the privilege reflects the give and take of the consultative process.  The doctrine is designed to prevent injury to the quality of the agency decision making process by chilling employees' willingness to express frank opinions and recommendations.  (Richards decl. ¶ 32, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 45**:    Plaintiff disagrees.  First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***.  Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.  Third, the defendant has failed to properly assert this exemption for dozens of documents.  Fourth, Plaintiff explains that the defendant

wrongfully withheld dozens of documents under the deliberative process privilege in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

46.    Information withheld pursuant to the deliberative process privilege includes analysis and conclusions of fact based upon that analysis and recommendations formulated therefrom, and staff memoranda containing recommendations to superiors. Documents properly withheld in full or in part pursuant to the deliberative process privilege prong of Exemption 5 are listed in paragraph 33 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 46**:    Plaintiff disagrees. First, it is improper to include legal conclusions and authority in a statement of *undisputed facts*. Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it. Third, the defendant has failed to properly assert this exemption for dozens of documents. Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under the deliberative process privilege in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

47.    The efficient governmental operations privilege is a privilege included within the civil discovery privileges incorporated into Exemption 5 of the FOIA, 5 U.S.C. § 552 (b)(5). (Richards decl. ¶ 34, Exhibit A.) Like other (b)(5) privileges, it is intended to ensure frank and open discussion by protecting from disclosure information obtained under a promise of confidentiality when confidentiality is necessary to ensure and/or encourage frank disclosures. The privilege exempts, for example, information provided to the government by companies seeking corporate amnesty who would not otherwise disclose their participation in a Sherman Act violation without an expectation of confidentiality. It also exempts information provided in

private investigative consultations with foreign government officials because Division and foreign officials rely on the confidentiality of those communications to effectively communicate regarding investigative and prosecutorial issues. It is for this reason that the privilege is recognized — without it the government would not be able to obtain such information. As discussed above in ¶¶ 9-10, 14 and in the Hammond declaration ¶¶ 6-11 (Exhibit B), the Division's leniency program is the cornerstone of its international anti-cartel enforcement program and companies in both domestic and international investigations are willing to self-disclose their cartel offenses to obtain the benefits of amnesty so long as their cooperation remains confidential. In addition, as noted in the Hammond declaration ¶¶ 5, 15-19 (Exhibit B), coordination with and assistance from foreign governments is critical in the investigation and prosecution of international cartels, and disclosure of investigative communications with foreign governments would have a chilling effect on investigations at issue, the willingness of foreign governments to communicate with the Division regarding other specific investigations, and the Division's international anti-cartel enforcement program. Accordingly, the privilege promotes the efficient operations of the Antitrust Division's Corporate Leniency program, a very important program that is instrumental in finding and prosecuting criminal violations of the antitrust law, and the efficient operations of the Division's international anti-cartel enforcement program. Information obtained from companies and individuals in proffers to obtain leniency and the resulting leniency agreements, as well as documents relating to private investigative consultations with foreign governments relating to the investigation of Stolt-Nielsen or the parcel tanker industry are covered by the privilege. The documents withheld in full pursuant to the efficient operations of government privilege included in Exemption 5 are listed in paragraph 34 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn*

Indexes.

**Plaintiff's Response To Proposed Fact No. 47**:     Plaintiff disagrees.   First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***.   Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.  Third, the defendant has failed to properly assert this exemption for dozens of documents.   Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under the so-called "efficient governmental operations privilege" in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

48.     Exemption (b)(6) protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  The only information redacted pursuant to Exemption 6 is personal telephone numbers and e-mail addresses contained in the documents listed in paragraph 35 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 48**:     Plaintiff disagrees.   First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***.   Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.  Third, the defendant has failed to properly assert this exemption for dozens of documents.   Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under Exemption 6 in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

