# Exhibit 28

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect.  To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site.  For an official signed copy, please contact the Antitrust Documents Group.



# DEPARTMENT OF JUSTICE

**The 2002 Antitrust Conference:
Antitrust Issues In Today's Economy**

**Presented By
The Conference Board**

## "A REVIEW OF RECENT CASES AND DEVELOPMENTS IN THE ANTITRUST DIVISION'S CRIMINAL ENFORCEMENT PROGRAM"

**By**

**SCOTT D. HAMMOND
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice**

**Presented at**

**The Waldorf Astoria
New York, New York**

**March 7, 2002**

## I. **Introduction**

This paper reviews recent cases and developments in the Antitrust Division's criminal enforcement program, recent actions by foreign governments which greatly impact the Division's enforcement efforts, and some significant "firsts" and record achievements in the prosecution and punishment of cartel activity here and abroad. Highlights from the last year include:

- The Division obtained over $280 million in criminal fines with the average corporate fine topping $18 million;

- A Japanese corporation, a 50% owner of a U.S. corporation that encouraged that U.S. affiliate to engage in international cartel activities, was not only convicted as an aider and abetter of the international cartel but also was sentenced to the fourth largest antitrust fine in history -- $134 million;

- The percentage of corporate defendants in criminal cases that were foreign-based firms grew from approximately 50 percent to nearly 70 percent;

- The Division obtained the longest jail sentences -- 10 years in one case -- and the largest restitution orders in the Division's history; and

- The trend toward more frequently imposed and longer average prison terms for antitrust offenders continued -- with the average jail sentence last year increasing to 15 months.

While the high fines and rising jail sentences in Division cases garner much of the attention, it is the recent actions of antitrust authorities abroad which may have the biggest impact on how international cartels are investigated, prosecuted, and defended in the United States. As discussed below, foreign antitrust authorities are: (1) joining the Division in creating effective leniency programs to detect cartel activity; (2) working together with the Division in the conduct of our investigations; and (3) aggressively investigating and punishing cartel activity that affects their businesses and consumers.

---

\* An earlier version of this paper was presented by the author at the ABA's National Institute on White Collar Crime on February 28, 2002. This version contains updates on a number of recent events, including a discussion of the EC's new leniency program.

## II. **Criminal Antitrust Enforcement Trends**

### A. **Crackdown On International Cartels Continues**

A comparison of the Division's criminal docket last year with those of previous years demonstrates its continued emphasis on cracking international cartels that target U.S. businesses and consumers. (See attached Status Report: International Cartel

Enforcement.) While ten years ago, the Antitrust Division only opened a few investigations of suspected international cartel activity, today there are nearly 35 grand juries around the country investigating suspected international cartel activity. Similarly, ten years ago, the Division filed only two cases against foreign-based companies, both involving domestic conspiracies, and did not bring a single case against a foreign individual defendant. Moreover, in the four preceding years, from FY 1987 thru FY 1990, the Division did not bring a single case against either a foreign firm or a foreign national. By comparison, nearly *70 percent* of the companies charged by the Division last year were foreign-based firms, and roughly *33 percent* of the individual defendants were foreign nationals. The Division has convicted foreign executives from Germany, Belgium, The Netherlands, England, France, Switzerland, Italy, Sweden, Canada, Mexico, Japan, and South Korea for violating U.S. antitrust laws. Moreover, executives from Canada, Germany, Switzerland, and Sweden have submitted to U.S. jurisdiction and served prison sentences in the United States for antitrust crimes.

## B.  Criminal Fines Up Again

The Division has prosecuted international cartels affecting well over $10 billion in U.S. commerce in the last five years. The commerce involved in these prosecutions has generally dwarfed the domestic and regional conspiracies that the Division had traditionally prosecuted over the years. Since fines for antitrust offenses under the U.S. Sentencing Guidelines are based in large part on the volume of affected commerce, the fine levels for antitrust offenses have increased dramatically. (See attached Status Report: Criminal Fines.) For example, going back ten years, antitrust defendants were fined a total of approximately $20 million. In fact, in the five years before and after FY 1991, the Division obtained, on average, about $27 million in criminal fines annually. By comparison, in FY 2001, the Division obtained fines of over $280 million, more than 10 times that prior average. Moreover, in the last five years, the Division has obtained over *$2 billion* in criminal fines. Well over 90 percent of these fines were in connection with the prosecution of multinational firms engaged in international cartel activity.

