# Exhibit 30



# THE STATUS REPORT

*News from the Atlanta Field Office of the Antitrust Division*

October 2002

## Chief's Corner

by Nezida S. Davis



Hello again and thank you for reading our 2002 edition of **The Status Report: News from the Atlanta Field Office.** The goal of this newsletter is to share with investigative agents and purchasing officials the latest news and criminal antitrust enforcement information that will help you learn how to detect anticompetitive schemes. Since it has been a while since the last edition came out, I will give you a quick refresher on who we are and what we do. The Atlanta Field Office primarily is responsible for enforcing the federal antitrust laws in seven Southeastern States (Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina and Tennessee), Puerto Rico, and the U.S. Virgin Islands. However, we also investigate cartel activity that is national or international in scope. Our primary mission is investigating and prosecuting criminally such cartel activities as price fixing, bid rigging, and customer or territorial allocation under the Sherman Act. 15 U.S.C. § 1. Violation of the (continued on page 2)

## What's Inside . . .

Feature                                                      Page
Atlanta Field Office Highlights...............................7
Chief's Corner.................................................1
Detecting Criminal Antitrust Violations ..................4
Division Highlights.........................................1
For Your Information.......................................8
Graphite Electrodes: A Case Study.........................6

## Division Highlights

For the fiscal year ending September 30, 2002, the Antitrust Division filed 33 cases against 13 corporations and 32 individuals. Fines obtained for the 2002 fiscal year totaled more than $76.1 million. At the end of the fiscal year, the Division had 98 grand juries and 87 preliminary inquiries pending to investigate criminal antitrust and related federal violations. Listed below are some of the Division's recent case highlights:

### Worldwide Vitamins Cartel



For the past several years, the Division's Dallas Field Office has been investigating the largest cartel ever uncovered by the Division -- the vitamins price-fixing conspiracy. This was a sophisticated cartel that was able to carve up the billion-dollar vitamin market among a few multi-national companies and reap huge illicit profits for nearly ten years. Nearly a billion dollars in criminal fines has been imposed against the cartel members, including a $500 million fine imposed against F. Hoffmann La Roche and a $225 million fine imposed on BASF AG. The $500 million fine is the largest ever imposed in a Department of Justice criminal case of any kind. In addition, eleven executives, including six Europeans, were sentenced to serve time in U.S. prison for their roles in this conspiracy. The vitamin producers also paid hundreds of millions of dollars in civil damages to the victims.

(continued on page 2)

*Chief's Corner* (continued from page 1)

Sherman Act is a felony punishable by a fine of up to $10 million for corporations and up to $350,000 or 3 years imprisonment (or both) for individuals. These maximum fines may be increased to twice the gain derived from the crime or twice the loss suffered by the victims of the crime, if either of those amounts is greater than the statutory maximum fine. We also prosecute the following criminal offenses where they arise from the grand jury investigation into anticompetitive conduct: mail fraud, wire fraud, obstruction of justice, conspiracy to defraud the government, major fraud against the government, false statements violations, and perjury.

This newsletter has an update on some of the latest investigations and cases in the Atlanta Field Office and the Antitrust Division as a whole. I also invite you to check out our web cite. It is a great way to keep up with what is going on in the Division between issues of the newsletter. We recently have revamped the site to include a report violations section that has greatly increased the number of "hits" by people interested in submitting a complaint about a civil or criminal antitrust violation. Elsewhere on the site, you can read the latest press releases, print the text of a recent speech by a top official, get the address and telephone number of one of the Division's field offices, or download a pamphlet on "Antitrust Enforcement and the Consumer." The address of the Division's web site is *www.usdoj.gov/atr*. Please book mark it and visit often.

This newsletter represents our attempt to build a stronger working relationship with agents and procurement officials in our region and to keep all of you informed of current developments relating to criminal antitrust investigations. You can continue to assist us in the criminal enforcement of the antitrust laws by identifying and referring to the Atlanta Field Office matters in which you suspect collusion among bidders or providers of services.

