# Exhibit 31



# DEPARTMENT OF JUSTICE

The 54th Annual
American Bar Association
Section of Antitrust Law
Spring Meeting

"Measuring the Value
of Second-In Cooperation
in Corporate Plea Negotiations"

Address By:

SCOTT D. HAMMOND
Deputy Assistant Attorney General
for Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Washington, D.C.

March 29, 2006

# Measuring the Value of Second-In Cooperation in Corporate Plea Negotiations

I. <u>Introduction</u>

The rewards for admission into the Division's Corporate Leniency Program to the first qualifying company to come forward and report a cartel offense have been much touted.[1] While the top prize is reserved for the amnesty applicant, a company that moves quickly to secure its place as "second in the door" and provides valuable cooperation can also reap substantial benefits. This paper discusses the rewards and incentives available for "second-in" companies that approach the Division after the opportunity for amnesty has passed.

A key component in the success of the Division's cartel enforcement program, particularly the Corporate Leniency Program, is transparency and predictability. Specifically, companies and their executives must be able to predict with a high degree of certainty the rewards if they self report and cooperate, and the consequences if they do not. With leniency, the rewards for the company and its qualifying employees – no criminal convictions, no criminal fines, and no jail sentences – are as predictable as they are extraordinary.

---

[1] For a copy of the Division's Corporate Leniency Policy and a fuller discussion of its application see Antitrust Division, U.S. Department of Justice Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/ atr/public /guidelines/0091.htm; Gary R. Spratling, The Corporate Leniency Policy: Answers To Recurring Questions, Speech Before the ABA Antitrust Section 1998 Spring Meeting (Apr. 1, 1998), *available at* http://www.usdoj.gov/atr/ public/speeches/1626.htm; Gary R. Spratling, Making Companies An Offer They Shouldn't Refuse, Speech Before the Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (Feb. 16, 1999), *available at* http://www.usdoj.gov/ atr/public/speeches/ 2247.htm; Scott D. Hammond, Detecting And Deterring Cartel Activity Through An Effective Leniency Program, Speech Before the International Workshop on Cartels (Nov. 21-22, 2000), *available at* http://www.usdoj.gov /atr/public/speeches/ 9928.htm; Scott D. Hammond, When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?, Speech Before the Fifteenth Annual National Institute On White Collar Crime (Mar. 8, 2001), *available at* http://www.usdoj.gov/ atr/public/speeches/7647.htm; Scott D. Hammond, Cornerstones of an Effective Leniency Policy, Speech Before the ICN Workshop on Leniency Programs (Nov. 22-23, 2004), *available at* http://www.usdoj.gov/atr/public/speeches/206611.htm.

  The rewards for second-in companies are not as uniform, because the value of a second-in company's cooperation can vary dramatically from case to case.  While a second-in company's cooperation typically will significantly advance an investigation, there are times when the cooperation is either cumulative or no longer needed.  For example, second-in cooperation likely would more significantly advance an investigation of a five-firm conspiracy than a two-firm conspiracy.  Second-in cooperation could come at the outset of an investigation when the Division is still developing key evidence against others, or after significant evidence already has been provided through an amnesty applicant or a successful covert investigation complete with consensual monitoring and coordinated search warrants.  The second-in company's cooperation could include self reporting on previously unidentified cartels warranting "Amnesty Plus" credit,[2] or be limited to conduct already detected.  The second-in company could offer its cooperation immediately after learning of the existence of the investigation, or only after it receives a target letter or after it has been indicted.

  If the Division were to establish an absolute, fixed discount for second-ins without consideration of these types of variables, then the need for proportionality would be sacrificed for increased transparency.  Proportional treatment also often requires consideration of factors shared only with the sentencing court and not the public, factors such as the state of the investigation at the time of the cooperation, the nature and extent to which the cooperation advanced the investigation, and whether the cooperation earned Amnesty Plus credit for disclosing undetected cartel offenses.  The Division carefully weighs all of these variables in measuring the value of a company's cooperation to ensure proportional treatment of cooperating parties across all Division matters.

