# Exhibit 35

No. 03-724

# In the Supreme Court of the United States

———

F. HOFFMANN-LA ROCHE LTD., ET AL., PETITIONERS

*v.*

EMPAGRAN, S.A., ET AL.

———

*ON WRIT OF CERTIORARI TO THE*
*UNITED STATES COURT OF APPEALS*
*FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING PETITIONERS**

———

WILLIAM H. TAFT, IV
  *Legal Adviser*
  *United States Department*
  *of State*
  *Washington, D.C. 20520*
JOHN D. GRAUBERT
  *Acting General Counsel*
  *Federal Trade Commission*
  *Washington, D.C. 20580*

EDWIN S. KNEEDLER
  *Acting Solicitor General*
  *Counsel of Record*
R. HEWITT PATE
  *Assistant Attorney General*
MAKAN DELRAHIM
  *Deputy Assistant Attorney*
  *General*
LISA S. BLATT
  *Assistant to the Solicitor*
  *General*
ROBERT B. NICHOLSON
STEVEN J. MINTZ
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *(202) 514–2217*

## QUESTIONS PRESENTED

1. Whether under the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. 6a, the Sherman Act applies to claims of foreign plaintiffs whose injuries do not arise from the effects of antitrust violations on United States commerce.

2. Whether such foreign plaintiffs lack antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. 15(a).

## TABLE OF CONTENTS

                                                                    Page

Interest of the United States ........................................    1
Statement ...........................................................    1
Summary of argument ...............................................    5
Argument:
    Respondents have no claim under the antitrust
    laws ...........................................................    7
    A.  The FTAIA requires a plaintiff's claim to arise
        out of a conspiracy's anticompetitive effect in the
        United States ...........................................    8
        1.  The text of the statute requires a plaintiff
            to allege that his claim arises from the domestic
            anticompetitive effect of a Sherman Act
            violation ...........................................    8
        2.  The FTAIA's legislative history does not
            reveal an intent to open United States courts to
            claims seeking redress for foreign injuries
            sustained as a result of foreign conduct ..............    16
        3.  Important policy considerations grounded in
            the antitrust laws significantly undermine the
            court of appeals' interpretation ............................    19
    B.  Plaintiffs whose injuries are not tied to a con-
        spiracy's anticompetitive effect on United
        States commerce lack antitrust standing ...................    25
Conclusion .........................................................    30

## TABLE OF AUTHORITIES

Cases:

    *Association Gen. Contractors of California, Inc.* v.
      *California State Council of Carpenters,* 459 U.S.
      519 (1983) ......................................    6, 26, 29, 30
      *Bennett* v. *Spear,* 520 U.S. 154 (1997) ...............    27

(III)

IV

Cases—Continued:                                                    Page

   *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429
    U.S. 477 (1977) ..........................................  26, 27, 28, 29
   *Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless,*
    *PLC*, 148 F.3d 1080 (D.C. Cir. 1998) ..............................  11
   *Den Norske Stats Oljeselskap As* v. *HeereMac Vof,*
    241 F.3d 420 (2001), cert. denied, 534 U.S. 1127
    (5th Cir. 2002) ........................................................  4, 7,
                                     9, 11, 13, 16
   *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244
    (1991) ....................................................................  7, 15
   *Foley* v. *Filardo*, 336 U.S. 281 (1949) .............................  15
   *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764
    (1993) ....................................................................  7, 13
   *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251 (1972) ............  26
   *Heckler* v. *Edwards*, 465 U.S. 870 (1984) .........................  10
   *Illinois Brick* v. *Illinois*, 431 U.S. 720 (1977) .................  26
   *Kruman* v. *Christies Int'l, PLC*, 284 F.3d 384 (2d Cir.
    2002), cert. dismissed, 124 S. Ct. 27 (2003) .................  4, 9, 11
   *Malamud* v. *Sinclair Oil Corp.*, 521 F.2d 1142 (6th
    Cir. 1975) ...............................................................  27
   *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................  7, 28, 29
   *McCulloch* v. *Sociedad Nacional de Marineros de*
    *Honduras*, 372 U.S. 10 (1963) ................................  15
   *Microsoft Corp. Antitrust Litig., In re*, 127 F. Supp.
    2d 702 (D. Md. 2001) .............................................  16
   *National Credit Union Admin.* v. *First Nat'l Bank*
    *& Trust Co.*, 522 U.S. 479 (1998) ........................  27
   *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308
    (1978) ............................................................  7, 16, 17, 28
   *San Diego Bldg. Trades Council* v. *Garmon*,
    359 U.S. 236 (1959) ..............................................  15
   *Textron Lycoming Reciprocating Engine Div. AVCO*
    *Corp.* v. *UAW*, 523 U.S. 653 (1998) .....................  9
   *Turicento, S.A.* v. *American Airlines Inc.*, 303
    F.3d 293 (3d Cir. 2002) ........................................  28

V

Cases—Continued:                                                     Page

*United Phosphorus, Ltd.* v. *Angus Chem. Co.*,
322 F.3d 942 (7th Cir.), cert. denied, 124 S. Ct.
533 (2003) ............................................................................     8

*U.S. Dep't. of Labor* v. *Triplett*, 494 U.S. 715
(1990) ...................................................................................     12

*United States* v. *Aluminum of America*, 148 F.2d
416 (2d Cir. 1945) ...............................................................     17

*United States* v. *Borden Co.*, 347 U.S. 514 (1954) ............     21

*United States* v. *Nippon Paper Indus. Co.*, 109
F.3d 1 (1st Cir. 1997), cert. denied, 522 U.S. 1044
(1998) ...................................................................................     7

*Valley Forge Christian Coll* v. *Americans United for
Separation of Church & State, Inc.*, 454 U.S. 464
(1982) ...................................................................................     12

*Verizon Communications Inc.* v. *Law Offices of
Curtis V. Trinko*, 124 S. Ct. 872 (2004) ...........................     26

*Vitamins Antitrust Litig., In re*, No. 99-197 TFH,
2000 WL 1737867 (D.D.C. Mar. 31, 2000) ........................     2

*Warth* v. *Seldin*, 422 U.S. 490 (1975) ..................................     12

Constitution and statutes:

Panama Const. art. 290 .............................................     25
15 U.S.C. 1 ...............................................................     2, 7, 11
15 U.S.C. 6a .............................................................     3, 14
15 U.S.C. 6a(1) .........................................................     3, 8, 23
15 U.S.C. 6a(2) .........................................................     *passim*
15 U.S.C. 15 .............................................................     5, 11, 20
15 U.S.C. 26 .............................................................     2
15 U.S.C. 4 ...............................................................     11, 27
18 U.S.C. 3571 .........................................................     24
18 U.S.C. 3663 .........................................................     24

Ecuador Civ. Code:

Art. 2211 .............................................................     25
Art. 2241 .............................................................     25
Art. 2256 .............................................................     25

VI

Statutes—Continued:                                          Page

   Ecuador Crim. Code:

      Art. 67 ................................................................    25

      Art. 363 ..............................................................    25

   Ecuador Organic Law for Consumer Protection:

      Art. 2 ..................................................................    25

      Art. 51 ................................................................    25

      Art. 70 ................................................................    25

      Art. 87 ................................................................    25

   Law of Ukraine On Protecting the Economic Com-
      petition (2001), art. 55 ...................................    25

