# Exhibit 36



# DEPARTMENT OF JUSTICE

---

**"MAKING COMPANIES AN OFFER
THEY SHOULDN'T REFUSE"**

**The Antitrust Division's
Corporate Leniency Policy -- An Update**

**By**

**GARY R. SPRATLING
Deputy Assistant Attorney General
Antitrust Division, U.S. Department of Justice**

**Presented at the**

**Bar Association of the District of Columbia's
35th Annual Symposium on Associations and Antitrust**

**The Carlton Hotel
Washington, D.C.**

**February 16, 1999**

# MAKING COMPANIES AN OFFER
# THEY SHOULDN'T REFUSE

### The Antitrust Division's
### Corporate Leniency Policy -- An Update

## I. Communicating The Leniency Policy's Message

> *"If someone in your company has been conspiring with competitors to fix prices, here's some sound advice. Get to the Justice Department before your co-conspirators do. Confess and the U.S. Department of Justice will let you off the hook. But hurry! Only one conspirator per cartel."*

The above quotation about the Antitrust Division's Leniency Policy ("Amnesty Program") does not come from a Division speech but rather was the introductory text in an article that appeared in <u>Forbes</u> magazine titled "Fix and tell."[1]  The fact that the Division's Amnesty Program was featured in a prominent  business publication reflects the business community's increasing awareness of the risks associated with violating the antitrust laws.  Moreover, as the article pointed out, companies have come to understand that acceptance into the Amnesty Program can potentially save a firm tens of millions of dollars in fines and can eliminate the threat of prosecution and incarceration for the firm's culpable executives.

In August 1993, the Division expanded its Amnesty Program to make it easier and more attractive for companies to come forward and cooperate with the Division.  The features of the revised Amnesty Program -- amnesty is automatic if there is no pre-existing investigation, amnesty may still be available even if cooperation begins after the investigation is underway, and all officers, directors, and employees who cooperate get complete protection -- remain as unique today as they were then.  No other governmental voluntary disclosure program offers as great an opportunity or incentive for companies to self report and cooperate.  (See attached Corporate Leniency Policy).

Perhaps because of the Amnesty Program's novelty, the antitrust bar initially was skeptical as to how the Division would apply it.  In the meantime, the Division seized every available opportunity to educate the bar and the business community on the merits of the Amnesty Program and, more importantly, built a solid record of applying the program consistently and fairly.  Eventually, we were joined by converted members of the antitrust bar who discussed the advantages of the Amnesty Program at continuing legal education programs.

---

[1]Janet Novack, "Fix and tell," Forbes, May 4, 1998 at 46.

Today, the Amnesty Program is the Division's most effective generator of large cases, and it is the Department's most successful leniency program.  Amnesty applications over the past year have been coming in at the rate of approximately two per month -- a more than *twenty-fold* increase as compared to the rate of applications under the old Amnesty Program.  Given this remarkable rate of amnesty applications, it certainly appears that the message has been communicated.

## II.  An Offer Companies Shouldn't Refuse

Whether a company ultimately decides to apply to the Amnesty Program depends, of course, on how it perceives and evaluates its alternatives.  If a company detects an antitrust offense before the Division does, it likely will weigh the potential risks and consequences of government detection and prosecution before deciding whether to report the violation.  No matter how seriously firms and their counsel considered these dangers in past years, a number of factors, in addition to the Amnesty Program, have combined to raise the stakes considerably.

First and foremost, the Division has been highly successful recently in cracking antitrust conspiracies and obtaining heavy fines against the participants.  In the last two years, the Division has obtained nearly a half-billion dollars in criminal fines.  To put these criminal fines in perspective, the total fines imposed on corporate defendants in the *past two years* is virtually identical to the total fines imposed in all of the Division's prosecutions during the *20 years* from 1976 to 1996.  In fact, in FY 1998, the average criminal fine imposed on corporations was roughly $12 million, a nearly *fifteen-fold* increase as compared to just two years earlier, FY 1996.  Thus, for a company facing the possibility of a heavy criminal fine, the opportunity to self report and pay *zero* dollars in criminal fines is one that it simply shouldn't refuse.

Second, for companies who are the first to uncover antitrust offenses, it is an increasingly risky proposition to hope that the conduct will not eventually be exposed by others.  Of course, the Division is using every available investigative means to detect antitrust offenses, such as the use of informants, consensual monitoring, audio and video tape recordings, and search warrants.  However, the private bar also has played an important role in detecting antitrust offenses in a way that contributes directly to the success of the Amnesty Program.  The private bar is largely responsible for the current prevalence and success of antitrust compliance programs.  Even when compliance programs fail to prevent antitrust offenses from occurring, they have proven to be very effective in terms of identifying violations.  Many of the Division's recent amnesty applications were initiated as a result of early detection by the firm's antitrust compliance program.  In these cases, the applicants understood that early detection gave them a head start in the race for amnesty, and they were unwilling to gamble that the activity would not be detected by another company who would take advantage of the Amnesty Program.

