# Exhibit 39

# 05-1480

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE THIRD CIRCUIT

STOLT-NIELSEN, ET AL.
*Plaintiffs-Appellees,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### JOINT APPENDIX
### VOLUME 2 OF 3
### (Pages JA-52 to JA-651)

George J. Terwilliger III
Christopher M. Curran
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth St., NW
Washington, DC 20005
(202) 626-3600
*Attorneys for Plaintiff-Appellee*
*Stolt-Nielsen S.A. and Stolt-Nielsen*
*Transportation Group, Ltd.*

Allen D. Black
Roberta D. Liebenberg
Gerard A. Dever
FINE, KAPLAN AND BLACK, R.P.C.
1845 Walnut St.
Suite 2300
Philadelphia, PA 19103
(215) 567-6565
*Attorneys for Plaintiff-Appellee*
*Richard B. Wingfield*

John J. Powers III
John P. Fonte
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
950 Pennsylvania Ave., NW
Room 3224
Washington, DC 20530
(202) 514-2435
*Attorneys for Defendant-*
*Appellant United States*
*of America*

THE COURT:  I don't think that Mr. Connolly says otherwise.  Do you believe there was material performance?

MR. CONNOLLY:  No, there was not.

THE COURT:  You mean they did not help you at all?

MR. CONNOLLY:  No.

THE COURT:  Did you get successful prosecutions?

MR. CONNOLLY:  Yes, your Honor, we did.

THE COURT:  I have thought that we agreed in the beginning that the problem is the material misrepresentation about the period of time that they were participating in the conspiracy and the roles of their executives.

MR. CONNOLLY:  All the witnesses got immunity who told us information what Stolt did not tell us.  So yes, our position is, they provided information and it was materially misleading and it was not completely truthful of what they were to provide under the cooperation agreement.

THE COURT:  Ask him about that.

Off the record

(Whereupon a discussion was held off the record)

(JAMES M. GRIFFIN, sworn)

DIRECT EXAMINATION

BY MS. HILL:

Q.    Mr. Griffin, you are currently Deputy Assistant Attorney General for the Antitrust Division For Criminal Enforcement; is that correct?

**JA-387**

86]

[187]

A.    Yes.

Q.    How long have you had that position?

A.    Since January of 2000.

Q.    I am going to ask you to look at Government's Exhibit 1, please.

Is this a letter from R. Hewitt Pate, who is the Assistant Attorney General For Antitrust, authorizing you to testify here on behalf of the Government today?

A.    Yes.

Q.    Are there any limitations that Mr. Pate placed on your ability to testify here today?

A.    It states I am authorized to testify about my involvement in negotiations for Stolt-Nielsen Transportation Group in the Amnesty Program and it lists the limitations on Government official testimony that exist in the Code of Federal Regulations.

Q.    It also provides that you are not authorized to reveal information protected by privilege; is that correct?

A.    That's correct.

Q.    Mr. Griffin, would you please state the positions that you have held since joining the Antitrust Division?

A.    I began as a trial lawyer in the Atlanta Field Office.  I eventually became Assistant Chief of that Office. I moved to Chicago as Chief of the Chicago Office in 1994 and then to Washington as Director Of Criminal Enforcement in late

1998 and my current job January of 2000.

Q.    Would you please tell the Court briefly your responsibilities as Deputy Assistant Attorney General?

A.    Basically, oversight supervision of the Division's criminal investigations and prosecutions.

Q.    Are you also responsible for the Division's Corporate Leniency Policy?

A.    Yes, I am responsible for its application and administration.

Q.    Who has final authority to make recommendations to the Assistant Attorney General about leniency agreements?

A.    I make the final recommendation -- I make the determination whether to recommend leniency or not to recommend leniency to the Assistant Attorney General.

Q.    In your capacity as deputy assistant Attorney General you were involved in Stolt-Nielsen application for leniency in late 2002, early 2003?

