# Exhibit 40

Case 1:05-cv-02217-RJL     Document 37-43     Filed 09/27/2006     Page 1 of 9

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect.  To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.



# DEPARTMENT OF JUSTICE

New York State Bar Association
Annual Meeting

Presented By The
Antitrust Law Section

"A SUMMARY OVERVIEW OF THE ANTITRUST DIVISION'S
CRIMINAL ENFORCEMENT PROGRAM"

By

SCOTT D. HAMMOND
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Presented at

The New York Marriott Marquis
New York

January 23, 2003

---

A Summary Overview Of The Antitrust
Division's Criminal Enforcement Program

Since the mid-1990's, the Antitrust Division of the U.S. Department of Justice ("Division") has employed a strategy of concentrating its enforcement resources on international cartels

that victimize American businesses and consumers. This enforcement emphasis has led to remarkable success in terms of cracking international cartels, securing the convictions of major conspirators, and obtaining record-breaking fines. However, international convictions and high fines do not begin to tell the whole story. The last two years has seen a string of consecutive record-breaking jail sentences, including one defendant sentenced to ten years imprisonment for his role in orchestrating a bid-rigging, bribery, and money laundering scheme. New highs were also reached this past year in terms of the total number of jail days imposed in Division cases -- more than 10,000 -- and the average jail sentence -- more than 18 months. As outlined in the summary below, there is no question that the stakes have continued to rise for companies and their executives who engage in antitrust offenses.

## INTERNATIONAL CARTEL ENFORCEMENT

- **Investigations**. Currently, there are nearly 40 sitting grand juries investigating suspected international cartel activity. International cartel investigations account for close to half of the Division's criminal investigations. The subjects and targets of the Division's international investigations are located on 6 continents and in nearly 25 different countries. However, the geographic scope of the criminal activity is even broader than these numbers reflect. Our investigations have uncovered meetings of international cartels in well over 100 cities in more than 35 countries, including most of the Far East and nearly every country in Western Europe.

- **Cartels Prosecuted**. Since the beginning of FY 1997, the Division has prosecuted international cartels affecting well over *$10 billion* in U.S. commerce. The Division has prosecuted international cartels operating in a number of sectors including vitamins, textiles, construction, food and feed additives, food preservatives, chemicals, graphite electrodes (used in steel making), fine arts, and marine construction and marine transportation services. The cartel activity uncovered in these cases has cost U.S. businesses and consumers many hundreds of millions of dollars annually. For example:

    o **Lysine** - Prices increased by 70% in the first 6 months; doubled over course of conspiracy; defendants agreed to pay U.S. customers more than $45 million in damages;

    o **Citric Acid** - Prices increased by over 30% during duration of conspiracy;

    o **Graphite Electrodes** - Prices increased by over 60% during duration of conspiracy;

    o **Vitamins** - Defendants agreed to pay U.S. customers more than $1 billion in damages.

- **Fines Imposed**. Of the over $2 billion dollars in criminal fines imposed in Division cases since FY 1997, well over 90 percent were obtained in connection with the prosecution of international cartel activity. The Division has obtained fines of $10 million or more against U.S., Dutch, German, Japanese, Belgian, Swiss, British, Luxembourgian, Norwegian, and Liechtenstein-based companies. In 32 of the 38 instances in which the Division has secured a fine of $10 million or greater, the corporate defendants were foreign-based. These numbers reflect the fact that the

typical international cartel likely consists of a U.S. company and three or four of its competitors that are market leaders in Europe, Asia, and throughout the world. (See Attached Chart of Sherman Act Violations Yielding a Fine of $10 Million or More.)

- **Percentage Of Foreign Corporate Defendants**. Since the beginning of FY 1998, roughly *50 percent* of corporate defendants in criminal cases brought by the Division were foreign-based. In FY 2001, the percentage of foreign-based firms charged by the Division rose to nearly 70 percent, and then returned to around 50 percent over the last year.

## PROSECUTION OF INDIVIDUALS

The Division has long supported the belief that the best and surest way to deter and punish cartel activity is to hold the most culpable individuals accountable by seeking jail sentences. For reasons that can not be explored in this summary, that view has really begun to take hold. [1] Antitrust offenders are being sent to jail with increasing frequency and for longer periods of time.

