# Exhibit 8

■ Law.com Home    ■ Newswire    ■ LawJobs    ■ CLE Center    ■ LawCatalog    ■ Our Sites    ■ Advertise

# LegalTimes.com
### LEGAL NEWS ONLINE FROM THE NATION'S CAPITAL

Home    Subscribe    Advertise    News    Decisions    LT150    Contact Us



**LEAVE NO STONE UNTURNED.**
Quickly uncover relevant relationships.



■ Advanced Search

RSS FEED
■ Last Week's Issue

■ **Legal Business**
Recent News
Inadmissible
*Prof. Announcements*
Calendar of Events

■ **National**
Recent News

■ **Court Watch**
Recent News
Recent Decisions
Supreme Court
Verdicts

■ **Influence**
Recent Lobbying News

■ **In-House Counsel**
Recent News

■ **Points of View**
Recent Commentary
Letters to the Editor

■ **After Hours**
Recent Features

LT150, Surveys
Law Firm Management
Leading Lawyers
More Special Reports

Intellectual Property
Energy
Government Contracts
More Practice Focuses

Corrections
Reach the Editors

## POINTS OF VIEW
### COMMENTARY

**REGISTRATION-FREE**
## What Is Confession Good for Now?

By John J. Vecchione and Andre P. Barlow
Legal Times
October 23, 2006

Image: Matthew Baek

- Printer-friendly Version
- Email this Article
- Comment on this Article
- Reprints & Permissions

For law enforcement seeking to clean up corporate malfeasance, the first hurdle is discovering the misdeeds. Waiting for the conscience-stricken to call is not a very effective strategy, hence the genius of a program run by the Department of Justice's Antitrust Division. For more than a decade now, the government has been persuading cartel members to turn against each other by offering amnesty from all criminal charges to the first company to tell all.

This makes the indictment of Stolt-Nielsen S.A. so confounding. Despite an amnesty deal made with the Norwegian global shipper when the company spilled the beans on a cartel, the Antitrust Division has now broken its promise not to prosecute.

For the first time, the Antitrust Division has revoked amnesty under its **Corporate Leniency Program**. Alarms should sound not so much for what may happen to Stolt-Nielsen, but for how the unprecedented decision undermines this very successful program. Distrust engendered by this move will dissuade self-reporting by other companies, thus increasing the likelihood that illegal cartel behavior will go undiscovered.

The Antitrust Division may have erred in a way that will cost Americans far more than the millions it seeks from Stolt-Nielsen in fines. Now the only thing standing between Stolt-Nielsen and the prosecutors is a pending petition before the Supreme Court, asking the Court to help the company and, more important, the future of anti-cartel enforcement.

Don't get us wrong: The fact pattern of Stolt-Nielsen's wrongdoing is compelling. By its own admission, it entered an anti-competitive scheme with its competitors to divvy up the market for parcel-tanker shipping services. It revealed this activity to the government. Stolt-Nielsen confessed not out of the goodness of its heart, but out of a desire to extricate itself from its self-created morass without incurring heavy penalties — punishment that can include massive fines and prison sentences for top executives.

Happily for the company's management, Stolt-Nielsen qualified for the Antitrust Division's Corporate Leniency Program as the first in its industry to come forward. Under the program, implemented by the Clinton administration in 1993, the first member of a cartel to reveal anti-competitive behavior is rewarded with lighter penalties than those coming forward later or not at all. Crucially, the first company evades all

- Martindale
  Lawyer Locator
- FTI
- RenewData
- Fios, Inc.
- Counsel Financial
  Services
- Merrill On-Demand
- Amicus Attorney
- Westlaw





■More Resources

criminal prosecution for past actions; the other members of the cartel do not. Since its inception, the leniency program has yielded *billions* of dollars in fines.

So successful has the program been that governments around the world have instituted similar policies. Cartel behavior leads to prosecution in many countries, but executives looking to escape the consequences of past sins now recognize that there is a way out.

Stolt-Nielsen made that calculation. In early 2003, it turned over evidence that led to guilty pleas by its co-conspirators, resulting in prison sentences for individual executives and corporate fines totaling $62 million. Having pocketed those convictions and gains, the Antitrust Division then broke its promise and announced that it intended to indict Stolt-Nielsen.

The government hangs its case on alleged cartel behavior by Stolt-Nielsen in the brief time just before the company self-reported its misdeeds. Critically, there is no allegation of wrongdoing occurring after the self-report date, Nov. 22, 2002, or after the date of the amnesty agreement, Jan. 15, 2003. The agreement grants Stolt-Nielsen amnesty for its collusive activities through the date of the agreement. Now the government says that's not what it meant. It's attempting to rewrite the deal by bringing a criminal prosecution for conduct that occurred before the self-reporting date.

On Jan. 14, 2005, the U.S. District Court for the Eastern District of Pennsylvania determined that Stolt-Nielsen had fulfilled all its obligations under the amnesty agreement and that the government was wrong to revoke it. Nonetheless, on March 23, 2006, the U.S. Court of Appeals for the 3rd Circuit chose not to halt the prosecution on separation-of-powers grounds. A two-judge panel found that the judicial branch cannot stop the executive branch from bringing indictments. (Then-Judge Samuel Alito Jr. heard oral argument in the case, but Justice Alito did not participate in the ruling.)

