# Exhibit 22

```
The Wall Street Journal
Op-Ed
BUSINESS WORLD
By HOLMAN W. JENKINS, JR.


If Sergio Leone Made a Movie About Antitrust . . .
October 25, 2006

Stolt-Nielsen is a name that won't ring many bells unless your peculiar
interest is ocean shipping or knotty business cases that might tempt the
Supreme Court's intervention.

Or perhaps you are a corporate counsel for a major international company who
just happened to be wondering, out of idle curiosity, whether the amnesty
deals signed by the Justice Department in price-fixing cases are worth the
paper they're written on. Just a theoretical interest, of course . . .

Here's Stolt's tale of woe. The company is one of a handful of specialty
chemical haulers that are dwarfed in size and clout by their customers,
including Dow Chemical, DuPont, Shell and BP. It is deemed an abomination in
some circles that these ship operators colluded over rates for several years,
pocketing in "excess profits" a sum that by now has been vastly exceeded by
the legal bills of all involved in the subsequent litigation (legal bills
that are naturally passed on to consumers and taxpayers).

Now Stolt finds itself hanging on whether the Supreme Court will hear its
plea challenging the Justice Department's right to revoke an amnesty deal
granted to Stolt in return for its help in cracking the cartel.

For what follows it's helpful to decide how nefarious you really think the
underlying offense is. Advocates of price-fixing prosecutions argue that
consumers are harmed by higher prices, but by this standard consumers are
harmed by any price above zero.

It seems right to mention that producers are people too and are harmed by
lower prices. Whose side should we take? Do consumers have any particular
"rights" here? Not that we can see. The only "rights" in jeopardy are those
of producers, whose freedom of contract and property are sacrificed on the
altar of a theorized higher good, known as "efficiency."

Yet the empirical record of this higher good is murky. In practice, price-
fixing seems mainly a temptation to companies seeking to preserve capacity in
periods of weak pricing. Take Stolt: It and its rivals colluded at a time
when their customers were consolidating and Stolt was piling up debt to bring
a new generation of chemical tankers into the marketplace. Indeed, these
features seem to be a hallmark of many price-fixing prosecutions: cyclical
commodity markets; large customers; suppliers who face high fixed costs to
maintain the capacity required by those customers.

What really goes on when companies collude could stand some fresh
examination, but trustbusters are not likely to question the provenance of
their last breadstick. On the contrary, Justice and its foreign counterparts
have become reliant on -- even made a growth business out of -- prosecuting
price-fixing as the last, unambiguous antitrust sin.
```

The new era began in 1993 when a Justice Department amnesty program was retooled to make it more enticing for firms to rat out their fellow miscreants in return for guaranteed leniency. The approach has been nothing if not fruitful: Brought to the bar have been dozens of industries, including bulk vitamins, animal-feed additives, copper concentrate, cement, hydrogen peroxide, sorbic acid, creosote, naphthalene, polyethylene film, citric acid and sodium gluconate.

That's a lot of price fixing, suggesting that intermittent collusion has long been a feature of markets for many industrial inputs and somehow the world has prospered anyway. Yet peer into the heart of the Stolt dispute, and the problem is precisely Justice's tender doubts about the sincerity of Stolt management's remorse for its crimes.

By the time the company showed up on Justice's doorstep, after all, the details of the plot had been well-aired in an executive whistleblower's private lawsuit and, later, in a front-page Journal story. Stolt's approach to Justice, in spirit if not word, was roughly: "The cat's out of the bag. Let's cut our losses by finking on our erstwhile partners and beat them into the amnesty program."

Let it be added that cartel activities have been a shipping tradition since long before antitrust was invented, and continue today in various form under grandfathered exemptions to the antitrust laws. Of Norwegian birth, Stolt is controlled by a shipping family that has been in the business since 1891.

Cynical bargain or not, Justice granted Stolt immunity in return for Stolt coughing up the evidence to allow the successful prosecution of its fellow conspirators (two Norwegian firms, one Japanese). Only after the cases were concluded did Justice renege on grounds that Stolt's management had allowed the collusion to continue for several months between the whistleblower's internal hullabaloo and Stolt's decision to seek amnesty. Of course, Justice had known all this from day one and had chosen to sign the agreement and benefit from Stolt's help anyway.

Nine petitioners, including the U.S. Chamber of Commerce, have joined Stolt in urging the Supreme Court to find that Justice has no business indicting Stolt and its employees until the lower courts have definitively ruled the amnesty deal invalid. In fact, the one federal court that looked into the matter ruled that Stolt had upheld its end of the bargain and ordered Justice to do likewise.

Here's our view: At best, antitrust is a questionable form of economic regulation that places a highly speculative theory of consumer good ahead of the actual, non-controversial rights of producers to sell on terms of their own choosing. Justice has done itself no favors by calling into question the reliability of its amnesty promises. The Gordian knot here is its excessive moralizing of its own position. With its brain a little less clouded by self-righteousness, the department might notice that its campaign to impose its dubious ideal of price regulation on the world might actually be helped if it grew up a little about antitrust.

URL for this article:
http://online.wsj.com/article/SB116173662871202743.html