UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Stolt-Nielsen Transportation Group Ltd.,

  *Plaintiff*,

    v.

United States of America,

  *Defendant*.

Consolidated Cases
Civil Action No. 05cv2217 (RJL)
Civil Action No. 06cv0474 (RJL)

**PLAINTIFF'S SURREPLY CONCERNING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Because the Division's reply brief (1) includes a new 7-page fact declaration from Robert Connolly; (2) contains misstatements of fact that necessitate correction; and (3) makes a new argument that Stolt-Nielsen has not had an opportunity to address, Stolt-Nielsen submits this surreply. A motion seeking leave to file this surreply has been filed separately.

**I. The Connolly Declaration Does Not Establish That Certain Communications With Plaintiffs' Attorneys Fall Within The Confidential Informant Exception To FOIA**

The Division's reply brief relies upon a newly-submitted declaration of Robert E. Connolly in an attempt to bolster movant's position that certain plaintiffs' attorneys are "confidential informants" under FOIA. Reply at 11-13. The Connolly Declaration, however, does not provide facts that meet the Division's burden. Mr. Connolly does not assert that there were ever any express assurances of confidentiality between the Antitrust Division and any of the confidential sources he discusses. Thus, under *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993), the Division must prove that there was an implied assurance of confidentiality between the Antitrust Division and each of these sources. It has not done so.

According to Mr. Connolly, "[i]t is reasonable to expect alleged victims of Stolt-Nielsen's criminal activity who are suing to collect damages would expect confidentiality when providing information during the grand jury investigation of Stolt-Nielsen." Connolly Decl. ¶ 8. But Mr. Connolly provides no *facts* that would support such an inference. Instead, the record indicates that none of the sources at issue had a reasonable expectation of confidentiality when communicating with the Antitrust Division.

### A. David Golub And Jonathan Levine — Counsel Of Record In *O'Brien v. SNTG* (Conn. Super. Ct.) Employment Litigation

David Golub and Jonathan Levine are counsel of record in a civil action alleging constructive discharge brought in 2002 by Paul E. O'Brien — the former General Counsel of Stolt-Nielsen. *See, e.g.*, October Lau Decl. Ex. 1 (amended complaint in *O'Brien v. Stolt-Nielsen Transp. Group Ltd., et al.*, CV 02-0190051S (Conn. Super. Ct. Nov. 1, 2002)); *O'Brien v. Stolt-Nielsen Transp. Group Ltd.*, 838 A.2d 1076 (Conn. Super. Ct. 2003). Mr. O'Brien's lawsuit is *public* — that fact alone strongly suggests that his counsel had no expectation of confidentiality when communicating with the Antitrust Division because Mr. O'Brien's adverse position with Stolt-Nielsen was already known. The fact that Mr. O'Brien is no longer employed by Stolt-Nielsen (Answer at 2, Jan. 31, 2006 (Docket No. 11)) also indicates that any "fear of economic retaliation" (Connolly Decl. ¶ 6) is illusory and not based upon fact.

The existence of communications between a criminal prosecuting authority (the Antitrust Division) and an active civil litigant also raises the specter that the Division discussed or attempted to coordinate the course of civil discovery during its ongoing grand jury investigation. As a result, Stolt-Nielsen requests that this Court review *in camera* all withheld correspondence between the Antitrust Division and Messrs. Golub and Levine to determine whether the government has sought to manipulate parallel civil proceedings in violation of Stolt-Nielsen's

2

constitutional rights. *See SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D. Ala. 2003) ("Because this is a case where the government has undoubtedly manipulated simultaneous criminal and civil proceedings, both of which it controls, 'there is a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means. In that special situation the risk to individuals' constitutional rights is arguably magnified.'") (quoting *Sterling Nat'l Bank v. A-1 Hotels, Int'l, Inc.*, 175 F. Supp. 2d 573, 579 (S.D.N.Y. 2001)). This Court has recognized that the "decision whether to perform *in camera* inspection is left to the broad discretion of the trial court judge." *Perry-Torres v. U.S. Dep't of State*, No. 04-1046 RJL, 2006 WL 2844357, at *5 (D.D.C. Sept. 29, 2006) (Leon, J.) (quoting *Lam Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C. Cir. 1991) (internal quotation marks omitted)). Such an *in camera* review of the communications is also warranted to determine whether the Division sought any of Stolt-Nielsen's privileged information. *See Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981) (corporation entitled to protections of attorney-client privilege).

