# Exhibit 6

```
 1

 2

 3

 4

 5

 6

 7

 8              Welcome to the 19th Annual National Institute

 9                     on White Collar Crime 2005

10              Presented by the American Bar Association

11                Criminal Justice Section and the Center

12                   for Continuing Legal Education

13                         March 3, 2005

14              Recent Developments in Antitrust Law

15               Recorded live in Las Vegas, Nevada

16

17

18

19

20

21

22

23

24

25
```

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 2

```
1
2
3
4
5
6
7
8
9              VOLUME 1
10            19th ANNUAL
11         NATIONAL INSTITUTE
12        WHITE COLLAR CRIME
13              2005
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1         T R A N S C R I P T
2    Narrator: Welcome to the 19th Annual National
3    Institute on White Collar Crime 2005.  Presented by
4    the American Bar Association, Criminal Justice
5    Section and the Center for Continuing Legal
6    Education.  Held March 3rd and 4th, 2005.  We now
7    join this session, Recent Developments in Antitrust
8    Law.  Recorded live in Las Vegas, Nevada.
9    GARY SPRATLING: -- This particular aspect of
10   the activity that you look at, whether it's the
11   growing number of fines above $10 million dollars,
12   which is now 46 companies, or the total amount of
13   fines in the hundreds of millions that they add
14   every year to this nest egg that has been built up
15   as a result of cartel enforcement.  You can look at
16   the increase in the imposition of jail sentences on
17   antitrust offenders, now 80 individuals in the
18   last five years, or you can look to the growing
19   percentage of individuals from each company, a
20   growing number of people from each company, against
21   whom the Antitrust Division will seek to obtain jail
22   sentences.  The most recent example being four
23   criminal sentences and jail sentences against the
24   number two cooperating firm in the DRAM
25   investigation.

Page 3

1                I N D E X
2
3    REMARKS                  PAGE
4    MR. GARY SPRATLING            4
5    MR. SCOTT HAMMOND            11
6    MR. JIM WALDEN          28
7    MR. JOE LINKLATER       35
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    You can look at the 50 grand juries continuing
2    at that pace -- 50 grand juries looking at
3    international cartel enforcement.  The expanding
4    number of countries where executives are
5    currently serving or have served time in jail.
6    Currently 18 individuals from nine countries.  The
7    number of times that a company from a foreign
8    jurisdiction has paid more than a $10 million
9    dollar fine.  That's now 39 times.
10   You can look at the increase in collaboration
11   among competition law enforcement agencies from
12   around the world.  And you can look at it in terms
13   of what people typically think of, which is a
14   coordination on the service of a search warrant, or
15   as they're called in other jurisdictions, dawn raids,
16   or inspections.  And that type of activity.
17   Or you can look at it in terms of the
18   collaboration that's now occurring in terms of
19   exchange of techniques and tactics, and training.
20   A very large amount of that going on.  Or the rate
21   of amnesty applications still coming in at the
22   just unbelievable rate of two a month.  So, that's
23   one perspective.
24   Another perspective that you get, and something
25   we did last year, that I thought was fun, and I

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
1-800-FOR-DEPO

Page 6

1  think the audience thought it was okay was to look
2  at -- I keep a file of all the Division press
3  releases.  And you just look through and you flip
4  through the Division press releases, and just look at
5  the headlines, or the subscript on that.  And if you
6  pull out just a few of those, it gives you an
7  amazing picture of the comprehensiveness and the
8  vigor of antitrust enforcement, not just in the
9  United States, but around the world.
10     And so, looking at my file from just last
11  year, from March of last year.  Two weeks after we
12  had this panel last year, there's the press release
13  "Crompton Corporation Agrees to Plead Guilty in
14  Rubber Chemicals Cartel.  Company agrees to pay a
15  $50 million dollar fine."  And then a related press
16  release, "Bayer AG Agrees to a $66 Million Fine
17  in the Rubber Chemicals Cartel."  In another topic,
18  "Five Indicted in Connection with a Scheme to
19  Defraud the Federal E-Rate Program."  "Four
20  Individuals Arrested, One a Fugitive" was the
21  subtitle.  And then  a related press release, "Two
22  Pakistani Citizens Face Incarceration in the United
23  States."
24     Another topic, "Dutch Shipping Company Agrees
25  to Plead Guilty in International Parcel Tanker

Page 7

1  Shipping Cartel."  Another, "DeBeers Pleads Guilty.
2  Agrees to Plead to Price Fixing Indictment."  Of
3  course, an indictment which had been returned 10
4  years earlier, in 1994.  Another, "Japanese Executive
5  Agrees to Plead Guilty to International Antitrust
6  Conspiracy."  Subtitle "Would be first Japanese
7  citizen to serve prison sentence in the United
8  States for antitrust offense."
9     And then the last topic, "Infineon Technologies
10  Agrees to Plead Guilty to DRAM Price Fixing
11  Conspiracy, Agrees to Pay $160 Million Dollar Fine."
12  "Third highest fine in United States history for an
13  antitrust offense."  And then a related press
14  release, "Four Infineon Executives Agree to Plead
15  Guilty."  Subtitle, "Three German Citizens Face Jail
16  Time in the United States."  Those titles, I submit
17  to you reveal so much about the Antitrust Division's
18  practice, in both the domestic cartel enforcement
19  and the international cartel enforcement.
20     But, that's not the only picture.  Another
21  perspective is provided by the anti-international
22  cartel enforcement frenzy, and I use that word
23  advisedly, frenzy around the globe.  Competition
24  law enforcement agencies in jurisdiction after
25  jurisdiction -- particularly the major law

Page 8

1  enforcement agencies, have made -- have specifically
2  identified anti-cartel enforcement as their number
3  one priority.  Their number one objective.  Not one
4  of the top priorities, not among the top priorities,
5  not "this is something we think really serious
6  about."  But, is the number one priority for the
7  competition enforcement group.
8     Hew Pate did it a number of times last year in
9  the speeches that you have read.  You may be
10  interested that Graham Samuel, who's the head of the
11  ACCC, and Neelie Kroes, who's the Commissioner of
12  Competition now for the EU, have each said in the
13  last four months, it is the number one enforcement
14  priority of their jurisdiction.  And it's not just
15  talk, it's action.  The Australian ACCC, the Czech
16  Anti-Monopoly Office, the Hungarian GVH, the Japan
17  JFTC, the Korean KFTC, have all announced that over
18  the last year, they either imposed the highest level
19  of fines in the history of their organizations
20  against cartel activity, or have imposed the
21  highest fine for a particular cartel in that
22  jurisdiction.
23     And on top of that we see the EU charging
24  longer time periods and imposing fines that are a
25  greater percentage of the volume of affected

Page 9

1  commerce than their North American sister
2  jurisdictions.  More than the Department of
3  Justice, more than Canada in related offenses.  And
4  we've got the UK announcing that it's now getting
5  amnesty applications.  The UK, with this infant
6  program is now getting amnesty applications at the
7  rate of once a month.  And on top of all that -- on
8  top of all that, we've got -- during the last year
9  we've seen legislation pass that increased the
10  level of fines and jail sentences for antitrust
11  offenses in the United States.  And most recently,
12  legislation making price fixing a predicate offense
13  for wire tap.
14     This is almost getting to be not a fair game
15  for those of us who are charged with representing
16  those who are the subjects of the investigations.
17  But I think no matter what your perspective,
18  prosecutor or defense counsel, I think you will
19  concur that the level and breadth of activity in
20  this arena, and the number of developments in just
21  the last year, is just jaw-dropping.
22     We've got a panel here this morning to talk
23  about that.  It is a panel that has extensive
24  experience in both the domestic and international
25  cartel fields.  And for that reason, as is

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime     March 3, 2005
Las Vegas, NV

Page 10

1 consistent with most of the programs at the
2 National White Collar Crime Institute, we are
3 going to engage in what we call bare minimum
4 introductions of people, with one exception.
5    To my far left is Joe Linklater who's a partner
6 with Baker & Mackenzie, in its Chicago office.
7 Next to him is Jim Walden, a partner with O'Melveny
8 & Myers in its New York office. I am Gary Spratling.
9 I'm a partner with Gibson, Dunn & Crutcher in its San
10 Francisco office.
11    And when we get to Scott Hammond, this is the
12 exception to the bare minimum introduction. And
13 that's not because I'm trying to curry favor with
14 this guy. It is because he is a person you have all
15 come to hear this morning. He is the person who is
16 going to do most of the talking this morning, by
17 design. Not because he told us that's the way he
18 wanted it. Although, he probably does like it that
19 way. But also because he has a completely unique
20 experience level. And by that I mean, he is now the
21 Deputy Assistant Attorney General for Criminal
22 Enforcement for the Antitrust Division. Before
23 that, for a period of four years, he was the Director
24 of Criminal Enforcement. Before that, for five
25 years, he was a Special Assistant to the Deputy

Page 11

1 Assistant Attorney General. And in those three
2 positions, in those three positions, he has been
3 involved in every international cartel prosecution
4 that the Department of Justice has brought in the
5 last decade. And there's no one else who can say
6 that. And so, given that background, we're going to
7 see how he does with a few questions.
8    And Scott, the first question, and we oftentimes
9 put this question to you as kind of a kick
10 off, is: in your opinion what do you think have been
11 the two most significant developments in the past
12 year in criminal antitrust enforcement?
13    SCOTT HAMMOND: Well, I mean there have been so
14 many blockbuster developments just in the past
15 three or four months. But, if I was going to stick
16 with two, I would say the removal, or the attempt to
17 remove Stolt from the Corporate Leniency Program,
18 would be number one. And the second one would be --
19    Audience: You've got to speak up --
20    SCOTT HAMMOND: I'm sorry. And the second -- can
21 you hear me now?
22    Audience: Yes.
23    SCOTT HAMMOND: All right. The second major
24 development would be our efforts to extradite a UK
25 executive, Ian Norris, from the UK for antitrust and

Page 12

1 obstruction offenses.
2    GARY SPRATLING: Now Scott, those are two major
3 topics. Why don't we split the discussion on both,
4 in terms of your commentary and then the follow-up
5 questions that we may have.
6    SCOTT HAMMOND: Okay.
7    GARY SPRATLING: So, let's start with Stolt-
8 Nielsen, then we'll break and then we'll hit
9 Ian Norris.
10    SCOTT HAMMOND: The Stolt-Nielsen -- removal of
11 Stolt-Nielsen from our Leniency Program is such a
12 significant development from our perspective. And
13 I would think from yours as well. Significant, not
14 just because the Leniency Program has been the
15 centerpiece of our international cartel enforcement
16 program, and has become, I think unquestionably
17 the most celebrated and successful voluntary
18 disclosure program in the entire Department of
19 Justice. But, also very significant because this
20 is the first time we have ever sought to remove a
21 company from our Corporate Leniency Program since
22 it was -- the program was revised in 1993.
23    I say we tried to remove them because earlier
24 this year, in January the -- a District Court Judge,
25 in the Eastern District of Pennsylvania granted a

Page 13

1 preliminary injunction that was requested by the
2 amnesty applicant preventing us from removing Stolt
3 from the Leniency Program. I am -- the Division
4 hasn't announced it's intentions yet, whether it's
5 going to appeal. So I'm going to be -- I'm not
6 going to spend a lot of time talking about the
7 judge's decision. Instead, what I would like to
8 focus on is the facts of that case. Facts that
9 unfortunately you won't see in the findings of
10 fact. But, facts that are in the record, and are a
11 matter of public record.
12    The judge, in deciding to grant this
13 preliminary injunction, became the first court in
14 the land to decide that a -- someone who receives a
15 non-prosecution agreement with the government, can
16 challenge and seek preliminary equitable relief
17 prior to the bringing of an indictment. Of course,
18 that's usually dealt with in a post-indictment
19 motion to dismiss. No court has found that a
20 defendant has a right to pre-indictment relief.
21 Judge Savage in the Eastern District of
22 Pennsylvania has made that call and decided that
23 a due process right exists. There's a paper that
24 is in the -- that Jim Walden has done, that does --
25 talks a great deal about that decision. Obviously,

4 (Pages 10 to 13)

Page 14

1  it's something we take great issue with. But, I'm
2  not going to talk about that here now. Because --
3  well, for reasons that I'll explain in a minute,
4  it's not nearly as important as some other issues
5  that I'd like to spend some time speaking to you
6  about.
7       You know we care very much about that case.
8  We care what the judge -- about the judge's
9  decision. But, frankly we care a great deal more
10 what you think about the decision. And by that I
11 mean, what you think about the Division's decision
12 to revoke leniency, and to remove them from the
13 program.
14      You are in effect our jury. You are the
15 audience that is the antitrust bar, the white
16 collar bar, the business community. You're the
17 folks that we rely upon the most in deciding
18 whether or not this program will continue to have
19 the transparency and predictability, and fairness
20 which has been its hallmark all along.
21      I submit to you that if you look at the record
22 in this case, you will find that this is a company
23 that deserved to be removed from the Leniency
24 Program. It did everything wrong, every step of
25 the way. And that you would think it would be in

Page 15

1  the best interest of this Leniency Program, the
2  continued success and availability of this
3  Leniency Program, that companies such as this are
4  removed. Let me give you some facts so that you
5  can reach your own conclusion.
6       The investigation involving Stolt -- the
7  investigation of the tanker industry, basically
8  began in November of 2002 when the Wall Street
9  Journal published an article on page 2A, in which
10 it described a lawsuit that was being brought by
11 the former general counsel of Stolt. The lawsuit
12 that was brought was basically on a theory of
13 constructive termination.
14      The general counsel claimed that he had
15 discovered that Stolt was involved in a price
16 fixing cartel. And that he had brought that
17 information to the attention of senior management.
18 And that the senior management had ignored it. And
19 had allowed it to continue. And that in fact the
20 conspiracy continued even after the discovery by
21 the general counsel. And so, that he faced a
22 decision he must, either to resign from the company
23 or to be complicit in the continued participation
24 by the company in this international cartel
25 activity.

Page 16

1       Those allegations, as I said were front and
2  center in the Wall Street Journal. As you can
3  imagine, it didn't take us long to open an
4  investigation. And as it turns out it didn't take
5  long for us to receive a call also from counsel
6  from Stolt asking and requesting to enter into
7  our Corporate Leniency Program.
8       Well, as I mentioned, this program is very
9  successful. And one of the reasons why it is very
10 successful is because it's very generous. Our
11 Leniency Program provides the greatest
12 opportunities -- probably the most generous
13 voluntary disclosure program out there. But there
14 are a couple of conditions. And one of those
15 conditions is that before you can be -- in order to
16 be accepted into the program, to receive a grant of
17 leniency, you must have taken prompt and effective
18 action to terminate participation in the cartel,
19 once it was discovered.
20      Now, we have also interpreted that condition
21 very generously. We wanted to make clear that for
22 example if you were the owner of the company, and
23 you were involved in the conspiracy from the get
24 go, could the company still qualify? I mean,
25 could the company take prompt and effective action

Page 17

1  to terminate once it was discovered, if the owner
2  of the company was involved from the get go? We
3  wanted to remove that uncertainty, so we defined
4  the company discovering the conduct in this way:
5  We said, the company will only be deemed to have
6  discovered the conduct, once either general
7  counsel, or outside counsel discovers it, or the
8  Board of Directors discovers it. If one of those
9  three entities discovers the conduct, then under
10 the program, it has been discovered, and there must
11 be prompt and effective action to terminate the
12 company's role in the conspiracy.
13      And so, when we received that call we said,
14 "you're not eligible." I mean, at least if the
15 allegations that are in the Wall Street Journal are
16 correct, that your general counsel is claiming that
17 he discovered this conduct in March of 2002, he
18 brought it to the attention of the senior management,
19 and the conduct continued, you can't be eligible.
20      And the company said, "let us come in and talk
21 to you about that. Let us come in and talk to you
22 about this former general counsel, who we think is
23 extorting this company. It's simply not true." And
24 so we met with the company, we laid out our
25 concerns again.

5 (Pages 14 to 17)

Page 18

1     And they said, "take a look at this." And they
2 laid before us letters -- they laid before us letters
3 that they had sent to each of their competitors, the
4 co-conspirators in this case. Letters that informed
5 those companies that effective immediately, Stolt
6 company has a new corporate compliance program, which
7 is attached to this letter. And all Stolt employees,
8 without deviation, will follow the scriptures of this
9 program. And they said, "this is unequivocal proof
10 that the general counsel is lying. And that we put
11 an end to this activity. We withdrew, we sent
12 letters out to our co-conspirators and told them,
13 without deviation we will abide by the new, strict
14 antitrust compliance program at Stolt-Nielsen."
15     We said, can we step outside for a minute? We
16 went in the hall. We looked at this letter. We
17 thought about it. And we said, "that's pretty good."
18 I mean the program doesn't require you to report
19 the conduct -- more on this later -- to report the
20 conduct as soon as you discover it, it says you
21 have to withdraw. You have to terminate. And
22 these letters suggested that they may have done that.
23     So, we went back into the meeting and we said,
24 to Stolt's counsel, "all right. If it turns -- you
25 can come into this program, but we want you to know

Page 19

1 two things. Number one, if it turns out that these
2 letters -- that the allegations of the general
3 counsel are true, you're out. If it turns out that
4 these letters that were sent were simply a head
5 fake, and that in fact the company had
6 continued to participate and simply sent the
7 letters out to create the illusion of terminating
8 its participation, you're out.
9     And keep in mind this, you'll have -- here's a
10 copy of our model corporate leniency letter. You
11 will notice it is a conditional grant of leniency.
12 It's conditioned on a number of things. It's
13 conditioned on your representation that you're not
14 the ring leader or organizer of the conspiracy.
15 It's conditioned on your representation that you
16 will make complete, continuing, and full
17 cooperation. It's continued on your representation
18 that you took prompt and effective action to
19 terminate your role in the conspiracy once it was
20 discovered.
21     Two months after that letter was issued, we
22 suspended Stolt's participation in the conspiracy.
23 Two months later, after talking to just two Stolt
24 witnesses, we had discovered that we had been lied to.
25 We had discovered that we have been provided

Page 20

1 with false information; we had discovered that they
2 had withheld information. We had discovered that
3 in fact the allegations in the Wall Street Journal
4 article that we read from day one, were true.
5     We ended up prosecuting the other
6 co-conspirators. We ended up getting guilty pleas.
7 We provided 5-K assistance to executives who told us
8 that they had continued to conspire with Stolt right
9 up until the time of the Wall Street Journal article.
10 We provide 8C4.1 downward departures for the
11 companies who also cooperated. We made those
12 cases. We provided downward departures for the
13 assistance that allowed us to make those cases. As
14 I said, we had already long ago suspended the
15 cooperation obligations of the company. And then
16 we moved to kick out Stolt from the Leniency Program
17 under two grounds.
18     Number one, that they had misrepresented to
19 us, and were not eligible for admission in the
20 program because they didn't take prompt and
21 effective action. And number two, because they
22 had failed to fully cooperate, they had provided us
23 with misleading information, false information that
24 had prejudiced our investigation.
