# Exhibit 7

THE AMERICAN BAR ASSOCIATION

SECTION OF ANTITRUST LAW AND THE ABA CENTER FOR

CONTINUING LEGAL EDUCATION PRESENT


CARTEL ENFORCEMENT ROUNDTABLE


RECORDED ON NOVEMBER 16, 2005


RECORDED LIVE AT THE NATIONAL PRESS CLUB

IN WASHINGTON DC

Cartel Enforcement Roundtable    11-16-2005

---

Page 2

1                    SPEAKERS

2

3    GARY R. SPRATLING (MODERATOR) – Gibson, Dunn & Crutcher

4         LLP, San Francisco, California

5

6    SCOTT D. HAMMOND – Deputy Assistant Attorney General for

7         Criminal Enforcement, Antitrust Division,

8         U.S. Department of Justice, Washington, D.C.

9

10   JOHN M. MAJORAS -  Jones Day, Washington, D.C.

11

12   KIRTIKUMAR MEHTA – Directorate-Cartels, European

13        Commission, Brussels, Belgium

14

15

16

17

18

19

20

21

22

---

Page 3

1            P R O C E E D I N G S

2            -   -   -   -   -

3         ASHLEY:  Welcome to the teleconference, Cartel

4    Enforcement Roundtable.  I'm Ashley, your teleconference

5    operator.  The ABA Section of Antitrust Law and the ABA

6    Center for Continuing Legal Education sponsors today's

7    program.

8         For more information about joining the Section

9    of Antitrust Law or getting a recording of today's

10   program or to learn more about future teleconferences,

11   please call ABA Member Services at 1-800-285-2221.

12        We have numerous people from all across the

13   country joining us on today's call.  Before we begin, I'd

14   like to remind participants that the website listed in

15   your confirmation packet includes bios of our presenters

16   and information on today's topic.  The information

17   consists of several papers you may download from the

18   program's website in the course materials section.

19        Also, many MCLE state regulators require

20   attendance confirmation and program evaluation forms for

21   the CLE accreditation, and we value your input, so please

22   remember to complete and fax your forms to the ABA.

---

Page 4

1         To obtain the attendance confirmation form, go

2    to the webpage for this program where you downloaded the

3    course materials and scroll down to the section of the

4    page titled, "To Obtain Course Credit" and click on the

5    online course evaluation link there.  When you have

6    finished with the quick evaluation, you will receive the

7    attendance confirmation form.

8         Once your confirmation and evaluation forms

9    have been received and your attendance has been verified,

10   a certificate of attendance will be faxed to you in the

11   following three to four weeks.

12        After the program, there is an opportunity to

13   ask questions by posting your questions to the panelists

14   on the ABA web board.  A link to the web board is listed

15   on the webpage for this event.

16        Please note that the views expressed by the

17   presenters are their own views and not the views of any

18   company, organization or government agency.

19        Now, it's my pleasure to introduce today's

20   panel.  Our moderator is Gary Spratling.  Mr. Spratling

21   is a partner with Gibson, Dunn & Crutcher where he co-

22   chairs the firm's Antitrust Practice Group.  He

---

Page 5

1    previously served as the Antitrust Division's Deputy

2    Assistant Attorney General for Criminal Enforcement in

3    the U.S. Department of Justice.  Mr. Spratling's practice

4    focuses on representing companies and individuals in

5    connection with the U.S. and foreign cartel

6    investigations and related litigation.

7         Scott Hammond is the Antitrust Division's

8    Deputy Assistant Attorney General for Criminal

9    Enforcement in the U.S. Department of Justice.  He is

10   responsible for the Division's criminal investigations

11   and litigation nationwide.

12        John Majoras is the Partner-In-Charge of

13   Business Development in the Washington, D.C. office of

14   the Jones Day Firm.  John has a wide variety of

15   experience in general commercial litigation with a

16   particular focus on antitrust matters.  He has been

17   involved in some of the most significant cartel cases

18   brought in the U.S. Civil Courts and is well-versed in

19   multi-district class action litigation.

20        Kirtikumar Mehta is the Cartels Directorate and

21   the Director General for Competition in the European

22   Commission.  Mr. Mehta is in charge of cartel

---

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable     11-16-2005

Page 6

1   enforcement, merger control, and abuse of dominance cases
2   in the industry, consumer goods and agricultural sections.
3           And now, here is your moderator, Gary
4   Spratling.
5           MR. SPRATLING:  Welcome to the CLE Program,
6   Cartel Enforcement Roundtable.  Today, we will look at
7   the current state of international cartel enforcement,
8   one of the most, if not the most, exciting, interesting
9   and dynamic areas of antitrust practice.
10          Its vibrancy is reflected in, first, the level
11  of cooperation among competition law enforcement
12  authorities, which has grown from two or three countries
13  occasionally exchanging limited information, to a network
14  of more than 80 countries regularly exchanging
15  information, meeting under the auspices of the
16  international competition network to discuss best
17  practices, cooperation and anti-cartel enforcement among
18  nations around the world.
19          Its vibrancy is also reflected in the number,
20  significance and frequency of developments in the
21  international cartel arena.
22          Looking first at the jurisdictions that are

Page 7

1   represented on the panel today and taking the first look
2   at the United States, last year, the United States
3   enacted legislation which increased the penalties for an
4   antitrust violation to a maximum of $100 million from
5   corporations, a maximum of $1 million for individuals, a
6   maximum period of incarceration of 10 years for
7   individuals.
8           Also last year, the Department of Justice, for
9   the first time, revoked the conditional amnesty of an
10  applicant, Stolt-Nielsen, a Luxembourg shipping company.
11          Also last year, the Department of Justice,
12  again for the first time, sought the extradition of a
13  foreign executive, Ian Norris, a U.K. citizen, to face
14  charges for bid-rigging and obstruction of justice in the
15  United States.
16          And just one month ago, Samsung Electronics
17  agreed to plead guilty and to pay a fine of $300 million
18  for price fixing in the DRAM industry, the second largest
19  fine in United States history, and this fine followed on
20  fines imposed upon other members of that conspiracy,
21  including a fine of $185 million against Hynix, also a
22  Korean corporation, and $160 million against Infineon, a

Page 8

1   German organization.
2           In the E.U., since May of 2004 modernization,
3   since that modernization went into effect -- so, that's
4   approximately a year-and-a-half ago -- members of the
5   European Competition Network have initiated 488
6   competition investigations.  In addition, the majority of
7   the E.U. member states, 19 at last count, have now passed
8   their own leniency policies.  As many of you know, the
9   E.U. is imposing very large fines in recent years; in a
10  number of cases, fines that are a greater percentage of
11  the volume of affected commerce than the fines imposed in
12  the United States for the related violation, regularly
13  totaling hundreds of millions of dollars -- excuse me,
14  hundreds of millions of Euros against the participants of
15  the major cartels.
16          The European Commission has established the new
17  Competition Directorate, that we just spoke of a moment
18  ago, and finally, the Competition Commissioner Neelie
19  Kroes has stated that the Commission is considering
20  European-wide, one-stop shop for cartel applicants and
21  certain other types of reforms, such as plea bargaining
22  that we will be talking about today.

Page 9

1           These developments in the United States and the
2   E.U. merely reflect the growing advances in cartel
3   enforcement that are occurring in the countries around
4   the world.  Every week, one hears or reads about a
5   country enacting a new antitrust legislation, increasing
6   the penalties for an antitrust violation, implementing a
7   new leniency statute, establishing a new cartel
8   enforcement unit, conducting dawn raids or searches,
9   obtaining unprecedented fines in cartels.  Every week,
10  this is happening.
11          Just three weeks ago, Canada announced or
12  issued answers to frequently asked questions about its
13  immunity policy.  We have heard, in the previous
14  discussion, what's happening in Japan.  There is the
15  criminalization of antitrust going on in Australia, and
16  in the paper that we've distributed, we have developments
17  in more than 20 countries that have happened recently.
18  Suffice it to say that the level of enforcement activity,
19  the degree of cooperation among enforcers and, indeed,
20  even the rate of change, the rate of advancement in
21  cartel enforcement is just staggering.
22          Let's start our roundtable discussion as to the

Page 10

1    current state of cartel enforcement -- international
2    cartel enforcement where the last panel left off, and by
3    that, I mean, nearly everyone in the defense bar and most
4    enforcers agree that the implementation, fine tuning and
5    proliferation of amnesty or immunity policies has been
6    the primary factor in the explosion of international
7    cartel enforcement.
8        I think you will all be interested to be
9    reminded of the fact that when the Antitrust Division of
10   the Department of Justice announced its revised leniency
11   program in 1993, there were only two leniency programs in
12   the world, the United States and Canada, and we've seen
13   what's happened since then.  There have been remarks in
14   the previous panel and throughout this conference about
15   what has happened with respect to international cartel
16   enforcement and the proliferation of amnesty programs and
17   the progeneration of major cases that has come about as a
18   result of that.  But nowhere has the introduction of an
19   immunity program been more remarkable in terms of the
20   number of applications and the number of cases generated
21   than in the European Union.
22       And so, Kirti, I wonder if you would kick off

Page 11

1    our discussion today by telling us a little bit about the
2    European Union's immunity policy.  Give us a sense of the
3    success of the Commission's program.  Tell us if that
4    huge success is causing some problems in the program, and
5    if you have time, share with us, if you would, any
6    predictions about whether or not any changes in that
7    program may be imminent.
8        MR. MEHTA:  Well, EU leniency policy has been
9    in force since 1996.  In 2002, we substantially revised
10   this leniency notice, and the basic provisions of our
11   current leniency notice is to grant immunity to the first
12   company that comes forward with information that can lead
13   to the Commission organizing its investigatory measures,
14   I mean dawn raids, and secondly, we also foresee immunity
15   in those cases where we might have already started
16   investigatory measures, but we get information from an
17   applicant that enables us to find an infringement.  So,
18   these are what we call 8A and 8B, Articles for Immunity.
19       There is also filings for reductions of fine in
20   our system.  We allow for the first one after the
21   immunity applicant reduction between 30 and 50 percent,
22   for the second one between 20 and 30 percent, and for the

Page 12

1    third one, up to 20 percent.
2        Just to show a little bit how this has been
3    working under the current notice since 2002, we have had
4    80 applications for immunity, conditional immunity.  In
5    this case, 49 were granted.  Of that, 45 would be under
6    8A, the standard that requires the applicant to bring
7    sufficient information for us to launch a dawn raid.
8    Four were under 8B, which is to provide sufficient
9    information for us to find an infringement.
10       We are still looking at 12 applications because
11   they are more recent, and the remaining 19 were where we
12   have rejected conditional immunity for various reasons,
13   either they did not fit into -- it was not a cartel that
14   they were bringing our attention to or for various other
15   reasons.
16       At the same time, we have had 79 applications
17   for reductions of fine, of which 18 -- 19 have been
18   already informed that we have granted them in the
19   different band.  Usually a case which starts with an
20   immunity application takes nearly two to three years, and
21   the information regarding the band in which an applicant
22   is situated for reduction of fine comes just before our

Page 13

1    statement of objection.  So, that is why this number is
2    much lower in terms of where we are today.
3        And if you look at the impact of this in our
4    enforcement, we have, since 2000, 36 decisions imposing
5    more than four billion Euro fines on 197 companies.
6    So, on average, in the last three, four years, we are at
7    six cartel decisions imposing fines, and you see the
8    immunity applications which will lead to cases between
9    two to three years later.
10       So, in a way, the success of the policy has
11   meant, on one side, we have a number of applications that
12   require enforcement and, of course, this is resource
13   intensive.  We have done, between 2002 and 2005, more
14   than 50 cartel inspections, to give you an idea of the
15   resources that are applied.
16       Secondly, of course, that has been one of the
17   reasons why we have now a Specialist Cartels Directorate
18   for response to that, three or four units with 60
19   specialized cartel case analysts is the entry
20   point for all immunity leniency cases and we ensure good
21   cooperation within the ECN.  So, I think this is one of
22   the reactions that we have to our policy.

Cartel Enforcement Roundtable    11-16-2005

Page 14

1    As regards to just a couple of points on what
2  you said for revisions, I think our most important in the
3  near term is to ensure that leniency applicants are not
4  worse off than those who do not come forward. So, we
5  would like for the procedure for protection of corporate
6  statements to introduce that as an integral part of our
7  leniency notice. So, essentially, parties can make all
8  of statements to us. Access are only given to the
9  transcripts, not to the audio itself. They might be able
10 to listen to it, but they cannot take a mechanical copy
11 of that.
12    We also require now systematically when they
13 come to access the file page, for other involved parties
14 to sign a document committing themselves to respect these
15 conditions of access and the sanction that we intend to
16 employ is we would lodge a complaint with the Bar
17 Association of lawyers in whichever country where we find
18 that this was not respected. I think, beyond that, we
19 shall look to the status -- it's too early to say how we
20 would now modify our policy -- but there are some other
21 interesting areas, avenues that we are discussing in the
22 European Competition Network.

Page 15

1    MR. SPRATLING: John, assume that one of your
2  clients comes to you and tells you that it believes that
3  it may have a cartel problem with respect to a product
4  that it distributes in multiple jurisdictions. Your
5  client may become aware of that as a result of an
6  internal audit, or at the other end of the spectrum, as
7  we see increasingly these days, your client may become
8  aware of it as a result of various of its facilities
9  being the subject of dawn raids by the European
10 Commission officials and National Police in Europe,
11 searches by the Royal Canadian Mounted Police in Canada,
12 execution of search warrants by the FBI in the United
13 States, compulsory inspections by the JFTC in Japan.
14    And while, obviously, the timing and manner and
15 strategy of your response is going to be affected by the
16 way in which your client became aware of the problematic
17 conduct, I wonder if you can talk to us how you take into
18 account this multitude of amnesty policies in developing
19 an integrated international response to cartel exposure.
20    We've got 19 jurisdictions in the E.U. that
21 have an amnesty policy, as well as the E.U. policy itself
22 and criminalization in the U.K, amnesty policies in the

Page 16

1  United States and Canada, amnesty policy in Australia
2  that is becoming far more active. How do you get your
3  arms around what the existence of all those policies do
4  to your decision whether or not to self-report in the
5  first place, what nations or countries you go to to seek
6  amnesty, how many of them do you seek amnesty in and in
7  what order?
8    (Laughter).
9    MR. SPRATLING: Can you tell us just how in the
10 world you come to grips with all that? Go ahead and take
11 a minute.
12    MR. MAJORAS: A whole minute? Thank you.
13 Obviously, it's a fairly daunting task when you're faced
14 with that. Even more critically, you're often faced with
15 that in a phone call out of the blue. If a company or a
16 client of yours comes to you and says, we've discovered
17 this, what should we do, and if you're not prepared with
18 how to deal with it right up front, recognizing all the
19 pitfalls that you can face, you may end up causing
20 more problems than you started with originally.
21    I think the fundamental answer to all of your
22 question is, yes, you do need a coordinated response.

Page 17

1  You need to be aware of the different programs that are
2  in place that may affect your particular client. You
3  need to do -- you need to look at all those and make sure
4  you know what the requirements are for leniency. If
5  you're going to try to apply for leniency, you also have
6  to know if there are countries in which -- that may have
7  a leniency program that you don't think you have a
8  problem with, because do you really want to open up an
9  investigation where your client has to go in, perhaps
10 with very early information, and start a process that
11 you'd really rather not engage in? So, all of those come
12 into play.
13    I think the critical issue is, where is the
14 process when it first comes to your attention? If it's
15 something where the company just discovered some
16 information, there's no reason to believe there are
17 ongoing investigations in various jurisdictions, perhaps
18 we have a little more time to act, and you can start an
19 investigation and try to ascertain what is out there.
20 But you're constantly in a race against time and you
21 don't know where your competitors are. Your competitors,
22 in this case, are the enforcement agencies, your

Cartel Enforcement Roundtable    11-16-2005

Page 18

1    competitors in this case may be other members of a
2    cartel, that's where you're engaged, because it's going
3    to be a race to get in and be the first reporting. Every
4    leniency program of any worth gives the leniency to the
5    first-in the best benefits are first in.
6        So, I think the critical thing is to make sure
7    you have a broad understanding of the programs that are
8    out there. You have to make quick assessments as to
9    whether you're going to go in or not. I think the fact
10   that you have more and more leniency programs, more and
11   more enforcement worldwide probably makes that decision
12   even easier than it was in the past where you might just
13   have one or two programs and you're not sure where it may
14   come out if the programs weren't as transparent as they
15   are now.
16       So, in approaching all of this, you're going to
17   look at those issues, try to conduct as much
18   investigation as possible, determine the specifics of
19   what you have to provide. Can you go in and get a marker
20   if you say, we are conducting this investigation based on
21   this information, can we get back to you in a certain
22   period of time? Some jurisdictions allow that, some

Page 19

1    don't. Do you need, as we just heard Mr. Uesugi say, to
2    send in a fax? I'm not sure that would immediately come
3    to -- the first thing I'd think about in approaching a
4    leniency program is I better prepare my fax right now,
5    but as you heard, it's a critical part of the program.
6        So, I think the proliferation of the leniency
7    programs, the greater enforcement, what it really does to
8    you in advising a client, it speeds up the clock. It
9    also puts a great emphasis on your knowledge of the
10   worldwide programs, your knowledge of the company's
11   business as to where you may have to go in and take some
12   action immediately.
13       MR. SPRATLING: Let me just offer a couple of
14   follow-up comments that your answer prompted in my mind,
15   John. The first is that John mentioned that it's obvious
16   that you have to be the first-in each jurisdiction.
17   Two comments on that. Number one, the Department of
18   Justice has made public now for a number of years that,
19   in some cases, the difference between being first-in and
20   being second-in in an international cartel, the
21   difference has been less than a business day.
22       When I was at the Department of Justice, we had

Page 20

1    one example where I watched that. As a counsel in
2    private practice, I was a party to a race where that was
3    true where the winning party won by less than a day over
4    the others. So, you have to move very, very quickly.
5        And in assessing the different requirements,
6    another point is that you get no credit in any
7    jurisdiction for being first in some other jurisdiction.
8    In fact, the Canadian leniency policy, I think they've
9    been particularly sensitive to the fact that people have
10   come in there late. The Canadian policy actually says,
11   we will give you no credit for whatever -- for what
12   you've done in another jurisdiction -- and the reason
13   that that's significant is because, as John said, the
14   differences in requirements of the various jurisdictions.
15   You don't go into the E.U. in the same manner -- or you
16   will not go into Japan, based on what Mr. Uesugi said, in
17   the same way that you can go in and get a marker in the
18   United States and Canada.
19       Thanks, John, for giving us an overview of
20   that.
21       Two of the specific requirements for amnesty in
22   every program in the world of which I'm aware are, first,

Page 21

1    that the applicant has terminated its activity, and
2    secondly, that the applicant cooperates fully and
3    completely in the ensuing investigation with the
4    enforcement authority.
5        Scott, the Department of Justice last year, in
6    a move that attracted attention around the world, revoked
7    the conditional leniency of Stolt-Nielsen, a Luxembourg
8    shipping company, as I mentioned in my introductory
9    remarks, and it did so, it stated publicly, because it
10   failed to meet those two requirements.
11       Can you give us a report on what the status of
12   the Stolt-Nielsen situation is?
13       MR. HAMMOND: Yeah, before I get to a status,
14   just two minutes by way of background. I imagine most of
15   the people in the room are familiar with this, and in a
16   moment, I certainly want to direct you to where you can
17   get more information.
18       But Stolt is an unfortunate example of a
19   company that did everything wrong. General counsel
20   discovered that the company was involved in an
21   international cartel. General counsel reported it to the
22   Chairman of the U.S. subsidiary, and yet, the company failed

depo@ftrinc.net    For The Record, Inc.    301-870-8025

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Page 22

1    to take advantage of the leniency program and failed to
2    report the conduct. Making matters worse, instead, Stolt
3    continued to conspire and participate in this same
4    international conspiracy.
5        Now, they conspired by continuing to have
6    senior executives meeting, discussing and participating
7    in the cartel with their competitors, and that conspiracy
8    continued right up until the time that the Wall Street
9    Journal reported the existence of the conspiracy. It was
10   only after that point in time that Stolt came in and
11   reported the conduct.
12       It lied to the Antitrust Division; that is, the
13   company misrepresented their way into the program by
14   saying that the conduct ended when it was discovered and
15   provided the Justice Department with false and misleading
16   information and withheld other information. When we
17   discovered that, they were removed from the program.
18       A District Court Judge in the Eastern District
19   of Philadelphia saw it differently. He decided that they
20   did not deserve to be revoked -- have their leniency
21   revoked. That decision was appealed to the Third
22   Circuit, and that's where it sits today.