49.     Exemption 7 authorizes the non-disclosure of "records or information compiled for law enforcement purposes."  In this case, such information falls into the following categories: information generated or obtained during the ongoing parcel tanker grand jury investigation of

plaintiff and other companies and individuals; indictments and informations arising from or proposed in that investigation; the ongoing litigation concerning plaintiff's grant and subsequent removal of conditional leniency; and other grand jury investigations involving amnesty applicants. The records reside in and were located primarily in the investigative and litigative files of the Philadelphia Field Office and the Office of the Deputy Assistant Attorney General. A small number of responsive documents were located in the files of other Division criminal sections and the Division's Appellate and Foreign Commerce Sections. (Richards decl. ¶ 36, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 49**:    Plaintiff disagrees. It is improper to include legal conclusions and authority in a statement of *undisputed facts*.

50.    As stated previously, the parcel tanker grand jury investigation and related litigation are ongoing. For the reasons discussed herein, release of information not already in the public domain is likely to harm the Division's current investigation and interfere with current and prospective enforcement proceedings. Exemption 7(A) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings." Exemption 7(A) protects against such interference by the harm likely to result from the premature production of law enforcement records. In addition to the general prejudice to the government's parcel tanker investigation and related litigation that almost certainly will result from the premature release of these records, the following additional potential sources of harm are evident:

**Plaintiff's Response To Proposed Fact No. 50**:     Plaintiff disagrees.  It is improper to include legal conclusions and authority in a statement of ***undisputed facts***.  Further, Defendant offers no cite to evidence in the record as the foundation for this statement.

(a)     Destruction or alteration of evidence that remains to be discovered.  Each of the categories of records described above in ¶ 49 contains information, such as allegations of illegal conduct, the direction and scope of the investigation, and the statements of witnesses, that, if disclosed prior to the appropriate point in the litigation process in a subsequent enforcement proceeding, may result in potential defendants taking steps to alter or destroy evidence.

**Plaintiff's Response To Proposed Fact No. 50(a)**:     Plaintiff   disagrees.     The   Antitrust Division has not provided this Court with enough detail in its *Vaughn* Indices to determine whether any of the information withheld falls into any of those categories.   Moreover, the Antitrust Division has presented no facts supporting its regurgitation of the legal standard regarding the destruction of evidence.

(b)     Witness Intimidation. Each of the categories of documents described above in ¶ 49 contains information concerning the identification of individuals and potential witnesses who possess information relevant to the investigation. Premature release of this information could lead to the possible intimidation of, or retaliation against, those individuals.

**Plaintiff's Response To Proposed Fact No. 50(b)**:     Plaintiff   disagrees.     The   Antitrust Division has not provided this Court with enough detail in its *Vaughn* Indices to determine whether any of the information withheld falls into any of those categories.   Moreover, the Antitrust Division has presented no facts supporting any alleged fear that the release of information could result in the possible intimidation of, or retaliation against, individuals and potential witnesses.

(c)    Scope and Direction of the Investigation.  Each of the categories of documents described above in ¶ 49 contains information that, if released prematurely, could damage any case the government might bring based on the current investigation by giving potential defendants insights into the government's strategy and the strength of its position.  There is no reasonably segregable portion of any of the documents responsive to plaintiffs' request that could be released without jeopardizing the ongoing investigation. (Richards decl. ¶ 37, Exhibit A.)

**Plaintiff's Response To Proposed Fact No. 50(c)**:    Plaintiff disagrees.   First, the Antitrust Division has not provided this Court with enough detail in its *Vaughn* Indices to determine whether any of the information withheld falls into any of those categories.  Second, the Antitrust Division has presented no facts supporting the notion that the release of the withheld information could damage the government's case or give potential defendants insight into the government's strategy  and strength of its position.   Finally, the Antitrust Division has not satisfied the statutory requirements for segregating exempt from non-exempt material.