Similarly, ten years ago, the largest corporate fine ever imposed in an antitrust prosecution was $2 million. By comparison, six antitrust defendants have now been fined $100 million or more, including a $500 million fine imposed on F. Hoffmann-La Roche for its leadership role in the international vitamin cartel. The $500 million fine has the distinction not only of being the highest fine ever imposed in an antitrust case, it is also the largest single fine imposed in a Department of Justice case for any crime under any statute. To date, the Division has obtained fines of $10 million or more against thirty-six companies, including six defendants in fiscal years 2001 and 2002 (partial) -- Mitsubishi Corp ($134 million/graphite electrodes); Bilhar International Establishment ($54 million/US AID construction); ABB Middle East & Africa Participations AG ($53 million/US AID construction); Sotheby's Holdings ($45 million/fine art auctions); Akzo Nobel Chemicals ($12 million/monochloroacetic acid); and Ueno Fine Chemicals ($11 million/sorbates). (See attached Chart of Sherman Act Violations Yielding a Fine of $10 Million or More.)

## C.  Longer Jail Sentences For Individual Offenders

Antitrust offenders are being sent to jail with increasing frequency, and for longer periods of time, than at any time in the Division's history. Nearly 50 years of imprisonment have been imposed on antitrust offenders in the last three years. During that time period, over 20 defendants were sentenced to incarceration for one year or longer. The average prison term in FY 2001 increased to nearly *15 months*.

In the last six months, a string of record-breaking jail sentences were imposed back-to-back-to-back on defendants convicted of antitrust and related offenses. As discussed in more detail below, the first two sentences were imposed on defendants convicted of bid rigging and other crimes associated with schemes to rig bids in the New York food distribution industry. Nicholas Penachio was sentenced to serve four years in prison and pay a $1 million fine and ordered, along with his company, to pay $4.2 million in restitution to the victims of the crimes.[1] Penachio's then-record prison sentence was topped when Melvyn Merberg, convicted two months later for his role in the same New York bid-rigging schemes, was sentenced to serve 63 months in prison and ordered to pay $2.2 million in restitution and $2 million in back taxes, penalties, and interest.[2] On January 22, 2002, these sentences were eclipsed in a prosecution bought by the Division and the Guam U.S. attorney's Office charging Austin "Sonny" Shelton, a former Guam government official, with orchestrating a bid-rigging, bribery, and money laundering scheme involving FEMA-funded contracts in Guam.[3] The official was sentenced to *10 years imprisonment*.

## III. Major International Enforcement Cases

Three of the Division's most notable international cartel prosecutions in 2001 were in industries as diverse as graphite electrodes manufacturing, wastewater treatment plant construction, and fine art auctions.

### A. Graphite Electrodes -- U.S. v. Mitsubishi

In February 2001, Mitsubishi Corporation was convicted, after a two-week trial in Philadelphia, of aiding and abetting a five-year conspiracy among the world's major manufacturers of graphite electrodes to fix prices and allocate sales volumes in the United States and around the world.[4] At sentencing, Mitsubishi was ordered to pay a fine of $134 million -- the fourth largest fine ever imposed in an antitrust case. In total, the Antitrust Division's graphite electrode investigation led to: the conviction of seven corporations and three individuals; over $400 million in criminal fines, including the highest antitrust criminal fine ever imposed on an individual ($10 million); and jail sentences ranging from 9 to 17 months. However, it is Mitsubishi's conviction that has perhaps the furthest-reaching implications.

The Mitsubishi prosecution and conviction is important, not for the additional entry the case provides on the list of corporations convicted and fined over $100 million for participating in international antitrust conspiracies, but for the precedent it sets on issues of fact and law and Division prosecutorial policy regarding aiding and abetting of price-fixing conspiracies. Mitsubishi did not manufacture graphite electrodes, but it owned 50% of the stock of a U.S. producer, UCAR International, and was also a trading house for several Japanese manufacturers. Mitsubishi aided the price-fixing cartel by encouraging UCAR to fix prices, facilitating cartel meetings, selling product

on behalf of manufacturers at prices it knew to be fixed, and concealing the existence of the conspiracy from customers, allowing the continuation of the conspiracy. Mitsubishi began facilitating the workings of the cartel within days of purchasing its UCAR ownership interest and continued facilitating the cartel even after it sold its ownership interest for a hefty profit. The Division's prosecution in these circumstances under the aiding and abetting statute confirms that the Division will hold accountable parent companies, organizational shareholders, joint venture partners, and/or trading houses if they knew of, assisted, and profited from a cartel.

Mitsubishi's $134 million fine was near the very top of its Guidelines fine range. The fine was based on the following calculations:

(1) Base Fine. *[U.S.S.G. §§ 2R1.1, 8C2.4.]*

| | |
|---|---|
| *50% of UCAR's volume of affected sales of graphite electrodes in the U.S. for the portion of the conspiracy period during which Mitsubishi owned 50% of UCAR (50% of $336,300,000)* | $168,150,000 |
| Mitsubishi's sales of graphite electrodes (manufactured by conspirator Tokai Carbon) to its only U.S. customer during the conspiracy. | $ 7,300,000 |
| Volume of Affected Commerce | $175,450,000 |
| Base Fine (20% of volume of affected commerce) | $ 35,090,000 |