> Nezida S. Davis is the Chief of the Atlanta Field Office, which has 15 attorneys, 9 paralegals, a detailed FBI agent, and 8 additional support staff.

## DIVISION HIGHLIGHTS
*(continued from page 1)*

### Graphite Electrodes Investigation Leads to Third and Fourth Largest Antitrust Fines Ever

The Philadelphia Field Office has successfully prosecuted a number of the participants in an international conspiracy to fix the prices of graphite electrodes. (See the case study on page 6). Graphite electrodes are large columns used in steelmaking. The electrodes generate the intense heat necessary to melt scrap and further refine steel. Total sales of graphite electrodes were more than $1.7 billion during the term of the conspiracy. Seven companies have been convicted and ordered to pay a total of more than $400 million in fines, including SGL Carbon AG, which was fined $135 million. Two top executives received jail sentences and a third was ordered to pay a $10 million personal fine.

The case against one of the companies, Mitsubishi Corporation, was unusual in that it was charged with aiding and abetting. Mitsubishi did not actually produce graphite electrodes, but assisted the producers in carrying out the conspiracy, by, among other things, facilitating meetings and communications among conspirators and selling graphite electrodes it bought from the conspirators at prices it knew to be fixed. Mitsubishi was convicted after trial and fined $134 million.

### Former Chairman of Sotheby's & Christie's Auction Charged in Price-Fixing Conspiracy

In May 2001, a grand jury in Manhattan indicted the former chairman of Sotheby's Holdings, Inc. & Christie's International plc, the two largest auction houses in the world, for fixing commission rates charged to sellers of works of art, jewelry, and furniture at auctions. A. Alfred Taubman, former chairman of Sotheby's, and Sir Anthony J. Tennant, former chairman of Christie's, were charged with fixing commission rates to *(continued on page 3)*

THE STATUS REPORT                                                                                                    Page 3

## DIVISION HIGHLIGHTS
*(continued from page 2)*

sellers from 1993 to 1999. During the six-year international conspiracy, Sotheby's and Christie's charged sellers in the United States at least $400 million in commissions.

### The Fine Art Auction Trial:
### The Billionaire, The Movie Star, and The Rigged Masterpieces

In early November 2001, Alfred Taubman, 76, went on trial in Manhattan for fixing prices of commissions charged to sellers of fine art at auctions. Taubman, who reportedly was a billionaire at one time and was worth over $700,000 million when the trial began, is one of the wealthiest individuals ever to go on trial on a felony charge in the United States. He is a shopping center magnate from Michigan and also was part owner and chairman of the art auction house, Sotheby's. A New York grand jury indicted Taubman for concocting a scheme in 1993 with his counterpart, Anthony Tennant, chairman of the other large auction house, Christie's, to inflate and fix the commission rates charged by the two companies to sellers who turned fine art over to one of the companies to be auctioned. Between them, Christie's and Sotheby's controlled over 90% of the world's art auctions. Sir Anthony, who also was indicted, decided not to come to the United States to answer the charges and could not be extradited under British law. He remains an international fugitive.

A trial attorney from the Antitrust Division's New York Field Office told the jurors that Taubman and Tennant worked out the price-fixing arrangement in a series of secret, one-on-one meetings beginning in 1993. The defense team from the silk-stocking law firm of Davis Polk & Wardwell did not deny that the meetings took place mostly at Taubman's New York apartment or his flat in London, but they claim that there were legitimate topics for the two men to discuss. In addition to the evidence of the secret meetings, the government offered the testimony of its star witnesses, Diana (DeDe) Brooks and Christopher Davidge, the former CEOs of Sotheby's and Christie's, respectively. Brooks ran the day-to-day business of Sotheby's during the conspiracy period and was known as the most powerful woman in the art world. Actress Sigourney Weaver, who is playing Brooks in an upcoming TV movie about the case, sat in the packed courtroom while Brooks testified and studied her mannerisms. Brooks said that Taubman had given her direct orders to meet with her counterpart, Davidge, to get prices up, because the two companies were killing each other. Davidge testified that his boss, Sir Anthony, told him about the deal with Taubman and instructed him to get with Brooks and work something out. The lead defense lawyer, Roy Fiske, played on Taubman's age and argued to the jury that Taubman did not have a grasp of the day-to-day business at Sotheby's, paid little attention to the financial numbers, sometimes fell asleep during important meetings, and seemed more interested in what was for lunch than the business being discussed at the meetings. Lead prosecutor John Greene scoffed at this characterization and called it the "dumb and hungry" defense. Greene told the jury "you don't become a millionaire or billionaire without being able to read the bottom line."