  This paper hopefully will provide more transparency as to the potential rewards and incentives available for second-in companies and the factors considered in determining the size of the cooperation discount.  The paper focuses on the benefits earned by Crompton Corporation for being second-in-the-door in the Division's rubber chemicals investigation and provides information that was not public at the time the company was sentenced.[3]  Crompton represents one end of the spectrum – a company that provided exemplary cooperation and, in return, received an *extraordinary* 59% discount off its minimum Guidelines criminal fine, representing a more than $70 million reduction in its fine.  Of course, the risk for the Division in selecting this example is that other companies may come forward and claim that they deserve the same percentage reduction received by Crompton.

---

[2]  The Division's Amnesty Plus program is described below in Section II.E.

[3]  <u>United States v. Crompton Corporation</u>, No. CR 04-0079 MJJ (N.D. Cal. 2004).

However, as described below, the bar was set very high in the Crompton case. Any company that hopes to match or even approach Crompton's discount will have to earn it.

## II.    Potential Rewards for Second-In Cooperation

### A.    Reward #1: Reducing The Scope Of Affected Commerce Used To Calculate A Company's Guidelines Fine Range

One significant benefit a second-in company may receive actually comes before – and may turn out to be even more valuable than – the calculation of the cooperation discount off its Guidelines fine range.[4] If a company's cooperation pursuant to a plea agreement reveals that the suspected conspiracy was broader

---

[4] The calculation of a corporate defendant's Guidelines fine range is based largely upon the company's volume of commerce in the product or service affected by the cartel for the entire duration of the conspiracy. The company's base fine under the Guidelines is generally 20% of the company's volume of commerce. U.S.S.G. §§2R1.1(d)(1); 8C2.4(a)-(b). The base fine is then multiplied by a minimum and maximum multiplier to arrive at the Guidelines fine range. U.S.S.G. §8C2.7. In cartel cases, U.S.S.G. §2R1.1(d)(2) provides that the minimum multiplier must be at least .75, so the bottom of the Guidelines range would be at least 15% of the volume of commerce. The minimum and maximum multipliers are determined from the company's culpability score, which is based on factors such as the number of employees in the company or relevant business unit, the involvement in or the tolerance of the offense by high-level or substantial authority personnel, the company's prior criminal history, any obstruction of justice by the company, and the company's cooperation and acceptance of responsibility. U.S.S.G. §§8C2.5, 8C2.6. In determining where within the range the fine should fall, the Guidelines provide that the Court consider, among other factors, the company's role in the offense, the need for deterrence, the need for the sentence to reflect the seriousness of the offense, the gain or loss caused by the conspiracy, measures taken by the company to prevent a recurrence of the offense, the lack of an effective compliance program, and the prior criminal record of any high-level personnel who were involved in, tolerated or were willfully ignorant of the cartel. U.S.S.G. §8C2.8. The Guidelines Manual is available at http://www.ussc.gov/guidelin.htm. For a discussion of the impact on antitrust sentencing of United States v. Booker, 543 U.S. 220 (2005), which changed the nature of the U.S. Sentencing Guidelines from mandatory to advisory, *see* Scott D. Hammond, Antitrust Sentencing in the Post-*Booker* Era: Risks Remain High for Non-Cooperating Defendants, Speech Before the ABA Section of Antitrust Law Spring Meeting (Mar. 30, 2005), *available at* http://www.usdoj.gov/atr/public/speeches/208354.htm.

than had been previously identified – either in terms of the length of the scheme or the products, contracts or commerce affected – then the Division's practice is not to use that self-incriminating information in determining the applicable Guidelines range, except as provided in Section 1B1.8(b) of the U.S. Sentencing Guidelines.[5]  It is not uncommon for a second-in corporate defendant to have its fine drastically reduced on this basis.  For example, an amnesty applicant may not have evidence of the origins or the full scope of a cartel because it joined an ongoing conspiracy, it was only a peripheral player, or its executives who participated in the cartel's formation are no longer employed by, or available to, the applicant.  Under any of these scenarios, a second-in company with information that expands the scope of the cartel would not only receive a substantial cooperation discount below the minimum Guidelines fine, but also the company's volume of affected commerce for cartel activity previously unknown to the Division would not be included in the defendant's Guidelines fine calculation.  There are numerous examples of corporate defendants that have benefitted greatly by providing timely cooperation and qualifying for this §1B1.8(b) credit.[6]