   Law of Ukraine On Restriction of Monopolism and
      Prevention of Unfair Competition in Business
      Activities (1992) ...........................................    25

Miscellaneous:

   1A Phillip E. Areeda & Herbert & Hovenkamp,
      *Antitrust Law* (2d ed. 2000) ...........................    28

   Phillip E. Areeda & H. Hovenkamp, *Antitrust Law*
      (Supp. 2003) ....................................................    28

   *Black's Law Dictionary* (6th ed. 1990) ................    10

   Chemical Business NewsBase:  Press Release, *Rhone-
      Poulence Issues Statement Regarding Vitamin
      Business*, 1999 WL 17728220 (May 26, 1999) .....    2

   B. Evans & C. Evans, *A Dictionary of Contemporary
      American Usage* (1957) ..................................    10

   H.R. Rep. No. 686, 97th Cong., 2d Sess. (1982) ..............    13, 16,
                                              17, 18, 19, 27

   H.R. 5235, 97th Cong., 2d Sess. (1982) ..................    18

   *<http://www.usdoj.gov/atr/public/guidelines/0091.*
      *html>* ...............................................................    1

   4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993) ...........    1, 10

   U.S. Dep't of Justice Press Release, *F. Hoffman-
      LaRoche and BASF Agree To Pay Record Criminal
      Fines For Participating In International Vitamin
      Cartel* (May 20, 1999) .................................    2

VII

Miscellaneous—Continued:                                    Page

U.S. Dep't of Justice, Scott D. Hammond, Director
   of Criminal Enforcement, Antitrust Division, *Detect-
   ing and Deterring Cartel Activity Through an
   Effective Leniency Program* Brighton, England
   Nov. 21-22, 2000) <http://www.sudoj.gov/atr/public
   speeches/9928.htm .................................................    23, 24
U.S. Dep't of Justice & Federal Trade Comm'n,
   *Antitrust Enforcement Guidelines For International
   Operations* (1995), *reprinted in* 4 Trade Reg. Rep.
   (CCH) ¶ 13,107 (Apr. 5, 1995)  ...................................    11, 17, 18

# In the Supreme Court of the United States

No. 03-724

F. HOFFMANN-LA ROCHE LTD., ET AL., PETITIONERS

*v.*

EMPAGRAN, S.A., ET AL.

*ON WRIT OF CERTIORARI TO THE*
*UNITED STATES COURT OF APPEALS*
*FOR THE DISTRICT OF COLUMBIA CIRCUIT*

**BRIEF FOR THE UNITED STATES**
**AS AMICUS CURIAE SUPPORTING PETITIONERS**

## INTEREST OF THE UNITED STATES

The Department of Justice and the Federal Trade Commission have primary responsibility for enforcing the federal antitrust laws, and thus they have a strong interest in the correct application of those laws and in the effect of judicial interpretations on antitrust enforcement programs. The United States is concerned that the court of appeals' holding will substantially harm its ability to uncover and break up international cartels and undermine law enforcement relationships between the United States and its trading partners.

## STATEMENT

1. The Antitrust Division of the United States Department of Justice has a Corporate Leniency Policy that provides amnesty from criminal prosecution in certain circumstances. 4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993); <*http://www.usdoj.gov/atr/public/guidelines/0091.htm*>. In 1999, one of the petitioners, Rhone-Poulenc SA, applied for admission to the government's amnesty program for Rhone-Poulenc's role in global price-fixing and market-allocation conspiracies among domestic and foreign manufacturers and

(1)

2

distributors of bulk vitamins. In exchange for amnesty, the
company exposed the cartel, which had sold billions of
dollars of vitamins in the United States and other countries
around the world. The company cooperated with the United
States' subsequent investigations into violations by the vita-
min companies of Section 1 of the Sherman Act, 15 U.S.C. 1.
Chemical Business NewsBase: Press Release, *Rhone-Pou-
lenc issues statement regarding vitamin business*, available
in 1999 WL 17728220 (May 26, 1999); U.S. Dep't Of Justice
Press Release, *F. Hoffman-LaRoche and BASF Agree To
Pay Record Criminal Fines For Participating In Interna-
tional Vitamin Cartel* (May 20, 1999) (Press Release).

To date, the investigation triggered by Rhone-Poulenc's
application for amnesty has resulted in plea agreements with
twelve corporate defendants and thirteen individual defen-
dants and the imposition of fines exceeding $900 million—
including the largest criminal fine ($500 million) ever ob-
tained by the Department of Justice under any statute.
Press Release, at 1-2. Eleven of the thirteen individuals
have received sentences resulting in imprisonment, and an
additional individual awaits a criminal trial. European
Union, Canadian, Australian, and Korean authorities simi-
larly have obtained record civil penalties exceeding ∈855
million against the vitamin companies. Pet. 5; Pet. App. 68a.

In the wake of the government's investigations, domestic
private parties sued the vitamin companies seeking treble
damages and attorney's fees, see 15 U.S.C. 1, 15, 26, for over-
charges that the domestic companies paid in United States
commerce as a result of the price-fixing conspiracy. In set-
tlement of suits by some United States purchasers, the vita-
min companies paid amounts "exceeding $2 billion." Pet. 5;
*In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL
1737867 (D.D.C. Mar. 31, 2000).

2. Respondents are foreign corporations domiciled in
Ecuador, Panama, Australia, and Ukraine. Pet. App. 6a; Pet.
ii, 5; Br. in Opp. ii. They brought this class action on behalf

3

of purchasers of "vitamins abroad from the vitamin companies or their alleged co-conspirators * * * for delivery outside the United States." Pet. App. 6a. The district court held (*id.* at 47a-53a) that it lacked subject matter jurisdiction over respondents' claims against petitioners under the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. 6a, which provides that the Sherman Act shall not apply to non-import foreign conduct unless it has "a direct, substantial, and reasonably foreseeable effect" on United States commerce, 15 U.S.C. 6a(1), and that "such effect gives rise to a claim" under the Sherman Act, 15 U.S.C. 6a(2).[1] The district court explained that, although respondents had alleged that "the conduct causing their injuries resulted in a 'direct, substantial, and reasonably foreseeable effect on U.S. commerce,'" they had not alleged that the conduct's effect on United States commerce gave rise to respondents' claims. Pet. App. 48a-49a. Because the district court found subject

---

[1]  The FTAIA, which was enacted in 1982 (Pub. L. No. 97-290, § 402, 96 Stat. 1248) and became Section 7 of the Sherman Act, 15 U.S.C. 6a, provides:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1)  such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2)  such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

matter jurisdiction lacking, the court did not reach petitioners' alternative contention that respondents lacked antitrust standing because they "fall outside the class of persons whom the Sherman Act is designed to protect." *Id.* at 53a, 54a.