The early identification of antitrust offenses through compliance programs, together with the opportunity to pay zero dollars in fines under the Division's Corporate Amnesty program, has resulted in "a race to the courthouse," to use the words of an experienced antitrust attorney

quoted in the <u>Forbes</u> article.  We frequently see situations where a company approaches the government a few days, or even less than one full day, after one of its conspirators has already approached the Division and secured its position as first in line for amnesty.  Of course, as in all things, timing is everything.  In two recent cases, being second in the door ended up costing companies tens of millions of dollars in fines as well as criminal exposure for the culpable executives.[2].As explained in the Model Amnesty Letter section below, the Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants.  However, the two amnesty applicants discussed herein identified themselves as amnesty applicants by issuing press releases announcing their acceptance into the Amnesty Program. [3]

### III.    Clarifying The Division's Application
        Of Its Corporate Leniency Policy

        In April 1998, the Division issued a paper titled "The Corporate Leniency Policy: Answers To Recurring Questions" which sought to clarify how the Amnesty Program would be applied in certain circumstances. (See Attachment.)[4]  However, the unprecedented number of amnesty applications over the past year has led to still more new issues relating to how the Division applies its Amnesty Program.  This section will clarify the Division's position on these new issues.

---

[2]The amnesty applications in the Division's ongoing marine construction and graphite electrodes investigations are prime examples of the financial benefits of the Amnesty Program.

  In the marine construction investigation, the amnesty applicant paid *zero* dollars in fines while the next company who agreed to cooperate paid a *$49 million* fine.  In the graphite electrodes investigation, the first company in the door after the amnesty applicant paid a *$32.5 million* fine and the next company to plead guilty paid a *$110 million* fine.  As these investigations continue, the financial advantages of the Amnesty Program may become more apparent and more dramatic.

[4]Attached is the section from the April 1998 paper on "Clarifying The Division's Application Of Its Corporate Leniency Policy."

Defining "Current Employee" Under The Leniency Policy

The Corporate Leniency Policy states that if a corporation qualifies for amnesty under Part A then "all directors, officers, and employees" who come forward and provide complete and truthful information will be granted leniency. The Amnesty Program covers only current employees, so questions have arisen as to how the Division defines "employee" status under the Amnesty Program and who qualifies as a "current employee" of the corporation.[5] To set up this issue, consider the following hypothetical fact pattern.

> *Counsel for ABC, Inc. learns that John Doe, an ABC Inc. vice president, attended meetings and participated in bid-rigging agreements with competitors in violation of the company's corporate compliance program. ABC Inc. decides to self report and apply to the Division's Amnesty Program. Before the company meets with the Division, it forces Doe to resign as vice president for violating the company's compliance program. However, Doe continues to receive compensation, including benefits, pursuant to his employment contract. Does' contract contains a non-compete clause and requires Doe to perform certain services for the company if called upon to do so. When ABC, Inc. applies for corporate amnesty, it makes clear to the Division that it does not want Doe or any other former employees involved in the bid rigging to be covered by the amnesty agreement. ABC, Inc. is accepted into the Corporate Amnesty program and all of its current directors, officers and employees who fully and truthfully cooperate with the Division receive leniency. Assuming Doe offers to provide full and truthful cooperation, is he a current employee entitled to leniency under the terms of the amnesty agreement?*

In situations where an individual's employment status is not clear, the Division will consider a number of employment indicia in determining whether an individual qualifies as an employee for leniency purposes. In the hypothetical above, if for all intents and purposes the individual is an *inactive* employee with no duties and responsibilities -- i.e., he has no office, no dedicated support staff, and infrequent business communication with the company -- then the individual will *not* be covered by the amnesty agreement as a current employee of the company, notwithstanding his uninterrupted receipt of compensation and other benefits from the amnesty applicant. If the individual is not a current employee in the amnesty analysis, then he is a former employee; it would be incumbent on the company applying for amnesty to ask the Division to

---

[5]The Amnesty Policy makes no reference to how the Division will treat former employees of the amnesty applicant. In the April 1998 paper, the Division clarified its policy regarding the status of former employees who were employed by the company during the conspiracy period: the Division is under no obligation to give immunity to former employees, even those who are willing to provide full and truthful cooperation. However, the Division may, at its discretion in the conditional amnesty letter, give non-prosecution protection to former employees.

exercise its discretion to grant protection to former employees and the hypothetical posits that the applicant does not want former employees covered by the amnesty agreement.

In the above hypothetical, the amnesty applicant's expressed desire to carve the individual out of the amnesty agreement is not determinative of whether an arguably current employee is covered. Yet, any statements made by the company at the time of the amnesty application reflecting that it did not consider the individual to be a current employee covered by the agreement would be weighed in the final analysis.