A.    Yes.

Q.    I want to ask you to look at Government's Exhibit 2, which is January 15th letter signed by you and Mr. Nannes concerning Stolt-Nielsen's conditional admission into the Leniency Policy; is that correct?

A.    That's correct.  This is the conditional amnesty agreement between the Division and Stolt-Nielsen.

Q.    I am going to ask you about the terms of the

**JA-389**

agreement, Mr. Griffin, but first, I would ask you to look at Government's Exhibit 3 which is the Corporate Leniency Policy and ask you if you could briefly describe the policy and the purpose of it?

A.    Sure.  This is the Corporate Leniency Policy that was adopted in August of 1993.  It provides an expanded opportunity and incentives for companies to come forward and cooperate with Division criminal investigations into illegal conduct.  It's designed to obtain assistance in obtaining evidence that would be used to prosecute other members of a cartel or antitrust conspiracy.  It has the effect of destabilizing cartels as they operate, simply because people know that one of the corporate conspirators could, for whatever reason decide to self report, cooperate with the Government and expose the other cartel members to criminal prosecution.

Q.    What has the Division done since 1993 to publicize its Corporate Leniency Policy?

A.    We get the word out.  We speak to Bar Associations, to business groups, to investigators, to the FBI, to just make sure that everyone is aware that this program exists and that we encourage corporations to take advantage of them.

Q.    Does the Division limit the number of corporations that can qualify in a particular investigation?

A.    Yes.

Q.    Why is that?

A.    To destabilize the cartels that exist and the whole purpose is to break them up and obtain for us the evidence necessary to prosecute others.  It's an investigative tool. It's not a solution.

Q.    How effective has that policy been?

A.    Extraordinary.  It is the Department's most successful self reporting program.  It's responsible for in the past seven years of breaking up numerous cartels, particularly international cartels and the imposition of over one and a half $1 billion in criminal fines.

Q.    There are two types of situations in which a company can apply for leniency under the 1993 policy, what's been referred to already as part "A" Leniency and Part "B" Leniency?

A.    That's right.

Q.    Could you briefly describe the differences?

A.    Part "A" applies in situations where the self reporting company comes in prior to the Division having any information about the conduct being reported from any other source.  Shorthand, we say that's preinvestigation.

Part "B" provides that a corporation that meets all of the other standards in the policy and is the first in and comes in prior to our having evidence sufficient to prosecute the company already, is eligible for amnesty, as well.  So

**JA-391**

[190]

[191]

ole

that's post investigation.

Q.    Stolt-Nielsen in this case was given and considered for leniency under Part "B" of the policy?

A.    That's correct.

Q.    The policy sets forth a number of conditions that a company has to meet to qualify for Part "B" Leniency and I would like to talk to you about condition 3 which requires that a company upon its discovery of the illegal activity being discovered, why is that condition important to the Division?

er

A.    Yes.

Q.    Why is that important?

s

A.    It's A(2), as well as B(3). It's important for a couple of reasons. One, as a matter of good public policy, we did not believe that it would be appropriate to provide leniency to a company that upon discovery of the illegal conduct chooses to continue engaging in that conduct. So we impose the obligation that upon discovery to take prompt and effective action to terminate.

Another practical reason that Mr. Connolly alluded to earlier is that this is an investigative tool. We want

all

quality and valuable evidence to come to us through the

d

program that we will use to prosecute other cartel members and

te

it effects the credibility of the evidence provided. It's for the company that makes the decision not to continue the

**JA-392**

conduct.

Q.    I am going so ask you to look back at the whole

January 15th agreement which is Exhibit 2 and first, point out

that the introduction to the agreement says that it is

conditional, that if all the conditions are met, that the

Division will notify Stolt-Nielsen in writing that it has been

admitted into the program.

Why is the agreement conditional?