- **Jail Sentences Have Increased**. Last year, defendants in cases prosecuted by the Division were sentenced to a record number of jail days, more than 10,000 in all, with the average jail sentence reaching a new high of more than 18 months. In the last four years, over 75 years of imprisonment have been imposed on antitrust offenders, with more than 30 defendants receiving jail sentences of one year or longer. To put that last figure in perspective, more individuals have been sentenced in Division cases to one year or longer in the last four years, then in the previous *decade* combined. The majority of those sentences were imposed against U.S. business executives. However, as noted below, recent cases have resulted in the imprisonment of foreign executives as well.

- **Record Jail Sentences In FY 2002**. Fiscal year 2002 sentences include a three-year jail term imposed on Elmore Roy Anderson for rigging USAID bids and defrauding USAID in connection with construction work in Egypt that the U.S. government funded as a part of the Camp David Peace Accords; a 63-month jail term imposed on Melvyn Merberg for his role in rigging bids submitted to, and defrauding, Newark public schools and other government, not-for-profit, and private entities in the New York City metropolitan area; and a record-breaking ten-year sentence imposed on Austin "Sonny" Shelton, a former Guam government official, for orchestrating a bid-rigging, bribery, and money laundering scheme involving FEMA-funded contracts in Guam.

- **Conviction Of Foreign Executives**. The Division has prosecuted foreign executives from The United Kingdom, Germany, Belgium, The Netherlands, France, Switzerland, Italy, Sweden, Canada, South Africa, Mexico, Japan, and Korea for engaging in cartel activity, resulting in heavy fines and, in some cases, imprisonment. Since FY 2001, roughly one-third of the individual defendants in our cases have been foreign nationals. Foreign defendants from Canada, Germany, Switzerland, Sweden, and France have served prison sentences in U.S. jails for violating U.S. antitrust laws.

- **Tracking Down International Fugitives**. In 2001, the Division adopted a policy of

placing indicted fugitives on a "Red Notice" list maintained by INTERPOL. A red notice watch is essentially an international "wanted" notice that, in many INTERPOL member nations, serves as a request that the subject be arrested, with a view toward extradition. Multiple fugitive defendants have already been apprehended through a Division INTERPOL red notice, and the Division is currently pursuing their extradition to the United States for prosecution. The Division's use of red notices clearly raises the stakes for foreign executives who hope to avoid prosecution by simply remaining outside of the United States. With the stiffening resolve that foreign governments are taking toward punishing cartel activity and their increased willingness to assist the United States in prosecuting cartel activity, the safe harbors for antitrust offenders are rapidly shrinking.

## CRIMINAL FINES

Since the beginning of FY 1997, the Division has obtained over $2 billion dollars in criminal fines. This total includes thirty-eight corporate fines of $10 million or more, six fines of $100 million or more, and one fine of $500 million -- the largest criminal fine ever imposed in the United States under any criminal statute.

- **Corporate Fines Have Increased Dramatically**. International cartels affect massive volumes of commerce. In some matters currently under investigation, the volume of commerce affected by the suspected conspiracy is well over $1 billion per year and in more than two-thirds of our international investigations, the volume of commerce affected is over $100 million over the term of the conspiracy. Because international cartels affect such a large volume of U.S. commerce and the U.S. Sentencing Guidelines fines are based in large part on the amount of commerce affected by the cartel, fines obtained by the Division have increased dramatically since FY 1997.

- **Year-End Total Fines**. In the 10 years prior to FY 1997, the Division obtained, on average, $29 million in criminal fines annually. In FY 1997, the Division collected $205 million in criminal fines - - which was 500 percent higher than during any previous year in the Division's history. In FY 1998, the Division obtained over $265 million in criminal fines. In FY 1999, the Division secured over $1.1 billion. In FYs 2000-2002, fines obtained exceeded $150 million, $280 million, and $75 million, respectively.