Hence, Stolt-Nielsen finds itself indicted on information that it provided the government for the purpose of ensuring no indictment. The company is now seeking enforcement of the amnesty agreement from the Supreme Court and, failing that, will likely appeal any conviction. But the damage has already been done to the Corporate Leniency Program.

**To INDICT OR NOT**

Of course, the Antitrust Division does not see it this way. Prosecutors contend that they embarked on the unprecedented course of revoking amnesty because of Stolt-Nielsen's failure to be wholly forthcoming. The division argues that Stolt-Nielsen was not frank in its claim to prosecutors that it had taken prompt action to stop all cartel behavior throughout its entire operation (once it decided to go straight) and that, in fact, some illegal activity continued beyond the time Stolt-Nielsen said it did. There are technical arguments each side can bring to bear on this issue, but after hearing all of them, U.S. District Judge Timothy Savage concluded that Stolt-Nielsen had done what it should have and that the Antitrust Division had not.

Savage put it succinctly: "We find that SNTG [Stolt-Nielsen Transportation Group] performed its obligation under the agreement when it supplied DOJ with self-incriminating evidence that led to the successful prosecution of SNTG's co-conspirators. Because DOJ got the benefit of its bargain, it cannot avoid fulfilling its promise based upon an understanding it contends the parties intended during negotiations but is not clearly defined in the integrated agreement. Thus, because SNTG did not breach the agreement, we shall enjoin the DOJ from prosecuting and indicting SNTG for its part in the antitrust conspiracy to the date of the agreement."

The lower court's ruling was overturned by the 3rd Circuit not because it was wrong on the facts, but because the Constitution grants the power to prosecute to the executive. The case, however, extends beyond questions of prosecutorial discretion.

The fact is that the government could have written any date it liked into the amnesty agreement. (Stolt-Nielson didn't have much leverage on this.) Indeed in other amnesty agreements, the government has used the date upon which the company first "discovered" its cartel activities. But the date upon which Stolt-Nielsen first learned of its wrongdoing, according to the government, is not the date in Stolt-Nielsen's amnesty agreement.

And that is the crux of the overreaching concern. If the Antitrust Division can unilaterally abrogate a binding contract with a company that has been accepted into the leniency program, then the program totters on unsteady feet.

By this one action, the Antitrust Division exponentially complicates the considerations for all executives (and the attorneys who advise them) on whether to come forward and reveal cartel behavior. There may be justifications for revoking amnesty in some cases. A blanket rule against revocation would put the government in an untenable position. However, where the government has had the opportunity to state when, how, and in what manner cartel behavior must stop, it cannot later decide that it made a bad deal.

Again, Savage said it clearly: "DOJ and SNTG made mutual promises. SNTG waived its constitutional rights and exposed itself to criminal liability by divulging incriminating information in exchange for DOJ's promise not to prosecute. Therefore, due process requires that before its amnesty can be revoked, SNTG is entitled

to a judicial determination whether it breached its agreement."

**THE LAWYER'S DILEMMA**

But the worst damage in this case is not to Stolt-Nielsen; it is to the pursuit of antitrust offenders. The biggest threat to the Corporate Leniency Program is not the company's actions; it is the Antitrust Division's precipitous response.

The leniency program relies on a version of "the prisoner's dilemma," which is so useful to prosecutors: If two prisoners keep quiet about their joint crime, both will be better off in any prosecution. So the government offers preferential treatment to the one who talks first. Now they both have an incentive to inform on the other. Trust between lawbreakers being what it is, information often begins to flow.

In the same way, a dependable leniency program gives executives who are thinking about coming clean — for whatever reason — that extra incentive to do so. There are compelling arguments against the true fairness of these amnesty agreements — primarily, that they enable scoundrels to walk. Without this program however, more scoundrels would be able to run around law enforcement.

The whole calculation could change with the Stolt-Nielsen case. What company will choose to incriminate itself if the Antitrust Division is allowed to break its deal? Moreover, if the U.S. government can unilaterally breach a solemn covenant that provides amnesty to a company cooperating in a criminal investigation under one leniency program, then every leniency program will be undermined. If the government's word becomes unreliable, all Americans will be damaged.

The Antitrust Division's current course is as shortsighted as the killing of the goose that laid the golden eggs. For one meal, a host of future riches to the government is forfeited. Prosecutors may think they're sending an important message about openness, but businesses are likely receiving a very different one about silence.

---

*John J. Vecchione is a litigator, a member of the D.C. Bar, and a principal in Valad & Vecchione. Andre P. Barlow is a partner at D.C.'s Doyle, Barlow & Mazard, where he provides antitrust and regulatory counseling to international and domestic companies.*

About ALM  |  Terms & Conditions  |  Privacy  |  Advertise  |  About LegalTimes.com
Copyright 2006 ALM Properties, Inc. All rights reserved.