    **B.**    **Conrad "Duke" Williams — Counsel Of Record In *O.N.E. Shipping, Inc. v. Odfjell, et al.*, No. 04-1749 (E.D. La. 2004)**

Conrad "Duke" Williams is an attorney who (1) represents the Chapter 7 Trustee of the Estate of O.N.E. Shipping, Inc. (which has sued Stolt-Nielsen in the United States District Court for the Eastern District of Louisiana); and (2) represented Mr. O'Brien. Mr. Williams' ***publicly-acknowledged*** representations of O.N.E. Shipping and Mr. O'Brien cannot support an inference of confidentiality in discussions with the Antitrust Division.

*First*, Mr. Williams' representations of O.N.E. Shipping and Mr. O'Brien are matters of public record. *See* Declaration of Lucius B. Lau, dated November 14, 2006 ("November Lau Decl.") Ex. 1 (complaint in *Geron, Chapter 7 Trustee of the Estate of O.N.E. Shipping, Inc. v.*

3

*Odfjell ASA*, No. 04-1749 (E.D. La. June 23, 2004)); November Lau Decl. Ex. 2 at 100-101 (transcript of testimony of Paul E. O'Brien in a public hearing in *O'Brien v. Stolt-Nielsen, S.A. et al.*, CV 02-0190051S (Conn. Super. Ct. July 27, 2004)). Again, the public nature of Mr. Williams' engagement on behalf of O.N.E. Shipping means that if O.N.E. Shipping feared any "stigma" or "retaliation" as Mr. Connolly asserts (Connolly Decl. ¶ 6), it would not have filed its public complaint. Moreover, Mr. O'Brien is a former — not current — employee of Stolt-Nielsen, and has brought his own public complaint. Thus, Mr. Connolly's declaration falls short of providing this Court with facts that Mr. Williams had any implied expectation of confidentiality when communicating with the Antitrust Division.

***Second***, Mr. Connolly is simply wrong when he asserts that O.N.E. Shipping is a "victim[] of the illegal cartel" (Connolly Decl. ¶ 8) and that O.N.E. Shipping is a "victim[] of Stolt-Nielsen's criminal activity." *Id.* In fact, Mr. Connolly stresses for O.N.E. Shipping and others "the sources' relation to the crime." *Id.* But the Antitrust Division's Indictment of this alleged crime is a purported conspiracy in which competitors drove prices up, by having "submitted bids with *intentionally high prices*," that conspirators "could continue to *charge higher prices* and earn greater profits" and that "defendants SNSA, SNTG and their co-conspirators derived *gross gains* . . . of *at least $100,000,000*." October Lau Decl. Ex. 21 at ¶¶ 6(d), 6(h), 16 (emphasis added); *see also* November Lau Decl. Ex. 3 ¶ 4(c) (Odfjell Seachem AS Plea Agreement, Nov. 3, 2003: "Defendant and co- conspirators discussed and exchanged prices to certain customers so as *not to undercut* one another's prices.") (emphasis added).

The O.N.E. Shipping Complaint has nothing to do with the Antitrust Division's charged conspiracy. O.N.E. Shipping alleges injury from a conspiracy among parcel tanker competitors to keep prices *too low*. *See* November Lau Decl. Ex. 1 at 19 (defendants agreed to "prepare bids

for those customers' business in a *below-cost* predatory fashion"); *id.* at 20 ("conspiracies . . . among Defendants resulted in the loss of customers by ONE because of *predatory pricing*, a sharp and immediate *decline in revenue* leading to substantial losses and an eventual forced departure from the Chemical Parcel Tanker Business.") (emphasis added).

*Third*, the fact that the Antitrust Division, during an active criminal investigation, is communicating with a civil plaintiffs' attorney during the pending civil litigation raises the *Healthsouth* concern that the Division could improperly seek to use civil discovery methods in violation of Stolt-Nielsen's constitutional rights. *See Healthsouth*, 261 F. Supp. 2d at 1326. Based on these concerns, and possible issues of privilege, an *in camera* review of these communications is warranted.