25     As I said, the District Court in Philadelphia

Page 21

1 didn't see it that way. If you read the opinion,
2 the focus of that opinion is on our letter. The
3 judge decided that basically that the Antitrust
4 Division attorneys including myself, that we were
5 pretty poor contract writers.
6     The judge understandably said, you are the
7 author of the letter here, and you could have put in
8 that letter if you wanted -- it says the
9 representation is they took prompt and effective
10 action to terminate their role in the conspiracy
11 once it was discovered. The judge said, "you should
12 have stuck in that letter, once it was discovered,
13 insert 'in March of 2002.' You didn't stick that in
14 the letter, you could have stuck it in the letter,
15 and I'm going to hold that against you."
16     Now obviously I disagree with that decision
17 very much. But again for purposes of going forward,
18 it doesn't really matter to the Leniency Program.
19     I mean hell we may get more leniency
20 applications if you think that we're that easily --
21 if you think we're bad contract writers, we write
22 loose contracts, and that a clever attorney can pull
23 one past us very easily. Come on in. That is not
24 going to stop us from getting leniency applications.
25 It shouldn't give you one bit of pause.

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
Las Vegas, NV

Page 22

1      It's the second part of the opinion that I'm
2  here to talk about.  We removed them on two
3  bases.  The second basis was failure to cooperate.
4  The judge really doesn't spend much time addressing
5  this.  At the beginning of it, he says he
6  acknowledges that they were kicked out for that,
7  but later on in the agreement he says the
8  government did not and does not claim, this is a
9  quote "did not and does not claim that Stolt
10  failed to cooperate, or that it withheld evidence."
11      I'm speechless.  We do claim; we did claim.
12  They did.  And then what the judge did, is he said,
13  "hey government, you got the benefit of the bargain
14  here.  You made cases, you got convictions, what
15  else do you want?"
16      He ignored the contract, what it said about
17  cooperation.  He ignored what the Third Circuit
18  says about cooperation.  And he said, cooperation
19  equals cases.  How would you like to see that in
20  your plea agreements, or your amnesty agreements?
21  I mean obviously they'd be thrown out.
22      Nobody would like to see that, our cross
23  examination would be killed and you know, courts
24  don't allow that anyways.  But that was the test
25  that was applied in this case.

Page 23

1      What you need to -- really it's so important.
2  I mean as the guardian of this Leniency Program,
3  it's so important for me to answer your questions
4  and for you to understand.  This was not about
5  gotcha.  This is about an issue that was identified
6  from the beginning.
7      This is about a company that did everything
8  wrong from the beginning.  This is about a company
9  that did everything wrong from the beginning, this
10  was about a company that discovered the conduct, and
11  didn't report it.  This was about a conduct that
12  continued after it was discovered and this was a
13  situation in which a company received leniency based
14  on false representations, that it shouldn't have
15  received.
16      GARY SPRATLING:  Scott, I have a question for you
17  at the risk of hitting on an emotional subject.
18  Let's accept that Stolt's conduct is at the far end
19  of the spectrum.  But my concern is that the Division
20  feeling that it doesn't want to be in this situation
21  again, will become more cautious and will become
22  better draftsmen and will tighten things up.  And then
23  I'll be in a situation where I've quote "discovered
24  something" and be accused of not taking prompt and
25  effective action.

Page 24

1      Let's say I'm a lawyer representing a multi-
2  national corporation.  I discover the conduct.
3  It's difficult to stop a multi-national company on
4  a dime.  And it's difficult to be confident that I
5  am shutting off everything that I have to shut off
6  in a remote location.  Let's say I've got a division,
7  an operation in Hong Kong and I've got a Vice
8  President of Sales in Hong Kong that I haven't
9  interviewed yet.  And I'm in to talk to you because
10  I want to make sure I'm the first person in.
11      Can I be confident that if that divisional Vice
12  President in charge of sales in Hong Kong is still
13  engaging in conduct before I've gotten there, that
14  I won't be kicked out of the program later because
15  I haven't taken prompt and effective action?
16      SCOTT HAMMOND:  Yeah, I mean you know what what
17  I'm saying to you basically is we've got a 12 year
18  history of enforcing this program.  This is the first
19  company we have kicked out.  We have a history of
20  enforcing it in a way in which we do not play gotcha,
21  and in which we're looking for ways to help companies
22  qualify.
23      But let's -- you mentioned that what if I got a
24  trader over in Hong Kong who I haven't interviewed
25  yet, who is continuing to have contacts with his

Page 25

1  competitors.
2      Just to be clear, what we had in this case
3  were the very top executives who were involved in
4  the conspiracy, once it was discovered by the
5  general counsel, the top two are still
6  participating in it afterwards.  The same people
7  that we had identified from the beginning as being
8  the high level executives that were involved, and
9  that identified to the company that if they
10  continued to be involved, would be grounds for
11  removing them from the program.
12      So I -- we're talking about, I think in this
13  case, a much different scenario than concern about
14  stopping this multi-national company and not being
15  in control of what people are doing everywhere.
16  But you know there is one thing you have to be
17  aware of.
18      I would suggest to you, that once you
19  discovered that, for reasons that were explored this
20  morning and we could spend more time talking about
21  it.  When you discover the conduct before the
22  government, I don't think you do have an option.  I
23  think you need to come in while the getting is
24  good.  But in this case, if you decide not to
25  report the conduct and you try to soft pedal the

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
1-800-FOR-DEPO

Page 26

1  withdrawal -- at best, that happened here -- then
2  you are at great risk.
3      This company, remember the executives I just
4  mentioned before, you know, the executives that were
5  identified by the general counsel in March of 2002.
6  They weren't fired. They didn't even have their
7  work reassigned. They didn't have their
8  responsibilities changed. Not only were they
9  allowed to continue to meet and talk with
10  competitors in violation of this so called paper
11  compliance program, but they were allowed to do
12  it without any in house or outside counsel
13  involved.
14      Even under the Stolt's version of the events,
15  this managing director was up to his eyeballs in
16  the conspiracy beforehand and who delivers the new
17  -- I told you about the letter that was sent to the
18  company saying here's our new corporate compliance
19  program. The letters to the two key conspirators
20  say, "pursuant to our recent conversation," comma,
21  "attached" they sent this managing director to
22  deliver the so called withdrawal by himself, in one
23  on one meetings with his competitors.
24      Anybody in this room think that's a good way
25  to conduct corporate compliance programs? Anyone

Page 27

1  would give advice to their client if they've
2  discovered, if they're fortunate enough to discover
3  the conspiracy before we do, an effective way to
4  terminate your involvement is to have your
5  executive who's involved in the conspiracy, go out
6  and deliver the news, one on one, without counsel
7  present, that we're not going to participate anymore?
8      That's the kind of soft pedal withdrawal that
9  I'm talking about. That if it turns out it doesn't
10  end, we will not be receptive to a company saying,
11  "hey we did everything we could."
12      So just to circle back to the beginning of the
13  question, no. There's not going to be a backlash
14  here. We're not looking to catch the next person
15  who did this.
16      We're talking about facts, which I've just got
17  to believe that we're all in agreement on this, are
18  so egregious, if we were talking about facts,
19  different facts, in which the company has done
20  everything it can, a company that has come in and
21  reported the conduct to us as quickly as it can,
22  who has done exactly what we have sent them to do,
23  which is come in before you've finished your
24  internal investigation. That's what we're telling
25  people to do. We're not going to penalize that

Page 28

1  company if it hasn't been able to terminate on a
2  dime.
3      GARY SPRATLING: Thank you Scott. Jim, you have
4  studied and analyzed the Stolt-Nielsen situation,
5  and shared a lot of that in a paper which everyone
6  has in the program materials. Based upon that, do
7  you think that Stolt-Nielsen is a situation that's
8  likely to repeat itself, and that's just a follow-up
9  question. What I'm asking here, what, if any impact
10  will this have on your advice to your clients
11  in dealing with the Division and amnesty situations?
12      JIM WALDEN: Well I mean I agree that Stolt is
13  surprising, but for two different reasons. One I'm
14  surprised that it hasn't happened sooner, because
15  anyone who practices on the Criminal Division side,
16  knows that it's not uncommon for U.S. Attorneys
17  offices to rip up cooperation agreements from time
18  to time and no one makes a big deal out of it.
19      And so, given the fact that there's so many
20  leniency applications and there's so many companies
21  that are now participating either as amnesty
22  applicants, or amnesty plus applicants, I'm just
23  surprised that it hasn't happened sooner. And I'm
24  surprised that there is a high level Division
25  official sitting and being completely transparent

Page 29

1  about the reasoning behind it, which is not
2  something that you often see on the Criminal
3  Division side. So the answer to the second part of
4  your question though, it's not something that's
5  keeping me awake at night, and I hope it's not
6  something that's keeping my clients awake at night.
7      The problem with Stolt-Nielsen's remediation,
8  was that if you look at the record of remediation
9  that you need to establish in order to be able to
10  live up to your representation that you've
11  terminated the agreement. It was like a glacier
12  that was a mile wide, but only an inch deep. It
13  looked like great evidence when you first saw it,
14  but then there was really nothing behind it.
15      And of course sophisticated clients know that
16  if you wish to remediate a problem like this,
17  knowing that in a company that's got international
18  operations with sales and marketing divisions all
19  over the world, you can't really control -- there
20  has to be very robust remediation.
21      And the first thing that has to happen is a
22  company has to create a prohibition against
23  competitor contact, period, unless the counsel is
24  present. And many companies don't want to do that,
25  but Stolt-Nielsen will be a cautionary tale to them

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime       March 3, 2005
Las Vegas, NV

Page 30

1  to convince them that that is the right way to
2  proceed after there is initial evidence of an
3  antitrust violation.
4      You've got to stop the business people from
5  interacting with competitors except for legitimate
6  business reasons with a clear agenda, and with
7  counsel present to ensure that antitrust rules are
8  being complied with.  And many companies operate
9  under those rules even without antitrust
10  investigations in their midst.
11     The second thing you have to do, is you have to
12  have an efficient internal investigation that finds
13  the culprits and then neutralizes them as quickly as
14  possible.  And we're going to talk a little bit later
15  about the difficulty in making those decisions.  It's
16  certainly more like three dimensional chess, than
17  it is like checkers.
18     But you need to identify the employees,
19  neutralize them in the sense of limiting their
20  responsibilities, moving them to other areas where
21  they're not going to have competitor contact, and
22  ultimately transitioning them out of the business as
23  a way to create the tone from the top that you need
24  on a go forward basis to show the other employees
25  that the conduct's not going to be tolerated in the

Page 31

1  future.
2      That's the way that you create a record of
3  remediation.  That's the way that you ensure that
4  you can live up to the representation in the
5  agreement and that's the way that most companies, at
6  least in my experience, behave because they see the
7  risks associated with not -- obviously there's a
8  tremendous difference between being the amnesty
9  applicant and being the second chair.  And getting
10  kicked out of the first chair is obviously an
11  extraordinary thing that no one wants to endure.
12  So I don't think it's going to change the advice
13  that I give my clients, it's just going to give one
14  more cautionary tale that if they don't follow my
15  advice, here's what can happen.
16     GARY SPRATLING:  I know that Joe and I had some
17  follow-up comments on these points during the
18  practice session, but I suggest we just go by them
19  to keep on track here time wise and jump to -- Scott,
20  your second major development in the last year, that
21  is the Division's request to extradite Ian Norris.
22     SCOTT HAMMOND:  Okay, I'll be briefer on this.
23  Ian Norris was the former CEO of a very large UK
24  conglomerate, and he was indicted on multi counts for
25  orchestrating a price fixing conspiracy, as well as a

Page 32

1  very extensive attempt to obstruct the investigation
2  involving document destruction, witness tampering and
3  a few other conspiracy counts.  He was arrested in the
4  UK in January of this year, and he will face an
5  xtradition hearing back to the United States, in May.
6      Some awful good facts here, that I'm not going
7  to spend a lot of time talking about, but we have
8  some speeches in terms of describing the obstruction
9  here, and I'm going to move through those now.
10  From the Division's perspective obviously this is
11  very important.  It's very important to me in one
12  sense, because the last few years here at the White
13  Collar Crime Conference, I have been forecasting that
14  this day would come when we would be seeking to
15  extradite a foreign national back to the United
16  States.  And I'm glad to be back in front of you this
17  time and be able to have delivered on that promise.
18  At least the promise that we will seek it.
19     As you know and Gary mentioned at the
20  beginning, we have done a pretty good job of
21  turning up the heat on foreign nationals who target
22  U.S. businesses and consumers for antitrust
23  crimes.  I think Gary said 18, I believe the number
24  is 19 foreign nationals have now served time, or
25  are serving time in U.S. prisons for violating U.S.

Page 33

1  antitrust laws.  I mentioned last year, our policy
2  of putting fugitives who decide not to return,
3  accept responsibility and cooperate in our
4  investigations, by putting them on Interpol Red
5  Notice Watches.  And you know this is the third
6  thing that we're going to be doing.  And that is
7  try to extradite those executives that we can.
8      It's a promise that I made as I said, I've
9  made before that we're intent on delivering on.
10     The other thing that's somewhat remarkable but
11  it's really -- to get the full import of this, you
12  need to have practiced in this area internationally
13  for a while, but to have the UK be the first
14  government to go to bat for us, and assist us in
15  seeking extradition is remarkable.
16     It wasn't that long ago, in fact I would say
17  about six or seven years, six years ago Gary and I
18  were over in the UK talking to the UK government
19  about just getting a cartel law period.  It wasn't
20  even a civil offense as late as the '90s.  Not only
21  did they adopt a criminal offense in 2000, but then
22  they went one step further a few years later, and
23  now they actually have made cartel activity a
24  criminal offense in the UK.
25     But this is just one more example of what Gary

9  (Pages 30 to 33)

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime     March 3, 2005
Las Vegas, NV

---

Page 34

1 said in his introductory remarks about the changing
2 attitudes abroad -- that we have the UK assisting us
3 here in our first extradition effort.
4     GARY SPRATLING: You know I will tell you, Scott,
5 that I think that the Antitrust Division's move to
6 extradite Norris is potentially the most significant
7 development in anti-international cartel enforcement
8 in years.
9     If this signals both the willingness and the
10 commitment of the Antitrust Division to seek
11 extradition of individuals who have been convicted
12 of offenses in all jurisdictions where treaties
13 would allow the extradition and where the
14 relationship between the competition law
15 enforcement authorities will allow it, then I think
16 it is an absolutely huge development. And I think it
17 has the chance to change the face of international
18 cartel enforcement forever. If executives believe
19 that they are no longer safely harbored within the
20 boundaries, national boundaries of their
21 jurisdiction, it is going to change completely
22 their calculus as to what they do in response to an
23 investigation, or what they do in response to an
24 indictment. It's going to change how their
25 counsel advise them. It's going to change the

Page 35

1 incentives to self report and I think will result,
2 if the Division goes through and keeps doing this
3 in other jurisdictions, I think it's going to result
4 in a wave of self reporting from jurisdictions where
5 that has not occurred before and open up whole new
6 areas of cartel enforcement.
7     So I think that the Ian Norris matter is hugely
8 more significant than the Stolt-Nielsen matter.
9     And Joe, do you have any thoughts on that?
10     JOE LINKLATER: Well, I agree with what you say
11 here, I think it's the big change. I don't think
12 Stolt-Nielsen is really much of a change. I agree
13 with Jim on that. But what this means is you can't
14 hunker down in your manor house in rural England,
15 as one fellow recently did and say "come and get
16 me, I know you can't."
17     This, if people don't know about it, this
18 decision, the Norris decision and the three bankers
19 that are being extradited, has caused enormous furor
20 in England. The notion of extraditing your own
21 citizens to the United States to go to jail is a big
22 deal. And lawyers are talking about it, the
23 newspapers, everybody is talking about it.
24     And I think Scott you ought to take another
25 minute, and talk about how the Fast Track Treaty will

Page 36

1 change the process, because you mentioned the speed
2 at which this is going and I think it's worth telling
3 people that the whole process is changing.
4     Audience Question: [Question partially inaudible]
5 How many countries in Europe and elsewhere is an
6 antitrust violation a criminal offense?
7     SCOTT HAMMOND: I can answer that question
8 also by answering his question, because the Fast
9 Track Extradition Treaty that the UK and the United
10 States entered into, in I think January of 2004,
11 has an impact on this particular extradition in a
12 number of different ways.
13     So first I'll get to your point Larry, this way.
14 It requires dual criminality. The conduct, Mr.
15 Norris's price fixing conduct predates the Enterprise
16 Act, the act that I mentioned earlier, that made
17 cartel offenses in the UK a criminal offense. Okay.
18 So his conduct predates the point in time when it
19 became a criminal offense in the UK. While the
20 Enterprise Act, though, also allows for extradition
21 on conspiracy to defraud, the UK government has
22 looked at the information that we have provided in
23 support of the extradition, and said "you know what,
24 that looks like conspiracy to defraud to us." And so
25 again, this is the attitude shift I'm talking about.

Page 37

1 These are governments who are looking for ways to
2 cooperate, as opposed to looking for ways not to
3 cooperate.
4     It answers Larry's question with respect to, how
5 many countries out there that have dual criminality,
6 that allow for extradition on antitrust? A
7 handful. How many have conspiracy to defraud as a
8 crime? A heck of a lot more.
9     If those companies start making the same
10 judgment that the UK has, man that changes
11 everything.
12     Oh by the way, that changes everything, not just
13 in terms of counseling your client who's over in the
14 UK. I would think changes what you're saying also to
15 your U.S. executive who may be feeling pretty
16 comfortable with the people that I conspire with are
17 over there and they're probably not coming back.
18 That's going to change, right. You can't be so
19 cozy sitting in the United States either, because
20 you have to now realize that there is a huge now
21 incentive for those foreign executives to come in
22 and cooperate early as well.
23     Now to answer the question about the Fast
24 Track Treaty some more, it has changed significantly
25 the time frame for these extraditions. It's changed

10 (Pages 34 to 37)

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 38

1  the amount of evidence that we have to present.  No
2  longer do we have to make a prima facie case in
3  support of the extradition request.  We don't have
4  to submit witness affidavits.  A hearsay affidavit by
5  the prosecutor is enough.  Appeal rights have been
6  curtailed.  This used to be a process that would
7  likely take a couple of years.  It's now been
8  reduced to a couple of months.  In this case, the
9  request was received in January of 2005.  The
10  defendant was immediately arrested, and his hearing
11  is set for May.  The Enron defendants we talked
12  about, that entire process just took three or four
13  months.  So it's moving very quickly.
14      THIS PRESENTATION IS CONTINUED ON THE NEXT CD
15
16
17
18
19
20
21
22
23
24
25

Page 39

1
2
3
4
5
6
7
8
9      VOLUME 2
10     19th ANNUAL
11    NATIONAL INSTITUTE
12    WHITE COLLAR CRIME
13        2005
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

1      T R A N S C R I P T
2      NARRATOR: Welcome back to the 19th Annual
3  National Institute on White Collar Crime 2005.
4      We now join this session, Recent Developments
5  in Antitrust Law, already in progress.