Page 23

1        Oral argument on this matter was September
2    30th. We hope to have a decision -- I'm sure all the
3    parties hope to have a decision soon. Interestingly,
4    Judge Alito is on the panel that heard oral argument.
5        (Laughter).
6        MR. HAMMOND: I certainly hope that doesn't
7    jeopardize our ability to get a quick decision.
8        I told you where you can get more information
9    on this. One place I'd certainly like you to go to is
10   our website. I don't expect you to take my word for it
11   in terms of our good faith.
12       I know that that is critical to your assessment
13   in terms of your recommendations in coming into the
14   leniency program. I think if you understand the facts of
15   this case, you will understand what an isolated instance
16   it is. I think if you appreciate the fact that this
17   program -- this revised leniency program has been in
18   existence for 12 years and, yet, this is the first and
19   only time that a company has been revoked. I hope that
20   will speak volumes to you in terms of how seriously we
21   take this issue.
22       Gary said a moment ago -- I wrote it down --

Page 24

1    that this decision got the attention of folks around the
2    world. Well, we have been known, from time to time, to
3    try to do something like that, to send a message to get
4    the attention of the board room and the business
5    community and so forth. This isn't one of these cases.
6    I mean, this is certainly not a case in which we take any
7    joy in revoking a company. We weren't itching for the
8    opportunity to kick somebody out of our leniency program.
9    Far from it. But what we have here is a company, as I
10   said, that lied its way into the program.
11       Their amnesty was revoked based on a long-
12   standing policy, a policy that was announced back in
13   1998. That policy is very straightforward. If a
14   company's general counsel, outside counsel or the board
15   of directors learns that a company is involved in an
16   antitrust violation, they must take prompt and effective
17   action to terminate their participation. That is not
18   what happened here. It's clearly not what happened here.
19       We've got a number of companies and individuals
20   who have admitted, pled guilty to, paid large fines, went
21   to jail for participating in this same conspiracy, as I
22   said, all the way up until the time that the Wall Street

Page 25

1    Journal reported its existence, nine months after it was
2    discovered by the general counsel.
3        If you soft-peddle your withdrawal, or worse,
4    if you allow senior executives to continue to attend
5    meetings with competitors, to continue to conspire after
6    it's discovered by general counsel, outside counsel, the
7    board of directors, you're not eligible, please don't
8    apply. Instead, what I would implore you to do is, if
9    you have the opportunity where it's discovered first, if
10   you have an effective compliance program, or at least
11   it's effective enough that you learn about it before we
12   do, take advantage of the leniency program.
13       Do not make the mistake that Stolt made.
14   Report the conduct, protect the company, protect the
15   individuals. That's the safest and still the best bet.
16       MR. SPRATLING: John, how does the Stolt-
17   Nielsen development affect your expectations or concerns
18   or risk assessment in making the leniency decision and
19   how, if at all, will it affect the manner in which you
20   deal with the Antitrust Division?
21       MR. MAJORAS: Well, I think right now where it
22   stands, it presents some uncertainty as to how the

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 26

1  Division will react.  Clearly, we have to wait and see
2  what the Third Circuit's decision is, ultimately to where
3  it comes out.
4      My view right now is that this is a case that's
5  fairly isolated on its particular facts.  You, obviously,
6  heard Scott go through his.  I've read all of the
7  briefing, and I don't have any conclusion as to where the
8  facts come out one way or the other.  But from the
9  standpoint of advising clients and going in and what this
10 might mean, initially, when you heard about it, that
11 amnesty had been revoked, I'm sure it went in to all of
12 our compliance programs, or if you're advising a client
13 on participating in an amnesty program, this was put out
14 there as if you don't fully cooperate, then you could run
15 into the Stolt-Nielsen problem.  With respect to getting
16 better cooperation from our client, that was actually a
17 pretty good thing.  So, if the Third Circuit comes out in
18 the Department's favor, I think we'll be back to that
19 same place.
20     If it doesn't, I suppose my concern really is
21 will the Division over-engineer the problem?  In other
22 words, will it take this particular issue and come out

Page 27

1  and demand more in writing?  There was a great deal of
2  focus on that in the District Court's opinion about the
3  contractual basis of this.  And I think from representing
4  a defendant in a case, that's something you really don't
5  want to have is a lot more in the way of writing, we've
6  been trying to avoid that, and I think the Department
7  understands those concerns.
8      So, I think the real question is, what will be
9  the reaction of the Department of Justice in how it deals
10 with the decision if it comes out adverse from the Third
11 Circuit?
12     The ability to participate in programs like
13 this, sitting with the enforcement agencies is something
14 that is really a great benefit to all of us as
15 practitioners because there is this back and forth, and
16 I've always felt, when I've had to deal with the Justice
17 Department on these issues, there is a great deal of
18 understanding and back and forth and you can talk about
19 these issues, and I would hope that will still be the
20 case regardless of the way the decision comes out.  But I
21 suppose that's the area of concern I have that remains to
22 be seen.

Page 28

1      MR. SPRATLING:  Scott, with respect to John's
2  comments of the possibility of over-engineering, do you
3  anticipate making any changes in the model conditional
4  leniency letter?
5      MR. HAMMOND:  Well, first, let me say, I think
6  John's right that the District Court, in ruling against
7  us, thought we wrote a bad contract.  We don't think we
8  did.  We think the policy -- the 1998 policy was very
9  clear.  We think our letter is very clear.  Unless the
10 Third Circuit tells us otherwise, I have great faith in
11 that.
12     If, after the -- you know, after this case is
13 resolved, the resolution of this case indicates that we
14 did write a bad contract, then obviously we would
15 consider -- well, we would consider making changes.  But
16 let me just say this to you -- I haven't said this
17 publicly before, but I don't mind saying it today.  If we
18 are going to make changes to our model letter -- and this
19 is a model letter that's been in effect since 1998.
20     If we're going to make changes to this model
21 letter, I'll pledge to you -- and if I'm gone, I'll
22 remind whoever replaces me that I -- if you don't mind

Page 29

1  not making me look bad, I made this promise, but we will
2  put our model letter -- our new draft -- out in draft for
3  all of you to see before it is made final.  That way, you
4  will have an opportunity to comment on it.  We could have
5  a program similar to this where we could go over the
6  changes in the model letter or take comments from you
7  all.  It's not going to be like it's on the Federal
8  Register, but we can take 30 days or something to get
9  your feedback, because we -- obviously, we care.
10     I mean, this is excellent what we heard the
11 JFTC did.  It's obviously something that we're on board
12 with with respect to transparency and, hopefully,
13 bringing you all on board in terms of if we're doing it
14 right.  So, we haven't made changes to our model letter
15 yet.  We haven't had a problem other than the Stolt
16 situation.  If we're going to make changes, you'll know
17 about it first before it happens.  So, I hope that would
18 alleviate any concerns you have.
19     I also want to say, you know, if you have a
20 question with respect to leniency, how are we going to
21 implement the program, perhaps you're troubled by what
22 you've read in the briefs in Stolt, you can pick up the

8 (Pages 26 to 29)

Cartel Enforcement Roundtable    11-16-2005

Page 30

1  phone and you can call me and I will talk to you and I
2  will try to answer your questions on leniency. I mean,
3  it's that important to me, it's that important to the
4  Justice Department.
5      So, when you call and when the secretary will
6  not put you through to me --
7      (Laughter).
8      MR. HAMMOND: -- tell them it's about leniency
9  and I promise you you'll get a call back.
10     MR. SPRATLING: Thanks, Scott. I assume that
11 you don't intend your caveat about the pledge to indicate
12 some potential that you're leaving soon.
13     MR. HAMMOND: Pardon me?
14     MR. SPRATLING: Some potential that you're
15 leaving soon.
16     (Laughter).
17     MR. HAMMOND: No, no, no, no.
18     MR. MAJORAS: The good news is this is all
19 being recorded, too.
20     (Laughter).
21     MR. SPRATLING: Kirti, has the Commission ever
22 withdrawn immunity from an applicant for its failure to

Page 31

1  live up to the conditions?
2      MR. MEHTA: Well, first, let me say that we
3  have now, as I said, a leniency policy in place since
4  '96, and I must say, we have had very good cooperation
5  with the people who come forward. As regards this
6  situation, we had -- I think last month, the Commission
7  adopted a decision for a cartel concerning raw tobacco
8  where, in fact, immunity was withdrawn because the
9  applicant had divulged to other cartel members
10 voluntarily and prior to our investigative measures, the
11 fact of cooperating with the Commission. See, in other
12 words, the conditions that we have of the notice on
13 cooperation were not respected. But in all these years,
14 this is the first case that we had.
15     MR. SPRATLING: So, now we have a situation in
16 each of the major enforcement jurisdictions where there's
17 been one revocation for failure to follow the conditions.
18 In the situation you're talking about, which occurred
19 just last month, was a deliberate, intentional failure to
20 observe the condition in the E.U. of keeping absolutely
21 confidential your amnesty application until -- excuse me,
22 immunity application in the E.U. until relieved of that

Page 32

1  condition by the Commission, is that correct?
2      MR. MEHTA: That's right. As I said,
3  voluntarily. And as you know, in our system, when we
4  have an immunity application and then we prepare our
5  investigative measures, there is a time period and, of
6  course, it's vital for our enforcement that we are able
7  to carry out the necessary inspections without the other
8  members knowing about it because then there is no
9  evidence.
10     As it turned out, we were quite fortunate that
11 it did work out, but I think this is quite important for
12 the credibility of our enforcement in our leniency
13 policy.
14     MR. SPRATLING: Let's change the subject. A
15 European Commission study has characterized private
16 enforcement in Europe as totally underdeveloped, and
17 Commissioner Kroes has said that comprehensive
18 enforcement of the competition rules in the E.U. is not
19 complete without private enforcement and that the E.C. is
20 preparing a green paper setting out the options for
21 private enforcement within the current system.
22     Kirti, can you tell us, what's the state of

Page 33

1  that green paper and what's some of the thinking of the
2  Commission in this area?
3      MR. MEHTA: Well, the Commission -- as you
4  refer to this study -- it is actually on our competition
5  website, available to anybody who wants to download it.
6  That sets out the state of the law in the different
7  member states and the procedures, and the idea is that by
8  the end of this year, beginning of next year, we would
9  like to adopt this green paper, which first is a state of
10 situation. It then outlines a number of obstacles that
11 exist to effective private actions and also suggests a
12 number of options on how to deal with that. So, in that
13 sense, this is really a green paper. There are no
14 particular lines that the Commission itself has favored.
15     We are very much looking forward to the debate,
16 the consultation will be open very soon and we hope to
17 get a lot of input on that. Certainly, in the area of
18 cartels where, you know, you might have less reserves
19 about private action in the sense that here, cartels deal
20 essentially with very serious infringement of competition
21 rules and you don't see much efficiency in that. So, I
22 think from that point of view, this is a particular area

9 (Pages 30 to 33)

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 34

1  where we look forward to input.
2      MR. SPRATLING:  And are those your personal
3  views as well?
4      MR. MEHTA:  Yes, I certainly agree that private
5  action will be an additional deterrent.  This is a
6  deterrent to, let's say, cartel formation because it
7  doesn't affect the -- hopefully, the defection and
8  reporting, which is what we try to increase the
9  incentives for.  And, certainly, it will also mean that
10 those who implement corporate compliance programs and it
11 will have some real seriousness about it because they
12 face additional liabilities on top of the fines that the
13 public enforcement brings to them.
14     MR. SPRATLING:  As we all know, private treble
15 damage exposure in the United States is enormous; in
16 fact, potentially crippling.  So much so that it is
17 nearly always a critical factor in a company's decision
18 to self-report and something that is discussed at some
19 great length with the board and the general counsel.
20 Nowadays, there are regularly 70, 80 and 90 private suits
21 filed in the wake of major DOJ investigations and
22 prosecutions.  In fact, in a matter that I was involved

Page 35

1  in, there were 90 private lawsuits filed in a Grand Jury
2  investigation where no charges were ever brought.
3  John told me earlier today that in the Vitamins
4  litigation, there were 200 private lawsuits filed in that
5  matter.
6      In addition to that, in recent years, the
7  defendants in those matters of civil litigation have
8  ended up paying more in private treble damage settlements
9  than they paid in fines in government actions in the
10 United States and the E.U. and Canada and all other
11 jurisdictions combined.  So, it is just major exposure.
12 We have growing numbers of civil actions in Canada.
13     Last year, there was a new consideration added
14 to the risk assessment in the civil litigation area with
15 the enactment of the legislation that limited the
16 exposure of an amnesty applicant that cooperates with the
17 private plaintiffs to single damages with no joint and
18 several liability.  Now, in addition to that development,
19 we have the prospect, at least, of civil litigation in
20 Europe.
21     John, against that background and with these
22 two developments, how does all of this affect the

Page 36

1  company's assessment of whether to self-report and to
2  seek amnesty?
3      MR. MAJORAS:  In case you haven't noticed the
4  pattern here, Gary's questioning to me will all be adding
5  one more straw until I eventually fall into full
6  depression.  So, we'll see if we get there on this one.
7      (Laughter).
8      MR. MAJORAS:  I would say I'm not used to being
9  surrounded by enforcement agencies, but I feel right at
10 home both literally and figuratively, so it's not a
11 problem.
12     (Laughter).
13     MR. MAJORAS:  I think there's no doubt that --
14     MR. SPRATLING:  For those that are listening in
15 the telecast, John is sitting between Scott and Kirti.
16     MR. MAJORAS:  And my wife, the Chairman of the
17 Federal Trade Commission, is across the row from me.  So,
18 no pressure here.
19     (Laughter).
20     MR. MAJORAS:  I think the -- clearly, as your
21 question implies, to say it politely, this does add an
22 additional layer of concern when you go into an amnesty

Page 37

1  program.  Frankly, when you're assessing with your
2  clients whether to participate in an amnesty program,
3  it's really a risk assessment.  What are the facts?  What
4  happened?  What is the likelihood that if nothing is done
5  there will actually be prosecutions?  What is the
6  likelihood that someone else may come forward and
7  participate in the leniency program and drag you into the
8  investigation anyway and you've lost the ability to
9  benefit from those programs?
10     Here, you've added one additional risk factor
11 that conceivably falls in the column of reasons not to go
12 into the amnesty program.  That by -- certainly, once you
13 go into an amnesty program or get involved in an
14 investigation, the civil suits will follow, and the civil
15 suits, often, only have one factual allegation and that
16 is that you reported that you are participating in an
17 amnesty program.  That's enough to get the civil lawsuits
18 going.
19     So, clearly, it could, I think in the close
20 cases and also depending on what risks you face in Europe
21 and what type of private enforcement there will be, will
22 it be some type of collective action, will it simply be

10  (Pages 34 to 37)

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 38

1  actions primarily by direct purchasers?  All of these
2  issues are discussed and will be discussed in Europe, and
3  how that eventually comes out will affect how big that
4  additional layer of risk is when you're advising a client
5  whether to essentially open up the doors, not only in the
6  enforcement arena, but also in the civil arena.
7       MR. SPRATLING:  Let's change the topic from
8  civil to criminal.  The U.S. Department of Justice has
9  imprisoned a large number of foreign nationals in recent
10 years for U.S. antitrust violations.  Scott, what's your
11 enforcement strategy for obtaining jurisdiction over and
12 prosecuting foreign nationals?
13      MR. HAMMOND:  Well, we have to hold foreign
14 nationals accountable so that John's clients cannot do
15 that sort of cost benefit analysis that he just
16 described.  I mean, if the client is weighing how much
17 it's going to cost me if I go in, what's it going to cost
18 me if I don't, and it's all about dollars and cents, then
19 we're in trouble.  But you can't put a dollar figure on
20 somebody's liberty, and so, we will put foreign nationals
21 in jail and use every means available to us to do so when
22 they're involved in international cartel activity and

Page 39

1  when they're not taking advantage of the leniency
2  program.
3       There has to be -- that has to be the case and
4  it has to be the case that John's clients have to
5  appreciate that the reality is those -- whether it's 80
6  or 90 or 200 lawsuits, they're going to happen no matter
7  what.  We're going to find out about this no matter what.
8  And the only question is whether or not the executives
9  are going to go to jail for it and whether the company is
10 also going to pay a high criminal fine.
11      And I think because of the success we've had,
12 not just in creating a very attractive leniency program
13 that folks are taking advantage of quite regularly, but
14 also the success that we have had in terms of rolling one
15 investigation into another, has really sent home the
16 message -- see, we do have some messages we like to send
17 -- sent home the message that we're going to find out
18 about it either way.
19      Half of our investigations -- half of our
20 international investigations are born out of a completely
21 separate investigation.  That means over 50 percent of
22 the time when we open up an investigation, we're going to

Page 40

1  roll that into a second investigation, and that's usually
2  done through the Amnesty Plus Program and that usually
3  ensnares -- almost always ensnares other companies and
4  other individuals.  Folks realize that, so we get amnesty
5  applications coming to us because they realize and they
6  have read, we're investigating somebody on Product A.
7  Well, they conspired with them on Product B.  They don't
8  want to sit around and wait and see if that company takes
9  advantage of Amnesty Plus.  They're going to beat them
10 in.  So, we get amnesty applications like that.
11      So, our strategy, of course, is to raise the
12 stakes for foreign nationals, and we have been very
13 successful.
14      Prior to 1999, there were two foreign nationals
15 who served time in prison in cases prosecuted by the
16 Antitrust Division.  There were two Canadians back in
17 1992.  Since 1999, we have put 20 foreign nationals in
18 jail from nine different jurisdictions.
19      We have, unfortunately, probably an equal
20 number of international defendants who are fugitives.  We
21 are doing everything we can to bring them back to the
22 United States and give them their day in court.  We do

Page 41

1  that a number of different ways.  We have border watches,
2  we have -- we can use sealed indictments and so forth, we
3  can arrest them if they do come into the country.  We put
4  them on Interpol red notice watches.  That's the highest
5  notice watch that Interpol carries and it allows us to be
6  able to track, detain and, hopefully, extradite
7  international fugitives back to the United States to face
8  antitrust charges.
9       Gary mentioned at the beginning, we're in the
10 process of trying to extradite Mr. Ian Norris back to the
11 United States.  Three of his subordinates, including a
12 U.K. executive and a Dutch executive have already served
13 time in a U.S. prison for a crime that he has alleged to
14 have orchestrated.  We would very much, as I said, like
15 to give him a chance to have a day in court here and
16 we're doing everything we can to bring him back.  The
17 U.K. Government won the first round and, hopefully, when
18 he has exhausted his appeals, we will have a trial here
19 in the U.S. involving Mr. Norris and we'll have our first
20 extradition.
21      So, those are among the strategies that we're
22 using, Gary.