(d)    Chilling of Cooperation.  The release of documents described above in ¶¶ 15 and 29 could interfere with cooperation from amnesty applicants in ongoing investigations by disclosing confidential information provided by the applicants and the applicants' status as confidential informants and discourage future amnesty applications by causing amnesty applicants to perceive that the application process is no longer confidential.   The release of documents described above in paragraph 20 relating to investigative consultations with specific foreign enforcers could have a chilling effect on the instant investigation and the willingness of foreign authorities to communicate with the Division regarding other specific investigations.

**Plaintiff's Response To Proposed Fact No. 50(d)**:    Plaintiff    disagrees.    The    Antitrust

Division has not provided this Court with enough detail in its *Vaughn* Indices to determine

whether any of the information withheld falls into any of those categories.    Moreover, the

Antitrust Division has presented no facts supporting these conclusory assertions.

51.    The documents withheld in full or released as redacted pursuant to Exemption

7(A) are listed in paragraph 38 of the Richards declaration, Exhibit A. and are described in the

Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 51**:    Admitted for the purposes of this Motion

only, subject to General Objections.

52.    Exemption 7(C) protects from disclosure "matters that . . . are records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . (C) could reasonably be expected to constitute

an unwarranted invasion of personal privacy."    Exemption (7)(C)'s privacy protection is

particularly applicable in investigations by criminal law enforcement agencies, which the

Division is, when, as here, it is investigating activities that are charged as criminal violations of

the Sherman Act.    Accordingly, defendant has withheld in full the names of persons mentioned

in records of this and other investigations, including subjects and others of investigatory interest,

for example, persons who are mentioned in a recommendation to file indictments or

informations; home addresses of individuals; and the identity of persons who were interviewed

in the course of the investigation.    There is no public interest that would be served by the release

of the such information.    The documents withheld in full or released as redacted pursuant to

Exemption 7(C) are listed in paragraph 39 of the Richards declaration, Exhibit A, and are

described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 52**:    Plaintiff disagrees.  First, it is improper to include legal conclusions and authority in a statement of *undisputed facts*.  Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it.  Third, the defendant has failed to properly assert this exemption for dozens of documents.  Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under Exemption 7(C) in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment.

53.    Exemption (b)(7)(D) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record of information compiled by a criminal law enforcement authority in the course of a criminal investigation . . . information furnished by a confidential source."  As noted in ¶¶ 3 and 49 above, the Antitrust Division is a criminal law enforcement component of the U.S. Department of Justice and compiled the information at issue in this action to investigate the parcel tanker industry and in furtherance of other grand jury investigations as is discussed above.  Conviction of a criminal violation of the Act offense brings with it serious financial consequences and potential jail sentences.  Many persons who provide information to the Division about conspirators engaged in criminal violations engendering such sentences are concerned that their identity and the information they provide not be revealed; companies are concerned that they will loose favor in their industry, becoming subject to retaliation by customers, competitors and others with whom they deal, while individuals are concerned that they will be subject to

harassment, loss of employability and/or social stigma and foreign government sources are concerned that such disclosure would interfere with cartel investigations. Thus, many seek explicit assurances of confidentiality before sharing any information. Others assume from the circumstances that their identity and any information they impart will be held in confidence. Defendant has withheld the identity of persons and information provided by such persons under both circumstances. Such information as may exist in the documents responsive to plaintiff's requests that would identify a confidential source and information provided by the source is exempt in full from disclosure pursuant to Exemption 7(D) of the FOIA. The records withheld in full or released as redacted pursuant to Exemption 7(D) are listed in paragraph 40 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

**Plaintiff's Response To Proposed Fact No. 53**:    Plaintiff disagrees. First, it is improper to include legal conclusions and authority in a statement of ***undisputed facts***. Second, the defendant has misstated the proper standard for applying this exemption, and included categories of documents that are not explicitly covered under it. Third, the defendant has failed to properly assert this exemption for dozens of documents. Fourth, Plaintiff explains that the defendant wrongfully withheld dozens of documents under Exemption 7(D) in Plaintiff's Opposition to the Defendant's Motion for Summary Judgment. Fifth, there is no indication from Ms. Richards' declaration that she possesses any personal knowledge with respect to the sources of the purportedly "confidential" information that the Division seeks to protect.