(2) Culpability Score. *[U.S.S.G. §§ 8C2.5 and 8C2.6]*

| | |
|---|---|
| Base level *[§8C2.5(a)]* | 5 |
| 200+ employees and high-level personnel involved *[§8C2.5 (b)]* | +3 |
| Prior criminal history *[§8C2.5(c)]* | +2 |
| No effective program to prevent and detect violations *[§8C2.5(f)]* | 0 |
| No acceptance of responsibility *[§8C2.5(g)]* | 0 |
| Total Culpability Score | 10 |

(3) Minimum and Maximum Multipliers *[§8C2.6]* — 2.0 - 4.0

(4) Guidelines Fine Range *[§8C2.7]* [base fine x multipliers] — $70,180,000 - $140,360,000

(5) Fine Imposed — $134,000,000

As indicated in the calculations above, the volume of commerce attributable to Mitsubishi for its participation in the conspiracy was based on: (1) half of UCAR's

volume of affected sales in the United States during that portion of the conspiracy period when Mitsubishi owned 50 percent of UCAR's stock; plus, (2) the U.S. sales made by Mitsubishi as a trading house for another co-conspirator. This total was then multiplied by .20 (or 20 percent) to calculate Mitsubishi's base fine. The next step under the Sentencing Guidelines is to calculate the organization's culpability score and its minimum and maximum multipliers. Because of the involvement of a high-level Mitsubishi employee in the crime, the company's prior antitrust conviction, and Mitsubishi's failure to cooperate or accept responsibility for its criminal conduct, Mitsubishi received the maximum culpability score resulting in the highest minimum and maximum multipliers (2.0 to 4.0) allowable under Chapter 8 of the Sentencing Guidelines. The Division's recommendation to fine Mitsubishi near the top of its Guidelines range took into account the seriousness of the offense, the highly profitable nature of the scheme, the objective of divesting Mitsubishi of illegal pecuniary gains from the offense, and the further objective of promoting adequate deterrence to protect U.S. businesses and consumers from similar criminal conduct in the future. Mitsubishi's $134 million fine, which amounted to 76 percent of the volume of commerce attributable to it in furtherance of the conspiracy, hopefully met these objectives.

### B. Wastewater Treatment Plants -- Bid Rigging On U.S. AID Contracts

The Division's Egyptian wastewater treatment investigation is an example of an international cartel that focused its collusive conduct in another country, but still victimized U.S. taxpayers. The investigation targeted companies and individuals who rigged bids on water treatment construction contracts in Cairo, Egypt funded by the United States Agency for International Development ("U.S. AID"). These construction projects were funded by the United States as part of the 1970's Camp David Peace Accords in order to foster stability and promote public health in the Middle East. The cartel involved hardcore bid rigging that included payoffs to co-conspirators totaling millions of dollars in order to suppress competition and inflate prices on taxpayer-funded projects.

The investigation was assisted by two investigative tools that have become increasingly common in international cartel investigations. The first is the execution of search warrants by foreign authorities on the Division's behalf to seize evidence abroad. In this investigation, over 100 German police officers assisted in the simultaneous execution of search warrants on multiple companies at locations across Germany. Germany is one of numerous countries to assist the Division in recent investigations by executing search warrants in response to assistance requests from the Division. Another tool in this investigation was the use of border watches. When a foreign executive was nabbed while entering the country, the individual was taken before a grand jury and his cooperation significantly advanced the investigation.

In July 2001, the Division obtained indictments against the U.S.-based company Bill Harbert International Construction, Inc. ("BHIC"); its Liechtenstein affiliate, Bilhar International Establishment ("Bilhar"); Bilhar's former president, Roy Anderson; and Peter Schmidt, a former executive of Philipp Holzmann AG ("Holzmann"), for rigging bids and conspiring to defraud U.S. AID on over $250 million of construction work on

the U.S.-funded projects in Egypt. On the eve of trial, Bilhar agreed to plead guilty and pay a $54 million fine. [The case against BHIC was dismissed as part of the plea agreement with Bilhar.] Anderson went to trial and was convicted by an Alabama jury. His sentencing is scheduled for May 16, 2002. Schmidt remains a fugitive. In addition to these indictments, the Division brought cases against U.S.-based American International Contractors, Inc.; ABB Middle East & Africa Participations AG of Switzerland ("ABB"); and Holzmann, all of which pled guilty to bid rigging on U.S. AID construction contracts in Egypt and received fines of more than $87 million. In addition, ABB and American International Contractors agreed to pay more than $10 million in restitution to the U.S. government.

At sentencing, the court not only imposed a term of probation on both Holzmann and ABB, but also imposed, as one of the conditions of their probation, the following requirement:

> "The defendant shall publicize at its expense in the Wall Street Journal and in the New York Times in prominent, one-quarter page advertisements within ten days of the date of conviction the nature of the offense committed by the defendant in this case, the fact of conviction, the sentence imposed in this case, and the steps that will be taken to prevent the recurrence of similar offenses."