After three weeks of trial, Taubman was found guilty by the jury. He was sentenced to serve a year and a day in jail and fined $7.5 million. In a separate private lawsuit, the two companies agreed to pay a $537 million settlement to the customers who were overcharged by the scheme. Sotheby's had earlier pled guilty to a criminal charge and was fined $45 million. Brooks also pled guilty and was sentenced to serve six months home confinement, three years probation, 1000 hours of community service and was fined $350,000. Christie's and Davidge avoided prosecution because Christie's confessed and qualified under the Antitrust Division's amnesty program.

# DETECTION OF CRIMINAL ANTITRUST VIOLATIONS

## Conditions Favorable for Collusion

Any one or a combination of the following conditions may make the market environment ripe for collusion:

- A small number of competitors or a few dominant ones;
- Recurrent purchases on which the same group of suppliers regularly bid;
- The competitors know each other well, through social connections, trade associations, legitimate business contacts or shifting employment from one company to another;
- The product is standardized and basically interchangeable, such as cement, milk, gasoline, or bread (not a high-tech product); and
- The bidders congregate in the same building or town to submit their bids, providing opportunity for last-minute communications.

## Bid Rigging

### Basic Schemes



One of the most common violations the Division prosecutes is bid rigging. In simple terms, bid rigging is fraud which involves bidding. It is an agreement among competitors as to who will be the winning bidder. Bid rigging occurs when a purchaser solicits bids to purchase goods or services. The bidders agree in advance who will submit the winning bid. The purchaser, which depends on competition between the bidders to generate the lowest competitive price, receives instead a "lowest bid" that is higher than the competitive market would bear.

There are four basic schemes involved in most bid-rigging conspiracies:

- ◆ *Bid Suppression:* In this type of scheme, one or more competitors agree not to bid, or withdraw a previously submitted bid, so that a designated bidder will win. In return, the non-bidder may receive a subcontract or payoff.

- ◆ *Complementary Bidding:* In this scheme, co-conspirators submit token bids which are intentionally high or which intentionally fail to meet all of the bid requirements in order to lose a contract. "Comp bids" are designed to give the appearance of competition.

- ◆ *Bid Rotation:* In bid rotation, all co-conspirators submit bids, but by agreement, take turns being the low bidder on a series of contracts.

- ◆ *Customer or Market Allocation:* In this scheme, co-conspirators agree to divide up customers or geographic areas. The result is that the co-conspirators will not bid or will submit only complementary bids when a solicitation for bids is made by a customer or in an area not assigned to them. This scheme is most commonly found in the service sector and may involve quoted prices for services as opposed to bids.

### Determining the Winner

Participants can decide who wins a particular contract using a number of allocation standards, including:

- ❏ Rotating contracts so that each will win an equal dollar volume over time;
- ❏ Rotating so that each will win an equal number of contracts over time;
- ❏ Allocating based on overall market share;
- ❏ Dividing up by territory, such as giving each company the accounts closest to its headquarters;
- ❏ Dividing up by type of customer, such as one taking federal accounts and the other taking state accounts; and
- ❏ On the basis of need -- splitting up the business so that each company keeps its assembly line or equipment fully occupied.

*(continued on page 5)*

THE STATUS REPORT                                                                                              Page 5

## Detecting Criminal Antitrust Violations
*(continued from page 4)*

### Payback

If a company agrees to intentionally lose business, naturally it must be given some compensation by the winning company. That compensation can take several forms including:

- The loser will be promised that it can win another contract later (this is the most common payback);
- The winning contractor may give a subcontract or supply a contract to one or more of the losers; or
- There may be a direct payoff in the form of goods, cash, or check, normally disguised as a legitimate payment.