      The Division's practice in this area is particularly generous in light of two considerations.  First, the Division is *not required* to restrict the use of self-incriminating information in calculating a defendant's applicable Guidelines fine range, unless it binds itself as part of a plea/cooperation agreement.  As noted above, however, the Division's practice is to agree to such language in its plea agreements as an additional inducement for companies to cooperate fully.  Second, U.S.S.G. §1B1.8(b)(5) and its corresponding Application Note 1 make clear that a defendant who qualifies for §1B1.8 credit may not be entitled to a "double dip" by also obtaining a departure based on substantial assistance.[7]  While the Guidelines grant sentencing courts discretion to refuse to depart, the Division has routinely recommended that companies that qualify for §1B1.8 credit also receive downward departures, and there are no examples where a court has failed to accept the government's recommendation to grant a downward departure on this basis.

---

[5] *See* U.S.S.G. § 1B1.8(a)-(b).

[6] *See e.g.* United States v. Hynix Semiconductor Inc., CR 05 00249 SI (N.D. Cal. 2005); U.S. v. Jo Tankers B.V., Crim. No.: 04-221 (E.D. Pa. 2004); U.S. v. Odfjell Seachem AS, Crim. No.: 03-654 (E.D. Pa. 2003).

[7] *See* U.S.S.G. §1B1.8, Application Note 1 ("[S]ubsection (b)(5) provides that consideration of such information is appropriate in determining whether, and to what extent, a downward departure is warranted pursuant to a government motion under §5K1.1 (Substantial Assistance to Authorities); e.g., a court may refuse to depart downward on the basis of such information.").

### B. Reward #2: Obtaining A Substantial Cooperation Discount

The reward to second-in companies for timely cooperation that undergoes the most scrutiny is the amount of the fine reduction. Second-in companies that provide cooperation that substantially advances an investigation can expect to receive a plea agreement that recommends a substantial assistance departure pursuant to U.S.S.G. §8C4.1 and a fine below the minimum Guidelines range. The amount of the recommended departure – often referred to as the "cooperation discount" – is measured as a percentage and reflects the overall value of the cooperation provided. As discussed below, the cooperation discount is applied to a specific point within the Guidelines range. Cooperation discounts for second-in companies are, on average, in the range of 30% to 35% off of the bottom of the Guidelines fine range.[8] Subsequent cooperators may still qualify for a cooperation discount below the Guidelines minimum if they provide substantial assistance. However, their cooperation discount will be lower, often substantially lower, than the second-in company, unless the company's cooperation includes the disclosure of undetected violations that warrant extraordinary Amnesty Plus credit.[9]

Section III below discusses the key factors that the Division considers when measuring and assessing a company's cooperation discount and looks at how these factors were applied in the Crompton case.

### C. Reward #3: Securing A Low Starting Point For Application Of The Cooperation Discount

As noted above, the cooperation discount is applied to a specific point within the Guidelines sentencing range. Except in a few situations that are described

---

[8] For example, in the Division's parcel tanker investigation, Odfjell received a 30% discount off the bottom of its minimum Guidelines sentence. Odfjell contacted the Division to offer its cooperation the day after the investigation went overt. It made its key personnel available to the Division in a timely manner, and two of its top executives agreed to submit to U.S. jurisdiction, serve jail terms, and cooperate with our investigation. For its cooperation, Odfjell was rewarded with a 30% discount off its minimum Guidelines fine.