3. A divided panel of the court of appeals reversed and remanded. Pet. App. 1a-42a. The court observed that the "Second and Fifth Circuits have split" on "the question whether FTAIA requires that the plaintiff's claim arise from the U.S. effect of the anticompetitive conduct." *Id.* at 14a-15a. The court explained (*ibid.*) that the Fifth Circuit in *Den Norske Stats Oljeselskap As* v. *HeereMac Vof*, 241 F.3d 420, 427 (2001) (*Statoil*), cert. denied, 534 U.S. 1127 (2002), held that the plain text of the FTAIA bars claims that do not stem from the conspiracy's anticompetitive domestic effects. By contrast, the court explained (Pet. App. 16a-17a), the Second Circuit in *Kruman* v. *Christie's International PLC*, 284 F.3d 384, 400 (2002), cert. dismissed, 124 S. Ct. 27 (2003), held that the FTAIA permits suit, even when the plaintiff's injury does not arise from the domestic effect of the conspiracy, as long as the "domestic effect violate[s] the substantive provisions of the Sherman Act."

The majority adopted a "view of the statute [that] falls somewhere between the views of the Fifth and Second Circuits, albeit somewhat closer to the latter than the former." Pet. App. 20a. The majority rejected respondents' argument —based on *Kruman*, 284 F.3d at 397-400—that the "FTAIA only speaks to the question what conduct is prohibited, not which plaintiffs can sue." Pet. App. 20a. The majority nonetheless interpreted the phrase "gives rise to a claim" in 15 U.S.C. 6a(2) as requiring only that "the conduct's harmful effect on United States commerce must give rise to 'a claim' by someone, even if not the foreign plaintiff who is before the court." Pet. App. 4a. The majority also found its interpretation supported by the FTAIA's legislative history, *id.* at 24a-30a, and by its view that asserting jurisdiction over

5

respondents' claims would maximize deterrence of international cartels by "forc[ing] the conspirator to internalize the full cost of his anticompetitive conduct," *id.* at 32a.

The majority further held that respondents have antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. 15(a). Pet. App. 33a-37a. The court reasoned that "the arguments that have already persuaded [the court] that, where anticompetitive conduct harms domestic commerce, FTAIA allows foreign plaintiffs injured by anticompetitive conduct to sue to enforce the antitrust laws similarly persuade us that the antitrust laws intended to prevent the harm that the foreign plaintiffs suffered here." *Id.* at 36a.

Judge Henderson dissented. Pet. App. 40a-42a. She disagreed with the majority's interpretation of the FTAIA, reasoning that the Fifth Circuit's reading was "unambiguously" supported by the Act's text and history. *Id.* at 40a.

## SUMMARY OF ARGUMENT

A. The Foreign Trade Antitrust Improvements Act provides that the Sherman Act shall not apply to foreign conduct unless it has a requisite effect on United States commerce and "such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a(2). The most natural reading of that statutory language is that the required effect on United States commerce must give rise to a claim by the particular plaintiff before the court. In rejecting that interpretation, the court of appeals reached the implausible conclusion that Congress intended to permit suits in the United States that seek redress for injuries that were sustained entirely overseas and that arise out of purely foreign commerce. That conclusion finds no support in the Act's legislative history.

Such an expansive interpretation of the FTAIA would greatly expand the potential liability for treble damages in United States courts and would thereby deter members of international cartels from seeking amnesty from criminal prosecution by the United States Government. The inter-

6

pretation adopted by the court of appeals thus would weaken the Department of Justice's criminal amnesty program, which has served as an effective means of cracking international cartels. That interpretation also likely would damage the cooperative law enforcement relationships that the United States has nurtured with foreign governments and would burden the federal courts with a wave of new international antitrust cases raising potentially complex satellite disputes that turn on hypothetical claims of persons not before the courts.

B. Antitrust standing principles independently support the conclusion that foreign plaintiffs whose claims arise solely from a conspiracy's effects on foreign commerce cannot bring antitrust lawsuits in United States courts. Section 4 of the Clayton Act, which defines the class of persons who may maintain a private damages action under the antitrust laws, does not provide a treble damages remedy for all injuries that result from an antitrust violation. *Associated General Contractors* v. *California State Council of Carpenters*, 459 U.S. 519 (1983). This Court accordingly has limited the types of plaintiffs who are proper parties to bring a private antitrust action based on substantive antitrust and other policy considerations.

Foreign plaintiffs whose claims arise from a conspiracy's effects outside the United States are not proper plaintiffs to invoke our antitrust laws. The focus of the FTAIA, and the fundamental purpose of the Sherman Act, are the protection of American consumers and commerce. To provide antitrust relief to respondents, even though their injuries have no connection to a conspiracy's effects on United States commerce, would divorce antitrust recovery from the central purposes of the antitrust laws.

7

## ARGUMENT

## RESPONDENTS HAVE NO CLAIM UNDER THE ANTI-TRUST LAWS

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. 1. Although this Court has articulated a general presumption in other contexts that Congress intends its laws to apply only within the territorial jurisdiction of the United States, *EEOC* v. *Arabian American Oil Co.*, 499 U.S. 244, 248 (1991), "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 796 (1993); *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 582-583 n.6 (1986); see *United States* v. *Nippon Paper Indus. Co.*, 109 F.3d 1, 4-6 (1st Cir. 1997) (holding that Sherman Act's criminal provisions apply to wholly foreign conduct with intended and substantial domestic effects), cert. denied, 522 U.S. 1044 (1998).

Consistent with that judicial construction of the Sherman Act, Congress provided in the FTAIA that the Sherman Act applies to foreign conduct when "(1) such [foreign] conduct has a direct, substantial, and reasonably foreseeable effect * * * on [United States domestic commerce] * * * and (2) such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a. It is not disputed in this case that, under Section 6a, the Sherman Act applies to a plaintiff's claim that arises from an illegal conspiracy's anticompetitive effects on domestic commerce, whether the plaintiff is located here or abroad, or is a citizen of the United States or of another country. *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308 (1978) (holding that a foreign government may sue under the Sherman Act); see *Statoil*, 241 F.3d at 427 n.22, 428 n.25.

8

The question presented in this case is whether the Sherman Act permits respondents to recover treble damages and attorney's fees under the United States' antitrust laws for injuries that they sustained entirely overseas and that arose out of purely foreign sales transactions that had no substantial effect on United States commerce. The court of appeals held that respondents were entitled to seek such relief on the theory that the foreign conduct by petitioners that injured respondents was part of a global price-fixing conspiracy that had anticompetitive effects in the United States, and that those effects give rise to a claim by some *other* person.

Such an expansive reach of the antitrust laws is not justified by either the text or history of the FTAIA. The result reached by the court of appeals is also highly likely to have the perverse effect of undermining the government's efforts to detect and deter international cartel activity.

## A. THE FTAIA REQUIRES A PLAINTIFF'S CLAIM TO ARISE OUT OF A CONSPIRACY'S ANTICOMPETITIVE EFFECT IN THE UNITED STATES

### 1. *The Text Of The Statute Requires A Plaintiff To Allege That His Claim Arises From The Domestic Anticompetitive Effect Of A Sherman Act Violation*

a. The FTAIA governs whether a federal court may hear a plaintiff's complaint alleging violations of the Sherman Act involving foreign conduct. Section 6a(1) provides that the Sherman Act extends to foreign conduct only when it has a requisite effect on United States commerce. 15 U.S.C. 6a(1). That such effect was caused by the vitamin cartel has not been disputed. Pet. App. 9a. A requisite effect is not enough to establish that the Sherman Act applies to foreign conduct, however, for Section 6a(2) imposes the further condition that

9

"such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a(2).[2]

It is a "fundamental principle of statutory construction" that the meaning of statutory language "cannot be determined in isolation, but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div.*, *AVCO Corp.* v. *UAW*, 523 U.S. 653, 657 (1998) (internal quotation marks omitted). The FTAIA's focus is explicitly and only on the *domestic* effect of anticompetitive conduct. Its text contains no hint of a statutory purpose to permit recovery where the situs of the plaintiff's injury is entirely foreign and that injury arises exclusively from a price-fixing or market-allocation conspiracy's effect on foreign commerce. Accordingly, read in context, by far the most natural reading of Section 6a(2)'s requirement that "such effect gives rise to a claim" under the Sherman Act is that the requisite anticompetitive effect on domestic commerce must give rise to a Sherman Act claim brought by the *particular plaintiff* before the court.