Finally, amnesty coverage for current officers, directors, and employees continues even if they leave their employment. Thus, if, for example, an executive leaves a company shortly after the company receives conditional amnesty, the individual can still qualify for amnesty if he/she provides full and truthful cooperation.

B.    Restrictions On Disclosing Information Obtained From
       An Amnesty Applicant To Foreign Authorities

As discussed above, the Amnesty Program has been the Division's most effective generator of large cases and, in particular, international cartel prosecutions. In the past year alone, the Amnesty Program has led to over a dozen convictions and hundreds of millions of dollars in criminal fines. Invariably, however, when a company is considering whether to report its involvement in international cartel activity, a concern is raised as to whether the Division will be free to disclose the information to any foreign governments in accordance with our obligations under bilateral antitrust cooperation agreements. This issue presents a difficult policy decision for the Division. On the one hand, the Division's policy is to treat the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. Thus, the Division will not disclose the identity of an amnesty applicant, absent prior disclosure by the applicant, unless required to do so. Moreover, the Division has an interest in maximizing the incentives for companies to come forward and self report antitrust offenses. In that vein, it would create a strong disincentive to self report and cooperate if a company believed that its self reporting would result in investigations in other countries and that its cooperation -- in the form of admissions, documents, employee statements, and witness identities -- would be provided to foreign authorities pursuant to antitrust cooperation agreements and then possibly used against the company. On the other hand, the Division has been at the forefront in advocacy and actions to enhance international cartel enforcement, and the Division has received substantial assistance from foreign governments in obtaining foreign-located evidence in a number of cases. A policy not to share with foreign governments information obtained from amnesty applicants may appear inconsistent with the Division's ongoing efforts to increase cooperation among the world's antitrust enforcement agencies.

In the final analysis, the Division's overriding interest in protecting the viability of the Amnesty Program has resulted in a policy of not disclosing to foreign antitrust agencies information obtained from an amnesty applicant unless the amnesty applicant agrees first to the

disclosure.[6]  Such a policy, in the long run, is in everyone's interest.  Based on five years' experience of amnesty negotiations under the Division's revised Amnesty Program, there is no doubt that amnesty applications would dry up if the Division took a different position.  Consequently, large numbers of international conspiracies would go unreported, and no one would have the information.  Moreover, amnesty applications lead the Division to other conspirators and to additional evidence provided by them -- information that we can and will share with foreign government agencies.  This aspect of the Division's amnesty nondisclosure policy will not insulate the amnesty applicant from proceedings in other countries.  But it will ensure that cooperation provided by an amnesty applicant will not be disclosed by the Division to its foreign counterparts pursuant to antitrust cooperation agreements.

.    <u>Expanding The Scope Of The Amnesty Protection</u>

Companies frequently apply for amnesty before completing their own internal investigations in order to ensure their place at the front of the line.  As a result, an ensuing investigation may uncover anticompetitive activity that is more extensive than the conduct originally reported and which falls outside of the nonprosecution protection of the conditional amnesty letter.  For example, an applicant's cooperation may lead to evidence showing that the anticompetitive activity was broader in terms of its geographic scope or the products covered by the conspiracy.  This then raises the issue as to whether a company's amnesty protection can be expanded to include the newly discovered conduct.  Assuming that the company is providing full, continuing, and complete cooperation, and that the company can meet the criteria for amnesty on the newly discovered conduct, the amnesty coverage will be expanded to include such conduct.  This is not an infrequent occurrence and, in most cases, the expanded coverage is accomplished by issuing an addendum to the original amnesty letter.

.    <u>"Amnesty Plus" - An Even Better Offer Than Amnesty</u>

Over 30 sitting grand juries are currently looking into suspected international cartel activity.  Roughly half of these investigations were initiated as a result of evidence developed during an investigation of a completely separate market.  This pattern has led the Division to take a proactive approach to attracting amnesty applications by encouraging subjects and targets of investigations to consider whether they may qualify for amnesty in other markets where they compete.  To set up this issue, consider the following hypothetical fact pattern.

*As a result of cooperation received pursuant to an amnesty application in the widgets market, a grand jury is investigating the other four producers in that market, including XYZ, Inc., for their participation in an international cartel.  As part of its internal*

---

[6]In contrast, the Division will *not* agree to restrictions in plea agreements which limit our ability to share information obtained from cooperating defendants with foreign government authorities.  The Division's policy for amnesty applicants is limited to such applicants because of disclosure's significantly adverse impact on the Amnesty Program.