A.    It's conditional because these agreements are

entered early on in an investigation.  They are entered and

they are forward looking.  They are entered at a time when you

are bargaining for cooperation that is throughout the

investigation and prosecution -- or prosecutions that result

from it.  So while we want to be able -- we want to set out

the expectations, the representations and all the requirements

of the policy, but in an agreement early on with a company to

insure its full cooperation.

So it is conditioned upon the company meeting its

obligations and our determination that the two important

representations that are required early in the investigation

are verified by the investigation.

Q.    Is that why paragraph 3 expressly provides that

they are subject to verification, the representations?

A.    Exactly, at this point in an investigation, we

don't have the information.

[193]

Q.    Now, could you please take a look at Government's Exhibit 4, Mr. Griffin, which is entitled:  "The Corporate Leniency Policy, Answers To Recurring Questions, April 1, 1998."

Why did the Antitrust Division determine it was appropriate to issue these answers to reoccurring questions in 1998?

A.    Well, this was one of -- I guess two major policy statements about the operation of the Leniency Policy.  There is the first and after five years of experience, we realized that there were some issues that kept coming up, some questions that we get kept getting that we felt like we needed to answer.

One of the most important aspects of this program is that the bar and the business community understand its provisions and that our application of it be transparent and understandable, so we wanted to answer publicly some of the questions that had been asked in -- either privately or in connection with amnesty applications.

Q.    Would you take a look at page 35, which is entitled, clarifying the Division's application of its corporate leniency policy.

What does this 1998 policy statement say about the requirement that a company take prompt and effective action to terminate its part in the antitrust activity that its

**JA-394**

reporting?

A.    The focus is termination of the activity.  The question that had arisen is what does a company have to do? Do they have to legally withdraw, go through whatever all of the legal requirements are for withdrawal from a conspiracy? We wanted to get the word out that no, that is not necessarily the case.  There could be conduct short of legal withdrawal that would satisfy that standard and in addition, we wanted to make sure that people understood that we -- you did not have to notify all the other coconspirators that you had withdrawn and in order to qualify for termination and there were two reasons for that.  One was that there was an express concern on some occasions that a company considering applying for leniency, if they felt they had to notify all their other conspirators, might in fact setup notice to the prosecutor that they in fact lost, even though somebody would get to us before them, so they were concerned about that as a qualification and we, quite frankly, didn't want companies believing that they necessarily had to notify all of their other coconspirators if there was an ongoing conspiracy before coming in, because if they come into us while it's going on, we may well have the opportunity to initiate a covert investigation.

Q.    Whether the company notified its competitors or came in and confessed to the Division, notified the Division,

**JA-395**

is there any question that the company was required to refrain
and stop its participation in the anticompetitive activity?

A.   However, they terminate it, they have to refrain
from continuing to participate.

THE COURT:  You are not suggesting that if they
have long term contract, that they have to cancel the
contract?

THE WITNESS:  No, your Honor.

Q.   In this same policy statement, the Division also
clarified when the Division deems a company to have discovered
its illegal conduct for purposes of the amnesty program.

Why did the Division find it necessary to make this
clarification?

A.   This one, when you think about it, it was pretty
clear, we needed to clarify it.  Many cartels operate through
fairly senior or if not have senior executives of the company.
When we looked at the policy and began getting questions, we
realized that some people were reading that to mean that if a
senior executive of the company was involved in the cartel,
then the company knew about the conduct at the time that the
executive of the company entered the cartel.

If that were the case, if that were the
interpretation, in many of our larger cases, particularly in
international cartels, no one would qualify.  There wouldn't
be a company that would qualify, because company knew from the

very beginning. So we clarified that by placing the discovery or defining discovery as a company by placing that with the responsible authoritative representatives of the company responsible for legal matters, either counsel inside or outside counsel or the board.

Q. Now, this policy statement also had attached to it a model leniency letter; is that right?

A. That's correct.

Q. Since 1998, I guess in 1998, the Division was making public the model leniency letter so people would know what its terms were; is that right?