- **Higher Top-End Fines**. Less than 10 years ago, the largest corporate fine ever imposed for a single Sherman Act count was $2 million. However, fines of $10 million or more have now been imposed against 38 corporate defendants and one individual defendant. The Division has obtained fines of $100 million or more in six cases:

    - **$500 million** against F. Hoffmann-La Roche (vitamin cartel - May 1999), largest fine ever imposed in a criminal prosecution of any kind;

    - **$225 million** against BASF AG (vitamin cartel - May 1999);

    - **$135 million** against SGL Carbon AG (graphite electrodes cartel - May 1999);

    - **$134 million** against Mitsubishi Corp. (graphite electrodes cartel - May 2001);

- **$110 million** against UCAR International (graphite electrodes cartel - April 1998); and

- **$100 million** against Archer Daniels Midland Company (lysine and citric acid cartels - October 1996).

## CORPORATE LENIENCY PROGRAM

In August 1993, the Division revised its Corporate Leniency Program to make it easier for and more attractive to companies to come forward and cooperate with the Division.[2] Three major revisions were made to the program: (1) amnesty is automatic if there is no pre-existing investigation; (2) amnesty may still be available even if cooperation begins after the investigation is underway; and (3) all officers, directors, and employees who cooperate are protected from criminal prosecution.[3] As a result of these changes, the Leniency Program is the Division's most effective generator of international cartel cases, and it is the Department's most successful leniency program. Moreover, it has served as a model for similar corporate leniency programs that have been adopted by antitrust authorities around the world.

- **Application Rate.** The revised Corporate Leniency Program has resulted in a surge in amnesty applications. Under the old policy, the Division obtained roughly one amnesty application per year. Under the new policy, the application rate has jumped to more than one per month. Moreover, the application rate has surged over the last year to better than two per month, and to over four per month in the first three months of this fiscal year. As a result of this increased interest, the Division frequently encounters situations where a company approaches the government within days, and in some cases less than one business day, after one of its co-conspirators has secured its position as first in line for amnesty. Of course, only the first company to qualify receives amnesty.

- **Case Generator**. Since FY 1997, cooperation from amnesty applications has resulted in scores of convictions and over $2 billion in criminal fines. In fact, the majority of the Division's major international investigations have been advanced through the cooperation of an amnesty applicant.

- **Foreign Authorities Following The U.S. Model**. The extraordinary success of the Division's leniency program has generated widespread interest around the world. We have advised a number of foreign governments in drafting and implementing effective leniency programs in their jurisdictions. As a result, countries such as Canada, Brazil, the United Kingdom, Germany, France, Ireland, The Czech Republic, the Netherlands and Korea have announced new or revised leniency programs, with still other countries in the process of following. Most significantly was the European Union's recent adoption of a revised leniency program in February 2002. The new program establishes a far more transparent and predictable policy than its predecessor and brings the EC's program closely in line with the Division's Corporate Leniency Policy. In fact, in greatly reducing the amount of discretion involved in assessing amnesty applications and in creating the opportunity for companies to qualify for full immunity after an investigation has begun, the blockbuster revisions are similar to the ones made by the Division when we successfully expanded our program in August 1993. The convergence in leniency programs has made it much easier and far more attractive for companies to simultaneously seek and obtain leniency in the United States, Europe,

Canada, and in other jurisdictions where the applicants have exposure.

- **Amnesty Rewards.** The vitamin, graphite electrodes, fine arts auctions, and USAID construction investigations offer four prime examples of the stunning incentives and rewards to companies *and their executives* that take advantage of the Amnesty Program. In each of these matters, the amnesty applicant paid *zero* dollars in criminal fines, and its cooperating executives received nonprosecution protection.

    - **Vitamins**. In the vitamin investigation, the amnesty applicant's cooperation directly led to F. Hoffmann-La Roche's (HLR) and BASF AG's decision to plead guilty and pay fines of $500 million and $225 million, respectively. Six Swiss and German executives from HLR and BASF were convicted for their role in the reported conspiracy, and all served time in U.S. prisons

    - **Graphite Electrodes**. In the graphite electrodes investigation, the second company in the door after the amnesty applicant paid a $32.5 million fine, the third company in paid a $110 million fine, and a fourth company pled guilty and paid a $135 million fine. Mitsubishi was later convicted at trial for its role as an aider and abetter of the cartel and was sentenced to pay a $134 million fine. Two U.S. executives were sentenced to lengthy prison terms and paid over $2 million in fines, and a German executive was fined $10 million

    - **Fine Arts Auctions**. The amnesty applicant's cooperation directly resulted in Sotheby's decision to plead guilty and pay a $45 million fine. Sotheby's former Chairman, Alfred Taubmann, was subsequently convicted at trial and sentenced to one year in jail and a $7.5 million fine.