### C.      Hector Torres — Counsel Of Record For Celanese In *Stolt-Nielsen SA v. Celanese,* 430 F.3d 567 (2d Cir. 2005)

Hector Torres represented Celanese (*Stolt-Nielsen SA v. Celanese*, 430 F.3d 567, 569 (2d Cir. 2005)), which commenced arbitration and court proceedings against various members of the parcel tanker industry that have long been *public*. *See Odfjell v. Celanese*, No. 04-1758 JSR, 2004 WL 1574728 (S.D.N.Y. July 14, 2004) (identifying Mr. Torres as counsel of record for Celanese). Any "fear of economic retaliation" (Connolly Decl. ¶ 6) is thus illusory.

Nowhere does the Connolly declaration provide facts sufficient to meet its *Landano* burden with respect to communications between the Division and the attorneys for Celanese who were publicly pursuing arbitration claims. Given the existence of communications with an attorney pursuing a parallel civil case at the time of the Division's communications, *in camera* review of the withheld Torres documents is also warranted. *See Healthsouth*, 261 F. Supp. 2d at 1326.

### D. Mr. Connolly's Remaining Claims Do Not Meet The Antitrust Division's Burden Under *Landano*.

According to Mr. Connolly, the Antitrust Division "has a public policy promising confidential treatment to those who provide information about criminal antitrust conspiracies . . . ." Connolly Decl. ¶ 9. But this "public policy promising confidentiality" is no different than the "presumption of confidentiality" sought by the FBI in *Landano*, which was soundly rejected by the Court. *See Landano*, 508 U.S. at 180-81 ("A prophylactic rule protecting the identities of all FBI criminal investigative sources undoubtedly would serve the Government's objectives and would be simple for the Bureau and the courts to administer. ***But we are not free to engraft that policy choice onto the statute that Congress passed.***") (emphasis added). Just as the *Landano* Court rejected the FBI's blanket confidentiality policy, so too should this Court reject the Antitrust Division's blanket assertion of its confidentiality policy here.

Mr. Connolly's declaration strains credulity when it seeks to rely on boilerplate recitations of confidentiality asserted in its fax cover sheet. According to Mr. Connolly's declaration (¶¶ 11, 12), the existence of "privileged and confidential" messages on various fax cover sheets and emails means that there is an expectation of confidentiality when parties communicate with the Antitrust Division. This is not so. The Division is relying on customary boilerplate designed to deal with mis-delivered faxes. The very same fax cover sheet has been used by the Antitrust Division in all of its faxes, including routine correspondence with Stolt-Nielsen in this FOIA action. *See, e.g.*, November Lau Decl. Ex. 4 (fax cover sheet used to send a communication from Ann Lea Richards to Lucius B. Lau, Feb. 2, 2006); November Lau Decl. Ex. 5 (fax cover sheet used to send a copy of the Indictment to Stolt-Nielsen, Sept. 6, 2006). Fax cover sheet boilerplate falls far short of the "more particularized approach" to confidentiality outlined by the *Landano* Court. 508 U.S. at 180.

The Connolly declaration's reliance upon 18 U.S.C. § 3771(a) (Connolly Decl. ¶ 10) fares no better. The rights afforded in subsection 3771(a) apply "[i]n any court proceeding involving an offense against a crime victim . . . ." 18 U.S.C. § 3771(b). This FOIA civil action, of course, does not involve an offense against a crime victim. Thus, by its own terms, 18 U.S.C. § 3771 does not apply to this proceeding.

## II. The Antitrust Division's Reply Brief Contains Certain False Assertions Concerning Its Speechmaking

In its reply brief, the Antitrust Division makes certain new assertions that are false: (1) that Deputy Assistant Attorney General Hammond did not give a speech that detailed how a second firm in the ongoing parcel tanker grand jury investigation approached the Division seeking amnesty (Reply at 3); and (2) that there is no "publicity campaign" against Stolt-Nielsen (Reply at 2) and that the Division only "responded to inquiries from the public . . . to provide requested guidance to the antitrust bar." *Id.* Each of these new misstatements necessitates correction.