6      Audience:  [Question inaudible].
7      GARY SPRATLING: No, after indictment,
8  I'm sorry I misspoke.  After indictment, if the
9  person does not come and stand for the charges,
10  then they are labeled an international fugitive.
11  I'm sorry if I misspoke on that.
12      JIM WALDEN: Let's talk about the other side of
13  that though, because I think there's another side to
14  that.  Another way that you can make the argument.
15  Certainly I understand how the big news could be the
16  proliferation of antitrust codes.  And certainly as
17  there are more countries that adopt them, it gives
18  people less places to hide, and Norris may be a small
19  part of that.  But I think the significance that Joe
20  and Gary are putting on it presumes that the
21  Division's really going to pursue this as an
22  aggressive consistent strategy of getting
23  extraditions.  And one could look at the track
24  record up to date and wonder whether that is really
25  true.

Page 41

1      I understand that for years there's been a
2  prediction that it's eventually going to happen,
3  now it has, is the Division really going to commit
4  the resources to extraditing people from all over the
5  world in light of the fact that it already has a
6  very heavy docket of cases that are taking the time
7  of staff attorneys as it stands now?
8      SCOTT HAMMOND: Jim, I'm troubled by the fact
9  that you seem to be doubting my sincerity on this.
10     Well look, I'm just hearing people who
11  obviously I respect a great deal saying they think
12  this is the most significant development in 10
13  years or something.  You're damn right we're going to
14  be trying to do this, we know how important it is.
15  We know that we have to do this in order to get,
16  not just to bring, antitrust offenders to justice, but
17  also to create the incentives that we need to have
18  foreign nationals cooperate with our investigation
19  to bring to us as evidence, documents, testimony that
20  we would otherwise have difficulty getting.
21     We're going to be doing it.  But on the
22  resource point, forget about it.  As I said we
23  don't even have to provide witness affidavits.  We
24  may begin, if we keep doing it, begin taxing the
25  resources of some foreign countries.  But from a

11 (Pages 38 to 41)

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime     March 3, 2005
Las Vegas, NV

|  | Page 42 |
|---|---|

1  Division resource perspective and from OIA who
2  assists us, it's nothing -- it's a drop in the bucket
3  compared to the bang for the buck we're getting on
4  this.
5       GARY SPRATLING: Scott, before we
6  leave the topic of developments. Can you give us a
7  prediction on the next two or three developments
8  that you think are going to have major impacts in
9  the future?
10      SCOTT HAMMOND: Well, I'm going to go
11 through these quick as I said. I can think of a
12 half dozen things that have happened just in the
13 last three months. And the three I'm going to
14 mention also, just happened in the last three
15 months, on top of what we've just been talking
16 about.
17      One would be, it's a perfect segue from the
18 last topic, the Australian government has just
19 announced that it will be introducing criminal
20 penalties for cartel offenses.
21      Another country just announced, and I can tell
22 you it looks very promising, because in the paper
23 the opposition party to the party that's in power
24 right now in Australia, their reaction was two-fold.
25 One was, what took you so long? And the second one

|  | Page 43 |
|---|---|

1  was, we're going to have to look at these five year
2  maximums to see if it's long enough.
3       So I think I can predict with a fair degree of
4  certainty that we will be seeing criminal sanctions
5  in Australia within the year.
6       That is going to have a big impact in a lot of
7  ways that these gentlemen are better able to talk
8  about with respect to simultaneous leniency
9  applications and so forth.
10      Secondly, just a couple of weeks ago, I'll
11 mention as a recent development you may want to pay
12 attention to, the Antitrust Division just got
13 authority to use wiretaps in its investigations,
14 and by that I mean antitrust offenses are now a
15 predicate offense for seeking wiretap authority.
16 That legislation was just passed in mid-February.
17 So you know, that may be coming soon to an
18 investigation near you.
19      And the third development to keep an eye on
20 obviously, is sentencing-related issues. You know
21 there's going to be a lot of talk in this conference
22 about Booker/Fanfan, and obviously the Division
23 like other prosecutors will have to adjust to that
24 case. But you know, something unique to the
25 Antitrust Division that I would just point your

|  | Page 44 |
|---|---|

1  attention to with respect to sentencing, has to do
2  with our new legislation. I hope all of you know
3  this, but in June of last year the statutory maximums
4  for antitrust offenses went way up. So for
5  individuals, the statutory maximum jail sentence went
6  from three years to 10 years, and the statutory
7  maximum fine under the Sherman Act for fines went
8  from $10 million to $100 million dollars.
9       The Congress, when it passed the legislation,
10 directed the Sentencing Commission to revisit 2R1.1,
11 which is the antitrust guideline, and told them to
12 make adjustments to that guideline to take into
13 effect the new statutory maximum. I think you will
14 see that the Commission is going to do that, and I
15 suspect that what they will do is raise the base
16 offense level and also raise the fine with commerce
17 adjustments as well.
18      Now, I can tell you in that in the Division
19 we're giving a great deal of thought to and
20 preparing for and what I -- you ought to keep your
21 eye on is -- once those guidelines go up, how is
22 that going to effect the Division's sentencing
23 recommendations?
24      Obviously, I think you all know the
25 Department's mandate after Booker is to keep on

|  | Page 45 |
|---|---|

1  recommending guideline sentences, so that much is
2  clear. We will do that.
3       But what about 5-K's? What is the Division
4  going to do in the 5-K situation if you received --
5  if you were in offense level 15, looking at an 18 to
6  24 month jail sentence before, and a 5-K got you a
7  three or four level drop and you got a sentence of
8  12 months or less, or nine months or whatever it was?
9  What's going to happen going forward when that same
10 defendant may be looking at a sentence of four, five
11 or six years? Is he still going to be -- is the
12 Division in its 5-K's, because oftentimes we use plea
13 agreements, going to be making the same sentencing
14 recommendation? Probably not.
15      I mean, I don't think we can be following clear
16 directives from the Hill on how we should treat
17 antitrust offenses if there was an upward adjustment.
18 Do I think it's going to happen all at once? No. Do
19 I think it's going to be problematic? Yes. But this
20 is stuff that I'm going office to office about,
21 talking to our prosecutors getting them thinking
22 about it, so that when the guidelines are adjusted,
23 we'll have a policy in place and try to have
24 uniformity, as much as possible with respect to how
25 we deal with this issue. Very important going

12 (Pages 42 to 45)

Page 46

1  forward.
2      GARY SPRATLING: Will Booker/Fanfan, Scott,
3  have any effect on the way the Division charges
4  cases? [inaudible]
5      SCOTT HAMMOND: No, I mean I don't
6  -- you know. Blakeley was a problem. Booker was a
7  relief after Blakeley. I mean, we have sentencing
8  adjustments -- every single Antitrust Division,
9  virtually every single Antitrust Division
10  defendant has sentencing adjustments for volume of
11  commerce, [inaudible] defense or what have you. If
12  we had to prove every single sentencing adjustment
13  and prove it beyond a reasonable doubt to a jury,
14  that would have been a headache.
15      Having to, you know life after Booker with
16  respect to charging positions, is not going to be a
17  big headache for the Antitrust Division.
18      GARY SPRATLING: Well what's with the next phase
19  then, negotiate, you charge it, you've got some
20  people who in anticipation of charge are in
21  contemplating negotiating a plea agreement. Does the
22  combination of Blakeley and Booker/Fanfan give a
23  putative defendant a lever against you in terms of
24  reducing the amount of the fine that it's willing to
25  agree to and that you are going to press to get, by

Page 47

1  saying to you, "listen, you know under these new
2  decisions you've got to be able to prove twice the
3  gain, twice the loss. We don't think you have a
4  prayer of doing that, so we're not going to enter
5  into this plea agreement. We like all the rest of
6  it. But that number you got down there, we want that
7  number down because of these decisions and the
8  responsibilities that are going to be imposed upon
9  you." How do you react to that, and does that work?
10      SCOTT HAMMOND: Well, it doesn't work.
11  And I'll explain why. First of all, this doesn't
12  come up in plea negotiations with individuals.
13  We're not looking for fines or sentences above 10
14  years right now.
15      Secondly, now we're talking about fines above
16  the statutory maximum, which soon will be $100
17  million dollars. Well it already is $100 million
18  dollars, and will be for conduct that postdates June
19  of 2004. But for conduct that predates that, or
20  conduct that postdates that, that wants to go above
21  $100 million dollars, yes we do get arguments from
22  defense counsel that says "hey, you're going to have
23  to prove gain or loss, you're going to have to prove
24  it to a jury beyond a reasonable doubt. We have an
25  economist that says you can't do that. And we've

Page 48

1  conducted a study and so we're willing to cooperate
2  and enter into a plea agreement with you all, but
3  you're going to have to take into account the fact
4  that you're going to have a difficult time with gain
5  and loss. And you're not going to be able to rely
6  on that 10 percent proxy that's in the sentencing
7  guideline that doesn't require you to establish gain
8  or loss in antitrust cases."
9      And you know, I mean our response to that is
10  uniform. We say, if you would like your day in
11  court, and if you would like to prove and litigate
12  the issue of gain or loss, we can do that. But we
13  will do that at the end of our investigation.
14  We're not going to do it in the middle of our
15  investigation. We're not going to stop our
16  investigation right now, go hire outside experts
17  and conduct a gain or loss calculation.
18      You want to litigate with the Division that's
19  fine, go to the end of the line. You want to plead
20  guilty, you want to cooperate. We're going to rely
21  upon the 10 percent proxy in the guidelines, we're
22  going to calculate a guidelines fine, we may then
23  depart substantially from that guidelines fine
24  based on your cooperation, we'll do a whole lot of
25  other things for you that we do for cooperating

Page 49

1  parties, but you can't have it both ways.
2      So again, these gentlemen to the right and
3  left of me know this dynamic, or at least know
4  better than I in terms of why companies do what
5  they do, but I'll tell you we've had no difficulty
6  obtaining fines above $10 million, above $100
7  million post-Apprendi, post-Blakeley, and post-
8  Booker.
9      GARY SPRATLING: Why don't we move to a new
10  subject, internal investigations. Jim, suppose
11  your internal investigation has identified the
12  company's employees who were involved in the
13  activity and you're talking to the board and the
14  board wants to know, what do we have to do to
15  make sure that this conduct has stopped and what
16  should we do to discipline the employees who've
17  been involved in the illegal conduct? We all know
18  that those are questions that the board frequently
19  puts to counsel reporting to them. What advice do
20  you give them?
21      JIM WALDEN: I guess part of it depends on who
22  you're representing, whether you're representing
23  senior management, or you're representing the
24  board.
25      Oftentimes, when you're doing an internal

13 (Pages 46 to 49)

Page 50

1 investigation, at least until about a year and half
2 ago, you're mostly representing senior management,
3 now it's more often that the board is actually doing
4 the investigation. But in those situations the
5 tension is always there. There's always a tension
6 between finding all the facts, and getting rid of
7 the wrongdoers and usually you can't have it both
8 ways at least not at the same time.
9     And so there is a real danger of pushing
10 people out of the tent too quickly. Even if you
11 simply remove people from their job responsibilities
12 and move them to a different area of the company,
13 that's a decision that's going to carry risks. If
14 people know that employment decisions are being made,
15 the person who's affected may be less forthcoming,
16 they may decide that he or she wants a lawyer.
17     It may also have a residual impact on other
18 employees. Especially if the decision is made to
19 prematurely terminate someone. Other employees in
20 the internal investigation may not be completely
21 candid with you, for fear that they will be impacted
22 as well. And so the advice that you have to give
23 when you're talking to the board is often very
24 difficult, because the board essentially, usually
25 wants doubts. They want to know who did it, and when

Page 51

1 can we get rid of them, and it's very hard from their
2 perspective to justify keeping someone a day longer
3 than the time that the internal investigators have
4 determined that the person was involved in price
5 fixing.
6     So you have to be prepared in those
7 circumstances to be able to explain to boards, and
8 especially boards who have been through this before
9 and know this tension full well. You have to be
10 prepared to explain to them the remedial steps
11 you're taking to curb the risks that employees that
12 are still in the tent are going to continue to
13 violate while at the same time emphasizing to them
14 the need to keep people in the tent long enough to
15 make sure that you have all of the facts. And to be
16 able to transition them out of the company in a way
17 that will make them continue to be available to
18 fulfill your obligations to the government to
19 cooperate.
20     Because the Division, or other parts of the
21 Criminal Division don't want to hear, "well I can't
22 produce so and so, I can't produce John Doe for an
23 interview, because the company decided to fire him."
24 And it's now not uncommon for prosecutors to ask at
25 the beginning of an investigation, once a company

Page 52

1 pledges full cooperation, ask the company lawyer
2 for advance notice of any employment decisions, so
3 that the Division official can interview the
4 person, before the board even knows that there's
5 going to be an adverse employment decision.
6     So these are all things that you need to
7 explain to the board candidly and in most instances
8 you're going to have to resist pressure from the
9 board to get rid of the people at an earlier point
10 than you're comfortable getting rid of them.
11     GARY SPRATLING: And isn't the last
12 point you made the crux, or it seems to me that it
13 is the crux in dealing with the board. That is
14 you're dealing with the board, and companies who have
15 been through this, especially as you mentioned,
16 companies who have through it more than once. And
17 have adopted the compliance policy and they're saying
18 the way we're getting this company straightened back
19 on the track, is this is going be zero tolerance, and
20 we're announcing.
21     The CEO goes out, goes on video camera to the
22 offices all over the world, and says we mean this.
23 If somebody violates this policy, you're gone.
24 You're history. And now they say, Walden, and now
25 you're telling me that we don't discharge this guy?

Page 53

1 This is not a premature severance. You've identified
2 the person responsible for this. You've identified
3 the guy who's gotten our butt in the crack on this
4 thing and we want this guy gone. Now why not? And
5 at least in my experience -- well we need to get more
6 of the facts and stuff like that doesn't work. What
7 really works is, you tell them "because if this
8 guy's gone and you can't deliver him you get no
9 credit with Hammond."
10     You can't -- we can't bring this guy forward,
11 we're not going to get the credit for that. He can
12 go forward independently but the company is not
13 going to get credit. And I wonder if either of you
14 have any reaction to that. I mean it's -- what the
15 board or the company understands. It's a very,
16 very difficult issue. But what generally is
17 persuasive to the board in my experience is that if
18 we don't do it this way. If we don't find a way to
19 keep them in the tent, get them out there,
20 different responsibilities, reassign them. Put
21 them in position that in fact the job description
22 is assisting the company in its response to the
23 government investigation. That's his job
24 description.
25     You take out everything else, out of the job

Page 54

1  description, and that's where you got him, and you
2  know, you keep his salary, and you just keep him
3  happy for a while until he gives you all that you
4  want, then you deal with it later. But it's
5  absolutely essential, because if you -- if you go
6  in to see Scott and you say you know we've got these
7  guys who have cooperated, unfortunately the guy who
8  is really involved is not cooperating, we can't
9  bring him in. Hammond says, "well that's worth about
10 zero." Any reaction to that?
11     SCOTT HAMMOND: I think you guys
12 have identified the tension, as you say. As Jim
13 says, the board wants scalps, they want compliance
14 with their code of conduct that you or some other
15 lawyer told them was really important. It's all
16 going to be fact driven. But it's also going to --
17 it's going to change according to whether you're in
18 an amnesty situation or not. And it's going to
19 change according to whether you're the company
20 counsel who wants to go slow and cautious and make
21 sure the company gets the best deal. Or whether
22 you're the Caremark counsel for the Board of
23 Directors, and you're there to advise them about the
24 concerns that they have.
25     GARY SPRATLING: Joe, what do you mean by

Page 55

1  Caremark counsel, what's Caremark counsel?
2      JOE LINKLATER: I'm sure most
3  people know, Caremark counsel is the lawyer that's
4  hired by the Board of Directors to advise them to
5  make sure they're complying with their either two,
6  or three depending on how you read the Delaware
7  decisions, duties -- loyalty, care and good faith.
8      And to avoid what they're all worried about
9  now, directors are ever more sophisticated, they
10 read the Wall Street Journal, they don't want a
11 denial order from the SEC, they don't want a personal
12 judgment against them in civil litigation. They
13 don't want somebody coming after their assets.
14 They don't even want to be named in those civil
15 lawsuits. So they hire their own lawyer to advise
16 them on those duties and if it's not the right
17 lawyer, or if -- well whether it is or isn't,
18 tensions can develop.
19     GARY SPRATLING: With respect to the
20 right lawyer, if you know, if you or Jim or I are
21 faced with this, do -- what do you think about us
22 advising the board on who the Caremark counsel
23 ought to be and the considerations that go into
24 that?
25     JOE LINKLATER: I think it's hugely

Page 56

1  important. I think it's as much your duty to give
2  the board information about that, and try to
3  influence that decision as you would in trying to
4  help the CEO decide who his individual lawyer
5  should be if he needs one.
6      The last thing you want in there, is somebody
7  who is fighting with you as the company's lawyer
8  every day about should we fire people, should we get
9  independent counsel for people, should we discipline
10 people. And if that lawyer is not experienced in the
11 aspects of a criminal antitrust investigation, you're
12 going to have those problems all the time every day
13 and it's going to be another layer in the three
14 dimensional chess that Jim mentioned earlier, and a
15 bad one, because the board's going to be listening to
16 that lawyer, and he's going to be saying "I'm making
17 sure that you're not going to get named in a lawsuit,"
18 "I'm making sure they're not going to take away that
19 third country home you've got somewhere or that
20 vacation home you've got in Hawaii, so you better
21 listen to me." You don't want those fights.
22     GARY SPRATLING: And you mentioned about
23 bringing in a separate counsel in the conduct of the
24 investigation, what are some of the considerations
25 that you go through as to the appropriate time to

Page 57

1  do that, and the ethical tensions that develop in
2  that situation?
3      JOE LINKLATER: Well if you're talking about an
4  antitrust investigation, in the amnesty situation
5  as we are here, as opposed to what Jim mentioned
6  earlier, the straight criminal investigation. I
7  think you can construct a very good argument that
8  you can go as slowly as we've described here, in
9  getting individual counsel for people, and you
10 don't have to kick them out of the tent so long as
11 two things -- you're meeting your ethical
12 obligations under 4.1 and 4.3, and so long as the
13 cooperation is continuing and finally of course, so
14 long as the conduct is shut down. If you have those
15 three things, then I think you can wait a while.
16     Sometimes admittedly, it helps if you get a
17 really rigid employee who's not cooperating,
18 sometimes it helps to get individual counsel for
19 him, and he can sit down and persuade him to be
20 more forthcoming with you, but that's a rare
21 situation.
22     GARY SPRATLING: Jim do you have any comments on
23 that?
24     JIM WALDEN: And part of it certainly depends on
25 how transparent the staff attorney that you're

ABA White Collar Crime 2005 Speech         ABA - White Collar Crime                    March 3, 2005
Las Vegas, NV

Page 58

1  dealing with is, and thankfully at least my
2  experience has been that there's nearly complete
3  transparency because if the Division official says
4  we're thinking about carving out these six people,
5  then the decision's made for you.  You get lawyers
6  for those six people, bringthem up to speed and try
7  and work with them.  Whereas in other parts of the
8  Division there is less transparency, and so the
9  decisions are harder to make.