11  (Pages 38 to 41)

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

1    MR. SPRATLING: John, from a defense
2  perspective, what does the DOJ's move to extradite Mr.
3  Norris or other defendants mean for your clients' risk
4  assessment and developing a strategy and how to respond
5  to international cartel exposure?
6    MR. MAJORAS: Well, I don't think it's a
7  surprise. Clearly, if you look at the enforcement
8  against individuals over the last number of years, no one
9  in the DOJ has made it a secret that they would like to
10  have -- and find it as important, as part of the
11  enforcement program, to go after individuals rather than
12  just companies. So, certainly, if you're advising a
13  client in a situation where you perceive a problem, Scott
14  is absolutely right. Personal liberty is not something
15  where you can easily put a price tag on it and it
16  obviously gets people's attention right away. So, in
17  that case, it's a very effective enforcement tool by the
18  DOJ.
19    I think that it's also very important, perhaps
20  even more so, in counseling clients in the compliance
21  programs. I'm sure those of us who provide compliance
22  programs all have our slide or two showing what the most

1  recent average stay in jail is for -- in prison is for
2  people who have committed violations, how many people
3  have been brought overseas and how much easier it's
4  becoming over time.
5    You also have to talk to your client merely
6  about the impact it might have on their business. If you
7  are dealing with high-ranking executives at a client who
8  may be at risk of border stops or extradition, in the
9  extreme case, then that's going to have a significant
10  impact on how well your client can continue to conduct
11  business, and that's something that hits home very
12  clearly when you're talking to clients in compliance
13  programs.
14    I think the concern that a lot of people
15  have -- it's one that I have from time to time, too -- is
16  whether at times there's almost too much zeal in going
17  after individuals, and that's something that I think
18  everyone's going to look at. You can only really assess
19  on a case-by-case basis as to whether it's the -- because
20  it is the goal of the DOJ to really be able to put people
21  out there and say, look what we can do, whether certain
22  people are being prosecuted with as much of that goal in

1  mind as to what that individual actually did in the
2  matter at hand.
3    I'm not going to say I have a great concern
4  about that. It's not something where I've really
5  encountered that and said, you're totally being unfair or
6  inconsistent in how you're applying the program, but I do
7  think that is an issue that all of us are going to be
8  watching over time to see where that stands because, as I
9  said earlier, there is a pretty good cooperation among
10  the private bar and the enforcers in knowing what's going
11  on and how things are being done. If you see something
12  where it's tipping too far in the other direction, that
13  is a concern that you have over time.
14    MR. SPRATLING: As I mentioned in my
15  introductory remarks, the European Commission is
16  beginning to study the possibility of plea bargaining, a
17  long-established practice in the United States and
18  Canada, but one that's still conceptual in the European
19  Union.
20    Kirti, what is the Commission's current
21  thinking with respect to the pluses and minuses of plea
22  bargaining? What challenges does the Commission face in

1  instituting a reform that's -- I guess it's not exactly
2  like plea bargaining in the United States, but something
3  like it, and I think you'll explain what the differences
4  are?
5    MR. MEHTA: Yeah, that's right. Commissioner
6  Kroes in a breakfast speech earlier this year referred to
7  direct settlements as a way of being able to deliver
8  swift enforcement with timely sanctions. So, I think
9  essentially if you look at our situation, we start a case
10  with an inspection following immunity application, and it
11  takes normally for our proceedings between two to three
12  years.
13    Now, a good indicator to at least companies is
14  what is the detection rate of an authority. You become
15  very credible the higher the detection rate you have.
16  And one of the ways is, of course, by doing regulated
17  decisions. You bring to close a cartel and you do
18  decisions with fines and letters, tremendous impact, and
19  we are, of course, as the Commissioner said, quite
20  interested to be able to deliver swift enforcement.
21    At this stage, I think we are at the very early
22  stage of reflection. The first question is, under our

Cartel Enforcement Roundtable    11-16-2005

Page 46

1  current regulation one, is it possible to have such a
2  system?  And, of course, if not, then we would have to
3  change the basic legislative framework which would take
4  some time.  Clearly, if we change the framework, you have
5  other options that you could introduce whereas currently,
6  as the regulation stands, I believe we do have
7  possibilities for introducing a streamlined proceeding, a
8  less elaborated final decision for cases addressed to
9  parties who, at an early stage, the parties accept surely
10 because they know from their own internal audit and from
11 what the Commission has got as a skeleton of its case,
12 quite in detail what is the geographic and product scope
13 of the cartel, how it works, what's involved and so on.
14 You know, the usual concrete questions.  On that basis,
15 they could make a decision to agree.  This is what we
16 have to work out in the practicalities of this procedure.
17      It would, in the context of our parallel
18 approach on private actions, of course, the Commission
19 would favor an infringement decision.  An infringement
20 decision, of course, has the impact as follow-on civil
21 actions can take place.  You should do a no-infringement
22 decision that might be, perhaps, more acceptable to some

Page 47

1  companies, but I think you would not have the same impact
2  as regards private action, which we are also a strong
3  supporter of.
4      So, these practical aspects, we are working
5  with our colleagues in the ECN and how far we can use
6  this tool of anti-cartel enforcement.  I think the
7  pluses, it's the usual pluses that you mentioned in I
8  think many companies, but we shall hear from John how
9  they would see it.  Certainly, when I've listened to
10 companies here, they say it's very good to know.  If you
11 know initially very clearly the worst case liability for
12 us, have a good idea of that, and to bring the process to
13 an end.  Usually, they have done a very good internal
14 inquiry, and so, they know extremely well whether our
15 case is good or not.
16      I think the main minus that would come to mind
17 would be that you would not like to undermine incentives
18 for companies to come forward with good evidence.  You
19 know, we don't want them to simply sit back and wait
20 until you start to offer to everybody that settlement,
21 because we would certainly like to maintain to do all the
22 elements for a case that would make a decision, because

Page 48

1  that is finally the most important tenet or, you know,
2  compelling aspect of it for companies because if not, we
3  will continue to do a decision and we may have to, for
4  those who do not accept, and that decision has to stand
5  and so this is something that we are, as I say, looking
6  at it.  The Commissioner has given us the -- let's say,
7  the encouragement to look at the practicalities and
8  discuss with colleagues in the competition network.
9      MR. SPRATLING:  I know that your look at this
10 is still very preliminary, but one thing I understand
11 actually from you that I think would be interesting to
12 the audience is that what you're looking at in terms of
13 the -- this direct settlement, which is your functional
14 equivalent of our plea agreement, is that the party would
15 actually -- there would actually be an infringement
16 rather than it be a contract, settling it, so that the
17 infringement could be used by those seeking damages in
18 the event that you develop that type of a system.  So,
19 there's that type of integration going on in your
20 thinking with respect to both plea bargaining and the
21 civil damage litigation, is that correct?
22      MR. MEHTA:  Yeah, as I said, currently, you can

Page 49

1  only make in our regulation Article 7 decisions which
2  are, what we call, infringement decisions.  Under Article
3  9, if you make a decision, you cannot have fines.  So,
4  you have to use a different word.  But you would have to
5  change the legislative -- the regulation to introduce a
6  possibility for having a decision with fines.  Also, for
7  other reasons, you would like to work towards
8  infringement decisions because, as I said, they have a
9  favorable impact on supporting private actions.
10      And by the way, I think private actions are
11 anyway taking place.  The risk is there anyway.  In
12 different member states, they are at work.  And I think
13 increasingly that will take place anyway.  So, for those
14 who assess the risks, they have to start counting on it
15 now in any case.
16      So, the only thing that this would change is,
17 as I said, it would be a faster proceeding.  And, of
18 course, if you make a decision which is less elaborate
19 and less -- you know, short form, that may mean you have
20 a risk, but perhaps less risk than today where even for
21 the immunity applicant, we make a decision which is, you
22 know, a full decision addressed to that party, even

Cartel Enforcement Roundtable    11-16-2005

Page 50

1 though they don't pay fine.
2     MR. SPRATLING: John, if you were able to rely
3 upon the greater certainty and predictability that one
4 typically associates with plea agreements, although in
5 this case, direct settlements, how would that affect your
6 ability to advise your clients in making the types of
7 decisions we're talking about here?
8     MR. MAJORAS: Well, clients always want to know
9 when things will happen, what it will eventually mean and
10 they want you to give them a 99 percent accuracy at the
11 time they ask a question. So, at any time you --
12     (Skip in recording.)
13     MR. MAJORAS: -- certainty into your advice,
14 that's obviously going to be a good thing. I certainly
15 applaud and encourage the efforts to look into direct
16 settlements in the E.U. I think that the experience that
17 we've had in the United States in negotiating pleas has
18 been a very productive one, both in terms of efficiency,
19 use of resources and what a great public policy guy I am.
20 So, I think we can have that same type of result if they
21 were to move in that direction in Europe as well.
22     The key thing is, obviously, going to be what

Page 51

1 are the trade-offs? What can you get by coming in
2 earlier and trying to negotiate something versus dragging
3 out the process? I think the expectation of most people
4 is that defendants want to drag out the process as long
5 as possible and avoid the pay-out. I don't think that's
6 always the case. I think often it's let's put this
7 behind us, let's go back to doing our business, so there
8 is some incentive to getting it done early.
9     I also think there are things other than what
10 the bottom line cost of the fine will be. Obviously,
11 that's very important. But as Kirti just talked about,
12 being able to influence what the final writing will be
13 that will come out with respect to your client is
14 critical. If you have to go through the process of the
15 Statement of Objections, you could try to then object to
16 the objections. Hopefully, that gets heard and maybe it
17 will get changed. But being in a direct face-to-face
18 negotiation on those types of issues, I think, can only
19 help the process. From the Commission standpoint, I
20 would think they would find it more efficient.
21     That's essentially what we do here in the
22 States with the process of negotiating what the plea will

Page 52

1 actually be, being able to negotiate what will be done in
2 terms of sentencing reports and things of that nature.
3 All those are very important, especially as you think
4 about what the follow-on litigation will look like.
5     So, I think it's a great idea, and I'll say
6 that as often as I can so Kirti may take that home with
7 him.
8     MR. SPRATLING: Scott, any quick thoughts on
9 any direct or collateral consequences if the E.U. were to
10 go to a direct settlement type of system?
11     MR. HAMMOND: Well, you know, I mean, if John
12 thinks it's a great idea, it's good for us.
13     (Laughter).
14     MR. MAJORAS: This is being recorded.
15     MR. HAMMOND: It is, it is. I mean that. You
16 know, I do look at this as win-win. We have --
17 certainly, in my experience, just as John said, they want
18 -- his clients want certainty, they do want immediacy,
19 they want to put this matter behind them and they very
20 much are interested in doing it in a way that would limit
21 the amount of information that goes in the public record.
22     Well, we do things differently than the E.U.

Page 53

1 currently right now because of our ability to do plea
2 bargaining, and frankly, we do things differently than
3 most Federal prosecutors. And by that, I mean, we do C
4 agreements. We routinely, in international cases, enter
5 into C agreements, which you won't find done in most
6 prosecuting offices around the world. In fact, when we
7 do it in many districts, they tell us they haven't seen
8 one of these in a long time. But we do it because it
9 provides certainty to the company.
10     We, also, routinely in these agreements, allow
11 the company to ask for immediate sentencing, waiving pre-
12 sentence reports, so that arraignment and sentencing can
13 take place on the same date. That's something I don't
14 think you see much outside of the Antitrust Division.
15 And, of course, then we have very little information
16 going in the public record, which all three of those
17 things are in our advantage as well. We want certainty.
18 With certainty, we can guarantee proportionality across
19 matters. With immediacy, we can create momentum in our
20 investigations. And we're not interested in putting a
21 lot of information in the public record because, again,
22 we're talking about plea agreements in an ongoing

depo@ftrinc.net    For The Record, Inc.    301-870-8025

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 54

1 investigation, and so, we're fairly guarded in that
2 respect as well.
3        So, you are looking at a situation here in
4 which there is mutual interest and why it can be an
5 incentive for the company to come forward in this manner.
6 So, if the Europeans can pull this off, and obviously,
7 they have a number of institutional challenges to
8 overcome, it's going to be good for them and that means
9 it's good for us.
10       MR. SPRATLING:  Let's turn to our final topic,
11 international cooperation.  I know it's always of
12 interest to non-enforcers and, I guess, in particular,
13 perhaps ex-enforcers, as to what the enforcers are
14 currently doing in all of these fora in which they now
15 get together to work cooperatively with one another.
16       Scott, I know that you recently attended a
17 meting of public prosecutors at the OECD, and this
18 weekend, you just came back from the latest meeting of
19 the International Competition Network in Seoul.  Can you
20 just, to the extent you can without breaching
21 confidentiality, open up and share with us some of the
22 things that have been discussed in those meetings?

Page 55

1        MR. HAMMOND:  Sure.  We have been very busy.
2 This is actually the ninth speech I've given in the last
3 four weeks, and most of it has been abroad.  As Gary
4 mentioned, at the OECD, we had an extraordinary session
5 several weeks ago where, for the first time ever, we
6 brought public prosecutors into the Working Group III
7 meeting, which is usually just, and has been, competition
8 officials and the occasional BIAC member who appears.
9        This time, we invited prosecutors from the OECD
10 member countries, 12 appeared, and we had a full-day
11 session in which, frankly, this was an "indoctrination"
12 process.  We -- I began by showing them the Lysine tapes
13 to set the stage in terms of why it's important to look
14 at this conduct as any other economic crime that they
15 investigate -- and most of these public prosecutors were
16 coming from economic crime or fraud sections.
17       We then talked about strategies in terms of how
18 competition authorities and public prosecutors can work
19 more closely together.  We talked about areas that need
20 significant improvement, and we developed relationships
21 that didn't exist before.  This is an audience, I can
22 tell you, that we here in the United States, and other

Page 56

1 jurisdictions as well, are going to be targeting.  We're
2 going to bring them into the ICN, we're going to bring
3 them into the OECD, we're going to have bilateral
4 conversations with them.  We very much would like to see
5 public prosecutors -- and by that, we're talking about
6 Federal prosecutors in countries where criminal -- where
7 antitrust conduct is criminal, but isn't necessarily
8 being prosecuted yet.
9        At the ICN, which was last week in Korea, this
10 is -- for many of you, I just want to mention, this is
11 the seventh cartel workshop of enforcers, but many of you
12 probably attended the first workshop, although it didn't
13 fall under the umbrella of the ICN.  If you remember back
14 on September 30th and October 1st of 1999, the Antitrust
15 Division hosted the first international cartel workshop,
16 and you were all invited for a luncheon session.  I know
17 that there are a number of people in the room who were
18 there for that.  That was the inaugural workshop.  And
19 since then, there have been six more, and Korea, as I
20 said, hosted the last one.
21       We spent three days in the workshop.  A full
22 day-and-a-half of that was devoted to electronic

Page 57

1 discovery.  This is an issue that all enforcers across
2 the globe understand to be very significant.  We want to
3 get high on the learning curve and we want to be effective
4 in searches, in particular with respect to gaining access
5 to electronic information.  The Antitrust Division's
6 Director of Criminal Enforcement, Marc Siegel, was the
7 co-chair of that aspect of the conference and has been --
8 certainly is a leading figure in that area.
9        We also led -- that is, the United States led
10 discussions on leniency and obstruction.  I'll say
11 something to you about obstruction and then I'll stop.
12 I'm going to tell you what I said to the enforcers in the
13 room -- and I don't know if I mentioned this, there were
14 enforcers from 38 different countries that attended this
15 workshop -- and that is, collectively, as enforcers,
16 currently, we're failing.  We're failing with respect to
17 protecting the integrity of our investigations.
18       Outside the United States, there have been
19 very, very few prosecutions for obstruction, whether it
20 be false statements, perjury, document destruction,
21 witness tampering.  You would be amazed, I believe, if
22 you saw the number of countries out there that have the

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 58

1   ability -- have in their books, their criminal statutes,
2   the ability to prosecute this sort of obstructive
3   conduct, but it's not taking place.
4       So, we talked about it in Sydney, we talked
5   about it at the OECD when the public prosecutors were
6   there, and I challenged them, and we talked about it --
7   we spent a good deal of time talking about it in Korea.
8   This is an area where the enforcers have got to be more
9   vigilant. We have to protect the integrity of our
10  investigations. I can assure you that we are exporting
11  the tools and techniques and strategies that we use in
12  order to help these other jurisdictions get a leg up on
13  this, and I hope that you will see the fruits of some of
14  that going forward.
15      MR. SPRATLING: Thank you. Kirti, the ECN which
16  you mentioned, the European Cooperation Network is a very
17  different organization than the ICN that Scott's just
18  been talking about. Can you compare those organizations
19  and tell us about the type of cooperation that you have
20  the benefit of in the European -- in the ECN?
21      MR. MEHTA: What we call the European
22  Competition Network is the network of all the national

Page 59

1   competition authorities. We have 25 plus the Commission,
2   so 26 authorities in this network, and we applied
3   especially for cross-border agreements concerning the
4   practice of cartels -- cross-border cartels. We are
5   applying the same local -- Article 81 of the Treaty.
6       Within that network, as soon as you mentioned,
7   19 member states have leniency programs. And let me say
8   in the first place that the ECN network notice -- we have
9   a notice on the work in that network -- specifically
10  safeguards leniency-related information. So, leniency
11  applicants' position is, in no way, weakened in the ECN
12  enforcement regime that's been in force since the 1st of
13  May, 2004.
14      Now, I think -- so, that's one difference.
15  Secondly, of course, in the network, there is always --
16  the Commission can always take a case if another
17  competition authority does not want to proceed with that
18  case. But I think if you -- the idea of the network is
19  to work on a coordinated way with consultation. And as
20  regards, for example, our cartel investigations, we have
21  a lot of support from the national authorities because
22  they are the ones who help us do the inspections and so

Page 60

1   on.
2       Now, one of the issues that comes up is who
3   does what. This is an issue that I think a question is
4   raised always. Essentially, a cartel which is Europe-
5   wide, it covers several member states, this is the kind
6   of cartel that we would, as the Commission, investigate.
7   We still have 20 percent of our cases which are what we
8   call ex officio, so there was no leniency or immunity
9   applicant we had from whistle blower or from our market
10  monitoring may have started case -- significant cases.
11  And if they are Europe-wide, then we would, of course,
12  proceed this case. We would have the support of the
13  ECN and they would know -- the network knows who is doing
14  the case.
15      Clearly, when you also have immunity
16  applications, there is a tendency that we note that they
17  come to the Commission because they want the Commission
18  do a case and they tend to put down, in very imprecise
19  terms, that this is a Europe-wide cartel. You must
20  really look at this. Of course, sometimes it's true, but
21  often you find that it may be look limited, a very
22  geographically limited cartel, in which case, of course,

Page 61

1   we need to see which is the most efficient way of doing
2   this investigation. It may not be the Commission.
3       So, we always advise applicants for immunity to
4   -- well, come to us, but also to go to the other authorities
5   and it's, in fact, quite interesting when you ask them,
6   where else have you been, and if they've not been
7   anywhere else, you say, well, why not? If you think this
8   is Europe-wide, why have you not gone there? And
9   that usually is quite a very informative response.
10      (Laughter).
11      MR. MEHTA: But we are further -- I will say
12  the ECN and many of the members, in fact, all of them are
13  also within the ICN and also come to OECD. So, they are
14  taking part in both these networks, playing their role in
15  the enforcement that Scott described. And I'm sure
16  furthermly, the ICN does many activities that don't
17  duplicate ours. For example, this electronic discovery
18  is a very big issue for all of us and it's very good that
19  it's being done in ICN.
20      My final remark is that, yes, this is a network
21  for anti-cartel enforcement. That is the purpose of it.
22  Of course, as you mentioned, there are other cases they

depo@ftrinc.net    For The Record, Inc.    301-870-8025

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 62

1  may do, monopolization, et cetera, and the idea is
2  efficient allocation of resources. But we are also
3  working -- as the Commissioner announced, that we would
4  like to try and find a way to have a more uniform system
5  and to take on changes so that the leniency programs are
6  much more close to each other with the result that we
7  could do something else, not only as simple as solution
8  to the multiple filing, because it's not the intention to
9  have unnecessary burdens.
10        It's true that leniency programs work by giving
11  incentives to defect and even more incentive to report,
12  and you add to it the race. The race is always very
13  important. And if you have to file it several -- because
14  the cartel is wider, it's very useful information for us
15  to say that. But, certainly, we would like to find ways
16  to make it work even more efficiently and not have the
17  unnecessary burden of filing.
18        MR. SPRATLING: John, in one of your earlier
19  answers, you said that with my questions, that I kept
20  adding more and more to the burden of your explanations
21  of what to do as defense counsel. But I think Scott and
22  Kirti have taken care of that this time.