## ADDITIONAL FACTS NOT IN DISPUTE

54.    There is a strong public interest in Stolt-Nielsen's FOIA case against the Antitrust

Division. *See* Lau Decl. Exs. 1-2.

55.    On or around June 26, 2002, Aventis S.A. publicly announced that it had

"avoided fines in other price-fixing cases by taking advantage of an amnesty provided by both

Brussels and Washington to the first firm to report a cartel . . . ." *See* Lau Decl. Ex. 3.

56.    Bayer AG publicly announced in its March 15, 2005 20-F filing with the

Securities and Exchange Commission ("SEC") that:

> To settle charges related to allegations that its NBR business unit engaged in anti-
> competitive activities between May 2002 and December 2002, Bayer AG agreed
> with the DOJ to plead guilty and pay a fine of U.S.$4.7 million. The sentencing
> court approved the agreement on December 8, 2004. Bayer AG has paid both the
> rubber chemicals fine and the NBR fine. The two agreements resolve all criminal
> charges against Bayer in the United States for activities related to its rubber
> chemicals and NBR business, provided Bayer continues to cooperate with the
> DOJ's ongoing investigations. Bayer AG is currently cooperating with the DOJ
> and the CCB with respect to their investigations of possible anti-competitive
> behavior involving a further product attributable to the former rubber-related lines
> of business. The DOJ and the CCB have granted conditional amnesty from the
> imposition of criminal liability in connection with these proceedings. Conditional
> amnesty requires continued cooperation by Bayer.

*See* Lau Decl. Ex. 4.

57.    On or around April 7, 1998 the Carbide/Graphite Group of Pittsburgh publicly

confirmed that it qualified for the Antitrust Division's corporate leniency program and thus had

been given amnesty in the Antitrust Division's ongoing investigation into the graphite electrode

market. *See* Lau Decl. Ex. 5.

58.    On June 30, 2005, Chemtrade Logistics (U.S.), Inc. filed a Memorandum of Law

in Support of Their Agreed Motion for a Finding of "Satisfactory Cooperation" and Limitation of

Damages Pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, in *In*

*re Sulfuric Acid Antitrust Litig.*, 2005 WL 3746773 (N.D. Ill. June 30, 2005). Page 1 of that

pleading states, in relevant part:

> Defendants Marsulex, Inc. ("Marsulex") and ChemTrade Logistics (U.S.), Inc.
> ("Chem Trade"), recipients of criminal amnesty from the Department of Justice
> for their role in cooperating with the Antitrust Division's investigation into an
> alleged price-fixing conspiracy in the sulfuric acid industry . . . .

*See* Lau Decl. Ex. 6.

59.     On or around December 12, 2003, Citizens Gas and Coke Utility publicly

announced in a press release that:

> Citizens Gas & Coke Utility is cooperating with the Antitrust Division of the
> United States Department of Justice (DOJ) in its investigation into possible anti-
> competitive practices by producers of foundry coke. . . . Citizens Gas promptly
> reported the findings of its internal investigation to the DOJ, and has been granted
> conditional amnesty under the Department's corporate leniency program.

*See* Lau Decl. Ex. 7.

60.     On or around December 12, 2002, Crompton Corporation ("Crompton") publicly

announced that:

> [Crompton] is cooperating with competition authorities in the U.S., Canada and
> the European Union that have opened an investigation into possible collusive
> behavior by manufacturers of a form of synthetic rubber known as ethylene
> propylene diene monomer or EPDM. . . . As a result, in each of the three
> jurisdictions, Crompton Corporation and its relevant affiliates have been
> conditionally granted amnesty with regard to criminal prosecution and fines with
> respect to EPDM.

*See* Lau Decl. Ex. 8.