A copy of Holzmann's statement published in the New York Times in compliance with the court order is attached. The Division will seek similar orders in appropriate cases.

### C.  Fine Art Auctions -- U.S. v. Alfred Taubman

The art auction price-fixing scheme, plotted by the world's two dominant auction houses through their top executives and exposed by the Division, received unprecedented coverage by the media. For generations, the Sotheby's and Christie's auction houses were known publicly as archrivals that competed vigorously on commissions and other terms in the fine arts auction business. Contrary to public perception, however, for most of the 1990s top officials of the two firms, which controlled more than 90 percent of the world's auction business, in fact had colluded in secret to defraud the sellers of art, antiques, and collectibles who had entrusted those firms with the sale of their merchandise. The criminal scheme injured both art and antique dealers and individuals selling their personal possessions. The scheme involved agreements on the sellers' commissions charged by the auction houses. Sellers' commissions are fees charged by the auction houses to the owners of art items for the sale of their goods. Prior to the conspiracy, sellers were often able to negotiate with the auction houses for commissions that were far below the firms' published commission rate schedules. But, when the conspiracy began, top officials of the two auction houses met in secret in the United States and Europe in order to limit competition for the sellers' goods by agreeing to raise sellers' commissions and to cease negotiating discounts from the published rate schedules.

The cartel was cracked, in large part, by the cooperation of Christie's and its executives who reported the criminal conduct pursuant to the Division's Corporate

Leniency Program. Christie's defection from the cartel led directly to guilty pleas by Sotheby's and the company's president and chief executive officer at the time of the conspiracy, Diana D. Brooks, who admitted to fixing the price of sellers' commissions charged in the United States and elsewhere. Sotheby's was sentenced to pay a $45 million fine, and Brooks is awaiting sentencing. In May 2001, the Division indicted Alfred Taubman, former chairman of the board of Sotheby's Holdings, Inc., and Anthony Tennant, former chairman of the board of Christie's International plc, for fixing sellers' commissions charged in the United States and elsewhere. Taubman was convicted at trial in December 2001. Tennant is a U.K. citizen who has refused to submit to U.S. jurisdiction and remains an international fugitive.

Taubman's trial was closely tracked by the defense bar as well as the media. This was the first trial where the Division relied heavily on testimony from a witness protected by a Corporate Amnesty agreement. The defense team aggressively cross-examined the witness about the grant of amnesty to his former employer as well as the terms of his non-prosecution agreement. The guilty verdict in this case demonstrates that evidence from an amnesty recipient can be very persuasive to a jury. Taubman's sentencing is scheduled for April 2, 2002.

## IV. Major Domestic Enforcement Cases

The Division also has remained active on the domestic front. Two of its most publicized domestic investigations, the New York food brokers investigation and the Guam FEMA construction investigation, focused on local bid-rigging conspiracies that defrauded public agencies. In these two investigations, the Division uncovered and prosecuted, in addition to the Sherman Act violations, other offenses such as tax violations, bribery, and money laundering. Such collateral offenses often accompany bid-rigging conspiracies, and the Division has aggressively prosecuted such offenses in conjunction with antitrust crimes. Finally, as discussed below, the Division recently prosecuted Moody's Investors Service, Inc. for obstructing justice by destroying documents responsive to a Civil Investigative Demand ("CID") that was issued in connection with an investigation of Moody's business practices. The case was the first of its kind by the Division under 18 U.S.C. § 1505.

### A. New York Food Brokers Investigation

To date, 31 individuals and 15 companies have been convicted for participating in massive bid-rigging conspiracies among food suppliers which defrauded multiple New York-area public and non-profit entities, including New York City schools, children's facilities, homeless shelters, hospitals, and jails; Newark, New Jersey schools; and Nassau County, New York jails. These fraudulent schemes affected contracts valued at more than $210 million. The bid-rigging conspiracies involved not only the usual agreements on price levels and allocations of contracts but also a slush fund totaling hundreds of thousands of dollars, which was used to pay off potential competitors to bid high, or not to bid at all, on contract solicitations that other conspirators were slated to win. In addition, many of the defendants also engaged in, and were charged with, multiple collateral crimes, including tax and conspiracy offenses related to the nonreporting of payoffs, kickbacks, and "off the books" compensation; obstruction of justice related to document destruction or

concealment; and fraud offenses involving payment of kickbacks and fraudulent procurement of loans.

All but two of the 46 defendants charged in the investigation ended up pleading guilty. The two exceptions, a company and one of its owners charged with bid rigging on frozen food contracts for the New York City schools, were convicted after trial in June 2001. In October 2001, the individual defendant was sentenced to serve 18 months in prison and to pay a $60,000 fine and the corporate defendant was ordered to pay $540,000 in restitution. At sentencing hearings held in the investigation thus far, 19 food company executives have been sentenced to prison, more than half of whom have been sentenced to prison sentences of 12 months or longer, including one executive who was sentenced to a then-record 63 month jail term. In addition, the court imposed more than $20 million in restitution for the New York City Board of Education and other victims, which contributed to a record amount of restitution imposed in Division cases in fiscal year 2001. Sentencing hearings for the remaining defendants are scheduled through July 2002.