### Suspicious Indicators:

- You receive identical bids from different companies either as to individual line items or lump sum bids;
- Bids come in way above the agency's estimate for the value of the contract or way above comparable bids by the same companies in other areas;
- A winning bidder subcontracts part of the business to one or more losing bidders;
- There is some indication of a physical alteration of bids, particularly at the last minute;
- Particular line items for some bidders are much higher than for others (no relation to cost);
- The range of bids shows a clear gap between the winner and all others (could be a number-to-bid-above situation);
- You notice the same increment between the bids of each company;
- All companies submit high bids when work is known to be scarce;
- The company gives different bids for the same line item on different contracts that are close in time;
- The companies obviously have engineered a split of the contract by each bidding low on some aspect of it and inexplicably high on other parts;
- There is physical evidence of cooperation, such as different companies submitting bids with the same handwriting, or in the same envelopes, or with the same mathematical or spelling errors;
- The same small group of bidders always shows up each time the contract is let;
- Qualified bidders do not bid, especially if they initially took steps to bid;
- If a contract is re-bid because all initial bids are unacceptable, the bidders come back in the same order or some bidders fail to re-bid;
- There are significant increases by most bidders over previous prices when there have been no substantial cost increases;
- Prices mysteriously drop when a new bidder appears on the scene (the bid riggers may have found out that a legitimate competitor was submitting a bid and called all bets off temporarily); and
- A number of competitors are seen meeting shortly before the bids are submitted.

### Quid Pro Quo

This is what you look for to spot payback patterns:

- Any kind of territorial pattern (draw out the area each company serves on a map);
- A company always bids for a contract but never wins it or conversely always wins it;
- All of the companies in the group win an equal volume of business over time;
- All of the companies win an equal number of contracts over time; or
- Any pattern (many are possible).

*(continued on page 6)*

## Detecting Criminal Antitrust Violations
*(continued from page 5)*

### Price Fixing

Price Fixing is a form of bid rigging, but procurement is usually not done by bidding but through purchase order or direct purchase. In this situation, co-conspirators may agree to raise or lower the prices they will charge for their goods or services, keep prices the same, or reduce or eliminate discounts.

#### Suspicious Indicators:

- Look for companies that always announce their price increases at the same time for the same amount or have staggered price increases with some pattern, such as appearing to take turns going first.
- Look for companies reducing or eliminating discounts at about the same time.
- Generally, be alert to businesses in which all prices seem to be uniform and all suppliers refuse to negotiate those prices.

### Customer or Market Allocation

As mentioned earlier, allocation schemes may involve bidding or quoted prices for services or goods.

#### Suspicious Indicators:

- Look for situations in which the same company seems to get your business over and over and the competitors never come around to solicit it. If you try to get other competitors interested in serving you, they may refuse to give you a quote or show reluctance in some way. If they do give you a quote, it may be ridiculously high to discourage you from changing suppliers. With bid rigging, look for situations where the competitors do not submit bids or submit complementary bids.
- Look for anything that makes it obvious that companies that should want your business are not interested in it.

## Graphite Electrodes Cartel: A Case Study

*From a presentation by Wendy Norman, trial attorney, and Joe Muoio, assistant chief of the Philadelphia Field Office*

The graphite electrodes investigation began in 1997 and concluded in 2001 with the conviction after trial of the Mitsubishi Corporation. Graphite electrodes are large columns of graphite (up to 8 feet long and 4000 pounds) used to conduct electricity in the manufacturing of steel, particularly in the electric arc furnaces that produce 50 percent of all U.S. steel. Electric arc furnace mills cannot function without these electrodes, which are consumed (melted) rapidly in production and cost thousands of dollars each. For this reason, U.S. steel mills have purchased up to $500 million worth of electrodes in a single year.