[9] While it is possible that a corporate defendant could obtain an even greater cooperation discount than an earlier cooperator by disclosing an Amnesty Plus "whopper," no corporate defendant has ever leapfrogged over another on this basis. That is not surprising, however, given that the majority of the Amnesty Plus recipients are second-in companies who have already positioned themselves to earn the best deal short of corporate amnesty. *See* Section II.E below.

below, the cooperation discount starting point for a number-two company is the minimum Guidelines fine. This reward for early cooperators can be extremely valuable. Subsequent cooperating companies that come forward *after* the second-in company may face a cooperation discount starting point well above the minimum Guidelines fine. Some may encounter cooperation starting points as high as the middle to the top of the Guidelines range, depending on how late the company is to accept responsibility.

In the case of Crompton, its Guidelines fine range was between $121 and $242 million. Crompton's cooperation discount of 59% was applied to the minimum Guideline fine of $121 million, resulting in a fine of $50 million. Therefore, before even applying the 59% cooperation discount, Crompton benefitted from having the minimum Guidelines fine as its cooperation discount starting point. For example, if Crompton's cooperation starting point had been at the middle of the range ($181 million) and its cooperation discount remained the same, Crompton would have faced a fine of $75 million.

There are two principal situations in which the cooperation discount for a second-in company will *not* be applied to the minimum Guidelines fine. The first situation is where the company had a significant leadership role in the conspiracy. The company's role in the offense will result in a sentencing enhancement, much like high-level, culpable individuals face at sentencing. The U.S. Sentencing Guidelines specifically recognize this factor, particularly in antitrust offenses,[10] and the Division has applied it in calculating corporate fines. For example, an organization with significant market power that organizes and coordinates collusive activities with its smaller competitors should expect to get this bump. The Division, however, recognizes the difference between a significant leadership role and the more common situations in which multiple players each have equally important roles in coordinating and implementing illegal agreements; in the latter situations, no upward adjustment is warranted.

---

[10] U.S.S.G. §8C2.8(a)(2) lists as one of the factors to consider in determining a corporate fine within the Guidelines range "the organization's role in the offense." Application Note 1 to this Guideline cites specifically to antitrust offenses:

> This consideration is particularly appropriate if the guideline fine range does not take the organization's role in the offense into account. For example, the guideline fine range in an antitrust case does not take into consideration whether the organization was an organizer or leader of the conspiracy. A higher fine within the guideline fine range ordinarily will be appropriate for an organization that takes a leading role in such an offense.

6

The other situation is "Penalty Plus." The Division's Penalty Plus program is the flip side of its Amnesty Plus program.[11] As discussed more fully below, Amnesty Plus induces companies that are already under investigation by the Division to clean house and report violations in other markets where they compete. Companies that elect not to take advantage of the Amnesty Plus opportunity risk harsh consequences. If a company fails to discover and report the second offense, and then later finds itself negotiating a plea after the conduct is discovered by the Division, then it should expect to receive a cooperation discount starting point at least as high as the *midpoint* of the Guidelines range for the second offense. If the Division learns that the company discovered the second offense and simply decided not to report it when it had a chance to qualify for Amnesty Plus credit, then the sentencing consequences will be even more severe. In that case, if the conduct is discovered and successfully prosecuted, the Division's policy is to urge the sentencing court to consider the company's and any culpable executives's failure to report the conduct voluntarily as an aggravating sentencing factor. We will request that the court impose a term and conditions of probation for the company pursuant to U.S.S.G. §8D1.1 - §8D1.4, and we will pursue a fine or jail sentence at or above the *upper end* of the Guidelines range. In addition to the considerations above, where a corporate defendant has a prior criminal history, its culpability score may be increased resulting in a higher Guidelines fine range.[12]

### D. Reward #4: Securing More Favorable Treatment For Culpable Executives

Second-in companies that move quickly to cooperate also have an opportunity to minimize the number of individual employees who are subject to prosecution and maximize the opportunity for those culpable executives that are subject to prosecution to receive favorable plea resolutions. Most corporate plea agreements provide a non-prosecution agreement for company employees who cooperate fully in the investigation. Yet certain culpable employees, employees who refuse to cooperate, and employees against whom the Division is still developing evidence may not receive any protection under the company plea agreement. These individuals are often referred to as "carve outs," meaning they are excluded (or "carved out") of the company deal. Culpable carve outs must negotiate separate plea agreements or face indictment. Most companies place a high value on

---

[11] *See* Scott D. Hammond, An Update of the Antitrust Division's Criminal Enforcement Program, Speech Before the ABA Section of Antitrust Law Fall Forum Cartel Enforcement Roundtable (Nov. 16, 2005), *available at* http://www.usdoj.gov/atr/public/speeches/213247.htm.