The requirement that a plaintiff tie his own claim to a conspiracy's domestic anticompetitive effect does not conflict with a supposedly literal or "plain" meaning of Section 6a(2), based on its use of the indefinite article "a," as has been suggested. See *Kruman*, 284 F.3d at 400; *Statoil*, 241 F.3d at 432 (Higginbotham, J., dissenting). "The word 'a' has varying meanings and uses," and "the meaning depends on context." *Black's Law Dictionary* 1 (6th ed. 1990). And in particular, although "[a] (or *an*) is called the indefinite article,"

---

[2] The court of appeals treated the FTAIA as setting forth a threshold requirement for subject matter jurisdiction rather than a substantive element of a Sherman Act claim. Pet. App. 8a; see generally *United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 949-951 (7th Cir.) (en banc), cert. denied, 124 S. Ct. 533 (2003). That issue has no bearing on the question of statutory interpretation before the Court, *i.e.*, whether the Sherman Act applies to foreign conduct when a claim by the plaintiff does not arise from a conspiracy's effect on United States commerce.

10

"[a]ctually, it is used to indicate a definite but unspecified individual, as in *a man in our town.* * * * When we wish to refer indefinitely to a single person or thing we say *any*, as in *any man in our town, any library book*." Bergen Evans & Cornelia Evans, *A Dictionary of Contemporary American Usage* 3 (1957). Thus, the article "a" is far too slender a reed on which to rest the conclusion that Congress intended to give Section 6a(2) an unprecedented world-wide scope whenever *any* person in the domestic commerce of the United States would have *any* claim under the Sherman Act based on the same conduct.

Moreover, the article "a" in Section 6a(2) is immediately followed by the specific term "claim." 15 U.S.C. 6a(2). Congress surely intended a federal court to examine not *any* hypothetical "claim," but a claim that is being asserted by the party seeking to invoke the jurisdiction of the court in the case actually pending before it. In other words, the reference to "a claim" *presupposes*, but leaves unstated, that the "claim" to which the conduct in question "gives rise" is one advanced by the plaintiff. In this respect, Section 6a(2) is just like Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal of a complaint for "failure to state a claim on which relief can be granted." Surely Rule 12(b)(6) refers to "a claim" asserted by the plaintiff in the case, not by some other hypothetical person not before the court. Accordingly, to recognize jurisdiction in a federal district court under the United States' antitrust laws over a private action lacking the requisite "effect" on United States commerce—on the premise that the requirement of such "a claim" might be satisfied by some third party—"would not be consistent with the 'sense of the thing,' and would confer upon [the court] jurisdiction beyond what 'naturally and properly belongs to it.'" *Heckler* v. *Edwards*, 465 U.S. 870, 879 (1984) (citation omitted). Instead, the critical inquiry under Section 6a(2) "is, regardless of the situs of the plaintiff's injury, did that injury arise from the anticom-

petitive effects on United States commerce?" *Statoil*, 241 F.3d at 427 n.22.[3]

For similar reasons, the Second Circuit in *Kruman*, 284 F.3d at 397-400, erred in concluding that the only relevant inquiry is whether the conduct that caused the anticompetitive domestic effect violated the substantive provisions of the antitrust laws, such that the *government* would have a valid claim for injunctive relief under Section 4 of the Sherman Act, 15 U.S.C. 4. Under that view, the phrase "gives rise to a claim" adds nothing, because the United States always has a claim under Section 4 of the Sherman Act whenever that Act is violated. Nor is there any suggestion in the FTAIA's text that Congress intended the availability of relief under the Sherman Act to turn on whether the government would have a claim—particularly since the FTAIA equally governs whether a private party may seek relief, and a price-fixing conspiracy that violates Section 1 of the Sherman Act, 15 U.S.C. 1, does not "give[] rise" to a private "claim" under the Sherman Act in the absence of injury to the particular plaintiff. See 15 U.S.C. 15(a) (providing for private right of action to "any person injured in his business or property"). In short, as the court of appeals in this case pointed out, "[t]he view that FTAIA must be taken to refer only to defendant's conduct tends to ignore the fact

---

[3] Contrary to respondents' contention, the government's reading of the statute does not mean that only injury that occurs *in the United States* comes within the terms of the FTAIA. Br. in Opp. 20-21. Rather, the text of the FTAIA requires that any anticompetitive injury, whether here or abroad, arise from the conspiracy's requisite effect on domestic commerce. See, *e.g., Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*, 148 F.3d 1080, 1086-1087 (D.C. Cir. 1998) (while the situs of injury was overseas, plaintiff's claim arose from a conspiracy's effect on the United States advertising market). Moreover, the federal agencies charged with the responsibility of enforcing the antitrust laws "do not discriminate in the enforcement of the antitrust laws on the basis of the nationality of the parties." U.S. Dep't of Justice & Federal Trade Comm'n, *Antitrust Enforcement Guidelines For International Operations* § 2 (1995), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,107, at 20,589-20,592 (Apr. 5, 1995).

12

that FTAIA does refer on its face to the conduct's effect giving rise to a claim"—which even the court acknowledged "arguably refers to a plaintiff's injury." Pet. App. 21a.

Thus, when the court of appeals recognized that "the usual meaning of 'a claim' is a private action," Pet. App. 22a, it should have further recognized that, in the context of a statute governing a private civil action, the words "a claim" are most naturally understood to refer to a claim that is actually being asserted in the civil action arising under that statute. Indeed, we are not aware of any statutory scheme that makes the determination of statutory coverage turn on whether a person not before the court, *i.e.*, a hypothetical plaintiff in some other civil action, has a claim. Ordinarily, a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth* v. *Seldin*, 422 U.S. 490, 499 (1975)). "This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party." *United States Dep't of Labor* v. *Triplett*, 494 U.S. 715, 720 (1990).

b. The implausibility of the panel's expansive interpretation of Section 6a(2) is confirmed by the fact that it would produce results that Congress could not have intended. The panel's holding would open United States courts to suits that are strikingly localized to foreign countries. For example, under the panel's holding, a buyer in Nigeria could file suit in the United States against its own Nigerian supplier if that supplier was a member of an international cartel, simply by alleging (and being able to prove if contested, see, p. 22, *infra*) that some unnamed third person who was injured by the same cartel in United States commerce would have a claim under the Sherman Act.