*investigation, XYZ, Inc. uncovers information of its executives' participation not only in a widgets cartel but also in a separate conspiracy in the sprockets market. The government has not detected the sprockets cartel, because the amnesty applicant was not a competitor in that market and no other investigation has disclosed the cartel activity. XYZ, Inc. is interested in cooperating with the Division's widgets investigation and seeking leniency by reporting its participation in the sprockets conspiracy. Assuming XYZ, Inc. qualifies for leniency, what benefits can XYZ, Inc. receive by following this path?*

XYZ, Inc. can obtain what we refer to as "Amnesty Plus."   In such a case, the Division will grant leniency to XYZ, Inc. in the sprockets investigation, meaning that XYZ, Inc. will pay zero dollars in fines for its role in the sprockets conspiracy and none of its officers, directors, and employees who cooperate will be prosecuted criminally in connection with anticompetitive activity in the sprockets industry. *Plus*, the Division will give XYZ, Inc. a substantial additional discount in calculating its fine in the widgets plea agreement -- i.e., a discount which takes into consideration the company's cooperation in both the widgets and sprockets investigations, and will, therefore, be greater than the discount it would have received for cooperation in the widgets investigation alone. Consequently, XYZ, Inc. will receive dual credit for coming forward and cooperating in the sprockets investigation both in terms of obtaining leniency in that matter and in terms of receiving a greater reduction in the recommended widgets fine.

## IV. <u>Model Amnesty Letters</u>

In the April 1998 paper, the Division attached its model letter for use in granting amnesty to corporations pursuant to the Corporate Leniency Policy. The model letter remains the same and is attached hereto. In addition, attached is a model letter for individuals who qualify for leniency pursuant to the Division's Individual Leniency Policy. As the model letter makes clear, individuals who approach the Division on their own behalf, not part of a corporate proffer or confession, and report anticompetitive activity will receive leniency or nonprosecution protection for the activity being reported.

## V. <u>Conclusion</u>

As discussed above, if a company detects an antitrust offense before the Division does, it is at a strategic crossroads. It has to chose whether to report the violation and seek leniency or to remain silent and hope for the best. By increasing the opportunities and incentives for companies to self report and cooperate, the Division has sweetened the carrot for companies opting for Corporate Amnesty. At the same time, the Division's recent record of successful prosecutions and heavy fines has sharpened the stick for companies who risk following the alternative path. Of course, the choice is the company's to make, but a complete pass from prosecution is an offer that companies shouldn't refuse.

## CORPORATE LENIENCY POLICY

The Division has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. "Leniency" means not charging such a firm criminally for the activity being reported. (The policy also is known as the corporate amnesty or corporate immunity policy.)

## A. **Leniency Before an Investigation Has Begun**

Leniency will be granted to a corporation reporting illegal activity before an investigation has begun, if the following six conditions are met:

1. At the time the corporation comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source;

2. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

3. The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation;

4. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

5. Where possible, the corporation makes restitution to injured parties; and

6. The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity.

## B. **Alternative Requirements for Leniency**

If a corporation comes forward to report illegal antitrust activity and does not meet all six of the conditions set out in Part A, above, the corporation, whether it comes forward before or after an investigation has begun, will be granted leniency if the following seven conditions are met:

1. The corporation is the first one to come forward and qualify for leniency with respect to the illegal activity being reported;

2. The Division, at the time the corporation comes in, does not yet have evidence against the company that is likely to result in a sustainable conviction;

3. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

4.  The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation;

5.  The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

6.  Where possible, the corporation makes restitution to injured parties; and

7.  The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity.  The burden of satisfying condition 7 will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity.  That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.


## C.  Leniency for Corporate Directors, Officers, and Employees

If a corporation qualifies for leniency under Part A, above, all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation.

If a corporation does not qualify for leniency under Part A, above, the directors, officers, and employees who come forward with the corporation will be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

## D.  Leniency Procedure

If the staff that receives the request for leniency believes the corporation qualifies for and should be accorded leniency, it should forward a favorable recommendation to the Office of Operations, setting forth the reasons why leniency should be granted.  Staff should not delay making such a recommendation until a fact memo recommending prosecution of others is prepared.  The Director of Operations will review the request and forward it to the Assistant Attorney General for final decision.  If the staff recommends against leniency, corporate counsel may wish to seek an appointment with the Director of Operations to make their views known. Counsel are not entitled to such a meeting as a matter of right, but the opportunity will generally be afforded.

Issued August 10, 1993

**Clarifying The Division's Application**
**Of Its Corporate Leniency Policy**\*

During the four years the Division's current Corporate Leniency Policy has been in effect, a number of questions have arisen about how the policy is to be applied in certain circumstances. In some instances, misplaced concerns or misinterpretations have resulted in corporations delaying their applications for amnesty or making no application at all.  Since even a 24-hour delay can potentially cost a company a criminal conviction and tens of millions of dollars in fines, this section attempts to clarify the Division's application of the Corporate Amnesty Program with respect to several recurring issues.

.    **Terminating The Activity**

(1)    **What Is Required**

In setting out one of the conditions that must be met to obtain amnesty, sections A2 and B3 of the Amnesty Program provide, "The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity."  Questions have arisen as to what is required for a corporation to "terminate its part in the activity."

Termination does not require announcement of withdrawal in the illegal activity to other participants in the activity (although that would constitute one means of termination). Termination can also be effectuated by reporting the illegal activity to the Division and refraining from further participation unless continued participation is with Division approval.