A. That's correct.

Q. And since 1998, the letter has been modified somewhat and I guess it was in 2002.

A. There have been some minor modifications to it, yes.

Q. Were the modified model letters also publicized?

A. Oh, yes.

Q. Was the most recent version of the model letter the basis for the Stolt leniency letter?

A. It is or was.

Q. Since the Division issued this 1998 speech and other speeches, has the Division gone about trying to publicize the speech and the policy statements and clarifications that were made?

A.    Yes, and a number of -- there are two major
interpretative speeches, interpretative of the amnesty policy.
This is one.  There was one in 1999 and then there was also a
third, not as major, but clarified some things in I believe it
was 2001 and quite often in other speeches and in other pages,
those speeches are either referenced or attached to them.

Q.    Now, I want to direct your attention to November
22nd, 2002, Mr. Griffin.  That day, did you receive a request
from the Philadelphia Field Office to begin an investigation
of possible collusion in the parcel tanker shipping industry?

A.    I did?

Q.    Was that based on information that staff had
gleaned from an article that had appeared that morning in the
Wall Street Journal?

A.    Yes, it was.

Q.    Would you take a look at Government's Exhibit 6.
Is that the article that the staff --

A.    That's the article.

Q.    -- had read?

A.    Yes.

Q.    What did the article say that caused the
Philadelphia Field Office to seek authority to look into the
industry?

A.    The article is reporting on a lawsuit brought by a
Mr. O'Brien, former General Counsel of Stolt-Nielsen and in

**JA-398**

the article it says that Mr. O'Brien has alleged that the company was involved in -- I don't recall the exact terminology, but antitrust conduct that would be violative of U.S. laws and other laws.

Q.    Against price fixing and other illegal conduct?

A.    Yes, price fixing and antitrust conduct.

Q.    Was there anything else in the article that was of particular interest to the Division about Mr. O'Brien's allegations?

A.    Yes, and it became even more so later, but the allegation and the report is or was that Mr. O'Brien alleged that when he brought the matter to the attention of senior management, they declined to withdraw or take appropriate action to withdraw from -- cease the illegal conduct.

Q.    Did you authorize the Philadelphia office to begin investigating the parcel tanker shipping industry?

A.    Yes.

Q.    Later that day, did your Office receive a call from Mr. Nannes concerning a potential amnesty application?



A.    Yes.

Q.    Did you ultimately speak with Mr. Nannes about that matter?

A.    Yes.

Q.    Would you please tell us what you discussed with Mr. Nannes during that phone call?

**JA-399**

[199]

A.    It was a fairly short call.  He told me that he had

a client that might be interested in applying for leniency and

wanted to talk a little bit about what information he would

need to give to me for me to be able to tell him whether

amnesty was available and if so, whether it was -- whether it

would be an "A" or "B" amnesty.  He wanted to give me as

little information as possible, but sufficient to allow me to

answer the question.  At that point, he asked if I could at

least answer the question, was amnesty available in connection

with transportation and I told him that that wasn't enough.

If I had to answer on that basis, then, at least in terms

of "A" amnesty, depending on where it went, we did have

investigations open in the transportation industry and that

wasn't enough.

Q.    Did you have further conversations with Mr. Nannes

in which he ultimately identified his client?

A.    We had several conversations.  I don't recall how

many over the next eight or ten days, yes.

Q.    When you learned that Stolt-Nielsen was Mr. Nannes'

client, what was your reaction? What did you tell him?