    - **USAID Construction**. The assistance of an amnesty applicant led to the conviction of four companies who engaged in a scheme to rig bids on water treatment construction contracts funded abroad by the United States Agency for International Development (USAID). To date, fines totaling more than $140 million have been imposed in addition to over $10 million in restitution to the U.S. government. A U.S. executive for one of the late pleading companies was convicted at trial and sentenced to three years imprisonment.

- **Amnesty Plus.** Currently, there are roughly 40 sitting grand juries investigating suspected international cartel activity. Nearly half of these investigations were initiated by evidence obtained as a result of an investigation of a completely separate industry. For example, a new investigation results when a company approaches the Division to negotiate a plea agreement in a current investigation and then seeks to obtain more lenient treatment by offering to disclose the existence of a second, unrelated conspiracy. Under these circumstances, companies that chose to self report and cooperate in a second matter can obtain what is referred to as "Amnesty Plus." In such a case, the company will receive amnesty, pay zero dollars in fines for its participation in the second offense, and none of its officers, directors, and employees who cooperate will be prosecuted criminally in connection with that offense. Plus, the company will receive a substantial additional discount by the Division in calculating an appropriate fine for its participation in the first conspiracy.

- **Penalty Plus**. Companies that elect not to take advantage of the Amnesty Plus

opportunity risk potentially harsh consequences. If a company participated in a second antitrust offense and does not report it, and the conduct is later discovered and successfully prosecuted, where appropriate, we will urge the sentencing court to consider the company's and any culpable executive's failure to report the conduct voluntarily as an aggravating sentencing factor. We will request that the court impose a term and conditions of probation for the company pursuant to U.S.S.G. §8D1.1, and we will pursue a fine or jail sentence at or above the upper end of the Guidelines range. Moreover, where multiple convictions occur, a company's or individual's Guidelines calculations may be increased based on the prior criminal history. For a company, the failure to self report under the Amnesty Plus program could mean the difference between a potential fine as high as 80 percent or more of the volume of affected commerce versus no fine at all on the Amnesty Plus product. For the individual, it could mean the difference between a lengthy jail sentence and avoiding jail altogether.

- **Confidentiality Policy**. The Division's policy is to treat as confidential the identity of amnesty applicants and any information obtained from the applicant. The Division will not disclose an amnesty applicant's identity, absent prior disclosure by or agreement with the applicant, unless authorized by court order. Further, in order to protect the integrity of the Amnesty Program, the Division has adopted a policy of not disclosing to foreign authorities, pursuant to cooperation agreements, information obtained from an amnesty applicant unless the amnesty applicant agrees first to the disclosure. Notwithstanding this policy, the Division frequently obtains waivers to share information with another jurisdiction in cases where the applicant has also sought and obtained leniency from that jurisdiction. Such waivers are helpful in ensuring that the Division is able to coordinate investigative steps with the other jurisdictions involved. In addition, amnesty applicants may issue press releases or, in the case of publicly-traded companies, submit public filings announcing their conditional acceptance into the corporate amnesty program thereby obviating the need to maintain their anonymity.

---

## FOOTNOTES

1. For more information on Division policies and initiatives directed towards the prosecution of individual offenders, see, "Negotiating the Waters of International Cartel Prosecutions" speech by Gary R. Spratling, before Thirteenth Annual National Institute On White Collar Crime (March 4, 1999); and "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" speech by Scott D. Hammond, before Fifteenth Annual National Institute On White Collar Crime (March 8, 2001). Division speeches can be found on our website at www.usdoj.gov/atr.

2. Antitrust Division, U.S. Department Of Justice, Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/atr/public/guidelines/lencorp.htm

3. For more information on the requirements and application of the Division's Amnesty Program, see, "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998); "Making Companies An Offer They

Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999); "Lessons Common To Detecting And Deterring Criminal Activity," speech by Scott D. Hammond, before 3rd Nordic Competition Policy Conference (September 12, 2000); and "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" speech by Scott D. Hammond, before Fifteenth Annual National Institute On White Collar Crime (March 8, 2001).