### A. The Antitrust Division Improperly Denies The Existence Of A Speech By Mr. Hammond Where He Describes How A Second Firm In The Parcel Tanker Industry Investigation Approached The Division Seeking Amnesty

According to the Division, Mr. Hammond never gave a speech that detailed how a second firm in the ongoing parcel tanker industry grand jury investigation approached the Antitrust Division seeking amnesty. *See* Reply at 4 ("No such speech was given"). In fact, Mr. Hammond gave such a speech on March 29, 2006, at the 54th Annual American Bar Association Section of Antitrust Law Spring Meeting in Washington, D.C. *See* September Lau Decl. Ex. 31. During this 2006 speech, Mr. Hammond discussed how the second firm, Odfjell, approached the Antitrust Division after Stolt-Nielsen's amnesty became public:

> For example, *in the Division's parcel tanker investigation*, Odfjell received a 30% discount off the bottom of its minimum Guidelines sentence. Odfjell

7

> *contacted the Division to offer its cooperation the day after the investigation went overt.* It made its key personnel available to the Division in a timely manner, and two of its top executives agreed to submit to U.S. jurisdiction, serve jail terms, and cooperate with our investigation. For its cooperation, Odfjell was rewarded with a 30% discount off its minimum Guidelines fine.

September Lau Decl. Ex. 31 at 5, n.8 (emphasis added).

Thus, the Antitrust Division is wrong to deny the existence of this speech. In fact, as of November 13, 2006, this speech is publicly available on the Antitrust Division's own website (http://www.usdoj.gov/atr/public/speeches/215514.htm).

### B. The Existence Of A "Publicity Campaign" Against Stolt-Nielsen Is Indisputable

In its complaint, Stolt-Nielsen identified six specific speeches in which Mr. Hammond spoke about Stolt-Nielsen. *See* Complaint ¶ 25, 06cv00474 RJL (Docket No. 1). By its Answer, the Antitrust Division "admits that Deputy Assistant Attorney General Scott D. Hammond spoke at the venues listed in ¶ 25 a, b, c, d, e and f . . . ." Answer ¶ 25, 06cv00474 RJL (Docket No. 11). The sheer number of speeches, by itself, establishes the existence of a "publicity campaign."

If there were any doubt on this issue, however, such doubt is readily dispelled reviewing the transcripts of two speeches that Stolt-Nielsen provides for the record. *See* November Lau Decl. Exs. 6 and 7. Mr. Hammond gave one of these speeches in Las Vegas to the ABA and the other at the *National Press Club* in Washington D.C. Both speeches centered on the Stolt-Nielsen case. Neither was provided by the Antitrust Division to Stolt-Nielsen in response to its FOIA request.

On March 3, 2005, Mr. Hammond gave a major address in Las Vegas, Nevada, focusing on the Stolt-Nielsen case. *See* November Lau Decl. Ex. 6. In his speech, the then recently-decided Stolt-Nielsen case was the centerpiece of his remarks, which span over 20 pages of the

transcript. *Id.* at 11-28, 62-65, 68-69, 70-71. In this speech, Mr. Hammond spoke at length regarding explicit details of the Stolt-Nielsen amnesty litigation. *See id.* at 11-27. These remarks were not limited to responses to "inquiries from the public." Reply at 2. Rather, Mr. Hammond took the occasion to argue at length his version of the Stolt-Nielsen facts to the audience:

- "You are in effect our jury." November Lau Decl. Ex. 6 at 14;

- "I submit to you that if you look at the record in this case, you will find that this is a company that deserved to be removed from the Leniency Program. It did everything wrong, every step of the way." *Id.*;

- "And so, when we received that call [from Stolt-Nielsen] we said 'you're not eligible.'" *Id.* at 17;

- "The judge decided that basically that the Antitrust Division attorneys, including myself, that we were pretty poor contract writers." *Id.* at 21;

- "He [the judge] ignored the contract, what it said about cooperation." *Id.* at 22;

- "This is about a company that did everything wrong from the beginning." *Id.* at 23;

- "[T]his managing director was up to his eyeballs in the conspiracy . . . ." *Id.* at 26;

- "Anybody in this room think that's a good way to conduct corporate compliance programs?" *Id.* at 26-27; and

- "We're talking about facts, which I've just got to believe that we're all in agreement on this, are so egregious . . . ." *Id.* at 27.

Mr. Hammond's speech, which was not produced to Stolt-Nielsen, was made *publicly* available by the program sponsors via an audio CD-ROM. *See* November Lau Decl. Ex. 8 at 12 (19th Annual National Institute on White Collar Crime 2005 brochure).