10      GARY SPRATLING: What do you think about
11  talking to Division staff about when they
12  identify the carve outs for you, and by that I
13  mean, you know, once a party is identified as a
14  carve out, the Division might tell you it could be
15  for one or two purposes.  They might tell you that
16  the carve out is for purposes of obtaining the -
17  the obvious purpose would be because the party is
18  targeted for prosecution, is a target in the
19  investigation.  Another might be because the
20  Division wants to deal with that person
21  independently, and by dealing with them
22  independently, retain some leverage with respect to
23  the cooperation so that the individual is not part
24  of the protected employees portion of a plea
25  agreement.  And therefore doesn't have quite the

Page 59

1  incentive to cooperate that he otherwise might
2  against the individuals that the Division is going
3  against.  In each of those situations it seems
4  clear to me, no matter what the reason is, that you
5  need to have separate counsel for that individual.
6  And I take it you both agree with that.
7      But I at times, as we've discussed and I won't
8  comment on what the result of the discussion was, but
9  at least discussed with Division folks.  If they have
10  those thoughts, to not advise me to use your word
11  Jim, prematurely about that, for fear that it would
12  affect the ability to conduct the internal
13  investigation by getting them separate counsel and
14  it just affects the dynamic of fact gathering.
15      And it's what one of the other speakers said in
16  the first panel this morning, that when you're trying
17  to move quickly in an investigation and develop the
18  facts, you oftentimes are better situated as in-house
19  counsel to work with the individuals to identify the
20  individuals with knowledge, to identify the contacts,
21  to make sure they're going to be available, to ensure
22  they're going to talk to you and to get the facts,
23  than if you suddenly advise the people that they are
24  a target of an investigation, or they're being carved
25  out in order to cooperate and they need to have a

Page 60

1  separate counsel.  And they can affect the ability to
2  cooperate, the company to cooperate and support that
3  individual.  Has that ever happened to you folks, or
4  do you have any thoughts on that?
5      JIM WALDEN: I haven't had a situation yet,
6  where the decision was announced to me prematurely
7  in a sense that it was before I was able to
8  thoroughly interview the people without counsel in
9  any event.
10      So in my experience it's been a decision that
11  has -- that at the point when they make it, they have
12  been transparent with me about who's involved and
13  that's a good thing.  But they haven't done it at
14  such an early stage in the process that it's impeded
15  me from getting the results of the investigation.
16  There was one case I had where it was someone that
17  we interviewed late.  It was someone that was a
18  relatively high level of the investigation.
19      GARY SPRATLING: And that's what I'm thinking
20  about.
21      JIM WALDEN: And in that particular
22  circumstance, it was difficult because he felt as
23  though he was being thrown out of the tent when we
24  really were at that stage getting him a lawyer in
25  a way to help keep him in the tent.  And we weren't

Page 61

1  able to get all of the information from that
2  individual that we might have otherwise would have
3  liked to get.  It didn't impede the investigation,
4  but it certainly wasn't as complete a fact finding as
5  I would have liked.
6      So when in those rare situations where it
7  happens, it can present real difficulties.
8      GARY SPRATLING: Scott, I'm going to ask you too,
9  if you have any thoughts on anything that we've said,
10  because I've seen you taking a couple of notes there.
11  They may be for private discussions with us later.
12  Or notes of what you're going to do to our clients.
13  But I'm also going to put a limit on this, because
14  something I didn't announce at the outset and I
15  apologize for doing this.  But I'm sure you've all
16  been thinking of questions anyway.  Is that we are
17  committed to leave a full 10 minutes and more if
18  possible at the end of this program for questions
19  to any of us.  Because we've found in the last few
20  years that that is sometimes the best part of this.
21  And so Scott with a five minute limitation, do you
22  have any thoughts on any of this.
23      SCOTT HAMMOND: I will comment if someone in the
24  audience wants to hear what I have to say.  Why don't
25  we give them the full time and if you have questions

Page 62

1  about that, I will.  Is that all right?
2     GARY SPRATLING: Sure.  Sure.  Sure.  Why don't
3  we throw it open to audience questions then.  We have
4  15 minutes.  And if there aren't audience questions,
5  then we can go to comments by Scott, or there's
6  plenty of questions that we've skipped along the
7  way in order to preserve this time for you folks.
8     Audience: I have a question going back to
9  Stolt -- to the issue of prompt and effective.  It
10  would seem to me in advising companies on the pros
11  and cons of the program knowing the obligations of
12  prompt and effective is the risk that the senior
13  management of the company is very, very serious about
14  the withdrawal, about the compliance program, about
15  the prompt and effective action.  There are
16  individuals who may not get to that program and even
17  reasonably high level people may not get to that
18  program but below the highest level.  And I would
19  think it would raise a question that the Division
20  could come back and say you weren't prompt and
21  effective because there was somebody who was a
22  reasonably high level rogue and there could be a real
23  issue about whether the compliance program was
24  genuine or not.  Senior management would say we had a
25  very genuine commitment but we can't control

Page 63

1  X-thousand employees, even some of the senior people
2  should know better.
3     SCOTT HAMMOND: I agree with you and that's not
4  what this case was about, so for the reasons I tried
5  to explain before, we were talking about the people
6  that continued to be involved with the same high
7  level people that were involved beforehand.  They
8  were the same people that we had identified, if
9  these people continued to be involved after you
10  discovered it, you're out.
11     And as I said, we're not talking about my
12  opinion, a good faith gold medal compliance effort.
13  It wasn't prompt and it certainly wasn't effective.
14  This was allowing the top level people who were still
15  involved in the conspiracy to continue to meet with
16  competitors, and in fact the company sent high level
17  executives to go meet with the competitors
18  afterwards.  Ostensibly, to deliver the news that
19  we're out.  But --
20     Audience: [Question inaudible].
21     SCOTT HAMMOND: No.  I am here to say
22  effective -- a prompt and effective doesn't mean
23  perfect.  We're not now laying in wait -- waiting
24  for your client for payback time.  This is not
25  about gotcha, it's never been about gotcha.  You

Page 64

1  know we have -- if you will look at our leniency
2  speeches that are out there -- you will see that
3  every single -- the clarification to our Leniency
4  Program, the answers to re-occurring questions, you
5  will see that every single clarification out there
6  is we have found ways to make the program more
7  generous and easier to come in.  We took the
8  language that says, there's a condition, you can't
9  be the ring leader organizer.  We've never kicked
10  anybody out for that.  It's not because there
11  wasn't a few sets of -- it wasn't that we haven't
12  swallowed hard on a few amnesty applications, I can
13  assure you.
14     It's because we're not -- if we play
15  gotcha with this -- if you're sitting there
16  paralyzed saying, I represent this multi-national
17  company, and I don't -- how can I -- we have
18  20,000 employees, how do I know that someone out
19  there didn't just send a fax the day after we came
20  in.  You're paralyzed, you won't be able to convince
21  the client to come in.  But again that's not the
22  set of facts here.
23     And then the last message that I delivered
24  earlier is, if you represent a company and you
25  discover it, and you don't report it and you decide

Page 65

1  that, well we're going to withdraw but not report,
2  then I do think you're at risk.  Then please don't
3  come to -- then I would be concerned.  So you
4  discover it, you don't report.  Six months later,
5  guess what, we've opened an investigation, you want
6  to come in and report the conduct.  You could still
7  be eligible, but if we found out that the conduct
8  continued, and we found out that the company really
9  soft pedaled -- this is an impossible situation the
10  company is in.  If you make a noisy withdrawal, if
11  you tell everybody unequivocally "we're out," guess
12  what, they're going to beat you in.  If they find out
13  that you're withdrawing, they know about the race,
14  you're going to lose.
15     But I'm also saying if you soft pedal the
16  withdrawal, you try to be cute about it.  You try
17  to tell everybody, "well we're withdrawing, but
18  we're not really withdrawing, you know take it
19  easy."  And it turns out that the message that your
20  employees got was, it's go time still.
21     I haven't been fired, I haven't been reassigned,
22  I'm allowed to keep meeting with my competitors, you
23  find yourself in that situation then, I think you
24  won't find a very receptive Antitrust Division,
25  because as I said before, they deserve to be kicked

17 (Pages 62 to 65)

Page 66

1  out. I'm trying to explain why and be transparent
2  about it because we're going to do it. With these
3  same set of facts, we'd do it again.
4       GARY SPRATLING: Let me say something in
5  response to the question because Scott gave a -- you
6  know -- obviously a very emotional response to the
7  one part of the question. And the message that I
8  understand, I understand why Scott is anxious to
9  reinforce the message that the Antitrust Division
10  still tilts in favor of the amnesty applicant
11  wherever possible, that's always been the message,
12  it's been the message since the revision of the
13  program in 1993. It is still the message. I believe
14  it's still the way the Division approaches things.
15  Unless, unless you violate one of the hearts of --
16  one of the -- the heart conditions of the program.
17  And I think Scott's answer addressed one part of your
18  question, but not another.
19       It addressed the person at the periphery who
20  did it, but it didn't address what if somebody that
21  was fairly high level but not the highest level did
22  it. In my opinion, you're out of the program. I
23  will let Scott respond in a moment. Because you're
24  at a high level, but not the highest level. You're
25  still at a level with people who should have known.

Page 67

1  the company ought to have been able to take care of
2  those people. There's no excuse for not doing it.
3       And at least my advice to the company, I say to
4  them, if anybody in this zone continues this conduct,
5  just assume that you're doing all this for nothing.
6  That the information, not only you're not going to get
7  the benefits of it, but the information is going to
8  end up being used against you. You're in deep
9  trouble. And it was verified at least in one of my
10  experiences, I think we've all had experiences like
11  this, where as Joe said earlier, you can't stop an
12  international corporation on a dime. You can't
13  turn it around. You can't take care of every
14  office in Hong Kong, Kuala Lumpur, Korea, et cetera,
15  and other areas where you might have trouble.
16       But if one of those situations come up and you
17  come to the Division and you say, "God, this is what
18  happened. We had this problem in this one area."
19  And in my experience, exactly as Scott just said,
20  the Division said, if you corrected it now, we
21  understand that. You've told us about the measures
22  you took to try to make sure that didn't happen. It
23  didn't work. You had a rogue employee who went out
24  there and kept doing it on this small basis in
25  wherever it was, but if we find out that somebody

Page 68

1  above this level in the corporation knew about it,
2  different story. And I --
3       SCOTT HAMMOND: Let me, underscore that but
4  then also direct -- you know, you can assume that I
5  mean, one day I assume we'll kick out a second
6  company. I will be back here if I'm still in this
7  position, or whoever is in my position will be back
8  here and we'll be as transparent again as I have been
9  here today.
10       We have to be. Okay. So we'll make the
11  decision in terms of whether or not we'll be able
12  to convince a room full of people that it was the
13  right thing to do. Now what I would factor in, is
14  this a type A leniency, is this a company that
15  discovered it, and tried to do the right thing and
16  came forward immediately, or is this a company that
17  didn't report it and only reported it after it
18  appeared in the Wall Street Journal? Is this
19  conduct that continued and then was discovered and
20  immediately brought to our attention, or is this
21  conduct that continued in the Stolt case, for nine
22  more months, was not brought to our attention by the
23  company, but instead we had to discover it on our
24  own?
25       I mean this is a decision that would involve a

Page 69

1  number of different factors, you know I can't make
2  a blank statement in terms of yes, you would always
3  be okay, or no, you would never be okay. But we
4  would be making a decision in which we would have
5  to feel comfortable that the equities involved that
6  the company had not taken effective action. Not
7  just prompt and effective, but effective action. Why
8  is it that this person still felt like he still had
9  the green light to conspire?
10       GARY SPRATLING: And did you have a comment, Joe?
11       JOE LINKLATER: No, you addressed my point.
12       GARY SPRATLING: Okay. Thank you. Yes.
13  Audience: [Question inaudible].
14       SCOTT HAMMOND: They're absolutely screwed.
15  [Laughter].
16       SCOTT HAMMOND: And you know that's the way it
17  has to be on a leniency program. I mean -- and it
18  happens all the time. I mean sometimes it's days
19  and sometimes it's hours. You know when a
20  conspiracy starts to unravel, it unravels fast,
21  and the race to our office is fast, and there's a
22  winner and there's a loser.
23       But we have -- in order to maintain that race,
24  in order to maintain the sort of instability and
25  panic that this causes, we have to make sure there's

18 (Pages 66 to 69)

Page 70

1  a big difference between the first and the second
2  coming in. Now just because you're not the first,
3  you're not going to get the big prize, but you know
4  we give out pretty substantial consolation prizes to
5  the second company in too, and that company in all
6  likelihood would receive substantial assistance,
7  departure from its fine range. We would very much
8  like the cooperation of their executives. And I'm
9  sure we would find ourselves and have repeatedly,
10 making favorable deals with those executives.
11     Obviously yes, we would recognize the fact
12 that they tried to do the right thing, but they
13 lost the race. But we will never give out two
14 first prizes. There will never be a tie for first
15 place. There will be a winner and there will be
16 losers.
17     Audience: [Question inaudible].
18     GARY SPRATLING: You might repeat the question
19 for those at the back.
20     SCOTT HAMMOND: I think I can. The question
21 is what happens if you're the second company in,
22 but the first company is disqualified from the
23 Leniency Program, does the second company move
24 into the first spot?
25     The answer is -- I mean, that's possible.

Page 71

1  That's not what happened in this case, and it's --
2  you know if you're the second company in, our
3  investigation is going to be farther along, and if
4  -- in this case the second company in, and there
5  were two other companies that came in, had to plead
6  guilty, and as I said they both received downward
7  departures and still may have received downward
8  departures even if the amnesty applicant hadn't been
9  removed because they provided immediate substantial
10 assistance, not long after subpoenas were issued,
11 and well before any indictments.
12     So I can't say it's not possible that a second
13 company in, but it's not an automatic thing either.
14 And we only have one experience to draw on.
15     GARY SPRATLING: And there's -- both the
16 policy of one jurisdiction and in speeches of
17 another jurisdiction allow for that possibility
18 in other jurisdictions, where number two, might
19 accede to the immunity position if the number one
20 doesn't qualify, so it's something that you should
21 look into in the each jurisdiction where you're in
22 that situation.
23     Incidentally, you mentioned the Stolt-Nielsen
24 situation where a person loses his amnesty status
25 because of failure to meet a condition. In there

Page 72

1  the condition involves, you all know I won't repeat
2  it, but the condition may be something else, such as
3  they were the leader or instigator. And see, that's
4  something you find out after a lot of fact gathering,
5  where somebody else might have come in immediately
6  afterwards, and with the benefit of that, somebody
7  might move into number two. So for example in the
8  EU, they consider that possibility of the number two
9  moving into number one, in the event that number one
10 is the instigator. So -- yes.
11     Audience: [Question inaudible].
12     SCOTT HAMMOND: All right, this would be
13 difficult to do justice to in even five minutes.
14 But what John has referred to is, the Antitrust
15 Division has something called a marker system.
16 Okay. And this goes back to something that we
17 talked about earlier where I said, the Division
18 is telling people that you must race in, and you
19 should come in even before you have completed
20 your investigation. You're sitting back dotting
21 all your I's and crossing your T's, and having
22 board meetings and let's talk about it again next
23 week. You're going to lose the race, we know that.
24     And remember we're trying to fuel this race, so
25 we're saying get in, get in quick even before you

Page 73

1  have completed your internal investigation and
2  get a marker. Okay. Now you will then have -- you
3  will meet with staff who will agree on some finite
4  period of time in which you will have to complete
5  your investigation in order to perfect that marker.
6  What I can't define for you and be formulaic
7  about is exactly what it takes to get a marker, in
8  terms of how much evidence do you have to give us
9  to get the marker, well I can't tell you exactly
10 how much time you have because every fact, every
11 case is going to be different.
12     And I'll give you an example. We have type A
13 amnesty, and type B amnesty. Type A amnesty is
14 available to companies who come in before an
15 investigation is begun. When we revised the
16 program in 1993, we even made amnesty available
17 after the investigation has begun. The company can
18 still receive a pass from prosecution, as can its
19 executives just so long as we haven't developed
20 sufficient evidence that we can use to bring cases
21 against the company and those executives.
22     Now, your ability to get a marker though could
23 be much different in a type A, versus a type B
24 situation. I think you will find if you come in to
25 the Antitrust Division in a type A situation for

19 (Pages 70 to 73)

Page 74

1  example, if you say I was just over in Europe
2  conducting some corporate compliance programs and
3  afterwards I was told X, Y, and Z, and we're very
4  concerned. I need to get back. I just flew back
5  yesterday, I just heard this yesterday, I'm going
6  to go back in two weeks. I'm going to conduct more
7  investigations, I will then come back and meet with
8  you. Can I have -- I think this process is going to
9  take 2 weeks, 3 weeks, 4 weeks. I think you'll
10  find a very receptive Antitrust Division, we'll say
11  "I'll give you that marker." Okay. We're taking
12  about someone who's just come and voluntarily
13  disclosed an antitrust conspiracy to us and wants
14  time to continue that investigation, come on in.
15      The next day, a company notifies us and says
16  we're ready to bring this package in front of you,
17  it's the results of our internal investigation,
18  it's got a great big bow on it, and we want to
19  report the same conduct that you heard about
20  yesterday, or maybe they don't say that, but we
21  know they do. And we're ready to go. Will we let
22  that second company with its juicy prepared ready
23  to go proffer leap frog over the first company?
24  Absolutely not. Go ahead, first company, take your
25  month, and let's bust that second company. That

Page 75

1  second company that had everything ready to go, and
2  decided not to bring it in. That company made the
3  wrong decision. And that's what we're trying to
4  say.
5      So the first company that came in, they get
6  their marker, they'll have the opportunity to
7  perfect that marker and no one will have an
8  opportunity to leap frog over that company. That's
9  how we create the race.
10      GARY SPRATLING: We've reached the end of the
11  time, and I want to thank the panels, and I
12  especially want to thank Scott, for something that
13  Jim made reference to in his answer, and that is the
14  extraordinarily rare circumstance when you hear a
15  government official being so transparent in his
16  answers. So please join me in thanking the panel
17  and Scott.
18      Narrator: Thank you. This concludes this
19  presentation from the 19th Annual National Institute
20  on White Collar Crime 2005, presented by the American
21  Bar Association Criminal Justice Section and the
22  Center for Continuing Legal Education, held March 3rd
23  and 4th, 2005. Thank you for listening.