Page 63

1        Defense counsel traditionally have had to worry
2  about MLATs and antitrust cooperation agreements as
3  methods of cooperation between competition law
4  enforcement authorities. And now, we hear about public
5  prosecutors fora at the OECD, the International
6  Competition Network, the European Competition Network,
7  and we also hear about, from all sources, what appears to
8  be an unprecedented eagerness to cooperate among
9  enforcement authorities.
10        What does all that mean to your decision-making
11  with respect to how to handle international cartel
12  exposure?
13        MR. MAJORAS: Let me first ask the guys next to
14  me to stop smirking.
15        (Laughter).
16        MR. MAJORAS: I mean, if I were going to be
17  looking into cartels, I'd start looking into these
18  meetings of prosecutors to see if we could get to the
19  bottom of this.
20        (Laughter).
21        MR. MAJORAS: It's the classic two-edged sword
22  in a lot of respects. I think that going back to -- one

Page 64

1  of the things I've mentioned repeatedly is trying to get
2  some certainty in the process. That's what your clients
3  are looking for when you're advising them on these types
4  of matters. And so, to the extent that these
5  organizations are adding to both the transparency of the
6  different programs and the certainty of how to go into
7  the programs without getting crosswise with one of the
8  others, that's certainly a very good thing. And so, I
9  look at those efforts and say, that probably helps me in
10  my practice.
11        On the other hand, as these various enforcement
12  agencies and the laws allowing enforcement of competition
13  violations expand globally, you're adding more and more
14  parties to the table. So, I mean, I can -- right now, I
15  have a pretty good idea of how the E.U. or the E.C. and
16  the DOJ interact with each other on investigations. We
17  have a pretty lengthy history of that. I have a pretty
18  good understanding of how the different agencies work
19  together.
20        Similarly, I have that with Canada, which has
21  had an enforcement policy for some time, although I will
22  say it was probably only within the last five to six

Page 65

1  years that even that relationship has cleared up where
2  you don't run into a situation where you're talking to
3  the DOJ on one hand and saying, okay, only talk to us,
4  yet on -- when you go and talk to the Canadian
5  authorities, well, why didn't you come to us earlier?
6        That's a situation I've run into in the past.
7  I think that has corrected over time in large part
8  because the enforcement agencies have recognized the
9  problem, themselves, and recognized that's only going to
10  help their programs to smooth that type of interaction
11  out. It still exists, though.
12        I think, again, a real simple example is
13  because in the E.U. the primary method of investigation
14  is the dawn raid, so much secrecy has to go into once an
15  investigation is started and once the dawn raid can get
16  geared up and coordinated. It seems like it can take a
17  long time to get there. So, there's a great emphasis
18  when you're talking to the Commission about keeping all
19  this confidential so you're not tipping off people to go
20  and destroy documents or whatever they might do before
21  the dawn raid comes.
22        On the other hand, you might be also in before

Cartel Enforcement Roundtable    11-16-2005

Page 66

1  the DOJ, and the DOJ says, great, thanks for coming in,
2  let's bring witnesses over as soon as you can and you run
3  the risk that you're now even exposing within your own
4  company the fact investigations are ongoing. Now, there
5  are ways to get around that and usually the way, again,
6  is through discussions with the enforcement authorities.
7  They recognize when these problems come up and they also
8  recognize it's not to their benefit to have these
9  conflicts out there.
10      But they do exist. You have to be aware of
11  them. You have to understand what it might mean when you
12  approach different agencies, how you time your approach
13  to different agencies. But the bottom line to all of
14  this is, as you see the greater and greater cooperation,
15  when you provide the advice to your clients, if there is
16  a problem about whether to participate in a leniency
17  program, even as a second or a third participant, it's
18  very easy to lay this out and say, look, the cards are
19  stacked against you, there's really no doubt about that.
20      And the fact that you have this cooperation,
21  which is even greater over time, means if you think
22  you're going to get away with far-flung cartel activity

Page 67

1  and you think you're going to be able to isolate where it
2  comes up or you're going to be able to keep this hidden,
3  it's not going to happen. That's the kind of advice
4  that's usually pretty easy to give. It's even easier now
5  when you can point to these types of efforts that the
6  different agencies are going through in cooperation. So,
7  it's very chilling.
8      MR. SPRATLING: Thank you, John. Scott, did
9  you have any follow-up comment with respect to the
10  cooperative efforts between the enforcement agencies to
11  avoid the types of conflicts that John was referring to?
12      MR. HAMMOND: Yes, and John alluded to it. You
13  can make it our problem. So, I mean, John has described
14  a situation where the staff that you're talking to in the
15  E.U. is saying, we don't want you to do anything. Now
16  that you've told us about it, we're going to get ready to
17  do some dawn raids. In the meantime, tell no one, do
18  nothing, don't even tell your own people. And then he
19  suggested on the U.S., there is a request to talk to
20  people to start looking at some documents. You
21  communicate that conflict to the staff.
22      We will work -- and then you can communicate

Page 68

1  that this needs to be something you all need to work out
2  and we will work it out, and we do routinely work it out.
3  And the way we work it out is to decide who's going to
4  take the lead in this area.
5      There's always going to be one jurisdiction
6  that has a little bit greater interest. Often, actually,
7  it's the European Union that we would defer to. So, if
8  we're looking at a conspiracy that we think is
9  Eurocentric and where the likelihood of obtaining good
10  documents is likely to be in Europe, then we will back
11  off and we will let the E.U. strategy take the lead,
12  which is they're putting a lot of eggs in the basket of
13  doing those searches and we will not require the company
14  to do anything then that will jeopardize their ability to
15  be successful. So, we'll still do simultaneous raids,
16  but we won't -- it will be the E.U. design and the E.U.
17  strategy that will take the lead. I think that happens
18  actually more than us getting our way in terms of how we
19  would like to do things.
20      So, make it our problem, it doesn't have to be
21  your problem.
22      MR. SPRATLING: John?

Page 69

1      MR. MAJORAS: Just a real quick follow-up. I
2  think one of the issues you have to -- in advising
3  clients and looking at the landscape of enforcement to be
4  looking at is, as more and more countries and
5  jurisdictions get involved in enforcement decisions, do
6  you end up with certain agencies that want to make their
7  mark; in other words, that want to get out in front, that
8  have a certain prosecutorial zeal that could get in the
9  way of these areas. So, there again, I think that's the
10  double-edged sword.
11      I'm actually happy to see that there was more
12  cooperation among the agencies because I think they're
13  the ones that are going to be able to direct that problem
14  better than I can address it, once I go in in an amnesty
15  program and say, look, these are all the problems I face.
16  Once you're in there, you're a little bit at -- not even
17  a little bit, you're at their discretion quite a bit.
18  So, it is good to have these types of gatherings and
19  information sharing.
20      MR. SPRATLING: There's more we'd like to talk
21  about, but we're cutting ourselves off in order to both
22  give you folks some questioning time and the CLE

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 70

1  requirement for our telephone audience requires that
2  there be a Q&A period, although they get to also submit
3  questions to us on the web, which we have to answer in 16
4  days, something I didn't know I was signing up for when I
5  agreed to do this.
6      (Laughter).
7      MR. SPRATLING:  But in any event, questions
8  from the audience here, the live audience?  Yes, sir?
9      UNIDENTIFIED MALE:  Scott, what do you insist
10 on in terms of seeing that the illegal activity has been
11 stopped and (inaudible) your need?
12     MR. SPRATLING:  I'm required by the CLE
13 requirements to repeat the question.  The question is to
14 Scott, what does the Department of Justice insist upon in
15 terms of evidence of illegal activity has stopped?
16     MR. HAMMOND:  That's a good question, and I'm
17 sure that others in the room probably have the same
18 concern:  that is, what if we represent a leniency
19 applicant and it's a multi-national company and that
20 company comes in and reports the conduct?  Also, what if
21 it then happens is we have, say, a trader or an executive
22 over in Hong Kong who doesn't get the message to

Page 71

1  terminate his communications with competitors and he
2  continues to talk to his counterpart after the amnesty
3  application has been made, is the Antitrust Division
4  going to say, you're out because we've found evidence
5  that one of your employees has continued to conspire?
6      We're not going to play gotcha.  As I said,
7  we've been doing this for 12 years.  We haven't kicked
8  anybody out before or after Stolt, and it's been a couple
9  years now since Stolt came in.
10     So, I just urge you to take a look at what the
11 facts are in this case and satisfy yourself that they're
12 so egregious that this -- they're so egregious and were
13 you to represent a company in terms of -- and found out
14 that the company had the issues that were identified by
15 the general counsel.  Look at the steps that were taken,
16 and more importantly that were not taken, by this company
17 and ask yourself if you think it would have passed a
18 litmus test.  I assure you that everybody in this room
19 would think that this did not -- was not effective in
20 terms of terminating the conduct.
21     UNIDENTIFIED MALE:  A follow-up (inaudible).
22 Do you require evidence of affirmative withdrawal from

Page 72

1  the conspiracy?
2      MR. HAMMOND:  Well --
3      MR. SPRATLING:  The follow-up question is, do
4  you require evidence of affirmative withdrawal from the
5  conspiracy?
6      MR. HAMMOND:  Our preference is you can achieve
7  withdrawal by coming in and reporting the conduct to us.
8  So, I mean, that is our preferred method of withdrawal.
9  You detect it, you come in and tell us about it, and
10 communication to the Justice Department would constitute
11 withdrawal.  So, that's the way we would like you to do
12 it.
13     MR. SPRATLING:  Phil?  Phil Proger?
14     MR. PROGER:  (Inaudible) I think the
15 (inaudible) explains the follow-up question (inaudible).
16 (Inaudible).
17     (Laughter).
18     MR. PROGER:  (Inaudible) question of the panel.
19 Have you encountered any instances where the amnesty
20 applicant in retrospect overstated (inaudible) and, if
21 so, what are the consequences of that?
22     MR. SPRATLING:  The question from Phil Proger

Page 73

1  is, have you encountered -- to the panel, have you
2  encountered any instances where the amnesty applicant
3  overstated what it was able to deliver and, if so, what
4  have been consequences?  You want to start, Scott, and
5  then we'll go to Kirti.
6      MR. HAMMOND:  Okay.  I have to say that -- and
7  I don't -- I won't limit this to amnesty applications
8  because the same concern could exist with plea
9  agreements.  I am impressed and thankful that the
10 antitrust bar and defense bar, in general, does not oversell
11 their cooperation.  I could see that happening.  I mean,
12 certainly, it may come as a surprise for me to tell you
13 this, I hope it doesn't, but you don't do that.  By and
14 large, really, really the vast majority of the time, it's
15 not oversold.  They communicate what it is that they can
16 provide and they deliver.  I mean, that's certainly the
17 way we want it and you're all doing a good job in that
18 regard.
19     MR. SPRATLING:  Before I go to Kirti for an
20 answer and continue the questions from the audience, it
21 is now 3:28 Eastern Standard Time.  We are required to
22 sign off from the audience -- with the telephone

19 (Pages 70 to 73)

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable    11-16-2005

Page 74

1   audience, to say goodbye to them.
2        Thank you for joining the program.  We hope
3   you've enjoyed this look into the current state of
4   international cartel enforcement, looking at the
5   requirements of amnesty programs, developments in the
6   area with respect to revocations of amnesty, civil
7   damages, extradition, criminal enforcement, plea
8   bargaining, and finally, cooperation.  So, we bid our
9   telephone audience adieu and we will continue the
10  questions here.
11       Kirti, did you have a follow-up to what. . .
12       ASHLEY:  The views expressed by our panel are
13  their own views and not the views of any company,
14  organization or government agency.  We would like to
15  remind you to please fill out the online evaluation form
16  accessed from the program's website to get your
17  attendance confirmation form.  Please follow the
18  instructions on the form to return it to the ABA Center
19  for CLEs to receive your CLE credit.
20       I will now give you your ABA participation
21  verification code required in some states in order to
22  earn CLE credit.  Please pay close attention and write it

Page 75

1   down so that you may provide the code where it requests
2   and if your state requires it.  The ABA participation
3   verification code is the number two, the letter T as in
4   tango, the number zero, the number five, the letter C as
5   in Charlie, the letter E as in echo, the letter R as in
6   Romeo and the number six.  That is 2T05CER6.
7        I will repeat that again.  The ABA
8   participation verification code is the number two, the
9   letter T as in Tango, the number zero, the number five,
10  the letter C as in Charlie, the letter E as in echo, the
11  letter R as in Romeo and the number six.  That is
12  2T05CER6.
13       On behalf of the Section of Antitrust Law and
14  the ABA Center for Continuing Legal Education, thanks for
15  listening.
16       (The recording was concluded.)
17
18
19
20
21
22

Page 76

1              CERTIFICATE OF TRANSCRIPTIONIST
2
3        I, Elizabeth M. Farrell, do hereby certify that
4   the foregoing transcription was reduced to typewriting
5   via CD-ROM provided to me; that I am neither counsel for,
6   related to, nor employed by any of the parties to the
7   action in which these proceedings were transcribed; that
8   I am not a relative or employee of any attorney or
9   counsel employed by the parties hereto, nor financially
10  or otherwise interested in the outcome of the action.
11
12
13
14            ELIZABETH M. FARRELL
15              Transcriptionist
16
17
18
19
20
21
22

65baa42e-1ae8-46b3-8582-3f04b2823f2b

Cartel Enforcement Roundtable        11-16-2005

**A**

**ABA** 1:7 3:5,5,11
3:22 4:14 74:18
74:20 75:2,7,14
**ability** 23:7 27:12
37:8 50:6 53:1
58:1,2 68:14
**able** 14:9 32:6 41:6
43:20 45:7,20
50:2 51:12 52:1
67:1,2 69:13 73:3
**abroad** 55:3
**absolutely** 31:20
42:14
**abuse** 6:1
**accept** 46:9 48:4
**acceptable** 46:22
**access** 14:8,13,15
57:4
**accessed** 74:16
**account** 15:18
**accountable** 38:14
**accreditation** 3:21
**accuracy** 50:10
**achieve** 72:6
**act** 17:18
**action** 5:19 19:12
24:17 33:19 34:5
37:22 47:2 76:7
76:10
**actions** 33:11 35:9
35:12 38:1 46:18
46:21 49:9,10
**active** 16:2
**activities** 61:16
**activity** 9:18 21:1
38:22 66:22 70:10
70:15
**add** 36:21 62:12
**added** 35:13 37:10
**adding** 36:4 62:20
64:5,13
**addition** 8:6 35:6
35:18
**additional** 34:5,12

36:22 37:10 38:4
**address** 69:14
**addressed** 46:8
49:22
**adieu** 74:9
**admitted** 24:20
**adopt** 33:9
**adopted** 31:7
**advancement** 9:20
**advances** 9:2
**advantage** 22:1
25:12 39:1,13
40:9 53:17
**adverse** 27:10
**advice** 50:13 66:15
67:3
**advise** 50:6 61:3
**advising** 19:8 26:9
26:12 38:4 42:12
64:3 69:2
**affect** 17:2 25:17
25:19 34:7 35:22
38:3 50:5
**affirmative** 71:22
72:4
**agencies** 17:22
27:13 36:9 64:12
64:18 65:8 66:12
66:13 67:6,10
69:6,12
**agency** 4:18 74:14
**ago** 7:16 8:4,18
9:11 23:22 55:5
**agree** 10:4 34:4
46:15
**agreed** 7:17 70:5
**agreement** 48:14
**agreements** 50:4
53:4,5,10,22 59:3
63:2 73:9
**agricultural** 6:2
**ahead** 16:10
**Alito** 23:4
**allegation** 37:15
**alleged** 41:13

**alleviate** 29:18
**allocation** 62:2
**allow** 11:20 18:22
25:4 53:10
**allowing** 64:12
**allows** 41:5
**alluded** 67:12
**amazed** 57:21
**AMERICAN** 1:6
**amnesty** 7:9 10:5
10:16 15:18,21,22
16:1,6,6 20:21
24:11 26:11,13
31:21 35:16 36:2
36:22 37:2,12,13
37:17 40:2,4,9,10
69:14 71:2 72:19
73:2,7 74:5,6
**amount** 52:21
**analysis** 38:15
**analysts** 13:19
**announced** 9:11
10:10 24:12 62:3
**answer** 16:21 19:14
30:2 70:3 73:20
**answers** 9:12 62:19
**anticipate** 28:3
**antitrust** 1:7 2:7
3:5,9 4:22 5:1,7
5:16 6:9 7:4 9:5,6
9:15 10:9 22:12
24:16 25:20 38:10
40:16 41:8 53:14
56:7,14 57:5 63:2
71:3 73:10 75:13
**anti-cartel** 6:17
47:6 61:21
**anybody** 33:5 71:8
**anyway** 37:8 49:11
49:11,13
**appealed** 22:21
**appeals** 41:18
**appeared** 55:10
**appears** 55:8 63:7
**applaud** 50:15