61.     On or around February 13, 2003, Crompton publicly announced that:

> [Crompton] is cooperating with competition authorities in the United States,
> Canada and the European Union that are investigating possible collusive behavior
> with respect to heat stabilizers for plastics.  Crompton Corporation and its
> relevant affiliates have been granted conditional amnesty with regard to criminal
> prosecution and fines in the United States and Canada and expect to be granted
> conditional amnesty in the European Union in the near future.

*See* Lau Decl. Ex. 9; *see also* Lau Decl. Ex. 10 ("Crompton adds that it has received conditional amnesty from criminal prosecution in the U.S. and Canadian heat-stabilizer investigations and expects similar treatment by European Commission officials").

62.     On or around December 19, 2003, Crompton publicly announced that:

[Crompton] is cooperating with competition authorities in the U.S., Canada and the European Union that are investigating possible anticompetitive activities by manufacturers of nitrile rubber. Crompton Corporation and its relevant affiliates have received assurances of conditional amnesty from each of these authorities with regard to criminal prosecution and fines with respect to nitrile rubber.

*See* Lau Decl. Ex. 11.

63.     On or around March 15, 2004, Crompton publicly announced that:

[Crompton] is cooperating with competition authorities in the U.S., Canada and the European Union that have opened an investigation into possible collusive behavior by manufacturers of urethanes and urethane chemicals. Crompton is cooperating fully with authorities and has received assurances of conditional amnesty in the U.S., Canada and the European Union regarding fines and criminal prosecution with respect to urethanes and urethane chemicals.

*See* Lau Decl. Ex. 12.

64.     On or around September 11, 2006, Deutsche Lufthansa publicly announced that:

[Deutsche Lufthansa] had applied for leniency with the U.S. Department of Justice and the European Commission, and that it had been granted conditional immunity in exchange for its continued cooperation with the investigation.

*See* Lau Decl. Ex. 13.

65.     On or around April 2, 2004, it was public knowledge that DuPont and its subsidiaries, agents, and affiliates were granted amnesty by the Antitrust Division regarding its ongoing investigation into the polyester staple fiber industry. *See* Lau Decl. Ex. 14.

66.     Akzo Nobel's 2005 Annual Report states that Flexsys, a 50/50 joint venture for rubber chemicals between Akzo Nobel and Solutia Inc., informed Akzo Nobel that:

[A]uthorities in the United States, Canada and Europe are investigating alleged antitrust violations in the rubber chemicals industry. We have been informed by

Flexsys management that it is cooperating with the authorities and will continue to do so and pursuant to this cooperation has been granted conditional amnesty by the US DOJ, the Canadian BOC and the EU Commission.

*See* Lau Decl. Ex. 15.

67.    In June 1999, Great Lakes Chemical Corporation publicly announced it had been accepted into the Antitrust Division's corporate amnesty program and had been cooperating with the Antitrust Division in its ongoing investigation of the bromine industry. *See* Lau Decl. Ex. 16.

68.    Great Lakes Chemical Corporation's Form 10-K, filed with the Securities and Exchange Commission for the fiscal year ended December 31, 2003, states that:

> The company cooperated with the United States Department of Justice (DOJ) and the European Commission in their respective investigations of the bromine and brominated products industry.  Both investigations were initiated after the Company self-reported to those agencies certain business practices that raised questions under antitrust laws.  As a result of the Company's cooperation, the Company and its current directors and employees were accepted into the DOJ's amnesty program.

*See* Lau Decl. Ex. 17.

69.    On or around May 29, 2003, Indiana University – Purdue University at Indianapolis ("IUPUI") publicly announced that:

> The Justice Department's Antitrust Division is investigating alleged price fixing between IUPUI's bookstores and an unidentified bookstore over an 18-month period that ended in December, administrators and an attorney for IUPUI revealed Thursday. . . . The department granted IUPUI conditional amnesty under a "corporate leniency program" available to businesses and organizations that report antitrust activity and cooperate with the government's investigation, Rivas said.  In return, IUPUI will not be prosecuted or fined.