## B. Bid-Rigging on FEMA-Funded Contracts in Guam

The Division, in a bid-rigging and public corruption investigation conducted jointly with the Guam U.S. Attorney's Office, has thus far charged six individuals in connection with multiple schemes to rig bids for the repair of damage caused by supertyphoon Paka in 1997. In this ongoing investigation, the most significant conviction to date has been that of Sonny Shelton, who was the Director of Guam's Department of Parks and Recreation and was responsible for awarding contracts to repair the typhoon damage. At Shelton's trial, four co-conspirators who had pled guilty to bid-rigging charges testified against him. A fifth co-conspirator who was scheduled to go to trial in March recently pled guilty to bid-rigging charges.

Shelton was convicted of organizing three separate bid-rigging conspiracies. Additionally, Shelton was convicted of soliciting and receiving bribes in excess of $100,000, committing wire fraud, and conspiring to launder money. Shelton is the highest-ranking official to have been convicted of such crimes in Guam in over a decade. The indictment and prospective trial received intense pretrial publicity on the island, which led the defense to file a motion for change of venue and the government to request that the jury be sequestered during deliberations. The court denied the change of venue motion. However, the court *ordered sequestration, not just during deliberations, but for the duration of the three-week trial*. In making this determination, the court cited the ongoing publicity, the defendant's visibility and importance in the community, the defendant's long-time presence in Guam, the importance of extended family connections on the island, and the general interconnected nature of the local population (and the jury pool).

Following the trial, the prosecutors and the Probation Office separately submitted Sentencing Guidelines calculations in support of sentencing level 27 (70-87 months). The court thereafter informed the parties that it intended to *depart upward* from level 27 on the bribery counts, and it requested briefs on the merits of such a course. The Guidelines for bribery note that where the defendant's conduct was "part of a systematic or pervasive corruption of a governmental function" an upward departure is appropriate. The government filed a brief requesting the court to make

findings that established the defendant's systematic corruption of the governmental bidding process. At the sentencing hearing the Court received testimony on the upward departure issue, departed upward, and sentenced Shelton to serve ten years in prison.

### C. U.S. v. Moody's -- Obstruction Of Justice

On April 10, 2001 the Division prosecuted Moody's Investors Service, Inc., the largest credit ratings agency in the United States, for obstructing justice by destroying documents responsive to a Civil Investigative Demand ("CID") that was issued in connection with an investigation of Moody's business practices. The case was the first of its kind by the Division under 18 U.S.C. § 1505. The investigation revealed that a Moody's employee deliberately destroyed responsive documents after learning of the CID. This misconduct was further exacerbated by the fact that Moody's later certified that it had produced all responsive documents, even though Moody's executives knew of, or should have known of, the destruction. Moody's reported the document destruction to the Division. However, it did not do so until nearly two years after the fact and a full year after certifying full compliance with the CID. Moreover, the disclosure was made only after Division attorneys had asked other witnesses about compliance with the CID and the Division had scheduled the depositions of witnesses who had knowledge of the destruction. Moody's pled guilty to the charge and was sentenced to pay a $195,000 fine for obstruction of the CID process.

### V. Widespread Interest Abroad In Following The Antitrust Division's Corporate Leniency Policy As A Model

The Division's Corporate Leniency Program -- which provides for a complete pass from prosecution for companies and their executives who are the first to come forward, cooperate, and meet the program's other requirements -- has played a major role in cracking the majority of the international cartels that the Division has prosecuted. [See attached Status Report: Corporate Leniency Program.] The extraordinary success of this program has generated widespread interest around the world. As a result, we have advised a number of foreign governments in drafting and implementing effective leniency programs in their jurisdictions. In the last few years, countries such as Canada, Brazil, the United Kingdom, Germany, France, Ireland, The Czech Republic, and Korea have announced new or revised leniency programs, with still other countries in the process of following.

The adoption of effective leniency programs by foreign antitrust enforcers has a direct impact on the Division's efforts to prosecute international cartels, because the existence of an effective leniency policy in another jurisdiction may influence whether an organization comes forward under the leniency program in the United States.[5] In some cases, companies who have exposure in multiple jurisdictions for their cartel conduct may want to simultaneously seek immunity in the jurisdictions where they are at risk. If differences exist in the respective leniency programs such that a company believes that it can not be assured of immunity in the jurisdiction where it faces the greatest, or even just significant, exposure, then it may decide against reporting its conduct anywhere. Nowhere is the need for convergence in leniency programs more important than between the U.S. and European

Commission ("EC") leniency programs.[6] Up until now, there have been significant differences in the application of our respective leniency programs. Fortunately, these differences, and the concerns that they have raised, are ending.