The graphite electrodes cartel began in 1992 with secret top-level meetings among the CEOs of the world's largest graphite electrodes manufacturers. The cartel's intent was to raise prices and eliminate competition worldwide. The cartel appointed working-level subordinates to carry out the day-to-day operation of the conspiracy. These top-level meetings in Europe and Japan continued over the next five years, and the parties' efforts over the course of the conspiracy led to U.S. price increases totaling 64 percent --- far in excess of increases in steel industry prices or inflation generally.

The graphite electrodes investigation proceeded covertly at the outset. The Philadelphia Field Office heard from customers about an industry in which, prior to 1992, graphite electrode manufacturers announced only occasional, uncoordinated price increases. In fact, discounts were common throughout the 1980s. However, the market changed virtually overnight in 1992---all manufacturers eliminated discounts and instituted regular price increases (once or twice per year) in lockstep fashion. Even the largest customers could not get the electrodes manufacturers to break ranks. Plus, several customers heard rumors from various industry sources that the manufacturers had met abroad to fix prices.

*(continued on page 7)*

## ATLANTA FIELD OFFICE HIGHLIGHTS

### Big Fines and Guilty Executive in Cairo Wastewater Investigation

An Atlanta Field Office grand jury investigation in Birmingham, Alabama uncovered a conspiracy to rig bids on several huge construction contracts in and around Cairo, Egypt. As part of its commitment under the Camp David Peace Accords, the United States has funded, through the United States Agency for International Development (USAID), numerous construction contracts tended to foster stability and promote public health in the Middle East. In addition, the U.S. Army Corps of Engineers (CORPS) has funded substantial construction work in Egypt. The Atlanta Office's investigative team working with the grand jury uncovered evidence of a conspiracy to rig bids on more than $250 million of USAID and CORPS construction work from May 1988 until September 1996.

On July 25, 2001, the grand jury indicted Bill Harbert International Construction, Inc. of Birmingham, Alabama and its Liechtenstein affiliate, Bilhar International Establishment (Bilhar); Elmore Roy Anderson, former Bilhar president; and Peter W. Schmidt, the former executive of Philipp Holzmann AG, for the bid-rigging conspiracy and for defrauding USAID. In February 2002, on the eve of trial, Bilhar pled guilty and was sentenced to pay a fine of $54 million. Anderson was convicted after trial and sentenced to serve three years in jail and to pay a $25,000 fine. Schmidt resides in Germany and remains an international fugitive.

Three other companies that participated in the bid rigging had pled guilty earlier and were sentenced to pay large fines. ABB Middle East & Africa Participations AG was fined $53 million; Philipp Holzmann AG was fined $30 million; and American International Contractors, Inc. was fined $4.2 million. This investigation resulted in total fines of more than $141.2 million and restitution of more than $13.7 million. These cases resulted from the joint investigative efforts of agents from the USAID Office of Inspector General and the FBI.

### Bid Rigging and Kickbacks in Industrial Valves Investigation

The Atlanta Field Office also has been investigating, through a grand jury in Atlanta, bid rigging on industrial valves and related equipment used in water and wastewater treatment plants in Alabama and Georgia. The companies that conspired to rig bids to public treatment plants from early 1994 until early 1998 took money directly out of the pockets of the taxpayers. Those prosecuted so far are: Eco-Tech, Inc. and its chief executive officer, Herbert H. Timmerman; The Wickliffe Services, Inc. and its owner Jerry R. Wickliffe; and Steele-Nickles Associates, Inc. Hundreds of thousands of dollars in fines and restitution have been ordered in those cases, and, Jerry Wickliffe was sentenced to serve four months in jail.

In connection with this investigation, the Atlanta Office also uncovered a kickback scheme. In May 2002, Pumps, Valves & Equipment, Inc. of Houston, Texas, pled guilty to participating in a conspiracy to defraud the Henry Pratt Company of Aurora, Illinois, by means of kickbacks paid to one of its now former employees to secure business from Henry Pratt. The defendant is awaiting sentencing. This investigation was conducted jointly with the FBI.