[12] U.S.S.G. §8C2.5(c).

7

minimizing the number of carve outs.[13]

Second-in companies that cooperate early in an investigation often have the advantage of being able to offer new and significant evidence through multiple employees. When this is the case, the Division will typically carve out only the highest-level culpable individuals as well as any employees who refuse to cooperate; mid- to lower-level employees who provide significant evidence furthering the investigation will be offered non-prosecution protection under the corporate plea agreement. In addition, those employees who are carved out often are able to negotiate more favorable deals because they are in a position to offer valuable cooperation early on in an investigation.

In *Crompton*, three high-level employees were carved out of the corporate plea agreement.[14] Subordinates of these carve-outs who engaged in illegal conduct, however, received full protection as part of the company plea in return for their cooperation. In comparison, Bayer AG, the number-three company in the rubber chemicals investigation, had *five* high- and mid-level individuals carved out of its corporate plea agreement.[15] Similarly in the Division's DRAM investigation, second-in Infineon had *four* individuals carved out of its plea agreement,[16] while

---

[13]  For a fuller discussion of the Division's carve-out policies see Scott D. Hammond, Charting New Waters in International Cartel Prosecutions, Speech Before the ABA Criminal Justice Section's Twentieth Annual National Institute on White Collar Crime (Mar. 2, 2006), *available at* http://www.usdoj.gov/atr/public/speeches/ 214861.htm.

[14] Two of the Crompton carve outs have been charged and have pled guilty. *See* Plea Agreement, United States v. James J. Conway, CR 04-0302 MJJ (N.D. Cal. filed Nov. 4, 2004); Plea Agreement, United States v. Joseph B. Eisenberg, CR 04-0296 MJJ (N.D. Cal. filed Nov. 18, 2004). Division case filings are available at http://www.usdoj.gov/atr/cases.html.

[15] Two of those employees have now been indicted by the Department and are international fugitives. *See* Indictment, United States v. Jurgen Ick, CR 05 00520 MJJ (N.D. Cal. filed Aug. 10, 2005); Indictment, United States v. Gunter Monn, CR 05 00519 MJJ (N.D. Cal. filed Aug. 10, 2005). Two other employees pled and were sentenced to four months jail each. *See* Plea Agreement, United States v. Martin Petersen, CR 04-0386 MJJ (N.D. Cal. Dec. 2, 2004); Plea Agreement, United States v. Wolfgang Koch, CR 05-0314 MJJ (N.D. Cal. June 24, 2005).

[16] The four Infineon carve outs have been charged and sentenced to serve jail terms ranging from four months to six months. *See* Plea Agreement, United States v. T.

third-in Hynix had *five* carve outs[17] and fourth-in Samsung had *seven*.[18]

### E. Reward #5 : Increasing The Likelihood That A Company Will Qualify For Amnesty Plus Credit

Here is a remarkable statistic: roughly half of the Division's current international cartel investigations were initiated by evidence obtained as a result of an investigation of a completely separate market. Most of the corporate defendants in international cartel cases are multinational companies selling hundreds of different products. It will come as no surprise then to learn that the Division's experience is that if a company is fixing prices in one market, the chances are good that it is doing so in other markets as well. If an executive readily meets with competitors to allocate customers, then he or she has likely done it before in his or her career. And, if you go back further in time, you will likely find a mentor who taught the colluding executive the tricks of the trade. Armed with this experience, the Division has had great success engaging in a strategy of "cartel profiling" techniques aimed at ferreting out violations that sprout "cartel trees" – where one investigation will eventually give root to prosecutions in a half-dozen or more

---

Rudd Corwin, CR 4-0397 PJH (N.D. Cal. Dec. 15, 2004); Plea Agreement, United States v. Heinrich Florian, CR 04-0397 PJH (N.D. Cal. Dec. 15, 2004); Plea Agreement, United States v. Günter Hefner, CR 04-0397 PJH (N.D. Cal. Dec. 15, 2004); Plea Agreement, United States v. Peter Schaefer, CR 04-0397 PJH (N.D. Cal. Dec. 15, 2004).