In other words, under the panel's reading of Section 6a(2), once *any* person is determined to have a claim arising from

13

an injury resulting from the domestic anticompetitive effects of a conspiracy, any foreign purchaser can piggyback on that claim and sue for treble damages in United States courts, even when that purchaser is "injured solely by that [conspiracy's] effect on foreign commerce." Pet. App. 4a. Consider, for example, an international price-fixing cartel with wholly foreign members that had annual foreign sales of $2 billion to 50 foreign customers, and annual sales in the United States of $1 million to one customer. Because the domestic customer could sue based on the conspiracy's domestic effects, all 50 foreign customers also could bring a claim under the Sherman Act, "even if those plaintiffs had no commercial relationship with any United States market and their injuries were unrelated to the injuries suffered in the United States." *Statoil*, 241 F.3d at 427-428.

No decision pre-dating the FTAIA has been cited that permitted such a suit. *Statoil*, 241 F.3d at 429 ("[W]e have found no case in which jurisdiction was found in a case like this—where a foreign plaintiff is injured in a foreign market with no injuries arising from the anticompetitive effect on a United States market."). Congress passed the FTAIA to "exempt from the Sherman Act export transactions that did not injure the United States economy," *Hartford Fire Ins. Co.*, 509 U.S. at 796 n.23, and to create a "single, objective test—the 'direct, substantial, and reasonably foreseeable effect' test"—to "serve as a simple and straightforward clarification of *existing* American law," H.R. Rep. No. 686, 97th Cong., 2d Sess. 2 (1982) (House Report) (emphasis added). It is highly doubtful that the same Congress that intended to codify *limits* on the extraterritorial reach of the antitrust laws intended at the same time to bring about the sweeping expansion that the court of appeals' decision would accomplish.

c. The statutory text should also be read in light of background principles concerning the extraterritorial reach of United States law. As noted above (see p. 7, *supra*),

14

although this Court has adopted a general presumption that Congress intends for its laws to apply only within the territorial jurisdiction of the United States, it is well established—quite apart from the FTAIA—that the Sherman Act applies to foreign conduct that was meant to and did produce some substantial effect in the United States. And the FTAIA ratifies that fundamental proposition by providing that the Sherman Act applies to foreign conduct that has a "direct, substantial, and reasonably foreseeable effect" on the domestic commerce of the United States, if that effect in turn "gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a. The Sherman Act and the FTAIA have thus supplanted any general background presumption against extraterritoriality within those fields involving effects on domestic commerce. It does not follow, however, that general background principles are entirely irrelevant in considering the further question presented in this case.

Here, respondents' alleged injuries do not flow from any effect of petitioners' conduct on the domestic commerce of the United States (*e.g.*, from sales to customers in the United States), which would fall within the rubric of *Hartford Fire Insurance Co.* and the terms of the FTAIA. They instead flow from sales transactions that occurred outside the United States, either entirely within one foreign country or between a seller in one foreign country and a purchaser in another. To apply the Sherman Act to those transactions would extend the Act one significant step further than this Court's Sherman Act decisions culminating in *Hartford Fire Insurance Co.* and anything required by the terms of the FTAIA. Such an application would regulate not merely the defendants' conduct (their conspiracy to fix prices and allocate markets) and the remedies for persons injured by that conduct in United States commerce (persons who bought vitamins from those defendants at supracompetitive prices in domestic sales transactions). It also would subject wholly foreign sales transactions having no significant effect

15

on United States commerce to regulation under our antitrust laws, by affording a Sherman Act claim to injured purchasers of vitamins in foreign countries against the defendants who charged them supracompetitive prices in those foreign transactions. See *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.").

In *Foley Brothers* v. *Filardo*, 336 U.S. 281 (1949), this Court held that a federal law requiring employers to pay overtime for work in excess of an eight-hour day did not apply in a foreign country. Because the statute and associated cause of action were motivated by "concern with domestic labor conditions," the Court saw no reason to apply them to conditions in foreign countries. *Id.* at 286. The Court concluded that "[a]n intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." *Ibid.* Similarly, in *EEOC* v. *Arabian American Oil Co.*, the Court declined to apply Title VII to employment in a foreign country in the absence of "clearer evidence of congressional intent." 499 U.S. at 255. In both cases, the Court's conclusion was reinforced by its determination that to subject such transactions or relationships in foreign countries to United States law would risk friction with the foreign governments concerned. So too here, in the absence of a clearer expression of congressional intent, the Court should not interpret Section 6a(2) to afford a private claim under the Sherman Act to foreign purchasers in wholly foreign sales transactions, which "are the primary concern of a foreign country" when such sales have no significant effect on our commerce. *Foley Bros.*, 336 U.S. at 286; see, *e.g.*, *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19, 21 (1963); *Romero* v. *International Terminal Operating Co.*, 358 U.S. 354, 382-383 (1959).

16

### 2. *The FTAIA's Legislative History Does Not Reveal An Intent To Open United States Courts To Claims Seeking Redress For Foreign Injuries Sustained As A Result Of Foreign Conduct*

The court of appeals' majority acknowledged that portions of the FTAIA's legislative history could be read to support the government's interpretation of the Act, Pet. App. 24a, 29a, but concluded that, on the whole, the legislative history favors an expansive interpretation because nothing in the history affirmatively "denigrate[s] or exclude[s]" an expansive interpretation, *ibid.* The majority thus assumed that, in the absence of express legislative history to the contrary, Congress must have intended the more expansive interpretation—a dubious analytical approach to begin with for a statute that was prompted in significant part by a perceived need to clarify the *limitations* of the Sherman Act's reach over international transactions. House Report 2.

More fundamentally, however, the majority looked for an answer to the wrong question in its review of the legislative history. Because application of the Sherman Act to wholly foreign sales transactions having no substantial effect on United States commerce would be contrary to the most natural reading of the text of the FTAIA and to the background presumption against application of United States laws to transactions in foreign countries, the proper question is whether the legislative history contains a clearly expressed intent to extend the reach of the Sherman Act in that manner. There is no suggestion, much less a clear expression, of such an intent. See *Statoil*, 241 F.3d at 429 n.28 ("Nothing is said about protecting foreign purchasers in foreign markets.") (quoting *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 715 (D. Md. 2001)).

The only explicit mention of suits by foreign purchasers, and the deterrent effect such suits might have, is a discussion in the House Report of this Court's decision in *Pfizer, supra.* House Report 10. *Pfizer*, however, addressed

17

neither the extraterritorial reach of the antitrust laws nor the extent to which a plaintiff's claim must have some connection to United States commerce. Rather, *Pfizer* held that a foreign government that purchased goods from United States companies is a "person" "entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff." 434 U.S. at 320. Although the Court in *Pfizer* observed that "suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers," *id.* at 314, the Court's decision in *Pfizer* involved foreign purchasers injured by anticompetitive *domestic* conduct and effects. *Id.* at 318 (observing that foreign governments "enter[ed] our commercial markets as a purchaser of goods or services"). The Court nowhere intimated that the purposes of the antitrust laws would support the availability of a private treble damages action when foreign injury is sustained exclusively as a result of *foreign* conduct, and the House Report's discussion of *Pfizer* therefore carries no such intimation either.