(2)    Terminating "Upon Discovery" When Top
        Executives Have Been Participants

Questions have also arisen about what it means for the corporation to "discover" the activity.  More specifically, in cases (usually involving small, closely held corporations) where the top executives, board members, or owners participated in the conspiracy, it has been suggested that the corporation may not be eligible for amnesty, because the corporation's "discovery" of the activity arguably occurred when those participants joined the conspiracy.  Under that approach, the corporation cannot be said to have promptly terminated its part in the activity.

_____

*Reprinted from Gary R. Spratling, "The Corporte Leniency Policy: Answers To Recurring Questions," April 1, 1998, pages 2-8.

Generally, the Division will consider the corporation to have discovered the illegal activity at the earliest date on which either the board of directors or counsel for the corporation (either inside or outside) were first informed of the conduct at issue.  Thus, the fact that top executives, board members, or owners participated in the conspiracy will not necessarily bar the corporation from eligibility for amnesty.  The purpose of this interpretation is to ensure that as soon as the authoritative representatives of the company for legal matters--the board or counsel representing

the corporation--are advised of the illegal activity, they take action to cease that activity. In the case of a closely held corporation in which the board of directors is never formally advised of the activity, because all members of the board are conspirators, the corporation still may qualify under this provision if the activity is terminated promptly after legal counsel is first informed.

**B.**    **Restitution**

    (1)    <u>When The Division Ultimately Brings No Criminal Case</u>

    In setting out another condition that must be met to obtain amnesty, sections A5 and B6 of the Amnesty Program state, "Where possible, the corporation makes restitution to injured parties." In certain cases where a corporation has otherwise met the requirements for amnesty and agreed to pay restitution, the Division may ultimately determine that either (a) the amnesty applicant has not engaged in any criminal antitrust conduct or (b) even though the amnesty applicant has engaged in criminal antitrust conduct, prosecution of the other conspiracy participants is not justified under the Principles of Federal Prosecution given the weakness of the evidence or other problems with the case. The issue has arisen as to whether, in such cases, the amnesty applicant still has to pay the agreed-upon restitution.

    In cases in which the Division's investigation ultimately reveals that the amnesty applicant has not engaged in any criminal antitrust conduct, the Division will not grant amnesty because it is unnecessary. Obligations placed on the applicant by the Leniency Policy, the Division's conditional grant of amnesty, or the applicant's leniency agreement with the Division no longer apply once the Division determines there is no underlying criminal conduct. The Division will so advise the applicant in writing. Accordingly, there is no duty to pay restitution. If the amnesty applicant has already paid restitution or is in the process of so doing, the applicant must resolve the matter with the recipient. Once the Division decides not to grant amnesty, the applicant has no duty towards the Division, nor does the Division have any duty to help "reverse" any steps taken towards payment.

    In cases where the Division concludes that the amnesty applicant has engaged in criminal antitrust activity and conditionally grants the amnesty application, but later closes the investigation without charging any other entity in the conspiracy, the obligation to pay restitution remains in effect. The Division will notify in writing the amnesty applicant and the subjects of the investigation that the investigation has been closed. In such cases, the amnesty applicant can withdraw its application. In that case, the obligations undertaken by the applicant -- including the payment of restitution -- are no longer in effect. The Division, for its part, is technically no longer prohibited from prosecuting the applicant and will not provide any additional assurances of non-prosecution. Again, the Division will not assist in restoring any restitution already paid if the amnesty application is withdrawn. Also, once an applicant has fulfilled all of the conditions for amnesty and the Division has issued a final amnesty letter, the Division will not permit the company to withdraw.

    (2)    <u>"Where Possible"</u>

The requirement in sections A5 and B6 that the applying corporation make restitution is qualified by the words "[w]here possible."  The issue has arisen as to whether this language means that the amnesty agreement should contain a provision that similarly limits the requirement of restitution to payment "if possible" -- thereby deferring the determination as to whether restitution will be made to some time after the amnesty agreement is conditionally entered into and arguably putting that determination into the hands of the amnesty candidate.

There is a strong presumption in favor of requiring restitution in amnesty situations.  Restitution will be excused only where, as a practical matter, it is not possible.  Examples of situations in which an applicant might be excused from making restitution include where the applicant is in bankruptcy and is prohibited by court order from undertaking additional obligations or where there was only one victim of the conspiracy and it is now defunct.  Another example of where the Division will not require the applicant to pay full restitution is if it would substantially jeopardize the organization's continued viability.  The issue of restitution is addressed in paragraph 2(g) of the model letter, which requires the applicant to make "all reasonable efforts, to the satisfaction of the Antitrust Division," to pay restitution.  This contemplates that, at some point before conditional amnesty becomes final, the Division will make a determination that the applicant has satisfied any obligation to pay restitution and will so inform the applicant.