A.    I told him a couple of things.  I told him, one,

that we did have an investigation ongoing in that matter, but

that it was early.  In fact, I think it was very early I said

in the investigation and therefore, a company that otherwise

qualified was available.  Amnesty was available, but I also

**JA-400**

[1]

ORIGINAL



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STOLT-NIELSEN, S.A. and          :          CIVIL ACTION
STOLT-NIELSEN TRANSPORTATION     :
GROUP, LTD.                      :
                                 :
          Plaintiffs             :
                                 :          NO.  04-537
          vs.                    :
                                 :
UNITED STATES OF AMERICA         :
                                 :
          Defendant.             :


                    Philadelphia, PA
                    April 14, 2004

          BEFORE:   HON. TIMOTHY J. SAVAGE, J


                    SECOND DAY
                (AFTERNOON SESSION)


                P R E S E N T:


          For the Plaintiff:

                    WHITE & CASE
          BY:  CHRISTOPHER M. CURRAN, ESQ.
               GEORGE J. TERWILLIGER, ESQ.
                 J. MARK GIDLEY, ESQ.
                 GEORGE PAUL, ESQ.
               601 Thirteenth Street, N.W.
                    Suite 600.
               Washington, D.C. 20005-3807


                    **JA-546**

[2]

BLANK ROME LLP.
BY:  IAN COMISKY, ESQ.
MATTHEW LEE, ESQ.
One Logan Square.
Philadelphia, PA 19103-6998
For Stolt-Nielsen


FINE, KAPLAN & BLACK.
BY:  ROBERTA D. LIEBENBERG, ESQ.
ALLEN D. BLACK, ESQ.
GERARD A. DEVER, ESQ.
23rd Floor
1845 Walnut Street.
Philadelphia, PA 19103-4723


JAMES A. BACKSTROM, ESQ.
Suite 200
Two Penn Center .
Philadelphia, PA 19102-1706.

For RICHARD WINGFIELD


For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Antitrust Division
BY:  ROBERT E. CONNOLLY, ESQ.
ANOTONIA R. HILL, ESQ.
WENDY NORMAN, ESQ.
The Curtis Center
Suite 650 West
7th and Walnut Streets
Philadelphia, PA., 19106.

FOR THE UNITED STATES


(Proceedings recorded by mechanical stenography,
transcript produced by computer)
1:15 P.M.
1:15 p.m.


**JA-547**

[3]

AFTERNOON SESSION

Appearances as noted, the following transpired in
open court:)

(JAMES M. GRIFFIN, resumed)

CROSS-EXAMINATION

BY MR. GIDLEY:

Q.    Mr. Griffin, I want to go back to some of your
testimony on direct, sir.

Sir, you testified that you attended a meeting with
John Nannes on December 4, 2002, correct?

A.    Yes.

Q.    Could you keep your voice up?

A.    Yes, 2002.

Q.    Thank you very much.

Sir, you testified at that meeting you used the
term head fake; is that correct?

A.    Yes.

Q.    And sir, would you tell the Court to the best of
your recollection, what exactly you said about head fake at
that meeting?

A.    It was in reference to the emails that had been
shown to us and the representation that that is when
Stolt-Nielsen withdrew from or ceased its activity, illegal
activity.

Q.    What were your exact words?

**JA-548**

[4]

A.    I can't recall my exact words, but it was something to the effect that if it was a head fake and you would not qualify for leniency and if it were a conditional amnesty agreement in effect, it would be revoked.

Q.    Did you say this at the beginning or at the end of the meeting, sir?

A.    Near the end.

Q.    What did Mr. Nannes say in response, if anything?

A.    I don't recall.  I don't recall what, if anything, he said.

Q.    At the December 4th meeting, did Mr. Nannes say that not a single antitrust violation had occurred at Stolt-Nielsen after March 31, 2002?

A.    No, he did not say that.

Q.    Did Mr. Nannes tell you that his law firm had audited the SNTG antitrust compliance from March to November, 2002?

A.    I do not believe he said that.

Q.    Did Mr. Nannes say that Skadden, Arps investigated all contacts with competitors after March 2002 at the December 4th meeting?

A.    No, he specifically said that he had more investigation to do.

Q.    And Mr. Nannes was very early in his assignment from Stolt-Nielsen; isn't that correct, on December 4th, 2002?

**JA-549**

[5]

A.    Well, I don't know that.  I know that his first contact with me was November 22nd and this was what is that, 12 days later or so?