Similarly, the transcript prepared from the audio recording of Mr. Hammond's National Press Club speech in November 2005 demonstrates that Mr. Hammond did more than merely "respond[] to inquiries from the public." Reply at 2. Instead, Mr. Hammond provided inflammatory commentary, particularly in light of the fact that this is an ongoing criminal matter:

9

- "Stolt is an unfortunate example of a company that did everything wrong." November Lau Decl. Ex. 7 at 21;

- "[T]hey conspired by continuing to have senior executives meeting, discussing and participating in the cartel with their competitors, and that conspiracy continued right up until the time that the Wall Street Journal reported the existence of the conspiracy." *Id.* at 22;

- "It lied to the Antitrust Division; that is, the company misrepresented their way into the program by saying that the conduct ended when it was discovered and provided the Justice Department with false and misleading information and withheld other information." *Id.*

This speech, which was not produced to Stolt-Nielsen, remains *for sale to the public* in CD-ROM form. *See* November Lau Decl. Ex. 9 at 10 (ABA Section of Antitrust Law Fall Forum). The audio CD-ROM recording of Mr. Hammond's speech (purchased from the American Bar Association) is being filed with the Court under separate cover.

These speeches are contrary to 28 C.F.R. § 50.2 and the Division's Manual: "Because charges that result in an indictment or a civil action should be argued and proved in court, and not in a newspaper or broadcast, *public comment on such charges should be limited out of fairness to the rights of individuals and corporations and to minimize the possibility of prejudicial pre-trial publicity*." October Lau Decl. Ex. 7 at VII.H.2 (emphasis added).

### III. The Antitrust Division's New Amnesty Agreement Argument Lacks Merit

In its reply, the Antitrust Division makes the new argument (Reply at 6-7) that the amnesty agreement texts sought by Stolt-Nielsen are akin to the disclosure of bank examiner auditing manuals discussed in *Nat'l Treasury Employees Union v. U.S. Customs*, 802 F.2d 525, 530 n.19 (D.C. Cir. 1986), and the promotion rating plan at issue in *Kaganove v. EPA*, 856 F.2d 884 (7th Cir. 1988). Purporting to quote from *Nat'l Treasury*, 802 F.2d at 530 n.19, the Division argues that providing the redacted texts of amnesty agreements to Stolt-Nielsen would be similar to "dig[ging] a den for the fox inside the chicken coop." Footnote 19 of *Nat'l Treasury*,

however, contains no such quote. Rather, that quote appears in *Ginsburg, Feldman & Bress v. Fed. Energy Admin*, 591 F.2d 717, 730 (D.C. Cir. 1978). In any event, such colorful imagery simply does not apply to the texts of the amnesty agreements at issue because the Division has made a point to *publicize* the terms of its amnesty agreements in order to induce companies to report antitrust violations to the Division. Then-Deputy Assistant Attorney General James Griffin explained the public nature of the amnesty agreement texts during the following sworn testimony (which the Division moved to make *public*):

> Q. Now, this policy statement also had attached to it a *model leniency letter*; is that right?
> A. That's correct.
>
> Q. Since 1998, I guess in 1998, *the Division was making public the model leniency letter so people would know what its terms were; is that right?*
> A. *That's correct.*
>
> Q. And since 1998, the letter has been modified somewhat and I guess it was in 2002.
> A. There have been some minor modifications to it, yes.
>
> Q. *Were the modified model letters also publicized?*
> A. *Oh, yes.*

See September Lau Decl. Ex. 39 at JA-397 (emphasis added); *see also* Government's Proposed Findings of Fact and Conclusions of Law, *Stolt-Nielsen SA et al. v. United States*, No. 04-537 (E.D. Pa. May 20, 2004) ("In 1998, the Antitrust Division prepared and *published* a model conditional corporate leniency agreement. The model letter agreement, and subsequent modifications thereto, also have been *publicized* so that its terms and conditions *are available to the public*.") (citing Mr. Griffin's testimony, included in the Joint Appendix at JA-397) (emphasis added).

\* \* \*

Sadly, in the Division's Amnesty Program today, "amnesty" means indictment; "transparent" means opaque. The Court should not allow the Antitrust Division to utilize Orwellian Newspeak to render the disclosure requirements of FOIA meaningless.

Dated: November 14, 2006

Respectfully submitted,

**WHITE & CASE** LLP

By: *[signature]*
J. Mark Gidley (D.C. Bar No. 417280)
Christopher M. Curran (D.C. Bar No. 408561)
Lucius B. Lau (D.C. Bar No. 446088)
701 Thirteenth St., N.W.
Washington, D.C. 20005
tel.: (202) 626-3600
fax: (202) 639-9355

*Counsel to Stolt-Nielsen Transportation Group Ltd.*