24      [End of audio]
25

20 (Pages 74 to 75)

ABA White Collar Crime 2005 Speech      ABA - White Collar Crime      March 3, 2005
Las Vegas, NV

**A**

abide 18:13
ability 59:12 60:1
  73:22
able 28:1 29:9
  32:17 43:7 47:2
  48:5 51:7,16
  60:7 61:1 64:20
  67:1 68:11
abroad 34:2
absolutely 34:16
  54:5 69:14
  74:24
ACCC 8:11,15
accede 71:19
accept 23:18
  33:3
accepted 16:16
account 48:3
accused 23:24
acknowledges
  22:6
act 36:16,16,20
  44:7
action 8:15 16:18
  16:25 17:11
  19:18 20:21
  21:10 23:25
  24:15 62:15
  69:6,7
activity 4:10 5:16
  8:20 9:19 15:25
  18:11 33:23
  49:13
add 4:13
address 66:20
addressed 66:17
  66:19 69:11
addressing 22:4
adjust 43:23
adjusted 45:22
adjustment
  45:17 46:12

adjustments
  44:12,17 46:8
  46:10
admission 20:19
admittedly 57:16
adopt 33:21
  40:17
adopted 52:17
advance 52:2
adverse 52:5
advice 27:1
  28:10 31:12,15
  49:19 50:22
  67:3
advise 34:25
  54:23 55:4,15
  59:10,23
advisedly 7:23
advising 55:22
  62:10
affect 59:12 60:1
affidavit 38:4
affidavits 38:4
  41:23
AG 6:16
agencies 5:11
  7:24 8:1
agenda 30:6
aggressive 40:22
ago 20:14 33:16
  33:17 43:10
  50:2
agree 7:14 28:12
  35:10,12 46:25
  59:6 63:3 73:3
agreement 13:15
  22:7 27:17
  29:11 31:5
  46:21 47:5 48:2
  58:25
agreements
  22:20,20 28:17
  45:13

agrees 6:13,14
  6:16,24 7:2,5
  7:10,11
ahead 74:24
allegations 16:1
  17:15 19:2 20:3
allow 22:24
  34:13,15 37:6
  71:17
allowed 15:19
  20:13 26:9,11
  65:22
allowing 63:14
allows 36:20
amazing 6:7
American 1:10
  4:4 9:1 75:20
amnesty 5:21 9:5
  9:6 13:2 22:20
  28:11,21,22
  31:8 54:18 57:4
  64:12 66:10
  71:8,24 73:13
  73:13,13,16
amount 4:12 5:20
  38:1 46:24
analyzed 28:4
announce 61:14
announced 8:17
  13:4 42:19,21
  60:6
announcing 9:4
  52:20
Annual 1:8 2:10
  4:2 39:10 40:2
  75:19
answer 23:3 29:3
  36:7 37:23
  66:17 70:25
  75:13
answering 36:8
answers 37:4
  64:4 75:16

anticipation
  46:20
antitrust 1:14 4:7
  4:17,21 6:8 7:5
  7:8,13,17 9:10
  10:22 11:12,25
  14:15 18:14
  21:3 30:3,7,9
  32:22 33:1 34:5
  34:10 36:6 37:6
  40:5,16 41:16
  43:12,14,25
  44:4,11 45:17
  46:8,9,17 48:8
  56:11 57:4
  65:24 66:9
  72:14 73:25
  74:10,13
anti-cartel 8:2
anti-internatio...
  7:21 34:7
Anti-Monopoly
  8:16
anxious 66:8
anybody 26:24
  64:10 67:4
anymore 27:7
anyway 61:16
anyways 22:24
apologize 61:15
appeal 13:5 38:5
appeared 68:18
applicant 13:2
  31:9 66:10 71:8
applicants 28:22
  28:22
applications 5:21
  9:5,6 21:20,24
  28:20 43:9
  64:12
applied 22:25
approaches
  66:14

appropriate
  56:25
area 33:12 50:12
  67:18
areas 30:20 35:6
  67:15
arena 9:20
argument 40:14
  57:7
arguments 47:21
arrested 6:20
  32:3 38:10
article 15:9 20:4
  20:9
asking 16:6 28:9
aspect 4:9
aspects 56:11
assets 55:13
assist 33:14
assistance 20:7
  20:13 70:6
  71:10
Assistant 10:21
  10:25 11:1
assisting 34:2
  53:22
assists 42:2
associated 31:7
Association 1:10
  4:4 75:21
assume 67:5
  68:4,5
assure 64:13
attached 18:7
  26:21
attempt 11:16
  32:1
attention 15:17
  17:18 43:12
  44:1 68:20,22
attitude 36:25
attitudes 34:2
attorney 10:21

11:1 21:22
57:25
**attorneys** 21:4
28:16 41:7
**audience** 6:1
11:19,22 14:15
36:4 40:6 61:24
62:3,4,8 63:20
69:13 70:17
72:11
**audio** 75:24
**Australia** 42:24
43:5
**Australian** 8:15
42:18
**author** 21:7
**authorities** 34:15
**authority** 43:13
43:15
**automatic** 71:13
**availability** 15:2
**available** 51:17
59:21 73:14,16
**avoid** 55:8
**awake** 29:5,6
**aware** 25:17
**awful** 32:6

___
**B**
**B** 73:13,23
**back** 18:23 27:12
32:5,15,16
37:17 40:2
52:18 62:8,20
68:6,7 70:19
72:16,20 74:4,4
74:6,7
**background** 11:6
**backlash** 27:13
**bad** 21:21 56:15
**Baker** 10:6
**bang** 42:3
**bankers** 35:18

**bar** 1:10 4:4
14:15,16 75:21
**bare** 10:3,12
**bargain** 22:13
**base** 44:15
**based** 23:13 28:6
48:24
**bases** 22:3
**basically** 15:7,12
21:3 24:17
**basis** 22:3 30:24
67:24
**bat** 33:14
**Bayer** 6:16
**beat** 65:12
**began** 15:8
**beginning** 22:5
23:6,8,9 25:7
27:12 32:20
51:25
**begun** 73:15,17
**behave** 31:6
**believe** 27:17
32:23 34:18
66:13
**benefit** 22:13
72:6
**benefits** 67:7
**best** 15:1 26:1
54:21 61:20
**better** 23:22 43:7
49:4 56:20
59:18 63:2
**beyond** 46:13
47:24
**big** 28:18 35:11
35:21 40:15
43:6 46:17 70:1
70:3 74:18
**bit** 21:25 30:14
**Blakeley** 46:6,7
46:22
**blank** 69:2

**blockbuster**
11:14
**board** 17:8 49:13
49:14,18,24
50:3,23,24 52:7
52:9,13,14
53:15,17 54:13
54:22 55:4,22
56:2 72:22
**boards** 51:7,8
**board's** 56:15
**Booker** 44:25
46:6,15 49:8
**Booker/Fanfan**
43:22 46:2,22
**boundaries**
34:20,20
**bow** 74:18
**breadth** 9:19
**break** 12:8
**briefer** 31:22
**bring** 41:16,19
53:10 54:9
73:20 74:16
75:2
**bringing** 13:17
56:23
**bringthem** 58:6
**brought** 11:4
15:10,12,16
17:18 68:20,22
**buck** 42:3
**bucket** 42:2
**built** 4:14
**business** 14:16
30:4,6,22
**businesses** 32:22
**bust** 74:25
**butt** 53:3

___
**C**
**C** 4:1 40:1
**calculate** 48:22

**calculation** 48:17
**calculus** 34:22
**call** 10:3 13:22
16:5 17:13
**called** 5:15 26:10
26:22 72:15
**camera** 52:21
**Canada** 9:3
**candid** 50:21
**candidly** 52:7
**care** 14:7,8,9
55:7 67:1,13
**Caremark** 54:22
55:1,1,3,22
**carry** 50:13
**cartel** 4:15 5:3
6:14,17 7:1,18
7:19,22 8:20,21
9:25 11:3 12:15
15:16,24 16:18
33:19,23 34:7
34:18 35:6
36:17 42:20
**carve** 58:12,14
58:16
**carved** 59:24
**carving** 58:4
**case** 13:8 14:7
14:22 18:4
22:25 25:2,13
25:24 38:2,8
43:24 60:16
63:4 68:21 71:1
71:4 73:11
**cases** 20:12,13
22:14,19 41:6
46:4 48:8 73:20
**catch** 27:14
**caused** 35:19
**causes** 69:25
**cautionary** 29:25
31:14
**cautious** 23:21

54:20
**CD** 38:14
**celebrated** 12:17
**center** 1:11 4:5
16:2 75:22
**centerpiece**
12:15
**CEO** 31:23 52:21
56:4
**certainly** 30:16
40:15,16 57:24
61:4 63:13
**certainty** 43:4
**cetera** 67:14
**chair** 31:9,10
**challenge** 13:16
**chance** 34:17
**change** 31:12
34:17,21,24,25
35:11,12 36:1
37:18 54:17,19
**changed** 26:8
37:24,25
**changes** 37:10
37:12,14
**changing** 34:1
36:3
**charge** 24:12
46:19,20
**charged** 9:15
**charges** 40:9
46:3
**charging** 8:23
46:16
**checkers** 30:17
**Chemicals** 6:14
6:17
**chess** 30:16
56:14
**Chicago** 10:6
**circle** 27:12
**Circuit** 22:17
**circumstance**

60:22 75:14
**circumstances**
  51:7
**citizen** 7:7
**citizens** 6:22 7:15
  35:21
**civil** 33:20 55:12
  55:14
**claim** 22:8,9,11
  22:11
**claimed** 15:14
**claiming** 17:16
**clarification** 64:3
  64:5
**clear** 16:21 25:2
  30:6 45:2,15
  59:4
**clever** 21:22
**client** 27:1 37:13
  63:24 64:21
**clients** 28:10
  29:6,15 31:13
  61:12
**code** 54:14
**codes** 40:16
**collaboration**
  5:10,18
**collar** 1:9 2:12
  4:3 10:2 14:16
  32:13 39:12
  40:3 75:20
**combination**
  46:22
**come** 10:15
  17:20,21 18:25
  21:23 25:23
  27:20,23 32:14
  35:15 37:21
  40:9 47:12
  62:20 64:7,21
  65:3,6 67:16,17
  72:5,19 73:14
  73:24 74:7,12

74:14
**comfortable**
  37:16 52:10
  69:5
**coming** 5:21
  37:17 43:17
  55:13 70:2
**comma** 26:20
**comment** 59:8
  61:23 69:10
**commentary**
  12:4
**comments** 31:17
  57:22 62:5
**commerce** 9:1
  44:16 46:11
**Commission**
  44:10,14
**Commissioner**
  8:11
**commit** 41:3
**commitment**
  34:10 62:25
**committed** 61:17
**community** 14:16
**companies** 4:12
  15:3 18:5 20:11
  24:21 28:20
  29:24 30:8 31:5
  37:9 49:4 52:14
  52:16 62:10
  71:5 73:14
**company** 4:19,20
  5:7 6:14,24
  12:21 14:22
  15:22,24 16:22
  16:24,25 17:2,4
  17:5,20,23,24
  18:6 19:5 20:15
  23:7,8,10,13
  24:3,19 25:9,14
  26:3,18 27:10
  27:19,20 28:1

29:17,22 50:12
  51:16,23,25
  52:1,18 53:12
  53:15,22 54:19
  54:21 60:2
  62:13 63:16
  64:17,24 65:8
  65:10 67:1,3
  68:6,14,16,23
  69:6 70:5,5,21
  70:22,23 71:2,4
  71:13 73:17,21
  74:15,22,23,24
  74:25 75:1,2,5
  75:8
**company's** 49:12
**company's** 17:12
  56:7
**compared** 42:3
**competition** 5:11
  7:23 8:7,12
  34:14
**competitor** 29:23
  30:21
**competitors** 18:3
  25:1 26:10,23
  30:5 63:16,17
  65:22
**complete** 19:16
  58:2 61:4 73:4
**completed** 72:19
  73:1
**completely** 10:19
  28:25 34:21
  50:20
**compliance** 18:6
  18:14 26:11,18
  26:25 52:17
  54:13 62:14,23
  63:12 74:2
**complicit** 15:23
**complied** 30:8
**complying** 55:5

**comprehensiv...**
  6:7
**concern** 23:19
  25:13
**concerned** 65:3
  74:4
**concerns** 17:25
  54:24
**concludes** 75:18
**conclusion** 15:5
**concur** 9:19
**condition** 16:20
  64:8 71:25 72:1
  72:2
**conditional** 19:11
**conditioned**
  19:12,13,15
**conditions** 16:14
  16:15 66:16
**conduct** 17:4,6,9
  17:17,19 18:19
  18:20 23:10,11
  23:18 24:2,13
  25:21,25 26:25
  27:21 36:14,15
  36:18 47:18,19
  47:20 48:17
  49:15,17 54:14
  56:23 57:14
  59:12 65:6,7
  67:4 68:19,21
  74:6,19
**conducted** 48:1
**conducting** 74:2
**conduct's** 30:25
**conference**
  32:13 43:21
**confident** 24:4
  24:11
**conglomerate**
  31:24
**Congress** 44:9
**Connection** 6:18

**cons** 62:11
**consider** 72:8
**considerations**
  55:23 56:24
**consistent** 10:1
  40:22
**consolation** 70:4
**conspiracy** 7:6
  7:11 15:20
  16:23 17:12
  19:14,19,22
  21:10 25:4
  26:16 27:3,5
  31:25 32:3
  36:21,24 37:7
  63:15 69:20
  74:13
**conspirators**
  26:19
**conspire** 20:8
  37:16 69:9
**construct** 57:7
**constructive**
  15:13
**consumers** 32:22
**contact** 29:23
  30:21
**contacts** 24:25
  59:20
**contemplating**
  46:21
**continue** 14:18
  15:19 26:9
  51:12,17 63:15
  74:14
**continued** 15:2
  15:20,23 17:19
  19:6,17 20:8
  23:12 25:10
  38:14 63:6,9
  65:8 68:19,21
**continues** 67:4
**continuing** 1:12

Page 79

24:25 57:13
75:22
**contract** 21:5,21
22:16
**contracts** 21:22
**control** 25:15
29:19 62:25
**conversation**
26:20
**convicted** 34:11
**convictions**
22:14
**convince** 30:1
64:20 68:12
**cooperate** 20:22
22:3,10 33:3
37:2,3,22 41:18
48:1,20 51:19
59:1,25 60:2,2
**cooperated**
20:11 54:7
**cooperating** 4:24
48:25 54:8
57:17
**cooperation**
19:17 20:15
22:17,18,18
28:17 48:24
52:1 57:13
58:23 70:8
**coordination**
5:14
**copy** 19:10
**corporate** 11:17
12:21 16:7 18:6
19:10 26:18,25
74:2
**corporation** 6:13
24:2 67:12 68:1
**correct** 17:16
**corrected** 67:20
**counsel** 9:18
15:11,14,21

16:5 17:7,7,16
17:22 18:10,24
19:3 25:5 26:5
26:12 27:6
29:23 30:7
34:25 47:22
49:19 54:20,22
55:1,1,3,22
56:9,23 57:9,18
59:5,13,19 60:1
60:8
**counseling** 37:13
**countries** 5:4,6
36:5 37:5 40:17
41:25
**country** 42:21
56:19
**counts** 31:24
32:3
**couple** 16:14
38:7,8 43:10
61:10
**course** 7:3 13:17
29:15 57:13
**court** 12:24
13:13,19 20:25
48:11
**courts** 22:23
**cozy** 37:19
**co-conspirators**
18:4,12 20:6
**crack** 53:3
**create** 19:7
29:22 30:23
31:2 41:17 75:9
**credit** 53:9,11,13
**crime** 1:9 2:12
4:3 10:2 32:13
37:8 39:12 40:3
75:20
**crimes** 32:23
**criminal** 1:11 4:4
4:23 10:21,24

11:12 28:15
29:2 33:21,24
36:6,17,19
42:19 43:4
51:21 56:11
57:6 75:21
**criminality** 36:14
37:5
**Crompton** 6:13
**cross** 22:22
**crossing** 72:21
**Crutcher** 10:9
**crux** 52:12,13
**culprits** 30:13
**curb** 51:11
**currently** 5:5,6
**curry** 10:13
**curtailed** 38:6
**cute** 65:16
**Czech** 8:15

**D**

**D** 3:1
**damn** 41:13
**danger** 50:9
**date** 40:24
**dawn** 5:15
**day** 20:4 32:14
48:10 51:2 56:8
56:12 64:19
68:5 74:15
**days** 69:18
**deal** 13:25 14:9
28:18 35:22
41:11 44:19
45:25 54:4,21
58:20
**dealing** 28:11
52:13,14 58:1
58:21
**deals** 70:10
**dealt** 13:18
**DeBeers** 7:1

**decade** 11:5
**decide** 13:14
25:24 33:2
50:16 56:4
64:25
**decided** 13:22
21:3 51:23 75:2
**deciding** 13:12
14:17
**decision** 13:7,25
14:9,10,11
15:22 21:16
35:18,18 50:13
50:18 52:5 56:3
60:6,10 68:11
68:25 69:4 75:3
**decisions** 30:15
47:2,7 50:14
52:2 55:7 58:9
**decision's** 58:5
**deemed** 17:5
**deep** 29:12 67:8
**defendant** 13:20
38:10 45:10
46:10,23
**defendants**
38:11
**defense** 9:18
46:11 47:22
**define** 73:6
**defined** 17:3
**defraud** 6:19
36:21,24 37:7
**degree** 43:3
**Delaware** 55:6
**deliver** 26:22
27:6 53:8 63:18
**delivered** 32:17
64:23
**delivering** 33:9
**delivers** 26:16
**denial** 55:11
**depart** 48:23

**Department** 9:2
11:4 12:18
**Department's**
44:25
**departure** 70:7
**departures** 20:10
20:12 71:7,8
**depending** 55:6
**depends** 49:21
57:24
**Deputy** 10:21,25
**described** 15:10
57:8
**describing** 32:8
**description**
53:21,24 54:1
**deserve** 65:25
**deserved** 14:23
**design** 10:17
**destruction** 32:2
**determined** 51:4
**develop** 55:18
57:1 59:17
**developed** 73:19
**development**
11:24 12:12
31:20 34:7,16
41:12 43:11,19
**developments**
1:14 4:7 9:20
11:11,14 40:4
42:6,7
**deviation** 18:8
18:13
**difference** 31:8
70:1
**different** 25:13
27:19 28:13
36:12 50:12
53:20 68:2 69:1
73:11,23
**difficult** 24:3,4
48:4 50:24

53:16 60:22
72:13
**difficulties** 61:7
**difficulty** 30:15
41:20 49:5
**dime** 24:4 28:2
67:12
**dimensional**
30:16 56:14
**direct** 68:4
**directed** 44:10
**directives** 45:16
**director** 10:23
26:15,21
**directors** 17:8
54:23 55:4,9
**disagree** 21:16
**discharge** 52:25
**discipline** 49:16
56:9