**applicant** 7:10
11:17,21 12:6,21
21:1,2 30:22 31:9
35:16 49:21 60:9
70:19 72:20 73:2
**applicants** 8:20
14:3 59:11 61:3
**application** 12:20
31:21,22 32:4
45:10 71:3
**applications** 10:20
12:4,10,16 13:8
13:11 40:5,10
60:16 73:7
**applied** 13:15 59:2
**apply** 17:5 25:8
**applying** 44:6 59:5
**appreciate** 23:16
39:5
**approach** 46:18
66:12,12
**approaching** 18:16
19:3
**approximately** 8:4
**area** 27:21 33:2,17
33:22 35:14 57:8
58:8 68:4 74:6
**areas** 6:9 14:21
55:19 69:9
**arena** 6:21 38:6,6
**argument** 23:1,4
**arms** 16:3
**arraignment** 53:12
**arrest** 41:3
**Article** 49:1,2 59:5
**Articles** 11:18
**ascertain** 17:19
**Ashley** 3:3,4 74:12
**asked** 9:12
**aspect** 48:2 57:7
**aspects** 47:4
**assess** 43:18 49:14
**assessing** 20:5 37:1
**assessment** 23:12
25:18 35:14 36:1

37:3 42:4
**assessments** 18:8
**Assistant** 2:6 5:2,8
**associates** 50:4
**Association** 1:6
14:17
**assume** 15:1 30:10
**assure** 58:10 71:18
**attend** 25:4
**attendance** 3:20
4:1,7,9,10 74:17
**attended** 54:16
56:12 57:14
**attention** 12:14
17:14 21:6 24:1,4
42:16 74:22
**attorney** 2:6 5:2,8
76:8
**attracted** 21:6
**attractive** 39:12
**audience** 48:12
55:21 70:1,8,8
73:20,22 74:1,9
**audio** 14:9
**audit** 15:6 46:10
**auspices** 6:15
**Australia** 9:15 16:1
**authorities** 6:12
55:18 59:1,2,21
61:4 63:4,9 65:5
66:6
**authority** 21:4
45:14 59:17
**available** 33:5
38:21
**avenues** 14:21
**average** 13:6 43:1
**avoid** 27:6 51:5
67:11
**aware** 15:5,8,16
17:1 20:22 66:10

**B**

**B** 40:7
**back** 18:21 24:12

Cartel Enforcement Roundtable    11-16-2005

Page 2

26:18 27:15,18
30:9 40:16,21
41:7,10,16 47:19
51:7 54:18 56:13
63:22 68:10
**background** 21:14
35:21
**bad** 28:7,14 29:1
**band** 12:19,21
**bar** 1:6 10:3 14:16
44:10 73:10,10
**bargaining** 8:21
44:16,22 45:2
48:20 53:2 74:8
**based** 18:20 20:16
24:11
**basic** 11:10 46:3
**basis** 27:3 43:19
46:14
**basket** 68:12
**beat** 40:9
**becoming** 16:2
43:4
**began** 55:12
**beginning** 33:8
41:9 44:16
**behalf** 75:13
**Belgium** 2:13
**believe** 17:16 46:6
57:21
**believes** 15:2
**benefit** 27:14 37:9
38:15 58:20 66:8
**benefits** 18:5
**best** 6:16 18:5
25:15
**bet** 25:15
**better** 19:4 26:16
69:14
**beyond** 14:18
**BIAC** 55:8
**bid** 74:8
**bid-rigging** 7:14
**big** 38:3 61:18
**bilateral** 56:3

**billion** 13:5
**bios** 3:15
**bit** 11:1 12:2 68:6
69:16,17,17
**blower** 60:9
**blue** 16:15
**board** 4:14,14 24:4
24:14 25:7 29:11
29:13 34:19
**books** 58:1
**border** 41:1 43:8
**born** 39:20
**bottom** 51:10 63:19
66:13
**breaching** 54:20
**breakfast** 45:6
**briefing** 26:7
**briefs** 29:22
**bring** 12:6 40:21
41:16 45:17 47:12
56:2,2 66:2
**bringing** 12:14
29:13
**brings** 34:13
**broad** 18:7
**brought** 5:18 35:2
43:3 55:6
**Brussels** 2:13
**burden** 62:17,20
**burdens** 62:9
**business** 5:13 19:11
19:21 24:4 43:6
43:11 51:7
**busy** 55:1

---

**C**

**C** 3:1 53:3,5 75:4
75:10
**California** 2:4
**call** 3:11,13 11:18
16:15 30:1,5,9
49:2 58:21 60:8
**Canada** 9:11 10:12
15:11 16:1 20:18
35:10,12 44:18

64:20
**Canadian** 15:11
20:8,10 65:4
**Canadians** 40:16
**can't** 38:19
**cards** 66:18
**care** 29:9 62:22
**carries** 41:5
**carry** 32:7
**cartel** 1:10 3:3 5:5
5:17,22 6:6,7,21
8:20 9:2,7,21 10:1
10:2,7,15 12:13
13:7,14,19 15:3
15:19 18:2 19:20
21:21 22:7 31:7,9
34:6 38:22 42:5
45:17 46:13 56:11
56:15 59:20 60:4
60:6,19,22 62:14
63:11 66:22 74:4
**cartels** 5:20 8:15
9:9 13:17 33:18
33:19 59:4,4
63:17
**case** 12:5,19 13:19
17:22 18:1 23:15
24:6 26:4 27:4,20
28:12,13 31:14
36:3 39:3,4 42:17
43:9 45:9 46:11
47:11,15,22 49:15
50:5 51:6 59:16
59:18 60:10,12,14
60:18,22 71:11
**cases** 5:17 6:1 8:10
10:17,20 11:15
13:8,20 19:19
24:5 37:20 40:15
46:8 53:4 60:7,10
61:22
**case-by-case** 43:19
**causing** 11:4 16:19
**caveat** 30:11
**CD-ROM** 76:5

**Center** 1:7 3:6
74:18 75:14
**cents** 38:18
**certain** 8:21 18:21
43:21 69:6,8
**certainly** 21:16
23:6,9 24:6 33:17
34:4,9 37:12
42:12 47:9,21
50:14 52:17 57:8
62:15 64:8 73:12
73:16
**certainty** 50:3,13
52:18 53:9,17,18
64:2,6
**certificate** 4:10
76:1
**certify** 76:3
**cetera** 62:1
**Chairman** 21:22
36:16
**chairs** 4:22
**challenged** 58:6
**challenges** 44:22
54:7
**chance** 41:15
**change** 9:20 32:14
38:7 46:3,4 49:5
49:16
**changed** 51:17
**changes** 11:6 28:3
28:15,18,20 29:6
29:14,16 62:5
**characterized**
32:15
**charge** 5:22
**charges** 7:14 35:2
41:8
**Charlie** 75:5,10
**chilling** 67:7
**Circuit** 22:22 26:17
27:11 28:10
**Circuit's** 26:2
**citizen** 7:13
**civil** 5:18 35:7,12

35:14,19 37:14,14
37:17 38:6,8
46:20 48:21 74:6
**class** 5:19
**classic** 63:21
**CLE** 3:21 6:5 69:22
70:12 74:19,22
**clear** 28:9,9
**cleared** 65:1
**clearly** 24:18 26:1
36:20 37:19 42:7
43:12 46:4 47:11
60:15
**CLEs** 74:19
**click** 4:4
**client** 15:5,7,16
16:16 17:2,9 19:8
26:12,16 38:4,16
42:13 43:5,7,10
51:13
**clients** 15:2 26:9
37:2 38:14 39:4
42:3,20 43:12
50:6,8 52:18 64:2
66:15 69:3
**clock** 19:8
**close** 37:19 45:17
62:6 74:22
**closely** 55:19
**CLUB** 1:14
**code** 74:21 75:1,3,8
**collateral** 52:9
**colleagues** 47:5
48:8
**collective** 37:22
**collectively** 57:15
**column** 37:11
**combined** 35:11
**come** 10:17 14:4,13
16:10 17:11 18:14
19:2 20:10 26:8
26:22 31:5 37:6
41:3 47:16,18
51:13 54:5 60:17
61:4,13 65:5 66:7

Cartel Enforcement Roundtable      11-16-2005

72:9 73:12
**comes** 11:12 12:22
  15:2 16:16 17:14
  26:3,17 27:10,20
  38:3 60:2 65:21
  67:2 70:20
**coming** 23:13 40:5
  51:1 55:16 66:1
  72:7
**comment** 29:4 67:9
**comments** 19:14,17
  28:2 29:6
**commerce** 8:11
**commercial** 5:15
**Commission** 2:13
  5:22 8:16,19
  11:13 15:10 30:21
  31:6,11 32:1,15
  33:2,3,14 36:17
  44:15,22 46:11,18
  51:19 59:1,16
  60:6,17,17 61:2
  65:18
**Commissioner**
  8:18 32:17 45:5
  45:19 48:6 62:3
**Commission's** 11:3
  44:20
**committed** 43:2
**committing** 14:14
**communicate**
  67:21,22 73:15
**communication**
  72:10
**communications**
  71:1
**community** 24:5
**companies** 5:4 13:5
  24:19 40:3 42:12
  45:13 47:1,8,10
  47:18 48:2
**company** 4:18 7:10
  11:12 16:15 17:15
  21:8,19,20,22
  22:13 23:19 24:7

24:9,15 25:14
  39:9 40:8 53:9,11
  54:5 66:4 68:13
  70:19,20 71:13,14
  71:16 74:13
**company's** 19:10
  24:14 34:17 36:1
**compare** 58:18
**compelling** 48:2
**competition** 5:21
  6:11,16 8:5,6,17
  8:18 14:22 32:18
  33:4,20 48:8
  54:19 55:7,18
  58:22 59:1,17
  63:3,6,6 64:12
**competitors** 17:21
  17:21 18:1 22:7
  25:5 71:1
**complaint** 14:16
**complete** 3:22
  32:19
**completely** 21:3
  39:20
**compliance** 25:10
  26:12 34:10 42:20
  42:21 43:12
**comprehensive**
  32:17
**compulsory** 15:13
**conceivably** 37:11
**conceptual** 44:18
**concern** 26:20
  27:21 36:22 43:14
  44:3,13 70:18
  73:8
**concerning** 31:7
  59:3
**concerns** 25:17
  27:7 29:18
**concluded** 75:16
**conclusion** 26:7
**concrete** 46:14
**condition** 31:20
  32:1

**conditional** 7:9
  12:4,12 21:7 28:3
**conditions** 14:15
  31:1,12,17
**conduct** 15:17
  18:17 22:2,11,14
  25:14 43:10 55:14
  56:7 58:3 70:20
  71:20 72:7
**conducting** 9:8
  18:20
**conference** 10:14
  57:7
**confidential** 31:21
  65:19
**confidentiality**
  54:21
**confirmation** 3:15
  3:20 4:1,7,8 74:17
**conflict** 67:21
**conflicts** 66:9 67:11
**connection** 5:5
**consequences** 52:9
  72:21 73:4
**consider** 28:15,15
**consideration**
  35:13
**considering** 8:19
**consists** 3:17
**conspiracy** 7:20
  22:4,7,9 24:21
  68:8 72:1,5
**conspire** 22:3 25:5
  71:5
**conspired** 22:5
  40:7
**constantly** 17:20
**constitute** 72:10
**consultation** 33:16
  59:19
**consumer** 6:2
**context** 46:17
**continue** 25:4,5
  43:10 48:3 73:20
  74:9

**continued** 22:3,8
  71:5
**continues** 71:2
**continuing** 1:8 3:6
  22:5 75:14
**contract** 28:7,14
  48:16
**contractual** 27:3
**control** 6:1
**conversations** 56:4
**cooperate** 26:14
  63:8
**cooperates** 21:2
  35:16
**cooperating** 31:11
**cooperation** 6:11
  6:17 9:19 13:21
  26:16 31:4,13
  44:9 54:11 58:16
  58:19 63:2,3
  66:14,20 67:6
  69:12 73:11 74:8
**cooperative** 67:10
**cooperatively**
  54:15
**coordinated** 16:22
  59:19 65:16
**copy** 14:10
**corporate** 14:5
  34:10
**corporation** 7:22
**corporations** 7:5
**correct** 32:1 48:21
**corrected** 65:7
**cost** 38:15,17,17
  51:10
**counsel** 20:1 21:19
  21:21 24:14,14
  25:2,6,6 34:19
  62:21 63:1 71:15
  76:5,9
**counseling** 42:20
**count** 8:7
**counterpart** 71:2
**counting** 49:14

**countries** 6:12,14
  9:3,17 16:5 17:6
  55:10 56:6 57:14
  57:22 69:4
**country** 3:13 9:5
  14:17 41:3
**couple** 14:1 19:13
  71:8
**course** 3:18 4:3,4,5
  13:12,16 32:6
  40:11 45:16,19
  46:2,18,20 49:18
  53:15 59:15 60:11
  60:20,22 61:22
**court** 22:18 28:6
  40:22 41:15
**Courts** 5:18
**Court's** 27:2
**covers** 60:5
**co-chair** 57:7
**create** 53:19
**creating** 39:12
**credibility** 32:12
**credible** 45:15
**credit** 4:4 20:6,11
  74:19,22
**crime** 41:13 55:14
  55:16
**criminal** 2:7 5:2,8
  5:10 38:8 39:10
  56:6,7 57:6 58:1
  74:7
**criminalization**
  9:15 15:22
**crippling** 34:16
**critical** 17:13 18:6
  19:5 23:12 34:17
  51:14
**critically** 16:14
**crosswise** 64:7
**cross-border** 59:3
  59:4
**Crutcher** 2:3 4:21
**current** 6:7 10:1
  11:11 12:3 32:21

44:20 46:1 74:3
**currently** 46:5
  48:22 53:1 54:14
  57:16
**curve** 57:3
**cutting** 69:21

**D**

**D** 2:6 3:1
**damage** 34:15 35:8
  48:21
**damages** 35:17
  48:17 74:7
**date** 53:13
**daunting** 16:13
**dawn** 9:8 11:14
  12:7 15:9 65:14
  65:15,21 67:17
**day** 2:10 5:14 19:21
  20:3 40:22 41:15
**days** 15:7 29:8
  56:21 70:4
**day-and-a-half**
  56:22
**DC** 1:15
**deal** 16:18 25:20
  27:1,16,17 33:12
  33:19 58:7
**dealing** 43:7
**deals** 27:9
**debate** 33:15
**decide** 68:3
**decided** 22:19
**decision** 16:4 18:11
  22:21 23:2,3,7
  24:1 25:18 26:2
  27:10,20 31:7
  34:17 46:8,15,19
  46:20,22 47:22
  48:3,4 49:3,6,18
  49:21,22
**decisions** 13:4,7
  45:17,18 49:1,2,8
  50:7 69:5
**decision-making**

63:10
**defect** 62:11
**defection** 34:7
**defendant** 27:4
**defendants** 35:7
  40:20 42:3 51:4
**defense** 10:3 42:1
  62:21 63:1 73:10
**defer** 68:7
**degree** 9:19
**deliberate** 31:19
**deliver** 45:7,20
  73:3,16
**demand** 27:1
**Department** 2:8
  5:3,9 7:8,11 10:10
  19:17,22 21:5
  22:15 27:6,9,17
  30:4 38:8 70:14
  72:10
**Department's**
  26:18
**depending** 37:20
**depression** 36:6
**Deputy** 2:6 5:1,8
**described** 38:16
  61:15 67:13
**deserve** 22:20
**design** 68:16
**destroy** 65:20
**destruction** 57:20
**detail** 46:12
**detain** 41:6
**detect** 72:9
**detection** 45:14,15
**determine** 18:18
**deterrent** 34:5,6
**develop** 48:18
**developed** 55:20
**developing** 15:18
  42:4
**development** 5:13
  25:17 35:18
**developments** 6:20
  9:1,16 35:22 74:5

**devoted** 56:22
**didn't** 55:21 56:12
  65:5 70:4
**difference** 19:19,21
  59:14
**differences** 20:14
  45:3
**different** 12:19
  17:1 20:5 33:6
  40:18 41:1 49:4
  49:12 57:14 58:17
  64:6,18 66:12,13
  67:6
**differently** 22:19
  52:22 53:2
**direct** 21:16 38:1
  45:7 48:13 50:5
  50:15 51:17 52:9
  52:10 69:13
**direction** 44:12
  50:21
**Director** 5:21 57:6
**Directorate** 5:20
  8:17 13:17
**Directorate-Cart...**
  2:12
**directors** 24:15
  25:7
**discovered** 16:16
  17:15 21:20 22:14
  22:17 25:2,6,9
**discovery** 57:1
  61:17
**discretion** 69:17
**discuss** 6:16 48:8
**discussed** 34:18
  38:2,2 54:22
**discussing** 14:21
  22:6
**discussion** 9:14,22
  11:1
**discussions** 57:10
  66:6
**distributed** 9:16
**distributes** 15:4

**District** 22:18,18
  27:2 28:6
**districts** 53:7
**Division** 2:7 10:9
  22:12 25:20 26:1
  26:21 40:16 53:14
  56:15 71:3
**Division's** 5:1,7,10
  57:5
**divulged** 31:9
**document** 14:14
  57:20
**documents** 65:20
  67:20 68:10
**doesn't** 23:6 26:20
  34:7 68:20 70:22
  73:13
**doing** 29:13 40:21
  41:16 45:16 51:7
  52:20 54:14 60:13
  61:1 68:13 71:7
  73:17
**DOJ** 34:21 42:9,18
  43:20 64:16 65:3
  66:1,1
**DOJ's** 42:2
**dollar** 38:19
**dollars** 8:13 38:18
**dominance** 6:1
**don't** 17:7,21 19:1
  20:15 23:10 25:7
  26:7,14 27:4 28:7
  28:17,22 30:11
  33:21 38:18 40:7
  42:6 47:19 50:1
  51:5 53:13 57:13
  61:16 65:2 67:15
  67:18 73:7,13
**doors** 38:5
**double-edged**
  69:10
**doubt** 36:13 66:19
**download** 3:17
  33:5
**downloaded** 4:2

**draft** 29:2,2
**drag** 37:7 51:4
**dragging** 51:2
**DRAM** 7:18
**Dunn** 2:3 4:21
**duplicate** 61:17
**Dutch** 41:12
**dynamic** 6:9
**D.C** 2:8,10 5:13

**E**

**E** 3:1,1 75:5,10
**eagerness** 63:8
**earlier** 35:3 44:9
  45:6 51:2 62:18
  65:5
**early** 14:19 17:10
  45:21 46:9 51:8
**earn** 74:22
**easier** 18:12 43:3
  67:4
**easily** 42:15
**Eastern** 22:18
  73:21
**easy** 66:18 67:4
**echo** 75:5,10
**ECN** 13:21 47:5
  58:15,20 59:8,11
  60:13 61:12
**economic** 55:14,16
**Education** 1:8 3:6
  75:14
**effect** 8:3 28:19
**effective** 24:16
  25:10,11 33:11
  42:17 57:3 71:19
**efficiency** 33:21
  50:18
**efficient** 51:20 61:1
  62:2
**efficiently** 62:16
**efforts** 50:15 64:9
  67:5,10
**eggs** 68:12
**egregious** 71:12,12