*See* Lau Decl. Ex. 18.

70.    On June 30, 2005, Marsulex, Inc. public admitted in a court pleading that the Antitrust Division and Marsulex, Inc. had entered into a Leniency Agreement regarding Antitrust Division's ongoing investigation into the sulfuric acid industry. *See* Lau Decl. Ex. 6.

71. On or around November 11, 2004, Micron Technology Inc. publicly announced that:

> [Micron] has cooperated "fully and actively" with the DOJ since the beginning on the [DRAM industry] investigation. . . . if Micron fully complies with the Corporate Leniency Policy, Micron will not be subject to criminal sanctions or fines. . . .

*See* Lau Decl. Ex. 19.

72. On or around May 12, 2006, it was publicly known that Mitsui, for example, was held liable for $147 million in a private suit for an antitrust violation after its subsidiary made an amnesty application to the United States government. *See* Lau Decl. Ex. 20.

73. In or around January 7, 2005, it was public knowledge that Parkdale America, LLC had been granted conditional amnesty from prosecution and fines from the Antitrust Division with respect to its activities related to the fixing of prices for Cotton Yarn. *See* Lau Decl. Ex. 21a.

74. In October 2004, it was public knowledge that Rhone-Poulenc had sought and received amnesty from the Antitrust Division. *See* Lau Decl. Ex. 22.

75. In or around March 10, 2006, Shelby Materials revealed in court papers that the Justice Department has agreed to give it amnesty from criminal fines and jail terms. *See* Lau Decl. Ex. 23; *see also* Lau Decl. Ex. 24.

76. Tier Technologies Inc. publicly announced in its May 6, 2005 10-Q filing with the SEC that:

> In June 2003, we received a subpoena from a grand jury in the Southern District of New York to produce certain documents pursuant to an investigation by the Antitrust Division of the Department of Justice (*"DOJ"*) involving the child support payment processing industry. We have fully cooperated, and intend to continue to cooperate fully, with the subpoena and with the DOJ's investigation. On November 20, 2003, the DOJ granted us conditional amnesty pursuant to the Antitrust Division's Corporate Leniency Policy. Consequently, the DOJ will not bring any criminal charges against us and our officers, directors and employees,

> as long as we continue to comply with the Corporate Leniency Policy, which requires, among other things, our full cooperation in the investigation and restitution payments if it is determined that parties were injured as a result of impermissible anticompetitive conduct.

*See* Lau Decl. Ex. 25.

77.     Unifi, Inc. publicly announced in its June 27, 2004 10-K/A filing with the SEC that:

> In late 2003, the Company disclosed to the United States Department of Justice ("DOJ") that it participated in certain anticompetitive activities that may have resulted in violation of antitrust laws. Subject to the Company's continuing and complete cooperation with the Antitrust Division of the DOJ, the Division agreed to provide protection for the Company and the Company's directors, officers, and employees from criminal prosecution related to the reported anticompetitive activity.

*See* Lau Decl. Ex. 26.

78.     UPM-Kymmene Oyj publicly announced in its 2005 20-F filing with the SEC that the company had been granted conditional leniency by the Antitrust Division with respect to two ongoing investigations, one into the U.S. labelstock industry and one into the magazine paper industry. *See* Lau Decl. Ex. 27.

79.     The Antitrust Division has made several speeches in which they openly discuss amnesty applicants. For instance, on March 7, 2002, Scott D. Hammond gave a speech entitled "A Review Of Recent Cases And Developments In The Antitrust Division's Criminal Enforcement Program" on March 7, 2002 in New York, NY. Page 13 of that speech states, in relevant part:

> Aventis, which has previously announced its acceptance into the Division's leniency program, likely avoided hundreds of millions of dollars in fines in the U.S. and Europe as a result of its decision to come forward and seek leniency.

*See* Lau Decl. Ex. 28.