## A. **The EC's Revised Leniency Program**

On February 13, 2002 the EC adopted a new leniency policy to replace its 1996 Notice on the Non-Imposition or Reduction of Fines in Cartel Cases ("1996 Notice").[7] The revised program establishes a far more transparent and predictable policy than its predecessor and brings the EC's program closely in line with the Division's Corporate Leniency Policy. In fact, in greatly reducing the amount of discretion involved in assessing amnesty applications and in creating the opportunity for companies to qualify for full immunity after an investigation has begun, the blockbuster revisions are similar to the ones made by the Division when we successfully expanded our program in August 1993.[8]

Requirements For Full Immunity. The EC's revised program promises complete immunity from fines to the first member of the cartel to inform the EC of an undetected cartel by providing sufficient information to allow the EC to launch an inspection on the premises of the suspected companies. In addition to being the first company to report the cartel activity, the immunity applicant must also: (1) provide full and continuous cooperation, (2) end its involvement in the infringement, and (3) not have taken any steps to coerce other companies to participate in the cartel.

If a company does not come forward until after the EU commences an investigation, full immunity may still be available under the revised program. In order to qualify for full immunity in these circumstances, the company must provide the EC with sufficient evidence to enable it to establish an infringement as well as meet the three other requirements listed above -- full cooperation, prompt termination of wrongdoing, and no coercion of others. Full immunity after an investigation is opened will only be available in cases where no other cartel member has qualified for immunity by initially reporting the cartel activity to the EC.

Expanding the program to allow the prospect of full immunity after an investigation has begun is a major change for the EC. Under the 1996 Notice, companies contemplating whether to come forward after an investigation had begun could only qualify for a maximum discount of between 50 to 75 percent off of their fine. Full immunity will serve as a powerful new inducement to create a race to Brussels every time the EC reveals one of its investigations with the execution of dawn raids. It certainly has been the case in the United States where investigations of suspected international cartels involving vitamins, graphite electrodes, fine art auctions, US AID construction contracts, and many others were cracked with the assistance of amnesty applicants that came forward after the Division opened an investigation.

Full vs. Partial Immunity. Another striking change made by the EC is that it has changed its band or sliding scale approach when rewarding the first company to report cartel activity in favor of an automatic full, 100 percent immunity grant. Under the EC's 1996 Notice, a company that reported wrongdoing before an investigation had begun, and met the program's other requirements, was eligible for a reduction in

fines ranging from 75 percent to 100 percent. (The potential reduction dropped down to between 50 percent and 75 percent if the company met all of the program's conditions, but came forward only after the EC opened an investigation.) However, since the EC fine guidelines mandate that an organization's potential fine exposure is up to 10 percent of the worldwide turnover for all products sold by the company, the difference between full (100%) and partial (75%) amnesty could be very striking. The EC's new program provides certainty together with a bigger prize for coming forward by promising full, 100 percent immunity to the first company to qualify under the leniency program.

Prompt Feedback In The Application Process. The EC has adopted a new process for handling requests for immunity that will greatly increase the level of certainty and transparency for applicants. Under the 1996 Notice, companies which came forward and sought immunity in exchange for their cooperation received no assurances up-front as to how much credit they would receive for their cooperation and had to wait until the very end of the case when the EC announced the disposition of all of the parties to learn how it fared. However, under the new program, the EC has committed itself to promptly notify a company in writing whether it conditionally qualifies for full immunity. As is the case under the Division's program, a written conditional grant of immunity is conditioned on the applicant meeting the programs' other requirements. In the EU, this means full and continuous cooperation, prompt termination of the wrongdoing, and no evidence of coercion of other cartel members by the applicant.

Changes To The Role In The Offense Requirement. Another significant change relates to a redrafting by the EC of the "role in the offense" requirement for obtaining full immunity. A condition of the 1996 Notice was that a company not have acted as "a" ringleader or "an" instigator or played "a" determining role in the cartel. This language differed from the Division's policy which states that the applicant must not have coerced another party to take part in the offense and must not have been "the" instigator or "the" leader of the illegal activity. Thus, under the Division's program, applicants will only be disqualified from obtaining total amnesty if they are clearly the single organizer or single ringleader of a conspiracy.[9] While under the EC's old program, there was a far greater degree of prosecutorial discretion involved and more than one company (or even, potentially, all of the companies) could be viewed as ineligible for full immunity in a given cartel. Of course, the cost of retaining greater discretion may have been that potential applicants were leery about seeking immunity in the EC because of uncertainty as to how the EC would apply this standard.

Fortunately, the EC's new program narrows the class of cartel members which would be ineligible under the program and makes it easier for companies to predict with certainty whether they qualify for full immunity. The revised program does not exclude from full immunity those cartel members that played an instigating or determining role, rather it simply requires that the leniency applicant not have taken steps "to coerce other undertakings to participate in the infringement." This change eliminates the uncertainty that existed in the old program and creates a greater opportunity for companies to qualify for full immunity.