### Graphite Electrodes: Case Study
*(continued from page 6)*

The investigation was clearly a promising one, and the Philadelphia staff made every effort to quietly develop evidence sufficient for probable cause for search warrants (which so often generate higher quality evidence than grand jury subpoenas despite potential prosecution for document destruction after subpoenas are served). The staff scoured public sources such as SEC filings, annual reports, stock analysts' reports, and articles in newspapers or trade journals for background information and conducted additional interviews with customers, industry consultants, and small distributors of electrodes.

One customer recalled a particularly specific reference to collusion from an electrodes salesman and agreed to tape a conversation with that salesman. *(continued on page 8)*

## Graphite Electrodes: Case Study
*(continued from page 7)*

The consensual monitoring yielded an admission that the cartel was organized by the salesman's former boss, the German head of the large German-American electrodes manufacturer, SGL Carbon. Subpoenaed credit card records placed an officer of SGL's U.S. subsidiary and the U.S. CEO of the largest electrodes manufacturer, UCAR Carbon Company, in the same hotel on the same day in the German city where SGL is headquartered shortly before the first price increase occurred in 1992.

While pricing information, travel records, and hearsay admissions provided circumstantial evidence of the cartel, getting a conspirator to cooperate was the staff's primary objective. To achieve this goal, they used a valuable investigative tool unique to antitrust investigations --- corporate amnesty. The Antitrust Division offers amnesty from prosecution for the first company that comes forward and admits its participation in a criminal antitrust conspiracy. To obtain amnesty, the company must promptly terminate its participation in the conspiracy, fully cooperate with the investigation, and make restitution to the victims. In addition, the company must have neither coerced anyone else to participate nor been the leader or originator of the conspiracy. Cooperating company executives normally will receive amnesty as well. In the graphite electrodes investigation, the staff had contact with a smaller U.S. manufacturer, the Carbide/Graphite Group (C/G), before serving subpoenas on the other manufacturer with U.S. facilities, and C/G decided to seek amnesty and cooperate. C/G was on the fringes of the conspiracy, but its cooperation provided valuable evidence supporting probable cause for search warrants without immunizing a more culpable conspirator.

In June 1997, search warrants were executed and subpoenas were served on the U.S. graphite electrodes facilities and a U.S. executive in concert with the civil seizure of documents in Europe by the European Union competition authorities. This coordinated pressure led Showa Denko Carbon, the U.S. subsidiary of a Japanese company, to promptly begin negotiating a plea agreement calling for its cooperation and ultimately the payment of a $32.5 million fine.

Almost three more years of investigation and trial preparation followed that included: reviewing, analyzing, and translating documents; subpoenaing additional documents; reviewing customs records; interviewing cooperating witnesses; and posting border watches for and subpoenaing other witnesses. Ultimately all six of the principal companies (UCAR, SGL, Showa Denko, and three smaller Japanese companies), the CEOs of UCAR (an American) and SGL (a German), and a UCAR vice president (an American) agreed to plead guilty. In 2001, a jury convicted a seventh company, the Mitsubishi Corporation, for aiding and abetting the cartel and fined it $134 million.

---

### For Your Information . . .

Attorneys in the Antitrust Division are happy to answer any questions you may have about possible violations and are ready to investigate and prosecute such violations. Please report any suspicions you have of possible antitrust violations to your boss, or if your procedures allow, directly to the Atlanta Field Office of the Antitrust Division:

Nezida S. Davis, Chief
E-mail: nezida.davis@usdoj.gov

Glenn D. Baker, Assistant Chief
E-mail: glenn.baker@usdoj.gov

U. S. Department of Justice
Antitrust Division
75 Spring Street, S.W., Suite 1176
Atlanta, Georgia 30303
(404) 331-7100 (office)
(404) 331-7110 (fax)

Please contact us at the above telephone number or e-mail address if you would like one of our attorneys to give a presentation to your group regarding the antitrust laws and detection of criminal antitrust violations. We look forward to working with you!