[17] Four of the Hynix carve outs have been charged, pled guilty, and have been sentenced to serve jail terms ranging from five to eight months. *See* Plea Agreement, United States v. Dae Soo Kim, CR 06-0126 PJH (N.D. Cal. Mar. 1, 2006); Plea Agreement, United States v. Chae Kyun Chung, CR 06-0126 PJH (N.D. Cal. Mar. 1, 2006); Plea Agreement, United States v. Kun Chul Suh, CR 06-0126 PJH (N.D. Cal. Mar. 1, 2006); Plea Agreement, United States v. Choon Yub Choi, CR 06-0126 PJH (N.D. Cal. Mar. 1, 2006).

[18] Three of the Samsung carve outs have been charged and have agreed to plead guilty. *See* Information, United States v. Sun Woo Lee, Yeongho Kang, Young Woo Lee, CR 06-0180 CRB (N.D. Cal. filed Mar. 22, 2006); Press Release, Dept. of Justice, Three Samsung Executives Agree to Plead Guilty, Serve Jail Time for Participating in DRAM Price Fixing Conspiracy (Mar. 22, 2006), *available at* http://www.usdoj.gov/atr/public/press_releases/2006/215199.htm.

different markets.[19]

The Division's success in rolling one investigation into another is well known within the antitrust bar and business community. Companies understand that they cannot afford to remain blissfully ignorant by limiting the scope of their internal investigation. Nor, can they hunker down and hope for the best if their internal investigation reveals antitrust violations in other markets before it is detected by the Division. The risks and the consequences to the company and its executives are too great. Instead, companies are taking advantage of the Division's Amnesty Plus Policy, which provides for more lenient treatment in an ongoing investigation when a cooperating company discovers an unrelated antitrust violation and reports it to the Division.

As the name suggests, the rewards for Amnesty Plus are twofold. The cooperating company not only receives the benefits of full amnesty in the uncovered offense, but also receives a substantial additional discount in its fine for its participation in the first conspiracy. The size of the additional discount depends on a number of factors, including: (1) the strength of the evidence provided by the cooperating company in the amnesty product; (2) the potential significance of the uncovered case, measured in such terms as the volume of commerce involved, the geographic scope, and the number of co-conspirator companies and individuals; and (3) the likelihood the Division would have uncovered the cartel absent the self reporting, *i.e.*, if there is little or no overlap in the corporate participants and/or the culpable executives involved in the original cartel under investigation and the Amnesty Plus matter, then the credit for the disclosure will be greater.[20]

The main beneficiaries of the Amnesty Plus program have been second-in companies that are quick to clean house to determine whether they have antitrust exposure in other markets where they might qualify for Amnesty Plus credit. Crompton is a prime example of a company whose independent board of directors decided to leave no stone unturned in its commitment to investigate, identify and report antitrust violations after the rubber chemical investigation commenced. As discussed below, the board's strategy resulted in the company receiving an extraordinary reduction in its rubber chemicals fine, and it also allowed the company to win the race for amnesty – thereby securing nonprosecution protection for the company and its employees – on multiple additional products that have

---

[19] *See* Scott D. Hammond, Cornerstones of an Effective Leniency Policy, Speech Before the ICN Workshop on Leniency Programs (Nov. 22-23, 2004), *available at* http://www.usdoj.gov/atr/public/speeches/206611.htm.

[20] Of these three factors, the first two are given the most weight.

already resulted in substantial penalties against co-conspirators.