The remainder of the legislative history, in fact, cuts strongly against such an interpretation. For example, the House Report states that the Act "preserves antitrust protections in the *domestic* marketplace for all purchasers, regardless of nationality or the situs of the business." House Report 10 (emphasis added).[4] Such purchasers, however, are markedly different from foreign purchasers who "bought [goods] exclusively outside the United States" and whose injuries arise exclusively from a conspiracy's foreign anticompetitive effects. Pet. App. 8a. Other passages in the House Report uniformly tie the application of United States anti-

---

[4] There was no Senate Report on the bill, and the brief discussion in the conference report, H.R. Conf. Rep. No. 924, 97th Cong., 2d Sess. 29-30 (1982), sheds no light on the issue.

18

trust laws to foreign transactions to a domestic anticompetitive effect.[5]

Finally, the explanation in the legislative history for the language of Section 6a(2) as ultimately enacted strongly undermines the court of appeals' interpretation. The House Judiciary Committee amended the relevant bill, as proposed by the Subcommittee, to add Section 6a(2) with language that provided that "(2) such effect is the basis of the violation alleged." House Report, 16; H.R. 5235, 97th Cong., 2d Sess. § 2 (Aug. 2, 1982). Absent that subsection, the House Report explained, a plaintiff might have been able to bring suit in federal court "merely by proving a *beneficial* effect within the United States, such as increased profitability of some other company or increased domestic employment." House Report 11. The Report explained that the language the Committee added would "require that the 'effect' providing the jurisdictional nexus *must also be the basis for the injury alleged under the antitrust laws.*" *Id.* at 11-12 (emphasis added). That passage unambiguously contemplates that the plaintiff's claim must be based on injury resulting from the

_____

[5] See, *e.g.*, House Report 5 ("Since Judge Learned Hand's opinion in *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 443-444 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects as opposed to the conduct, that determines whether United States antitrust law applies."); *ibid.* (quoting Antitrust Div., DOJ, *Antitrust Guide to International Operations* 6-7 (1977) ("[I]t would be a miscarriage of Congressional intent to apply the Sherman Act to 'foreign activities which have no direct or intended effect on United States consumers or export opportunities."); *id.* at 7 (bill would "reinforc[e] the fundamental commitment of the United States to a competitive domestic marketplace"); *id.* at 9-10 ("A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for purposes of this legislation, be treated in the same manner as export transactions— that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on a domestic consumer or a domestic competitor.").

19

domestic effect of the defendant's conduct in violation of the Sherman Act.

As contemplated in the separate statement by Chairman Rodino (see House Report 18), Section 6a(2), as added by the Committee, was subsequently amended to require that "such effect gives rise to a claim." The Chairman stated that "[t]he substituted language accomplishes the same result as the Committee version" but was preferable "because the Committee language may suggest that an effect, rather than conduct, is the basis for a violation." *Ibid.* Thus, Section 6a(2) as finally enacted was intended to accomplish the same result as the language the House Report described as requiring that the "effect" of the defendant's conduct on United States commerce "must also be the basis for the injury alleged"—*i.e.*, by the plaintiff—"under the antitrust laws." *Id.* at 2. The decision of the court of appeals cannot be reconciled with that expression of congressional intent.

### 3. *Important Policy Considerations Grounded In The Antitrust Laws Significantly Undermine The Court Of Appeals' Interpretation*

a. The court of appeals' interpretation of the FTAIA would substantially interfere with the primary enforcement of the antitrust laws by the United States Government. Price-fixing conspiracies, including those operating globally, are inherently difficult to detect and prosecute. Cooperation by one of the conspirators, through provision of documents or testimony, is often vital to law enforcement.

In light of those practical realities, the Antitrust Division of the Department of Justice maintains a robust amnesty program that offers strong incentives to conspirators who voluntarily disclose their criminal conduct and cooperate with prosecutors. Cf. Germany Am. Br. Pet. Stage 14-16 (discussing EU and German amnesty policies). Since 1993, the program has offered: (1) automatic (*i.e.*, not discretionary) amnesty to corporations that come forward prior to an

20

investigation and meet the program's requirements; (2) the possibility of amnesty even if cooperation begins after an investigation is underway; and (3) if a corporation qualifies for automatic amnesty, all directors, officers, and employees who come forward and agree to cooperate also receive automatic amnesty. 4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993). Critically, amnesty is available only to the first conspirator to break ranks with the cartel and come forward. The incentives, transparency, and certainty of treatment established by the program set up a "winner take all" dynamic that sows tension and mistrust among cartel members and encourages defection from the cartel.

The amnesty program has been extremely valuable to enforcement of the antitrust laws. The majority of the Antitrust Division's major international investigations, including the investigation of the vitamin cartel, have been advanced through cooperation of an amnesty applicant. The program has been responsible for cracking more international cartels than all of the Division's search warrants, secret audio or videotapes, and FBI interrogations *combined*. Since 1997, cooperation from amnesty applications has resulted in scores of criminal convictions and more than $1.5 billion in criminal fines.

The court of appeals' interpretation of Section 6a would undermine the effectiveness of the government's amnesty program. Even those conspirators who come forward and receive amnesty from *criminal* prosecution still face exposure to private treble damage actions under 15 U.S.C. 15(a). Potential amnesty applicants therefore weigh their civil liability exposure when deciding whether to avail themselves of the government's amnesty program. The court of appeals' interpretation would tilt the scale for conspirators against seeking amnesty by expanding the scope of their potential civil liability. Faced with joint and several liability for co-conspirators' illegal acts all over the world, a conspirator could not readily quantify its potential liability. The pros-

21

pect of civil liability to all global victims would provide a significant disincentive to seek amnesty from the government.

From a practical standpoint, moreover, the court of appeals' analysis of deterrence is unsound because its focus is on private lawsuits that often follow the exposure of a cartel by the government. Such lawsuits are possible, of course, only if the cartel is discovered in the first place. A private action "supplements government enforcement of the antitrust laws; but it is the Attorney General and the United States district attorneys who are primarily charged by Congress with the duty of protecting the public interest under these laws." *United States* v. *Borden Co.*, 347 U.S. 514, 518 (1954).

In the government's judgment, the amnesty program, by creating a high risk of defection and exposure, deters cartel behavior more effectively than an increase in private litigation after the cartel has been exposed. It follows that deterrence is best maximized, and United States consumers are best protected, not by maximizing the potential number of private lawsuits, but by encouraging conspirators to seek amnesty and thus expose cartels in the first place.

b.  The court of appeals' holding would also present a risk of undermining the foreign relations of the United States. Germany, a major trading partner of the United States, expressed the view in its amicus brief at the petition stage (at 9) that, "[b]y applying the United States' antitrust laws in cases where neither the plaintiff nor the alleged harm has direct effects on United States commerce, the court of appeals' decision fails to respect the fundamental right of foreign sovereigns to regulate their own markets and industries." We understand that other countries share that view. A scheme in which United States courts would adjudicate treble damages actions arising out of transactions that occur wholly in foreign countries and that have no meaningful connection to the United States would be likely to result in tension with our trading partners and attempts by foreign

22

countries to enact statutory counter-reactions to any judg-ments entered in such suits. See *id.* at 11-14 (describing foreign "blocking" and "claw back" statutes and refusals to enforce certain United States judgments). It is for reasons such as these that the Court declined to apply United States law to transactions in foreign countries in *Arabian American Oil Co.* and *Foley Brothers.* See p. 15, *supra.*