(3)    "Injured Parties"

The issue has arisen as to whether this phrase includes foreign parties in international conspiracies.  "Injured parties" is intended to refer only to government entities, businesses and individuals located in the United States.

## C.    Confession Truly A Corporate Act

In setting out another condition that must be met to obtain amnesty, sections A4 and B5 state, "The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."  Other conditions that must be met for amnesty are set out in sections A3 and B4.  Section A3 states, "The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation."  Section B4 states, "The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation."  Issues have arisen as to whether, if individual corporate executives represented by independent counsel refuse to cooperate, the corporation is barred from amnesty on the basis that the confession is no longer a "corporate act" or that the corporation is not providing "full . . . and complete" cooperation.

In order for the confession of wrongdoing to be a "corporate act" and in order for the cooperation to be considered "full, continuing and complete," the corporation must, in the Division's judgment, be taking all legal, reasonable steps to cooperate with the Division's investigation.  If the corporation is unable to secure the cooperation of one or more individuals,

that will not necessarily prevent the Division from granting the amnesty application.  However, the number and significance of the individuals who fail to cooperate, and the steps taken by the company to secure their cooperation, are relevant in the Division's determination as to whether the corporation's cooperation is truly "full, continuing and complete."

## D.    <u>Partial Amnesty</u>

Questions have arisen as to whether a corporation that has been convicted of illegal antitrust activity -- or is the target of an investigation involving illegal antitrust activity where amnesty is no longer available -- can receive "partial amnesty" for criminal antitrust conduct that is essentially unrelated to the conduct for which amnesty is no longer available.

According to the policy, leniency means not criminally charging a firm "for the activity being reported."  If a firm reports activity that is independent of the conduct for which amnesty is no longer available (because the company has been convicted, another firm has received amnesty, the investigation is too far advanced for amnesty, etc.), amnesty is still available for the other activity, provided that all the requirements of the Leniency Policy are met with respect to that conduct.

## E.    <u>Non-Prosecution Of All Employees Who Cooperate</u>

Part C of the Amnesty Program provides that "[i]f a corporation qualifies for leniency under Part A . . . all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation."  In some cases, certain directors, officers, and employees have had some awareness of, or incidental participation in, the illegal antitrust activity, but no significant involvement.  In such cases, the issue has arisen as to whether, by acknowledging such awareness or incidental participation, such individuals will receive leniency even though it can be argued that they have not admitted "their involvement in the illegal antitrust activity" or admitted "their wrongdoing" -- because they were not "involved" and did not engage in "wrongdoing."

With respect to individuals, the principal purpose of the Corporate Leniency Policy is to encourage as many employees as possible to come forward with the company and cooperate fully with the Division and give complete and truthful accounts.  The intent also is to assure all such employees that they will be granted some form of non-prosecution protection.  Employees who committed no crime technically are not covered by the Leniency Policy, because there is nothing for which to give leniency.  The model letter addresses in paragraph 4 the concern of giving appropriate assurances to all cooperating employees, those who need leniency and those who do not, by making **a non-prosecution commitment to all directors, officers and employees who cooperate.**

## F.    <u>Not The Leader Or Originator Of The Activity</u>

In order to obtain amnesty under Part A, according to section A6, it must be true that "[t]he corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity."  Similarly, section B7 in Part B states:

> The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.  In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. . . .

Issues have arisen as to what it means to be "the leader in, or originator of, the activity."

The Amnesty Program refers to "the" leader and "the" originator of the activity, rather than "a" leader or "an" originator.  Accordingly, in situations where the corporate conspirators are viewed as co-equals or where there are two or more corporations that are viewed as leaders or originators, any of the corporate participants will qualify under this part of section A6 and may qualify under the more discretionary section B7.

## G.  <u>Former Employees</u>

Because the Corporate Leniency Policy makes no reference to how the Division will treat former employees of the amnesty applicant who were employed by the company during the conspiracy period, the issue has arisen as to how such employees should be treated.

Part C of the Leniency Policy does not refer to former employees, so the Division is under no obligation to grant leniency to former employees who cooperate fully and provide complete and truthful information.  However, the Division has the power to agree not to prosecute former employees who come forward.  It is therefore permissible, and in many cases advisable, to negotiate with the applicant to include in the amnesty agreement protection for former employees on the same basis as current employees.  The model letter provides optional language for the inclusion of former employees in paragraphs 2(c)-(f), 3, and 4.

**U.S. Department of Justice**
Antitrust Division

---

*Office of the Deputy Assistant Attorney General*
*Washington, D.C.  20530*

[insert]

Dear [insert]:

This letter sets forth the terms and conditions of an agreement between the Antitrust Division of the United States Department of Justice and ABC, Inc., in connection with possible [insert description of conduct: e.g., price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the [insert generic description of industry: e.g., widget] industry [insert geographic scope--e.g., worldwide, in the United States]. This agreement is conditional and depends upon ABC, Inc., satisfying the conditions set forth below.  After all of these conditions are met, the Division will notify ABC, Inc. in writing that the application has been granted. It is further agreed that disclosures made by counsel for ABC, Inc. in furtherance of the amnesty application will not constitute a waiver of the attorney-client privilege or the work-product privilege.