Q.    Between November 22nd and December 4th, you had a series of phone calls with Mr. Nannes; is that correct?

A.    That's correct.

Q.    Sir, in the course of those phone calls, did you tell Mr. Nannes there was a "shoot the messenger" issue that the Division had?

A.    I do not recall using that term, "shoot the messenger."

Q.    That's to the best of your recollection, you did not use that term, sir, to Mr. Nannes?

A.    I don't recall using it, no.

Q.    Did you mention to Mr. Nannes that you were also looking into Treasury allegations and that would also be an issue with the application that SNTG was proffering to the Division?

A.    Yes, we talked about that.  They weren't proffering that to the Division, though.

Q.    But, sir, did you mention to Mr. Nannes that there was an issue about the Treasury Department investigation and you needed to check that out in the course of approving the amnesty application?

A.    Yes.

**JA-550**

Q.    Sir, that Treasury Department investigation is not listed as something in your corporate Leniency Policy that you look into; isn't that correct?

A.    That's correct.

Q.    But nonetheless, you told Mr. Nannes that was a threshold issue for admission into the program; isn't that correct?

A.    I told him we needed to do some due diligence on that.  We weren't going to inadvertently give amnesty on that issue.

Q.    But, sir, didn't you say to Mr. Nannes that you would not be in a position to approve the amnesty application until you cleared the O'Brien issue, employment issue, lawsuit issue as well as the Treasury Department issue; isn't that correct?

A.    Well, the way you have asked the question, no, but I -- they were on two separate tracks.  There was due diligence I needed to do within the Department -- within the government on the treasury issue and then, there was the issue of whether or not the company had taken prompt and effective action.  So both of those issues were at work, yes.

Q.    Let's go to the December 4th meeting and I want to show you a demonstrative exhibit.  I have given you several books of exhibits, sir.  If I can direct you to the second book, tab one and it will be on the screen, as well.

**JA-551**

[7]

A.    I see it.

Q.    Can you see the exhibit?

A.    Yes.

Q.    It's been marked is as SND-1.

At the December 4th meeting, Mr. Nannes outlined a series of steps that SNTG had taken?

A.    Yes.

Q.    One of the steps he outlined at the December 4th meeting is that SNTG revised its antitrust handbook?

A.    That's correct.

Q.    Mr. Nannes also mentioned that the company had implemented mandatory antitrust compliance training; isn't that correct?

A.    Yes, he did.

Q.    Isn't it the case that Mr. Nannes also mentioned that all agreements with competitors were to be in writing and approved by counsel as part of the measures that were implemented; isn't that correct?

A.    I believe that's correct.

Q.    Sir, directing your attention to item 4, isn't it the case Mr. Nannes mentioned that written certifications had been obtained by SNTG employees?

A.    Yes.

Q.    Didn't Mr. Nannes mention he gave the SNTG antitrust policy to competitors that that had been given by

**JA-552**

SNTG in the spring?

    A.    Yes.

    Q.    Mr. Nannes also mentioned SNTG delivered its new antitrust policy to some of its business partners?

    A.    That's correct.

    Q.    Mr. Nannes at the December 4th meeting gave you those emails; isn't that correct?

    A.    Yes.

    Q.    Sir, at that meeting, did you ask Mr. Nannes what dates the certifications had been obtained from the various employees?

    A.    I don't believe I did.

    Q.    Did anyone from the government ask Mr. Nannes during what time period the certifications had been obtained, to the best of your recollection?

    A.    There was some discussion of that, yes.

    Q.    Did anyone from the government specifically ask what the last date was of the last certification that was turned in in 2002?

    A.    I believe we were told. I don't remember a specific question, but I believe Mr. Nannes told us.

    Q.    Well, sir, as you sit here today, what is your understanding as to the last certification that was turned in in 2002 by the SNTG employees?