**disclosed** 74:13
**disclosure** 12:18
16:13
**discover** 18:20
24:2 25:21 27:2
64:25 65:4
68:23
**discovered** 15:15
16:19 17:1,6,10
17:17 19:20,24
19:25 20:1,2
21:11,12 23:10
23:12,23 25:4
25:19 27:2
63:10 68:15,19
**discovering** 17:4
**discovers** 17:7,8
17:9
**discovery** 15:20
**discussed** 59:7,9
**discussion** 12:3
59:8
**discussions**

61:11
**dismiss** 13:19
**disqualified**
70:22
**District** 12:24,25
13:21 20:25
**division** 4:21 6:2
6:4 10:22 13:3
21:4 23:19 24:6
28:11,15,24
29:3 34:10 35:2
41:3 42:1 43:12
43:22,25 44:18
45:3,12 46:3,8
46:9,17 48:18
51:20,21 52:3
58:3,8,11,14
58:20 59:2,9
62:19 65:24
66:9,14 67:17
67:20 72:15,17
73:25 74:10
**divisional** 24:11
**divisions** 29:18
**Division's** 40:21
**Division's** 7:17
14:11 31:21
32:10 34:5
44:22
**docket** 41:6
**document** 32:2
**documents** 41:19
**Doe** 51:22
**doing** 25:15 33:6
35:2 41:21,24
47:4 49:25 50:3
61:15 67:2,5,24
**dollar** 5:9 6:15
7:11
**dollars** 4:11 44:8
47:17,18,21
**domestic** 7:18
9:24

**dotting** 72:20
**doubt** 46:13
47:24
**doubting** 41:9
**doubts** 50:25
**downward** 20:10
20:12 71:6,7
**dozen** 42:12
**draftsmen** 23:22
**DRAM** 4:24
7:10
**draw** 71:14
**driven** 54:16
**drop** 42:2 45:7
**dual** 36:14 37:5
**due** 13:23
**Dunn** 10:9
**Dutch** 6:24
**duties** 55:7,16
**duty** 56:1
**dynamic** 49:3
59:14

───────────
**E**
**E** 3:1
**earlier** 7:4 12:23
36:16 52:9
56:14 57:6
64:24 67:11
72:17
**early** 37:22
60:14
**easier** 64:7
**easily** 21:20,23
**Eastern** 12:25
13:21
**easy** 65:19
**economist** 47:25
**Education** 1:12
4:6 75:22
**effect** 14:14
44:13,22 46:3
**effective** 16:17

16:25 17:11
18:5 19:18
20:21 21:9
23:25 24:15
27:3 62:9,12,15
62:21 63:13,22
63:22 69:6,7,7
**efficient** 30:12
**effort** 34:3 63:12
**efforts** 11:24
**egg** 4:14
**egregious** 27:18
**either** 8:18 15:22
17:6 28:21
37:19 53:13
55:5 71:13
**eligible** 17:14,19
20:19 65:7
**emotional** 23:17
66:6
**emphasizing**
51:13
**employee** 57:17
67:23
**employees** 18:7
30:18,24 49:12
49:16 50:18,19
51:11 58:24
63:1 64:18
65:20
**employment**
50:14 52:2,5
**ended** 20:5,6
**endure** 31:11
**enforcement**
4:15 5:3,11 6:8
7:18,19,22,24
8:1,2,7,13
10:22,24 11:12
12:15 34:7,15
34:18 35:6
**enforcing** 24:18
24:20

**engage** 10:3
**engaging** 24:13
**England** 35:14
35:20
**enormous** 35:19
**Enron** 38:11
**ensure** 30:7 31:3
59:21
**enter** 16:6 47:4
48:2
**entered** 36:10
**Enterprise** 36:15
36:20
**entire** 12:18
38:12
**entities** 17:9
**equals** 22:19
**equitable** 13:16
**equities** 69:5
**especially** 50:18
51:8 52:15
75:12
**essential** 54:5
**essentially** 50:24
**establish** 29:9
48:7
**et** 67:14
**ethical** 57:1,11
**EU** 8:12,23 72:8
**Europe** 36:5 74:1
**event** 60:9 72:9
**events** 26:14
**eventually** 41:2
**everybody** 35:23
65:11,19
**evidence** 22:10
29:13 30:2 38:1
41:19 73:8,20
**exactly** 27:22
67:19 73:7,9
**examination**
22:23
**example** 4:22

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

16:22 33:25
72:7 73:12 74:1
**exception** 10:4
10:12
**exchange** 5:19
**excuse** 67:2
**executive** 7:4
11:25 27:5
37:15
**executives** 5:4
7:14 20:7 25:3
25:8 26:3,4
33:7 34:18
37:21 63:17
70:8,10 73:19
73:21
**exists** 13:23
**expanding** 5:3
**experience** 9:24
10:20 31:6 53:5
53:17 58:2
60:10 67:19
71:14
**experienced**
56:10
**experiences**
67:10,10
**experts** 48:16
**explain** 14:3
47:11 51:7,10
52:7 63:5 66:1
**explored** 25:19
**extensive** 9:23
32:1
**extorting** 17:23
**extradite** 11:24
31:21 32:15
33:7 34:6
**extradited** 35:19
**extraditing** 35:20
41:4
**extradition** 33:15
34:3,11,13 36:9

36:11,20,23
37:6 38:5
**extraditions**
37:25 40:23
**extraordinarily**
75:14
**extraordinary**
31:11
**eye** 43:19 44:21
**eyeballs** 26:15
**E-Rate** 6:19

**F**
**face** 6:22 7:15
32:4 34:17
**faced** 15:21
55:21
**facie** 38:2
**fact** 13:10 15:19
19:5 20:3 28:19
33:16 41:5,8
48:3 53:21
54:16 59:14
61:4 63:16
70:11 72:4
73:10
**factor** 68:13
**factors** 69:1
**facts** 13:8,8,10
15:4 27:16,18
27:19 32:6 50:6
51:15 53:6
59:18,22 64:22
66:3
**failed** 20:22
22:10
**failure** 22:3
71:25
**fair** 9:14 43:3
**fairly** 66:21
**fairness** 14:19
**faith** 55:7 63:12
**fake** 19:5

**false** 20:1,23
23:14
**far** 10:5 23:18
**farther** 71:3
**fast** 35:25 36:8
37:23 69:20,21
**favor** 10:13
66:10
**favorable** 70:10
**fax** 64:19
**fear** 50:21 59:11
**Federal** 6:19
**feel** 69:5
**feeling** 23:20
37:15
**fellow** 35:15
**felt** 60:22 69:8
**fields** 9:25
**fighting** 56:7
**fights** 56:21
**file** 6:2,10
**finally** 57:13
**find** 14:22 53:18
65:12,23,24
67:25 70:9 72:4
73:24 74:10
**finding** 50:6 61:4
**findings** 13:9
**finds** 30:12
**fine** 5:9 6:15,16
7:11,12 8:21
44:7,16 46:24
48:19,22,23
70:7
**fines** 4:11,13
8:19,24 9:10
44:7 47:13,15
49:6
**finished** 27:23
**finite** 73:3
**fire** 51:23 56:8
**fired** 26:6 65:21
**firm** 4:24

**first** 7:6 11:8
12:20 13:13
24:10,18 29:13
29:21 31:10
33:13 34:3
36:13 47:11
59:16 70:1,2,14
70:14,22,24
74:23,24 75:5
**five** 4:18 6:18
10:24 43:1
45:10 61:21
72:13
**fixing** 7:2,10 9:12
15:16 31:25
36:15 51:5
**flew** 74:4
**flip** 6:3
**focus** 13:8 21:2
**folks** 14:17 59:9
60:3 62:7
**follow** 18:8 31:14
**following** 45:15
**follow-up** 12:4
28:8 31:17
**forecasting**
32:13
**foreign** 5:7 32:15
32:21,24 37:21
41:18,25
**forever** 34:18
**forget** 41:22
**former** 15:11
17:22 31:23
**formulaic** 73:6
**forth** 43:9
**forthcoming**
50:15 57:20
**fortunate** 27:2
**forward** 21:17
30:24 45:9 46:1
53:10,12 68:16
**found** 13:19

61:19 64:6 65:7
65:8
**four** 4:22 6:19
7:14 8:13 10:23
11:15 38:12
45:7,10
**frame** 37:25
**Francisco** 10:10
**frankly** 14:9
**frenzy** 7:22,23
**frequently** 49:18
**frog** 74:23 75:8
**front** 16:1 32:16
74:16
**fuel** 72:24
**fugitive** 6:20
40:10
**fugitives** 33:2
**fulfill** 51:18
**full** 19:16 33:11
51:9 52:1 61:17
61:25 68:12
**fully** 20:22
**fun** 5:25
**furor** 35:19
**further** 33:22
**future** 31:1 42:9

**G**
**gain** 47:3,23 48:4
48:7,12,17
**game** 9:14
**Gary** 3:4 4:9 10:8
12:2,7 23:16
28:3 31:16
32:19,23 33:17
33:25 34:4 40:7
40:20 42:5 46:2
46:18 49:9
52:11 54:25
55:19 56:22
57:22 58:10
60:19 61:8 62:2

ABA White Collar Crime 2005 Speech   ABA - White Collar Crime   March 3, 2005
Las Vegas, NV

66:4 69:10,12 70:18 71:15 75:10
**gathering** 59:14 72:4
**general** 10:21 11:1 15:11,14 15:21 17:6,16 17:22 18:10 19:2 25:5 26:5
**generally** 53:16
**generous** 16:10 16:12 64:7
**generously** 16:21
**gentlemen** 43:7 49:2
**genuine** 62:24,25
**German** 7:15
**getting** 9:4,6,14 20:6 21:24 25:23 31:9 33:19 40:22 41:20 42:3 45:21 50:6 52:10,18 57:9 59:13 60:15,24
**Gibson** 10:9
**give** 15:4 21:25 27:1 31:13,13 42:6 46:22 49:20 50:22 56:1 61:25 70:4 70:13 73:8,12 74:11
**given** 11:6 28:19
**gives** 6:6 40:17 54:3
**giving** 44:19
**glacier** 29:11
**glad** 32:16
**globe** 7:23
**go** 16:24 17:2

27:5 30:24 31:18 33:14 35:21 42:10 44:21 47:20 48:16,19 53:12 54:5,20 55:23 56:25 57:8 62:5 63:17 65:20 74:6,21,23,24 75:1
**God** 67:17
**goes** 35:2 52:21 52:21 72:16
**going** 5:20 10:3 10:16 11:6,15 13:5,5,6 14:2 21:15,17,24 27:7,13,25 30:14,21,25 31:12,13 32:6,9 33:6 34:21,24 34:25 35:3 36:2 37:18 40:21 41:2,3,13,21 42:8,10,13 43:1 43:6,21 44:14 44:22 45:4,9,9 45:11,13,18,19 45:20,25 46:16 46:25 47:4,8,22 47:23 48:3,4,5 48:14,15,20,22 50:13 51:12 52:5,8,19 53:11 53:13 54:16,16 54:17,18 56:12 56:13,15,16,17 56:18 59:2,21 59:22 61:8,12 61:13 62:8 65:1 65:12,14 66:2 67:6,7 70:3 71:3 72:23

73:11 74:5,6,8
**gold** 63:12
**good** 18:17 25:24 26:24 32:6,20 55:7 57:7 60:13 63:12
**gotcha** 23:5 24:20 63:25,25 64:15
**gotten** 24:13 53:3
**government** 13:15 22:8,13 25:22 33:14,18 36:21 42:18 51:18 53:23 75:15
**governments** 37:1
**Graham** 8:10
**grand** 5:1,2
**grant** 13:12 16:16 19:11
**granted** 12:25
**great** 13:25 14:1 14:9 26:2 29:13 41:11 44:19 74:18
**greater** 8:25
**greatest** 16:11
**green** 69:9
**grounds** 20:17 25:10
**group** 8:7
**growing** 4:11,18 4:20
**guardian** 23:2
**guess** 49:21 65:5 65:11
**guideline** 44:11 44:12 45:1 48:7
**guidelines** 44:21 45:22 48:21,22

48:23
**guilty** 6:13,25 7:1 7:5,10,15 20:6 48:20 71:6
**guy** 10:14 52:25 53:3,4,10 54:7
**guys** 54:7,11
**guy's** 53:8
**GVH** 8:16

---

## H

**half** 42:12 50:1
**hall** 18:16
**hallmark** 14:20
**Hammond** 3:5 10:11 11:13,20 11:23 12:6,10 24:16 31:22 36:7 41:8 42:10 46:5 47:10 53:9 54:9,11 61:23 63:3,21 68:3 69:14,16 70:20 72:12
**handful** 37:7
**happen** 29:21 31:15 41:2 45:9 45:18 67:22
**happened** 26:1 28:14,23 42:12 42:14 60:3 67:18 71:1
**happens** 61:7 69:18 70:21
**happy** 54:3
**harbored** 34:19
**hard** 51:1 64:12
**harder** 58:9
**Hawaii** 56:20
**head** 8:10 19:4
**headache** 46:14 46:17
**headlines** 6:5

**hear** 10:15 11:21 51:21 61:24 75:14
**heard** 74:5,19
**hearing** 32:5 38:10 41:10
**hearsay** 38:4
**heart** 66:16
**hearts** 66:15
**heat** 32:21
**heavy** 41:6
**heck** 37:8
**held** 4:6 75:22
**hell** 21:19
**help** 24:21 56:4 60:25
**helps** 57:16,18
**Hew** 8:8
**hey** 22:13 27:11 47:22
**hide** 40:18
**high** 25:8 28:24 60:18 62:17,22 63:6,16 66:21 66:24
**highest** 7:12 8:18 8:21 62:18 66:21,24
**Hill** 45:16
**hire** 48:16 55:15
**hired** 55:4
**history** 7:12 8:19 24:18,19 52:24
**hit** 12:8
**hitting** 23:17
**hold** 21:15
**home** 56:19,20
**Hong** 24:7,8,12 24:24 67:14
**hope** 29:5 44:2
**hours** 69:19
**house** 26:12 35:14

**huge** 34:16 37:20
**hugely** 35:7
  55:25
**hundreds** 4:13
**Hungarian** 8:16
**hunker** 35:14

**I**

**Ian** 11:25 12:9
  31:21,23 35:7
**identified** 8:2
  23:5 25:7,9
  26:5 49:11 53:1
  53:2 54:12
  58:13 63:8
**identify** 30:18
  58:12 59:19,20
**ignored** 15:18
  22:16,17
**illegal** 49:17
**illusion** 19:7
**imagine** 16:3
**immediate** 71:9
**immediately**
  18:5 38:10
  68:16,20 72:5
**immunity** 71:19
**impact** 28:9
  36:11 43:6
  50:17
**impacted** 50:21
**impacts** 42:8
**impede** 61:3
**impeded** 60:14
**import** 33:11
**important** 14:4
  23:1,3 32:11,11
  41:14 45:25
  54:15 56:1
**imposed** 8:18,20
  47:8
**imposing** 8:24
**imposition** 4:16

**impossible** 65:9
**inaudible** 46:11
**inaudible** 36:4
  40:6 46:4 63:20
  69:13 70:17
  72:11
**Incarceration**
  6:22
**incentive** 37:21
  59:1
**incentives** 35:1
  41:17
**inch** 29:12
**Incidentally**
  71:23
**including** 21:4
**increase** 4:16
  5:10
**increased** 9:9
**independent**
  56:9
**independently**
  53:12 58:21,22
**indicted** 6:18
  31:24
**indictment** 7:2,3
  13:17 34:24
  40:7,8
**indictments**
  71:11
**individual** 56:4
  57:9,18 58:23
  59:5 60:3 61:2
**individuals** 4:17
  4:19 5:6 6:20
  34:11 44:5
  47:12 59:2,19
  59:20 62:16
**industry** 15:7
**infant** 9:5
**Infineon** 7:9,14
**influence** 56:3
**information**

15:17 20:1,2,23
  20:23 36:22
  56:2 61:1 67:6
  67:7
**informed** 18:4
**initial** 30:2
**injunction** 13:1
  13:13
**insert** 21:13
**inspections** 5:16
**instability** 69:24
**instances** 52:7
**instigator** 72:3
  72:10
**Institute** 1:8 2:11
  4:3 10:2 39:11
  40:3 75:19
**intent** 33:9
**intentions** 13:4
**interacting** 30:5
**interest** 15:1
**interested** 8:10
**internal** 27:24
  30:12 49:10,11
  49:25 50:20
  51:3 59:12 73:1
  74:17
**international** 5:3
  6:25 7:5,19
  9:24 11:3 12:15
  15:24 29:17
  34:17 40:10
  67:12
**internationally**
  33:12
**Interpol** 33:4
**interpreted**
  16:20
**interview** 51:23
  52:3 60:8
**interviewed** 24:9
  24:24 60:17
**introducing**

42:19
**introduction**
  10:12
**introductions**
  10:4
**introductory**
  34:1
**investigation**
  4:25 15:6,7
  16:4 20:24
  27:24 30:12
  32:1 34:23
  41:18 43:18
  48:13,15,16
  49:11 50:1,4,20
  51:25 53:23
  56:11,24 57:4,6
  58:19 59:13,17
  59:24 60:15,18
  61:3 65:5 71:3
  72:20 73:1,5,15
  73:17 74:14,17
**investigations**
  9:16 30:10 33:4
  43:13 49:10
  74:7
**investigators**
  51:3
**involve** 68:25
**involved** 11:3
  15:15 16:23
  17:2 25:3,8,10
  26:13 27:5
  49:12,17 51:4
  54:8 60:12 63:6
  63:7,9,15 69:5
**involvement**
  27:4
**involves** 72:1
**involving** 15:6
  32:2
**in-house** 59:18
**issue** 14:1 23:5

45:25 48:12
  53:16 62:9,23
**issued** 19:21
  71:10
**issues** 14:4 43:20
**it's** 14:4
**I's** 72:21

**J**

**jail** 4:16,21,23
  5:5 7:15 9:10
  35:21 44:5 45:6
**January** 12:24
  32:4 36:10 38:9
**Japan** 8:16
**Japanese** 7:4,6
**jaw-dropping**
  9:21
**JFTC** 8:17
**Jim** 3:6 10:7
  13:24 28:3,12
  35:13 40:12
  41:8 49:10,21
  54:12 55:20
  56:14 57:5,22
  57:24 59:11
  60:5,21 75:13
**job** 32:20 50:11
  53:21,23,25
**Joe** 3:7 10:5
  31:16 35:9,10
  40:19 54:25
  55:2,25 57:3
  67:11 69:10,11
**John** 51:22 72:14
**join** 4:7 40:4
  75:16
**Journal** 15:9
  16:2 17:15 20:3
  20:9 55:10
  68:18
**judge** 12:24
  13:12,21 14:8

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 84

21:3,6,11 22:4
22:12
**judge's** 13:7 14:8
**judgment** 37:10
55:12
**juicy** 74:22
**jump** 31:19
**June** 44:3 47:18
**juries** 5:1,2
**jurisdiction** 5:8
7:24,25 8:14,22
34:21 71:16,17
71:21
**jurisdictions** 5:15
9:2 34:12 35:3
35:4 71:18
**jury** 14:14 46:13
47:24