**either** 12:13 39:18
**elaborate** 49:18
**elaborated** 46:8
**electronic** 56:22
  57:5 61:17
**Electronics** 7:16
**elements** 47:22
**eligible** 25:7
**Elizabeth** 76:3,14
**emphasis** 19:9
  65:17
**employ** 14:16
**employed** 76:6,9
**employee** 76:8
**employees** 71:5
**enables** 11:17
**enacted** 7:3
**enacting** 9:5
**enactment** 35:15
**encountered** 44:5
  72:19 73:1,2
**encourage** 50:15
**encouragement**
  48:7
**ended** 22:14 35:8
**enforcement** 1:10
  2:7 3:4 5:2,9 6:1
  6:6,7,11,17 9:3,8
  9:18,21 10:1,2,7
  10:16 13:4,12
  17:22 18:11 19:7
  21:4 27:13 31:16
  32:6,12,16,18,19
  32:21 34:13 36:9
  37:21 38:6,11
  42:7,11,17 45:8
  45:20 47:6 57:6
  59:12 61:15,21
  63:4,9 64:11,12
  64:21 65:8 66:6
  67:10 69:3,5 74:4
  74:7
**enforcers** 9:19 10:4
  44:10 54:13 56:11
  57:1,12,14,15

58:8
**engage** 17:11
**engaged** 18:2
**enjoyed** 74:3
**enormous** 34:15
**ensnares** 40:3,3
**ensuing** 21:3
**ensure** 13:20 14:3
**enter** 53:4
**entry** 13:19
**equal** 40:19
**equivalent** 48:14
**especially** 52:3
  59:3
**essentially** 14:7
  33:20 38:5 45:9
  51:21 60:4
**established** 8:16
**establishing** 9:7
**et** 62:1
**EU** 11:8
**Euro** 13:5
**Eurocentric** 68:9
**Europe** 15:10
  32:16 35:20 37:20
  38:2 50:21 60:4
  68:10
**European** 2:12
  5:21 8:5,16 10:21
  11:2 14:22 15:9
  32:15 44:15,18
  58:16,20,21 63:6
  68:7
**Europeans** 54:6
**European-wide**
  8:20
**Europe-wide** 60:11
  60:19 61:8
**Euros** 8:14
**evaluation** 3:20 4:5
  4:6,8 74:15
**event** 4:15 48:18
  70:7
**eventually** 36:5
  38:3 50:9

**everybody** 47:20
  71:18
**everyone's** 43:18
**evidence** 32:9
  47:18 70:15 71:4
  71:22 72:4
**ex** 60:8
**exactly** 45:1
**example** 20:1 21:18
  59:20 61:17 65:12
**excellent** 29:10
**exchanging** 6:13,14
**exciting** 6:8
**excuse** 8:13 31:21
**execution** 15:12
**executive** 7:13
  41:12,12 70:21
**executives** 22:6
  25:4 39:8 43:7
**exhausted** 41:18
**exist** 33:11 55:21
  66:10 73:8
**existence** 16:3 22:9
  23:18 25:1
**exists** 65:11
**expand** 64:13
**expect** 23:10
**expectation** 51:3
**expectations** 25:17
**experience** 5:15
  50:16 52:17
**explain** 45:3
**explains** 72:15
**explanations** 62:20
**explosion** 10:6
**exporting** 58:10
**exposing** 66:3
**exposure** 15:19
  34:15 35:11,16
  42:5 63:12
**expressed** 4:16
  74:12
**extent** 54:20 64:4
**extradite** 41:6,10
  42:2

**extradition** 7:12
  41:20 43:8 74:7
**extraordinary** 55:4
**extreme** 43:9
**extremely** 47:14
**ex-enforcers** 54:13
**E.C** 32:19 64:15
**E.U** 8:2,7,9 9:2
  15:20,21 20:15
  31:20,22 32:18
  35:10 50:16 52:9
  52:22 64:15 65:13
  67:15 68:11,16,16

**F**

**face** 7:13 16:19
  34:12 37:20 41:7
  44:22 69:15
**faced** 16:13,14
**face-to-face** 51:17
**facilities** 15:8
**fact** 10:9 18:9 20:8
  20:9 23:16 31:8
  31:11 34:16,22
  53:6 61:5,12 66:4
  66:20
**factor** 10:6 34:17
  37:10
**facts** 23:14 26:5,8
  37:3 71:11
**factual** 37:15
**failed** 21:10,22
  22:1
**failing** 57:16,16
**failure** 30:22 31:17
  31:19
**fairly** 16:13 26:5
  54:1
**faith** 23:11 28:10
**fall** 36:5 56:13
**falls** 37:11
**false** 22:15 57:20
**familiar** 21:15
**far** 16:2 24:9 44:12
  47:5

**Farrell** 76:3,14
**far-flung** 66:22
**faster** 49:17
**favor** 26:18 46:19
**favorable** 49:9
**favored** 33:14
**fax** 3:22 19:2,4
**faxed** 4:10
**FBI** 15:12
**Federal** 29:7 36:17
  53:3 56:6
**feedback** 29:9
**feel** 36:9
**felt** 27:16
**figuratively** 36:10
**figure** 38:19 57:8
**file** 14:13 62:13
**filed** 34:21 35:1,4
**filing** 62:8,17
**filings** 11:19
**fill** 74:15
**final** 29:3 46:8
  51:12 54:10 61:20
**finally** 8:18 48:1
  74:8
**financially** 76:9
**find** 11:17 12:9
  14:17 39:7,17
  42:10 51:20 53:5
  60:21 62:4,15
**fine** 7:17,19,19,21
  10:4 11:19 12:17
  12:22 39:10 50:1
  51:10
**fines** 7:20 8:9,10,11
  9:9 13:5,7 24:20
  34:12 35:9 45:18
  49:3,6
**finished** 4:6
**Firm** 5:14
**firm's** 4:22
**first** 6:10,22 7:1,9
  7:12 11:11,20
  16:5 17:14 18:3,5
  19:3,15 20:7,22

Cartel Enforcement Roundtable    11-16-2005

23:18 25:9 28:5
29:17 31:2,14
33:9 41:17,19
45:22 55:5 56:12
56:15 59:8 63:13
**first-in** 18:5 19:16
19:19
**fit** 12:13
**five** 64:22 75:4,9
**fixing** 7:18
**focus** 5:16 27:2
**focuses** 5:4
**folks** 24:1 39:13
40:4 69:22
**follow** 31:17 37:14
74:17
**followed** 7:19
**following** 4:11
45:10
**follow-on** 46:20
52:4
**follow-up** 19:14
67:9 69:1 71:21
72:3,15 74:11
**fora** 54:14 63:5
**force** 11:9 59:12
**foregoing** 76:4
**foreign** 5:17,13
38:9,12,13,20
40:12,14,17
**foresee** 11:14
**form** 4:1,7 49:19
74:15,17,18
**formation** 34:6
**forms** 3:20,22 4:8
**forth** 24:5 27:15,18
41:2
**fortunate** 32:10
**forward** 11:12 14:4
31:5 33:15 34:1
37:6 47:18 54:5
58:14
**found** 71:4,13
**four** 4:11 12:8 13:5
13:6,18 55:3

**framework** 46:3,4
**Francisco** 2:4
**frankly** 37:1 53:2
55:11
**fraud** 55:16
**frequency** 6:20
**frequently** 9:12
**front** 16:18 69:7
**fruits** 58:13
**fugitives** 40:20
41:7
**full** 36:5 49:22
56:21
**fully** 21:2 26:14
**full-day** 55:10
**functional** 48:13
**fundamental** 16:21
**further** 61:11
**furtherly** 61:16
**future** 3:10

### G

**G** 3:1
**gaining** 57:4
**Gary** 2:3 4:20 6:3
23:22 41:9,22
55:3
**Gary's** 36:4
**gatherings** 69:18
**geared** 65:16
**general** 2:6 5:2,8
5:15,21 21:19,21
24:14 25:2,6
34:19 71:15 73:10
**generated** 10:20
**geographic** 46:12
**geographically**
60:22
**German** 8:1
**getting** 3:9 26:15
51:8 64:7 68:18
**Gibson** 2:3 4:21
**give** 11:2 13:14
20:11 21:11 40:22
41:15 50:10 67:4

69:22 74:20
**given** 14:8 48:6
55:2
**gives** 18:4
**giving** 20:19 62:10
**globally** 64:13
**globe** 57:2
**go** 4:1 16:5,10 17:9
18:9,19 19:11
20:15,16,17 23:9
26:6 29:5 36:22
37:11,13 38:17
39:9 42:11 51:7
51:14 52:10 61:4
64:6 65:4,14,19
71:4 73:5,19
**goal** 43:20,22
**goes** 52:21
**going** 9:15 15:15
17:5 18:2,9,16
26:9 28:18,20
29:7,16,20 37:18
38:17,17 39:6,7,9
39:10,17,22 40:9
43:9,16,18 44:3,7
44:10 48:19 50:14
50:22 53:16 54:8
56:1,2,2,3 57:12
58:14 63:16,22
65:9 66:22 67:1,2
67:3,6,16 68:3,5
69:13 71:4,6
**good** 13:20 23:11
26:17 30:18 31:4
44:9 45:13 47:10
47:12,13,15,18
50:14 52:12 54:8
54:9 58:7 61:18
64:8,15,18 68:9
69:18 70:16 73:17
**goodbye** 74:1
**goods** 6:2
**gotcha** 71:6
**government** 4:18
35:9 41:17 74:14

**Grand** 35:1
**grant** 11:11
**granted** 12:5,18
**great** 19:9 27:1,14
27:17 28:10 34:19
44:3 50:19 52:5
52:12 65:17 66:1
**greater** 8:10 19:7
50:3 66:14,14,21
68:6
**green** 32:20 33:1,9
33:13
**grips** 16:10
**Group** 4:22 55:6
**growing** 9:2 35:12
**grown** 6:12
**guarantee** 53:18
**guarded** 54:1
**guess** 45:1 54:12
**guilty** 7:17 24:20
**guy** 50:19
**guys** 63:13

### H

**half** 39:19,19
**Hammond** 2:6 5:7
21:13 23:6 28:5
30:8,13,17 38:13
52:11,15 55:1
67:12 70:16 72:2
72:6 73:6
**hand** 44:2 64:11
65:3,22
**handle** 63:11
**happen** 39:6 50:9
67:3
**happened** 9:17
10:13,15 24:18,18
37:4
**happening** 9:10,14
73:11
**happens** 29:17
68:17 70:21
**happy** 69:11
**haven't** 28:16

29:14,15 36:3
53:7 71:7
**hear** 47:8 63:4,7
**heard** 9:13 19:1,5
23:4 26:6,10
29:10 51:16
**hears** 9:4
**help** 51:19 58:12
59:22 65:10
**helps** 64:9
**hereto** 76:9
**hidden** 67:2
**high** 39:10 57:3
**higher** 45:15
**highest** 41:4
**high-ranking** 43:7
**history** 7:19 64:17
**hits** 43:11
**hold** 38:13
**home** 36:10 39:15
39:17 43:11 52:6
**Hong** 70:22
**hope** 23:2,3,6,19
27:19 29:17 33:16
58:13 73:13 74:2
**hopefully** 29:12
34:7 41:6,17
51:16
**hosted** 56:15,20
**huge** 11:4
**hundreds** 8:13,14
**Hynix** 7:21

### I

**Ian** 7:13 41:10
**ICN** 56:2,9,13
58:17 61:13,16,19
**idea** 13:14 33:7
47:12 52:5,12
59:18 62:1 64:15
**identified** 71:14
**III** 55:6
**illegal** 70:10,15
**imagine** 21:14
**immediacy** 52:18

53:19
**immediate** 53:11
**immediately** 19:2
19:12
**imminent** 11:7
**immunity** 9:13
10:5,19 11:2,11
11:14,18,21 12:4
12:4,12,20 13:8
13:20 30:22 31:8
31:22 32:4 45:10
49:21 60:8,15
61:3
**impact** 13:3 43:6
43:10 45:18 46:20
47:1 49:9
**implement** 29:21
34:10
**implementation**
10:4
**implementing** 9:6
**implies** 36:21
**implore** 25:8
**important** 14:2
30:3,3 32:11
42:10,19 48:1
51:11 52:3 55:13
62:13
**importantly** 71:16
**imposed** 7:20 8:11
**imposing** 8:9 13:4
13:7
**imprecise** 60:18
**impressed** 73:9
**imprisoned** 38:9
**improvement**
55:20
**inaudible** 70:11
71:21 72:14,15,15
72:16,18,20
**inaugural** 56:18
**incarceration** 7:6
**incentive** 51:8 54:5
62:11
**incentives** 34:9

47:17 62:11
**includes** 3:15
**including** 7:21
41:11
**inconsistent** 44:6
**increase** 34:8
**increased** 7:3
**increasing** 9:5
**increasingly** 15:7
49:13
**indicate** 30:11
**indicates** 28:13
**indicator** 45:13
**indictments** 41:2
**individual** 44:1
**individuals** 5:4 7:5
7:7 24:19 25:15
40:4 42:8,11
43:17
**indoctrination**
55:11
**industry** 6:2 7:18
**Infineon** 7:22
**influence** 51:12
**information** 3:8,16
3:16 6:13,15
11:12,16 12:7,9
12:21 17:10,16
18:21 21:17 22:16
22:16 23:8 52:21
53:15,21 57:5
59:10 62:14 69:19
**informative** 61:9
**informed** 12:18
**infringement** 11:17
12:9 33:20 46:19
46:19 48:15,17
49:2,8
**initially** 26:10
47:11
**initiated** 8:5
**input** 3:21 33:17
34:1
**inquiry** 47:14
**insist** 70:9,14

**inspection** 45:10
**inspections** 13:14
15:13 32:7 59:22
**instance** 23:15
**instances** 72:19
73:2
**instituting** 45:1
**institutional** 54:7
**instructions** 74:18
**integral** 14:6
**integrated** 15:19
**integration** 48:19
**integrity** 57:17
58:9
**intend** 14:15 30:11
**intensive** 13:13
**intention** 62:8
**intentional** 31:19
**interact** 64:16
**interaction** 65:10
**interest** 54:4,12
68:6
**interested** 10:8
45:20 52:20 53:20
76:10
**interesting** 6:8
14:21 48:11 61:5
**Interestingly** 23:3
**internal** 15:6 46:10
47:13
**international** 6:7
6:16,21 10:1,6,15
15:19 19:20 21:21
22:4 38:22 39:20
40:20 41:7 42:5
53:4 54:11,19
56:15 63:5,11
74:4
**Interpol** 41:4,5
**introduce** 4:19
14:6 46:5 49:5
**introducing** 46:7
**introduction** 10:18
**introductory** 21:8
44:15

**investigate** 55:15
60:6
**investigating** 40:6
**investigation** 17:9
17:19 18:18,20
21:3 35:2 37:8,14
39:15,21,22 40:1
54:1 61:2 65:13
65:15
**investigations** 5:6
5:10 8:6 17:17
34:21 39:19,20
53:20 57:17 58:10
59:20 64:16 66:4
**investigative** 31:10
32:5
**investigatory** 11:13
11:16
**invited** 55:9 56:16
**involved** 5:17
14:13 21:20 24:15
34:22 37:13 38:22
46:13 69:5
**involving** 41:19
**isn't** 24:5 56:7
**isolate** 67:1
**isolated** 23:15 26:5
**issue** 17:13 23:21
26:22 44:7 57:1
60:3 61:18
**issued** 9:12
**issues** 18:17 27:17
27:19 38:2 51:18
60:2 69:2 71:14
**itching** 24:7
**it's** 4:19 14:19
16:13 17:14 18:2
19:5,15 24:18
25:6,9,11 29:7,7
29:11 30:3,3,8
32:6 36:10 37:3
38:17,18 39:5
42:6,17,19 43:3
43:15,19 44:4,12
45:1 47:7,10 51:6

52:5,12,12 54:8,9
54:11 55:13 58:3
60:20 61:5,18,19
62:8,10,14 63:21
66:8,17 67:3,4,7
68:7 70:19 71:8
73:14
**I'd** 3:13 19:3 23:9
63:17
**I'll** 28:21,21 52:5
57:10,11
**I'm** 3:4 19:2 20:22
23:2 26:11 28:21
36:8 42:21 44:3
57:12 61:15 69:11
70:12,16
**I've** 26:6 27:16,16
44:4 47:9 55:2
64:1 65:6

---
**J**

**jail** 24:21 38:21
39:9 40:18 43:1
**Japan** 9:14 15:13
20:16
**jeopardize** 23:7
68:14
**JFTC** 15:13 29:11
**job** 73:17
**John** 2:10 5:12,14
15:1 19:15,15
20:13,19 25:16
35:3,21 36:15
42:1 47:8 50:2
52:11,17 62:18
67:8,11,12,13
68:22
**John's** 28:1,6 38:14
39:4
**joining** 3:8,13 74:2
**joint** 35:17
**Jones** 2:10 5:14
**Journal** 22:9 25:1
**joy** 24:7
**Judge** 22:18 23:4

**jurisdiction** 19:16
20:7,7,12 38:11
68:5
**jurisdictions** 6:22
15:4,20 17:17
18:22 20:14 31:16
35:11 40:18 56:1
58:12 69:5
**Jury** 35:1
**justice** 2:8 5:3,9 7:8
7:11,14 10:10
19:18,22 21:5
22:15 27:9,16
30:4 38:8 70:14
72:10

**K**

**keep** 67:2
**keeping** 31:20
65:18
**kept** 62:19
**key** 50:22
**kick** 10:22 24:8
**kicked** 71:7
**kind** 60:5 67:3
**Kirti** 10:22 30:21
32:22 36:15 44:20
51:11 52:6 58:15
62:22 73:5,19
74:11
**Kirtikumar** 2:12
5:20
**know** 8:8 17:4,6,21
23:12 28:12 29:16
29:19 32:3 33:18
34:14 46:10,14
47:10,11,14,19
48:1,9 49:19,22
50:8 52:11,16
54:11,16 56:16
57:13 60:13 70:4
**knowing** 32:8
44:10
**knowledge** 19:9,10
**known** 24:2

**knows** 60:13
**Kong** 70:22
**Korea** 56:9,19 58:7
**Korean** 7:22
**Kroes** 8:19 32:17
45:6

**L**

**landscape** 69:3
**large** 8:9 24:20
38:9 65:7 73:14
**largest** 7:18
**late** 20:10
**latest** 54:18
**Laughter** 16:8 23:5
30:7,16,20 36:7
36:12,19 52:13
61:10 63:15,20
70:6 72:17
**launch** 12:7
**law** 1:7 3:5,9 6:11
33:6 63:3 75:13
**laws** 64:12
**lawsuits** 35:1,4
37:17 39:6
**lawyers** 14:17
**lay** 66:18
**layer** 36:22 38:4
**lead** 11:12 13:8
68:4,11,17
**leading** 57:8
**learn** 3:10 25:11
**learning** 57:3
**learns** 24:15
**leaving** 30:12,15
**led** 57:9,9
**left** 10:2
**leg** 58:12
**Legal** 1:8 3:6 75:14
**legislation** 7:3 9:5
35:15
**legislative** 46:3
49:5
**length** 34:19
**lengthy** 64:17