80.    On March 8, 2001, Scott D. Hammond gave a speech entitled "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" at the Fifteenth Annual National Institute on White Collar Crime in San Francisco, California.   In that speech, he stated, "The Carbide/Graphite Group, Inc. obtained corporate amnesty, and so *all* of its officers, directors, and employees received full non-prosecution protection for any crimes committed in connection with the antitrust conspiracy.  *See* Lau Decl. Ex. 29.

81.    In the October 2002 issue of "The Status Report, News from the Atlanta Field Office of the Antitrust Division," there is an article entitled "Graphite Electrodes Cartel: A Case Study."  On page 8, that story states, in relevant part:

> In the graphite electrodes investigation, the staff had contact with a smaller U.S. manufacturer, the Carbide/Graphite Group (C/G), before serving subpoenas on the other manufacturer with U.S. facilities, and C/G decided to seek amnesty and cooperate.  C/G was on the fringes of the conspiracy, but its cooperation provided valuable evidence supporting probably cause for search warrants without immunizing a more culpable conspirator.

*See* Lau Decl. Ex. 30.

82.    On March 29, 2006, Scott D. Hammond gave a speech entitled "Measuring the Value of Second-In Cooperation in Corporate Plea Negotiations" at the 54th Annual American Bar Association Section of Antitrust Law Spring Meeting in Washington, D.C.  In that speech, he stated:

> The paper focuses on the benefits earned by Crompton Corporation for being second-in-the-door in the Division's rubber chemicals investigation and provides information that was not public at the time the company was sentenced.

*See* Lau Decl. Ex. 31.

83.    On September 12, 2000, Scott D. Hammond gave a speech entitled "Lessons Common to Detecting and Deterring Cartel Activity," at the 3rd Nordic Competition Policy Conference in Stockholm, Sweden.  In that speech he stated:

> For example, the worldwide vitamin cartel was cracked by the cooperation provided by French-based Rhône-Poulenc SA.

This sentence is footnoted with the following information:

> The Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. However, confidentiality is not required in this case with respect to Rhône-Poulenc's amnesty status, because the company has already issued a press release announcing its acceptance into the Amnesty Program.

*See* Lau Decl. Ex. 32.

84.    On or around November 21-22, 2000, Scott D. Hammond gave a speech entitled "Detecting and Deterring Cartel Activity Through an Effective Leniency Program," at the International Workshop on Cartels in Brighton, England.  In that speech he stated:

> For example, the worldwide vitamin cartel was cracked by the cooperation provided by French-based Rhône-Poulenc SA.

This sentence is footnoted with the following information:

> The Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. However, confidentiality is not required in this case with respect to Rhône-Poulenc's amnesty status, because the company has already issued a press release announcing its acceptance into the Amnesty Program.

*See* Lau Decl. Ex. 33.

85.    On March 8, 2001, Scott D. Hammond gave a speech entitled "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" at the Fifteenth Annual National Institute on White Collar Crime in San Francisco, California.  In that speech, he stated:

> It has been widely acknowledged that one of the keys to the Division's success in cracking the worldwide vitamin cartel was the cooperation provided by Rhône-Poulenc SA pursuant to its amnesty application.

> Rhône-Poulenc obtained corporate amnesty, and *all* of its officers, directors, and employees in the United States and abroad received full non-prosecution protection for any crimes committed in connection with the antitrust conspiracy.

*See* Lau Decl. Ex. 29.

86.    On or around November 23-24, 2004, Scott D. Hammond gave a speech entitled

"Cornerstones of an Effective Leniency Program" before the ICN Workshop on Leniency

Programs in Sydney, Australia.  In that speech he stated:

> It has been widely acknowledged that one of the keys to the Division's success in cracking the worldwide vitamin cartel was the cooperation provided by Rhône-Poulenc SA pursuant to its amnesty application.

*See* Lau Decl. Ex. 34.