## B. The EC's Commitment To Rewarding Leniency Applicants

With a flurry of cases announced over the last three months, the EC set the stage for its new leniency program by demonstrating a clear commitment to rewarding companies who are the first to come forward and report cartel activity, while at the same time imposing heavy fines on those who engage in cartel activity and do not provide timely cooperation. Until November 2001, the EC had never granted full, 100% immunity to a company that came forward and cooperated pursuant to its 1996 Leniency Notice. The EC then did it twice within a month, and it did so in two of the biggest cartel matters ever investigated by the EC.

The first 100% leniency grant was awarded in the EC's investigation of the worldwide vitamin cartel.[10] The French corporation, Aventis S.A., was granted full immunity in regard to its participation in the vitamin A and E cartels after being the first company to cooperate with the EC in these matters. On November 21, 2001, the EC fined eight companies a total of more than 850 million euro for participating in cartels affecting vitamin products, including fines of 462 million euro against F. Hoffmann-La Roche AG ("HLR") and 296 million euro against BASF AG.[11] Aventis, which has previously announced its acceptance into the Division's leniency program, likely avoided hundreds of millions of dollars in fines in the U.S. and Europe as a result of its decision to come forward and seek leniency. In addition, unlike both HLR and BASF which had three of their high-level European executives serve time in U.S. prisons, the officers, directors and employees of Aventis received non-prosecution protection in exchange for their cooperation with the Division.

Shortly after the vitamin fines were announced, the EC announced its second-ever grant of full immunity to Sappi Limited (South Africa) after the company came forward and supplied information on a price-fixing cartel in the European carbonless paper market.[12] While Sappi, which was identified by the EC as one of the three largest companies in the cartel, paid nothing in fines, the EU imposed fines against ten other companies totaling over 310 million euro, including a 184 million euro fine against Arjo Wiggins Appleton, the alleged leader of the cartel.

The EC's timing in announcing these cases on the eve of its introduction of its revised leniency program is perfect. While the new program on paper is a tremendous improvement in terms of the level of transparency that it provides to potential leniency applicants, the real test is how it is implemented -- which is why these recent cases are so important. They demonstrate that the EC is committed to fairly rewarding leniency applicants who are the first to report cartel activity with full immunity. This signal was clearly sent even before the new policy went into effect. I have no doubt that the EC's message, together with the revised leniency program, will lead to a substantial increase in the number of firms reporting international cartel activity to both authorities.

## VI. Cracking Down On Hardcore Cartels Abroad

The high-profile nature of some of the Division's international prosecutions -- such as the lysine, vitamin, and fine art auctions cases -- and the massive fines that have been imposed have grabbed the attention of foreign governments, as well as business and consumer groups around the world. This focus has caused many governments to question: (1) whether they had sufficient penalties in place to deter

cartel activity; (2) whether their antitrust authorities had the necessary investigative tools to detect cartel activity when it occurs; (3) whether cartel activity should be treated as an administrative violation or a criminal offense; and (4) whether individuals, as well as corporations, should be punished for participating in cartel offenses?[13] The United Kingdom and Brazil are two prime examples of countries that have grappled with these issues over the last few years and have instituted dramatic changes in their cartel enforcement programs.

In March 2000, the British government implemented a new competition law that prohibited cartels and other anti-competitive behavior and gave its Office of Fair Trading new investigative powers and expanded resources for detecting cartel activity. The new civil powers included the creation of a corporate leniency program modeled after the Division's program. The Competition Act also imposed a fining scheme that will lead to stiff penalties of up to 30 percent of a company's U.K. annual turnover for violators. Little more than a year later, the U.K. and U.S. governments agreed to remove a "side letter" to the U.K.-U.S. Mutual Legal Assistance Treaty ("MLAT") which had excluded antitrust matters from the scope of the cooperation provisions of the MLAT. The types of assistance in antitrust matters that the U.K. can now provide to the Division include the use of the U.K. courts to take testimony from witnesses, obtain documents, and assist in the collection of criminal fines. Finally, in November 2001, the U.K. government proposed legislation that would create a new criminal offense for individuals who engage in hardcore cartel activity. The proposed law would provide for maximum jail sentences of up to five years for antitrust offenders. The criminalization of cartel offenses in the U.K. may also make it possible in the near future to extradite individuals involved in cartels from the U.K. to face antitrust charges in the United States.