### F. Reward #6: Qualifying As A Candidate For Affirmative Amnesty

As noted above, when the Division is investigating suspected international cartel conduct in one market, the chances are about even that it will lead to the Division opening up an investigation into cartel conduct in a second, unrelated market. Sometimes, the second-in company detects it before we do and qualifies for Amnesty Plus credit. Other times, the Division discovers it first. When the Division uncovers it first, staff may elect to approach one of the subject companies with information about the suspected cartel and provide it with an opportunity to cooperate in the covert investigation in return for amnesty. This strategy, known as "affirmative amnesty," gives the amnesty candidate a head start in the race for amnesty when its competitors will not even be aware that the gun has sounded. In return, the Division seeks cooperation from an insider who will expose the inner-workings of the cartel.

The Division is very circumspect in its application of the affirmative amnesty strategy. Once the Division discloses the existence of the investigation to the affirmative amnesty candidate, it runs the risk that word of the investigation will leak to the other subjects, thereby losing the element of surprise and jeopardizing the preservation of documents and testimony. Notwithstanding the heightened risk of obstructive conduct, the Division has successfully employed this strategy on a number of occasions by targeting companies – usually publicly-owned multinational companies – that have already established their bona fides by accepting responsibility, cleaning house, and offering full and timely cooperation on other Division criminal matters. Typically, only companies that have obtained amnesty, amnesty plus, or second-in cooperation status would warrant consideration as a candidate for affirmative amnesty.

### III.    Calculating the Cooperation Discount Percentage:  The Crompton Case

Turning to the calculation of the cooperation discount, three key factors largely determine the size of the discount. Those factors are (1) the timing of the cooperation; (2) the value and significance of the information provided; and (3) whether the company brings forward evidence of other collusive activity and receives an additional Amnesty Plus discount.

### A. Timing of Cooperation

The old adage, "timing is everything," certainly applies to the value the Division will place on a company's offer to cooperate. It is not enough to accept responsibility and pledge cooperation to obtain the benefits outlined in this paper,

11

the cooperation must come at a time when it will substantially advance the investigation. The Division typically places a premium on getting the first plea/cooperation agreement to spark the investigation and to put pressure on other companies to accept responsibility. Those companies who belatedly offer their cooperation only after learning that a co-conspirator has offered to plead and cooperate will find the Division taking a much harder line in plea negotiations. The Division's practice is to give the second-in company a significantly better cooperation discount than the third company. While the gap between the second and third companies may not be as stark as it is between the amnesty applicant and the second-in, it is typically greater than it is between the third and the fourth company, and so on.

The need for speed clearly was not lost on Crompton's counsel or its board of directors. Within days of first learning of the investigation, Crompton's counsel met with Division staff, admitted responsibility for its activities in the rubber chemicals conspiracy and provided a proffer outlining the preliminary findings of its internal investigation. Crompton promptly identified for staff key documents relating to activities under investigation and provided extensive attorney proffers based on internal interviews and its own document review. The company also provided an overview of additional areas of its internal investigation to be conducted. Crompton's early cooperation allowed the Division to conserve and focus its resources and to immediately put additional pressure on other subject companies and individuals to cooperate.

Crompton's cooperation also highlights an issue related to the sequence of when cooperation begins to take place. Specifically, when does the company begin to provide meaningful cooperation, including access to relevant information, documents, and witnesses? Does a company provide access to key evidence uncovered in its internal investigation before a disposition has been agreed upon with the Division, or wait and hold onto the evidence until the last "t" is crossed in hopes of using it as leverage to negotiate a more favorable plea agreement? We encounter both strategies, although we naturally encourage and will reward companies that provide early and full access to their evidence. Companies that wait too long in holding onto their evidence as a bargaining tool also run the risk that the value of the evidence will decrease over time as the investigation continues.

### B. The Significance Of Evidence Provided In The Ongoing Investigation

To receive a substantial discount, a cooperating company must provide evidence, wherever located, of the illegal activity under investigation. This evidence can come through witnesses, documents, and other information. In the case of Crompton, key documents and witness proffers were provided initially to the Division. Later, certain Crompton employees with knowledge of conspiratorial

activity who had been identified by the company were offered full protection through the company deal and interviewed by the Division.