Extension of the Sherman Act to foreign transactions having no substantial relation to the United States might also undermine the cooperative relationships that this Na-tion's antitrust agencies have forged with their foreign counterparts in recent years. In the cartel area, conspirato-rial meetings frequently take place in more than one coun-try, witnesses may be scattered around the world, and docu-mentary evidence may be located in multiple jurisdictions. Effective prosecution of an international cartel requires the ability to gather evidence in different countries and, fre-quently, coordination of investigative strategies among multi-national enforcement agencies. Because the United States and many of its foreign counterparts now have similar views on the seriousness of cartel behavior (see *infra,* p. 24), and effective mechanisms for coordinating investigations, the United States has become more effective in attacking conspiracies that straddle borders. But those cooperative relationships depend on mutual good will and reciprocity. If our foreign counterparts fear that the fruits of their coopera-tion ultimately will be used to support follow-on treble dam-age actions in the United States that they perceive as inappropriate, cooperation may be strained, to the overall detriment of international cartel enforcement.

c. The court of appeals' decision also would be likely to burden the federal courts with a wave of antitrust cases rais-ing potentially complex satellite disputes. For cases in which defendants contest whether the Sherman Act applies to foreign conduct covered by the FTAIA, plaintiffs must prove both that the challenged foreign conduct had the

23

requisite effects on United States commerce and that those effects give rise to a claim. 15 U.S.C. 6a(1) and (2).

For plaintiffs whose injuries are sustained in United States commerce, proof of the FTAIA's prerequisites will overlap substantially with the merits of the plaintiff's claim. But for plaintiffs entitled to sue under the court of appeals' holding, *i.e.*, plaintiffs whose injuries are sustained entirely abroad and arise from purely foreign transactions, the statutory inquiry would turn on claims and persons not before the court. Courts faced with such suits nonetheless would be forced to adjudicate whether the challenged foreign conduct was part of some global conspiracy, whether that global conspiracy had the requisite effects on domestic commerce, and whether some third person was injured in United States commerce in such a way that gave rise to a claim. Pet. App. 4a, 20a. Those questions might be intensely factual, hotly disputed, and difficult to resolve, particularly when the critical person and claim are not before the court. The court of appeals' decision thus would thrust upon federal courts the potential for burdensome and protracted satellite litigation that is far removed from the claim before the court.

d. The court of appeals failed to take into account any of the foregoing considerations. It rather believed that "forc[ing] the conspirator to internalize the full costs of his anticompetitive conduct" would provide maximum deterrence to cartels that injure American consumers. Pet. App. 32a. The theoretical possibility of additional deterrence contemplated by the court, however, would come only at the expense of weakening the ability of the United States government to discover the wrongdoing in the first place. The court of appeals similarly overlooked that the primary deterrent to cartel activity is the threat of imprisonment and other criminal penalties (especially when heightened through the fear of exposure created by the amnesty program). Scott D. Hammond, Director of Criminal Enforcement, Antitrust Div., *Detecting and Deterring Cartel Activity Through an*

24

*Effective Leniency Program* (Brighton, England, Nov. 21-22, 2000) ("Based on our experience, there is no greater deterrent to the commission of cartel activity than the risk of imprisonment for corporate officials.") (available at *<http://www. usdoj.gov/atr/public/speeches/9928.htm>)*. Criminal fines also can be substantial, as the penalties imposed on the participants in the vitamin cartel demonstrate. P. 2, *supra*.[6]

The court of appeals likewise failed to consider the large number of antitrust statutes around the world that deter and punish cartel activity. It is our understanding that approximately 100 countries now have comprehensive antitrust laws, and at least one-third of those, including most of the major industrialized countries, allow private lawsuits to recover damages for antitrust violations or provide for damages in conjunction with administrative proceedings.[7] Private civil suits have been filed against the vitamin cartel in Canada, the United Kingdom, Germany, Belgium, and the Netherlands, and class actions have been filed in Canada, Australia, and New Zealand. Pet. 5. At least three of the four home countries of respondents have antitrust laws that

---

[6] Persons who violate the Sherman Act are subject to a maximum statutory term of imprisonment of three years, a statutory maximum corporate fine of $10 million, and a statutory maximum individual fine of $350,000. 15 U.S.C. 1. Fines may exceed those amounts however, as defendants may be fined up to twice the gross gain from the offense or twice the gross loss to victims of the offense if those amounts exceed the Sherman Act's maximum fine. 18 U.S.C. 3571. Defendants may also be ordered to pay restitution in the full amount of the victim's loss. 18 U.S.C. 3663, 3663A; U.S.S.G. § 8B1.1.

[7] *E.g.*, ABA Section of Antitrust Law, *Competition Laws Outside the United States* 1:13, 2:13-14, 3:16-17, 9:11, 10:10 (2001); Global Competition Review, *Cartel Regulation, Getting the Fine Down in 25 Jurisdictions Worldwide* (2002); Global Competition Review, *Private Antitrust Litigation in 16 Jurisdictions Worldwide* (2004); World Trade Organization, Working Group on the Interaction Between Trade and Competition Policy, *Overview of Members' National Competition Legislation, Note by the Secretariat*, WT/WGTCP/W/128/Rev. 2 (July 4, 2000), available at *<http://www.wto.org/english/tratop_e/comp_e/comp_e.htm>*

25

prohibit price-fixing and laws that authorize private civil actions by persons who suffer damages from antitrust violations.[8]  These countries have enacted the remedies that their governments consider appropriate, and United States law should not promote forum shopping that undermines those sovereign judgments.

## B.  PLAINTIFFS WHOSE INJURIES ARE NOT TIED TO A CONSPIRACY'S ANTICOMPETITIVE EFFECT ON UNITED STATES COMMERCE LACK ANTITRUST STANDING

Even if the Court were to conclude, contrary to our submission in Point A, that the FTAIA does not limit the application of the Sherman Act itself in a manner that excludes claims arising from wholly foreign sales transactions with no significant effect on United States commerce, respondents' suit must fail because the Clayton Act does not in any event offer a cause of action in these circumstances.

1.  Section 4 of the Clayton Act, 15 U.S.C. 15(a), provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages and attorney's fees. Despite that broad language, Section 4 never was intended

---

[8]  Australia Trade Practices Act § 45A (agreement is unlawful if it has purpose or effect of "fixing, controlling or maintaining * * * the price for * * * goods or services") and Federal Court of Australia Act § 33C, *et seq.*; Panama Const. art. 290 and Law No. 29 of 1996 arts. 5, 11(1) (per se violations include any agreement that involves "to fix, manipulate, arrange or impose the sale or purchase price of goods or services or to exchange information with the same purpose or effect"), 142 (allowing suit by "any affected party"); Law of Ukraine On Restriction of Monopolism and Prevention of Unfair Competition in Business Activities (1992) and Law of Ukraine On Protecting the Economic Competition art. 55 (2001).  The situation in Ecuador is less clear, but it does appear that damages caused by cartel behavior (which appears to be illegal in Ecuador, Crim. Code arts. 67, 363) may be available under Ecuador's general consumer protection and contract laws.  Ecuador Organic Law for Consumer Protection arts. 2, 51, 70, 87; Civ. Code arts. 2211, 2241, 2256.