## <u>AGREEMENT</u>

1.  **Representations**: ABC desires to report to the Antitrust Division possible [e.g., price fixing] activity or other conduct violative of the Sherman Act in the [insert] industry [e.g., worldwide].  ABC represents to the Antitrust Division that, in connection with the anticompetitive activity being reported, it:

> (a)    took prompt and effective action to terminate its part in the activity upon discovery of the activity; and

> (b)    did not coerce any other party to participate in the activity and was not the leader in, or the originator of, the activity.

2.  **Cooperation**: ABC agrees to provide full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported, including, but not limited to, the following:

> (a)    providing a full exposition of all facts known to ABC relating to the reported activity;

*-1-*

(b)    providing promptly, and without requirement of subpoena, all documents or other items in its possession, custody or control, wherever located, requested by the Antitrust Division, to the extent not already produced;

(c)    using its best efforts to secure the complete, candid and truthful cooperation of its current [and former][1] directors, officers and employees, and encouraging such persons voluntarily to provide the Antitrust Division with any information relevant to possible [e.g., price-fixing] agreements or other conduct violative of 15 U.S.C. § 1 in the [insert] industry [e.g., worldwide];

(d)    facilitating the ability of current [and former] directors, officers and employees to appear for such interviews or testimony as the Antitrust Division may require at the times and places designated by the Antitrust Division;

(e)    using its best efforts to ensure that current [and former] directors, officers and employees who provide information to the Antitrust Division respond completely, candidly and truthfully to all questions asked in interviews, and grand jury appearances and at trial;

(f)    using its best efforts to ensure that current [and former] directors, officers and employees who provide information to the Antitrust Division make no attempt either falsely to protect or falsely to implicate any person or entity; and

(g)    making all reasonable efforts, to the satisfaction of the Antitrust Division, to pay restitution to any person or entity injured as a result of any [e.g., price-fixing] agreements or other conduct violative of 15 U.S.C. § 1 in the [insert] industry [e.g., worldwide], in which ABC was a participant.

3. **Corporate Leniency**:  Subject to verification of ABC's representations in paragraph 1 above, and subject to its full, continuing and complete cooperation, as described in paragraph 2 above, the Antitrust Division agrees conditionally to accept ABC into [Part A/Part B] of the Corporate Leniency Program, as explained in an Antitrust Division policy statement dated August 10, 1993 (attached).  Pursuant to that policy, the Antitrust Division agrees not to bring any criminal prosecution against ABC for any act or offense it may have committed prior to the date

---

[1]Former employees are not covered by the Leniency Policy, but may be included in the negotiated coverage of the agreement in appropriate cases.  The decision on whether the Division includes former employees will depend on a number of factors, including whether the applicant company is interested in protecting its former employees and whether it has the ability to help to secure the cooperation of key former employees.

of this letter in connection with the anticompetitive activity being reported in the [insert] industry [e.g., worldwide].  The commitments in this paragraph are binding only upon the Antitrust Division, although, upon request of ABC, the Antitrust Division will bring this Agreement to the attention of other prosecuting offices or administrative agencies.  If the Antitrust Division at any time determines that ABC has violated this Agreement, this Agreement shall be void, and the Antitrust Division may revoke the conditional acceptance of ABC into the Corporate Leniency Program.  Should the Antitrust Division revoke the conditional acceptance of ABC into the Corporate Leniency Program, the Antitrust Division may thereafter initiate a criminal prosecution against ABC, without limitation.  Should such a prosecution be initiated, any documentary or other information provided by ABC, as well as any statements or other information provided by any current [or former] director, officer or employee of ABC to the Antitrust Division pursuant to this Agreement, may be used against ABC in any such prosecution.

      4. **Non-Prosecution Protection For Corporate Directors, Officers And Employees**: Subject to ABC's full, continuing and complete cooperation, the Antitrust Division agrees that current [and former] directors, officers and employees of ABC who admit their knowledge of, or participation in, and fully and truthfully cooperate with the Antitrust Division in its investigation of the anticompetitive activity being reported, shall not be prosecuted criminally by the Antitrust Division for any act or offense committed [during their period of employment at ABC] prior to the date of this letter in connection with the anticompetitive activity being reported in the [insert] industry [e.g., worldwide].  Such full and truthful cooperation shall include, but not be limited to:

      (a)     making his relevant personal documents and records available in the United States to attorneys and agents of the United States;

      (b)     making himself available in the United States to attorneys and agents of the United States for interviews;

      (c)     responding fully and truthfully to all inquiries of the United States in connection with [describe offense being reported], without falsely implicating any person or intentionally withholding any information;

      (d)     otherwise giving the United States access to knowledge or information he may have relevant to [describe offense being reported]; and

      (e)     when called upon to do so by the United States, testifying in trial and grand jury or other proceedings in the United States, fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621) and making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), in connection with [describe offense being reported].