    A.    I believe it was not until sometime in the summer.

[9]

Q.    July, the end of July; is that correct?

A.    I was going to say June or July.

Q.    Now, Mr. Lee of SNTG sought those certifications in a May, 2002 memo; isn't that correct?

A.    I am not sure I have seen a May, 2002 memo.

Q.    Let me direct your attention to tab 10 of book II, sir.

A.    Yes?

Q.    It's a form memo with a date of May 14th and it's under the signature or over the signature of Reginald J. R. Lee, CEO of SNTG; do you see that?

A.    Yes.

Q.    Is this the first time you have examined this document?

A.    I believe that it is, yes.

Q.    Turning the page under tab 10, there is a form, SNTG antitrust compliance policy, do you see that?

A.    Yes.

Q.    Have you seen this before?

A.    No.

Q.    Have you seen this in a signed executed form?

A.    No, I don't think I have seen this before?

Q.    Let me direct your attention to tab 11, sir, if I could.

Mr. Griffin, have you seen this document before.

## JA-554

It's labeled for the record is Exhibit 51 and it's entitled:

"SNTG Antitrust Compliance Policy Confirmation".

Do you see that?

A.    Yes.

Q.    Have you seen that before?

A.    No.

Q.    It's July 31, 2002; is it not?

A.    Yes.

Q.    Weren't these compliance policies delivered to you on July 9, 2003 at a meeting in the Justice Department?

A.    They well could have been.

Q.    But, you didn't look at the signed certifications; is that correct?

A.    I don't recall seeing this.

Q.    Let me take you back to November 22, 2002 for a minute.

Sir, when Stolt-Nielsen came in and phoned you, did Stolt-Nielsen know whether there was a Government investigation into the parcel tanker industry?

A.    No, that was the first question.

Q.    You had had this investigation open only for a matter of hours when Mr. Nannes called, correct?

A.    That's correct.

Q.    Mr. Nannes's call was on Friday November 22, 2002, correct?

A.    It was November 22nd.  I don't recall whether it was a Friday or not, but yes.

Q.    You weren't in the office, so he left a voicemail; is that correct?

A.    That's right.

Q.    You picked up the mail and you had a conversation over the weekend, correct?

A.    That's right.

Q.    Now, sir, Friday Morning, the Wall Street Journal article had come out, correct?

A.    Yes.

Q.    Can you describe for me the process of opening an antitrust investigation that involves criminal charges?

Can you briefly outline that for me?

A.    Well, it can be done in any number of ways, but if we're opening a preliminary inquiry, it can be done by a phone call, because that does not authorize any kind of compulsory process and the staff or office calls me or calls the Director and lays out what they want to do and they want to begin an investigation, preliminary investigation, that authority can be given orally.  It will then be papered up by a short memo.

Q.    When you say "papered up", when is the investigation formally opened as a matter of Division policy? Does not the paperwork have to be completed?

A.    Formally opened in terms of -- yes, in terms of

opening a file within the Department, the paperwork has to go

through.

    Q.    When was the file opened in this matter, sir?

    THE COURT:  Excuse me, are we arguing --

    MR. GIDLEY:  This is relevant to the questions

about SNTG employees and what John Nannes was applying for at

the time he made the phone call.

    THE COURT:  So it bears on the "A" and "B" sides.

    MR. GIDLEY:  Yes.

    THE COURT:  We're proceeding under "B", it's a

given.

    MR. GIDLEY:  The inquiry was opened hours earlier

by a phone call.

    THE COURT:  So what, they are under "B" the line of

your questions appear to me that you are suggesting that it

should have been subject to part 1, rather than "B" because

there really was an investigation going and what I am saying

to you it does not matter because they went in for "B."

    MR. GIDLEY:  I agree, it's limited to Part "B."

    THE COURT:  Tell me what this is relevant to?

    MR. GIDLEY:  I think it's relevant to whether or

not at the time that Mr. Nannes called, he knew he was going

for "A" or "B" side amnesty.

    THE COURT:  That Mr. Nannes knew?

    MR. GIDLEY:  Yes.

**JA-557**