**justice** 1:11 4:4
9:3 11:4 12:19
41:16 72:13
75:21
**justify** 51:2

**K**
**keep** 6:2 19:9
31:19 41:24
43:19 44:20,25
51:14 53:19
54:2,2 60:25
65:22
**keeping** 29:5,6
51:2
**keeps** 35:2
**kept** 67:24
**key** 26:19
**KFTC** 8:17
**kick** 11:9 20:16
57:10 68:5
**kicked** 22:6
24:14,19 31:10
64:9 65:25
**killed** 22:23

**kind** 11:9 27:8
**knew** 68:1
**know** 14:7 18:25
22:23 24:16
25:16 26:4
29:15 31:16
32:19 33:5 34:4
35:16,17 36:23
41:14,15 43:17
43:20,24 44:2
44:24 46:6,15
47:1 48:9 49:3
49:3,14,17
50:14,25 51:9
54:2,6 55:3,20
58:13 63:2 64:1
64:18 65:13,18
66:6 68:4 69:1
69:16,19 70:3
71:2 72:1,23
74:21
**knowing** 29:17
62:11
**knowledge** 59:20
**known** 66:25
**knows** 28:16
52:4
**Kong** 24:7,8,12
24:24 67:14
**Korea** 67:14
**Korean** 8:17
**Kroes** 8:11
**Kuala** 67:14

**L**
**labeled** 40:10
**laid** 17:24 18:2,2
**land** 13:14
**language** 64:8
**large** 5:20 31:23
**Larry** 36:13
**Larry's** 37:4
**Las** 1:15 4:8

**late** 33:20 60:17
**Laughter** 69:15
**law** 1:14 4:8 5:11
7:24,25 33:19
34:14 40:5
**laws** 33:1
**lawsuit** 15:10,11
56:17
**lawsuits** 55:15
**lawyer** 24:1
50:16 52:1
54:15 55:3,15
55:17,20 56:4,7
56:10,16 60:24
**lawyers** 35:22
58:5
**layer** 56:13
**laying** 63:23
**leader** 19:14
64:9 72:3
**leap** 74:23 75:8
**leave** 42:6 61:17
**left** 10:5 49:3
**Legal** 1:12 4:5
75:22
**legislation** 9:9,12
43:16 44:2,9
**legitimate** 30:5
**leniency** 11:17
12:11,14,21
13:3 14:12,23
15:1,3 16:7,11
16:17 19:10,11
20:16 21:18,19
21:24 23:2,13
28:20 43:8 64:1
64:3 68:14
69:17 70:23
**letter** 18:7 19:10
19:21 21:2,7,8
21:12,14,14
26:17
**letters** 18:2,2,4

18:12,16,22
19:2,4,7 26:19
**let's** 12:7 23:18
24:1,6,23 40:12
72:22 74:25
**level** 8:18 9:10
9:19 10:20 25:8
28:24 44:16
45:5,7 60:18
62:17,18,22
63:7,14,16
66:21,21,24,24
66:25 68:1
**lever** 46:23
**leverage** 58:22
**lied** 19:24
**life** 46:15
**light** 41:5 69:9
**liked** 61:3,5
**likelihood** 70:6
**limit** 61:13
**limitation** 61:21
**limiting** 30:19
**line** 48:19
**Linklater** 3:7
10:5 35:10 55:2
55:25 57:3
69:11
**listen** 47:1 56:21
**listening** 56:15
75:23
**litigate** 48:11,18
**litigation** 55:12
**little** 30:14
**live** 1:15 4:8
29:10 31:4
**location** 24:6
**long** 16:3,5 20:14
33:16 42:25
43:2 51:14
57:10,12,14
71:10 73:19
**longer** 8:24

34:19 38:2 51:2
**look** 4:10,15,18
5:1,10,12,17
6:1,3,4 14:21
18:1 29:8 40:23
41:10 43:1 64:1
71:21
**looked** 18:16
29:13 36:22
**looking** 5:2 6:10
24:21 27:14
37:1,2 45:5,10
47:13
**looks** 36:24
42:22
**loose** 21:22
**lose** 65:14 72:23
**loser** 69:22
**losers** 70:16
**loses** 71:24
**loss** 47:3,23 48:5
48:8,12,17
**lost** 70:13
**lot** 13:6 28:5 32:7
37:8 43:6,21
48:24 72:4
**loyalty** 55:7
**Lumpur** 67:14
**lying** 18:10

**M**
**Mackenzie** 10:6
**maintain** 69:23
69:24
**major** 7:25 11:23
12:2 31:20 42:8
**making** 9:12
30:15 37:9
45:13 56:16,18
69:4 70:10
**man** 37:10
**management**
15:17,18 17:18

49:23 50:2
62:13,24
**managing** 26:15
26:21
**mandate** 44:25
**manor** 35:14
**March** 1:13 4:6
6:11 17:17
21:13 26:5
75:22
**marker** 72:15
73:2,5,7,9,22
74:11 75:6,7
**marketing** 29:18
**materials** 28:6
**matter** 9:17
13:11 21:18
35:7,8 59:4
**maximum** 44:5,7
44:13 47:16
**maximums** 43:2
44:3
**mean** 10:20
11:13 14:11
16:24 17:14
18:18 21:19
22:21 23:2
24:16 28:12
43:14 45:15
46:5,7 48:9
52:22 53:14
54:25 58:13
63:22 68:5,25
69:17,18 70:25
**means** 35:13
**measures** 67:21
**medal** 63:12
**meet** 26:9 63:15
63:17 71:25
73:3 74:7
**meeting** 18:23
57:11 65:22
**meetings** 26:23

72:22
**mention** 42:14
43:11
**mentioned** 16:8
24:23 26:4
32:19 33:1 36:1
36:16 52:15
56:14,22 57:5
71:23
**message** 64:23
65:19 66:7,9,11
66:12,13
**met** 17:24
**middle** 48:14
**midst** 30:10
**mid-February**
43:16
**mile** 29:12
**million** 4:11 5:8
6:15,16 7:11
44:8,8 47:17,17
47:21 49:6,7
**millions** 4:13
**mind** 19:9
**minimum** 10:3,12
**minute** 14:3
18:15 35:25
61:21
**minutes** 61:17
62:4 72:13
**misleading** 20:23
**misrepresented**
20:18
**misspoke** 40:8
40:11
**model** 19:10
**moment** 66:23
**month** 5:22 9:7
45:6 74:25
**months** 8:13
11:15 19:21,23
38:8,13 42:13
42:15 45:8,8

65:4 68:22
**morning** 9:22
10:15,16 25:20
59:16
**motion** 13:19
**move** 32:9 34:5
49:9 50:12
59:17 70:23
72:7
**moved** 20:16
**moving** 30:20
38:13 72:9
**multi** 24:1 31:24
**multi-national**
24:3 25:14
64:16
**Myers** 10:8

## N

**N** 3:1 4:1 40:1
**named** 55:14
56:17
**Narrator** 4:2
40:2 75:18
**national** 1:8 2:11
4:2 10:2 24:2
32:15 34:20
39:11 40:3
75:19
**nationals** 32:21
32:24 41:18
**near** 43:18
**nearly** 14:4 58:2
**need** 23:1 25:23
29:9 30:18,23
33:12 41:17
51:14 52:6 53:5
59:5,25 74:4
**needs** 56:5
**Neelie** 8:11
**negotiate** 46:19
**negotiating**
46:21

**negotiations**
47:12
**nest** 4:14
**neutralize** 30:19
**neutralizes** 30:13
**Nevada** 1:15 4:8
**never** 63:25 64:9
69:3 70:13,14
**new** 10:8 18:6,13
26:16,18 35:5
44:2,13 47:1
49:9
**news** 27:6 40:15
63:18
**newspapers**
35:23
**Nielsen** 12:8
**night** 29:5,6
**nine** 5:6 45:8
68:21
**noisy** 65:10
**non-prosecution**
13:15
**Norris** 11:25
12:9 31:21,23
34:6 35:7,18
40:18
**Norris's** 36:15
**North** 9:1
**notes** 61:10,12
**notice** 19:11 33:5
52:2
**notifies** 74:15
**notion** 35:20
**November** 15:8
**number** 4:11,20
4:24 5:4,7 8:2,3
8:6,8,13 9:20
11:18 19:1,12
20:18,21 32:23
36:12 47:6,7
69:1 71:18,19
72:7,8,9,9

## O

**objective** 8:3
**obligations** 20:15
51:18 57:12
62:11
**obstruct** 32:1
**obstruction** 12:1
32:8
**obtain** 4:21
**obtaining** 49:6
58:16
**obvious** 58:17
**obviously** 13:25
21:16 22:21
31:7,10 32:10
41:11 43:20,22
44:24 66:6
70:11
**occurred** 35:5
**occurring** 5:18
**offenders** 4:17
41:16
**offense** 7:8,13
9:12 33:20,21
33:24 36:6,17
36:19 43:15
44:16 45:5
**offenses** 9:3,11
12:1 34:12
36:17 42:20
43:14 44:4
45:17
**office** 8:16 10:6,8
10:10 45:20,20
67:14 69:21
**offices** 28:17
52:22
**official** 28:25
52:3 58:3 75:15
**oftentimes** 11:8
45:12 49:25
59:18
**Oh** 37:12

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime       March 3, 2005
Las Vegas, NV

**OIA** 42:1
**okay** 6:1 12:6
  31:22 36:17
  68:10 69:3,3,12
  72:16 73:2
  74:11
**once** 9:7 16:19
  17:1,6 19:19
  21:11,12 25:4
  25:18 44:21
  45:18 51:25
  52:16 58:13
**open** 16:3 35:5
  62:3
**opened** 65:5
**operate** 30:8
**operation** 24:7
**operations** 29:18
**opinion** 11:10
  21:1,2 22:1
  63:12 66:22
**opportunities**
  16:12
**opportunity** 75:6
  75:8
**opposed** 37:2
  57:5
**opposition** 42:23
**option** 25:22
**orchestrating**
  31:25
**order** 16:15 29:9
  41:15 55:11
  59:25 62:7
  69:23,24 73:5
**organizations**
  8:19
**organizer** 19:14
  64:9
**Ostensibly** 63:18
**ought** 35:24
  44:20 55:23
  67:1

**outs** 58:12
**outset** 61:14
**outside** 17:7
  18:15 26:12
  48:16
**owner** 16:22 17:1
**O'Melveny** 10:7

——————
**P**

**P** 4:1 40:1
**pace** 5:2
**package** 74:16
**page** 3:3 15:9
**paid** 5:8
**Pakistani** 6:22
**panel** 6:12 9:22
  9:23 59:16
  75:16
**panels** 75:11
**panic** 69:25
**paper** 13:23
  26:10 28:5
  42:22
**paralyzed** 64:16
  64:20
**Parcel** 6:25
**part** 22:1 29:3
  40:19 49:21
  57:24 58:23
  61:20 66:7,17
**partially** 36:4
**participate** 19:6
  27:7
**participating**
  25:6 28:21
**participation**
  15:23 16:18
  19:8,22
**particular** 4:9
  8:21 36:11
  60:21
**particularly** 7:25
**parties** 49:1

**partner** 10:5,7,9
**parts** 51:20 58:7
**party** 42:23,23
  58:13,17
**pass** 9:9 73:18
**passed** 43:16
  44:9
**Pate** 8:8
**pause** 21:25
**pay** 6:14 7:11
  43:11
**payback** 63:24
**pedal** 25:25 27:8
  65:15
**pedaled** 65:9
**penalize** 27:25
**penalties** 42:20
**Pennsylvania**
  12:25 13:22
**people** 4:20 5:13
  10:4 25:6,15
  27:25 30:4
  35:17 36:3
  37:16 40:18
  41:4,10 46:20
  50:10,11,14
  51:14 52:9 55:3
  56:8,9,10 57:9
  58:4,6 59:23
  60:8 62:17 63:1
  63:5,7,8,9,14
  66:25 67:2
  68:12 72:18
**percent** 48:6,21
**percentage** 4:19
  8:25
**perfect** 42:17
  63:23 73:5 75:7
**period** 10:23
  29:23 33:19
  73:4
**periods** 8:24
**periphery** 66:19

**person** 10:14,15
  24:10 27:14
  40:9 50:15 51:4
  52:4,4 53:2
  58:20 66:19
  69:8 71:24
**personal** 55:11
**perspective** 5:23
  5:24 7:21 9:17
  12:12 32:10
  42:1 51:2
**persuade** 57:19
**persuasive** 53:17
**phase** 46:18
**Philadelphia**
  20:25
**picture** 6:7 7:20
**place** 45:23
  70:15
**places** 40:18
**play** 24:20 64:14
**plea** 22:20 45:12
  46:21 47:5,12
  48:2 58:24
**plead** 6:13,25 7:2
  7:5,10,14 48:19
  71:5
**Pleads** 7:1
**pleas** 20:6
**please** 65:2
  75:16
**pledges** 52:1
**plenty** 62:6
**plus** 28:22
**point** 36:13,18
  41:22 43:25
  52:9,12 60:11
  69:11
**points** 31:17
**policy** 33:1 45:23
  52:17,23 71:16
**poor** 21:5
**portion** 58:24

**position** 53:21
  68:7,7 71:19
**positions** 11:2,2
  46:16
**possibility** 71:17
  72:8
**possible** 30:14
  45:24 61:18
  66:11 70:25
  71:12
**post** 49:7
**postdates** 47:18
  47:20
**post-Apprendi**
  49:7
**post-Blakeley**
  49:7
**post-indictment**
  13:18
**potentially** 34:6
**power** 42:23
**practice** 7:18
  31:18
**practiced** 33:12
**practices** 28:15
**prayer** 47:4
**predates** 36:15
  36:18 47:19
**predicate** 9:12
  43:15
**predict** 43:3
**predictability**
  14:19
**prediction** 41:2
  42:7
**prejudiced** 20:24
**preliminary** 13:1
  13:13,16
**premature** 53:1
**prematurely**
  50:19 59:11
  60:6
**prepared** 51:6,10

74:22
**preparing** 44:20
**present** 27:7
29:24 30:7 38:1
61:7
**presentation**
38:14 75:19
**presented** 1:10
4:3 75:20
**preserve** 62:7
**President** 24:8
24:12
**press** 6:2,4,12,15
6:21 7:13 46:25
**pressure** 52:8
**presumes** 40:20
**pretty** 18:17 21:5
32:20 37:15
70:4
**preventing** 13:2
**pre-indictment**
13:20
**price** 7:2,10 9:12
15:15 31:25
36:15 51:4
**prima** 38:2
**prior** 13:17
**priorities** 8:4,4
**priority** 8:3,6,14
**prison** 7:7
**prisons** 32:25
**private** 61:11
**prize** 70:3
**prizes** 70:4,14
**probably** 10:18
16:12 37:17
45:14
**problem** 29:7,16
46:6 67:18
**problematic**
45:19
**problems** 56:12
**proceed** 30:2

**process** 13:23
36:1,3 38:6,12
60:14 74:8
**produce** 51:22
51:22
**proffer** 74:23
**program** 6:19 9:6
11:17 12:11,14
12:16,18,21,22
13:3 14:13,18
14:24 15:1,3
16:7,8,11,13
16:16 17:10
18:6,9,14,18
18:25 20:16,20
21:18 23:2
24:14,18 25:11
26:11,19 28:6
61:18 62:11,14
62:16,18,23
64:4,6 66:13,16
66:22 69:17
70:23 73:16
**programs** 10:1
26:25 74:2
**progress** 40:5
**prohibition** 29:22
**proliferation**
40:16
**promise** 32:17
32:18 33:8
**promising** 42:22
**prompt** 16:17,25
17:11 19:18
20:20 21:9
23:24 24:15
62:9,12,15,20
63:13,22 69:7
**proof** 18:9
**pros** 62:10
**prosecuting** 20:5
**prosecution** 11:3
58:18 73:18

**prosecutor** 9:18
38:5
**prosecutors**
43:23 45:21
51:24
**protected** 58:24
**prove** 46:12,13
47:2,23,23
48:11
**provide** 20:10
41:23
**provided** 7:21
19:25 20:7,12
20:22 36:22
71:9
**provides** 16:11
**proxy** 48:6,21
**public** 13:11
**published** 15:9
**pull** 6:6 21:22
**purpose** 58:17
**purposes** 21:17
58:15,16
**pursuant** 26:20
**pursue** 40:21
**pushing** 50:9
**put** 11:9 18:10
21:7 53:20
61:13
**putative** 46:23
**puts** 49:19
**putting** 33:2,4
40:20

**Q**

**qualify** 16:24
24:22 71:20
**question** 11:8,9
23:16 27:13
28:9 29:4 36:4
36:4,7,8 37:4
37:23 40:6 62:8
62:19 63:20

66:5,7,18 69:13
70:17,18,20
72:11
**questions** 11:7
12:5 23:3 49:18
61:16,18,25
62:3,4,6 64:4
**quick** 42:11
72:25
**quickly** 27:21
30:13 38:13
50:10 59:17
**quite** 58:25
**quote** 22:9 23:23

**R**

**R** 4:1,1 40:1,1
**race** 65:13 69:21
69:23 70:13
72:18,23,24
75:9
**raids** 5:15
**raise** 44:15,16
62:19
**range** 70:7
**rare** 57:20 61:6
75:14
**rate** 5:20,22 9:7
**reach** 15:5
**reached** 75:10
**react** 47:9
**reaction** 42:24
53:14 54:10
**read** 8:9 20:4
21:1 55:6,10
**ready** 74:16,21
74:22 75:1
**real** 50:9 61:7
62:22
**realize** 37:20
**really** 8:5 21:18
22:4 23:1 29:14
29:19 33:11

35:12 40:21,24
41:3 53:7 54:8
54:15 57:17
60:24 65:8,18
**reason** 9:25 59:4
**reasonable**
46:13 47:24
**reasonably**
62:17,22
**reasoning** 29:1
**reasons** 14:3
16:9 25:19
28:13 30:6 63:4
**reassign** 53:20
**reassigned** 26:7
65:21
**receive** 16:5,16
70:6 73:18
**received** 17:13
23:13,15 38:9
45:4 71:6,7
**receives** 13:14
**receptive** 27:10
65:24 74:10
**recognize** 70:11
**recommendation**
45:14
**recommendati...**
44:23
**recommending**
45:1
**record** 13:10,11
14:21 29:8 31:2
40:24
**Recorded** 1:15
4:8
**Red** 33:4
**reduced** 38:8
**reducing** 46:24
**reference** 75:13
**referred** 72:14
**reinforce** 66:9
**related** 6:15,21

7:13 9:3
**relationship**
34:14
**relatively** 60:18
**release** 6:12,16
6:21 7:14
**releases** 6:3,4
**relief** 13:16,20
46:7
**rely** 14:17 48:5
48:20
**remarkable**
33:10,15
**remarks** 3:3 34:1
**remedial** 51:10
**remediate** 29:16
**remediation** 29:7
29:8,20 31:3
**remember** 26:3
72:24
**remote** 24:6
**removal** 11:16
12:10
**remove** 11:17
12:20,23 14:12
17:3 50:11
**removed** 14:23
15:4 22:2 71:9
**removing** 13:2
25:11
**repeat** 28:8
70:18 72:1