**leniency** 8:8 9:7
10:10,11 11:8,10
11:11 13:20 14:3
14:7 17:4,5,7 18:4
18:4,10 19:4,6
20:8 21:7 22:1,20
23:14,17 24:8
25:12,18 28:4
29:20 30:2,8 31:3
32:12 37:7 39:1
39:12 57:10 59:7
59:10 60:8 62:5
62:10 66:16 70:18
**leniency-related**
59:10
**letter** 28:4,9,18,19
28:21 29:2,6,14
75:3,4,5,5,9,10,10
75:11
**letters** 45:18
**let's** 9:22 32:14
34:6 38:7 48:6
51:6,7 54:10 66:2
**level** 6:10 9:18
**liabilities** 34:12
**liability** 35:18
47:11
**liberty** 38:20 42:14
**lied** 22:12 24:10
**likelihood** 37:4,6
68:9
**limit** 52:20 73:7
**limited** 6:13 35:15
60:21,22
**line** 51:10 66:13
**lines** 33:14
**link** 4:5,14
**listed** 3:14 4:14
**listen** 14:10
**listened** 47:9
**listening** 36:14
75:15
**literally** 36:10
**litigation** 5:6,11,15
5:19 35:4,7,14,19

48:21 52:4
**litmus** 71:18
**little** 11:1 12:2
17:18 53:15 68:6
69:16,17
**live** 1:14 31:1 70:8
**LLP** 2:4
**local** 59:5
**lodge** 14:16
**long** 24:11 51:4
53:8 65:17
**long-established**
44:17
**look** 6:6 7:1 13:3
14:19 17:3 18:17
29:1 34:1 42:7
43:18,21 45:9
48:7,9 50:15 52:4
52:16 55:13 60:20
60:21 64:9 66:18
69:15 71:10,15
74:3
**looking** 6:22 12:10
33:15 48:5,12
54:3 63:17,17
64:3 67:20 68:8
69:3,4 74:4
**lost** 37:8
**lot** 27:5 33:17
43:14 53:21 59:21
63:22 68:12
**lower** 13:2
**luncheon** 56:16
**Luxembourg** 7:10
21:7
**Lysine** 55:12

**M**

**M** 2:10 76:3,14
**main** 47:16
**maintain** 47:21
**major** 8:15 10:17
31:16 34:21 35:11
**Majoras** 2:10 5:12
16:12 25:21 30:18

36:3,8,13,16,20
42:6 50:8,13
52:14 63:13,16,21
69:1
**majority** 8:6 73:14
**making** 22:2 25:18
28:3,15 29:1 50:6
**MALE** 70:9 71:21
**manner** 15:14
20:15 25:19 54:5
**Marc** 57:6
**mark** 69:7
**marker** 18:19
20:17
**market** 60:9
**materials** 3:18 4:3
**matter** 23:1 34:22
35:5 39:6,7 44:2
52:19
**matters** 5:16 22:2
35:7 53:19 64:4
**maximum** 7:4,5,6
**MCLE** 3:19
**mean** 10:3 11:14
24:6 26:10 29:10
30:2 34:9 38:16
42:3 49:19 50:9
52:11,15 53:3
63:10,16 64:14
66:11 67:13 72:8
73:11,16
**means** 38:21 39:21
54:8 66:21
**meant** 13:11
**measures** 11:13,16
31:10 32:5
**mechanical** 14:10
**meet** 21:10
**meeting** 6:15 22:6
54:18 55:7
**meetings** 25:5
54:22 63:18
**Mehta** 2:12 5:20,22
11:8 31:2 32:2
33:3 34:4 45:5

48:22 58:21 61:11
**member** 3:11 8:7
  33:7 49:12 55:8
  55:10 59:7 60:5
**members** 7:20 8:4
  18:1 31:9 32:8
  61:12
**mention** 56:10
**mentioned** 19:15
  21:8 41:9 44:14
  47:7 55:4 57:13
  58:16 59:6 61:22
  64:1
**merely** 9:2 43:5
**merger** 6:1
**message** 24:3 39:16
  39:17 70:22
**messages** 39:16
**method** 65:13 72:8
**methods** 63:3
**meting** 54:17
**million** 7:4,5,17,21
  7:22
**millions** 8:13,14
**mind** 19:14 28:17
  28:22 44:1 47:16
**minus** 47:16
**minuses** 44:21
**minute** 16:11,12
**minutes** 21:14
**misleading** 22:15
**misrepresented**
  22:13
**mistake** 25:13
**MLATs** 63:2
**model** 28:3,18,19
  28:20 29:2,6,14
**moderator** 2:3 4:20
  6:3
**modernization** 8:2
  8:3
**modify** 14:20
**moment** 8:17 21:16
  23:22
**momentum** 53:19

**monitoring** 60:10
**monopolization**
  62:1
**month** 7:16 31:6,19
**months** 25:1
**Mounted** 15:11
**move** 20:4 21:6
  42:2 50:21
**multiple** 15:4 62:8
**multitude** 15:18
**multi-district** 5:19
**multi-national**
  70:19
**mutual** 54:4

**N**

**N** 3:1
**national** 1:14 15:10
  58:22 59:21
**nationals** 38:9,12
  38:14,20 40:12,14
  40:17
**nations** 6:18 16:5
**nationwide** 5:11
**nature** 52:2
**near** 14:3
**nearly** 10:3 12:20
  34:17
**necessarily** 56:7
**necessary** 32:7
**need** 16:22 17:1,3,3
  19:1 55:19 61:1
  68:1 70:11
**needs** 68:1
**Neelie** 8:18
**negotiate** 51:2 52:1
**negotiating** 50:17
  51:22
**negotiation** 51:18
**neither** 76:5
**network** 6:13,16
  8:5 14:22 48:8
  54:19 58:16,22,22
  59:2,6,8,9,15,18
  60:13 61:20 63:6

63:6
**networks** 61:14
**new** 8:16 9:5,7,7
  29:2 35:13
**news** 30:18
**Nielsen** 25:17
**nine** 25:1 40:18
**ninth** 55:2
**non-enforcers**
  54:12
**normally** 45:11
**Norris** 7:13 41:10
  41:19 42:3
**note** 4:16 60:16
**notice** 11:10,11
  12:3 14:7 31:12
  41:4,5 59:8,9
**noticed** 36:3
**NOVEMBER** 1:12
**Nowadays** 34:20
**no-infringement**
  46:21
**number** 6:19 8:10
  10:20,20 13:1,11
  19:17,18 24:19
  33:10,12 38:9
  40:20 41:1 42:8
  54:7 56:17 57:22
  75:3,4,4,6,8,9,9
  75:11
**numbers** 35:12
**numerous** 3:12

**O**

**O** 3:1
**object** 51:15
**objection** 13:1
**objections** 51:15,16
**observe** 31:20
**obstacles** 33:10
**obstruction** 7:14
  57:10,11,19
**obstructive** 58:2
**obtain** 4:1,4
**obtaining** 9:9 38:11

68:9
**obvious** 19:15
**obviously** 15:14
  16:13 26:5 28:14
  29:9,11 42:16
  50:14,22 51:10
  54:6
**occasional** 55:8
**occasionally** 6:13
**occurred** 31:18
**occurring** 9:3
**October** 56:14
**OECD** 54:17 55:4
  55:9 56:3 58:5
  61:13 63:5
**offer** 19:13 47:20
**office** 5:13
**offices** 53:6
**officials** 15:10 55:8
**officio** 60:8
**okay** 65:3 73:6
**once** 4:8 37:12
  65:14,15 69:14,16
**ones** 59:22 69:13
**one-stop** 8:20
**ongoing** 17:17
  53:22 66:4
**online** 4:5 74:15
**open** 17:8 33:16
  38:5 39:22 54:21
**operator** 3:5
**opinion** 27:2
**opportunity** 4:12
  24:8 25:9 29:4
**options** 32:20
  33:12 46:5
**oral** 23:1,4
**orchestrated** 41:14
**order** 16:7 58:12
  69:21 74:21
**organization** 4:18
  8:1 58:17 74:14
**organizations**
  58:18 64:5
**organizing** 11:13

**originally** 16:20
**outcome** 76:10
**outlines** 33:10
**outside** 24:14 25:6
  53:14 57:18
**overcome** 54:8
**overseas** 43:3
**oversell** 73:10
**oversold** 73:15
**overstated** 72:20
  73:3
**overview** 20:19
**over-engineer**
  26:21
**over-engineering**
  28:2

**P**

**P** 3:1
**packet** 3:15
**page** 4:4 14:13
**paid** 24:20 35:9
**panel** 4:20 7:1 10:2
  10:14 23:4 72:18
  73:1 74:12
**panelists** 4:13
**paper** 9:16 32:20
  33:1,9,13
**papers** 3:17
**parallel** 46:17
**Pardon** 30:13
**part** 14:6 19:5
  42:10 61:14 65:7
**participant** 66:17
**participants** 3:14
  8:14
**participate** 22:3
  27:12 37:2,7
  66:16
**participating** 22:6
  24:21 26:13 37:16
**participation** 24:17
  74:20 75:2,8
**particular** 5:16
  17:2 26:5,22

33:14,22 54:12
57:4
**particularly** 20:9
**parties** 14:7,13
23:3 46:9,9 64:14
76:6,9
**partner** 4:21
**Partner-In-Char...**
5:12
**party** 20:2,3 48:14
49:22
**passed** 8:7 71:17
**pattern** 36:4
**pay** 7:17 39:10 50:1
74:22
**paying** 35:8
**pay-out** 51:5
**penalties** 7:3 9:6
**people** 3:12 20:9
21:15 31:5 43:2,2
43:14,20,22 51:3
56:17 65:19 67:18
67:20
**people's** 42:16
**perceive** 42:13
**percent** 11:21,22
12:1 39:21 50:10
60:7
**percentage** 8:10
**period** 7:6 18:22
32:5 70:2
**perjury** 57:20
**personal** 34:2
42:14
**perspective** 42:2
**Phil** 72:13,13,22
**Philadelphia** 22:19
**phone** 16:15 30:1
**pick** 29:22
**pitfalls** 16:19
**place** 16:5 17:2
23:9 26:19 31:3
46:21 49:11,13
53:13 58:3 59:8
**plaintiffs** 35:17

**play** 17:12 71:6
**playing** 61:14
**plea** 8:21 44:16,21
45:2 48:14,20
50:4 51:22 53:1
53:22 73:8 74:7
**plead** 7:17
**pleas** 50:17
**please** 3:11,21 4:16
25:7 74:15,17,22
**pleasure** 4:19
**pled** 24:20
**pledge** 28:21 30:11
**plus** 40:2,9 59:1
**pluses** 44:21 47:7,7
**point** 13:20 20:6
22:10 33:22 67:5
**points** 14:1
**Police** 15:10,11
**policies** 8:8 10:5
15:18,22 16:3
**policy** 9:13 11:2,8
13:10,22 14:20
15:21,21 16:1
20:8,10 24:12,12
24:13 28:8,8 31:3
32:13 50:19 64:21
**politely** 36:21
**position** 59:11
**possibilities** 46:7
**possibility** 28:2
44:16 49:6
**possible** 18:18 46:1
51:5
**posting** 4:13
**potential** 30:12,14
**potentially** 34:16
**practical** 47:4
**practicalities** 46:16
48:7
**practice** 4:22 5:3
6:9 20:2 44:17
59:4 64:10
**practices** 6:17
**practitioners** 27:15

**pre** 53:11
**predictability** 50:3
**predictions** 11:6
**preference** 72:6
**preferred** 72:8
**preliminary** 48:10
**prepare** 19:4 32:4
**prepared** 16:17
**preparing** 32:20
**PRESENT** 1:8
**presenters** 3:15
4:17
**presents** 25:22
**PRESS** 1:14
**pressure** 36:18
**pretty** 26:17 44:9
64:15,17,17 67:4
**previous** 9:13
10:14
**previously** 5:1
**price** 7:18 42:15
**primarily** 38:1
**primary** 10:6 65:13
**prior** 31:10 40:14
**prison** 40:15 41:13
43:1
**private** 20:2 32:15
32:19,21 33:11,19
34:4,14,20 35:1,4
35:8,17 37:21
44:10 46:18 47:2
49:9,10
**probably** 18:11
40:19 56:12 64:9
64:22 70:17
**problem** 15:3 17:8
26:15,21 29:15
36:11 42:13 65:9
66:16 67:13 68:20
68:21 69:13
**problematic** 15:16
**problems** 11:4
16:20 66:7 69:15
**procedure** 14:5
46:16

**procedures** 33:7
**proceed** 59:17
60:12
**proceeding** 46:7
49:17
**proceedings** 45:11
76:7
**process** 17:10,14
41:10 47:12 51:3
51:4,14,19,22
55:12 64:2
**product** 15:3 40:6
40:7 46:12
**productive** 50:18
**progeneration**
10:17
**Proger** 72:13,14,18
72:22
**program** 3:7,10,20
4:2,12 6:5 10:11
10:19 11:3,4,7
17:7 18:4 19:4,5
20:22 22:1,13,17
23:14,17,17 24:8
24:10 25:10,12
26:13 29:5,21
37:1,2,7,12,13,17
39:2,12 40:2
42:11 44:6 66:17
69:15 74:2
**programs** 10:11,16
17:1 18:7,10,13
18:14 19:7,10
26:12 27:12 34:10
37:9 42:21,22
43:13 59:7 62:5
62:10 64:6,7
65:10 74:5
**program's** 3:18
74:16
**proliferation** 10:5
10:16 19:6
**promise** 29:1 30:9
**prompt** 24:16
**prompted** 19:14

**proportionality**
53:18
**prosecute** 58:2
**prosecuted** 40:15
43:22 56:8
**prosecuting** 38:12
53:6
**prosecutions** 34:22
37:5 57:19
**prosecutorial** 69:8
**prosecutors** 53:3
54:17 55:6,9,15
55:18 56:5,6 58:5
63:5,18
**prospect** 35:19
**protect** 25:14,14
58:9
**protecting** 57:17
**protection** 14:5
**provide** 12:8 18:19
42:21 66:15 73:16
75:1
**provided** 22:15
76:5
**provides** 53:9
**provisions** 11:10
**public** 19:18 34:13
50:19 52:21 53:16
53:21 54:17 55:6
55:15,18 56:5
58:5 63:4
**publicly** 21:9 28:17
**pull** 54:6
**purchasers** 38:1
**purpose** 61:21
**put** 26:13 29:2 30:6
38:19,20 40:17
41:3 42:15 43:20
51:6 52:19 60:18
**puts** 19:9
**putting** 53:20
68:12

-----

**Q**

**question** 16:22

27:8 29:20 36:21
39:8 45:22 50:11
60:3 70:13,13,16
72:3,15,18,22
**questioning** 36:4
69:22
**questions** 4:13,13
9:12 30:2 46:14
62:19 70:3,7
73:20 74:10
**quick** 4:6 18:8 23:7
52:8 69:1
**quickly** 20:4
**quite** 32:10,11
39:13 45:19 46:12
61:5,9 69:17
**Q&A** 70:2

### R

**R** 2:3 3:1 75:5,11
**race** 17:20 18:3
20:2 62:12,12
**raid** 12:7 65:14,15
65:21
**raids** 9:8 11:14
15:9 67:17 68:15
**raise** 40:11
**raised** 60:4
**rate** 9:20,20 45:14
45:15
**raw** 31:7
**react** 26:1
**reaction** 27:9
**reactions** 13:22
**read** 26:6 29:22
40:6
**reads** 9:4
**ready** 67:16
**real** 27:8 34:11
65:12 69:1
**reality** 39:5
**realize** 40:4,5
**really** 17:8,11 19:7
26:20 27:4,14
33:13 37:3 39:15

43:18,20 44:4
60:20 66:19 73:14
73:14
**reason** 17:16 20:12
**reasons** 12:12,15
13:17 37:11 49:7
**receive** 4:6 74:19
**received** 4:9
**recognize** 66:7,8
**recognized** 65:8,9
**recognizing** 16:18
**recommendations**
23:13
**record** 52:21 53:16
53:21
**recorded** 1:12,14
30:19 52:14
**recording** 3:9
50:12 75:16
**red** 41:4
**reduced** 76:4
**reduction** 11:21
12:22
**reductions** 11:19
12:17
**refer** 33:4
**referred** 45:6
**referring** 67:11
**reflect** 9:2
**reflected** 6:10,19
**reflection** 45:22
**reform** 45:1
**reforms** 8:21
**regard** 73:18
**regarding** 12:21
**regardless** 27:20
**regards** 14:1 31:5
47:2 59:20
**regime** 59:12
**Register** 29:8
**regularly** 6:14 8:12
34:20 39:13
**regulated** 45:16
**regulation** 46:1,6
49:1,5

**regulators** 3:19
**rejected** 12:12
**related** 5:6 8:12
76:6
**relationship** 65:1
**relationships** 55:20
**relative** 76:8
**relieved** 31:22
**rely** 50:2
**remaining** 12:11
**remains** 27:21
**remark** 61:20
**remarkable** 10:19
**remarks** 10:13
21:9 44:15
**remember** 3:22
56:13
**remind** 3:14 28:22
74:15
**reminded** 10:9
**removed** 22:17
**repeat** 70:13 75:7
**repeatedly** 64:1
**replaces** 28:22
**report** 21:11 22:2
25:14 62:11
**reported** 21:21
22:9,11 25:1
37:16
**reporting** 18:3 34:8
72:7
**reports** 52:2 53:12
70:20
**represent** 70:18
71:13
**represented** 7:1
**representing** 5:4
27:3
**request** 67:19
**requests** 75:1
**require** 3:19 13:12
14:12 68:13 71:22
72:4
**required** 70:12
73:21 74:21

**requirement** 70:1
**requirements** 17:4
20:5,14,21 21:10
70:13 74:5
**requires** 12:6 70:1
75:2
**reserves** 33:18
**resolution** 28:13
**resolved** 28:13
**resource** 13:12
**resources** 13:15
50:19 62:2
**respect** 10:15 14:14
15:3 26:15 28:1
29:12,20 44:21
48:20 51:13 54:2
57:4,16 63:11
67:9 74:6
**respected** 14:18
31:13
**respects** 63:22
**respond** 42:4
**response** 13:18
15:15,19 16:22
61:9
**responsible** 5:10
**result** 10:18 15:5,8
50:20 62:6
**retrospect** 72:20
**return** 74:18
**revised** 10:10 11:9
23:17
**revisions** 14:2
**revocation** 31:17
**revocations** 74:6
**revoked** 7:9 21:6
22:20,21 23:19
24:11 26:11
**revoking** 24:7
**right** 16:18 19:4
22:8 25:21 26:4
28:6 29:14 32:2
36:9 42:14,16
45:5 53:1 64:14
**risk** 25:18 35:14