87.    In 2004, the Antitrust Division filed an amicus brief with the United States

Supreme Court, stating that:

> In 1998, one of the petitioners, Rhone-Poulenc SA, applied for admission to the government's amnesty program for Rhone-Poulenc's role in global price-fixing and market-allocation conspiracies among domestic and foreign manufacturers and distributors of bulk vitamins.  In exchange for amnesty, the company exposed the cartel, which had sole billions of dollars of vitamins in the United States and other countries around the world.

*See* Lau Decl. Ex. 35.

88.    The Antitrust Division's "Confidentiality Policy" regarding the Corporate

Leniency Program states:

> The Division's policy is to treat as confidential the identity of amnesty applicants and any information obtained from the applicant.  Thus, the Division will not disclose an amnesty applicant's identity, absent prior disclosure by or agreement with the applicant, unless authorized by court order . . . . In addition, amnesty applicants may issue press releases or, in the case of publicly-traded companies, submit public filings announcing their conditional acceptance into the corporate amnesty program thereby obviating the need to maintain their anonymity.

The Antitrust Division has repeated this policy in several speeches, including a speech given by Scott Hammond on January 23, 2003, to the Annual Meeting of the New York State Bar Association. *See* Lau Decl. Ex. 40.

89.    On March 29, 2006, approximately four and a half months before executing his declaration in this case, Scott Hammond gave a speech at the 54th Annual American Bar Association Section of Antitrust Law Spring Meeting in which he publicly discussed the Antitrust Division's ongoing investigation into the parcel tanker industry and the cooperation of a competitor in that industry. He stated:

> For example, in the Division's parcel tanker investigation, Odfjell received a 30% discount off the bottom of its minimum Guidelines sentence. Odfjell contacted the Division to offer its cooperation the day after the investigation went overt. It made its key personnel available to the Division in a timely manner, and two of its top executives agreed to submit to U.S. jurisdiction, serve jail terms, and cooperate with our investigation. For its cooperation, Odfjell was rewarded with a 30% discount off its minimum Guidelines fine.

*See* Lau Decl. Ex. 31.

90.    In its Corporate Leniency Program, the Antitrust Division uses a standard form which it refers to as its "Model Amnesty Letter" for drafting amnesty agreements with entrants into the program. *See* Lau Decl. Ex. 36.

91.    On June 18, 2002, Paul O'Brien, former General Counsel of Stolt-Nielsen, filed suit against Stolt-Nielsen for wrongful employment termination. That lawsuit is ongoing. *See* Lau Decl. Exs. 44-45.

92.    David Golub is the attorney of record for Paul O'Brien's employment litigation against Stolt-Nielsen. *See* Lau Decl. Exs. 44-45.

93.    On the afternoon of November 22, 2002, John Nannes, an attorney for Stolt-Nielsen, called James Griffin, the Deputy Assistant Attorney General for the Antitrust Division, to inquire about the Corporate Leniency Program. *See* Lau Decl. Ex. 39.

94.    Mr. Griffin stated under oath that the Antitrust Division's investigation into the parcel tanker industry began on November 22, 2002. *See* Lau Decl. Ex. 39.

95.    Stolt-Nielsen was amenable to receiving redacted amnesty agreements. *See* Lau Decl. Ex. 37.

96.    Hector Torres is identified as the counsel of record for various private civil litigants engaged in actions against Stolt-Nielsen and other parcel tanker firms. *See* Lau Decl. Exs. 42-43.

Dated:  September 27, 2006                    Respectfully submitted,

**WHITE & CASE** LLP

By: _____
J. Mark Gidley (D.C. Bar No. 417280)
Christopher M. Curran (D.C. Bar. No. 408561)
Lucius B. Lau (D.C. Bar No. 446088)
701 Thirteenth St., N.W.
Washington, D.C.  20005
tel.: (202) 626-3600
fax: (202) 639-9355

*Counsel to Stolt-Nielsen Transportation Group Ltd.*