The Brazilian government has advanced the fight against cartels in the face of reduced investigative resources and a lack of a culture of competition, a common scenario in many countries around the world. Increased competition advocacy in Brazil has enhanced the culture of competition in the business community and society in general and, in turn, increased the demand for anti-cartel enforcement. Hence, two government initiatives have promoted the effort to detect, and obtain evidence of, cartels. First, the government recently enacted a leniency program for individuals and organizations which should encourage cartel members to confess and cooperate with competition authorities. Second, Brazilian antitrust agencies are scheduled to sign a cooperation agreement with the federal police that will provide additional resources through police assistance in antitrust cases. This assistance will be of particular importance during searches, increasing their effectiveness. In addition, the Brazilian government has taken measures to clarify the law relating to cartel agreements, which will assist competition authorities and the courts in enforcing and applying the law. One such measure is proposed legislation to make cartel agreements per se illegal, which will aid in deterring and more efficiently prosecuting cartel activity. Another measure will clarify the type of agreements that constitute criminal offenses. Under the proposed legislation, only traditional hardcore cartels will be considered a crime.

To foster cooperation with foreign governments with respect to the investigation and prosecution of international cartels and other aspects of antitrust enforcement, the Division has in the last few years entered antitrust cooperation agreements with four

foreign governments -- Japan, Brazil, Israel, and Mexico. The agreements complement agreements previously reached with Australia, Germany, Canada, the European Union, and Israel. In addition, in the last fiscal year, the Division's International Antitrust Enforcement Assistance Agreement with Australia became effective. This agreement is a comprehensive antitrust mutual legal assistance agreement which allows the two countries to exchange evidence and assist each other's antitrust investigative efforts.

## VII. Conclusion

Now more than ever, those that engage in international cartel activity face an increasingly greater risk of detection, prosecution, and punishment by antitrust authorities in the United States, Europe, Canada and around the world. Antitrust enforcers have taken a page from the cartel handbook by coordinating investigative strategy, cooperating in evidence gathering, and learning from each other by sharing "best practices." This "harmonization" stems from a growing global consensus that cartel activity needs to be deterred and punished. Countries that used to wink at cartel enforcement are now drafting new laws, allocating additional resources, and developing aggressive policies aimed at fighting cartels. If you practice in this area, be advised -- more changes are ahead.

Attachment 1 --- Status Report: International Cartel Enforcement
Attachment 2 --- Status Report: Criminal Fines
Attachment 3 --- Status Report: Corporate Leniency Program
Attachment 4--- Sherman Act Violations Yielding a Fine of $10 Million or More

## FOOTNOTES

1. U.S. v. Nicholas A. Penachio et al., S2 00 Cr. 584 (JSR) (S.D.N.Y.).

2. U.S. v. Melvyn Merberg, S1 00 Cr. 1176 (LTS) (S.D.N.Y.).

3. U.S. v. Austin J. "Sonny" Shelton, CR 01-00007 (Territory of Guam).

4. U.S. v. Mitsubishi Corporation, Crim. No. 00-033 (E.D. Pa.).

5. See, Scott D. Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" Fifteenth Annual National Institute On White Collar Crime (March 8, 2001), *available at* http://www.usdoj.gov/atr/public/speeches/7647.htm.

6. Antitrust Division, U.S. Department Of Justice, Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/atr/public/guidelines/lencorp.htm.; Commission Notice on the Non-Imposition or Reduction of Fines in Cartel Cases, 1996 O.J. C 207) 4. Commission notices are available at http://europa.eu.int/eur-lex/en/search/search_oj.html.

7. Commission Notice on Immunity from Fines and Reduction of Fines in Cartel Cases, 2002 O.J. C 45) 3.

8. Since the EC only fines companies and not individuals for their participation in cartel activity, the EC's program does not include a promise of non-prosecution for officers, directors, and employees who come forward with the company and agree to cooperate -- the third major revision to the Division's program.

9. For example, if there are two ringleaders in a five-firm conspiracy, then all of the firms, including the two leaders, are potentially eligible for amnesty. Or, if in a two-firm conspiracy, each firm played a decisive role in the operation of the cartel, both firms may qualify for amnesty.

10. Press Release, European Commission, Commission Imposes Fines on Vitamin Cartels 4 (November 21, 2001). Commission press releases are available at http://europa.eu.int/rapid/start/cgi/guesten.ksh.

11. The Division's prior prosecution of the vitamin cartel has resulted, to date, in the conviction of 10 corporations and 12 individuals, the imposition of nearly $900 million in fines, and the incarceration of 11 vitamin executives.

12. Press Release, European Commission, Commission Fines Ten Companies for Carbonless Paper Cartel 4 (December 20, 2001).

13. For example, legislative changes affecting hardcore cartel enforcement have been recently proposed or enacted in Sweden, Spain, the Czech Republic, Canada, Denmark, Switzerland, the United Kingdom, and Brazil. Leniency Programs have been revised or enacted in the EC, the United Kingdom, Canada, Sweden, the Czech Republic, and Brazil. Other recent developments over the last year include: record breaking fines in the EC (vitamins) and Australia (vitamins); the first-time imposition of jail sentences for antitrust offenders (Israel); and the establishment of specialized cartel units (Finland).