Invariably, companies like Crompton that are able to provide significant evidence to the Division also conduct very thorough internal investigations utilizing a variety of investigative methods to locate, preserve, and produce relevant evidence. Only after a company has demonstrated that it has committed significant resources to locating and preserving potentially relevant evidence, documents, and witnesses, wherever located worldwide, will the Division be fully satisfied that all potentially relevant evidence has been produced.

Crompton's efforts to quickly locate and preserve evidence at the start of the rubber chemicals investigation were exemplary. Within hours of learning of the investigation, Crompton secured a massive amount of documents that were considered relevant or possibly relevant to the Division's investigation. Some of these documents were identified by Crompton to the Division as soon as the first meeting with Division staff. Crompton, with operations worldwide, also immediately searched for and secured foreign-located documents possibly relevant to the investigation. The company went so far as to conduct simultaneous raids of two of it own foreign offices and the office of a joint venture it was involved in to ensure the preservation of relevant and probative documents. In the end, Crompton produced more than 500,000 documents – in both electronic and paper form – and more than thirty witnesses. The evidence implicated not only other entities, but its own executives carved out of the company deal.

In the rubber chemicals investigation, the Crompton plea agreement was followed by plea agreements with Bayer AG,[21] former Crompton executives Joseph Eisenberg and James Conway, and two former Bayer AG executives, Martin Petersen and Wolfgang Koch, and indictments against two additional former Bayer AG executives, Gunter Monn and Jurgen Ick. Bayer AG was sentenced to pay a $66 million fine for its participation in the rubber chemicals cartel. As noted above, Petersen and Koch were sentenced to four month jail terms. Eisenberg and Conway are awaiting sentencing, and Ick and Monn are international fugitives.[22]

---

[21] *See* Plea Agreement, United States v. Bayer AG, CR 04-0235 MJJ (N.D. Cal. Dec. 9, 2004).

[22] *See* footnotes 14 and 15 above.

### C. Amnesty Plus

The final factor that the Division will consider when measuring the value of a company's cooperation is whether it disclosed any previously undetected antitrust offenses so as to warrant Amnesty Plus credit. The Crompton case is a prime example of how both the Division and the company under investigation can benefit from this program.

At the start of the rubber chemicals investigation, Crompton immediately launched a company-wide probe to identify any potentially collusive activities involving other products. Its internal investigation eventually led to amnesty applications in four other product areas – ethylene propylene diene monomers (EPDM); heat stabilizers; acrylonitrile-butadiene rubber (NBR); and polyester polyols – with combined annual U.S. sales in the hundreds of millions.[23] All four investigations are currently active, and the Division is getting results. The NBR investigation already has resulted in cases filed again Bayer AG and Zeon Chemicals and fines more than $15 million. The polyester polyols investigation has resulted in a fine of $33 million against Bayer Corporation. More cases are expected from these investigations. Attached at the end of this paper is a chart showing the convictions to date of cases resulting from Amnesty Plus leads initiated by Crompton's cooperation.

### IV. Conclusion

Although the rewards for being first in the door and receiving amnesty can't be beat, a second-in company also receives significant rewards in reduced fines and more favorable treatment of its culpable executives if the company offers timely and substantial cooperation against remaining subjects in an investigation. To maximize the rewards, however, the company must act quickly and approach the Division as early as possible in the investigation and be prepared to leave no stone unturned in its effort to cooperate with the Division. Evidence, wherever located, must be quickly located, preserved and provided to the Division as soon as possible. The cooperation rewards are even greater (and the future risk of penalty-plus minimized) if the company thoroughly cleans house and takes advantage of the Division's Amnesty Plus program by providing evidence of other cartel activity. Second-in cooperators with a proven record of cleaning house and offering full cooperation also become the most likely candidates for affirmative amnesty.

---

[23] The Division has a policy of treating the identity of amnesty applicants as a confidential matter. However, in this case, Crompton issued public statements announcing its acceptance into the Division's Corporate Leniency Program on each of these four products.