26

"to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General Contractors*, 459 U.S. at 529; accord *Verizon Communications, Inc.* v. *Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 877 (2004) (concurring opinion of Stevens, J). Thus, even if an antitrust plaintiff has suffered harm sufficient to satisfy the constitutional standing requirement of "injury in fact," the court must make a further determination whether the plaintiff has "antitrust standing," *i.e.*, "whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors*, 459 U.S. at 535 n.31.

This Court accordingly has established several limitations on antitrust standing based on substantive antitrust and policy considerations. For instance, in *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251 (1972), the Court held that States could not sue in their *parens patriae* capacity for damages to their general economy. Similarly, in *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977), the Court held that the antitrust laws do not provide relief to indirect purchasers who paid an enhanced price because their suppliers had been victimized by a price-fixing conspiracy. In *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), the Court held that a plaintiff must show "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." And in *Associated General Contractors*, 459 U.S. at 545, the Court found that a union lacked antitrust standing to sue a multi-employer association for alleged antitrust violations, after considering "the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy."

Those decisions establish that antitrust standing should be denied to a plaintiff whose suit would "divorce[] antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so." *Brunswick*, 429 U.S. at 487; accord *Associated General Contractors*, 459 U.S. at 538 (observing that the plaintiff should be seeking to redress injuries that are tied to the central purposes of the antitrust laws). In analogous circumstances, this Court has interpreted the Administrative Procedure Act, 5 U.S.C. 701 *et seq.*, and other statutes to deny standing when the plaintiff's interests do not fall within the "zone of interests" protected by the statute. *E.g.*, *National Credit Union Admin.* v. *First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998); *Bennett* v. *Spear*, 520 U.S. 154, 163 (1997); see *Malamud* v. *Sinclair Oil Corp.*, 521 F.2d 1142, 1152 (6th Cir. 1975) (applying zone of interests analysis to the antitrust laws).

2. Foreign purchasers in transactions having no substantial connection to United States commerce are not proper plaintiffs under Section 4 of the Clayton Act. As explained above, there is a background presumption that Congress did not intend to regulate such transactions in foreign countries under United States law, and nothing in the Clayton Act itself suggests a congressional intent to afford a treble damages remedy. The FTAIA did not amend the Clayton Act, and nothing in the text or history of the FTAIA's amendment of the Sherman Act suggests a congressional intent, much less a "clear statutory command" (*Brunswick*, 429 U.S. at 487), to displace the background presumption and create a treble damages remedy under the Clayton Act for a wide class of global plaintiffs whose injuries have no connection to United States commerce. To the contrary, the House Report makes clear (at 11) that the FTAIA was "not intend[ed] to alter existing concepts of antitrust injury or antitrust standing." And to conclude, as did the court of appeals, that such a class of plaintiffs may sue based on the rights of third

parties who were injured in the United States conflicts with basic principles of standing generally.  See p., 12, supra.

The court of appeals reasoned that "[t]he foreign plaintiffs' paying of inflated prices in foreign commerce" was a loss that the antitrust laws were designed to prevent. Pet. App. 35a.  The fact that respondents were direct purchasers victimized by a price-fixing conspiracy, however, does not mean that respondents suffered the kind of injury contemplated by Section 4 of the Clayton Act when their particular injuries did not arise from anticompetitive effects on United States commerce.  Under the FTAIA, the conduct of petitioners at issue in this case was unlawful under the Sherman Act only because of its anticompetitive effect on domestic United States commerce. Respondents' injury, which is not based on any such an effect, does not "flow[] from that which makes the defendants' acts unlawful," *Brunswick Corp.*, 429 U.S. at 489, and therefore is outside the zone of interests protected by the antitrust laws.

"American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). Rather, the central purpose of the antitrust laws is to protect consumers, competition, and commerce *in the United States.* "Congress' foremost concern in passing the antitrust laws was the protection of Americans." *Pfizer*, 434 U.S. at 314; see 1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h, at 358 (2d ed. 2000) ("[The FTAIA] makes clear that the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers."); *Turicentro, S.A.* v. *American Airlines Inc.*, 303 F.3d 293, 307 (3d Cir. 2002) ("Plaintiffs' injuries occurred exclusively in foreign markets.  They are not of the type Congress intended to prevent through the [FTAIA] or the Sherman Act.").  Accordingly, to award treble damages and attorney's fees to a class of foreign plaintiffs whose injuries arise exclusively from a conspiracy's

29

foreign anticompetitive effects would "divorce antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so." *Brunswick Corp.*, 429 U.S. at 487; *Matsushita*, 475 U.S. at 582-284 & nn. 6 & 7 (antitrust damages unavailable except where foreign conduct caused plaintiffs' injury in American market).[9]

The conclusion that the Clayton Act does not afford respondents a cause of action is reinforced by the fact that private suits such as this would undermine enforcement of the Sherman Act by the United States Government, which is primarily responsible for protecting American consumers and markets. All of the lower court decisions interpreting Section 6a(2), *i.e.*, this case, *Kruman* and *Statoil*, have involved private actions by foreign plaintiffs that followed directly on the heels of criminal or civil enforcement actions initiated by United States and foreign antitrust authorities. As explained previously, the United States' experience is that the most effective method of enforcement features an amnesty program that offers strong incentives to conspirators to break ranks with and expose their cartels by seeking amnesty from criminal prosecution. Greatly expanding the scope of private follow-on litigation would weaken the incentives to seek amnesty, and ultimately weaken the protection of United States consumers by making international cartels difficult to detect. See pp. 19-21, *supra*. Opening our courts to suits with no connection to United States commerce also would risk undermining the relationships with foreign governments that are important to the

---

[9] The court of appeals viewed respondents as proper plaintiffs because respondents' claimed injuries, in the court's view, suffered none of the defects mentioned in *Associated General Contractors*, *supra*. Pet. App. 36a-37a. The factors mentioned in that decision, however, simply persuaded the Court that the plaintiffs in that particular case lacked standing. The Court did not intimate that those factors were exclusive, and explicitly stated that "[a] number of other factors may be controlling" in determining whether a plaintiff has antitrust standing. 459 U.S. at 538.

30

United States' enforcement efforts and would impose on federal courts potentially burdensome and complex antitrust suits brought by plaintiffs around the globe based on transactions that took place overseas.  See pp. 21-23, *supra*; cf. *Associated General Contractors*, 459 U.S. at 545 ("massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits").  Those considerations, and the fact that such suits are far removed from the core policy of the antitrust laws to protect commerce in the United States, establish that respondents lack standing to invoke the treble damages remedy of Section 4 of the Clayton Act.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted.

EDWIN S. KNEEDLER[*]
    *Acting Solicitor General*
R. HEWITT PATE
    *Assistant Attorney General*
MAKAN DELRAHIM
    *Deputy Assistant Attorney*
    *General*

WILLIAM H. TAFT, IV
    *Legal Adviser*
    *United States Department*
    *of State*
JOHN D. GRAUBERT[**]
    *Acting General Counsel*
    *Federal Trade Commission*

LISA S. BLATT
    *Assistant to the Solicitor*
    *General*
ROBERT B. NICHOLSON
STEVEN J. MINTZ
    *Attorneys*

FEBRUARY 2004

_____

[*]  The Solicitor General is recused in this case.
[**] The General Counsel is recused in this case.