The commitments in this paragraph are binding only upon the Antitrust Division, although, upon the request of ABC, the Antitrust Division will bring this Agreement to the attention of other prosecuting offices or administrative agencies.  In the event a current [or former] director, officer

or employee of ABC fails to comply fully with his/her obligations hereunder, this Agreement as it pertains to such individual shall be void, and any leniency, immunity or non-prosecution granted to such individual under this Agreement may be revoked by the Antitrust Division.  Should any leniency, immunity or non-prosecution granted be revoked, the Antitrust Division may thereafter prosecute such person criminally, and any statements or other information provided by such person to the Antitrust Division pursuant to this Agreement may be used against him/her in such prosecution.

5.  **Entire Agreement**:  This letter constitutes the entire agreement between the Antitrust Division and ABC, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.

6.  **Authority And Capacity**:  The Antitrust Division and ABC represent and warrant each to the other that the signatories to this Agreement on behalf of each party hereto have all the authority and capacity necessary to execute this Agreement and to bind the respective parties hereto.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

Sincerely yours,

Date:  _____

Gary R. Spratling
Deputy Assistant Attorney General
Antitrust Division

_____     Date:  _____
[Name]
ABC, Inc.

_____     Date:  _____
[Counsel for ABC, Inc.]

-4-

**U.S. Department of Justice**
Antitrust Division

---

*General*

*Office of the Deputy Assistant Attorney*

*Washington, D.C.  20530*

[insert]

Dear [insert]:

This letter sets forth the terms and conditions of an agreement between the Antitrust Division of the United States Department of Justice and [you/your client], [Name] ("Applicant"), in connection with possible [insert description of conduct: e.g., price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the [insert generic description of industry: e.g., widget] industry [insert geographic scope--e.g., worldwide, in the United States].  This agreement is conditional and depends upon Applicant satisfying the conditions set forth below.  After all of these conditions are met, the Division will notify Applicant in writing that the application has been granted. [It is further agreed that disclosures made by counsel for Applicant in furtherance of the amnesty application will not constitute a waiver of the attorney-client privilege or the work-product privilege.]

## AGREEMENT

1.  **Representations**: Applicant desires to report to the Antitrust Division possible [e.g., price fixing] activity or other conduct violative of the Sherman Act in the [insert] industry [e.g., worldwide].  Applicant represents to the Antitrust Division that, in connection with the anticompetitive activity being reported, he did not coerce any other party to participate in the activity and was not the leader in, or the originator of, the activity.

2.  **Cooperation**: Applicant agrees to provide full, continuing, and complete cooperation to the Antitrust Division in connection with the activity being reported, including, but not limited to, the following:

  (a)    making his relevant personal documents and records available [in the United States] to attorneys and agents of the United States;

  (b)    making himself available [in the United States] to attorneys and agents of the United States for interviews at the request of the United States;

  (c)    responding fully and truthfully to all inquiries of the United States in connection with [describe offense being reported], without falsely implicating any person or intentionally withholding any information;

*-1-*

(d)  otherwise giving the United States access to knowledge or information he may have relevant to [describe offense being reported]; and

(e)  when called upon to do so by the United States, testifying in trial and grand jury or other proceedings [in the United States], fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621) and making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), in connection with [describe offense being reported].

3.  **Individual Leniency**: Subject to verification of Applicant's representations in paragraph 1 above, and subject to Applicant's full, continuing, and complete cooperation, as described in paragraph 2 above, the Antitrust Division agrees conditionally to accept Applicant into the Individual Leniency Program, as explained in an Antitrust Division policy statement dated August 10, 1994 (attached).  Pursuant to that policy, the Antitrust Division agrees not to bring any criminal prosecution against Applicant for any act or offense he may have committed prior to the date of this letter in connection with the anticompetitive activity being reported in the [insert] industry [e.g., worldwide].  If the Antitrust Division at any time determines that Applicant has violated this Agreement, this Agreement shall be void, and the Antitrust Division may revoke the conditional acceptance of Applicant into the Individual Leniency Program.  Should the Antitrust Division revoke the conditional acceptance of Applicant into the Individual Leniency Program, the Antitrust Division may thereafter initiate a criminal prosecution against Applicant, without limitation.  Should such a prosecution be initiated, any documentary information, statements, or other information provided by Applicant to the Antitrust Division pursuant to this Agreement may be used against Applicant in any such prosecution.

4.  **Entire Agreement**:  This letter constitutes the entire agreement between the Antitrust Division and Applicant, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.  The commitments in this letter are binding only upon the Antitrust Division.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

Sincerely,

Date: _____

Gary R. Spratling
Deputy Assistant Attorney General
Antitrust Division

_____  Date: _____
[Applicant Name]

_____  Date: _____
[Counsel for Applicant]