**repeatedly** 70:9
**report** 18:18,19
23:11 25:25
35:1 64:25 65:1
65:4,6 68:17
74:19
**reported** 27:21
68:17
**reporting** 35:4
49:19
**represent** 64:16

64:24
**representation**
19:13,15,17
21:9 29:10 31:4
**representations**
23:14
**representing**
9:15 24:1 49:22
49:22,23 50:2
**request** 31:21
38:3,9
**requested** 13:1
**requesting** 16:6
**require** 18:18
48:7
**requires** 36:14
**residual** 50:17
**resign** 15:22
**resist** 52:8
**resource** 41:22
42:1
**resources** 41:4
41:25
**respect** 37:4
41:11 43:8 44:1
45:24 46:16
55:19 58:22
**respond** 66:23
**response** 34:22
34:23 48:9
53:22 66:5,6
**responsibilities**
26:8 30:20 47:8
50:11 53:20
**responsibility**
33:3
**responsible** 53:2
**rest** 47:5
**result** 4:15 35:1
35:3 59:8
**results** 60:15
74:17
**retain** 58:22

**return** 33:2
**returned** 7:3
**reveal** 7:17
**revised** 12:22
73:15
**revision** 66:12
**revisit** 44:10
**revoke** 14:12
**re-occurring**
64:4
**rid** 50:6 51:1 52:9
52:10
**right** 11:23 13:20
13:23 18:24
20:8 30:1 37:18
41:13 42:24
47:14 48:16
49:2 55:16,20
62:1 68:13,15
70:12 72:12
**rights** 38:5
**rigid** 57:17
**ring** 19:14 64:9
**rip** 28:17
**risk** 23:17 26:2
62:12 65:2
**risks** 31:7 50:13
51:11
**robust** 29:20
**rogue** 62:22
67:23
**role** 17:12 19:19
21:10
**room** 26:24
68:12
**Rubber** 6:14,17
**rules** 30:7,9
**rural** 35:14

_____
S
_____
**S** 4:1 40:1
**safely** 34:19
**salary** 54:2

**sales** 24:8,12
29:18
**Samuel** 8:10
**San** 10:9
**sanctions** 43:4
**Savage** 13:21
**saw** 29:13
**saying** 24:17
26:18 27:10
37:14 41:11
47:1 52:17
56:16 64:16
65:15 72:25
**says** 18:20 21:8
22:5,7,18 47:22
47:25 52:22
54:9,13 58:3
64:8 74:15
**scalps** 54:13
**scenario** 25:13
**Scheme** 6:18
**Scott** 3:5 10:11
11:8,13,20,23
12:2,6,10 23:16
24:16 28:3
31:19,22 34:4
35:24 36:7 41:8
42:5,10 46:2,5
47:10 54:6,11
61:8,21,23 62:5
63:3,21 66:5,8
66:23 67:19
68:3 69:14,16
70:20 72:12
75:12,17
**Scott's** 66:17
**screwed** 69:14
**scriptures** 18:8
**search** 5:14
**SEC** 55:11
**second** 11:18,20
11:23 22:1,3
29:3 30:11 31:9

31:20 42:25
68:5 70:1,5,21
70:23 71:2,4,12
74:22,25 75:1
**Secondly** 43:10
47:15
**Section** 1:11 4:5
75:21
**see** 8:23 11:7
13:9 21:1 22:19
22:22 29:2 31:6
43:2 44:14 54:6
64:2,5 72:3
**seeing** 43:4
**seek** 4:21 13:16
32:18 34:10
**seeking** 32:14
33:15 43:15
**seen** 9:9 61:10
**segue** 42:17
**self** 35:1,4
**send** 64:19
**senior** 15:17,18
17:18 49:23
50:2 62:12,24
63:1
**sense** 30:19
32:12 60:7
**sent** 18:3,11 19:4
19:6 26:17,21
27:22 63:16
**sentence** 7:7
44:5 45:6,7,10
**sentences** 4:16
4:22,23,23 9:10
45:1 47:13
**sentencing** 44:1
44:10,22 45:13
46:7,10,12 48:6
**sentencing-rel...**
43:20
**separate** 56:23
59:5,13 60:1

serious 8:5 62:13
serve 7:7
served 5:5 32:24
service 5:14
serving 5:5 32:25
session 4:7 31:18
40:4
set 38:11 64:22
66:3
sets 64:11
seven 33:17
severance 53:1
shared 28:5
Sherman 44:7
shift 36:25
Shipping 6:24 7:1
show 30:24
shut 24:5 57:14
shutting 24:5
side 28:15 29:3
40:12,13
signals 34:9
significance
40:19
significant 11:11
12:12,13,19
34:6 35:8 41:12
significantly
37:24
simply 17:23
19:4,6 50:11
simultaneous
43:8
sincerity 41:9
single 46:8,9,12
64:3,5
sister 9:1
sit 57:19
sitting 28:25
37:19 64:15
72:20
situated 59:18
situation 23:13

23:20,23 28:4,7
45:4 54:18 57:2
57:4,21 60:5
65:9,23 71:22
71:24 73:24,25
situations 28:11
50:4 59:3 61:6
67:16
six 33:17,17
45:11 58:4,6
65:4
skipped 62:6
slow 54:20
slowly 57:8
small 40:18
67:24
soft 25:25 27:8
65:9,15
somebody 52:23
55:13 56:6
62:21 66:20
67:25 72:5,6
somewhat 33:10
soon 18:20 43:17
47:16
sooner 28:14,23
sophisticated
29:15 55:9
sorry 11:20 40:8
40:11
sort 69:24
sought 12:20
speak 11:19
speakers 59:15
speaking 14:5
Special 13:2
specifically 8:1
spectrum 23:19
speeches 8:9
32:8 64:2 71:16
speechless 22:11
speed 36:1 58:6
spend 13:6 14:5

22:4 25:20 32:7
split 12:3
spot 70:24
Spratling 3:4 4:9
10:8 12:2,7
23:16 28:3
31:16 34:4 40:7
42:5 46:2,18
49:9 52:11
54:25 55:19
56:22 57:22
58:10 60:19
61:8 62:2 66:4
69:10,12 70:18
71:15 75:10
staff 41:7 57:25
58:11 73:3
stage 60:14,24
stand 40:9
stands 41:7
start 12:7 37:9
starts 69:20
statement 69:2
States 6:9,23 7:8
7:12,16 9:11
32:5,16 35:21
36:10 37:19
status 71:24
statutory 44:3,5
44:6,13 47:16
step 14:24 18:15
33:22
steps 51:10
stick 11:15 21:13
Stolt 11:17 12:7
13:2 15:6,11,15
16:6 18:5,7
19:23 20:8,16
22:9 28:12 62:9
68:21
Stolt's 18:24
19:22 23:18
26:14

Stolt-Nielsen
12:10,11 18:14
28:4,7 29:25
35:8,12 71:23
Stolt-Nielsen's
29:7
stop 21:24 24:3
30:4 48:15
67:11
stopped 49:15
stopping 25:14
story 68:2
straight 57:6
straightened
52:18
strategy 40:22
Street 15:8 16:2
17:15 20:3,9
55:10 68:18
strict 18:13
stuck 21:12,14
studied 28:4
study 48:1
stuff 45:20 53:6
subject 23:17
49:10
subjects 9:16
submit 7:16
14:21 38:4
subpoenas 71:10
subscript 6:5
substantial 70:4
70:6 71:9
substantially
48:23
subtitle 6:21 7:6
7:15
success 15:2
successful 12:17
16:9,10
suddenly 59:23
sufficient 73:20
suggest 25:18

31:18
suggested 18:22
support 36:23
38:3 60:2
suppose 49:10
sure 24:10 49:15
51:15 54:21
55:2,5 56:17,18
59:21 61:15
62:2,2,2 67:22
69:25 70:9
surprised 28:14
28:23,24
surprising 28:13
suspect 44:15
suspended 19:22
20:14
swallowed 64:12
system 72:15

_____

**T**

T 4:1,1 40:1,1
tactics 5:19
take 14:1 16:3,4
16:25 18:1
20:20 35:24
38:7 44:12 48:3
53:25 56:18
59:6 65:18 67:1
67:13 74:9,24
taken 16:17
24:15 69:6
takes 73:7
tale 29:25 31:14
talk 8:15 9:22
14:2 17:20,21
22:2 24:9 26:9
30:14 35:25
40:12 43:7,21
59:22 72:22
talked 38:11
72:17
talking 10:16

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime     March 3, 2005
Las Vegas, NV

13:6 19:23
25:12,20 27:9
27:16,18 32:7
33:18 35:22,23
36:25 42:15
45:21 47:15
49:13 50:23
57:3 58:11 63:5
63:11
**talks** 13:25
**tampering** 32:2
**tanker** 6:25 15:7
**tap** 9:13
**target** 32:21
58:18 59:24
**targeted** 58:18
**taxing** 41:24
**techniques** 5:19
**Technologies** 7:9
**tell** 34:4 42:21
44:18 49:5 53:7
58:14,15 65:11
65:17 73:9
**telling** 27:24 36:2
52:25 72:18
**tension** 50:5,5
51:9 54:12
**tensions** 55:18
57:1
**tent** 50:10 51:12
51:14 53:19
57:10 60:23,25
**terminate** 16:18
17:1,11 18:21
19:19 21:10
27:4 28:1 50:19
**terminated** 29:11
**terminating** 19:7
**termination**
15:13
**terms** 5:12,17,18
12:4 32:8 37:13
46:23 49:4

**third** 7:12 22:17
33:5 43:19
56:19
**thoroughly** 60:8
**thought** 5:25 6:1
18:17 44:19
**thoughts** 35:9
59:10 60:4 61:9
61:22
**three** 7:15 11:1,2
11:15 17:9
30:16 35:18
38:12 42:7,13
42:13,14 44:6
45:7 55:6 56:13
57:15
**throw** 62:3
**thrown** 22:21
60:23
**tie** 70:14
**tighten** 23:22
**tilts** 66:10
**time** 5:5 7:16
8:24 12:20 13:6
14:5 20:9 22:4
25:20 28:17,18
31:19 32:7,17
32:24,25 36:18
37:25 41:6 48:4
50:8 51:3,13
56:12,25 61:25
62:7 63:24
65:20 69:18
73:4,10 74:14
75:11
**times** 5:7,9 8:8
59:7
**titles** 7:16
**today** 68:9
**told** 10:17 18:12
20:7 26:17
44:11 54:15
67:21 74:3

**test** 22:24
**testimony** 41:19
**thank** 28:3 69:12
75:11,12,18,23
**thankfully** 58:1
**thanking** 75:16
**theory** 15:12
**they'd** 22:21
**thing** 25:16 29:21
30:11 31:11
33:6,10 53:4
56:6 60:13
68:13,15 70:12
71:13
**things** 19:1,12
23:22 42:12
48:25 52:6
57:11,15 66:14
**think** 5:13 6:1 8:5
9:17,18 11:10
12:13,16 14:10
14:11,25 17:22
21:20,21 25:12
25:22,23 26:24
28:7 31:12
32:23 34:5,15
34:16 35:1,3,7
35:11,11,24
36:2,10 37:14
40:13,19 41:11
42:8,11 43:3
44:13,24 45:15
45:18,19 47:3
54:11 55:21,25
56:1 57:7,15
58:10 62:19
65:2,23 66:17
67:10 70:20
73:24 74:8,9
**thinking** 45:21
58:4 60:19
61:16

68:11 69:2 73:8
**tolerance** 52:19
**tolerated** 30:25
**tone** 30:23
**top** 8:4,4,23 9:7,8
25:3,5 30:23
42:15 63:14
**topic** 6:17,24 7:9
42:6,18
**topics** 12:3
**total** 4:12
**track** 31:19
35:25 36:9
37:24 40:23
52:19
**trader** 24:24
**training** 5:19
**transition** 51:16
**transitioning**
30:22
**transparency**
14:19 58:3,8
**transparent**
28:25 57:25
60:12 66:1 68:8
75:15
**treat** 45:16
**treaties** 34:12
**Treaty** 35:25
36:9 37:24
**tremendous** 31:8
**tried** 12:23 63:4
68:15 70:12
**trouble** 67:9,15
**troubled** 41:8
**true** 17:23 19:3
20:4 40:25
**try** 25:25 33:7
45:23 56:2 58:6
65:16,16 67:22
**trying** 10:13
41:14 56:3
59:16 66:1
72:24 75:3

**turn** 67:13
**turning** 32:21
**turns** 16:4 18:24
19:1,3 27:9
65:19
**twice** 47:2,3
**two** 4:24 5:22
6:11,21 11:11
11:16 12:2 19:1
19:21,23,23
20:17,21 22:2
25:5 26:19
28:13 42:7 55:5
57:11 58:15
70:13 71:5,18
72:7,8 74:6
**two-fold** 42:24
**type** 5:16 68:14
73:12,13,13,23
73:23,25
**typically** 5:13
**T's** 72:21

**U**

**UK** 9:4,5 11:24
11:25 31:23
32:4 33:13,18
33:18,24 34:2
36:9,17,19,21
37:10,14
**ultimately** 30:22
**unbelievable**
5:22
**uncertainty** 17:3
**uncommon** 28:16
51:24
**underscore** 68:3
**understand** 23:4
40:15 41:1 66:8
66:8 67:21
**understandably**
21:6
**understands**

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime       March 3, 2005
Las Vegas, NV

Page 91

53:15
**unequivocal** 18:9
**unequivocally**
  65:11
**unfortunately**
  13:9 54:7
**uniform** 48:10
**uniformity** 45:24
**unique** 10:19
  43:24
**United** 6:9,22 7:7
  7:12,16 9:11
  32:5,15 35:21
  36:9 37:19
**unquestionably**
  12:16
**unravel** 69:20
**unravels** 69:20
**upward** 45:17
**use** 7:22 43:13
  45:12 59:10
  73:20
**usually** 13:18
  50:7,24
**U.S** 28:16 32:22
  32:25,25 37:15

**V**
**vacation** 56:20
**Vegas** 1:15 4:8
**verified** 67:9
**version** 26:14
**versus** 73:23
**Vice** 24:7,11
**video** 52:21
**vigor** 6:8
**violate** 51:13
  66:15
**violates** 52:23
**violating** 32:25
**violation** 26:10
  30:3 36:6
**virtually** 46:9

**volume** 2:9 8:25
  39:9 46:10
**voluntarily** 74:12
**voluntary** 12:17
  16:13

**W**
**wait** 57:15 63:23
**waiting** 63:23
**Walden** 3:6 10:7
  13:24 28:12
  40:12 49:21
  52:24 57:24
  60:5,21
**Wall** 15:8 16:2
  17:15 20:3,9
  55:10 68:18
**want** 18:25 22:15
  23:20 24:10
  29:24 43:11
  47:6 48:18,19
  48:20 50:25
  51:21 53:4 54:4
  54:13 55:10,11
  55:13,14 56:6
  56:21 65:5
  74:18 75:11,12
**wanted** 10:18
  16:21 17:3 21:8
**wants** 31:11
  47:20 49:14
  50:16,25 54:13
  54:20 58:20
  61:24 74:13
**warrant** 5:14
**wasn't** 33:16,19
  61:4 63:13,13
  64:11,11
**Watches** 33:5
**wave** 35:4
**way** 10:17,19
  14:25 17:4 21:1
  24:20 26:24

27:3 30:1,23
  31:2,3,5 36:13
  37:12 40:14
  44:4 46:3 51:16
  52:18 53:18,18
  60:25 62:7
  66:14 69:16
**ways** 24:21 36:12
  37:1,2 43:7
  49:1 50:8 64:6
**week** 72:23
**weeks** 6:11
  43:10 74:6,9,9
  74:9
**Welcome** 1:8 4:2
  40:2
**went** 18:16,23
  33:22 44:4,5,7
  67:23
**weren't** 26:6
  60:25 62:20
**we'll** 12:8,8
  45:23 48:24
  68:5,8,10,11
  74:10
**we're** 11:6 21:20
  21:21 24:21
  25:12 27:7,14
  27:16,17,24,25
  30:14 33:6,9
  41:13,21 42:3
  43:1 44:19 47:4
  47:13,15 48:1
  48:14,15,20,21
  52:18,20 53:11
  58:4 63:11,19
  63:23 64:14
  65:1,11,17,18
  66:2 72:24,25
  74:3,11,16,21
  75:3
**we've** 9:4,8,9,22
  24:17 42:15

47:25 49:5 54:6
  57:8 59:7 61:9
  61:19 62:6 64:9
  65:5 67:10
  75:10
**white** 1:9 2:12
  4:3 10:2 14:15
  32:12 39:12
  40:3 75:20
**who's** 10:5
**who've** 49:16
**wide** 29:12
**willing** 46:24
  48:1
**willingness** 34:9
**winner** 69:22
  70:15
**wire** 9:13
**wiretap** 43:15
**wiretaps** 43:13
**wise** 31:19
**wish** 29:16
**withdraw** 18:21
  65:1
**withdrawal** 26:1
  26:22 27:8
  62:14 65:10,16
**withdrawing**
  65:13,17,18
**withdrew** 18:11
**withheld** 20:2
  22:10
**witness** 32:2 38:4
  41:23
**witnesses** 19:24
**wonder** 40:24
  53:13
**word** 7:22 59:10
**work** 26:7 47:9
  47:10 53:6 58:7
  59:19 67:23
**works** 53:7
**world** 5:12 6:9

29:19 41:5
  52:22
**worried** 55:8
**worth** 36:2 54:9
**write** 21:21
**writers** 21:5,21
**wrong** 14:24 23:8
  23:9 75:3
**wrongdoers** 50:7

**X**
**X** 3:1 74:3
**xtradition** 32:5
**X-thousand** 63:1

**Y**
**Y** 74:3
**Yeah** 24:16
**year** 4:14 5:25
  6:11,11,12 8:8
  8:18 9:8,21
  11:12 12:24
  24:17 31:20
  32:4 33:1 43:1
  43:5 44:3 50:1
**years** 4:18 7:4
  10:23,25 32:12
  33:17,17,22
  34:8 38:7 41:1
  41:13 44:6,6
  45:11 47:14
  61:20
**yesterday** 74:5,5
  74:20
**York** 10:8

**Z**
**Z** 74:3
**zero** 52:19 54:10
**zone** 67:4

**$**
**$10** 4:11 5:8 44:8
  49:6

**$100** 44:8 47:16
   47:17,21 49:6
**$160** 7:11
**$50** 6:15
**$66** 6:16

---
**1**
---

**1** 2:9
**10** 7:3 41:12 44:6
   47:13 48:6,21
   61:17
**11** 3:5
**12** 24:17 45:8
**15** 45:5 62:4
**18** 5:6 32:23 45:5
**19** 32:24
**19th** 1:8 2:10 4:2
   39:10 40:2
   75:19
**1993** 12:22 66:13
   73:16
**1994** 7:4

---
**2**
---

**2** 39:9 74:9
**2A** 15:9
**2R1.1** 44:10
**20,000** 64:18
**2000** 33:21
**2002** 15:8 17:17
   21:13 26:5
**2004** 36:10 47:19
**2005** 1:9,13 2:13
   4:3,6 38:9
   39:13 40:3
   75:20,23
**24** 45:6
**28** 3:6

---
**3**
---

**3** 1:13 74:9
**3rd** 4:6 75:22
**35** 3:7
**39** 5:9

---
**4**
---

**4** 3:4 74:9
**4th** 4:6 75:23
**4.1** 57:12
**4.3** 57:12
**46** 4:12

---
**5**
---

**5-K** 20:7 45:4,6
**5-K's** 45:3
**5-K's** 45:12
**50** 5:1,2

---
**8**
---

**8C4.1** 20:10
**80** 4:17

---
**9**
---

**90s** 33:20