37:3,10 38:4 42:3
43:8 49:11,20,20
66:3
**risks** 37:20 49:14
**role** 61:14
**roll** 40:1
**rolling** 39:14
**Romeo** 75:6,11
**room** 21:15 24:4
56:17 57:13 70:17
71:18
**round** 41:17
**roundtable** 1:10
3:4 6:6 9:22
**routinely** 53:4,10
68:2
**row** 36:17
**Royal** 15:11
**rules** 32:18 33:21
**ruling** 28:6
**run** 26:14 65:2,6
66:2

### S

**S** 3:1
**safeguards** 59:10
**safest** 25:15
**Samsung** 7:16
**San** 2:4
**sanction** 14:15
**sanctions** 45:8
**satisfy** 71:11
**saw** 22:19 57:22
**saying** 22:14 28:17
65:3 67:15
**says** 16:16 20:10
66:1
**scope** 46:12
**Scott** 2:6 5:7 21:5
26:6 28:1 30:10
36:15 38:10 42:13
52:8 54:16 61:15
62:21 67:8 70:9
70:14 73:4
**Scott's** 58:17

**scroll** 4:3
**sealed** 41:2
**search** 15:12
**searches** 9:8 15:11
  57:4 68:13
**second** 7:18 11:22
  40:1 66:17
**secondly** 11:14
  13:16 21:2 59:15
**second-in** 19:20
**secrecy** 65:14
**secret** 42:9
**secretary** 30:5
**section** 1:7 3:5,8,18
  4:3 75:13
**sections** 6:2 55:16
**see** 13:7 15:7 26:1
  29:3 31:11 33:21
  36:6 39:16 40:8
  44:8,11 47:9
  53:14 56:4 58:13
  61:1 63:18 66:14
  69:11 73:11
**seeing** 70:10
**seek** 16:5,6 36:2
**seeking** 48:17
**seen** 10:12 27:22
  53:7
**self-report** 16:4
  34:18 36:1
**send** 19:2 24:3
  39:16
**senior** 22:6 25:4
**sense** 11:2 33:13,19
**sensitive** 20:9
**sent** 39:15,17
**sentence** 53:12
**sentencing** 52:2
  53:11,12
**Seoul** 54:19
**separate** 39:21
**September** 23:1
  56:14
**serious** 33:20
**seriously** 23:20

**seriousness** 34:11
**served** 5:1 40:15
  41:12
**Services** 3:11
**session** 55:4,11
  56:16
**set** 55:13
**sets** 33:6
**setting** 32:20
**settlement** 47:20
  48:13 52:10
**settlements** 35:8
  45:7 50:5,16
**settling** 48:16
**seventh** 56:11
**share** 11:5 54:21
**sharing** 69:19
**shipping** 7:10 21:8
**shop** 8:20
**short** 49:19
**show** 12:2
**showing** 42:22
  55:12
**side** 13:11
**Siegel** 57:6
**sign** 14:14 73:22
**significance** 6:20
**significant** 5:17
  20:13 43:9 55:20
  57:2 60:10
**signing** 70:4
**similar** 29:5
**Similarly** 64:20
**simple** 62:7 65:12
**simply** 37:22 47:19
**simultaneous** 68:15
**single** 35:17
**sir** 70:8
**sit** 40:8 47:19
**sits** 22:22
**sitting** 27:13 36:15
**situated** 12:22
**situation** 21:12
  29:16 31:6,15,18
  33:10 42:13 45:9

  54:3 65:2,6 67:14
**six** 13:7 56:19
  64:22 75:6,11
**skeleton** 46:11
**Skip** 50:12
**slide** 42:22
**smirking** 63:14
**smooth** 65:10
**soft-peddle** 25:3
**solution** 62:7
**somebody** 24:8
  40:6
**somebody's** 38:20
**soon** 23:3 30:12,15
  33:16 59:6 66:2
**sort** 38:15 58:2
**sought** 7:12
**sources** 63:7
**speak** 23:20
**SPEAKERS** 2:1
**Specialist** 13:17
**specialized** 13:19
**specific** 20:21
**specifically** 59:9
**specifics** 18:18
**spectrum** 15:6
**speech** 45:6 55:2
**speeds** 19:8
**spent** 56:21 58:7
**spoke** 8:17
**sponsors** 3:6
**Spratling** 2:3 4:20
  4:20 6:4,5 15:1
  16:9 19:13 25:16
  28:1 30:10,14,21
  31:15 32:14 34:2
  34:14 36:14 38:7
  42:1 44:14 48:9
  50:2 52:8 54:10
  58:15 62:18 67:8
  68:22 69:20 70:7
  70:12 72:3,13,22
  73:19
**Spratling's** 5:3
**stacked** 66:19

**staff** 67:14,21
**stage** 45:21,22 46:9
  55:13
**staggering** 9:21
**stakes** 40:12
**stand** 48:4
**standard** 12:6
  73:21
**standing** 24:12
**standpoint** 26:9
  51:19
**stands** 25:22 44:8
  46:6
**start** 9:22 17:10,18
  45:9 47:20 49:14
  63:17 67:20 73:4
**started** 11:15 16:20
  60:10 65:15
**starts** 12:19
**state** 3:19 6:7 10:1
  32:22 33:6,9 74:3
  75:2
**stated** 8:19 21:9
**statement** 13:1
  51:15
**statements** 14:6,8
  57:20
**states** 7:2,2,15,19
  8:7,12 9:1 10:12
  15:13 16:1 20:18
  33:7 34:15 35:10
  40:22 41:7,11
  44:17 45:2 49:12
  50:17 51:22 55:22
  57:9,18 59:7 60:5
  74:21
**status** 14:19 21:11
  21:13
**statute** 9:7
**statutes** 58:1
**stay** 43:1
**steps** 71:15
**Stolt** 21:18 22:2,10
  25:13,16 29:15,22
  71:8,9

**Stolt-Nielsen** 7:10
  21:7,12 26:15
**stop** 57:11 63:14
**stopped** 70:11,15
**stops** 43:8
**straightforward**
  24:13
**strategies** 41:21
  55:17 58:11
**strategy** 15:15
  38:11 40:11 42:4
  68:11,17
**straw** 36:5
**streamlined** 46:7
**Street** 22:8 24:22
**strong** 47:2
**study** 32:15 33:4
  44:16
**subject** 15:9 32:14
**submit** 70:2
**subordinates** 41:11
**subsidiary** 21:22
**substantially** 11:9
**success** 11:3,4
  13:10 39:11,14
**successful** 40:13
  68:15
**Suffice** 9:18
**sufficient** 12:7,8
**suggested** 67:19
**suggests** 33:11
**suits** 34:20 37:14
  37:15
**support** 59:21
  60:12
**supporter** 47:3
**supporting** 49:9
**suppose** 26:20
  27:21
**sure** 17:3 18:6,13
  19:2 23:2 26:11
  42:21 55:1 61:15
  70:17
**surely** 46:9
**surprise** 42:7 73:12

Cartel Enforcement Roundtable     11-16-2005

**surrounded** 36:9
**swift** 45:8,20
**sword** 63:21 69:10
**Sydney** 58:4
**system** 11:20 32:3
    32:21 46:2 48:18
    52:10 62:4
**systematically**
    14:12

**T**

**T** 75:3,9
**table** 64:14
**tag** 42:15
**take** 14:10 15:17
    16:10 19:11 22:1
    23:10,21 24:6,16
    25:12 26:22 29:6
    29:8 46:3,21
    49:13 52:6 53:13
    59:16 62:5 65:16
    68:4,11,17 71:10
**taken** 62:22 71:15
    71:16
**takes** 12:20 40:8
    45:11
**talk** 15:17 27:18
    30:1 43:5 65:3,4
    67:19 69:20 71:2
**talked** 51:11 55:17
    55:19 58:4,4,6
**talking** 8:22 31:18
    43:12 50:7 53:22
    56:5 58:7,18 65:2
    65:18 67:14
**tampering** 57:21
**tango** 75:4,9
**tapes** 55:12
**targeting** 56:1
**task** 16:13
**techniques** 58:11
**telecast** 36:15
**teleconference** 3:3
    3:4
**teleconferences**

3:10
**telephone** 70:1
    73:22 74:9
**tell** 11:3 16:9 30:8
    32:22 53:7 55:22
    57:12 58:19 67:17
    67:18 72:9 73:12
**telling** 11:1
**tells** 15:2 28:10
**tend** 60:18
**tendency** 60:16
**tenet** 48:1
**term** 14:3
**terminate** 24:17
    71:1
**terminated** 21:1
**terminating** 71:20
**terms** 10:19 13:2
    23:11,13,20 29:13
    39:14 48:12 50:18
    52:2 55:13,17
    60:19 68:18 70:10
    70:15 71:13,20
**test** 71:18
**Thank** 16:12 58:15
    67:8 74:2
**thankful** 73:9
**thanks** 20:19 30:10
    66:1 75:14
**that's** 8:3 18:2
    20:13 22:22 25:15
    26:4 27:4,21
    28:19 32:2 37:17
    40:1 41:4 43:9,11
    43:17 44:18 45:1
    45:5 50:14 51:5
    51:11,21 53:13
    59:12,14 64:2,8
    65:6,9 67:3,4 69:9
    70:16 72:11 73:16
**there's** 17:16 31:16
    36:13 43:16 48:19
    65:17 66:19 68:5
    69:20
**they're** 38:22 39:1

39:6 40:9 68:12
    69:12 71:11,12
**they've** 20:8 61:6
**thing** 18:6 19:3
    26:17 48:10 49:16
    50:14,22 64:8
**things** 44:11 50:9
    51:9 52:2,22 53:2
    53:17 54:22 64:1
    68:19
**think** 10:8 13:21
    14:2,18 16:21
    17:7,13 18:6,9
    19:3,6 20:8 23:14
    23:16 25:21 26:18
    27:3,6,8 28:5,7,8
    28:9 31:6 32:11
    33:22 36:13,20
    37:19 39:11 42:6
    42:19 43:14,17
    44:7 45:3,8,21
    47:1,6,8,16 48:11
    49:10,12 50:16,20
    51:3,5,6,9,18,20
    52:3,5 53:14
    59:14,18 60:3
    61:7 62:21 63:22
    65:7,12 66:21
    67:1 68:8,17 69:2
    69:9,12 71:17,19
    72:14
**thinking** 33:1
    44:21 48:20
**thinks** 52:12
**third** 12:1 22:21
    26:2,17 27:10
    28:10 66:17
**thought** 28:7
**thoughts** 52:8
**three** 4:11 6:12
    9:11 12:20 13:6,9
    13:18 41:11 45:11
    53:16 56:21
**time** 7:9,12 11:5
    12:16 17:18,20

18:22 22:8,10
    23:19 24:2,2,22
    32:5 39:22 40:15
    41:13 43:4,15,15
    44:8,13 46:4
    50:11,11 53:8
    55:5,9 58:7 62:22
    64:21 65:7,17
    66:12,21 69:22
    73:14,21
**timely** 45:8
**times** 43:16
**timing** 15:14
**tipping** 44:12 65:19
**titled** 4:4
**tobacco** 31:7
**today** 6:6 7:1 8:22
    11:1 13:2 22:22
    28:17 35:3 49:20
**today's** 3:6,9,13,16
    4:19
**told** 23:8 35:3
    67:16
**tool** 42:17 47:6
**tools** 58:11
**top** 34:12
**topic** 3:16 38:7
    54:10
**totaling** 8:13
**totally** 32:16 44:5
**track** 41:6
**Trade** 36:17
**trader** 70:21
**trade-offs** 51:1
**traditionally** 63:1
**transcribed** 76:7
**transcription** 76:4
**Transcriptionist**
    76:1,15
**transcripts** 14:9
**transparency**
    29:12 64:5
**transparent** 18:14
**Treaty** 59:5
**treble** 34:14 35:8

**tremendous** 45:18
**trial** 41:18
**trouble** 38:19
**troubled** 29:21
**true** 20:3 60:20
    62:10
**try** 17:5,19 18:17
    24:3 30:2 34:8
    51:15 62:4
**trying** 27:6 41:10
    51:2 64:1
**tuning** 10:4
**turn** 54:10
**turned** 32:10
**two** 6:12 10:11
    12:20 13:9 18:13
    19:17 20:21 21:10
    21:14 35:22 40:14
    40:16 42:22 45:11
    75:3,8
**two-edged** 63:21
**type** 37:21,22 48:18
    48:19 50:20 52:10
    58:19 65:10
**types** 8:21 50:6
    51:18 64:3 67:5
    67:11 69:18
**typewriting** 76:4
**typically** 50:4

**U**

**Uesugi** 19:1 20:16
**ultimately** 26:2
**umbrella** 56:13
**uncertainty** 25:22
**underdeveloped**
    32:16
**undermine** 47:17
**understand** 23:14
    23:15 48:10 57:2
    66:11
**understanding**
    18:7 27:18 64:18
**understands** 27:7
**unfair** 44:5

Cartel Enforcement Roundtable    11-16-2005

Page 14

unfortunate 21:18
unfortunately
  40:19
UNIDENTIFIED
  70:9 71:21
uniform 62:4
Union 10:21 44:19
  68:7
Union's 11:2
unit 9:8
United 7:2,2,15,19
  8:12 9:1 10:12
  15:12 16:1 20:18
  34:15 35:10 40:22
  41:7,11 44:17
  45:2 50:17 55:22
  57:9,18
units 13:18
unnecessary 62:9
  62:17
unprecedented 9:9
  63:8
urge 71:10
use 38:21 41:2 47:5
  49:4 50:19 58:11
useful 62:14
usual 46:14 47:7
usually 12:12 40:1
  40:2 47:13 55:7
  61:9 66:5 67:4
U.K 7:13 15:22
  41:12,17
U.S 2:8 5:3,5,9,18
  21:22 38:8,10
  41:13,19 67:19

_____

**V**

value 3:21
variety 5:14
various 12:12,14
  15:8 17:17 20:14
  64:11
vast 73:14
verification 74:21
  75:3,8

verified 4:9
versus 51:2
vibrancy 6:10,19
view 26:4 33:22
views 4:16,17,17
  34:3 74:12,13,13
vigilant 58:9
violation 7:4 8:12
  9:6 24:16
violations 38:10
  43:2 64:13
vital 32:6
Vitamins 35:3
volume 8:11
volumes 23:20
voluntarily 31:10
  32:3

_____

**W**

wait 26:1 40:8
  47:19
waiving 53:11
wake 34:21
Wall 22:8 24:22
want 17:8 21:16
  27:5 29:19 40:8
  47:19 50:8,10
  51:4 52:17,18,18
  52:19 53:17 56:10
  57:2,3 59:17
  60:17 67:15 69:6
  69:7 73:4,17
wants 33:5
warrants 15:12
Washington 1:15
  2:8,10 5:13
watch 41:5
watched 20:1
watches 41:1,4
watching 44:8
way 13:10 15:16
  20:17 21:14 22:13
  24:10,22 26:8
  27:5,20 29:3
  39:18 45:7 49:10

52:20 59:11,19
  61:1 62:4 66:5
  68:3,18 69:9
  72:11 73:17
ways 41:1 45:16
  62:15 66:5
weakened 59:11
web 4:14,14 70:3
webpage 4:2,15
website 3:14,18
  23:10 33:5 74:16
week 9:4,9 56:9
weekend 54:18
weeks 4:11 9:11
  55:3,5
weighing 38:16
Welcome 3:3 6:5
well-versed 5:18
went 8:3 24:20
  26:11
weren't 18:14 24:7
we'd 69:20
we'll 26:18 36:6
  41:19 68:15 73:5
we're 28:20 29:11
  29:13,16 38:19
  39:7,17,22 40:6
  41:9,16,21 50:7
  53:20,22 54:1
  56:1,2,3,5 57:16
  57:16 67:16 68:8
  69:21 71:6
we've 9:16 10:12
  15:20 16:16 24:19
  27:5 39:11 50:17
  71:4,7
what's 9:14 10:13
  32:22 33:1 38:10
  38:17 44:10 46:13
whichever 14:17
whistle 60:9
who's 68:3
wide 5:14 60:5
wider 62:14
wife 36:16

winning 20:3
win-win 52:16
withdrawal 25:3
  71:22 72:4,7,8,11
withdrawn 30:22
  31:8
withheld 22:16
witness 57:21
witnesses 66:2
won 20:3 41:17
wonder 10:22
  15:17
won't 53:5 68:16
  73:7
word 23:10 49:4
words 26:22 31:12
  69:7
work 32:11 46:16
  49:7,12 54:15
  55:18 59:9,19
  62:10,16 64:18
  67:22 68:1,2,2,3
working 12:3 47:4
  55:6 62:3
works 46:13
workshop 56:11,12
  56:15,18,21 57:15
world 6:18 9:4
  10:12 16:10 20:22
  21:6 24:2 53:6
worldwide 18:11
  19:10
worry 63:1
worse 14:4 22:2
  25:3
worst 47:11
worth 18:4
write 28:14 74:22
writing 27:1,5
  51:12
wrong 21:19
wrote 23:22 28:7

_____

**Y**

Yeah 21:13 45:5

48:22
year 7:2,8,11 21:5
  33:8,8 35:13 45:6
years 7:6 8:9 12:20
  13:6,9 19:18
  23:18 31:13 35:6
  38:10 42:8 45:12
  65:1 71:7,9
year-and-a-half
  8:4
you'd 17:11
you'll 29:16 45:3
you're 16:13,14,17
  17:5,20 18:2,9,13
  18:16 25:7 26:12
  29:21 30:12,14
  31:18 37:1 38:4
  42:12 43:12 44:5
  44:6 48:12 64:3
  64:13 65:2,18,19
  66:3,22 67:1,2,14
  69:16,16,17 71:4
  73:17
you've 20:12 29:22
  37:8,10 67:16
  74:3

_____

**Z**

zeal 43:16 69:8
zero 75:4,9

_____

**$**

$1 7:5
$100 7:4
$160 7:22
$185 7:21
$300 7:17

_____

**1**

1st 56:14 59:12
1-800-285-2221
  3:11
10 7:6
12 12:10 23:18
  55:10 71:7
16 1:12 70:3

**18** 12:17
**19** 8:7 12:11,17
  15:20 59:7
**197** 13:5
**1992** 40:17
**1993** 10:11
**1996** 11:9
**1998** 24:13 28:8,19
**1999** 40:14,17
  56:14

**2**

**2T05CER6** 75:6,12
**20** 9:17 11:22 12:1
  40:17 60:7
**200** 35:4 39:6
**2000** 13:4
**2002** 11:9 12:3
  13:13
**2004** 8:2 59:13
**2005** 1:12 13:13
**25** 59:1
**26** 59:2

**3**

**3:28** 73:21
**30** 11:21,22 29:8
**30th** 23:2 56:14
**36** 13:4
**38** 57:14

**4**

**45** 12:5
**488** 8:5
**49** 12:5

**5**

**50** 11:21 13:14
  39:21

**6**

**60** 13:18

**7**

**7** 49:1
**70** 34:20

**79** 12:16

**8**

**8A** 11:18 12:6
**8B** 11:18 12:8
**80** 6:14 12:4 34:20
  39:5
**81** 59:5

**9**

**9** 49:3
**90** 34:20 35:1 39:6
**96** 31:4
**99** 50:10